ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
Dennis S. Ellis (State Bar No. 178196)
    dellis@egcfirm.com
Noah S. Helpern (State Bar No. 254023)
    nhelpern@egcfirm.com
Ryan Q. Keech (State Bar No. 280306)
    rkeech@egcfirm.com
Stefan Bogdanovich (State Bar No. 324525)
    sbogdanovich@egcfirm.com
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697

Joseph Kiefer (*pro hac vice* forthcoming)
    jkiefer@egcfirm.com
152 West 57th St., 28th Fl.
New York, New York 10019
Telephone: (212) 413-2600
Facsimile: (212) 413-2629_

FRANK SIMS & STOLPER LLP
Jason Frank (State Bar No. 190957)
    jfrank@lawfss.com
Scott H. Sims (State Bar No. 234148)
    ssims@lawfss.com
Andrew D. Stolper (State Bar No. 205462)
    astolper@lawfss.com
19800 MacArthur Blvd., Suite 855
Irvine, California 92612
Telephone: (949) 210-2400
Facsimile: (949) 201-2405

Attorneys for Plaintiff Aaron Braxton, on
behalf of himself and all others similarly
situated

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AARON BRAXTON, on behalf of himself and all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR:** |
| vs. | **1. VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT, 15 U.S.C. § 1691, *ET SEQ.*** |
| WELLS FARGO BANK, N.A., a Delaware corporation; WELLS FARGO HOME MORTGAGE, INC., a | **2. RACE DISCRIMINATION IN VIOLATION OF THE FAIR** |

Case No.

1   Delaware corporation,

2                   Defendants.

**HOUSING ACT OF 1968, 42**
**U.S.C. § 3601, *ET SEQ.***
**3. RACE DISCRIMINATION IN**
**VIOLATION OF 42 U.S.C. § 1981**
**4. VIOLATION OF THE UNRUH**
**CIVIL RIGHTS ACT,**
**CALIFORNIA CIVIL CODE § 51**
**5. VIOLATION OF THE**
**CALIFORNIA UNFAIR**
**COMPETITION LAW**

**DEMAND FOR JURY TRIAL**

Plaintiff Aaron Braxton, individually and as a representative of a nationwide class of Black applicants for home mortgage refinancing through Wells Fargo and its related entities (collectively "Plaintiffs" or the "Class"), alleges as follows:

## I.      NATURE OF ACTION

1.      Homeownership has long been considered the cornerstone of the American Dream—allowing citizens to accumulate wealth through access to credit, generating equity, and reducing housing costs.[1]  For a decade, historically low interest rates have provided more and more Americans with access to this dream and, by way of refinanced lower home mortgages, the ability to pass their properties on to their next generation.

2.      But careful students of American history know that homeownership has for far too long been unattainable for a disproportionate number of Black Americans, and even worse, more difficult for Black Americans to maintain once achieved.  Indeed, prior to the passage of the Civil Rights Act (and sometimes even afterwards), Black American homeowners were systematically denied access to the financial benefits of this particular American Dream through the use of pernicious

---

[1] https://www.forbes.com/sites/forbesrealestatecouncil/2021/09/28/homeownership-and-the-american-dream/?sh=1c78499623b5

and pervasive race-based exclusions. These included, for example, the Federal Housing Administration's refusal to insure mortgages in and near Black neighborhoods—a practice now referred to as "redlining"—at the same time that the FHA subsidized builders who mass-produced entire subdivisions made for White Americans. These also included restrictive covenants in deeds that prohibited or restricted the sale of American homes to Black Americans.

3.     The passage of the Civil Rights Act in 1965—and the judicial interventions that followed—were supposed to fix that historical injustice, eliminate race-based gatekeeping practices like redlining and restrictive covenants while righting this long-standing American wrong. For many homeowners seeking a first or refinanced mortgage with some banks, it did.

4.     However, despite publicly touting their commitment to "help[] ensure that all people across our workforce, our communities, and our supply chain feel valued and respected and have equal access to resources, services, products, and opportunities to succeed,"[2] Defendants in this case—Wells Fargo Bank, N.A. and Wells Fargo Home Mortgage (collectively "Defendants" or "Wells Fargo")—have continued to discriminate against Black American home loan applicants. Federal data shows that over the last several years thousands of Black homeowners have been unable to maintain the dream of home ownership because of Wells Fargo's ongoing and discriminatory modern day "redlining" practices. These practices delayed, obstructed and denied Black homeowners the benefit of lower interest rates obtained through refinancing, forcing them to pay more for their loans than was required of non-Black applicants, and in many cases sending them into foreclosure.[3]

---

[2] https://www.wellsfargo.com/about/diversity/diversity-and-inclusion/

[3] https://www.nclc.org/images/pdf/special_projects/covid-19/IB_Covid_Black_Forbearance_Foreclosure.pdf

5.      Bloomberg reported that the data released under the federal Home Mortgage Disclosure Act shows unequivocally that Wells Fargo rejects a disproportionate number of Black homeowners' refinancing applications.[4]  Wells Fargo also makes the refinancing application process purposely more difficult and less attractive for Black applicants than others—on a consistently national scale— demanding higher interest rates for loans secured by homes located in neighborhoods with greater proportions of Black residents by placing its loan officers much farther away from those same neighborhoods.[5]  And Wells Fargo customers report that loan officers state that certain "areas" with large Black populations are ineligible for rapid valuations.[6]  Black applicants are further subjected to delays, feigned mistakes, and other obstacles, leading many Black Americans to withdraw their requests for refinancing, and leading others to wait indefinitely while Wells Fargo refuses to act upon their applications.

