ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
Dennis S. Ellis (State Bar No. 178196)
    dellis@egcfirm.com
Trent B. Copeland (State Bar No. 136890)
    tcopeland@egcfirm.com
Ryan Q. Keech (State Bar No. 280306)
    rkeech@egcfirm.com
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697


FRANK SIMS & STOLPER LLP
Jason Frank (State Bar No. 190957)
    jfrank@lawfss.com
Scott H. Sims (State Bar No. 234148)
    ssims@lawfss.com
Andrew D. Stolper (State Bar No. 205462)
    astolper@lawfss.com
19800 MacArthur Blvd., Suite 855
Irvine, California 92612
Telephone: (949) 210-2400
Facsimile: (949) 201-2405

(Additional Counsel on Signature Page)

Attorneys for Plaintiffs Aaron Braxton,
Gia Gray, Bryan Brown, Paul Martin, on
behalf of themselves and all others
similarly situated

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AARON BRAXTON, GIA GRAY, BRYAN BROWN AND PAUL MARTIN, on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>     vs.<br><br>WELLS FARGO BANK, N.A., a Delaware corporation; WELLS FARGO HOME MORTGAGE, INC., a Delaware corporation; WELLS FARGO & CO., a Delaware corporation, | Case No. 4:22-cv-01748-KAW<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR:**<br><br>**1. VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT, 15 U.S.C. § 1691, *ET SEQ.***<br>**2. RACE DISCRIMINATION IN VIOLATION OF THE FAIR HOUSING ACT OF 1968, 42 U.S.C. § 3601, *ET SEQ.*** |

2029104

Defendants.

**3. RACE DISCRIMINATION IN
VIOLATION OF 42 U.S.C. § 1981
4. VIOLATION OF THE UNRUH
CIVIL RIGHTS ACT,
CALIFORNIA CIVIL CODE § 51
5. VIOLATION OF THE
CALIFORNIA UNFAIR
COMPETITION LAW**

**DEMAND FOR JURY TRIAL**

Plaintiffs Aaron Braxton, Gia Gray, Bryan Brown and Paul Martin, individually and as representatives of a nationwide class of Black applicants for home mortgage refinancing through Wells Fargo and its related entities (collectively "Plaintiffs" or the "Class"), allege as follows:

## I.      NATURE OF ACTION

1.      The benefits of homeownership have long been the cornerstone of the American Dream—allowing citizens to accumulate wealth through access to credit, generating equity, and reducing housing costs.[1]

2.      However, the benefits of homeownership have for far too long been unattainable for a disproportionate number of Black Americans, and more difficult for Black Americans to maintain once achieved.  Historically, Black Americans have been repeatedly and systematically denied access to the financial benefits of homeownership through the use of pernicious and pervasive race-based exclusions. These denials included, for example, the Federal Housing Administration's refusal to insure mortgages in and near Black neighborhoods—a practice now referred to as "redlining"—at the same time that the FHA subsidized builders who mass-produced entire subdivisions made for White Americans.

[1] https://www.forbes.com/sites/forbesrealestatecouncil/2021/09/28/homeownership-and-the-american-dream/?sh=1c78499623b5.

2029104

3.     The passage of civil rights legislation in the 1960s was supposed to fix that historical injustice, eliminate race-based gatekeeping practices like redlining and restrictive covenants while righting this long-standing American wrong.  For many homeowners seeking a first or refinanced mortgage with some banks, it did. For many Black Americans, however, discrimination in the realm of home ownership remains a vestige of the country's prejudice narrative.

4.     Over the past few years, historically low interest rates spawned an unprecedented opportunity for homeowners to refinance their home mortgages. Refinanced mortgages allow homeowners to reduce their monthly payments (as well as the overall interest due during the life of their loan) while still amassing equity in their homes.  Not surprisingly, millions of homeowners across the nation sought to reduce their payments through refinancing.

5.     Unfortunately, Black homeowners who sought to refinance through the Defendants in this case—Wells Fargo Bank, N.A., Wells Fargo & Co., and Wells Fargo Home Mortgage (collectively "Defendants" or "Wells Fargo")—were disproportionately denied refinance applications or, even if ultimately approved, faced unjustified delays in the processing of their applications.

6.     Wells Fargo ***denied the applications of over 50%*** of the Black Americans seeking to refinance in 2020, and ***denied the applications of just under 50%*** of the Black Americans seeking to refinance in 2021.  No other major lending institution refused to refinance the homes of Black Americans at such stunning rates.

7.     The numbers associated with Defendants' misconduct tell a shameful story, without any legitimate explanation.  Data from eight million refinancing applications from 2020 reveal that "the highest-income Black applicants [had] an approval rate about the same as White borrowers in the lowest-income bracket."[2]

---

[2] *Id.*

2029104

White refinancing applicants earning between $0 and $63,000 a year were ***more likely*** to have their refinancing application approved by Wells Fargo than Black refinancing applicants earning between $120,000 and $168,000 a year.[3]  Overall, in 2020, Wells Fargo rejected a ***majority*** of all the completed applications submitted by Black homeowners.[4]  And because Wells Fargo designed an application process that is disproportionately difficult for Black homeowners to complete, 27% of all Black homeowners who began a refinance application with Wells Fargo withdrew it.[5]  When this group of Black homeowners who were unable to complete the refinance process due to discriminatory barriers are added to the total pool of Black homeowner refinance applicants, just one-third of the Black homeowners who applied for a refinance loan with Wells Fargo were successful.

8.      In 2020—at the height of the refinancing boom, when millions of Americans benefitted from the historically low interest rate environment—Wells Fargo approved 47% of all applications by Black homeowners (meaning that Wells Fargo rejected the majority of applications from Black homeowners), whereas all other lenders approved 71% of all applications by Black homeowners.[6]  In 2020, no other lending institution rejected a majority of Black homeowners' applications for refinancing.[7]

9.      Wells Fargo was the only major lender in the United States that approved a smaller share of refinancing applications from Black homeowners in

---

[3] *Id.*

[4] *Id.*

[5] *Id.*

[6] *Id.*

[7] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-refinancing/.

2029104

Case No. 4:22-cv-01748-KAW
FIRST AMENDED CLASS ACTION COMPLAINT

2020 than it had in 2010.[8]

10.     The story in 2021 was the same, with Wells Fargo approving a much lower percentage of Black homeowner applicants than any other lender.[9]  Wells Fargo approved only 58% of Black applicants compared to other lenders, which approved 74% of Black homeowner applicants.[10]  And the disparity between Black and White refinance approval rates was 21% at Wells Fargo, nearly double the disparity (13%) for all other for other lenders.[11]  And while Wells Fargo's Black homeowner refinancing approval rate improved slightly from 2020, the same was true at all other lenders, due to broader economic conditions.[12]  By comparison, other major lenders approved much higher rates of Black homeowner refinancing applicants in 2021:  JP Morgan Chase & Co. approved 87% of Black homeowner applicants (only 6% less than White applicants), Rocket Mortgage LLC approved 81% of Black homeowner applicants (only 7% less than White applicants), and Bank of America Corporation approved 75% of Black homeowner applicants (only 11% less than White applicants).[13]

11.     Overall, the data released under the federal Home Mortgage Disclosure Act shows unequivocally that Wells Fargo rejects a disproportionate number of Black homeowners' refinancing applications.[14]  Wells Fargo also makes the

---

[8] *Id.*

[9] https://www.bloomberg.com/news/articles/2022-03-25/wells-fargo-faces-persistent-racial-gap-in-mortgage-refinancing.

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-

refinancing application process more difficult for Black homeowner applicants than others on a national scale.[15]  And Wells Fargo customers report loan officers stating that Wells Fargo's underlying refinance calculation tools consider certain "areas" with large Black populations to be ineligible for rapid valuations.[16]  Black homeowner applicants are further subjected to delays, feigned mistakes, and other obstacles, leading many Black Americans to withdraw their requests for refinancing and leading others to wait indefinitely while Wells Fargo refuses to act upon their applications.

12.     In light of this, Wells Fargo's stated commitment to "help[] ensure that all people across our workforce, our communities, and our supply chain feel valued and respected and have equal access to resources, services, products, and opportunities to succeed"[17] rings hollow.  Instead, Wells Fargo pervasively denies Black homeowners' refinancing applications and consistently delays the applications it does not deny, in many cases ultimately forcing Black homeowners into foreclosure.[18]

13.     Core responsibility for Wells Fargo's discriminatory treatment of Black homeowner applicants lies with its decision to employ centralized, universal, race-infected lending algorithms without correction to differentially assess, delay and ultimately reject refinancing applications.

14.     Used properly, automated underwriting technology helps individual

_____

refinancing/.

[15] *Id*.

[16] *Id*.

[17] https://www.wellsfargo.com/about/diversity/diversity-and-inclusion/.

[18] https://www.nclc.org/images/pdf/special_projects/covid-19/IB_Covid_Black_Forbearance_Foreclosure.pdf.

2029104

loan officers who are properly trained and familiar with the legal environment in which banks operate make sound, individualized underwriting decisions that protect the interests of borrowers, banks, investors, insurers and the federal government, taking into account race-neutral data points and employing formulae based on those data points to decide whether or not the proposed loan is in the best interest of the bank and the borrower.

15.    But that is not how Wells Fargo utilized its automated underwriting technology.  Quite the contrary:  confidential informants with knowledge of Wells Fargo's refinance operations confirm that the onset of the COVID-19 pandemic led Wells Fargo to jettison or otherwise ignore well-established internal fair lending checks and balances in favor of implementing a centralized, "pioneering automated underwriting" system—sometimes referred to as CORE—without sufficient, or sometimes any, human supervision or involvement.

16.    These witnesses describe troubling facts whereby, as COVID-19 hit, multiple loan processors and underwriters were terminated or otherwise left the bank's residential lending operations and were not replaced, and, instead, the CORE pioneering automated underwriting system was increasingly centralized to facilitate at-home work by originators, processors, and underwriters.  According to these same witnesses, the coding and machine learning endemic to the CORE algorithmic underwriting platform were—byte by byte—stuffed chock-full of numerous Wells Fargo-generated geographic, demographic, race-stratified liquidity and appraisal and other "overlays" that Wells Fargo knew served no legitimate underwriting basis but, instead, functioned as signals for race discrimination in Wells Fargo's residential refinance decisions.

17.    These and other "overlays" pervasively infecting Wells Fargo's CORE algorithms—which become even more invidious with each successive denial that taught the algorithm these denials were appropriate—ultimately serve Wells Fargo's purpose of segregating the creditworthiness of prospective applicants based on their

1  race, and differentiate Wells Fargo's assessments from the other major lending

2  institutions.

3      18.   Confidential informants with knowledge of Wells Fargo's recent

4  lending operations also specify just how heavily Wells Fargo relied on its

5  systematically racist algorithmic underwriting decisions and increasing lack of an

6  individualized human element in Wells Fargo's process.  As but one example, Wells

7  Fargo loan processors supposedly responsible for shepherding applications through

8  the bank's systems—typically expected to process 30 applications per month but

9  forced by Wells Fargo's CORE platform to process more than 50 and sometimes

10  nearly 100 per month—were rendered powerless to supervise the process, override

11  the algorithm, or otherwise intervene on the side of basic compliance with the fair

12  housing laws.