6.      Wells Fargo also uses automated algorithms and machine learning to make underwriting decisions.  But these, too, are infected with Wells Fargo's pervasive race-based discrimination.  Wells Fargo's algorithms and machine learning select "areas" and other characteristics for greater or lesser scrutiny of credit applications, which, over time, only exacerbates the wealth disparities between people living in those areas or among groups which tend to have certain characteristics analyzed by the algorithms and machine learning.

7.      Numbers do not lie and, here, the numbers tell a shameful story, without any legitimate explanation.  Data from eight million refinancing

---

[4] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-refinancing/

[5] *Id.*

[6] *Id.*

applications from 2020 reveal that "the highest-income Black applicants [had] an approval rate about the same as White borrowers in the lowest-income bracket."[7] White refinancing applicants earning between $0 and $63,000 a year were ***more likely*** to have their refinancing application approved by Wells Fargo than Black refinancing applicants earning between $120,000 and $168,000 a year.[8]  Overall, in 2020, Wells Fargo rejected a ***majority*** of all the completed applications submitted by Black homeowners.[9]  And because Wells Fargo designed an application process that is disproportionately difficult for Black homeowners to complete, 27% of all Black homeowners who began a refinance application with Wells Fargo withdrew it.[10]

8.      As a result of its discriminatory practices, Wells Fargo was the only major lender in the United States that approved a smaller share of refinancing applications from Black homeowners in 2020 than it had in 2010.[11]  And its disproportionally low approval rates for Black applicants are well below the national average.

9.      In 2020—at the height of the refinancing boom, when millions of Americans benefitted from the historically low interest rate environment—Wells Fargo approved 47% of all applications by Black homeowners (meaning that Wells Fargo rejected the majority of applications from Black homeowners), whereas all

---

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.*

other lenders approved 71% of all applications by Black homeowners.[12]

10.     No other lending institution rejected a majority of Black homeowners' applications for refinancing.[13]

11.     Wells Fargo also systematically and discriminatorily applied to Black refinance applicants some of the tightest lending standards in the industry, which disproportionately affect minority applicants.[14]  A study done by the Board of Governors of the Federal Reserve System analyzing federal mortgage data stated that they "do not have any evidence [a]s to whether these tighter standards reduce loan risk to justify the disparate impact on minority denials they are associated with."[15]  And after controlling for relevant underwriting factors (debt-to-income ratios, loan-to-value ratios, credit scores, etc.) the study found that "[l]enders who impose the strictest standards on their white applicants [like Wells Fargo] tend to have the largest unexplained excess denials of minority applicants."[16]

12.     Plaintiff Aaron Braxton is one victim of Wells Fargo's discriminatory policies.  Mr. Braxton is a financially successful and eminently creditworthy Black playwright, performer, and a math and science teacher with a Masters degree from the University of Southern California.[17]  He has authored several award winning

---

[12] *Id*.

[13] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-refinancing/

[14] *Id*.

[15] *How Much Does Racial Bias Affect Mortgage Lending? Evidence from Human and Algorithmic Credit Decisions*, Neil Bhutta, Aurel Hizmo, and Daniel Ringo (July 2021), at 12, n.20. Available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3887663

[16] *Id*. at 12.

[17] https://www.imdb.com/name/nm1347914/bio?ref_=nm_ov_bio_sm

plays, including *DID YOU DO YOUR HOMEWORK?*, which broke the Beverly Hills Playhouse's record for longest running play (9 months).[18]  He has also written several films and television pilots, and acted in several film, television, and theatre projects.[19]

13.     In addition, for two decades, Mr. Braxton was a loyal Wells Fargo mortgage customer.  He purchased his home in 2000, in a historically Black neighborhood located in South Los Angeles near the campus of the University of Southern California and secured his property with a Wells Fargo home mortgage insured by the Federal Housing Administration.  Mr. Braxton always made his mortgage payments and bills on time, and he had a good credit score.

14.     Yet despite his successful career and his creditworthiness, when Mr. Braxton sought to refinance his home mortgage loans in August of 2019, Wells Fargo consistently obstructed his ability to refinance his loan.  Despite favorable loan-to-value metrics and his personal history with the institution, Wells Fargo was focused more on his race and the location of his home within a historically Black Los Angeles neighborhood, and used the fact of his race and the location of his home to delay, obstruct and deny him the full benefits of historically low home mortgage interest rates.  Wells Fargo did this even though, having paid his loan for more than 18 years, Mr. Braxton had equity in his home far greater than the amount remaining, on his Federal Housing Administration (FHA) secured loan.