13      19.   Some of these same confidential informants have further confirmed

14  that, over and over during the COVID-19 pandemic and afterwards, they referred

15  denied Black homeowner applicants to competitor financial institutions that swiftly

16  approved the applications and asked, because the applications should have resulted

17  in "easy approvals" for Wells Fargo, how Wells Fargo could have denied them.

18      20.   Wells Fargo propounds its discriminatory treatment of Black

19  homeowners by incorporating, without adjustment, appraisals that have been shaped

20  by years of race-based valuation standards or appraisals that are based on race-based

21  criteria that have markedly affected Black homeowners into its analysis.  Homes in

22  majority Black neighborhoods are worth an average of 23% less than homes in

23  neighborhoods with "very few or no Black residents" and similar home quality.[19]

24

25  _____

[19] https://www.brookings.edu/research/devaluation-of-assets-in-black-

26  neighborhoods/?utm_source=newsletter&utm_medium=email&utm_campaign=sen

27  dto_newslettertest_business&stream=top#_ga=2.213288596.1000901909.16495538

87-1080662765.1648140872.

28

The disparities in home appraisals leave Black homeowners at a disadvantage where below market home appraisals limit refinancing options.

21.     In September 2021, the Federal Home Loan Mortgage Corporation released the results of a five-year study based on more than 12 million appraisals.[20] The study found that "Appraisers' opinions of value are more likely to fall below the contract price in Black and Latino census tracts, and the extent of the gap increases as the percentage of Black or Latino people in the tract increases."[21]  Wells Fargo's practice of engaging in appraisal discrimination has not only led to delays in the application process for Black homeowners but has forced those who received under-market appraisals from Wells Fargo to abandon the process with Wells Fargo and turn elsewhere.

22.     Plaintiffs are the unfortunate victims of Wells Fargo's pervasive misconduct:  Black homeowners from across the country whose applications to refinance their home loans have been systematically delayed or denied because Wells Fargo's CORE algorithm operates to discriminate against them.  Tens of thousands have been victimized by Wells Fargo's intentional, knowing and systematic race discrimination, violating the contractual, commercial and civil rights of Class members and causing millions (and perhaps even billions) of dollars in damages to the Nationwide Class.  Individually and as representatives of the Class (defined below), Plaintiffs bring this action to enjoin the present day redlining by Wells Fargo through its discriminatory practices and to make good to the Class all damages resulting from Defendants' violations of civil rights laws and to restore to the Class any amounts to which they otherwise would have been entitled, together with such other equitable and remedial relief as the Court may deem appropriate.

---

[20] https://www.freddiemac.com/research/insight/20210920-home-appraisals.

[21] *Id.*

2029104

## II.   JURISDICTION AND VENUE

23.   This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332(d), and 1343, because the Plaintiffs assert federal causes of action, because Plaintiffs assert civil rights causes of action, because at least one member of the Class is a citizen of a different state than all Defendants, and because the amount in controversy exceeds $5,000,000.

24.   Personal jurisdiction is appropriate over Defendants because Wells Fargo Bank, N.A. transacts business in the State of California and has its principal place of business in San Francisco, California, Wells Fargo Home Mortgage, Inc. originates loans to California customers from its California offices and maintains a systematic and continuous presence in the State, Wells Fargo & Co. has its corporate headquarters in San Francisco, California.

25.   Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b) because Wells Fargo Bank, N.A. resides in this district, a substantial part of the events or omissions giving rise to the claim occurred in this district, Wells Fargo Bank, N.A.'s principal place of business is in this district, and Wells Fargo & Co. has its corporate headquarters in this district.

## III.   PARTIES

### *Aaron Braxton*

26.   Plaintiff Aaron Braxton, who is a Black homeowner, is a natural person and a citizen of the State of California and resides in Los Angeles, California.

27.   Mr. Braxton is one victim of Wells Fargo's discriminatory policies.  He is a financially successful and eminently creditworthy Black playwright, performer, and a math and science teacher with a Master's degree from the University of Southern California.[22]  He has authored several award-winning plays, including *DID*

---

[22] https://www.imdb.com/name/nm1347914/bio?ref_=nm_ov_bio_sm.

*YOU DO YOUR HOMEWORK?*, which broke the Beverly Hills Playhouse's record for longest running play (nine months).[23]  He has also written several films and television pilots, and acted in several film, television, and theatre projects.[24]

28.     In addition, for two decades, Mr. Braxton was a Wells Fargo mortgage customer.  He purchased his home in 2000, in a historically Black neighborhood located in South Los Angeles near the campus of the University of Southern California, and secured his property with a Wells Fargo home mortgage insured by the Federal Housing Administration (FHA).  Mr. Braxton always made his mortgage payments and bills on time, and he had a good credit score.

29.     Yet despite his successful career and his creditworthiness, when Mr. Braxton sought to refinance his home mortgage loans in August of 2019, Wells Fargo consistently obstructed his ability to refinance his loans.  Despite favorable loan-to-value metrics and his personal history with the institution, Wells Fargo was focused more on his race and the location of his home within a historically Black Los Angeles neighborhood, and used the fact of his race and the location of his home to delay, obstruct and deny him the full benefits of historically low home mortgage interest rates.  Wells Fargo did this even though, having paid his loans for more than 18 years, Mr. Braxton had equity in his home far greater than the amount remaining on his FHA-secured loan.

30.     Mr. Braxton was given the runaround to such an extent that it took him over nine months to refinance his federally backed mortgage loan (and 12 months to refinance his home equity loan) at an above-market interest rate of around 4%.  This was after various Wells Fargo representatives kept telling him they lost his paperwork, made incomplete inquiries and needed to request more information, delayed their responses, and even placed him into an unsolicited debt-trap deferred

---

[23] *Id.*

[24] *Id.*

payment program without his permission.  It was only after Mr. Braxton notified the Department of Housing and Urban Development ("HUD") that Wells Fargo approved the refinancing of his federally backed FHA loans (indeed, Wells Fargo approved the application the very next day).  Of course, for the prolonged period that Mr. Braxton was waiting for Wells Fargo to refinance his loans, he was paying the higher rates associated with his original loans.

*Gia Gray*

31.     Plaintiff Gia Gray, who is a Black homeowner, is a natural person and a citizen of the State of California and resides in Danville, California.

32.     Mrs. Gray is another victim of Wells Fargo's discriminatory policies. Mrs. Gray is a physician, as is her husband.  Both are employed and both, individually, are in the top quintile of income earners.  The same was true when they applied to refinance their loans with Wells Fargo.  Mrs. Gray's FICO score is above 800.

33.     The Grays own three homes.  Their primary residence is in Danville, California, a predominately White area.  The couple also own income properties in Stockton, California and Chicago, Illinois that are more diverse areas.  The couple had Wells Fargo mortgages for their three homes, and, save for a balance of approximately $1,000 on a credit card, the couple has and had no other debt.  The couple never missed a mortgage payment and always paid on time.  They began the refinancing process for their homes in February 2020.

34.     The Grays were only able to refinance the Danville, California property—in the predominately White area—after four months.  Their loan officer was located in Walnut Creek, California, another predominately White area, and he actually took time out of his day to visit their multimillion-dollar home in Danville in-person to sign refinancing documentation.  Even still, Wells Fargo kept asking the Grays to provide additional information, and even contacted the Human Resources department at Mrs. Gray's office.

2029104

35.     The Grays were not as lucky on their two other income properties.  The loan officer would try to steer Mrs. Gray away from these properties and only expressed an interest in refinancing her Danville, California property.  Wells Fargo eventually switched the couple's Walnut Creek loan officer to a Black assistant to handle these properties.  Wells Fargo would not return their calls for inquiries on refinancing these two properties.  When the couple did manage to get a hold of the assistant or loan officer, they were told that the Stockton, California property was in a bad area, and that the Chicago, Illinois property, although in a good area, was high risk, and that Wells Fargo was not looking to refinance high-risk areas.  Frustrated by Wells Fargo's ambivalence and inaction, the couple gave up on refinancing these properties in December 2020, nearly a year after they started.

### *Bryan Brown*

36.     Plaintiff Bryan Brown, who is a Black homeowner, is a natural person and a citizen of the State of Connecticut and resides in Bristol, Connecticut.

37.     Mr. Brown is another victim of Wells Fargo's discriminatory policies.  For the past two decades, Mr. Brown has been a CAD designer at a prominent engineering company in Connecticut, and has invested in residential properties in Bristol and Plymouth, Connecticut.

38.     Mr. Brown is a long-time Wells Fargo mortgage customer.  Having purchased his multi-unit home in December 2010 with a Wells Fargo home mortgage, he has always made his mortgage payments, paid his bills on time, and maintained a good credit score.

39.     In October 2020, Mr. Brown sought to refinance his loan to convert his conventional 30-year loan to a 15-year fixed mortgage and to obtain a lower interest rate.

40.     Despite his investment properties, longstanding employment, and creditworthiness, when Mr. Brown sought to refinance his home mortgage, Wells Fargo subjected him to long periods of nonresponsiveness, arbitrary requests for

additional documents, and multiple calls to his employer requesting verification of his employment.  Despite favorable loan-to-value metrics and his personal history with the institution, Wells Fargo denied Mr. Brown's application to refinance after a four-month runaround.  Wells Fargo did this even though, having paid his loan for more than ten years, Mr. Brown had equity in his home that was almost equal to the amount remaining on his loan.

41.     To this day, Mr. Brown's interest rate remains at 4.75%.

*Paul Martin*

42.     Plaintiff Paul Martin, who is a Black homeowner, is a natural person and a citizen of the State of California and resides in Los Angeles, California.

43.     Mr. Martin has been a Hollywood entertainment executive at Sony Pictures for 14 years.  In 2020, Paul Martin sought to refinance his home in the Ladera Heights neighborhood of Los Angeles, which has a higher proportion of affluent Black residents than most Los Angeles neighborhoods.  His multimillion-dollar home was previously owned by WNBA superstar Lisa Leslie and NBA player Aaron Afflalo.

44.     But Wells Fargo refused to refinance Mr. Martin's loan.  The bank would not refinance his home unless he could get it appraised for $2 million.  Wells Fargo's appraiser refused to come inside Mr. Martin's home, and appraised it at just shy of $2 million based on comparisons with homes in less affluent Black-populated neighborhoods, apparently conflating all areas with a high concentration of Black residents.  Mr. Martin went to another lender, who appraised the home at $2.4 million and promptly refinanced his loan.

*Wells Fargo Entities*

45.     Defendant Wells Fargo Bank, N.A. is a nationally chartered bank with its principal place of business located in San Francisco, California, and is chartered in Wilmington, Delaware.  It has 19,234 employees across all its locations, including several in the Northern District of California, and generates nearly $70

billion in sales annually.

46.     Defendant Wells Fargo Home Mortgage, Inc. is a home lending company that is part of the "Wells Fargo banking family."  It operates about 725 mortgage stores nationally and originates and services one-to-four-family residential first and junior-lien mortgages and home equity loans.  On average, it originates approximately $300 billion worth of loans per year.  It is incorporated in the State of Delaware, and has its principal place of business in Des Moines, Iowa.  Wells Fargo Home Mortgage, Inc. originates loans to California customers from its California office locations.