15.     Mr. Braxton was given the runaround to such an extent that it took him over nine months to refinance his federally backed mortgage loan (and 12 months to refinance his home equity loan) at an above-market interest rate of around 4%.  This was after various Wells Fargo representatives kept telling him they lost his paperwork, made incomplete inquiries and needed to request more information,

[18] *Id.*

[19] *Id.*

delayed its responses, and even placed him into an unsolicited debt-trap deferred payment program without his permission.  It was only after Mr. Braxton notified the Department of Housing and Urban Development ("HUD") that Wells Fargo approved the refinancing of his federally backed FHA loan (indeed, Wells Fargo approved the application the very next day).  Of course, for the prolonged period that Mr. Braxton was waiting for Wells Fargo to refinance his loans, he was paying the higher rates associated with his original loans.

16.     Mr. Braxton's experience is unfortunately consistent with the experiences of thousands of Black Americans who have been victimized by Wells Fargo's intentional, knowing and systematic race discrimination, violating the contractual, commercial and civil rights of Class members and causing millions (and perhaps even billions) of dollars in damages to the Nationwide Class.  Individually and as a representative of the Class, Mr. Braxton brings this action to make good to the Class all damages resulting from Defendants' violations of the federal civil rights laws and to restore to the Class any amounts to which they otherwise would have been entitled, together with other equitable and remedial relief as the Court may deem appropriate.

## II.     JURISDICTION AND VENUE

17.     This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332(d), and 1343, because the Plaintiff asserts federal causes of action, because Plaintiff asserts civil rights causes of action, and because at least one member of the Class is a citizen of a different state than all Defendants, and because the amount in controversy exceeds $5,000,000.

18.     Personal jurisdiction is appropriate over Defendants because Wells Fargo Bank, N.A. transacts business in the State of California and has its principal place of business in San Francisco, California.  Wells Fargo Home Mortgage, Inc. originates loans to California customers from its California offices and maintains a systematic and continuous presence in the State.

19.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b) because Wells Fargo Bank, N.A. resides in this district, a substantial part of the events or omissions giving rise to the claim occurred in this district, and Wells Fargo Bank, N.A.'s principal place of business is in this district.

## III.    PARTIES

20.     Plaintiff Aaron Braxton, who is Black, is a natural person and a citizen of the State of California and resides in Los Angeles, California.

21.     Defendant Wells Fargo Bank, N.A. is a publicly traded, global financial services firm and a Fortune 500 corporation incorporated in Delaware with its principal place of business in San Francisco, California.  As of December 31, 2020, Wells Fargo has assets of approximately $1.9 trillion, loans of $887.6 billion, deposits of $1.4 trillion, and stockholders' equity of $185 billion.  Wells Fargo is a mortgage lender; and also provides a wide variety of financial products and services to its global and domestic clients.

22.     Defendant Wells Fargo Home Mortgage, Inc. is a home lending company that is part of the "Wells Fargo banking family."  It operates about 725 mortgage stores nationally and originates and services one-to-four-family residential first and junior-lien mortgages and home equity loans.  On average, it originates approximately $300 billion worth of loans per year.  It is incorporated in the State of Delaware, and has its principal place of business in Des Moines, Iowa. Wells Fargo Home Mortgage, Inc. originates loans to California customers from its California office locations.

## IV.    FACTUAL ALLEGATIONS

23.     During the last few years interest rates were near an all-time low in the United States, and homeowners who held mortgage loans at higher rates (meaning a great deal of homeowners) sought to refinance their loans at lower rates. Refinancing would allow a homeowner to significantly reduce their monthly payments and to owe less mortgage interest over the life of the loan.  Over the last

2013830.1

two years, homeowners in the United States refinanced over $5 trillion worth of mortgages.

**A.     Wells Fargo's Discriminatory Refinancing Practices**

24.     Wells Fargo is a major issuer of home-based loans in the United States, holding nearly a trillion dollars in outstanding debt.

25.     Wells Fargo's discrimination began at the latest in 2018 and continues through today.

26.     In 2020, Defendant Wells Fargo approved Black homeowner refinancing applications at a rate lower than that of any other major lender in America.  It is the only lender that approved fewer such applications in 2020 than it did in 2010.[20]

27.     Bloomberg analyzed data from eight million refinancing applications from 2020, released under the Home Mortgage Disclosure Act, and found that, for Wells Fargo, "the highest-income Black applicants [had] an approval rate about the same as White borrowers in the lowest-income bracket."[21]

28.     The disparate treatment of Black applicants results at least in part from Wells Fargo's tactics that, in practice, perpetuate redlining of areas with disproportionately more Black residents and imposing in those areas hurdles and obstacles that either delay or prevent refinancing.