47.     Defendant Wells Fargo & Co. is a nationwide, diversified financial holding company and bank holding company incorporated in the State of Delaware with its principal place of business in San Francisco, California.  Wells Fargo provides banking, insurance, investment, and mortgage and consumer finance services through storefronts, the Internet, and other distribution channels across the United States and internationally.  It is the parent company of Wells Fargo Bank, N.A.

## IV.   FACTUAL ALLEGATIONS

**A.     The History of Discrimination in Housing**

48.     This country has an unfortunate history of discrimination, and housing discrimination has always been a large part of this historical discrimination.

49.     In 1924, the National Association of Realtors Code of Ethics mandated that a realtor should "never be instrumental in introducing into a neighborhood members of any race whose presence will be clearly detrimental to any property values in the neighborhood."[25]  In other words, realtors were instructed that it was an ethical infraction to integrate neighborhoods.

---

[25] https://sf.curbed.com/2020/4/29/21240456/moms-4-housing-oakland-house-history.

2029104

50.     Pursuant to this policy and so many others like it, realtors and developers would routinely designate specific properties to White Americans while reserving properties in other areas for minority Americans.  These designations would be found in rules, restrictions, and covenants attached to the properties.

51.     Legislation introduced during the New Deal purporting to help homeowners nationwide, in fact, codified racism into housing.  The Home Owners' Loan Corporation and the Federal Housing Administration graded residential areas from A-D, with A being the most likely to receive federal loan insurance, and D the least.  Areas with "Colored" and "Oriental" people were automatically given D ratings.[26]

52.     Federal Housing Administration underwriting manuals issued in 1938 sought to present the "infiltration of inharmonious racial groups" and directed underwriters to refuse to insure mortgages that would lead to "a change in social or racial occupancy."[27]

53.     As observed above, California has long perpetuated these discriminatory practices.  In Los Angeles, which was a leader in the nation's discriminatory segregation, a Black American in 1917 said "we were encircled by invisible walls of steel.  The whites surrounded us and made it impossible for us to go beyond these walls."[28]  In this era, Black Americans were excluded from living in 95% of the houses in Los Angeles.[29]

---

[26] *Id.*

[27] https://sf.curbed.com/2020/4/29/21240456/moms-4-housing-oakland-house-history.

[28] https://www.latimes.com/opinion/story/2021-09-10/racial-covenants-los-angeles-pioneered.

[29] *Id.*

2029104

54.     In Oakland, racialized zoning and restrictive covenants directed 80% of the city's Black population to West Oakland following World War II.[30]  Redlining made it impossible for these residents to obtain loans to improve their properties. Instead of helping, the city eventually, in the 1960s, razed large swaths of West Oakland, purportedly to build new homes, but the replacement projects languished and most residents were simply forced from their homes with nowhere to go.[31]

55.     Similarly, in the San Francisco area, homes from the 1930s included in title reports restrictions that "no person of any other race other than the Caucasian or white race" may own or occupy the property, except for "domestic servants of a different race domiciled with the homeowner or tenant."[32]  Similar provisions would often prohibit residents of "African, Mongolian, or Japanese" descent.[33]

56.     When a Black American would obtain one of these properties despite the clauses, White neighbors would sue, and the courts would force the Black Americans to leave their properties, cementing the discrimination.[34]  Indeed, the California Supreme Court specifically held in 1919 that Black Americans could own houses with restrictive clauses, they just could not reside there.[35]  While the states no longer enforce these covenants, they still charge a fee to homeowners wishing to

---

[30] https://sf.curbed.com/2020/4/29/21240456/moms-4-housing-oakland-house-history.

[31] *Id.*

[32] https://www.mercurynews.com/2019/02/26/for-whites-only-shocking-language-found-in-property-docs-throughout-bay-area/.

[33] *Id.*

[34] *Id.*

[35] https://www.latimes.com/opinion/story/2021-09-10/racial-covenants-los-angeles-pioneered.

2029104

1  strike them from their property records.[36]

2  57.    Even after the Civil Rights Act was passed, California adopted

3  Proposition 14, allowing for continued discrimination under the guise of freedom.

4  The proposition was ruled unconstitutional, but the state's residents had made clear

5  their position on discrimination in housing.[37]

6  58.    The pervasive discrimination against Black homeowners and those

7  wishing to become homeowners sadly persists to this day, and Wells Fargo's

8  treatment of Black homeowners seeking refinancing during the refinance boom that

9  took place over the last few years is just the latest attack on these long-maligned

10  citizens of this country.

11  **B.    Wells Fargo Has an Established History of Discrimination**

12  59.    Wells Fargo's discriminatory behavior described herein is completely

13  in line with Wells Fargo's history of discrimination in lending.  Indeed, the genesis

14  of its latest discriminatory practices seems to have followed the end of the policies it

15  put in place after an earlier series of lawsuits.

16  60.    In 2012, Wells Fargo agreed to pay $184 million to settle claims with

17  the Department of Justice that the bank pushed Black and Hispanic homeowners to

18  obtain subprime mortgages and then charged them higher fees and interest rates.[38]

19  61.    In 2015, the City of Oakland filed suit against Wells Fargo over its

20  racially discriminatory banking practices in seeking to originate mortgage loans on

21  predatory terms in minority neighbors and then its "subsequent [refusal] to extend

22  credit to minority borrowers seeking to refinance previously issued unnecessarily

---

[36] https://www.mercurynews.com/2019/02/26/for-whites-only-shocking-language-found-in-property-docs-throughout-bay-area/.

[37] *Id.*

[38] https://www.justice.gov/opa/pr/justice-department-reaches-settlement-wells-fargo-resulting-more-175-million-relief.

2029104

expensive loans."[39]  And "when a minority borrower who previously received a predatory loan sought to refinance the loan," they "discover[ed] that Wells Fargo refused to extend credit at all, or on equal terms as refinancing similar loans issued to [W]hite borrowers."[40]  Even when refinancing applications were approved, the loans turned from a "fixed-rate loan into an adjustable-rate loan that the lender knows the borrower cannot afford should interest rates rise… the likely result of such practices is to cause homeowners who are otherwise…comfortably making payments on a modest existing mortgage, to be unable to make payment on a new, unaffordable loan."[41]

62.    The City of Oakland also performed a decade-long regression analysis of Wells Fargo loans in Oakland, which controlled for objective variables like "credit history, loan to value ratio, and the ratio of loan amount to income."  The City of Oakland found that, controlling for these factors, "an African-American borrower is 2.583 times more likely to result in foreclosure than a more favorable and less expensive loan issued to a [W]hite borrower in Oakland."[42]  This corroborated other national studies which found that Black American borrowers were "124% more likely to receive a subprime refinance loan" than their White counterparts.[43]

63.    Moreover, the City of Oakland alleged that Wells Fargo employed systematic policies like "giving loan officers and others responsible for mortgage

---

[39] *City of Oakland v. Wells Fargo Bank, N.A.*, 3:15-cv-04321, Dkt. No. 1, at 2 (N.D. Cal. Sept. 21, 2015).

[40] *Id*. at 4.

[41] *Id*. at 20.

[42] *Id*. at 20-21.

[43] *Id*. at 15.

lending large financial incentives to issue loans to African-Americans and Hispanics that are costlier than better loans for which they qualify" and "failing to monitor" for racial disparities after "Wells Fargo had notice of widespread product placement disparities based on race and national origin."[44]  Wells Fargo also systematically "fail[ed] to underwrite loans based on traditional underwriting criteria such as debt-to-income ratio, loan-to-value ratio, FICO score, and work history."[45]  This led District Judge Edward M. Chen to conclude that "Oakland has identified specific employment practices in addition to the mere delegation of discretion."[46]

64.     The practices leading to the 2012 and 2015 suits against Wells Fargo included manual revisions to applications to reverse redline applicants who would have been classified in a more risky area.  For a time, these practices receded, and Wells Fargo's refinancing rates to Black homeowners were similar to those of other major lenders.  But by 2020, Wells Fargo's rates plummeted in relation to the approval rates at other banks.

65.     The City of Oakland is not the sole municipality that has sought to hold Wells Fargo to account for its discriminatory conduct.  Cook County (Chicago) brought suit alleging predatory lending practices to strip minority homeowners of the equity from their homes.[47]  "Publicly available loan origination data indicates that the percentage of high-cost and other nonprime loans issued by Wells Fargo in Cook County to minority borrowers well exceeded the County's percentage of

---

[44] *Id*. at 33.

[45] *Id*. at 9.

[46] *City of Oakland v. Wells Fargo Bank, N.A.*, No. 15-CV-04321-EMC, 2018 WL 3008538, at *15 (N.D. Cal. June 15, 2018), *aff'd in part, rev'd in part on other grounds City of Oakland v. Wells Fargo & Co.,* 14 F.4th 1030 (9th Cir. 2021).

[47] *Cty. of Cook, Illinois v. Wells Fargo & Co*., 14-C-9548-GF (N.D. Ill.).

1  minority home owners—typically by a factor of two to three."[48]  And the

2  disproportionately White employees at Wells Fargo were given "discretion to steer

3  prime-eligible minority borrowers into nonprime loans."[49]  "Wells Fargo subjected

4  minority borrowers to equity stripping to a greater extent than it did nonminority

5  borrowers with similar credit histories."[50]  And "minority borrowers were

6  particularly susceptible to Wells Fargo's predatory practices because they were

7  more likely than nonminority borrowers to lack access to low-cost credit,

8  relationships with banks and other traditional depository institutions, and adequate

9  comparative financial information."[51]

10      66.    In 2019, Wells Fargo settled a lawsuit with the City of Philadelphia

11  premised on allegations that it purposefully made it difficult for minorities to

12  refinance their mortgages.[52]  The court in that case identified seven Wells Fargo

13  policies that contributed to the discrimination against minorities:  (1) knowing about

14  lending practices that either created high risk and higher cost loans to minorities

15  compared to comparably credit situated White borrowers or failing to adequately

16  monitor the Bank's practices regarding mortgage loans, including but not limited to

17  originations, marketing, sales, and risk management; (2) failing to underwrite loans

18  based on traditional underwriting criteria such as debt-to-income ratio, loan-to-value

19  ratio, FICO score, and work history; (3) failing to prudently underwrite hybrid

20  adjustable-rate mortgages ("ARMs"), such as 2/28s and 3/27s; (4) failing to

21  prudently underwrite refinance loans, where borrowers substitute unaffordable

22

23  [48] *Cty. of Cook, Illinois v. Wells Fargo & Co.*, 314 F. Supp. 3d 975, 980 (N.D. Ill. 2018).

24  [49] *Id.*

25  [50] *Id.*

26  [51] *Id.*

27

28  [52] https://www.phila.gov/2019-12-16-city-of-philadelphia-and-wells-fargo-resolve-litigation/.