29.     For example, in order to minimize the likelihood and frequency of Black mortgage applications, Wells Fargo systematically and intentionally places its loan officers in areas with disproportionately low numbers of Black residents.  In many cities across the nation with large Black populations, like Atlanta, Baltimore,

---

[20] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-refinancing/

[21] *Id.*

and Philadelphia, Wells Fargo's online store locator will direct individuals in predominately Black ZIP codes to areas in predominately White ZIP codes.[22] Likewise, in New Haven, Connecticut, which in 2020 was a hot spot for denials, the nearest Wells Fargo loan officer available to homeowners was 25 miles away.  Even to initiate the application process by visiting a loan officer, a Black applicant had to do more than a non-Black applicant.

30.    The effect of this is clear: while Wells Fargo's approval rates for Black refinancing applicants are much lower than the approval rates for Black applicants at other national banks, ***this gap widens in counties with more Black residents***.[23]  As noted above, nationally, Wells Fargo approved just 47% of its Black refinancing applicants.[24]  However, in Fulton County, which has more Black than white residents, Wells Fargo only approved 43% of its Black refinancing applications, nearly 10% less than its already-low national approval rate.[25]

31.    And even for those Black applicants whose loans were ultimately approved, they faced delays that White applicants living in predominately White neighborhoods did not, causing them damages through continued higher mortgage rates during the unjustified delay as they awaited loan approval.  In some cases, Wells Fargo officers simply told Black applicants living in predominately Black neighborhoods that "perhaps the area is not eligible" for quick evaluations of refinancing applications.[26]  Wells Fargo regularly approved refinancing applications

---

[22] https://www.wellsfargo.com/locator/mortgage/consultant .

[23] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-refinancing/

[24] *Id.*

[25] *Id.*

[26] *Id.*

of non-Black homeowners in a matter of weeks, but only approved the applications of Black homeowners after many months (if those Blacks applicants happened to be approved).

32.    Wells Fargo also perpetuated its discriminatory practices using algorithms.  Wells Fargo identifies neighborhoods eligible for quick evaluations of refinancing applications using an internal algorithm.

33.    The director of the CFPB describes these types of banking algorithms as "black boxes behind brick walls."[27]  "When consumers and regulators do not know how decisions are made by the algorithms, consumers are unable to participate in a fair and competitive market free from bias." [28]

34.    Wells Fargo's algorithm singled out predominately Black neighborhoods and labeled those neighborhoods ineligible for rapid processing, which led loan officers to inform Black applicants that they could not enjoy the same rapid application processing as white applicants.

35.    Wells Fargo's lending standards also help to perpetuate its discrimination of Black applicants.  Wells Fargo has the strictest lending policies of any other major lender.[29]  And as a result, Wells Fargo has the largest disparity between the approval rates of Black refinancing applicants to white refinancing applicants—25% compared to 16%.[30]  A study done by the Board of Governors of the Federal Reserve System analyzing federal mortgage data stated that they "do not

---

[27] https://www.consumerfinance.gov/about-us/newsroom/remarks-of-director-rohit-chopra-at-a-joint-doj-cfpb-and-occ-press-conference-on-the-trustmark-national-bank-enforcement-action/

[28] *Id*.

[29] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-refinancing/

[30] *Id*.

Case No.

have any evidence [ ] as to whether these tighter standards reduce loan risk to justify the disparate impact on minority denials they are associated with."[31]  And after controlling for relevant underwriting factors (debt-to-income ratios, loan-to-value ratios, credit scores, etc.) the study found that "[l]enders who impose the strictest standards on their white applicants tend to have the largest unexplained excess denials of minority applicants."[32]  The study also found that, under the more stringent standards, "Black applicants are 1.9 percentage points more likely…to be denied than a comparable white applicant after controlling flexibly for an array of important underwriting factors."[33]

36.    This Federal Reserve study also found that the most common reasons for denials "for Black applicants [were] 'incomplete' [documents] and 'verification'" issues.[34]  The study found that loan officers like those of Wells Fargo "may work less diligently with minority borrowers to gather all necessary documents or verify aspects of their application, resulting in a denial."[35]  Excess denials are also caused by "issues with the latter stages of the mortgage application process that disproportionately affect minorities."[36]  Wells Fargo's loan officers' lack of diligence in processing applications from Black homeowners seeking refinancing caused disproportionate delays in the processing of their applications,

---

[31] *How Much Does Racial Bias Affect Mortgage Lending? Evidence from Human and Algorithmic Credit Decisions*, Neil Bhutta, Aurel Hizmo, and Daniel Ringo (July 2021), at 12, n.20. Available at:
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3887663

[32] *Id*. at 12.

[33] *Id*. at 9.

[34] *Id*. at 13.

[35] *Id*. at 13, n.23.

[36] *Id*. at 14.

causing damage even when the loans were ultimately approved.

37. The above practices are arbitrary and artificial and unnecessary to achieve a valid interest or legitimate objective.  The vast difference between refinancing approval rates Wells Fargo issued to Black Americans as compared to any other lending institutions' approval rates negates any possible legitimate objective.

38. As noted, the above practices have a disproportionately adverse effect on Black Americans seeking to refinance their loans.  Black Americans are members of a protected class.