1   mortgage loans for existing mortgages that they are well-suited for and that allow

2   them to build equity; (5) failing to monitor and implement necessary procedures

3   within Wells Fargo's Internal Audit, Corporate Risk, Human Resources, Law

4   Department, and Board of Directors throughout the Community Banking segment,

5   which includes Wells Fargo's retail mortgage banking business responsible for the

6   unlawful activities set forth herein, to ensure compliance with federal fair lending

7   laws; (6) failing to abide by the terms of Wells Fargo's Vision & Values, which

8   purportedly guides Defendants' business practices and relationships with customers;

9   and (7) failing to ensure that Wells Fargo's decentralized organizational structure

10  was capable of properly monitoring mortgage lending activities within Community

11  Banking.

12          67.     Wells Fargo's pervasive discrimination is not limited to housing.  In

13  August 2020, the company entered into a conciliation agreement with the U.S.

14  Department of Labor and paid $7,800,000 over allegations of racist hiring practices.

15  The Department of Labor under the Trump administration found that the company

16  "discriminated against 34,193 African American applicants for banking, customer

17  sales and service, and administrative support positions at U.S. locations

18  nationwide."[53]

19  **C.      The Refinancing Boom**

20          68.     During the last few years, interest rates were near an all-time low in the

21  United States, and homeowners who held mortgage loans at higher rates (meaning a

22  great deal of homeowners) sought to refinance their loans at lower rates.

23  Refinancing during this time allowed homeowners to significantly reduce their

24  monthly payments and to owe less mortgage interest over the life of the loan.  Over

25  the last two years, homeowners in the United States refinanced over $5 trillion

---

[53] https://www.dol.gov/newsroom/releases/ofccp/ofccp20200824.

2029104

Case No. 4:22-cv-01748-KAW

FIRST AMENDED CLASS ACTION COMPLAINT

worth of mortgages.

69.     In 2020, the prevailing market interest rates on mortgages "fell below 3% for the first time"[54] since it began being surveyed in 1970.[55]  And a study by the Federal Reserve Banks of Boston, Atlanta, and Philadelphia found these unprecedented low rates "spurred a boom in refinances" that was distributed unequally.[56]  Although "Black and [W]hite borrowers were about equally likely to refinance before the pandemic, [] Black borrowers were 40 less likely than [W]hite borrowers to refinance after the pandemic started and interest rates dropped."[57]  All told, only 6% of Black borrowers refinanced during the COVID-19 pandemic, compared to 12% of White borrowers.[58]  With respect to Wells Fargo, that disparity does not result from a lack of interest in refinancing by Black homeowners; it results from disparate and discriminatory treatment by Wells Fargo that blocked Black homeowners from engaging in the process.

**D.     Wells Fargo's COVID-19 Era Refinancing Application Process**

Part 1: Gathering of Key Geographic, Financial and Demographic Data and Submission of Form 1003 Through "Blend"

70.     Refinancing is necessarily a simpler process than obtaining an initial home loan.  Homeowners who have made their payments on time and who seek to refinance already own the necessary collateral and have already been approved for a

---

[54] *Racial Differences in Mortgage Refinancing, Distress, and Housing Wealth Accumulation during COVID-19*, Kristopher Gerardi, Lauren Lambie-Hanson, and Paul Willen, available at https://www.bostonfed.org/-/media/Documents/Workingpapers/PDF/2021/cpp20210622.pdf.

[55] *Id*. at 1.

[56] *Id*.

[57] *Id*. at 2.

[58] *Id*.

home loan.  In addition, if the borrower is refinancing with the same bank that holds the original mortgage, that bank has access to detailed information about a borrower's payment history and, in many cases, will be evaluating that borrower's ability to make an even *lower* monthly payment than what was already being made. Determining whether to refinance, thus, is a less involved process than determining whether to issue a mortgage, or at least it should be.

71.     On November 27, 2017, as part of its explicit policy to "leverage the ideas in Silicon Valley and beyond" in mortgage underwriting, then-Wells Fargo CEO Tim Sloan announced its partnership with San Francisco startup Blend Labs to develop a new online mortgage application and related tools.

72.     During the COVID-19 era, Wells Fargo's idea of "leverag[ing] the ideas in Silicon Valley" involved, first, obtaining a prospective refinance applicant's personal information, including name, phone number, email address, and the last four digits of the prospective applicant's Social Security number.  Applicants are, thus, required to have and utilize email to participate in the process, including checking Wells Fargo's loan tracker system for updates and requests for additional information.  When, during the pandemic, visiting loan officers in person became infeasible, applicants without technical sophistication were disadvantaged.

73.     At this preliminary stage, Wells Fargo's algorithm obtains the first data points that are subsequently utilized in its discriminatory refinance decisions: names, phone numbers (including area codes), email addresses and Social Security numbers that can then be tied to other data and used in other formulae within Wells Fargo's systems.

74.     Next, Wells Fargo sends the applicant, via electronic mail, a dedicated link through Blend, the digital banking platform developed by Wells Fargo in conjunction with Blend Labs.  That link enables the applicant to complete a Uniform Residential Loan Application (Form 1003) and submit that application to Wells Fargo.

2029104

75.     It is here that Wells Fargo collects more information for its lending algorithm to use:  the information collected on this form includes the borrower's name, alternate names, Social Security number, date of birth, citizenship status, names of borrowers, marital status, number and ages of dependents, home, mobile and work phone numbers, the subject property address, property value, status of property, intended occupancy and monthly expenses, former addresses, mailing addresses, employment information, income information, asset information, liabilities and expenses, and military service.

76.     Next, a Wells Fargo loan officer conducts a follow-up telephone or in-person interview with the refinance applicant to obtain additional information that cannot be submitted online, including the financial acknowledgment form and the Demographic Information Addendum, which specifically asks about ethnicity, race, and gender.

77.     Here, Wells Fargo's process places particular emphasis on race:  the company demands that, to the extent the interview is conducted in person, the loan officer must visually observe the applicant and consider the applicant's surname in an effort to determine the race of the prospective applicant.  Here, too, Wells Fargo's algorithm receives key demographic and financial data that it then utilizes in its lending decisions.

Part 2: Running "Blend" Data Through Automated CORE "Pioneering Underwriting System" Systematically Infected with Racially Infected Algorithms and Overlays

78.     Having obtained all of the geographic, demographic and other data necessary through Blend and the submission of the Form 1003, the Wells Fargo loan originator does the equivalent of pressing "send," submitting the 1003 for decision to Wells Fargo's CORE automated underwriting system.  Confidential informants with knowledge of the operation of these systems recount that after operating as described herein—running both Desktop Underwriter ("DU") and Loan Prospector

("LP") simultaneously—CORE's decision would come back as A1 or A2; which meant that the loan was approved; C1, which meant that the loan had to go through a manual underwriting process; or C2, which meant that the applicant was deemed "not loanable" and denied.  During the COVID-19 era, Black refinance applicants were systematically slotted by CORE into C1 and C2 categories.

79.    The idea of something that operates generally like CORE is, of course, nothing new or nothing unique.  Used properly, automated underwriting systems can quickly use Fannie Mae and Freddie Mac underwriting criteria to evaluate the risk profile of a loan and recommend its approval or denial with respect to race-neutral criteria to human underwriters and loan processors who can, on average, comfortably handle 30 files per month, who are specially trained in the bank's fair lending compliance programs and procedures, and who can ensure that the guidelines and mechanics of the algorithm are operating in accordance with these requirements.

80.    But the consequences can be immediate and pernicious when CORE-like systems are not properly used or supervised by employees with training in fair lending practices.  The director of the Consumer Financial Protection Bureau ("CFPB") describes these types of banking algorithms as "black boxes behind brick walls."[59]  "When consumers and regulators do not know how decisions are made by the algorithms, consumers are unable to participate in a fair and competitive market free from bias."[60]

81.    Such was indeed the case at Wells Fargo.  As recognized by a group of United States Senators, including the chairman of the Senate Finance Committee,

---

[59] https://www.consumerfinance.gov/about-us/newsroom/remarks-of-director-rohit-chopra-at-a-joint-doj-cfpb-and-occ-press-conference-on-the-trustmark-national-bank-enforcement-action/.

[60] *Id*.

who wanted to investigate the bank for "potentially illegal discrimination" and demanded the bank produce to the Committee the data and algorithms it uses to evaluate applicants,[61] the operations and impact of Wells Fargo's CORE automated underwriting system are both new and unique in their treatment of Black applicants.

82.     More specifically, confidential informants with knowledge of Wells Fargo's residential mortgage lending operations describe a situation where, around the time that COVID-19 hit, understaffed Wells Fargo underwriting departments made a series of deliberate and intentional choices to centralize lending decisions. These decisions, ostensibly made in order to facilitate work-from-home, took human supervision and fair-lending compliance out of the process.  Seemingly trumpeting the effect of these decisions, Wells Fargo went so far as to make an internal announcement that it would place increasing and undue reliance on machine learning processes in an automated underwriting system.  But that system was increasingly infected with explicit and implicit racial signals (so-called "overlays") that had, as their proximate and likely result, the disparate impact reflected in the statistical analyses set forth in this Amended Complaint during the time periods at issue herein.

83.     These Wells Fargo-specific overlays represent manifestations of the same continuous and unbroken practice of engaging in business policies and practices that create an "artificial, arbitrary, and unnecessary" barrier to fair-housing opportunities for Black home purchasers and owners.

84.     ***Geographic Indicators***.  Among the overlays utilized by Wells Fargo's COVID-19 era CORE automated underwriting processes are geographic indicators, the effect of which is modern-day redlining.  Borrowers seeking to refinance

---

[61] *Wells Fargo Pressed by Senators on Race Disparity in Refinancing*, Yahoo! Finance, accessible at: https://finance.yahoo.com/news/wells-fargo-pressed-senators-race-171439115.html.

property in Black-majority neighborhoods are deemed by the algorithm to be more of a lending risk than similarly situated White borrowers seeking to refinance property in non-Black-majority neighborhoods.  Wells Fargo's algorithm effectuates this racial signaling by comparing address data provided in the borrower's Form 1003 to low and moderate income census tract data within Wells Fargo's internal systems, and identifying borrowers with property in Black-majority neighborhoods as more of a lending risk than borrowers with property in White-majority neighborhoods.  None of this is required by legitimate, race-neutral underwriting criteria, let alone criteria approved by Fannie Mae and Freddie Mac.

85. ***Post-Close Liquidity Requirements***.  Another overlay utilized by Wells Fargo's CORE underwriting system is a 50% increase in Wells Fargo's requirements for post-close liquidity and severe restrictions on the sources of that liquidity.  Before March 2020—and consistent with Fannie Mae and Freddie Mac underwriting guidelines—Wells Fargo generally required borrowers to be able to show 12 months of post-close reserves in order to close their loans.  When COVID-19 hit, however, Wells Fargo programmed its system to only approve borrowers who could show 18 months of post-close liquidity for W-2 wage earners, and 24 months for self-employed K-1 borrowers.  Wells Fargo further changed the definition of post-close liquidity to allow only 50% of the post-close liquidity to come from retirement accounts, often the greatest source of liquidity for borrowers.