39. Wells Fargo's practices directly harmed Black Americans by forcing them to pay higher interest rates while applications were pending, by forcing them to pay higher interest rates when applications were completed, and/or by denying refinancing applications.  In the absence of these policies, Black Americans would not have had to pay higher rates or face rejection in their refinancing applications.

40. The disparity between Wells Fargo's treatment of Black American applicants and non-Black American applicants is significant and shocking.  As noted, a White American in the lowest income bracket was just as likely to receive refinancing approval as a Black American in the highest income bracket.

41. Wells Fargo's racial discrimination during the refinancing boom is consistent with Wells Fargo's sordid history of racial discrimination in lending.  In 2012, it agreed to pay $184 million to settle claims with the Department of Justice that the bank pushed Black and Hispanic homeowners to obtain subprime mortgages, and then charged them higher fees and interest rates.[37]

42. Several municipalities have sued Wells Fargo as well.  In 2019, it settled a lawsuit with the City of Philadelphia premised on allegations that it

---

[37] https://www.justice.gov/opa/pr/justice-department-reaches-settlement-wells-fargo-resulting-more-175-million-relief.

COMPLAINT

Case No.

2013830.1

1  purposefully made it difficult for minorities to refinance their mortgages.[38]

2      43.    Worse yet, despite harming Black homeowners by making it more

3  difficult to refinance their loans, Wells Fargo deceives the public by trumpeting its

4  supposed commitment to diversity, equity and inclusion.  In its 2020 annual report,

5  Wells Fargo expressed its supposed commitment to "the concept of equity to our

6  diversity and inclusion efforts in recognition of the systemic and structural

7  challenges in our society that have contributed to disparities that exist today." [39]

8      44.    In the same year that Wells Fargo denied a majority of Black

9  homeowners' refinancing applications, the Wells Fargo CEO claimed that "the calls

10 for racial justice in 2020 reinforced the urgency of working to create a company

11 culture with broad representation in who we are, how we think, and how we make

12 decisions."[40]  However these words ultimately ring hollow, because it denied Black

13 homeowners refinancing at much higher rates than any other major lender in that

14 same year.

15 **B.    Plaintiff Aaron Braxton is Harmed by Wells Fargo's Race-Based**
16 **Discrimination**

17     45.    Plaintiff Aaron Braxton purchased his home in South Los Angeles,

18 California, near the University of Southern California, in April 2000, through a

19 Wells Fargo home loan for $139,500 ("First Loan").  This First Loan was insured

20 through the FHA. In 2005, after the price of the house appreciated, he took out a

21 second home equity line of credit loan, also from Wells Fargo ("Second Loan").  He

22 improved upon the property and built an accessory dwelling unit.  Today, the home

23

24 _____

[38] https://www.phila.gov/2019-12-16-city-of-philadelphia-and-wells-fargo-resolve-
25 litigation/.

[39] 2020 Annual Report, at 17; accessible at
26 https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/annual-
27 reports/2020-annual-report.pdf.

28 [40] *Id*. at 16.

2013830.1

is worth approximately $800,000, as it was in 2019.  In or about August 2019, Mr. Braxton began the process of applying to refinance his two Wells Fargo loans to take advantage of reduced interest rates.  At the time, he owed $185,000 on both his Wells Fargo loans and paid a 6% interest rate on both loans, multiple percentage points higher than the average refinance rate at the time.

46.   When Mr. Braxton initially applied to refinance his First Loan, Wells Fargo repeatedly asked him to resubmit paperwork because Wells Fargo representatives claimed the paperwork was either missing or lost.  Wells Fargo representatives also continually took weeks and weeks to issue or reply to correspondence.  Mr. Braxton thereafter began the process of refinancing his Second Loan and was confronted with the same delays.

47.   Frustrated by the delays and because he was continuing to pay a higher mortgage rate while his applications were pending, Mr. Braxton regularly contacted his loan officers and other Wells Fargo personnel to ask about the status of his applications.

48.   After months of frustrating encounters with Wells Fargo personnel, Mr. Braxton decided to call HUD.  A HUD representative informed Mr. Braxton that they would be contacting Wells Fargo.  The very next day, Wells Fargo approved the refinancing of Mr. Braxton's federally backed FHA home loan, approximately nine months after he began the process.

49.   Eventually, around October 2020, Wells Fargo finally approved a refinancing of his Second Loan.  However, despite the contact from HUD, which presumably prompted it to act on Mr. Braxton's First Loan, Wells Fargo continued its discrimination through race-based application delays.  It continued to claim that paperwork needed to process the Second Loan was missing, even though Mr. Braxton had already provided the paperwork.  At one point, after having sent a notary to his home to finalize some paperwork, Wells Fargo informed Mr. Braxton that the notary had lost the paperwork and he needed to complete some forms again.