86. Not only was this huge increase not required by legitimate, race-neutral underwriting criteria, it was a change that Wells Fargo knew would effectuate a racially disparate impact.  An April 2020 JP Morgan Chase Institute report found that for every dollar in liquid assets held by White Americans, Black Americans held 32 cents.[62]  On average, while Black families have $2,000 or less in liquid

---

[62] https://www.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/institute/pdf/institute-race-report.pdf.

1    savings, the typical White family has more than four times that amount.[63]

2        87.    ***Demographic Indicators***.  A further criteria utilized by Wells Fargo is,

3    indeed, race itself.  For example, employees responsible for the programming of

4    Wells Fargo's automated underwriting processes describe the system's use of

5    Bayesian Improved Surname Geocoding ("BISG"),[64] a method that applies Bayes'

6    Rule to predict the race or ethnicity of an individual utilizing the individual's

7    surname and geocoded location.  This process, which necessitates an internal

8    determination by the CORE algorithm of which neighborhoods are associated with

9    which racial group, works as follows:[65]

10       (i)       first, by calculating the prior probability of an individual – $i$ –

11   being of a certain racial group $r$ given their surname:

12   $$Pr(R_i = r | S_i = s)$$

13       (ii)      next, by updating that probability with the probability of the

14   individual $i$ living in a geographic location $g$ that is associated with a

15   particular racial group $r$:

16   $$Pr(G_i = g | R_i = r)$$

17       (iii)     and finally, by using Bayes' Theorem to determine the

18   probability that a particular borrower actually belongs to a particular racial or

19   ethnic group.

20
21   $$Pr(R_i = r | S_i = s, G_i = g) = \frac{Pr(G_i = g | R_i = r) Pr(R_i = r | S_i = s)}{\sum_{i=1}^{n} Pr(G_i = g | R_i = r) Pr(R_i = r | S_i = s)}$$

22       88.    By utilizing BISG processes in its automated underwriting processes,

23   Wells Fargo's formulae utilize demographic criteria, including race, "imputed from

24
25   ───────────────

     [63] *Id.*

26   [64] https://ww2.amstat.org/meetings/sdss/2020/onlineprogram/ViewPresentation.
27   cfm?file=309619.pdf.

28   [65] https://cran.r-project.org/web/packages/eiCompare/vignettes/bisg.html.

databases of names and addresses" using processes like Bayesian Improved Surname Geocoding that associate neighborhoods with races to supplement Form 1003's race disclosures and assist in the overall racial assessment that allows the algorithm, improperly, to rely on race in the risk determination process.

89.     ***Uncorrected and Racially Biased Appraisals***.  Wells Fargo also considers uncorrected historical and current appraisal data from geographically differentiated locations in its refinance evaluation process.  Race-stratified differentials in appraisal data are well known to Wells Fargo and others in the banking industry.  Indeed, according to a March 23, 2022 report in *The Washington Post* citing Brookings Institution data, "homes in Black neighborhoods" (which, as already discussed, CORE identifies) routinely appraise at "23 percent less, on average, than those in comparable White neighborhoods – despite having similar neighborhood and property characteristics and amenities."[66]  Freddie Mac has similarly "found that 12.5 percent of appraisals for home purchases in Black neighborhoods and 15.4 percent in Latino neighborhoods came in below the contract price, compared with 7.4 percent of appraisals in White neighborhoods,"[67] due in part to the well-known and systematic failure of appraisers to choose comparisons sales in an appropriately broad geographic range for properties located in Black and Latino neighborhoods.[68]  Failure to correct for this longstanding disparity within automated underwriting systems will automatically and systematically skew the loan-to-value calculations against Black homeowners, making their loans look like riskier bets than they actually are for the banks.

90.     Wells Fargo's automated underwriting system does not correct

---

[66] https://www.washingtonpost.com/business/2022/03/23/home-appraisal-racial-bias/.

[67] *Id.*

[68] *Id.*

2029104

appropriately for these racial disparities in appraisals, instead placing undue reliance on an uncorrected data point that systematically undervalues properties in neighborhoods populated by Black homeowners.  Wells Fargo's failure to correct for this well-known disparity is not required by any legitimate underwriting criteria.

91.  ***Unjustified Increased FICO Requirements***.  A further COVID-19 era algorithmic overlay utilized by the Wells Fargo CORE system is increased credit score requirements.  According to a confidential informant, Wells Fargo imposed a higher minimum credit score than that required for an FHA loan or a Fannie Mae-backed loan.  According to the confidential informant, if Fannie Mae required a minimum credit score of 600, Wells Fargo would require a minimum score of 620, meaning CORE automatically rejected anyone with a credit score below 620.  The racial impact of this change, which was not justified by legitimate underwriting criteria, is clear:  in February 2021, it was reported that one in five Black consumers have FICO scores below 620; meanwhile one out of every 19 White consumers are in the sub-620 category.[69]

92.  A study done by the Board of Governors of the Federal Reserve System analyzing federal mortgage data identified no "evidence [a]s to whether these tighter standards reduce loan risk to justify the disparate impact on minority denials they are associated with."[70]  And after controlling for relevant underwriting factors (debt-to-income ratios, loan-to-value ratios, credit scores, etc.) the study found that "[l]enders who impose the strictest standards on their [W]hite applicants [like Wells

---

[69] https://www.forbes.com/advisor/credit-cards/from-inherent-racial-bias-to-incorrect-data-the-problems-with-current-credit-scoring-models/.

[70] *How Much Does Racial Bias Affect Mortgage Lending? Evidence from Human and Algorithmic Credit Decisions*, Neil Bhutta, Aurel Hizmo, and Daniel Ringo (July 2021), at 12, n.20, available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3887663.

Fargo] tend to have the largest unexplained excess denials of minority applicants," including Black applicants.[71]

93.     In 2021, six Wells Fargo employees and officers with doctorate degrees published a study warning about the dangers of banking algorithms used by Wells Fargo and its peers.  The study was published on arXiv, an open-access archive of scholarly articles in the fields of computer science, quantitative finance, statistics, and economics, among others, which is operated by Cornell University.[72]

94.     The authors of the study noted that "despite 'years of intense scrutiny, lending discrimination still persist[s]'" and that the arrival of flexible and automated AI/ML [artificial intelligence/machine learning] algorithms and "the availability of alternative sources of data are… exacerbating" this discrimination.[73]

95.     The potential sources of bias and discrimination are multifold. According to the study, historical data can often be skewed against specific groups, particularly where there is limited information on protected groups.[74]  Moreover, biases in historical data can be exacerbated with the use of machine learning because algorithms, which automate feature engineering, can ignore the presence of surrogate variables for protected attributes.[75]

96.     Bias can also be present in alternate sources of data, which can be harvested from the worldwide web, social media, and blogs.  Often, one's digital

---

[71] *Id*. at 12.

[72] https://arxiv.org/.

[73] *Bias, Fairness, and Accountability with AI and ML Algorithms*, Nengfeng Zhou, Zach Zhang, Vijayan N. Nair, Harsh Singhal, Jie Chen, and Agus Sudjianto, Corporate Model Risk, Wells Fargo (May 6, 2021), available at: https://arxiv.org/ftp/arxiv/papers/2105/2105.06558.pdf, at page 4.

[74] *Id.* at 5.

[75] *Id*.

footprint has strong predictive performance in credit scoring, but these "predictors are highly correlated with socio-economic variables that are surrogates for protected groups."[76]  "[T]hese variables are highly related to protected classes, and the availability of such seemingly innocuous information, combined with flexible 'data snooping' ML algorithms, can easily lead to 'proxy discrimination.'"[77]

97.    "Unstructured data, *such as texts, audio, and images*, are increasingly analyzed through AI/ML [artificial intelligence/machine learning] techniques in banking and finance."[78]  Such a "selection process can suffer from 'implicit biases'" because the use of social media data is highly correlated with individuals' race and national origin.  It is easy to envision the invidious nature of this technology.  An algorithm that reviews billions of social media posts will start to associate accounts with more posts with more Black faces as having lower creditworthiness than posts with more lighter-skinned faces.  This same algorithm also analyzes the speech patterns used in the videos, and associate's creditworthiness with "talking white" and speaking fluent English.  The same algorithm deems those who speak in an Urban vernacular, Gullah, or those who learned English as a second language as less creditworthy.  Worse yet, this algorithm learns to judge creditworthiness based on word choice and use of certain slang.  What is more, these algorithms are more prone to perpetuate guilt by association because it is well known that face recognition technologies consistently misidentify Black faces at much higher rates than White faces.[79]  Thus, "[f]airness concerns are heightened when alternative

---

[76] *Id.*

[77] *Id.*

[78] *Id.* at 6.

[79] *Racial Discrimination in Face Recognition Technology*, Alex Najibi, Harvard University Graduate School of Arts and Sciences (October 24, 2020), available at: https://sitn.hms.harvard.edu/flash/2020/racial-discrimination-in-face-recognition-

2029104

sources of data, such as ***social-media data, information on biometrics, speech or language***, are used because it is not easy to scrub the data of ***demographic proxies***."[80]

98.     In addition to data bias, the automated nature of machine learning algorithms "miss[es] the potential for correlated surrogate variables causing proxy discrimination."[81]  "Data bias together with poor optimization of algorithms can cause severe harm to protected groups."[82]

99.     Notably, the study concludes that the use of "black-box algorithms that are not well-understood" have "potential for serious harm" in the consumer lending space, and the models "must be continually monitored for disparate impact testing."[83]  A "[s]eparate fair lending group conducts periodic backtesting and trend analysis to validate that credit underwriting systems do not discriminate against applicants on a prohibited basis."[84]

**E.     Wells Fargo's COVID-19 Era Understaffing and Failure to Correct for Discriminatory Automated Lending Decisions**

100.   Wells Fargo is no doubt well aware that properly functioning banks, including its competitors, correct for biases within automated underwriting processes by employing trained underwriters and fair lending teams that are supposed to act as a backstop against the racially pernicious consequences that arise

---

technology/.

[80] *Id*. at 13.

[81] *Id*. at 6.

[82] *Id*. at 7.

[83] *Id*. at 13.

[84] https://ww2.amstat.org/meetings/sdss/2020/onlineprogram/ViewPresentation.cfm?file=309619.pdf.

from the unrestrained functioning of automated processes that, left unchecked, can systematically identify Black borrowers as undue credit risks.

101.   Such was not the case at Wells Fargo.  Confidential informants with knowledge of Wells Fargo's refinance practices in recent years describe a system where Wells Fargo made a business decision to centralize and emphasize automated processes at the expense of individualized lending decisions.  They explain that Wells Fargo's loan originators, processors and underwriters were overworked—sometimes handling as many as ***three times*** the normal monthly volume expected of loan processors and underwriters—and systematically disincentivized to "check the work" of the CORE system.  These witnesses also describe changes that were made, such as to remove their ability to make changes within Wells Fargo's automated system, that would result in a greater likelihood of an application being approved.

102.   Given the racially signaled functioning of Wells Fargo's COVID-19 era CORE algorithm, the effect of this was clear:  nobody was available to provide a check on the racially biased lending decisions taking place at Wells Fargo, which resulted in delays, denials and systematic application of higher interest rates to Black borrowers at a rate that far exceeded anything in the industry.