50.     All told, Mr. Braxton submitted four applications because Wells Fargo kept losing them.  During the 16 months that his applications were pending, Mr. Braxton continued to pay the higher original mortgage rates instead of the lower refinanced rates he was seeking (and ultimately proven entitled to).  However, unbeknownst to Mr. Braxton, in the end the rate he received for his refinancing, while lower than his original rate, was much higher than the fair market rate received by similarly situated non-Black applicants.

## V.     CLASS ALLEGATIONS

51.     Plaintiff Aaron Braxton brings this action on behalf of himself and a potential class of similarly situated Black Americans.

52.     Each and every claim alleged in this case is also alleged on behalf of every member of the Class.

**A.     Class Definition**

53.     The Class includes all Black persons in the United States who, from January 1, 2018 through the present (the "Class Period"), submitted an application to refinance their home mortgage through Defendants that was (i) processed at a rate slower than that of the average processing time of applications made by non-Black applicants; or (ii) whose applications were denied; or (iii) whose resulting refinance loans were made at higher interest rates as compared to similarly situated non-Black applicants.  Excluded from the Class are Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this complaint, and the United States government.

54.     Class certification is authorized under Federal Rule of Civil Procedure 23 and applies to claims for injunctive and equitable relief, including restitution, under Rule 23(b)(2), and for monetary damages under Rule 23(b)(3).

55.     There are at least 13,000 members of the Class.

56.     The number of persons who fall within the definitions of the Class are so numerous and geographically dispersed so as to make joinder of all members of

the Class or Subclass in their individual capacities impracticable, inefficient, and unmanageable, and without class-wide relief, each member of the Class would effectively be denied his, her, or their rights to prosecute and obtain legal and equitable relief based on the claims and allegations averred in the Complaint.

57.     Plaintiff, as detailed below, can fairly and adequately represent the proposed Class.  In the alternative, Plaintiff can act as the representative of the below subclasses.

**B.     Proposed Subclasses**

58.     Additionally, or in the alternative, pursuant to Federal Rule of Civil Procedure 23(c)(5), Mr. Braxton brings this action on behalf of the following subclasses:

59.     The Delayed Refinancing Subclass:  All Black persons in the United States who applied for refinancing from the Defendants during the class period and whose applications processed at a rate slower than that of the average processing time of applications made by non-Black applicants.

60.     The Higher Rate Subclass:  All Black persons in the United States who applied for refinancing from the Defendants during the class period and whose refinancing applications were eventually approved, but at a higher interest rate than prevailing market rates based on their creditworthiness.

**C.     Numerosity and Ascertainability**

61.     **Numerosity.**  While the exact numbers of the members of the Class and Subclasses are unknown to Plaintiff at this time, membership in the Class and Subclasses may be ascertained from the records maintained by Wells Fargo.  At this time, Plaintiff is informed and believes that the Class includes hundreds of thousands of members and the Subclasses includes tens of thousands of members. Therefore, the Class and Subclasses are sufficiently numerous that joinder of all members of the Class and Subclasses in a single action is impracticable under Rule 23(a)(1) of the Federal Rules of Civil Procedure, and the resolution of their claims

1   through a class action will be of benefit to the parties and the Court.

2         62.   **Ascertainability.**  The names and addresses of the members of the

3   Class and Subclasses are contained in Wells Fargo's records.  Notice can be

4   provided to the members of the Class and Subclasses through direct mailing, email,

5   publication, or otherwise using techniques and a form of notice similar to those

6   customarily used in consumer class actions arising under State and Federal law.

7   **D.**   **Commonality and Predominance**

8         63.   This matter involves common questions of law and fact which

9   predominate over any question solely affecting individual Class Members.

10         64.   The common questions of law and fact include, but are not limited to:

11   - Whether Defendant systematically discriminated against Class Members on account of their race;

13   - Whether Black applicants' home mortgage and refinance applications were processed at a rate slower than that of the average processing time of applications made by non-Black applicants;

15   - Whether Black applicants' home mortgage and refinance applications were denied when the score of a similarly situated non-Black applicant would be approved;

17   - Whether Black applicants' resulting refinance loans were made at higher interest rates as compared to similarly situated non-Black applicants;

19   - Whether Defendant selected disproportionately white areas for rapid refinancing evaluation and disproportionately Black areas for increased scrutiny;

21   - Whether Defendants' underwriting algorithms and machine learning programs were racially biased and led to unfairly discriminatory credit policies that harmed Black refinancing applicants.

24         65.   **Predominance.**  Class action status is warranted under Rule 23(b)(3) of

25   the Federal Rules of Civil Procedure because questions of law or fact common to the

26   members of the Class and Subclasses predominate over any questions affecting only

27   individual members.  The interests of the members of the Class and Subclasses in

28   individually controlling the prosecution of separate actions are theoretical and not

Case No.
2013830.1

practical.  Prosecution of this action through multiple Class Representatives would be superior to individual lawsuits.  Plaintiff is not aware of any difficulty which will be encountered in the management of this litigation which should preclude its maintenance as a class action.

**E.      Typicality and Adequacy**

66.     Plaintiff Aaron Braxton's claims are typical of the other Class Members' claims because all Class Members were injured in the same manner as a result of substantially similar conduct by Wells Fargo.