F.   **Wells Fargo's Knowledge of Disparate Impact of Overlays**

103.   Not providing a human check on Wells Fargo's discriminatory lending practices did not, however, mean that Wells Fargo was unaware of the discriminatory impact of its practices.  Quite the contrary:  throughout the relevant time period, confidential informants with knowledge of Wells Fargo's residential lending practices emphasize the extent to which senior Wells Fargo executives were fully aware of the disparate impact of these policies and practices.

104.   These witnesses emphasize that throughout the relevant time period, Wells Fargo generated a "Diversity Market Segments Report" that was distributed companywide via electronic mail distribution on a monthly basis.  Comprised of Wells Fargo's nationwide lending statistics, the report included, among other things,

the racial breakdown of Wells Fargo's lending, the percentage of loans being made in certain locations and by certain originators and offices, whether Wells Fargo met the Community Reinvestment Act[85] requirements, and the percentage of loans that were made to first-time homebuyers.  These reports were reviewed and discussed during monthly regional calls that congratulated employees on their efforts reflected therein.

105.   And yet, despite these monthly reports that provided a real-time exposé of the pernicious significant adverse effect of its overlays on Black applicants, Wells Fargo did nothing.

**G.     Wells Fargo's Algorithm Has a Disparate Impact on Black Homeowners**

106.   The above practices, policies, and procedures are arbitrary and artificial and unnecessary to achieve a valid underwriting interest or legitimate objective.  The vast difference between refinancing approval rates Wells Fargo issued to Black homeowners as compared to any other lending institution's approval rates negates any possible legitimate objective.

107.   As noted, the above practices have a disproportionately adverse effect on Black Americans seeking to refinance their loans.  Black homeowners are members of a protected class.

108.   Wells Fargo's practices directly harmed Black homeowners by forcing them to pay higher interest rates while applications were pending, by forcing them to pay higher interest rates when applications were completed, and/or by denying refinancing applications.  In the absence of these policies, Black homeowners would not have had to pay higher rates or face rejection in their refinancing applications.

109.   The disparity between Wells Fargo's treatment of Black homeowner

---

[85] The Community Reinvestment Act, enacted in 1977, requires the Federal Reserve and other federal banking regulators to encourage financial institutions to help meet the credit needs of the communities in which they do business, including low- and moderate-income neighborhoods.

2029104

applicants and non-Black homeowner applicants is significant and shocking.  As noted, a White American in the lowest income bracket was just as likely to receive refinancing approval as a Black homeowner in the highest income bracket.

110.   Overall, in 2020, 8.4 million homeowners refinanced their mortgage loans to take advantage of historically low interest rates.[86]  White homeowners saved an estimated $3.8 billion in 2020.  In comparison, Black homeowners who make up 9% of all homeowners saved just $198 million, less than 4% of the total savings.[87]

111.   In 2020, using its algorithm, Defendant Wells Fargo approved Black homeowner refinancing applications at a rate lower than that of any other major lender in America.  Wells Fargo was the only major lender in the United States that approved a smaller share of refinancing applications from Black homeowners in 2020 than it had in 2010.[88]

112.   Wells Fargo *denied over 50%* of the Black homeowners seeking to refinance in 2020, and *denied just under 50%* of the Black homeowners seeking to refinance in 2021.  No other major lending institution refused to refinance the homes of Black Americans at such stunning rates.  The numbers tell a shameful story, without any legitimate explanation.  In 2020—at the height of the refinancing boom, when millions of Americans benefitted from the historically low interest rate environment—Wells Fargo approved 47% of all applications by Black homeowners

---

[86] "Data Point 2020: Mortgage Market Activity and Trends," Consumer Financial Protection Bureau, August 2021, pg. 11, available at https://files.consumerfinance.gov/f/documents/cfpb_2020-mortgage-market-activitytrends_report_2021-08.pdf.

[87] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-refinancing/.

[88] *Id.*

2029104

1   (meaning that Wells Fargo rejected the majority of applications from Black

2   homeowners), whereas all other lenders approved 71% of all applications by Black

3   homeowners.[89]  In 2020, no other lending institution rejected a majority of Black

4   homeowners' applications for refinancing.[90]

5          113.   As shown in a recent Bloomberg article by Shawn Donnan, Ann Choi,

6   Hannah Levitt, and Christopher Cannon, data from eight million refinancing

7   applications from 2020 reveal that "the highest-income Black applicants [had] an

8   approval rate about the same as White borrowers in the lowest-income bracket."[91]

9   White refinancing applicants earning between $0 and $63,000 a year were ***more***

10  ***likely*** to have their refinancing application approved by Wells Fargo than Black

11  refinancing applicants earning between $120,000 and $168,000 a year.[92]

12

13

14

15

16

17

18

19

20

21

22

23  _____

24  [89] *Id.*

25  [90] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-
    refinancing/.

26

27  [91] *Id.*

28  [92] *Id.*

2029104



**Higher Income, Same Approval**
Wells Fargo's refinancing approval rates were higher for the lowest-income White applicants in 2020 than for all but the highest-income Black applicants.

Source: Bloomberg analysis of Home Mortgage Disclosure Act data for 8 million completed applications to refinance conventional loans in 2020.

114.   Black applicants with properties in predominately Black counties fared worse.  In Fulton County, where the population was 43.6% African American in 2020,[93] Wells Fargo approved fewer than 43% of refinancing applications completed by Black homeowners, the lowest approval rate among major lenders.[94]

---

[93] https://data.census.gov/cedsci/table?g=0500000US13121&tid=ACSDP5Y2020.DP05.

[94] *Id*.

2029104

1    115.   And even for those Black applicants whose loans were ultimately

2    approved, they faced delays that White applicants living in predominately White

3    neighborhoods did not, causing them damages through continued higher mortgage

4    rates during the unjustified delay as they awaited loan approval.  In some cases,

5    Wells Fargo officers simply told Black applicants living in predominately Black

6    neighborhoods that "perhaps the area is not eligible" for quick evaluations of

7    refinancing applications.[95]  Wells Fargo regularly approved refinancing applications

8    of non-Black homeowners in a matter of weeks, but only approved the applications

9    of Black homeowners after many months (if those Black applicants happened to be

10    approved).

11    116.   And because Wells Fargo designed an application process that is

12    disproportionately difficult for Black homeowners to complete and engages in a

13    practice of "soft denials," where the loan officers leave applicants hanging or

14    encourage them to look elsewhere, 27% of all Black homeowners who began a

15    refinance application with Wells Fargo withdrew it.[96]  Thus, only one-third of the

16    17,702 Black homeowners who sought refinancing were successful.[97]

17    117.   The story in 2021 was the same, with Wells Fargo approving a much

18    lower percentage of Black American applicants than any other lender.[98]  While the

19    number of Black refinance applicants at Wells Fargo nearly doubled in 2021,

20    accounting for 7% of the bank's total refinance applicants and two percent higher

21    than industry averages, Wells Fargo's approval rates for Black borrowers continued

22

23    _____

     [95] *Id.*

24    [96] *Id.*

25    [97] *Id.*

26

27    [98] https://www.bloomberg.com/news/articles/2022-03-25/wells-fargo-faces-
     persistent-racial-gap-in-mortgage-refinancing.

28

to lag behind its major competitors.

118.   Wells Fargo approved only 58% of Black applicants compared to other lenders, which approved 74% of Black applicants.[99]  And the disparity between Black and White refinance approval rates was 21% at Wells Fargo, nearly double the disparity (13%) for all other for other lenders.[100]



**Refinancing Disparities**
Wells Fargo approved fewer Black homeowners' applications in 2021 than other lenders.

Source: Bloomberg analysis of Home Mortgage Disclosure Act data.
Note: Approval rates for completed applications for refinancing conventional, non-jumbo and first-lien mortgages in 2021.

119.   And though Wells Fargo's Black refinancing approval rate improved slightly from 2020, the same was true at all other lenders, due to broader economic conditions.[101]  By comparison, other major lenders approved much higher rates of Black refinancing applicants in 2021: JP Morgan Chase & Co. approved 87% of Black applicants (only 6% less than White applicants), Rocket Mortgage LLC

---

[99] *Id.*

[100] *Id.*

[101] *Id.*

approved 81% of Black applicants (only 7% less than White applicants), and Bank of America Corporation approved 75% of Black applicants (only 11% less than White applicants).[102]

**H.      Plaintiffs and the Class are Harmed by Wells Fargo's Race-Based Discrimination**

120.    The stories of Black Americans whose applications were delayed or denied are legion.

121.    One Black American applicant sought to refinance an $890,000 mortgage in February 2020.  The applicant worked as a dentist and earned approximately $250,000 a year.  The applicant had never missed a mortgage payment and had minimal credit card debt.  The applicant had over $1 million in a Wells Fargo account, and also owned several rental properties with paying tenants.  Nevertheless, over a six-month period, Wells Fargo asked and re-asked for documents.  After the lengthy delay, Wells Fargo denied the application.  The applicant subsequently sought refinancing from a different institution that granted the refinancing over the phone.

122.    Another applicant sought to refinance a loan already held by Wells Fargo, which it had issued two years prior.  The applicant had never missed a payment and had never even been late on a payment.  They held the same job they held when they obtained the mortgage, and their credit score was over 780.  For at least two months, Wells Fargo demanded more and more documents, leading the applicant to complain to his broker's superior.  The applicant had to fax the same documents four or five times, which Wells Fargo claimed to have lost.  Before Wells Fargo decided to deny the loan, the applicant went to another lender, who refinanced the loan in only three or four days.

123.    Yet another applicant waited four months for Wells Fargo to approve

---

[102] *Id.*

their refinancing applications. This applicant is a practicing doctor who owns
multiple investment properties attempting to refinance their primary residence.
During the application process, Wells Fargo repeatedly asked for documents and
repeatedly went silent, refusing to return the applicant's calls.

124.   Plaintiff Aaron Braxton purchased his home in South Los Angeles,
California, near the University of Southern California, in April 2000, through a
Wells Fargo home loan for $139,500 ("First Loan"). This First Loan was insured
through the FHA. In 2005, after the price of the house appreciated, he took out a
second home equity line of credit loan, also from Wells Fargo ("Second Loan"). He
improved upon the property and built an accessory dwelling unit. Today, the home
is worth approximately $800,000, as it was in 2019. In or about August 2019, Mr.
Braxton began the process of applying to refinance his two Wells Fargo loans to
take advantage of reduced interest rates. At the time, he owed $185,000 on both his
Wells Fargo loans and paid a 6% interest rate on both loans, multiple percentage
points higher than the average refinance rate at the time.

125.   When Mr. Braxton initially applied to refinance his First Loan, Wells
Fargo repeatedly asked him to resubmit paperwork because Wells Fargo
representatives claimed the paperwork was either missing or lost. Wells Fargo
representatives also continually took weeks and weeks to issue or reply to
correspondence. Mr. Braxton thereafter began the process of refinancing his Second
Loan and was confronted with the same delays.

126.   Frustrated by the delays and because he was continuing to pay a higher
mortgage rate while his applications were pending, Mr. Braxton regularly contacted
his loan officers and other Wells Fargo personnel to ask about the status of his
applications.