67.     Mr. Braxton is an adequate Class Representative because his interests do not conflict with the interests of the other members of the Class and Subclasses he seeks to represent.  Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.  The Class and Subclasses' interests will be fairly and adequately protected by Plaintiff and his counsel.

**F.      Superiority**

68.     A class action is the superior method for the fair and efficient adjudication of this matter, because the damages and other harms suffered by Plaintiff and other Class Members are small compared to the burden and expense of individual litigation.  Thus, it would be impractical, if not impossible, for individual plaintiffs to seek redress against Defendants for the harms suffered.

69.     Individual litigation of these harms would also be inefficient for the court system, and would create a risk of inconsistent or contradictory rulings and judgments.

70.     No unusual circumstances exist that would make this matter more difficult to manage than a typical class action.  Individualized damages figures can be mathematically computed by collecting data about the length of each Class Member's delay and the differential between the interest rates they ultimately received versus the prevailing market rate based on race-neutral variables such as

debt-to-income ratio, loan-to-value ratio, and credit score.

**G.      Injunctive Relief**

71.      Plaintiff also seeks to represent a class under Rule 23(b)(2) seeking injunctive relief forcing Wells Fargo to cease and desist its current discriminatory practices.

## COUNT I

## VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT
### 15 U.S.C. § 16901, *et seq.*

72.      Plaintiff, on behalf of himself and all those similarly situated, realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

73.      The Equal Credit Opportunity Act makes it unlawful for a creditor to discriminate against any applicant with respect to any aspect of a credit transaction on the basis of race.

74.      The Equal Credit Opportunity Act applies to applications for refinancing, like those of the Plaintiff and others similarly situated.  Plaintiff applied for credit by seeking to refinance his home loans.

75.      Defendants are creditors because they regularly extend, renew, and continue issuances of credit.

76.      Defendants' consistent delays, roadblocks, feigned difficulties, and sometimes denials of applications for refinancing submitted by Black Americans constitute race-based discrimination forbidden by the Equal Credit Opportunity Act.

77.      Plaintiff and all those similarly situated were harmed by Defendants' conduct, including but not limited to harm in the form of higher interest rates paid while applications were pending, higher interest rates paid upon a delayed approval, or from a denied application.

78.      On behalf of himself and the Class he seeks to represent, Plaintiff requests the relief set forth below.

## COUNT II

### RACE DISCRIMINATION IN VIOLATION OF THE FAIR HOUSING ACT OF 1968, 42 U.S.C. § 3601, *et seq.*

79.     Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

80.     The Fair Housing Act makes it unlawful, in residential real estate transactions, such as refinancing, to discriminate against designated classes of individuals.

81.     Plaintiff and others similarly situated sought to engage in residential real estate transactions with the Defendants.

82.     Plaintiff and others similarly situated are Black Americans and therefore members of a protected class under the Fair Housing Act.

83.     Defendants refused to transact business with Plaintiff and others similarly situated when they refused to approve refinancing applications on the same timeline as the applications made by other parties with similar qualifications that were not members of the protected class, by causing applicants to withdraw applications due to roadblocks and feigned difficulties, or by denying refinancing applications.  As noted, Defendants approved fewer than half of Black homeowners' refinancing applications in 2020 while approving 71% of the applications of White homeowners.

84.     Defendants refused to transact business with Plaintiff and those similarly situated during the Class Period and at the same time did transact business with non-Black homeowners with similar qualifications.

85.     Plaintiff and those similarly situated were injured by Defendants' refusal to transact business with them because they paid application fees for refinancing applications that were delayed or denied, because they continued to pay higher interest rates while their delayed applications were pending, because they were provided with higher interest rates than other homeowners with similar

1   qualifications, and/or because their applications were denied.

2   ## COUNT III

3   **RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981**

4   86.    Plaintiff realleges each and every paragraph above and incorporates

5   them by reference as though fully stated herein.

6   87.    Under 42 U.S.C. § 1981, persons of all races are guaranteed the same

7   right to make and enforce contracts, regardless of race.  The term "make and

8   enforce" contracts includes the making, performance, modification, and

9   terminations of contracts, as well as all of the other aspects of a contractual

10  relationship.

11  88.    By seeking to refinance their home loans and submitting an application

12  to Defendants, Plaintiff and others similarly situated sought to "make and enforce"

13  contracts with the Defendants.

14  89.    Plaintiff and those similarly situated were denied their right to make

15  and enforce contracts when Defendants refused to provide refinancing on the same

16  terms as they offered to members of a different race, by delaying or frustrating the

17  applications process, and/or by denying the applications.

18  90.    Plaintiff and those similarly situated were harmed by Defendants'

19  denial of their rights to make and enforce contracts.

20  ## COUNT IV

21  **VIOLATION OF THE UNRUH CIVIL RIGHTS ACT,**

22  **CALIFORNIA CIVIL CODE §51**

23  91.    Plaintiff realleges each and every paragraph above and incorporates

24  them by reference as though fully stated herein.