127.   After months of frustrating encounters with Wells Fargo personnel, Mr.
Braxton decided to call HUD. A HUD representative informed Mr. Braxton that
they would be contacting Wells Fargo. The very next day, Wells Fargo approved

the refinancing of Mr. Braxton's federally backed FHA home loan, approximately nine months after he began the process.

128.   Eventually, around October 2020, Wells Fargo finally approved a refinancing of his Second Loan.  However, despite the contact from HUD, which presumably prompted it to act on Mr. Braxton's First Loan, Wells Fargo continued its discrimination through race-based application delays.  It continued to claim that paperwork needed to process the Second Loan was missing, even though Mr. Braxton had already provided the paperwork.  At one point, after having sent a notary to his home to finalize some paperwork, Wells Fargo informed Mr. Braxton that the notary had lost the paperwork, and he needed to complete some forms again.

129.   All told, Mr. Braxton submitted four applications because Wells Fargo kept losing them.  During the 16 months that his applications were pending, Mr. Braxton continued to pay the higher original mortgage rates instead of the lower refinanced rates he was seeking (and ultimately proven entitled to).  However, unbeknownst to Mr. Braxton, in the end the rate he received for his refinancing, while lower than his original rate, was much higher than the fair market rate received by similarly situated non-Black applicants.

130.   Plaintiff Gia Gray is a Black homeowner who resides in Danville, California.

131.   Mrs. Gray is another victim of Wells Fargo's discriminatory policies. Both Mrs. Gray and her husband are physicians.  Both are employed and both, individually, are in the top quintile of income earners.  The same was true when they applied to refinance their loans with Wells Fargo.  Mrs. Gray's FICO score is above 800.

132.   The couple owns three homes.  Their primary residence is in Danville, California—a predominately White area.  The couple also own income properties in Stockton, California, and Chicago, Illinois—more diverse areas.  The couple had Wells Fargo mortgages for all these homes, and, save for a balance of approximately

1   $1,000 on their credit card, the couple has and had no other debt.  The couple never

2   missed a mortgage payment, and they always paid on time.  They began the

3   refinancing process for their homes in February 2020.

4          133.   The couple was only able to finance the Danville, California property—

5   in the predominately White area—after four months.  Their loan officer was located

6   in Walnut Creek, California, another predominately White area, who actually took

7   time out of his day to visit their multimillion-dollar home in Danville in-person to

8   sign refinancing documentation.  Even still, Wells Fargo kept asking them to

9   provide additional information, and even contacted the Human Resources

10  department at Mrs. Gray's office.

11         134.   The couple was not as lucky on their two other income properties.  The

12  loan officer would try to steer Mrs. Gray away from these properties and only

13  expressed an interest in refinancing her Danville, California property.  Wells Fargo

14  eventually switched the couple's Walnut Creek loan officer to a Black assistant to

15  handle these properties.  Wells Fargo would not return their calls for inquiries on

16  refinancing these two properties.  When the couple did manage to get a hold of the

17  assistant or loan officer, they were told that Stockton, California property was in a

18  bad area, and that the Chicago, Illinois property, although in a good area, was high

19  risk, and that Wells Fargo was not looking to refinance high-risk areas.  Frustrated

20  by Wells Fargo's ambivalence and inaction, the couple gave up on refinancing these

21  properties in December 2020, nearly a year after they started.

22         135.   Plaintiff Bryan Brown is a Black homeowner who resides at 18 Elm

23  Street, 3rd Floor, Bristol, Connecticut 06010.

24         136.   Mr. Brown purchased a three-unit, multifamily property in Bristol,

25  Connecticut in December 2010, through a Wells Fargo home loan for approximately

26  $204,000.  Mr. Brown and his family reside in one of the units, and he receives

27  rental income from the other two units.  Today, the property is worth approximately

28  $250,000.

137.   In October 2020, Mr. Brown began the process of applying to refinance his loan to take advantage of reduced interest rates and to convert his conventional 30-year loan to a 15-year fixed mortgage.   At the time, Mr. Brown owed approximately $150,000 and paid a 4.75% interest rate.

138.   When Mr. Brown initially applied to refinance his loan, he submitted financial statements, including but not limited to those relating to his three investment properties.  Frustrated by the delays and because he was continuing to pay a higher mortgage rate while his application was pending, Mr. Brown regularly contacted Wells Fargo personnel to ask about the status of his application.  Rather than provide Mr. Brown an explanation as to the delay, Wells Fargo repeatedly requested that Mr. Brown *resubmit* financial documents and/or provide additional documentation to demonstrate *how* he paid his credit card statements.  Wells Fargo also contacted Mr. Brown's employer on multiple occasions requesting that they verify his employment.

139.   Four months after Mr. Brown submitted his application, in or around January/February 2021, Mr. Brown's application was denied.

140.   Plaintiff Paul Martin is a Black homeowner and resides in Los Angeles, California.

141.   Paul Martin is a 14-year Hollywood entertainment executive at Sony Pictures.  In 2020, Paul Martin sought to refinance his home in the Ladera Heights neighborhood of Los Angeles, California, which has a higher proportion of affluent Blacks.  His multimillion-dollar home was previously owned by WNBA superstar Lisa Leslie and NBA player Aaron Afflalo.

142.   But even Mr. Martin's shot was blocked by Wells Fargo.  The bank would not refinance his home unless he could get it appraised for $2.0 million. Wells Fargo's appraiser refused to come into Mr. Martin's home, and appraised it at just shy of $2.0 million based on comparisons in the neighborhood.  Mr. Martin went to another lender, who appraised the home at $2.4 million and promptly

1  refinanced his loan.

2    143.   Plaintiffs' experiences are emblematic of the experiences of Black

3  Americans all over the country.

4                    **V.    CLASS ALLEGATIONS**

5    144.   Plaintiffs bring this action on behalf of themselves and a potential class

6  of similarly situated Black homeowners.

7    145.   Each and every claim alleged in this case is also alleged on behalf of

8  every member of the Class.

9  **A.    Class Definition**

10    146.   The Class includes all Black homeowners in the United States who,

11  from January 1, 2018 through the present (the "Class Period"), submitted an

12  application to refinance their home mortgage through Defendants that was (i)

13  processed at a rate slower than that of the average processing time of applications

14  made by non-Black applicants; or (ii) whose applications were denied; or (iii) whose

15  resulting refinance loans were made at higher interest rates as compared to similarly

16  situated non-Black applicants.  Excluded from the Class are Defendants and their

17  employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not

18  named in this Complaint, and the United States government.

19    147.   Class certification is authorized under Federal Rule of Civil Procedure

20  23 and applies to claims for injunctive and equitable relief, including restitution,

21  under Rule 23(b)(2), and for monetary damages under Rule 23(b)(3).

22    148.   There are at least 13,000 members of the Class.

23    149.   The number of persons who fall within the definitions of the Class are

24  so numerous and geographically dispersed so as to make joinder of all members of

25  the Class or Subclass in their individual capacities impracticable, inefficient, and

26  unmanageable, and without class-wide relief, each member of the Class would

27  effectively be denied his, her, or their rights to prosecute and obtain legal and

28  equitable relief based on the claims and allegations averred in the Complaint.

2029104

150.   Plaintiffs, as detailed below, can fairly and adequately represent the proposed Class.  In the alternative, Plaintiffs can act as the representatives of the below subclasses.

**B.    Proposed Subclasses**

151.   Additionally, or in the alternative, pursuant to Federal Rule of Civil Procedure 23(c)(5), Plaintiffs bring this action on behalf of the following subclasses:

152.   **The Delayed Refinancing Subclass**:  All Black persons in the United States who applied for refinancing from the Defendants during the class period and whose applications processed at a rate slower than that of the average processing time of applications made by non-Black applicants.

153.   **The Higher Rate Subclass**:  All Black persons in the United States who applied for refinancing from the Defendants during the class period and whose refinancing applications were eventually approved, but at a higher interest rate than prevailing market rates based on their creditworthiness.

154.   **The Denied Refinancing Subclass**:  All Black persons in the United States who applied for refinancing from the Defendants during the class period and whose applications were denied but should have been approved based on objective, race-neutral factors, including but not limited to:  loan-to-value ratio, debt-to-income ratio, and credit score.

**C.    Numerosity and Ascertainability**

155.   **Numerosity**.  While the exact numbers of the members of the Class and Subclasses are unknown to Plaintiffs at this time, membership in the Class and Subclasses may be ascertained from the records maintained by Defendants.  At this time, Plaintiffs are informed and believe that the Class includes at least 13,000 and the Subclasses include tens of thousands of members.  Therefore, the Class and Subclasses are sufficiently numerous that joinder of all members of the Class and Subclasses in a single action is impracticable under Rule 23(a)(1) of the Federal Rules of Civil Procedure, and the resolution of their claims through a class action

1   will be of benefit to the parties and the Court.

2       156.  **Ascertainability**.  The names and addresses of the members of the

3   Class and Subclasses are contained in Defendants' records.  Notice can be provided

4   to the members of the Class and Subclasses through direct mailing, email,

5   publication, or otherwise using techniques and a form of notice similar to those

6   customarily used in consumer class actions arising under State and Federal law.

7   **D.    Commonality and Predominance**

8       157.  This matter involves common questions of law and fact which

9   predominate over any question solely affecting individual Class Members.

10      158.  The common questions of law and fact include, but are not limited to:

- Whether Defendants systematically discriminated against Class Members on account of their race;

- Whether Black applicants' refinance applications were processed at a rate slower than that of the average processing time of applications made by non-Black applicants;

- Whether Black applicants' refinance applications were denied when the score of a similarly situated non-Black applicant would be approved;

- Whether Black applicants' resulting refinance loans were made at higher interest rates as compared to similarly situated non-Black applicants;

- Whether Defendants selected disproportionately White areas for rapid refinancing evaluation and disproportionately Black areas for increased scrutiny;

- Whether Defendants' underwriting algorithms and machine learning programs were racially biased and led to unfairly discriminatory credit policies that harmed Black refinancing applicants;

- Defendants' knowledge;

- Defendants' consumer disclosures;

- Defendants' internal approval process; and

- Defendants' use of appraisals.

159.  **Predominance**.  Class action status is warranted under Rule 23(b)(3) of the Federal Rules of Civil Procedure because questions of law or fact common to the

members of the Class and Subclasses predominate over any questions affecting only individual members.  The interests of the members of the Class and Subclasses in individually controlling the prosecution of separate actions are theoretical and not practical.  Prosecution of this action through multiple Class Representatives would be superior to individual lawsuits.  Plaintiffs are not aware of any difficulty which will be encountered in the management of this litigation which should preclude its maintenance as a class action.

**E.      Typicality and Adequacy**

160.    Plaintiffs' claims are typical of the other Class Members' claims because all Class Members were injured in the same manner as a result of substantially similar conduct by Defendants.

161.    Plaintiffs are adequate Class Representatives because their interests do not conflict with the interests of the other members of the Class and Subclasses they seek to represent.  Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.  The Class and Subclasses' interests will be fairly and adequately protected by Plaintiffs and their counsel.