25  92.    The Unruh Civil Rights Act provides that all persons within the State of

26  California are free and equal no matter their race and are entitled to full and equal

27  treatment in all business establishments.

28  93.    The Unruh Civil Rights Act thus prohibits discrimination of any kind

against any person in any business establishment.

94.    Defendants are business establishments under the Unruh Civil Rights Act.

95.    Plaintiff and other individuals similarly situated were denied full and equal treatment under the Unruh Civil Rights Act when Defendants refused to offer them refinancing terms on the same terms as individuals who were not Black Americans.

96.    Plaintiff and other individuals similarly situated were harmed by Defendants' refusal to transact business with them because they paid application fees for refinancing applications that were delayed or denied, because they continued to pay higher interest rates while their delayed applications were pending, because they were provided with higher interest rates than other homeowners with similar qualifications, and/or because their applications were denied.

## COUNT V

## VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW

97.    Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

98.    The California Unfair Competition Law ("UCL") forbids "unlawful, unfair or fraudulent" conduct in connection with business activity.

99.    Defendants' business offering refinancing of existing loans is a business activity under the UCL.

100.    Plaintiff and others similarly situated are "persons" under the UCL.

101.    Defendants' conduct described herein constitutes unlawful competition, as in the course of engaging in the business acts described above, it engaged in conduct that constituted a predicate violation of the laws identified herein, namely the Equal Credit Opportunity Act, the Fair Housing Act, 42 U.S.C. § 1981, and the Unruh Civil Rights Act.

102.    Defendants' conduct described herein constitutes unfair competition

under the UCL, as their practices are likely to deceive the public by informing the public of an alleged commitment to diversity and equality, but instead using hidden business practices designed to deny, delay and refuse the refinancing of loans of Black Americans, and subjecting those that are approved, to unfavorable terms.  As there is no legitimate justification for these practices, which have a disproportionately negative impact on the public, in comparison to any fair business, purpose Defendants' practices are unfair as defined under the UCL.

103.   Defendants' conduct described herein constitutes fraudulent competition under the UCL, as they advertise and other wise state that they are committed to diversity and equality, and will fairly and quickly process the refinancing applications of all applicants, but instead use hidden business practices designed to deny, delay and refuse the refinancing of loans of Black Americans, and subjecting those that are approved, to unfavorable terms.  These business practices are likely to deceive the public, and thus are fraudulent.

104.   Plaintiff and those similarly situated were injured by Defendants' refusal to transact business with them because they paid application fees for refinancing applications that were delayed or denied, because they continued to pay higher interest rates while their delayed applications were pending, because they were provided with higher interest rates than other homeowners with similar qualifications, and/or because their applications were denied.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court provides the following relief:

a. Certify the 23(b)(2) and 23(b)(3) classes outlined above;

b. Designate Plaintiff as a Class Representative and designate the undersigned counsel as lead Class Counsel;

c. Find that Defendants' acts described herein violate the Equal Credit Opportunity Act, the Fair Housing Act, 42 U.S.C. § 1981, the Unruh

1    Civil Rights Act, and the California UCL;

2    d.    Find that Defendants have engaged in a pattern and practice of racial

3          discrimination resulting in the harm to Plaintiff and class members

4          described above;

5    e.    Award Plaintiff and all others similarly situated restitutionary relief,

6          together with compensatory and punitive damages;

7    f.    Award Plaintiff and all others similarly situated injunctive relief by

8          ordering Defendants to stop the discriminatory practices described

9          herein;

10   g.    Award Plaintiff and all others similarly situated prejudgment interest

11         and attorney's fees, costs, and disbursements; and

12   h.    Award Plaintiff and all others similarly situated such other relief as this

13         Court deems just and proper.

14                          **<u>DEMAND FOR JURY TRIAL</u>**

15   Plaintiff demands a trial by jury of all issues so triable.

16

17   DATED:  March 18, 2022          ELLIS GEORGE CIPOLLONE
                                     O'BRIEN ANNAGUEY LLP
18                                       Dennis S. Ellis
19                                       Noah S. Helpern
                                         Ryan Q. Keech
20                                       Joseph Kiefer (*pro hac vice* forthcoming)
21                                       Stefan Bogdanovich

22

23

                                     By: _____
24                                            Dennis S. Ellis
25                                   Attorneys for Plaintiff Aaron Braxton and all
                                     other similarly situated Plaintiffs
26

27

28

2013830.1

1    DATED:  March 18, 2022       FRANK, SIMS & STOLPER LLP

2                                  Jason M. Frank
                                 Scott H. Sims

3                                  Andrew D. Stolper

4

5

6                          By:        /s/ Jason Frank

7                                  Jason Frank
                        Attorneys for Plaintiff Aaron Braxton and all

8                         other similarly situated Plaintiffs

9    **<u>Attestation under N.D. Cal. L.R. 5-1(h)</u>**: the ECF filer of this document attests that

10  all of the other signatories have concurred in the filing of the document, which shall
serve in lieu of their signatures on the document.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28