**F.      Superiority**

162.    A class action is the superior method for the fair and efficient adjudication of this matter because the damages and other harms suffered by Plaintiffs and other Class Members are small compared to the burden and expense of individual litigation.  Thus, it would be impractical, if not impossible, for individual plaintiffs to seek redress against Defendants for the harms suffered.

163.    Individual litigation of these harms would also be inefficient for the court system, and would create a risk of inconsistent or contradictory rulings and judgments.

164.    No unusual circumstances exist that would make this matter more difficult to manage than a typical class action.  Individualized damages figures can

be mathematically computed by collecting data about the length of each Class Member's delay and the differential between the interest rates they ultimately received versus the prevailing market rate based on race-neutral variables such as debt-to-income ratio, loan-to-value ratio, and credit score.

**G.    Injunctive Relief**

165.    Plaintiffs also seek to represent a class under Rule 23(b)(2) seeking injunctive relief forcing Wells Fargo to cease and desist its current discriminatory practices.

<u>**COUNT I**</u>

**VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT**

**15 U.S.C. § 16901, *et seq.***

166.    Plaintiffs, on behalf of themselves and all those similarly situated, reallege each and every paragraph above and incorporate them by reference as though fully stated herein.

167.    The Equal Credit Opportunity Act makes it unlawful for a creditor to discriminate against any applicant with respect to any aspect of a credit transaction on the basis of race.

168.    The Equal Credit Opportunity Act applies to applications for refinancing, like those of the Plaintiffs and others similarly situated. Plaintiffs applied for credit by seeking to refinance their home loans.

169.    Defendants are creditors because they regularly extend, renew, and continue issuances of credit.

170.    Defendants' consistent delays, roadblocks, feigned difficulties, and sometimes denials of applications for refinancing submitted by Black Americans constitute race-based discrimination forbidden by the Equal Credit Opportunity Act.

171.    Plaintiffs and all those similarly situated were harmed by Defendants' conduct, including but not limited to harm in the form of higher interest rates paid while applications were pending, higher interest rates paid upon a delayed approval,

1  or from a denied application.

2      172.   On behalf of themselves and the Class they seek to represent, Plaintiffs

3  request the relief set forth below.

4  ## COUNT II

5  **RACE DISCRIMINATION IN VIOLATION OF THE FAIR HOUSING ACT**

6  **OF 1968, 42 U.S.C. § 3601, *et seq.***

7      173.   Plaintiffs reallege each and every paragraph above and incorporate

8  them by reference as though fully stated herein.

9      174.   The Fair Housing Act makes it unlawful, in residential real estate

10  transactions, such as refinancing, to discriminate against designated classes of

11  individuals.

12      175.   Plaintiffs and others similarly situated sought to engage in residential

13  real estate transactions with the Defendants.

14      176.   Plaintiffs and others similarly situated are Black Americans and

15  therefore members of a protected class under the Fair Housing Act.

16      177.   Defendants refused to transact business with Plaintiffs and others

17  similarly situated when they refused to approve refinancing applications on the same

18  timeline as the applications made by other parties with similar qualifications that

19  were not members of the protected class, by causing applicants to withdraw

20  applications due to roadblocks and feigned difficulties, or by denying refinancing

21  applications.  As noted, Defendants approved fewer than half of Black homeowners'

22  refinancing applications in 2020 while approving 71% of the applications of White

23  homeowners.

24      178.   Defendants refused to transact business with Plaintiffs and those

25  similarly situated during the Class Period and at the same time did transact business

26  with non-Black homeowners with similar qualifications.

27      179.   Plaintiffs and those similarly situated were injured by Defendants'

28  refusal to transact business with them because they paid application fees for

2029104

refinancing applications that were delayed or denied, because they continued to pay higher interest rates while their delayed applications were pending, because they were provided with higher interest rates than other homeowners with similar qualifications, and/or because their applications were denied.

## COUNT III

### RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981

180.   Plaintiffs reallege each and every paragraph above and incorporate them by reference as though fully stated herein.

181.   Under 42 U.S.C. § 1981, persons of all races are guaranteed the same right to make and enforce contracts, regardless of race.  The term "make and enforce" contracts includes the making, performance, modification, and terminations of contracts, as well as all of the other aspects of a contractual relationship.

182.   By seeking to refinance their home loans and submitting an application to Defendants, Plaintiffs and others similarly situated sought to "make and enforce" contracts with the Defendants.

183.   Plaintiffs and those similarly situated were denied their right to make and enforce contracts when Defendants refused to provide refinancing on the same terms as they offered to members of a different race, by delaying or frustrating the applications process, and/or by denying the applications.

184.   Plaintiffs and those similarly situated were harmed by Defendants' denial of their rights to make and enforce contracts.

## COUNT IV

### VIOLATION OF THE UNRUH CIVIL RIGHTS ACT,
### CALIFORNIA CIVIL CODE §51

185.   Plaintiffs reallege each and every paragraph above and incorporate them by reference as though fully stated herein.

186.   The Unruh Civil Rights Act provides that all persons within the State of

California are free and equal no matter their race and are entitled to full and equal treatment in all business establishments.

187.   The Unruh Civil Rights Act thus prohibits discrimination of any kind against any person in any business establishment.

188.   Defendants are business establishments under the Unruh Civil Rights Act.

189.   Plaintiffs and other individuals similarly situated were denied full and equal treatment under the Unruh Civil Rights Act when Defendants refused to offer them refinancing terms on the same terms as individuals who were not Black Americans.

190.   Plaintiffs and other individuals similarly situated were harmed by Defendants' refusal to transact business with them because they paid application fees for refinancing applications that were delayed or denied, because they continued to pay higher interest rates while their delayed applications were pending, because they were provided with higher interest rates than other homeowners with similar qualifications, and/or because their applications were denied.

## COUNT V

## VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW

191.   Plaintiffs reallege each and every paragraph above and incorporate them by reference as though fully stated herein.

192.   The California Unfair Competition Law ("UCL") forbids "unlawful, unfair or fraudulent" conduct in connection with business activity.

193.   Defendants' business offering refinancing of existing loans is a business activity under the UCL.

194.   Plaintiffs and others similarly situated are "persons" under the UCL.

195.   Defendants' conduct described herein constitutes unlawful competition, as in the course of engaging in the business acts described above, it engaged in conduct that constituted a predicate violation of the laws identified herein, namely

2029104

the Equal Credit Opportunity Act, the Fair Housing Act, 42 U.S.C. § 1981, and the Unruh Civil Rights Act.

196.   Defendants' conduct described herein constitutes unfair competition under the UCL, as their practices are likely to deceive the public by informing the public of an alleged commitment to diversity and equality, but instead using hidden business practices designed to deny, delay and refuse the refinancing of loans of Black Americans, and subjecting those that are approved, to unfavorable terms.  As there is no legitimate justification for these practices, which have a disproportionately negative impact on the public, in comparison to any fair business purpose, Defendants' practices are unfair as defined under the UCL.

197.   Defendants' conduct described herein constitutes fraudulent competition under the UCL, as they advertise and otherwise state that they are committed to diversity and equality, and will fairly and quickly process the refinancing applications of all applicants, but instead use hidden business practices designed to deny, delay and refuse the refinancing of loans of Black Americans, and subjecting those that are approved, to unfavorable terms.  These business practices are likely to deceive the public, and thus are fraudulent.

198.   Plaintiffs and those similarly situated were injured by Defendants' refusal to transact business with them because they paid application fees for refinancing applications that were delayed or denied, because they continued to pay higher interest rates while their delayed applications were pending, because they were provided with higher interest rates than other homeowners with similar qualifications, and/or because their applications were denied.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court provides the following relief:

a.   Certify the 23(b)(2) and 23(b)(3) classes outlined above;

b.   Designate Plaintiffs as Class Representatives and designate the

1    undersigned counsel as lead Class Counsel;

2       c.    Find that Defendants' acts described herein violate the Equal Credit

3              Opportunity Act, the Fair Housing Act, 42 U.S.C. § 1981, the Unruh

4              Civil Rights Act, and the California UCL;

5       d.    Find that Defendants have engaged in a pattern and practice of racial

6              discrimination resulting in the harm to Plaintiffs and class members

7              described above;

8       e.    Award Plaintiffs and all others similarly situated restitutionary relief,

9              together with compensatory and punitive damages;

10      f.    Award Plaintiffs and all others similarly situated injunctive relief by

11            ordering Defendants to stop the discriminatory practices described

12            herein;

13      g.    Award Plaintiffs and all others similarly situated prejudgment interest

14            and attorney's fees, costs, and disbursements; and

15      h.    Award Plaintiffs and all others similarly situated such other relief as

16            this Court deems just and proper.

17                    **<u>DEMAND FOR JURY TRIAL</u>**

18    Plaintiffs demand a trial by jury of all issues so triable.

1  DATED:  April 12, 2022

2

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP

3  By:        */s/ Dennis S. Ellis*

4          Dennis S. Ellis (SBN 178196)
          Trent B. Copeland (SBN 136890)

5          Ryan Q. Keech (SBN 280306)
          Stefan Bogdanovich (SBN 324525)

6          2121 Avenue of the Stars, Suite 2800

7          Los Angeles, California 90067
          Telephone: (310) 274-7100

8          Facsimile: (310) 275-5697

9          Email:  dellis@egcfirm.com

10                 tcopeland@egcfirm.com
                 rkeech@egcfirm.com

11                 sbogdanovich@egcfirm.com

12

ELLIS GEORGE CIPOLLONE

13  O'BRIEN ANNAGUEY LLP
          Noah S. Helpern (SBN 254023)

14          Milin Chun (SBN 262674)

15          801 South Figueroa Street, Suite 2000
          Los Angeles, California 90017

16          Telephone: (213) 725-9800

17          Facsimile: (213) 725-9808
          Email:  nhelpern@egcfirm.com

18                 mchun@egcfirm.com

19

20  ELLIS GEORGE CIPOLLONE
      O'BRIEN ANNAGUEY LLP

21          Joseph N. Kiefer (*pro hac vice forthcoming*)

22          (NY Bar No. 5345657)
          157 West 57th Street, Suite 28 S

23          New York, New York 10019

24          Telephone: (212) 413-2600
          Facsimile: (212) 413-2629

25          Email:  jkiefer@egcfirm.com

26

27  Attorneys for Plaintiffs Aaron Braxton, Gia
    Gray, Bryan Brown, Paul Martin and all others

28  similarly situated

2029104

-57-                    Case No. 4:22-cv-01748-KAW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DATED:  April 12, 2022                    FRANK, SIMS & STOLPER LLP
                                                      Jason M. Frank (SBN 190957)
                                                      Scott H. Sims (SBN 234148)
                                                      Andrew D. Stolper (SBN 205462)


                                          By:        /s/ Jason Frank
                                                        Jason Frank
                                          Attorneys for Plaintiffs Aaron Braxton, Gia
                                          Gray, Bryan Brown, Paul Martin and all others
                                          similarly situated

**Attestation under N.D. Cal. L.R. 5-1(h)**: the ECF filer of this document attests that all of the other signatories have concurred in the filing of the document, which shall serve in lieu of their signatures on the document.

2029104

-58-                                      Case No. 4:22-cv-01748-KAW