# EXHIBIT A

**WINSTON & STRAWN LLP**
AMANDA L. GROVES (SBN 187216)
agroves@winston.com
KOBI K. BRINSON (*pro hac vice forthcoming*)
kbrinson@winston.com
STACIE C. KNIGHT (*pro hac vice forthcoming*)
sknight@winston.com
333 S. Grand Avenue, 38th Floor
Los Angeles, California 90071
Telephone: (213) 615-1700
Facsimile: (213) 615-1750

**MCGUIREWOODS LLP**
ALICIA A. BAIARDO (SBN 254228)
abairdo@mcguirewoods.com
AVA E. LIAS-BOOKS (*Pro Hac Vice forthcoming*)
aliasbooker@mcguirewoods.com
JASMINE K. GARDNER (*Pro Hac Vice forthcoming*)
jgardner@mcguirewoods.com
Two Embarcadero Center, Suite 1300
San Francisco, California 94111-3821
Telephone: (415) 844-9944
Facsimile: (415) 844-9922

*Attorneys for Defendants Wells Fargo Bank, N.A. and Wells Fargo & Co.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALFRED POPE, individually and on behalf of all others similarly situated,<br><br>       Plaintiff,<br><br>   v.<br><br>WELLS FARGO BANK, N.A., WELLS FARGO & COMPANY,<br><br>       Defendants. | Case No. 4:22-cv-01793-KAW<br><br>Magistrate Judge Kandis A. Westmore<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFF IFEOMA EBO'S ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES SHOULD BE RELATED PURSUANT TO CIVIL LOCAL RULE 3-12** |

1    Plaintiff Ifeoma Ebo's Administrative Motion to Consider Whether Cases Should Be Related

2  Pursuant to Civil Local Rule 3-12, referred to this Court by Magistrate Judge Sallie Kim, is on the

3  right track, but it misidentifies the first-filed case in this District. Ebo is represented by one of four

4  attorney groups who filed five separate class actions in this District. Each concerns allegations of

5  discrimination against African American borrowers by Wells Fargo Bank, N.A. and its affiliates

6  (collectively, "Wells Fargo") in its residential mortgage business. Wells Fargo has already filed an

7  administrative motion to consider whether cases should be related with respect to the only two

8  actions in which it has actually been served with a summons and copy of the complaint—*Williams et*

9  *al. v. Wells Fargo Bank, N.A. et al.*, No. 3:22-cv-00990-JD ("*Williams*") and *Braxton v. Wells Fargo*

10 *Bank, N.A. et al.*, No. 3:22-cv-01748-JSC ("*Braxton*"). *See Williams*, No. 3:22-cv-00990-JD, ECF

11 No. 32 ("*Williams* Motion," attached as Exhibit A to Declaration of Amanda L. Groves ("Groves

12 Decl.")). The other cases that concern essentially the same allegations (in which Wells Fargo has not

13 been served) are *Ebo v. Wells Fargo Bank, N.A.*, No. 3:22-cv-02535-SK ("*Ebo*"), *Pope v. Wells*

14 *Fargo Bank, N.A. et al.*, No. 4:22-cv-01793-KAW ("*Pope*"), and *Thomas et al. v. Wells Fargo Bank,*

15 *N.A. et al.*, No. 3:22-cv-01931-LB ("*Thomas*"). The same attorney represents plaintiffs in both *Pope*

16 and *Thomas*.

17    For reasons that are not clear, Ebo does not ask that her case be deemed related to the first-

18 filed case, but to the third-filed case. She is correct that her lawsuit is related to *Pope*, but it is also

19 related to *Williams*, *Braxton*, and *Thomas*. As Civil Local Rule 3-12 requires related cases be

20 reassigned to the judge with the lowest-numbered case, Ebo's case should be deemed related to

21 *Williams*, not to *Pope*.

22 **I.    Procedural and Factual Background**

23        **A.    The Complaint in the *Williams* Action**

24    On February 17, 2022, Christopher Williams filed a putative class action against Wells

25 Fargo, alleging that it discriminated against him on the basis of race when he applied for a home

26 mortgage loan, and that its home mortgage origination and underwriting practices intentionally and

27 disproportionately discriminate against African American home loan applicants. Groves Decl., Ex.

28 B, ¶¶ 6–18. Two additional named plaintiffs joined him in an Amended Complaint filed on April 14,

1

DEFENDANT'S RESPONSE TO PLAINTIFF IFEOMA EBO'S ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES
SHOULD BE RELATED PURSUANT TO CIVIL LOCAL RULE 3-12
CASE NO. 4:22-cv-01793-KAW

2022. *Id.*, Ex. C. The *Williams* plaintiffs brought claims under (1) the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.* ("ECOA"); (2) 42 U.S.C. § 1981 ("Section 1981"); (3) 42 U.S.C. § 1982 ("Section 1982"); and the (4) Fair Housing Act of 1968, 42 U.S.C § 3601 *et seq.* ("FHA"). They sought to represent a putative class of "Black and/or African American applicants or borrowers who applied for, received, or maintained credit from Defendants related to residential real estate and who were subjected to discrimination by Defendants due to their race." *Id.*, ¶ 44.

**B.      The Complaint in the *Braxton* Action**

Following and quoting heavily from an article published in *Bloomberg News* on March 10, 2022, Aaron Braxton filed a putative class action against Wells Fargo on March 18, 2022. *Id.*, Ex. D. Braxton also alleged that Wells Fargo discriminated against him on the basis of race when he applied to refinance his mortgage loan, and that Wells Fargo's residential mortgage policies and practices discriminate against African American applicants. *Id.*, ¶¶ 4–16. Braxton alleged that Wells Fargo's actions violated the ECOA, Section 1981, and the FHA. *Id.*, ¶¶ 72–90. Braxton also brought claims under the California Unruh Civil Rights Act and Unfair Competition Law. *Id.*, ¶¶ 91–104. Braxton sought to represent a class (and putative subclasses) of African American applicants who submitted an application to refinance their home mortgage through Wells Fargo "that was (i) processed at a rate slower than that of the average processing time of applications made by non-Black applicants; or (ii) whose applications were denied; or (iii) whose resulting refinance loans were made at higher interest rates as compared to similarly situated non-Black applicants." *Id.*, ¶¶ 53, 152–54. Braxton, too, was joined by two additional named plaintiffs in an April 18, 2022 Amended Complaint, with substantially the same causes of action and putative classes as his original complaint. *Id.*, Ex. E.

**C.      The Complaint in the *Pope* Action**

On March 21, 2022, Alfred Pope filed a putative class action against Wells Fargo. *Id.*, Ex. F. On the basis of the same *Bloomberg News* article, Pope also alleged that Wells Fargo discriminated against him on the basis of race when he applied to refinance his mortgage loan, and that Wells Fargo's residential mortgage policies and practices discriminate against African American and female applicants (albeit without any allegations concerning female applicants). *Id.*, ¶¶ 2, 19–24. Pope alleged that Wells Fargo's actions violated the ECOA, the FHA, and California's Unfair

2

DEFENDANT'S RESPONSE TO PLAINTIFF IFEOMA EBO'S ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES
SHOULD BE RELATED PURSUANT TO CIVIL LOCAL RULE 3-12
CASE NO. 4:22-cv-01793-KAW

1   Competition Law. *Id.*, ¶¶ 41–66. Pope sought to represent a class of "all first and second lien Wells

2   Fargo minority mortgage refinance applicants from 2019-present . . . whose refinancing applications

3   were discriminatorily denied." *Id.*, ¶ 31. Pope filed an Amended Complaint on March 25, 2022 that

4   made substantially the same allegations and sought to represent the same putative class. *Id.* Ex. G, ¶¶

5   2, 22–27, 34, 44–68.

6        **D.    The Complaint in the *Thomas* Action**

7        Winfred Thomas and Michelle Sims, represented by the same attorneys as Pope, filed a

8   putative class action against Wells Fargo on March 26, 2022. *Id.*, Ex. H. Again relying on the

9   *Bloomberg News* article, Thomas and Sims alleged that Wells Fargo discriminated against them on

10  the basis of race when they applied to refinance their mortgage loans, and that Wells Fargo's

11  residential mortgage policies and practices discriminate against African American, Hispanic/Latino,

12  and female applicants. *Id.*, ¶¶ 2, 23–28. As in *Pope*, there were no allegations concerning female

13  applicants. Thomas and Sims alleged that Wells Fargo's actions violated the ECOA, the FHA, and

14  California's Unfair Competition Law. *Id.*, ¶¶ 45–68. They sought to represent a class of "all first and

15  second lien Wells Fargo minority mortgage refinance applicants from 2019-present . . . whose

16  refinancing applications were discriminatorily denied." *Id.*, ¶ 35.

17       **E.    The Complaint in the *Ebo* Action**

18       Ifeoma Ebo filed a putative class action against Wells Fargo on April 26, 2022, again relying

19  heavily on the *Bloomberg News* article. *Id.*, Ex. I. Ebo alleged that Wells Fargo discriminated against

20  her on the basis of race when she applied for a home mortgage loan, and that its home mortgage

21  origination and underwriting practices intentionally and disproportionately discriminate against

22  African American home loan applicants. *Id.*, ¶¶ 13–32. Based on those allegations, Ebo brought

23  claims under the ECOA, Section 1981, and the FHA. *Id.*, ¶¶ 55–84. Ebo sought to represent "All

24  Black Americans (1) who submitted applications to obtain or refinance a mortgage loan with respect

25  to residential real property, (2) who were qualified to receive mortgage loans from Wells Fargo, and

26  (3) whose applications were either (a) denied by Wells Fargo, (b) never completed, due to Wells

27  Fargo's demands for documentation or information that would not have been imposed by Wells

28  Fargo in connection with a similarly situated White applicant, or (c) granted by Wells Fargo, but on

3

Defendant's Response to Plaintiff Ifeoma Ebo's Administrative Motion to Consider Whether Cases
Should Be Related Pursuant to Civil Local Rule 3-12
Case No. 4:22-cv-01793-KAW

1   less favorable terms than a similarly situated White borrower would have received." *Id.*, ¶ 50.

2               **F.      Wells Fargo's Administrative Motion in *Williams* and Ebo's Motion**

3               By May 27, 2022, Wells Fargo still had not been served in *Pope*, *Thomas*, or *Ebo*.

4   Consequently, Wells Fargo filed the *Williams* Motion to have *Braxton* deemed related to *Williams*,

5   noting that it planned to file similar motions with respect to *Pope*, *Thomas*, and *Ebo* when it was

6   actually served. *Id.*, Ex. A at 3 n.2. On May 31, 2022, Williams and Braxton filed responses to the

7   *Williams* Motion. Although the *Williams* plaintiffs asserted that *Braxton* was not necessarily related,

8   they nonetheless argued that there was sufficient overlap that it should be dismissed or stayed

9   pending class certification practice in *Williams*, emphasizing the work they had done in bringing the

10  complaint and class action experience. *Id.*, Ex. J at 2.

11              Despite the fact that attorneys for Wells Fargo have been in contact with Ebo's counsel since

12  April 2022 concerning potential waiver of service (which Ebo's counsel did not pursue), Ebo filed

13  the present motion on June 1, 2022 without inquiring whether Wells Fargo would stipulate to it.[1]

14  Indeed, Ebo served the present motion on Wells Fargo before even serving Wells Fargo with a

15  summons. After Ebo filed her motion, counsel for Wells Fargo met and conferred with her counsel

16  on Friday, June 3, 2022, and informed her counsel that *Williams*, not *Pope*, was in fact the first-filed

17  case. Without explaining how *Ebo* could be related to *Pope* but not to *Williams*, Ebo's counsel

18  declined to agree to an order declaring that *Ebo* and *Williams* are related. Groves Decl. ¶¶ 10, 13–14.

19  **II.     *Ebo* Is Related to *Williams* Pursuant to Civil Local Rule 3-12.**

20              The same factors identified in Ebo's Motion concerning the relation of *Ebo* and *Pope*

21  demonstrate that *Ebo* is related to *Williams*. To avoid the inefficiency of serial reassignments of this

22  case, *Ebo* should be deemed related to the lowest-numbered case, not to the third-filed case in these

23  overlapping class actions, and the lowest-numbered case is *Williams*.

24              The parties, allegations, and causes of action are substantially the same in both cases,

25  satisfying Civil Local Rule 3-12(a)(1). Both *Ebo* and *Williams* seek to represent an identical class of

26

27  [1] Plaintiff's Motion also does not indicate whether a stipulation was sought from plaintiffs' counsel
    in *Pope*, contrary to Civil L.R. 7-11(a). Apparently, Ebo elected not to meet and confer with any of
28  the affected parties.

4

1   African American mortgage applicants concerning identical claims of discrimination against Wells

2   Fargo Bank, N.A. *Compare* Groves Decl. Ex. I, ¶ 50 *with* Groves Decl. Ex. C ¶ 44. (*Williams*, like

3   *Pope*, also names the parent company as a defendant.) *Ebo* and *Williams* make the same allegations.

4   *Compare* Groves Decl. Ex. I, ¶¶ 5, 16, 25–27, 32 *with* Groves Decl., Ex. C ¶¶ 8, 10–11, 14, 20, 23,

5   26, 31, 34 (alleging unfavorable interest rates and additional fees); Groves Decl. Ex. I ¶¶ 16, 28–32,

6   41–46 *with* Groves Decl. Ex. C ¶ 25 (alleging undue application delays); Groves Decl. Ex. I ¶¶ 16,

7   19–21, 23–24, 32 *with* Groves Decl. Ex. C ¶¶ 10, 19, 35 (alleging improperly denied applications).

8   They both bring claims under the ECOA, Section 1981, and the FHA, and they seek the same relief,

9   including compensatory damages, punitive damages, attorneys' fees and costs, and injunctive relief.

10  Courts routinely relate cases that involve the same class allegations and the same or overlapping

11  putative classes. *See*, *e.g.*, *In re Facebook Privacy Litig.*, 2010 WL 5387616, at *1 (N.D. Cal. Dec.

12  21, 2010); *In re Leapfrog Enter., Inc. Sec. Litig.*, 2005 WL 5327775, at *1 (N.D. Cal. July 5, 2005);

13  *McGee v. Ross Stores, Inc.*, 2007 WL 2900507, *1 (N.D. Cal. Oct. 1, 2007).

14          Civil Local Rule 3-12(a)(2) is also satisfied: it is likely that there will be an unduly

15  burdensome duplication of labor and expense and conflicting results if *Williams* and *Ebo* are

16  conducted before different judges. Indeed, the cases will undoubtedly involve overlapping discovery,

17  and the same factual and legal issues will have to be addressed in both. A single judge can better

18  handle the jockeying among attorney groups to be lead counsel for the putative class, and that

19  decision should be made explicitly and in the context of class motion practice, not administrative

20  motions under Civil Local Rule 3-12. Thus, relation will conserve judicial and party resources by

21  avoiding duplicative presentation of the issues and will allow a single judge to determine scheduling,

22  resolve any discovery disputes, rule on dispositive motions, and resolve contests over lead counsel

23  status. For these same reasons, relation will avoid the risk of conflicting results should these

24  substantially similar cases involving substantially the same issues proceed before two different

25  judges in the same District.

26  **III.    CONCLUSION**

27          Because *Williams* is the first-filed case in this set of substantially identical putative class

28  actions in this District, *Ebo* should be related to *Williams*.

5

DEFENDANT'S RESPONSE TO PLAINTIFF IFEOMA EBO'S ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES
SHOULD BE RELATED PURSUANT TO CIVIL LOCAL RULE 3-12
CASE NO. 4:22-cv-01793-KAW

Dated: June 6, 2022                    **WINSTON & STRAWN LLP**

By: */s/ Amanda L. Groves*
           AMANDA L GROVES (SBN 187216)
           agroves@winston.com
           333 S. Grand Avenue, 38th Floor
           Los Angeles, California 90071
           Telephone: (213) 615-1700
           Facsimile: (213) 615-1750

           KOBI K. BRINSON (*Pro Hac Vice forthcoming*)
           kbrinson@winston.com
           STACIE C. KNIGHT (*Pro Hac Vice forthcoming*)
           sknight@winston.com
           300 South Tryon Street, 16th Flood
           Charlotte, North Carolina 28202
           Telephone: (704) 350-7700
           Facsimile: (704) 350-7800

           **MCGUIREWOODS LLP**
           ALICIA A. BAIARDO (SBN 254228)
           abairdo@mcguirewoods.com
           AVA E. LIAS-BOOKS (*Pro Hac Vice forthcoming*)
           aliasbooker@mcguirewoods.com
           JASMINE K. GARDNER (*Pro Hac Vice forthcoming*)
           jgardner@mcguirewoods.com
           Two Embarcadero Center, Suite 1300
           San Francisco, California 94111-3821
           Telephone: (415) 844-9944
           Facsimile: (415) 844-9922

           *Attorneys for Defendants*
           *Wells Fargo Bank, N.A. and*
           *Wells Fargo & Co.*

6

DEFENDANT'S RESPONSE TO PLAINTIFF IFEOMA EBO'S ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES
SHOULD BE RELATED PURSUANT TO CIVIL LOCAL RULE 3-12
CASE NO. 4:22-cv-01793-KAW

**WINSTON & STRAWN LLP**
AMANDA L. GROVES (SBN 187216)
agroves@winston.com
KOBI K. BRINSON (*Pro Hac Vice forthcoming*)
kbrinson@winston.com
STACIE C. KNIGHT (*Pro Hac Vice forthcoming*)
sknight@winston.com
333 S. Grand Avenue, 38th Floor
Los Angeles, California 90071
Telephone: (213) 615-1700
Facsimile: (213) 615-1750

**MCGUIREWOODS LLP**
ALICIA A. BAIARDO (SBN 254228)
abairdo@mcguirewoods.com
AVA E. LIAS-BOOKS (*Pro Hac Vice forthcoming*)
aliasbooker@mcguirewoods.com
JASMINE K. GARDNER (*Pro Hac Vice forthcoming*)
jgardner@mcguirewoods.com
Two Embarcadero Center, Suite 1300
San Francisco, California 94111-3821
Telephone: (415) 844-9944
Facsimile: (415) 844-9922

*Attorneys for Defendants Wells Fargo Bank, N.A. and Wells Fargo & Co.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALFRED POPE, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> WELLS FARGO BANK, N.A., WELLS FARGO & COMPANY, <br><br> Defendants. | Case No. 4:22-cv-01793-KAW <br><br> Magistrate Judge Kandis A. Westmore <br><br> **DECLARATION OF AMANDA L. GROVES IN SUPPORT OF DEFENDANTS' RESPONSE TO PLAINTIFF IFEOMA EBO'S ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES SHOULD BE RELATED PURSUANT TO CIVIL LOCAL RULE 3-12** |

I, Amanda L. Groves, declare:

1. I am an attorney duly authorized to practice before this Court and am an attorney an at the law firm of Winston & Strawn LLP, counsel for Defendants Wells Fargo Bank, N.A. and Wells Fargo & Company ("Wells Fargo") in this matter. I have personal knowledge of the facts herein and, if called as a witness, could and would competently testify thereto.

2. On February 17, 2022, a putative class action complaint was filed against Wells Fargo Bank, N.A. and Wells Fargo & Company titled *Christopher Williams v. Wells Fargo Bank, N.A. et al.*, No. 3:22-cv-00990-JD ("*Williams*"). A true and correct copy of the *Williams* Complaint is attached as Exhibit B.

3. On March 18, 2022, a putative class action complaint was filed against Wells Fargo Bank, N.A and Wells Fargo Home Mortgage, Inc. titled *Aaron Braxton v. Wells Fargo Bank, N.A. et al.*, No. 3:22-cv-01748-JSC ("*Braxton*"). A true and correct copy of the *Braxton* Complaint is attached as Exhibit D.

4. On March 21, 2022, a putative class action complaint was filed against Wells Fargo Bank, N.A. and Wells Fargo & Company titled *Alfred Pope v. Wells Fargo Bank, N.A. et al.*, No. No. 4:22-cv-01793-KAW ("*Pope*"). A true and correct copy of the *Pope* Complaint is attached as Exhibit F.

5. On March 25, 2022, an Amended Complaint was filed in *Pope*, a true and correct copy of which is attached as Exhibit G.

6. On March 26, 2022, a putative class action complaint was filed against Wells Fargo Bank, N.A. and Wells Fargo & Company titled *Winfred Thomas et al. v. Wells Fargo Bank, N.A. et al.*, No. 3:22-cv-01931-LB ("*Thomas*"). A true and correct copy of the *Thomas* Complaint is attached as Exhibit H.

7. On April 14, 2022, an Amended Complaint was filed in *Williams*, a true and correct copy of which is attached as Exhibit C.

8. On April 18, 2022, an Amended Complaint was filed in *Braxton*, a true and correct copy of which is attached as Exhibit E.

9. On April 26, 2022, a putative class action complaint was filed against Wells Fargo

1

1   Bank, N.A. titled *Ifeoma Ebo v. Wells Fargo Bank, N.A.* No. 3:22-cv-02535-SK ("*Ebo*"). A true and

2   correct copy of the *Ebo* Complaint is attached as Exhibit I.

3        10.     On April 28, 2022, Brian D. Flick, counsel for Ifeoma Ebo, asked me whether Wells

4   Fargo Bank, N.A. would waive service in the *Ebo* action. I responded on May 2, 2022, saying that if

5   he sent a waiver I would execute it. To date, Ebo has neither served Wells Fargo Bank, N.A. nor sent

6   a waiver of service form.

7        11.     On May 27, 2022, Wells Fargo filed in *Williams* an Administrative Motion to

8   Consider Whether Cases should be related with respect to *Williams* and *Braxton*. A true and correct

9   copy of that administrative motion is attached as Exhibit A.

10       12.     On May 31, 2022, counsel for the plaintiffs in *Williams* and *Braxton* filed responses

11  to Wells Fargo's administrative motion in *Williams*. A true and correct copy of the response filed by

12  the plaintiffs in *Williams* is attached as Exhibit J.

13       13.     On June 1, 2022, Ebo filed in *Ebo* an Administrative Motion to Consider Whether

14  Cases Should Be Related Pursuant to Civil Local Rule 3-12 with respect to *Ebo* and *Pope*. Counsel

15  for Ebo did not reach out to counsel for Wells Fargo to inquire whether Wells Fargo would stipulate

16  to the motion before filing it. On June 2, 2022, Magistrate Judge Sallie Kim referred Ebo's motion to

17  this Court. Dkt. No. 10.

18       14.     On June 3, 2022, I met and conferred by telephone with Marc Dann and Brian Flick,

19  counsel for Ebo, concerning Ebo's motion, and we discussed Wells Fargo's position that *Ebo* should

20  be deemed related to *Williams* rather than *Pope*. I followed up by email the morning of June 6, 2022,

21  and Dann responded that his team does oppose relating *Ebo* to *Williams*. A true and correct copy of

22  that email exchange is attached as Exhibit K.

23

24       I declare under penalty of perjury under the laws of the United States of America that the

25  foregoing is true and correct. Executed this 6th day of June, 2022 in Charlotte, North Carolina.

26

27                                  */s/ Amanda L. Groves*
                                    Amanda L. Groves

28

# EXHIBIT A

**MCGUIREWOODS LLP**
ALICIA A. BAIARDO (SBN 254228)
abaiardo@mcguirewoods.com
AVA E. LIAS-BOOKER (*Pro Hac Vice Forthcoming*)
aliasbooker@mcguirewoods.com
JASMINE K. GARDNER (*Pro Hac Vice Forthcoming*)
jgardner@mcguirewoods.com
Two Embarcadero Center, Suite 1300
San Francisco, CA  94111-3821
Telephone:  415.844.9944
Facsimile:  415.844.9922

*Attorneys for Defendants Wells Fargo Bank, N.A.*
*and Wells Fargo & Co.*

**WINSTON & STRAWN LLP**
AMANDA L. GROVES (SBN 187216)
agroves@winston.com
KOBI K. BRINSON (*Pro Hac Vice Admission*)
kbrinson@winston.com
STACIE C. KNIGHT (*Pro Hac Vice Admission*)
sknight@winston.com
333 S. Grand Avenue, 38th Floor
Los Angeles, CA 90071
Telephone: 213.615.1700
Facsimile: 213.615.1750

*Attorneys for Defendants Wells Fargo Bank, N.A.*
*and Wells Fargo & Co.*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CHRISTOPHER WILLIAMS, SAM ALBURY, and SHAIA BECKWITH SIMMONS, individually and on behalf of all others similarly situated, | Case No. 3:22-cv-00990-JD |
| | Hon. James Donato |
| Plaintiffs, | **ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES SHOULD BE RELATED** |
| v. | |
| WELLS FARGO BANK, N.A. and WELLS FARGO & CO., | |
| Defendants. | |

1

1   Pursuant to Local Rules 3-12 and 7-11, Defendants Wells Fargo Bank, N.A. and Wells Fargo

2   & Company (collectively "Wells Fargo") bring this Administrative Motion to Consider Whether the

3   Cases [*Braxton v. Wells Fargo Bank, N.A. et al.*, No. 3:22-cv-01748-JSC ("*Braxton*") and this action

4   ("*Williams*")] Should Be Related.  The plaintiffs in *Braxton* and *Williams*—both putative class

5   actions—bring overlapping causes of action based on their allegation that Wells Fargo discriminates

6   against African Americans in connection with its home mortgage business.  Thus, it is likely that

7   there will be an unduly burdensome duplication of labor and expense, as well as conflicting results,

8   if the cases are conducted before different judges.

9   **I.      Procedural and Factual Background**

10  **A.      The Original Complaint in This Action**

11  On February 17, 2022, Christopher Williams filed this putative class action against Wells

12  Fargo, alleging that it discriminated against him on the basis of race when he applied for a home

13  mortgage loan, and that its home mortgage origination and underwriting practices intentionally and

14  disproportionately discriminate against African American home loan applicants.  Dkt. No. 1, ¶¶ 6-

15  18.  Based on those allegations, Williams brought claims under (1) the Equal Credit Opportunity

16  Act, 15 U.S.C. § 1691 *et seq.* ("ECOA"); (2) 42 U.S.C. § 1981 ("Section 1981"); (3) 42 U.S.C. §

17  1982 ("Section 1982"); and the (4) Fair Housing Act of 1968, 42 U.S.C § 3601 *et seq.* ("FHA").  *See*

18  *id.*  Williams sought to represent "a class of African Americans who applied for credit related to

19  residential real estate and who were subjected to discrimination by Defendants due to their race."

20  *Id.*, ¶ 19.

21  **B.      The Original Complaint in the *Braxton* Action**

22  Following, and quoting heavily from an article published in *Bloomberg News* on March 10,

23  2022, Aaron Braxton filed a putative class action against Wells Fargo Bank, N.A. and Wells Fargo

24  Home Mortgage, Inc. on March 18, 2022.  Declaration of Alicia A. Baiardo ("Baiardo Decl."), Ex.

25  A.  Like the original complaint in this action, Braxton alleged that Wells Fargo discriminated against

26  him on the basis of race when he applied to refinance his mortgage loan, and that Wells Fargo's

27  residential mortgage policies and practices discriminate against African American applicants.  *Id.*, ¶¶

28  4-16.  Also like the original complaint in this action, Braxton alleged that Wells Fargo's actions

violated the ECOA, Section 1981, and the FHA.  *Id*., ¶¶ 72-90.[1]  Braxton sought to represent a class (and putative subclasses) of Black homeowners that submitted an application to refinance their home mortgage through Wells Fargo "that was (i) processed at a rate slower than that of the average processing time of applications made by non-Black applicants; or (ii) whose applications were denied; or (iii) whose resulting refinance loans were made at higher interest rates as compared to similarly situated non-Black applicants."  *Id*., ¶¶ 53, 152-54.[2]

C.     **The Amended Complaints in This Action and the *Braxton* Action**

On April 14, 2022, Williams filed an amended complaint that added two putative named plaintiffs.  Dkt. No. 22.  The amended *Williams* complaint asserts the same causes of action as the original complaint, but seeks to expand the putative class, which is now defined to include "Black and/or African American applicants or borrowers who applied for, received, or maintained credit from Defendants related to residential real estate and who were subjected to discrimination by Defendants due to their race."  *Id.*, ¶ 44.

Four days later, on April 18, 2022, Braxton filed an amended complaint, adding three putative named plaintiffs and Wells Fargo & Company as a defendant.  Baiardo Decl., Ex. B.  The causes of action and putative classes and subclasses are unchanged from the original *Braxton* complaint.  *See id*.

II.    **The *Williams* and *Braxton* Actions Are Related Pursuant to Local Rule 3-12.**

1.     ***Williams* and *Braxton* Concern Substantially the Same Parties, Factual Allegations, and Causes of Action.**

*Williams* and *Braxton* involve substantially the same parties, factual allegations, and causes of action and thus meet the first element of the test under Local Rule 3-12(a).

First, the parties are substantially the same in both cases.   Both cases name Wells Fargo

[1] Braxton also brought claims under the California Unruh Civil Rights Act and Unfair Competition Law.  *Id*., ¶¶ 91-104.

[2] Shortly after Braxton filed his original complaint, three additional complaints were filed in the Northern District of California raising allegations similar to those made here and in *Braxton*: *Pope v. Wells Fargo Bank, N.A. et al*., 3:22-cv-01793; *Thomas et al. v. Wells Fargo & Co. et al*., 3:22-cv-01931; *Ebo et al. v. Wells Fargo Bank, N.A*., 3:22-cv-02535-SK.  Wells Fargo has not been served in any of those actions.  However, at the appropriate time, Wells Fargo intends to file an administrative motion to consider whether those cases should be related to *Williams* pursuant to Local Rule 3-12.

1    Bank, N.A. and Wells Fargo & Company as defendants,[3] and the plaintiffs seek to represent

2    overlapping classes.  The *Williams* plaintiffs seek to represent a broad class of "Black and/or African

3    American applicants or borrowers who applied for, received, or maintained credit from Defendants

4    related to residential real estate and who were subjected to discrimination by Defendants due to their

5    race."  Dkt. No. 22, ¶ 44.  This proposed class in *Williams* is so broad that it wholly subsumes the

6    proposed class and subclasses in *Braxton*.  Baiardo Decl., Ex. B ¶¶ 146, 152-54.

7         Second, the cases make substantially the same factual allegations, namely, that Wells Fargo

8    discriminates against Black and/or African American borrowers in connection with its home lending

9    business.  *Compare* Dkt. No. 22,  ¶¶ 8, 10-11, 14, 20, 23, 26, 31, 34 *with* Baiardo Decl., Ex. B ¶¶ 29,

10   69, 102, 108, 146 (alleging unfavorable interest rates and additional fees); Dkt. No. 22, ¶¶ 25 *with*

11   Baiardo Decl., Ex. B ¶¶ 11-13, 21-22, 29, 152 (alleging undue application delays ); Dkt. No. 22, ¶¶

12   10, 19, 35 *with* Baiardo Decl., Ex. B ¶¶ 6, 12, 22, 40, 112, 146, 154 (alleging improperly denied

13   applications).

14        Finally, based on the substantially similar factual allegations, the plaintiffs in both cases

15   bring overlapping causes of action.  Indeed, in both cases, the plaintiffs purport to bring class wide

16   claims under the ECOA, Section 1981, and the FHA, and seek the same relief, including

17   compensatory damages, punitive damages, attorneys' fees and costs, and injunctive relief.  Dkt. No.

18   22, Prayer for Relief; Baiardo Decl., Ex. B, Prayer for Relief.  Courts routinely relate cases under

19   these circumstances.  For example, in *In re Facebook Privacy Litig.*, 2010 WL 5387616, at *1 (N.D.

20   Cal. Dec. 21, 2010), the court granted a motion to relate putative class actions because they involved

21   the same defendant and had "overlapping classes" and "overlapping causes of action and factual

22   inquiries."  Similarly, in *In re Leapfrog Enter., Inc. Sec. Litig.*, 2005 WL 5327775, at *1 (N.D. Cal.

23   July 5, 2005), the court related cases based on its observation that the complaints "completely

24   overlap."  As the court explained, the complaints "name the same defendants, make similar factual

25   allegations, and seek redress for violation of the same [law].  In addition, the [first] complaint's class

26

27   [3] The *Braxton* plaintiffs have also named "Wells Fargo Home Mortgage, Inc.," an entity that was
     merged into Wells Fargo Bank, N.A. in 2004 and thus no longer exists.  That entity should thus have

28   no bearing on the result here.

period encompasses the [second] complaint's class period."  *Id.*; *see also McGee v. Ross Stores, Inc.*, 2007 WL 2900507, *1 (N.D. Cal. Oct. 1, 2007) (granting motion to relate cases on grounds that the cases involved substantially the same parties, putative classes, alleged claims and underlying events, and damages sought).  Accordingly, *Williams* and *Braxton* meet the first element of the test under Local Rule 3-12(a).

     **2.**     **There Will Be an Unduly Burdensome Duplication of Labor and Expense and Conflicting Results If the Cases Are Conducted Before Different Judges.**

The second element of Rule 3-12(a) is also met: it is likely that there will be an unduly burdensome duplication of labor and expense and conflicting results if *Williams* and *Braxton* are conducted before different judges.  Indeed, the cases will undoubtedly involve overlapping discovery, and, as shown above, they raise common issues of fact and law.  Thus, relation will conserve judicial and party resources by avoiding duplicative presentation of the issues and will allow a single judge to determine scheduling, resolve any discovery disputes, and rule on dispositive motions.  For these same reasons, relation will avoid the risk of conflicting results should these substantially similar cases involving substantially the same issues proceed before two different judges in the same Court.

**III.**    **STATEMENT REGARDING STIPULATION**

Pursuant to Civil Local Rule 7-11, Wells Fargo's counsel met and conferred with plaintiffs' counsel in the *Braxton* matter on the morning of May 27, 2022.  Baiardo Decl., ¶ 6.  Counsel for *Braxton* indicated they could not advise as of the time of this filing whether they would oppose this motion. *Id.*, ¶ 6.  Wells Fargo's counsel also met and conferred with plaintiffs' counsel in *Williams* on the morning of May 27, 2022.  *Id.*, ¶ 7. Although counsel for *Williams* indicated they did not oppose this motion, a stipulation could not be obtained because Wells Fargo's counsel was unable to obtain a similar commitment from counsel in *Braxton* as of the time of this filing. *Id.*, ¶ 7.

**IV.**    **CONCLUSION**

For the foregoing reasons, Defendants Wells Fargo Bank, N.A. and Wells Fargo & Company request that this Court grant its motion and issue an order relating the *Williams* and *Braxton* actions.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DATED:  May 27, 2022                **MCGUIREWOODS LLP**

By:   */s/ Alicia A. Baiardo*
_____
Alicia A. Baiardo
abaiardo@mcguirewoods.com
Two Embarcadero Center, Suite 1300
San Francisco, CA  94111-3821
Telephone:  415.844.9944
Facsimile:  415.844.9922

**WINSTON & STRAWN LLP**
AMANDA L. GROVES (SBN 187216)
agroves@winston.com
333 S. Grand Avenue, 38th Floor
Los Angeles, CA 90071
Telephone: 213.615.1700
Facsimile: 213.615.1750

KOBI K. BRINSON (*Pro Hac Vice Admission*)
kbrinson@winston.com
STACIE C. KNIGHT (*Pro Hac Vice Admission*)
sknight@winston.com
300 South Tryon Street, 16th Floor
Charlotte, NC 28202
Telephone: 704.350.7700
Facsimile: 704.350.7800

Counsel for Defendants Wells Fargo &
Company and Wells Fargo Bank, N.A.

ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES SHOULD BE RELATED
CASE NO. 3:22-cv-00990

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 27, 2022, a copy of the foregoing pleading was filed electronically with the clerk of court via ECF, which will serve all counsel of record, and served via First-Class Mail to any party not filing ECF, postage prepaid.

Dated:  May 27, 2022

By:     */s/ Alicia A. Baiardo*
        Alicia A. Baiardo
        Attorney for Defendants Wells Fargo Bank,
        N.A. and Wells Fargo & Co.

# EXHIBIT B

LINDA D. FRIEDMAN (pro hac vice to be requested)
DANIEL LEWIN (pro hac vice to be requested)
JARED A. CALVERT (pro hac vice to be requested)
STOWELL & FRIEDMAN LTD.
303 W. Madison St., Suite 2600
Chicago, Illinois 60606
(312) 431-0888
Lfriedman@sfltd.com

Sam Sani (SBN 273993)
SANI LAW, APC
15720 Ventura Blvd., Suite 405
Encino, CA 91436
Telephone:      (310) 935-0405
Facsimile:      (310) 935-0409
ssani@sanilawfirm.com

Attorneys for Plaintiff
CHRISTOPHER WILLIAMS

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| CHRISTOPHER WILLIAMS, individually and on behalf of all others similarly situated, | CASE NO: |
| | **COMPLAINT** |
| Plaintiff, | |
| v. | Class Action |
| | |
| WELLS FARGO BANK, N.A. and WELLS FARGO & CO., | Jury Trial Demanded |
| | |
| Defendants. | |

**<u>COMPLAINT</u>**
**CLASS ACTION**

Plaintiff Christopher Williams ("Williams"), on behalf of himself and all others similarly situated, by and through his attorneys, hereby files this Complaint against Defendants Wells Fargo Bank, N.A. and Wells Fargo & Co. (collectively "Wells Fargo" or the "Firm"), and states as follows:

COMPLAINT

462878

## JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343. In addition, this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000, Plaintiff is a citizen of Georgia, and neither Defendant is a citizen of Georgia. Defendant Wells Fargo & Co. is incorporated in Delaware and its principal place of business is in San Francisco, California, as set forth further below. Defendant Wells Fargo Bank, N.A. is a national banking association chartered in South Dakota and with its principal place of business in San Francisco, California.

2.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b) because both Defendants reside in this District and a substantial part of the events or omissions giving rise to the claim occurred in this district, as the discriminatory policies emanated and were executed from Wells Fargo's headquarters in this District.  Venue is proper in the San Francisco Division of the Northern District of California because a substantial part of the events or omissions giving rise to the claims occurred in the county of San Francisco.

## PARTIES

3.     Defendant Wells Fargo & Co., is a publicly-traded, global financial services firm and Fortune 500 corporation incorporated in Delaware and has its principal place of business in San Francisco, California. As of December 31, 2020, Wells Fargo has assets of approximately $1.9 trillion, loans of $887.6 billion, deposits of $1.4 trillion and stockholders' equity of $185 billion.[1] Wells Fargo provides a wide variety of financial products and services to its global and domestic clients, who include corporations, governments, financial institutions and individuals, including

---

[1] https://www.wellsfargo.com/assets/pdf/about/investor-relations/sec-filings/2020/10k.pdf

COMPLAINT
- 2 -

462878

home mortgages. Wells Fargo claims to serve at least one out of three households in the United States.[2]

4.      Defendant Wells Fargo Bank, N.A. is a national banking association chartered in South Dakota with its principal place of business in San Francisco, California, and a subsidiary of Wells Fargo & Co.

5.      Plaintiff Christopher Williams is African American and a citizen of Georgia.  As described below, Williams applied for a home mortgage with Wells Fargo and was discriminated against on the basis of his race in the mortgage lending process by Wells Fargo.

## **FACTUAL ALLEGATIONS**

6.      As stated above, Wells Fargo is one of the largest banks in the country and one of the top residential mortgage providers in the United States. Across the country, Wells Fargo applies mortgage origination and underwriting policies and practices that intentionally and disproportionately discriminate against and harm African American home loan applicants. Williams was one of the many victims of Wells Fargo's racially discriminatory residential mortgage policies and practices.

7.      Wells Fargo has a long history of discriminating against African Americans and maintains a corporate culture replete with harmful racial stereotypes and biased views about African American customers. While Wells Fargo has long advertised its willingness to symbolically support racial equality in banking, such as making investments to black owned

---

[2] https://newsroom.wf.com/English/news-releases/news-release-details/2021/Wells-Fargo-launches-Banking-Inclusion-Initiative-to-accelerate-unbanked-households-access-to-affordable-transactional-accounts/default.aspx#:~:text=Wells%20Fargo%20%26%20Company%20(NYSE%3A,of%20banking%2C%20investment%20and%20mortgage

COMPLAINT
- 3 -

462878

banks,[3] it has not and will not meaningfully redress its systematic discrimination against its Black and African American customers, borrowers, and mortgage applicants.

8.      Wells Fargo's racial bias is illustrated by racial redlining and other discriminatory practices against customers of color, as illustrated in a number of recent lawsuits and settlements. For example, in 2011, a jury found Wells Fargo guilty of systematically discriminating against minority home buyers by using a computer software for minority homeowners which resulted in them paying more for their home loans than white borrowers. *Opal Jones, et. al v. Wells Fargo Bank, N.A., et al.*, Case No. BC337821 (Los Angeles Superior Court) ($3.5 million verdict). Wells Fargo has also paid hundreds of millions of dollars to avoid litigating its discriminatory home lending practices.  Indeed, Wells Fargo agreed to a settlement valued at over $440 million of a lawsuit challenging the Firm's redlining practices that resulted in a disproportionate number of foreclosures in African American neighborhoods in Shelby County and the City of Memphis. *City of Memphis and Shelby County, et al. v. Wells Fargo Bank, N.A., et al.*, Case No. 2:09-CV-02857 (W.D. Tenn.).   Wells Fargo also settled a lawsuit for $37 million led by the National Fair Housing Alliance alleging that Wells Fargo took better care of foreclosed properties that it owned in white neighborhoods than those in African American and Latino communities. *National Fair Housing Alliance, et al. v. Wells Fargo Bank N.A., et al*, HUD Case No. 09-12-0708-8 (U.S. Department of Housing & Urban Development Office of Fair Housing & Equal Opportunity). Wells Fargo has also faced and settled numerous lawsuits challenging its "reverse redlining" practices of charging higher rates and imposing less favorable terms for minority home borrowers than for white home borrowers. For instance, in 2013, Wells Fargo paid $175 million to settle a lawsuit brought by the United States Department of Justice alleging that the Firm charged higher rates to its African

---

[3] https://www.foxbusiness.com/markets/wells-fargo-announces-investments-in-six-black-owned-banks

COMPLAINT
- 4 -

462878

American and Latino borrowers. *United States v. Wells Fargo Bank, NA*, Case No. 1:12-cv-01150 (D.D.C.).

9.      In 2019, Wells Fargo paid $10 million to settle a similar claim brought by the City of Philadelphia. *City of Philadelphia v. Wells Fargo & Co., et al.*, No. 2:17-cv-02203-AB (E.D. Pa. 2019). Philadelphia alleged that Wells Fargo simply swapped the evil of redlining—refusing to lend to minority communities—for the similarly pernicious reverse redlining—lending to minority borrowers, but only saddling them with more expensive loans with worse terms than those extended to white borrowers. *City of Philadelphia v. Wells Fargo & Co., et al.*, No. 2:17-cv-02203-AB (E.D. Pa. 2019), Dkt. 1 (Complaint) ¶¶ 5–21. Philadelphia alleged that "since at least 2004 . . . Wells Fargo has systematically engaged in a continuous and unbroken discriminatory pattern and practice of issuing higher cost or more onerous mortgage loans to minority borrowers in Philadelphia when more favorable and less expensive loans were being offered to similarly situated non-minority borrowers." *Id.* ¶ 5 (E.D. Pa.). Philadelphia's statistical analysis revealed that African American borrowers were more than twice as likely to "receive a high-cost or high-risk loan" than a white borrower even when controlling for credit score. *Id.* ¶ 14. Indeed, the discrimination worsened as the credit score increased—especially creditworthy "African-Americans with FICO scores over 660 were 2.570 times more likely to receive a high-cost or high-risk loan from Wells Fargo as a white borrower." *Id.* The predictable result of Wells Fargo's foisting high-cost, high-risk loans on African Americans was an explosion of foreclosures in minority communities, where loans were "4.710 times more likely to result in foreclosure than is a loan in a predominantly white neighborhood." *Id.* ¶ 12. This precipitated what "many leading commentators describe[d] as the 'greatest loss of wealth for people of color in modern US history.'" *Id.* ¶ 18.

10.      Wells Fargo discriminates against its African American employees just as readily as it does its customers. In 2016, Wells Fargo was charged with systemic discrimination against

COMPLAINT
- 5 -

462878

minority Financial Advisors including by African American Financial Advisors in the class action lawsuit *Slaughter v. Wells Fargo Advisors*, 14-cv-06368 (N.D Ill. 2014). Wells Fargo eventually settled the *Slaughter* litigation for over $35 million. *Slaughter v. Wells Fargo Advisors*, 14-cv-06368 (N.D Ill. 2014), Dkt. 99-1 (Settlement Agreement), 29

11.     Rather than earnestly trying to address and remedy the problems raised by these numerous lawsuits, Wells Fargo has worked to circumvent and diminish fair housing and credit laws, including delaying and appealing multiple fair housing lending lawsuits brought by municipalities across the Country so that it could continue to discriminate against black borrowers.[4] Wells Fargo's discrimination in lending against African Americans has therefore continued unbated.

12.     Specifically, in determining home loans, interest rates, points, etc., Wells Fargo intentionally uses factors to determine eligibility for home loan rates, terms, and conditions that facilitate redlining and reverse redlining against and disfavor African American borrowers. Specifically, Wells Fargo's uniform, nationwide policies and practices related to mortgage approvals, interest rate determinations, fees, and costs that intentionally discriminate against African Americans and have a disparate impact on African Americans. These policies and practices include but are not limited to:

(a)     placing black borrowers in predatory and higher costs loans even though they qualify for prime loans on better terms;

(b)     failing to underwrite loans based on traditional underwriting criteria such as debt-to-income ratio, loan-to-value ratio, FICO score, and work history and instead utilizing factors that intentionally discriminate and/or have a disparate impact on black borrowers;

(c)     subjective surcharges on minority borrowers of additional points, fees, and other credit and servicing costs over and above an otherwise objective risk-based financing rate for such loan products;

---

[4] *See* generally, *Oakland v. Wells Fargo,* 15-cv-04321 (N.D. Cal.); *Sacramento v. Wells Fargo*, 18-cv-00416 (E.D. Cal.); *Miami v. Wells Fargo*, 13-cv-24508, (S.D. Fla.).

COMPLAINT
- 6 -

(d)     charging excessive points and fees that are not associated with any increased benefits to black borrowers;

(e)     failing to adequately monitor the Bank's policies and practices regarding mortgage loans, including but not limited to originations, marketing, sales, and risk management;

(f)     Reverse redlining;

(g)     and Redlining;

13.     The racially discriminatory policies and practices at Wells Fargo are uniform and national in scope and create an artificial, arbitrary, and unnecessary barrier to fair housing opportunities for Black or African American borrowers. Class members are relying on Plaintiff to protect their rights applied for loans at Wells Fargo offices across the country and were harmed by these same policies and practices.  Wells Fargo's policies are practices are implemented with discrimination intent and/or disproportionately impact Black of African Americans borrowers.

## PLAINTIFF WAS INJURED BY DEFENDANT'S
## DISCRIMINATORY POLICIES AND PRACTICES

14.     Williams is African American. Williams was a well-qualified African American home borrower. When he applied for his mortgage, Williams maintained a FICO score of over 750. Based on this, Williams believed he should have qualified for Wells Fargo's prime interest rate, which would have saved him substantial money over time on his home mortgage. However, consistent with Wells Fargo's pattern of discrimination against African American borrowers, Wells Fargo offered Williams an interest rate nearly three points higher than the prime interest rate offered by Wells Fargo, which is disproportionately and discriminatorily offered to white applicants.

15.     Believing it to be a mistake, Williams spoke to Wells Fargo's home lending department to have his credit report rechecked and for his interest rate to be lowered. Instead, the Firm refused to reconsider his credit score or his interest rate.

16.     Williams agreed to revisit its refusal to extend the loan to Williams on favorable terms.  However, in a letter dated September 5, 2019, Wells Fargo finally articulated for the first

time, that it did not use solely FICO credit scores to determine home interest rates, but instead used "a unique scoring model, which considers more than credit scores to evaluate applications."

17.     Indeed, the "other" factors used by Wells Fargo to determine interest rates for home loans serve to intentionally exclude Black or African American borrowers from affordable and lower-risk loans, force African American borrowers to pay higher interest rates and other fees that similarly situated white borrowers, and have a disparate impact based on race.  Williams applied for and received a home loan from another bank at its prime interest rate.

18.     Williams did identify his race to Wells Fargo during the application process.

## CLASS ALLEGATIONS

19.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and a class of African Americans who applied for credit related to residential real estate and who were subjected to discrimination by Defendants due to their race. Plaintiff seeks certification of a liability and injunctive and declaratory relief class under Rule 23(b)(2) and 23(c)(4), and/or certification of a broader class under Rule 23(b)(3).  All requirements of class certification are met by the proposed class.

20.     The class of African Americans who applied for credit related to residential real estate is so numerous that joinder of all members is impracticable. Fed. R.Civ.P. 23(a)(1).

21.     There are questions of law and fact common to the class, and those questions can and should be resolved in a single proceeding that furthers this litigation. Fed. R.Civ.P. 23(a)(2).

22.     The claims alleged by Plaintiff are typical of the claims of the class. Fed. R.Civ.P. 23(a)(3).

23.     Plaintiff will fairly and adequately represent and protect the interests of the class. Fed. R.Civ.P. 23(a)(4).

462878

24.     The issue of determining liability regarding whether Defendant's policies and practices result in a pattern or practice of intentional discrimination and/or have a disparate impact on African Americans is appropriate for issue certification under Rule 23(c)(4).  Other common issues are also appropriate for certification.

25.     Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate with regard to the class as a whole.  Fed. R.Civ.P. 23(b)(2).

26.     The questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R.Civ.P. 23(b)(3).

## COUNT I

### EQUAL CREDIT OPPORTUNITY ACT

27.     Plaintiff, on behalf of himself and all those similarly situated, realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

28.     The Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*, makes it unlawful for a creditor to discriminate against any applicant with respect to any aspect of a credit transaction on the basis of race.

29.     As described above, Defendants are creditors because they regularly extend, renew, and continue credit, and Plaintiff was an applicant for credit.

30.     Defendants maintained a nationwide set of uniform, discriminatory mortgage loan origination and underwriting practices and engaged in a pattern or practice of systemic race discrimination against African American mortgage loan applicants that constitutes illegal intentional race discrimination in violation of the Equal Credit Opportunity Act.

462878

31.     Plaintiff and all those similarly situated were subjected to and harmed by Defendant's systemic and individual discrimination.

32.     Defendants' unlawful conduct resulted in considerable harm to Plaintiff and all those similarly situated.

33.     On behalf of himself and the class he seeks to present, Plaintiff requests the relief set forth below.

**COUNT II**

**RACE DISCRIMINATION IN VIOLATION
OF 42 U.S.C. § 1981**

34.     Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

35.     Under 42 U.S.C. § 1981, persons of all races are guaranteed the same right to make and enforce contracts, regardless of race.  The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

36.     Defendants maintained a nationwide set of uniform, discriminatory mortgage loan origination and underwriting practices and engaged in a pattern or practice of systemic race discrimination against African American mortgage loan applicants that constitutes illegal intentional race discrimination in the making and modification of contracts in violation of 42 U.S.C. § 1981.

37.     Plaintiff and all those similarly situated were subjected to and harmed by Defendants' systemic and individual discrimination.

38.     On behalf of himself and the class he seeks to present, Plaintiff requests the relief set forth below.

**COUNT III**

COMPLAINT
- 10 -

462878

**RACE DISCRIMINATION IN VIOLATION
OF 42 U.S.C. § 1982**

39.     Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

40.     Under 42 U.S.C. § 1982, all citizens are guaranteed the same right to inherit, purchase, lease, sell, hold, and convey real and personal property, regardless of race.

41.     As set forth above, Defendants maintained a nationwide set of uniform, discriminatory mortgage loan origination and underwriting practices and engaged in a pattern or practice of systemic race discrimination against African American mortgage loan applicants that constitutes illegal intentional race discrimination and disparately impacts African Americans in violation of 42 U.S.C. § 1982.

42.     Plaintiff and all those similarly situated were subjected to and harmed by Defendants' systemic and individual discrimination.

43.     On behalf of himself and the class he seeks to present, Plaintiff requests the relief set forth below.

**<u>COUNT IV</u>**

**RACE DISCRIMINATION IN VIOLATION OF
THE FAIR HOUSING ACT OF 1968, 42 U.S.C § 3601 *et seq.***

44.     Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

45.     The Fair Housing Act, 42 U.S.C. § 3605(a), prohibits any entity whose business includes engaging in residential real estate-related transactions from discriminating against any person in making available such a transaction on the basis of race.

46.     Defendants' business includes engaging in residential real estate-related transactions.

462878

47.   As set forth above, Defendants maintained a nationwide set of uniform, discriminatory mortgage loan origination and underwriting practices and engaged in a pattern or practice of systemic race discrimination against African American mortgage loan applicants that constitutes illegal intentional race discrimination and disparately impacts African Americans in violation of the Fair Housing Act of 1968.

48.   Plaintiff and all those similarly situated were subjected to and harmed by Defendants' systemic and individual discrimination.

49.   On behalf of himself and the class he seeks to present, Plaintiff requests the relief set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court find against Defendants as follows:

a.   Certify this case as a class action;

b.   Designate Plaintiff as a Class Representative and designate Plaintiff's counsel of record as Class Counsel;

c.   Declare that Defendants' acts, conduct, policies and practices are unlawful and violate the Equal Credit Opportunity Act, 42 U.S.C. §§ 1981 and 1982, and the Fair Housing Act;

d.   Declare that Wells Fargo engaged in a pattern and practice of racial discrimination against African Americans;

e.   Order Plaintiff and all others similarly situated offered mortgage loans at non-discriminatory rates, and otherwise make Plaintiff whole;

f.   Award Plaintiff and all others similarly situated compensatory and punitive damages;

COMPLAINT
- 12 -

462878

i.   Award Plaintiff and all others similarly situated prejudgment interest and attorneys fees, costs and disbursements, as provided by law;

j.   Award Plaintiff and all others similarly situated such other make whole equitable, injunctive and legal relief as this Court deems just and proper to end the discrimination and fairly compensate Plaintiff and all others similarly situated.

k.   Award Plaintiff and all others similarly situated such other relief as this Court deems just and proper.

Respectfully submitted,

STOWELL & FRIEDMAN, LTD.

By: _____
      Linda D. Friedman (pro hac vice to be requested)
      Daniel Lewin (pro hac vice to be requested)
      Jared Calvert (pro hac vice to be requested)
      **STOWELL & FRIEDMAN LTD.**
      303 W. Madison St., Suite 2600
      Chicago, Illinois 60606
      Phone: (312) 431-0888
      Lfriedman@sfltd.com


SANI LAW, APC

By: _/s/ Sam Sani_____
      Sam Sani
      **SANI LAW, APC**
      15720 Ventura Blvd., Suite 405
      Encino, CA 94612
      Tel: (310) 935-0405
      ssani@sanilawfirm.com

      Attorneys for Plaintiff

COMPLAINT
- 13 -

462878

1

## **DEMAND FOR A JURY TRIAL**

2

Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of

3

Civil Procedure and Civil Local Rule 3-6.

4

STOWELL & FRIEDMAN, LTD.

5

6        By:_____

7              Linda D. Friedman (pro hac vice to be requested)
             Daniel Lewin (pro hac vice to be requested)
             Jared Calvert (pro hac vice to be requested)

8              **STOWELL & FRIEDMAN LTD.**
             303 W. Madison St., Suite 2600

9              Chicago, Illinois 60606
             Phone: (312) 431-0888

10             Lfriedman@sfltd.com

11

12        SANI LAW, APC

13        By: */s/ Sam Sani*_____
             Sam Sani

14             **SANI LAW, APC**
             15720 Ventura Blvd., Suite 405

15             Encino, CA 94612
             Tel: (310) 935-0405

16             ssani@sanilawfirm.com

17             Attorneys for Plaintiff

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT
- 14 -

462878

# EXHIBIT C

BENJAMIN L. CRUMP (Pro hac vice to be requested)
BEN CRUMP, PLLC
633 Pennsylvania Avenue Northwest
Floor 2
Washington D.C. 20004
(800) 713-1222
court@bencrump.com

LINDA D. FRIEDMAN (Appearing pro hac vice)
SUZANNE E. BISH (Pro hac vice to be requested)
STOWELL & FRIEDMAN LTD.
303 W. Madison St.
Suite 2600
Chicago, Illinois 60606
(312) 431-0888
Lfriedman@sfltd.com

SAM SANI (SBN 2733993) (Local Counsel)
SANI LAW, APC
15720 Ventura Blvd.
Suite 405
Encino, CA 91436
Telephone:     (310) 935-0405
Facsimile:     (310) 935-0409
ssani@sanilawfirm.com

Attorneys for Plaintiffs
CHRISTOPHER WILLIAMS, SAM ALBURY, AND SHAIA BECKWITH SIMMONS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| CHRISTOPHER WILLIAMS, SAM ALBURY, and SHAIA BECKWITH SIMMONS, individually and on behalf of all others similarly situated, | CASE NO: 3:22-cv-00990-JD |
| | **AMENDED COMPLAINT** |
| Plaintiffs, | Class Action |
| v. | Jury Trial Demanded |
| WELLS FARGO BANK, N.A. and WELLS FARGO & CO., | Hon. James Donato |
| Defendant. | |

AMENDED
COMPLAINT

464456

## AMENDED COMPLAINT
### CLASS ACTION

Plaintiffs Christopher Williams ("Williams"), Sam Albury ("Albury"), and Shaia Beckwith Simmons ("Simmons"), on behalf of themselves and all others similarly situated, by and through their attorneys, hereby file this Amended Complaint against Defendants Wells Fargo Bank, N.A. and Wells Fargo & Co. (collectively "Wells Fargo" or the "Firm"), and state as follows:

### JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT

1.   This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343. In addition, this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(d), as the amount in controversy exceeds $5,000,000, and at least one member of the class is a citizen of a different state than any defendant. Plaintiff Williams is a citizen of Georgia, Plaintiff Albury is a citizen of Nevada, Plaintiff Simmons is a citizen of Florida, and neither Defendant is a citizen of Georgia, Nevada, or Florida. Defendant Wells Fargo & Co. is incorporated in Delaware and its principal place of business is in San Francisco, California, as set forth further below. Defendant Wells Fargo Bank, N.A. is a national banking association chartered in South Dakota and with its principal place of business in San Francisco, California.

2.   Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b) because both Defendants reside in this District and a substantial part of the events or omissions giving rise to the claim occurred in this District, as the discriminatory policies emanated and were executed from Wells Fargo's headquarters in this District. Venue is proper in the San Francisco Division of the Northern District of California because a substantial part of the events or omissions giving rise to the claims occurred in the county of San Francisco.

## **PARTIES**

3.      Defendant Wells Fargo & Co. is a publicly-traded, global financial services firm and Fortune 500 corporation incorporated in Delaware and has its principal place of business in San Francisco, California. As of December 31, 2020, Wells Fargo has assets of approximately $1.9 trillion, loans of $887.6 billion, deposits of $1.4 trillion and stockholders' equity of $185 billion.[1] Wells Fargo provides a wide variety of financial products and services to its global and domestic clients, who include corporations, governments, financial institutions and individuals, including home mortgages. Wells Fargo claims to serve at least one out of three households in the United States.[2]

4.      Defendant Wells Fargo Bank, N.A. is a national banking association chartered in South Dakota with its principal place of business in San Francisco, California, and a subsidiary of Wells Fargo & Co.

5.      Plaintiff Christopher Williams is African American and a citizen of Georgia. As described below, Williams applied for a home mortgage with Wells Fargo and was subjected to racial discrimination in Wells Fargo's mortgage lending process.

6.      Plaintiff Sam Albury is African American and a citizen of Nevada. As described below, Albury applied for a home mortgage with Wells Fargo and was subjected to racial discrimination in Wells Fargo's mortgage lending process.

7.      Plaintiff Shaia Beckwith Simmons is African American and a citizen of Florida. As described below, Plaintiff Simmons obtained a home mortgage with Wells Fargo and was subjected to racial discrimination in Wells Fargo's mortgage lending process.

---

[1] https://www.wellsfargo.com/assets/pdf/about/investor-relations/sec-filings/2020/10k.pdf
[2] https://newsroom.wf.com/English/news-releases/news-release-details/2021/Wells-Fargo-launches-Banking-Inclusion-Initiative-to-accelerate-unbanked-households-access-to-affordable-transactional-accounts/default.aspx#:~:text=Wells%20Fargo%20%26%20Company%20(NYSE%3A,of%20banking%2C%20investment%20and%20mortgage

AMENDED
COMPLAINT
- 3 -

**FACTUAL ALLEGATIONS**

8.      As stated above, Wells Fargo is one of the largest banks in the country and one of the top residential mortgage providers in the United States. Across the country, Wells Fargo applies mortgage origination, approvals, interest rate determinations, fees, costs, refinancing, underwriting, deferment, forbearance, default, and foreclosure policies and practices that intentionally and disproportionately discriminate against and harm Black and/or African American home loan applicants and home mortgage borrowers. Williams, Albury, and Simmons were injured by Wells Fargo's racially discriminatory residential mortgage policies and practices.

9.      Wells Fargo has a long history of racial discrimination and maintains a corporate culture replete with harmful racial stereotypes and biased views about Black and/or African American customers.

10.     Wells Fargo discriminates against Black and/or African American customers throughout its lending process, from application—where Wells Fargo disproportionately denies credit to Black and/or African American applicants—to origination—where Wells Fargo disproportionately charges higher interest rates, imposes higher fees and costs, and offers worse terms to Black and/or African Americans compared to non-Black, non-African Americans—to refinancing—where Wells Fargo disproportionately denies Black and/or African Americans the opportunity to modify or lower their interest rates—and servicing—where Black and/or African American borrowers are subjected to additional racial discrimination.

11.     Wells Fargo engages in redlining by approving white applicants for mortgage loans at substantially higher rates than Black and/or African American applicants. In 2020, for instance, according to an analysis of nationwide data published under the Home Mortgage Disclosure Act, Wells Fargo approved approximately 67.1% of white borrowers who applied for a mortgage, compared to only 51.8% of Black and/or African American applicants.

12.     When evaluating statistical disparities like the one described above, statisticians use a tool called the "standard deviation" to assess the likelihood that the disparity is due to chance. The more standard deviations, the more the observed result deviates from the expected result and the less likely that the disparity is due to random chance. Courts and statisticians consider a disparity "statistically significant"—that there is a 95% level of confidence that random chance did not cause the disparity—at 1.96 standard deviations. In this case, the difference in approvals is statistically significant at *over 29 standard deviations*.

13.     When Wells Fargo approves Black and/or African American borrowers' mortgage applications, it does so on substantially worse terms than offered to non-Black, non-African American borrowers. Nationwide, in 2020, the average interest rate Wells Fargo charged to Black and/or African American borrowers was 3.34%, versus 3.23% to white borrowers. The difference is statistically significant at over 17 standard deviations.

14.     Wells Fargo also imposes higher costs on Black and/or African American borrowers relative to the size of their loans. In 2020, Black and/or African American borrowers nationwide had to spend, on average, 2.0% of their Wells Fargo loan value on costs and fees, versus 1.7% for white borrowers. The disparity is statistically significant at 9 standard deviations.

15.     Wells Fargo has faced a number of recent lawsuits and settlements challenging these practices and disparities. For example, in 2011, a jury found Wells Fargo guilty of systematically discriminating against minority home buyers by using a computer software for minority homeowners which resulted in them paying more for their home loans than white borrowers. *Opal Jones, et. al v. Wells Fargo Bank, N.A., et al.*, Case No. BC337821 (Los Angeles Superior Court) ($3.5 million verdict). Wells Fargo has also paid hundreds of millions of dollars to avoid litigating its discriminatory home lending practices. Indeed, Wells Fargo agreed to a settlement valued at over $440 million of a lawsuit challenging the Firm's redlining practices,

AMENDED
COMPLAINT
- 5 -

resulting in a disproportionate number of foreclosures in African American neighborhoods in Shelby County and the City of Memphis. *City of Memphis and Shelby County, et al. v. Wells Fargo Bank, N.A., et al.*, Case No. 2:09-CV-02857 (W.D. Tenn.). Wells Fargo also settled a lawsuit for $37 million led by the National Fair Housing Alliance alleging that Wells Fargo took better care of foreclosed properties that it owned in white neighborhoods than those in African American and Latino communities. *National Fair Housing Alliance, et al. v. Wells Fargo Bank N.A., et al.*, HUD Case No. 09-12-0708-8 (U.S. Department of Housing & Urban Development Office of Fair Housing & Equal Opportunity).

16.     Wells Fargo has also faced and settled numerous lawsuits challenging its "reverse redlining" practices of charging higher rates and imposing less favorable terms for minority home borrowers than for white home borrowers. For instance, in 2013, Wells Fargo paid $175 million to settle a lawsuit brought by the United States Department of Justice alleging that the Firm charged higher rates to its African American and Latino borrowers. *United States v. Wells Fargo Bank, NA*, Case No. 1:12-cv-01150 (D.D.C.).

17.     In 2019, Wells Fargo paid $10 million to settle a similar claim brought by the City of Philadelphia. *City of Philadelphia v. Wells Fargo & Co., et al.*, No. 2:17-cv-02203-AB (E.D. Pa. 2019). Philadelphia alleged that Wells Fargo simply swapped the evil of redlining—refusing to lend to minority communities—for the similarly pernicious reverse redlining—lending to minority borrowers, but saddling them with more expensive loans with worse terms than those extended to white borrowers. *City of Philadelphia v. Wells Fargo & Co., et al.*, No. 2:17-cv-02203-AB (E.D. Pa. 2019), Dkt. 1 (Complaint) ¶¶ 5–21. Philadelphia alleged that "since at least 2004 . . . Wells Fargo has systematically engaged in a continuous and unbroken discriminatory pattern and practice of issuing higher cost or more onerous mortgage loans to minority borrowers in Philadelphia when more favorable and less expensive loans were being offered to similarly

AMENDED
COMPLAINT
- 6 -

situated non-minority borrowers." *Id.* ¶ 5 (E.D. Pa.). Philadelphia's statistical analysis revealed that African American borrowers were more than twice as likely to "receive a high-cost or high-risk loan" than a white borrower even when controlling for credit score. *Id.* ¶ 14. Indeed, the discrimination worsened as the credit score increased—especially creditworthy "African-Americans with FICO scores over 660 were 2.570 times more likely to receive a high-cost or high-risk loan from Wells Fargo as a white borrower." *Id.* The predictable result of Wells Fargo's foisting high-cost, high-risk loans on African Americans was an explosion of foreclosures in minority communities, where loans were "4.710 times more likely to result in foreclosure than is a loan in a predominantly white neighborhood." *Id.* ¶ 12. This precipitated what "many leading commentators describe[d] as the 'greatest loss of wealth for people of color in modern US history.'" *Id.* ¶ 18.

18.     Wells Fargo has found new avenues to discriminate against Black and/or African American customers with recent changes to the home mortgage market. Nationwide, homeowners have had the opportunity to take advantage of historically low interest rates through refinancing, which occurs when a homeowner applies for credit related to their residential real estate to change the terms of an earlier loan. Over the last two years, U.S. homeowners refinanced almost $5 trillion in mortgages, generating untold savings.[3] This could have been an opportunity for African American homeowners to build wealth and secure their families' futures.

19.     Wells Fargo, however, systematically and intentionally shut Black and/or African American customers out of this major wealth event. According to an analysis of 2020 Home Mortgage Disclosure Act data, Wells Fargo approved 33.7% of refinancing applications from Black and/or African American applicants, compared with 49.1% from white applicants. Wells

---

[3] https://www.bloomberg.com/graphics/2022-wells-fargo-black-home-loan-refinancing/

Fargo denied Black and/or African Americans borrowers' applications outright 36.1% of the time, versus 20.3% of the time for white borrowers. These disparities are statistically significant at over 31 standard deviations.

20.     And just as it does with home purchase loans, Wells Fargo charges higher costs and interest rates to Black and/or African American customers who obtain refinancing. In 2020, Wells Fargo charged the average national Black and/or African American refinancing recipient 3.18% versus 3.11% for white refinancing recipients, and charged Black and/or African American customers an average of $5,335 in costs and fees versus $4,193 for white borrowers, for an average cost of borrowing of 2.6% for Black and/or African American customers versus 1.8% for white borrowers. All these disparities are statistically significant.

21.     Wells Fargo's failure to extend refinancing and other home loans to Black and/or African American customers has even drawn the attention of members of Congress. Senators Elizabeth Warren and Ron Wyden recently wrote a letter to Wells Fargo's Chief Executive Officer Charles Scharf excoriating the Bank for its "shocking disparity" in its approval ratings of Black and/or African American refinancing applicants.[4] The Senators stated that Wells Fargo's recent actions were consistent with "Wells Fargo's long history of scamming and mistreating consumers of color."[5] Furthermore, the Senators believed "Wells Fargo's treatment of Black borrowers is deeply concerning, no matter how one looks at the data" and concluded, "Wells Fargo appears to be simply unable or unwilling to stop preying upon customers of color."[6]

22.     Wells Fargo discriminates against its African American employees just as readily as it does its customers. In 2016, Wells Fargo was charged with systemic discrimination against

---

[4]Letter from Senators Elizabeth Warren and Ron Wyden, March 16, 2022
https://www.warren.senate.gov/imo/media/doc/2022.3.16%20Letter%20to%20Wells%20Fargo%20on%20Refinancing%20Discrimination.pdf
[5] *Id.*
[6] *Id.*

AMENDED
COMPLAINT
- 8 -

minority Financial Advisors including by African American Financial Advisors in the class action

lawsuit *Slaughter v. Wells Fargo Advisors*, 14-cv-06368 (N.D Ill. 2014). Wells Fargo eventually

settled the *Slaughter* litigation for over $35 million. *Slaughter v. Wells Fargo Advisors*, 14-cv-

06368 (N.D Ill. 2014), Dkt. 99-1.

23.     In determining home loans, interest rates, points, and other credit and contractual

terms, Wells Fargo intentionally uses factors to determine eligibility for home loan rates, terms,

and conditions that facilitate redlining and reverse redlining against and disfavor Black and/or

African American applicants.

24.     Many traditional techniques for determining creditworthiness, such as FICO score,

debt-to-income ratio, and work history, have been demonstrated to cause an unlawful disparate

impact against Black borrowers and/or African Americans. Wells Fargo, however, employs an

even more discriminatory "unique scoring model" that eschews even these traditionally

discriminatory origination and underwriting techniques. Wells Fargo thereby intentionally

discriminates and creates an unlawful disparate impact against Black and/or African American

mortgage applicants, including applicants for refinancing.

25.     Additionally, pursuant to its Firm-wide discriminatory culture, Wells Fargo unduly

scrutinizes and is unduly skeptical of the application materials submitted by Black and/or African

American applicants, causing undue delays and rejections of Black and/or African American

mortgage applicants, including applicants for refinancing.

26.     In the rare case Wells Fargo offers mortgage loans to Black and/or African

American customers on reasonable terms, Wells Fargo engages in predatory lending practices to

force Black and/or African American borrowers out of those terms, including pressuring Black

and/or African American borrowers to increase their rates by improperly treating Black and/or

African American borrowers' loans in default and instituting improper foreclosures.

27.    The racially discriminatory policies and practices at Wells Fargo are uniform and national in scope and create an artificial, arbitrary, and unnecessary barrier to fair housing opportunities for Black and/or African American borrowers. Class members who applied for loans at Wells Fargo offices across the country and were harmed by these same policies and practices are relying on Plaintiffs and this lawsuit to protect their rights. Wells Fargo's policies are practices are implemented with discriminatory intent and/or disproportionately impact Black and/or African Americans borrowers.

**PLAINTIFFS WERE INJURED BY DEFENDANTS' DISCRIMINATORY POLICIES AND PRACTICES**

**Christopher Williams**

28.    Williams is African American. Williams was a well-qualified African American home borrower. When he applied for his mortgage loan, Williams was highly creditworthy, as reflected in his high FICO score of over 750. Based on this, Williams believed he should have qualified for Wells Fargo's prime interest rate, which would have saved him substantial money over time on his home mortgage. However, consistent with Wells Fargo's pattern of discrimination against African American borrowers, Wells Fargo offered Williams an interest rate nearly three points higher than the prime interest rate offered by Wells Fargo, which is disproportionately and discriminatorily offered to white applicants.

29.    Believing it to be a mistake, Williams spoke to Wells Fargo's home lending department to have his credit report rechecked and for his interest rate to be lowered. Instead, the Firm refused to reconsider his credit score or his interest rate.

30.    Wells Fargo agreed to revisit its refusal to extend the loan to Williams on favorable terms. However, in a letter dated September 5, 2019, Wells Fargo finally articulated for the first time, that it did not use solely FICO credit scores to determine home interest rates, but

instead used "a unique scoring model, which considers more than credit scores to evaluate applications."

31.     Indeed, the "other" factors used by Wells Fargo to determine interest rates for home loans serve to intentionally exclude Black and/or African American borrowers from affordable and lower-risk loans, force Black and/or African American borrowers to pay higher interest rates and other fees that similarly situated white borrowers, and have a disparate impact based on race. Williams applied for and received a home loan from another bank at its prime interest rate.

32.     Williams identified his race to Wells Fargo during the application process.

**Sam Albury**

33.     Plaintiff Albury is African American. Albury is a well-qualified African American home borrower. When he applied for his mortgage, Albury was gainfully employed, had already owned two properties, and was highly creditworthy. In or around June 2020, Albury agreed to purchase a new home in Las Vegas, Nevada. To do so, Albury agreed to close on the property in 35 days and paid the buyer a considerable amount of earnest money. Despite being warned not to use Wells Fargo by his realtor, Albury believed he would receive a prime mortgage due to his preexisting banking relationship with Wells Fargo.

34.     However, consistent with Wells Fargo's pattern of discrimination against Black and/or African American borrowers across the country, Wells Fargo offered Albury an interest rate higher than the prime interest rate offered by Wells Fargo to white applicants. Wells Fargo also unduly scrutinized his application and subjected him to baseless inquiries regarding his finances and work history. Worried that Wells Fargo would not approve his mortgage application in time for the scheduled closing, Albury answered all of Wells Fargo's baseless inquiries.

35.     Wells Fargo continued to string Albury along until, just days before his scheduled closing, Wells Fargo denied his application in full. Wells Fargo's actions forced Albury to walk away from his home purchase, thereby forfeiting thousands of dollars in earnest money.

**Shaia Beckwith Simmons**

36.     Plaintiff Shaia Beckwith Simmons is a public relations expert, community advocate, and motivational speaker, with a Bachelor's in Business Administration and Management and a Master's in Educational Leadership and Administration from Florida A&M University. She and her husband, the head coach of Florida A&M's Division I football team, are pillars of their local community.

37.     Simmons is a well-qualified African American home borrower who obtained a home mortgage loan from Wells Fargo in 2009 and refinanced it for a lower interest rate in 2013.

38.     Simmons is a model homeowner and has timely made her monthly payments without incident. During the COVID-19 pandemic, as required by the CARES Act, Wells Fargo offered existing home mortgage borrowers the option to defer their payments. Simmons accepted Wells Fargo's deferment option, which allowed her to restructure her loan to defer monthly payments during the pandemic and instead make those monthly payments at the end of her loan.

39.     After several months of approved deferments, Simmons promptly resumed making her mortgage payments in full, as she had done for decades without issue.

40.     Yet consistent with its nationwide discriminatory practices, Wells Fargo maliciously and unlawfully instituted foreclosure proceedings against Simmons without prior notice, asserting without justification that Simmons was in default for failure to make mortgage payments during her deferment.

41.     Consistent with its nationwide practices of predatory lending to extract wealth from Black and/or African American customers, Wells Fargo presented Simmons with an

ultimatum: she could renegotiate her loan, potentially at a higher interest rate that would cost her many thousands of dollars over the remaining life of the loan, or Wells Fargo would persist with the unjustified foreclosure to take her home away from her and resell it in a booming market.

42.     Simmons refused to renegotiate her loan and is resisting the wrongful foreclosure, which remains pending.

43.     Wells Fargo's unlawful actions have caused Simmons emotional distress, and the pendency of the wrongful foreclosure and filing of a lis pendens against her property have damaged Simmons's credit rating, causing further injury.

## **CLASS ALLEGATIONS**

44.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and a class of Black and/or African American applicants or borrowers who applied for, received, or maintained credit from Defendants related to residential real estate and who were subjected to discrimination by Defendants due to their race. Plaintiffs seek certification of a liability and injunctive and declaratory relief class under Rule 23(b)(2) and 23(c)(4), and/or certification of a broader class under Rule 23(b)(3). All requirements of class certification are met by the proposed class.

45.     The class of Black and/or African American participants in Wells Fargo's home lending process is so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1).

46.     There are questions of law and fact common to the class, and those questions can and should be resolved in a single proceeding that furthers this litigation. Fed. R. Civ. P. 23(a)(2).

47.     The claims alleged by Plaintiffs are typical of the claims of the class. Fed. R. Civ. P. 23(a)(3).

48.     Plaintiffs will fairly and adequately represent and protect the interests of the class. Fed. R. Civ. P. 23(a)(4).

49.     The issue of determining liability regarding whether Defendant's policies and practices result in a pattern or practice of intentional discrimination and/or have a disparate impact against African Americans is appropriate for issue certification under Rule 23(c)(4). Other common issues are also appropriate for certification.

50.     Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate with regard to the class as a whole.  Fed. R. Civ. P. 23(b)(2).

51.     The questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3).

## COUNT I

### EQUAL CREDIT OPPORTUNITY ACT

52.     Plaintiffs, on behalf of themselves and all those similarly situated, reallege each and every paragraph above and incorporate them by reference as though fully stated herein.

53.     The Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*, makes it unlawful for a creditor to discriminate against any applicant with respect to any aspect of a credit transaction on the basis of race.

54.     As described above, Defendants are creditors because they regularly extend, renew, and continue credit, and Plaintiffs were applicants for credit.

55.     Defendants maintained a nationwide set of uniform, discriminatory mortgage loan origination, refinancing, and underwriting practices and engaged in a pattern or practice of

systemic race discrimination against Black and/or African American mortgage loan applicants and borrowers that constitutes illegal intentional race discrimination in violation of the Equal Credit Opportunity Act.

56.     Plaintiffs and all those similarly situated were subjected to and harmed by Defendant's systemic and individual discrimination.

57.     Defendants' unlawful conduct resulted in considerable harm to Plaintiffs and all those similarly situated.

58.     On behalf of themselves and the class they seek to present, Plaintiffs request the relief set forth below.

## COUNT II

### RACE DISCRIMINATION IN VIOLATION
### OF 42 U.S.C. § 1981

59.     Plaintiffs, on behalf of themselves and all those similarly situated, reallege each and every paragraph above and incorporate them by reference as though fully stated herein.

60.     Under 42 U.S.C. § 1981, persons of all races are guaranteed the same right to make and enforce contracts, regardless of race. The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

61.     Defendants maintained a nationwide set of uniform, discriminatory mortgage loan origination, refinancing, and underwriting practices and engaged in a pattern or practice of systemic race discrimination against Black and/or African American mortgage loan applicants and borrowers that constitutes illegal intentional race discrimination in the making and modification of contracts in violation of 42 U.S.C. § 1981.

AMENDED
COMPLAINT
- 15 -

62.     Plaintiffs and all those similarly situated were subjected to and harmed by Defendants' systemic and individual discrimination.

63.     On behalf of themselves and the class they seek to present, Plaintiffs request the relief set forth below.

## COUNT III

### RACE DISCRIMINATION IN VIOLATION
### OF 42 U.S.C. § 1982

64.     Plaintiffs reallege each and every paragraph above and incorporate them by reference as though fully stated herein.

65.     Under 42 U.S.C. § 1982, all citizens are guaranteed the same right to inherit, purchase, lease, sell, hold, and convey real and personal property, regardless of race.

66.     As set forth above, Defendants maintained a nationwide set of uniform, discriminatory mortgage loan origination, refinancing, and underwriting practices and engaged in a pattern or practice of systemic race discrimination against Black and/or African American mortgage loan applicants and borrowers that constitutes illegal intentional race discrimination and disparately impacts Black and/or African American applicants and borrowers in violation of 42 U.S.C. § 1982.

67.     Plaintiffs and all those similarly situated were subjected to and harmed by Defendants' systemic and individual discrimination.

68.     On behalf of themselves and the class they seek to present, Plaintiffs request the relief set forth below.

## COUNT IV

### RACE DISCRIMINATION IN VIOLATION OF
### THE FAIR HOUSING ACT OF 1968, 42 U.S.C § 3601 *et seq.*

69.     Plaintiffs reallege each and every paragraph above and incorporate them by reference as though fully stated herein.

70.     The Fair Housing Act, 42 U.S.C. § 3605(a), prohibits any entity whose business includes engaging in residential real estate-related transactions from discriminating against any person in making available such a transaction on the basis of race.

71.     Defendants' business includes engaging in residential real estate-related transactions.

72.     As set forth above, Defendants maintained a nationwide set of uniform, discriminatory mortgage loan origination, refinancing, and underwriting practices and engaged in a pattern or practice of systemic race discrimination against Black and/or African American mortgage loan applicants and borrowers that constitutes illegal intentional race discrimination and disparately impacts Black and/or African American mortgage loan applicants and borrowers in violation of the Fair Housing Act of 1968.

73.     Plaintiffs and all those similarly situated were subjected to and harmed by Defendants' systemic and individual discrimination.

74.     On behalf of themselves and the class they seek to present, Plaintiffs request the relief set forth below.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court find against Defendants as follows:

a.     Certify this case as a class action;

AMENDED
COMPLAINT
- 17 -

b.   Designate Plaintiffs as Class Representatives and designate Plaintiffs' counsel of record as Class Counsel;

c.   Declare that Defendants' acts, conduct, policies and practices are unlawful and violate the Equal Credit Opportunity Act, 42 U.S.C. §§ 1981 and 1982, and the Fair Housing Act;

d.   Declare that Wells Fargo engaged in a pattern and practice of racial discrimination against Black and/or African American applicants and borrowers;

e.   Order Plaintiffs and all others similarly situated offered mortgage loans at non-discriminatory rates, and otherwise make Plaintiffs whole;

f.   Award Plaintiffs and all others similarly situated compensatory and punitive damages;

i.   Award Plaintiffs and all others similarly situated prejudgment interest and attorneys fees, costs and disbursements, as provided by law;

j.   Award Plaintiffs and all others similarly situated such other make whole equitable, injunctive and legal relief as this Court deems just and proper to end the discrimination and fairly compensate Plaintiffs and all others similarly situated.

k.   Award Plaintiffs and all others similarly situated such other relief as this Court deems just and proper.

1

## **DEMAND FOR A JURY TRIAL**

2
   Plaintiffs hereby demand a jury trial as provided by Rule 38(a) of the Federal Rules of

3
Civil Procedure and Civil Local Rule 3-6.

4
                                                Respectfully submitted,

5
                                                BEN CRUMP, PLLC

6
                                                BENJAMIN CRUMP (Pro hac vice to be requested)

7
                                                633 Pennsylvania Avenue Northwest
                                                Floor 2

8
                                                Washington D.C. 20004

9
                                                Tel: (800) 713-1222
                                                court@bencrump.com

10
                                                STOWELL & FRIEDMAN, LTD.

11

12
                                                By: /s/ Linda D. Friedman
                                                LINDA D. FRIEDMAN (Appearing pro hac vice)

13
                                                SUZANNE E. BISH (Pro hac vice to be requested)
                                                **STOWELL & FRIEDMAN LTD.**

14
                                                303 W. Madison St.
                                                Suite 2600

15
                                                Chicago, Illinois 60606

16
                                                Phone: (312) 431-0888
                                                Lfriedman@sfltd.com

17

18
                                                SANI LAW FIRM

19
                                                SAM SANI (local counsel)
                                                **SANI LAW FIRM**

20
                                                15720 Ventura Blvd.
                                                Suite 405

21
                                                Encino, CA 94612
                                                Tel: (310) 935-0405

22
                                                ssani@sanilawfirm.com

23
                                                *Attorneys for Plaintiffs Williams, Albury, Simmons,*

24
                                                *individually and on behalf of all others similarly*
                                                *situated*

25

26

27

28
                                                AMENDED
                                                COMPLAINT
                                                - 19 -

# EXHIBIT D

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
Dennis S. Ellis (State Bar No. 178196)
  dellis@egcfirm.com
Noah S. Helpern (State Bar No. 254023)
  nhelpern@egcfirm.com
Ryan Q. Keech (State Bar No. 280306)
  rkeech@egcfirm.com
Stefan Bogdanovich (State Bar No. 324525)
  sbogdanovich@egcfirm.com
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697

Joseph Kiefer (*pro hac vice* forthcoming)
  jkiefer@egcfirm.com
152 West 57th St., 28th Fl.
New York, New York 10019
Telephone: (212) 413-2600
Facsimile: (212) 413-2629_

FRANK SIMS & STOLPER LLP
Jason Frank (State Bar No. 190957)
  jfrank@lawfss.com
Scott H. Sims (State Bar No. 234148)
  ssims@lawfss.com
Andrew D. Stolper (State Bar No. 205462)
  astopler@lawfss.com
19800 MacArthur Blvd., Suite 855
Irvine, California 92612
Telephone: (949) 210-2400
Facsimile: (949) 201-2405

Attorneys for Plaintiff Aaron Braxton, on
behalf of himself and all others similarly
situated

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AARON BRAXTON, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>WELLS FARGO BANK, N.A., a Delaware corporation; WELLS FARGO HOME MORTGAGE, INC., a | Case No.<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>**1. VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT, 15 U.S.C. § 1691, *ET SEQ.*<br>2. RACE DISCRIMINATION IN VIOLATION OF THE FAIR** |

Case No.

1  Delaware corporation,

2        Defendants.

**HOUSING ACT OF 1968, 42 U.S.C. § 3601, *ET SEQ.***
**3. RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981**
**4. VIOLATION OF THE UNRUH CIVIL RIGHTS ACT, CALIFORNIA CIVIL CODE § 51**
**5. VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**

**DEMAND FOR JURY TRIAL**

Plaintiff Aaron Braxton, individually and as a representative of a nationwide class of Black applicants for home mortgage refinancing through Wells Fargo and its related entities (collectively "Plaintiffs" or the "Class"), alleges as follows:

## I.     NATURE OF ACTION

1.     Homeownership has long been considered the cornerstone of the American Dream—allowing citizens to accumulate wealth through access to credit, generating equity, and reducing housing costs.[1]  For a decade, historically low interest rates have provided more and more Americans with access to this dream and, by way of refinanced lower home mortgages, the ability to pass their properties on to their next generation.

2.     But careful students of American history know that homeownership has for far too long been unattainable for a disproportionate number of Black Americans, and even worse, more difficult for Black Americans to maintain once achieved.  Indeed, prior to the passage of the Civil Rights Act (and sometimes even afterwards), Black American homeowners were systematically denied access to the financial benefits of this particular American Dream through the use of pernicious

_____

[1] https://www.forbes.com/sites/forbesrealestatecouncil/2021/09/28/homeownership-and-the-american-dream/?sh=1c78499623b5

COMPLAINT
Case No.

2013830.1

1   and pervasive race-based exclusions.  These included, for example, the Federal
2   Housing Administration's refusal to insure mortgages in and near Black
3   neighborhoods—a practice now referred to as "redlining"—at the same time that the
4   FHA subsidized builders who mass-produced entire subdivisions made for White
5   Americans.  These also included restrictive covenants in deeds that prohibited or
6   restricted the sale of American homes to Black Americans.

7       3.      The passage of the Civil Rights Act in 1965—and the judicial
8   interventions that followed—were supposed to fix that historical injustice, eliminate
9   race-based gatekeeping practices like redlining and restrictive covenants while
10   righting this long-standing American wrong.  For many homeowners seeking a first
11   or refinanced mortgage with some banks, it did.

12       4.      However, despite publicly touting their commitment to "help[] ensure
13   that all people across our workforce, our communities, and our supply chain feel
14   valued and respected and have equal access to resources, services, products, and
15   opportunities to succeed,"[2] Defendants in this case—Wells Fargo Bank, N.A. and
16   Wells Fargo Home Mortgage (collectively "Defendants" or "Wells Fargo")—have
17   continued to discriminate against Black American home loan applicants.  Federal
18   data shows that over the last several years thousands of Black homeowners have
19   been unable to maintain the dream of home ownership because of Wells Fargo's
20   ongoing and discriminatory modern day "redlining" practices.  These practices
21   delayed, obstructed and denied Black homeowners the benefit of lower interest rates
22   obtained through refinancing, forcing them to pay more for their loans than was
23   required of non-Black applicants, and in many cases sending them into foreclosure.[3]
24

25   _____
26   [2] https://www.wellsfargo.com/about/diversity/diversity-and-inclusion/

27   [3] https://www.nclc.org/images/pdf/special_projects/covid-
     19/IB_Covid_Black_Forbearance_Foreclosure.pdf
28

2013830.1

5.      Bloomberg reported that the data released under the federal Home Mortgage Disclosure Act shows unequivocally that Wells Fargo rejects a disproportionate number of Black homeowners' refinancing applications.[4]  Wells Fargo also makes the refinancing application process purposely more difficult and less attractive for Black applicants than others—on a consistently national scale—demanding higher interest rates for loans secured by homes located in neighborhoods with greater proportions of Black residents by placing its loan officers much farther away from those same neighborhoods.[5]  And Wells Fargo customers report that loan officers state that certain "areas" with large Black populations are ineligible for rapid valuations.[6]  Black applicants are further subjected to delays, feigned mistakes, and other obstacles, leading many Black Americans to withdraw their requests for refinancing, and leading others to wait indefinitely while Wells Fargo refuses to act upon their applications.

6.      Wells Fargo also uses automated algorithms and machine learning to make underwriting decisions.  But these, too, are infected with Wells Fargo's pervasive race-based discrimination.  Wells Fargo's algorithms and machine learning select "areas" and other characteristics for greater or lesser scrutiny of credit applications, which, over time, only exacerbates the wealth disparities between people living in those areas or among groups which tend to have certain characteristics analyzed by the algorithms and machine learning.

7.      Numbers do not lie and, here, the numbers tell a shameful story, without any legitimate explanation.  Data from eight million refinancing

---

[4] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-refinancing/

[5] *Id*.

[6] *Id*.

applications from 2020 reveal that "the highest-income Black applicants [had] an approval rate about the same as White borrowers in the lowest-income bracket."[7] White refinancing applicants earning between $0 and $63,000 a year were ***more likely*** to have their refinancing application approved by Wells Fargo than Black refinancing applicants earning between $120,000 and $168,000 a year.[8]  Overall, in 2020, Wells Fargo rejected a ***majority*** of all the completed applications submitted by Black homeowners.[9]  And because Wells Fargo designed an application process that is disproportionately difficult for Black homeowners to complete, 27% of all Black homeowners who began a refinance application with Wells Fargo withdrew it.[10]

8.     As a result of its discriminatory practices, Wells Fargo was the only major lender in the United States that approved a smaller share of refinancing applications from Black homeowners in 2020 than it had in 2010.[11]  And its disproportionally low approval rates for Black applicants are well below the national average.

9.     In 2020—at the height of the refinancing boom, when millions of Americans benefitted from the historically low interest rate environment—Wells Fargo approved 47% of all applications by Black homeowners (meaning that Wells Fargo rejected the majority of applications from Black homeowners), whereas all

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.*

other lenders approved 71% of all applications by Black homeowners.[12]

10.   No other lending institution rejected a majority of Black homeowners' applications for refinancing.[13]

11.   Wells Fargo also systematically and discriminatorily applied to Black refinance applicants some of the tightest lending standards in the industry, which disproportionately affect minority applicants.[14]  A study done by the Board of Governors of the Federal Reserve System analyzing federal mortgage data stated that they "do not have any evidence [a]s to whether these tighter standards reduce loan risk to justify the disparate impact on minority denials they are associated with."[15]  And after controlling for relevant underwriting factors (debt-to-income ratios, loan-to-value ratios, credit scores, etc.) the study found that "[l]enders who impose the strictest standards on their white applicants [like Wells Fargo] tend to have the largest unexplained excess denials of minority applicants."[16]

12.   Plaintiff Aaron Braxton is one victim of Wells Fargo's discriminatory policies.  Mr. Braxton is a financially successful and eminently creditworthy Black playwright, performer, and a math and science teacher with a Masters degree from the University of Southern California.[17]  He has authored several award winning

---

[12] *Id*.

[13] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-refinancing/

[14] *Id*.

[15] *How Much Does Racial Bias Affect Mortgage Lending? Evidence from Human and Algorithmic Credit Decisions*, Neil Bhutta, Aurel Hizmo, and Daniel Ringo (July 2021), at 12, n.20. Available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3887663

[16] *Id*. at 12.

[17] https://www.imdb.com/name/nm1347914/bio?ref_=nm_ov_bio_sm

1   plays, including *DID YOU DO YOUR HOMEWORK?*, which broke the Beverly

2   Hills Playhouse's record for longest running play (9 months).[18]  He has also written

3   several films and television pilots, and acted in several film, television, and theatre

4   projects.[19]

5        13.    In addition, for two decades, Mr. Braxton was a loyal Wells Fargo

6   mortgage customer.  He purchased his home in 2000, in a historically Black

7   neighborhood located in South Los Angeles near the campus of the University of

8   Southern California and secured his property with a Wells Fargo home mortgage

9   insured by the Federal Housing Administration.  Mr. Braxton always made his

10  mortgage payments and bills on time, and he had a good credit score.

11       14.    Yet despite his successful career and his creditworthiness, when Mr.

12  Braxton sought to refinance his home mortgage loans in August of 2019, Wells

13  Fargo consistently obstructed his ability to refinance his loan.  Despite favorable

14  loan-to-value metrics and his personal history with the institution, Wells Fargo was

15  focused more on his race and the location of his home within a historically Black

16  Los Angeles neighborhood, and used the fact of his race and the location of his

17  home to delay, obstruct and deny him the full benefits of historically low home

18  mortgage interest rates.  Wells Fargo did this even though, having paid his loan for

19  more than 18 years, Mr. Braxton had equity in his home far greater than the amount

20  remaining, on his Federal Housing Administration (FHA) secured loan.

21       15.    Mr. Braxton was given the runaround to such an extent that it took him

22  over nine months to refinance his federally backed mortgage loan (and 12 months to

23  refinance his home equity loan) at an above-market interest rate of around 4%.  This

24  was after various Wells Fargo representatives kept telling him they lost his

25  paperwork, made incomplete inquiries and needed to request more information,

26  _____

27  [18] *Id.*

28  [19] *Id.*

1  delayed its responses, and even placed him into an unsolicited debt-trap deferred

2  payment program without his permission.  It was only after Mr. Braxton notified the

3  Department of Housing and Urban Development ("HUD") that Wells Fargo

4  approved the refinancing of his federally backed FHA loan (indeed, Wells Fargo

5  approved the application the very next day).  Of course, for the prolonged period

6  that Mr. Braxton was waiting for Wells Fargo to refinance his loans, he was paying

7  the higher rates associated with his original loans.

8       16.   Mr. Braxton's experience is unfortunately consistent with the

9  experiences of thousands of Black Americans who have been victimized by Wells

10  Fargo's intentional, knowing and systematic race discrimination, violating the

11  contractual, commercial and civil rights of Class members and causing millions (and

12  perhaps even billions) of dollars in damages to the Nationwide Class.  Individually

13  and as a representative of the Class, Mr. Braxton brings this action to make good to

14  the Class all damages resulting from Defendants' violations of the federal civil

15  rights laws and to restore to the Class any amounts to which they otherwise would

16  have been entitled, together with other equitable and remedial relief as the Court

17  may deem appropriate.

18               **II.   JURISDICTION AND VENUE**

19       17.   This Court has federal question jurisdiction over this matter pursuant to

20  28 U.S.C. §§ 1331, 1332(d), and 1343, because the Plaintiff asserts federal causes of

21  action, because Plaintiff asserts civil rights causes of action, and because at least one

22  member of the Class is a citizen of a different state than all Defendants, and because

23  the amount in controversy exceeds $5,000,000.

24       18.   Personal jurisdiction is appropriate over Defendants because Wells

25  Fargo Bank, N.A. transacts business in the State of California and has its principal

26  place of business in San Francisco, California.  Wells Fargo Home Mortgage, Inc.

27  originates loans to California customers from its California offices and maintains a

28  systematic and continuous presence in the State.

19.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b) because Wells Fargo Bank, N.A. resides in this district, a substantial part of the events or omissions giving rise to the claim occurred in this district, and Wells Fargo Bank, N.A.'s principal place of business is in this district.

### III.   PARTIES

20.     Plaintiff Aaron Braxton, who is Black, is a natural person and a citizen of the State of California and resides in Los Angeles, California.

21.     Defendant Wells Fargo Bank, N.A. is a publicly traded, global financial services firm and a Fortune 500 corporation incorporated in Delaware with its principal place of business in San Francisco, California.  As of December 31, 2020, Wells Fargo has assets of approximately $1.9 trillion, loans of $887.6 billion, deposits of $1.4 trillion, and stockholders' equity of $185 billion.  Wells Fargo is a mortgage lender; and also provides a wide variety of financial products and services to its global and domestic clients.

22.     Defendant Wells Fargo Home Mortgage, Inc. is a home lending company that is part of the "Wells Fargo banking family."  It operates about 725 mortgage stores nationally and originates and services one-to-four-family residential first and junior-lien mortgages and home equity loans.  On average, it originates approximately $300 billion worth of loans per year.  It is incorporated in the State of Delaware, and has its principal place of business in Des Moines, Iowa. Wells Fargo Home Mortgage, Inc. originates loans to California customers from its California office locations.

### IV.   FACTUAL ALLEGATIONS

23.     During the last few years interest rates were near an all-time low in the United States, and homeowners who held mortgage loans at higher rates (meaning a great deal of homeowners) sought to refinance their loans at lower rates.  Refinancing would allow a homeowner to significantly reduce their monthly payments and to owe less mortgage interest over the life of the loan.  Over the last

two years, homeowners in the United States refinanced over $5 trillion worth of mortgages.

**A.      Wells Fargo's Discriminatory Refinancing Practices**

24.     Wells Fargo is a major issuer of home-based loans in the United States, holding nearly a trillion dollars in outstanding debt.

25.     Wells Fargo's discrimination began at the latest in 2018 and continues through today.

26.     In 2020, Defendant Wells Fargo approved Black homeowner refinancing applications at a rate lower than that of any other major lender in America.  It is the only lender that approved fewer such applications in 2020 than it did in 2010.[20]

27.     Bloomberg analyzed data from eight million refinancing applications from 2020, released under the Home Mortgage Disclosure Act, and found that, for Wells Fargo, "the highest-income Black applicants [had] an approval rate about the same as White borrowers in the lowest-income bracket."[21]

28.     The disparate treatment of Black applicants results at least in part from Wells Fargo's tactics that, in practice, perpetuate redlining of areas with disproportionately more Black residents and imposing in those areas hurdles and obstacles that either delay or prevent refinancing.

29.     For example, in order to minimize the likelihood and frequency of Black mortgage applications, Wells Fargo systematically and intentionally places its loan officers in areas with disproportionately low numbers of Black residents.  In many cities across the nation with large Black populations, like Atlanta, Baltimore,

---

[20] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-refinancing/

[21] *Id.*

COMPLAINT

Case No.

2013830.1

and Philadelphia, Wells Fargo's online store locator will direct individuals in predominately Black ZIP codes to areas in predominately White ZIP codes.[22] Likewise, in New Haven, Connecticut, which in 2020 was a hot spot for denials, the nearest Wells Fargo loan officer available to homeowners was 25 miles away.  Even to initiate the application process by visiting a loan officer, a Black applicant had to do more than a non-Black applicant.

30.     The effect of this is clear: while Wells Fargo's approval rates for Black refinancing applicants are much lower than the approval rates for Black applicants at other national banks, *this gap widens in counties with more Black residents*.[23]  As noted above, nationally, Wells Fargo approved just 47% of its Black refinancing applicants.[24]  However, in Fulton County, which has more Black than white residents, Wells Fargo only approved 43% of its Black refinancing applications, nearly 10% less than its already-low national approval rate.[25]

31.     And even for those Black applicants whose loans were ultimately approved, they faced delays that White applicants living in predominately White neighborhoods did not, causing them damages through continued higher mortgage rates during the unjustified delay as they awaited loan approval.  In some cases, Wells Fargo officers simply told Black applicants living in predominately Black neighborhoods that "perhaps the area is not eligible" for quick evaluations of refinancing applications.[26]  Wells Fargo regularly approved refinancing applications

---

[22] https://www.wellsfargo.com/locator/mortgage/consultant .

[23] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-refinancing/

[24] *Id*.

[25] *Id*.

[26] *Id*.

of non-Black homeowners in a matter of weeks, but only approved the applications of Black homeowners after many months (if those Blacks applicants happened to be approved).

32.    Wells Fargo also perpetuated its discriminatory practices using algorithms.  Wells Fargo identifies neighborhoods eligible for quick evaluations of refinancing applications using an internal algorithm.

33.    The director of the CFPB describes these types of banking algorithms as "black boxes behind brick walls."[27]  "When consumers and regulators do not know how decisions are made by the algorithms, consumers are unable to participate in a fair and competitive market free from bias." [28]

34.    Wells Fargo's algorithm singled out predominately Black neighborhoods and labeled those neighborhoods ineligible for rapid processing, which led loan officers to inform Black applicants that they could not enjoy the same rapid application processing as white applicants.

35.    Wells Fargo's lending standards also help to perpetuate its discrimination of Black applicants.  Wells Fargo has the strictest lending policies of any other major lender.[29]  And as a result, Wells Fargo has the largest disparity between the approval rates of Black refinancing applicants to white refinancing applicants—25% compared to 16%.[30]  A study done by the Board of Governors of the Federal Reserve System analyzing federal mortgage data stated that they "do not

---

[27] https://www.consumerfinance.gov/about-us/newsroom/remarks-of-director-rohit-chopra-at-a-joint-doj-cfpb-and-occ-press-conference-on-the-trustmark-national-bank-enforcement-action/

[28] *Id*.

[29] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-refinancing/

[30] *Id*.

1   have any evidence [ ] as to whether these tighter standards reduce loan risk to justify

2   the disparate impact on minority denials they are associated with."[31]   And after

3   controlling for relevant underwriting factors (debt-to-income ratios, loan-to-value

4   ratios, credit scores, etc.) the study found that "[l]enders who impose the strictest

5   standards on their white applicants tend to have the largest unexplained excess

6   denials of minority applicants."[32]   The study also found that, under the more

7   stringent standards, "Black applicants are 1.9 percentage points more likely…to be

8   denied than a comparable white applicant after controlling flexibly for an array of

9   important underwriting factors."[33]

10       36.    This Federal Reserve study also found that the most common reasons

11   for denials "for Black applicants [were] 'incomplete' [documents] and

12   'verification'" issues.[34]   The study found that loan officers like those of Wells Fargo

13   "may work less diligently with minority borrowers to gather all necessary

14   documents or verify aspects of their application, resulting in a denial."[35]   Excess

15   denials are also caused by "issues with the latter stages of the mortgage application

16   process that disproportionately affect minorities."[36]   Wells Fargo's loan officers'

17   lack of diligence in processing applications from Black homeowners seeking

18   refinancing caused disproportionate delays in the processing of their applications,

19

20   [31] *How Much Does Racial Bias Affect Mortgage Lending? Evidence from Human*
21   *and Algorithmic Credit Decisions*, Neil Bhutta, Aurel Hizmo, and Daniel Ringo
     (July 2021), at 12, n.20. Available at:
22   https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3887663

23   [32] *Id*. at 12.

24   [33] *Id*. at 9.

25   [34] *Id*. at 13.

26   [35] *Id*. at 13, n.23.

27   [36] *Id*. at 14.

28

2013830.1

causing damage even when the loans were ultimately approved.

37.    The above practices are arbitrary and artificial and unnecessary to achieve a valid interest or legitimate objective.  The vast difference between refinancing approval rates Wells Fargo issued to Black Americans as compared to any other lending institutions' approval rates negates any possible legitimate objective.

38.    As noted, the above practices have a disproportionately adverse effect on Black Americans seeking to refinance their loans.  Black Americans are members of a protected class.

39.    Wells Fargo's practices directly harmed Black Americans by forcing them to pay higher interest rates while applications were pending, by forcing them to pay higher interest rates when applications were completed, and/or by denying refinancing applications.  In the absence of these policies, Black Americans would not have had to pay higher rates or face rejection in their refinancing applications.

40.    The disparity between Wells Fargo's treatment of Black American applicants and non-Black American applicants is significant and shocking.  As noted, a White American in the lowest income bracket was just as likely to receive refinancing approval as a Black American in the highest income bracket.

41.    Wells Fargo's racial discrimination during the refinancing boom is consistent with Wells Fargo's sordid history of racial discrimination in lending.  In 2012, it agreed to pay $184 million to settle claims with the Department of Justice that the bank pushed Black and Hispanic homeowners to obtain subprime mortgages, and then charged them higher fees and interest rates.[37]

42.    Several municipalities have sued Wells Fargo as well.  In 2019, it settled a lawsuit with the City of Philadelphia premised on allegations that it

---

[37] https://www.justice.gov/opa/pr/justice-department-reaches-settlement-wells-fargo-resulting-more-175-million-relief.

COMPLAINT

2013830.1

purposefully made it difficult for minorities to refinance their mortgages.[38]

43.     Worse yet, despite harming Black homeowners by making it more difficult to refinance their loans, Wells Fargo deceives the public by trumpeting its supposed commitment to diversity, equity and inclusion.  In its 2020 annual report, Wells Fargo expressed its supposed commitment to "the concept of equity to our diversity and inclusion efforts in recognition of the systemic and structural challenges in our society that have contributed to disparities that exist today." [39]

44.     In the same year that Wells Fargo denied a majority of Black homeowners' refinancing applications, the Wells Fargo CEO claimed that "the calls for racial justice in 2020 reinforced the urgency of working to create a company culture with broad representation in who we are, how we think, and how we make decisions."[40]  However these words ultimately ring hollow, because it denied Black homeowners refinancing at much higher rates than any other major lender in that same year.

**B.     Plaintiff Aaron Braxton is Harmed by Wells Fargo's Race-Based Discrimination**

45.     Plaintiff Aaron Braxton purchased his home in South Los Angeles, California, near the University of Southern California, in April 2000, through a Wells Fargo home loan for $139,500 ("First Loan").  This First Loan was insured through the FHA. In 2005, after the price of the house appreciated, he took out a second home equity line of credit loan, also from Wells Fargo ("Second Loan").  He improved upon the property and built an accessory dwelling unit.  Today, the home

---

[38] https://www.phila.gov/2019-12-16-city-of-philadelphia-and-wells-fargo-resolve-litigation/.

[39] 2020 Annual Report, at 17; accessible at https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/annual-reports/2020-annual-report.pdf.

[40] *Id*. at 16.

Case No.

2013830.1

is worth approximately $800,000, as it was in 2019.  In or about August 2019, Mr. Braxton began the process of applying to refinance his two Wells Fargo loans to take advantage of reduced interest rates.  At the time, he owed $185,000 on both his Wells Fargo loans and paid a 6% interest rate on both loans, multiple percentage points higher than the average refinance rate at the time.

46.     When Mr. Braxton initially applied to refinance his First Loan, Wells Fargo repeatedly asked him to resubmit paperwork because Wells Fargo representatives claimed the paperwork was either missing or lost.  Wells Fargo representatives also continually took weeks and weeks to issue or reply to correspondence.  Mr. Braxton thereafter began the process of refinancing his Second Loan and was confronted with the same delays.

47.     Frustrated by the delays and because he was continuing to pay a higher mortgage rate while his applications were pending, Mr. Braxton regularly contacted his loan officers and other Wells Fargo personnel to ask about the status of his applications.

48.     After months of frustrating encounters with Wells Fargo personnel, Mr. Braxton decided to call HUD.  A HUD representative informed Mr. Braxton that they would be contacting Wells Fargo.  The very next day, Wells Fargo approved the refinancing of Mr. Braxton's federally backed FHA home loan, approximately nine months after he began the process.

49.     Eventually, around October 2020, Wells Fargo finally approved a refinancing of his Second Loan.  However, despite the contact from HUD, which presumably prompted it to act on Mr. Braxton's First Loan, Wells Fargo continued its discrimination through race-based application delays.  It continued to claim that paperwork needed to process the Second Loan was missing, even though Mr. Braxton had already provided the paperwork.  At one point, after having sent a notary to his home to finalize some paperwork, Wells Fargo informed Mr. Braxton that the notary had lost the paperwork and he needed to complete some forms again.

50.     All told, Mr. Braxton submitted four applications because Wells Fargo kept losing them.  During the 16 months that his applications were pending, Mr. Braxton continued to pay the higher original mortgage rates instead of the lower refinanced rates he was seeking (and ultimately proven entitled to).  However, unbeknownst to Mr. Braxton, in the end the rate he received for his refinancing, while lower than his original rate, was much higher than the fair market rate received by similarly situated non-Black applicants.

## V.     CLASS ALLEGATIONS

51.     Plaintiff Aaron Braxton brings this action on behalf of himself and a potential class of similarly situated Black Americans.

52.     Each and every claim alleged in this case is also alleged on behalf of every member of the Class.

**A.     Class Definition**

53.     The Class includes all Black persons in the United States who, from January 1, 2018 through the present (the "Class Period"), submitted an application to refinance their home mortgage through Defendants that was (i) processed at a rate slower than that of the average processing time of applications made by non-Black applicants; or (ii) whose applications were denied; or (iii) whose resulting refinance loans were made at higher interest rates as compared to similarly situated non-Black applicants.  Excluded from the Class are Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this complaint, and the United States government.

54.     Class certification is authorized under Federal Rule of Civil Procedure 23 and applies to claims for injunctive and equitable relief, including restitution, under Rule 23(b)(2), and for monetary damages under Rule 23(b)(3).

55.     There are at least 13,000 members of the Class.

56.     The number of persons who fall within the definitions of the Class are so numerous and geographically dispersed so as to make joinder of all members of

1  the Class or Subclass in their individual capacities impracticable, inefficient, and

2  unmanageable, and without class-wide relief, each member of the Class would

3  effectively be denied his, her, or their rights to prosecute and obtain legal and

4  equitable relief based on the claims and allegations averred in the Complaint.

5        57.    Plaintiff, as detailed below, can fairly and adequately represent the

6  proposed Class.  In the alternative, Plaintiff can act as the representative of the

7  below subclasses.

8  **B.**    **Proposed Subclasses**

9        58.    Additionally, or in the alternative, pursuant to Federal Rule of Civil

10  Procedure 23(c)(5), Mr. Braxton brings this action on behalf of the following

11  subclasses:

12        59.    The Delayed Refinancing Subclass:  All Black persons in the United

13  States who applied for refinancing from the Defendants during the class period and

14  whose applications processed at a rate slower than that of the average processing

15  time of applications made by non-Black applicants.

16        60.    The Higher Rate Subclass:  All Black persons in the United States who

17  applied for refinancing from the Defendants during the class period and whose

18  refinancing applications were eventually approved, but at a higher interest rate than

19  prevailing market rates based on their creditworthiness.

20  **C.**    **Numerosity and Ascertainability**

21        61.    **Numerosity.**  While the exact numbers of the members of the Class

22  and Subclasses are unknown to Plaintiff at this time, membership in the Class and

23  Subclasses may be ascertained from the records maintained by Wells Fargo.  At this

24  time, Plaintiff is informed and believes that the Class includes hundreds of

25  thousands of members and the Subclasses includes tens of thousands of members.

26  Therefore, the Class and Subclasses are sufficiently numerous that joinder of all

27  members of the Class and Subclasses in a single action is impracticable under Rule

28  23(a)(1) of the Federal Rules of Civil Procedure, and the resolution of their claims

1  through a class action will be of benefit to the parties and the Court.

2        62.    **Ascertainability.**  The names and addresses of the members of the

3  Class and Subclasses are contained in Wells Fargo's records.  Notice can be

4  provided to the members of the Class and Subclasses through direct mailing, email,

5  publication, or otherwise using techniques and a form of notice similar to those

6  customarily used in consumer class actions arising under State and Federal law.

7  **D.**    **Commonality and Predominance**

8        63.    This matter involves common questions of law and fact which

9  predominate over any question solely affecting individual Class Members.

10        64.    The common questions of law and fact include, but are not limited to:

11        •    Whether Defendant systematically discriminated against Class
Members on account of their race;

12

13        •    Whether Black applicants' home mortgage and refinance
applications were processed at a rate slower than that of the
average processing time of applications made by non-Black
applicants;

14

15        •    Whether Black applicants' home mortgage and refinance
applications were denied when the score of a similarly situated
non-Black applicant would be approved;

16

17        •    Whether Black applicants' resulting refinance loans were made
at higher interest rates as compared to similarly situated non-
Black applicants;

18

19        •    Whether Defendant selected disproportionately white areas for
rapid refinancing evaluation and disproportionately Black areas
for increased scrutiny;

20

21        •    Whether Defendants' underwriting algorithms and machine
learning programs were racially biased and led to unfairly
discriminatory credit policies that harmed Black refinancing
applicants.

22

23

24        65.    **Predominance.**  Class action status is warranted under Rule 23(b)(3) of

25  the Federal Rules of Civil Procedure because questions of law or fact common to the

26  members of the Class and Subclasses predominate over any questions affecting only

27  individual members.  The interests of the members of the Class and Subclasses in

28  individually controlling the prosecution of separate actions are theoretical and not

-19-
COMPLAINT               Case No.

1 | practical.  Prosecution of this action through multiple Class Representatives would

2 | be superior to individual lawsuits.  Plaintiff is not aware of any difficulty which will

3 | be encountered in the management of this litigation which should preclude its

4 | maintenance as a class action.

5 | **E.     Typicality and Adequacy**

6 |     66.     Plaintiff Aaron Braxton's claims are typical of the other Class

7 | Members' claims because all Class Members were injured in the same manner as a

8 | result of substantially similar conduct by Wells Fargo.

9 |     67.     Mr. Braxton is an adequate Class Representative because his interests

10 | do not conflict with the interests of the other members of the Class and Subclasses

11 | he seeks to represent.  Plaintiff has retained counsel competent and experienced in

12 | complex class action litigation, and Plaintiff intends to prosecute this action

13 | vigorously.  The Class and Subclasses' interests will be fairly and adequately

14 | protected by Plaintiff and his counsel.

15 | **F.     Superiority**

16 |     68.     A class action is the superior method for the fair and efficient

17 | adjudication of this matter, because the damages and other harms suffered by

18 | Plaintiff and other Class Members are small compared to the burden and expense of

19 | individual litigation.  Thus, it would be impractical, if not impossible, for individual

20 | plaintiffs to seek redress against Defendants for the harms suffered.

21 |     69.     Individual litigation of these harms would also be inefficient for the

22 | court system, and would create a risk of inconsistent or contradictory rulings and

23 | judgments.

24 |     70.     No unusual circumstances exist that would make this matter more

25 | difficult to manage than a typical class action.  Individualized damages figures can

26 | be mathematically computed by collecting data about the length of each Class

27 | Member's delay and the differential between the interest rates they ultimately

28 | received versus the prevailing market rate based on race-neutral variables such as

1  debt-to-income ratio, loan-to-value ratio, and credit score.

2  **G.   Injunctive Relief**

3      71.   Plaintiff also seeks to represent a class under Rule 23(b)(2) seeking

4  injunctive relief forcing Wells Fargo to cease and desist its current discriminatory

5  practices.

6  <u>**COUNT I**</u>

7  **VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT**

8  **15 U.S.C. § 16901, *et seq.***

9      72.   Plaintiff, on behalf of himself and all those similarly situated, realleges

10  each and every paragraph above and incorporates them by reference as though fully

11  stated herein.

12      73.   The Equal Credit Opportunity Act makes it unlawful for a creditor to

13  discriminate against any applicant with respect to any aspect of a credit transaction

14  on the basis of race.

15      74.   The Equal Credit Opportunity Act applies to applications for

16  refinancing, like those of the Plaintiff and others similarly situated.  Plaintiff applied

17  for credit by seeking to refinance his home loans.

18      75.   Defendants are creditors because they regularly extend, renew, and

19  continue issuances of credit.

20      76.   Defendants' consistent delays, roadblocks, feigned difficulties, and

21  sometimes denials of applications for refinancing submitted by Black Americans

22  constitute race-based discrimination forbidden by the Equal Credit Opportunity Act.

23      77.   Plaintiff and all those similarly situated were harmed by Defendants'

24  conduct, including but not limited to harm in the form of higher interest rates paid

25  while applications were pending, higher interest rates paid upon a delayed approval,

26  or from a denied application.

27      78.   On behalf of himself and the Class he seeks to represent, Plaintiff

28  requests the relief set forth below.

## COUNT II

### RACE DISCRIMINATION IN VIOLATION OF THE FAIR HOUSING ACT
### OF 1968, 42 U.S.C. § 3601, *et seq.*

79.     Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

80.     The Fair Housing Act makes it unlawful, in residential real estate transactions, such as refinancing, to discriminate against designated classes of individuals.

81.     Plaintiff and others similarly situated sought to engage in residential real estate transactions with the Defendants.

82.     Plaintiff and others similarly situated are Black Americans and therefore members of a protected class under the Fair Housing Act.

83.     Defendants refused to transact business with Plaintiff and others similarly situated when they refused to approve refinancing applications on the same timeline as the applications made by other parties with similar qualifications that were not members of the protected class, by causing applicants to withdraw applications due to roadblocks and feigned difficulties, or by denying refinancing applications.  As noted, Defendants approved fewer than half of Black homeowners' refinancing applications in 2020 while approving 71% of the applications of White homeowners.

84.     Defendants refused to transact business with Plaintiff and those similarly situated during the Class Period and at the same time did transact business with non-Black homeowners with similar qualifications.

85.     Plaintiff and those similarly situated were injured by Defendants' refusal to transact business with them because they paid application fees for refinancing applications that were delayed or denied, because they continued to pay higher interest rates while their delayed applications were pending, because they were provided with higher interest rates than other homeowners with similar

qualifications, and/or because their applications were denied.

## COUNT III

### RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981

86.     Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

87.     Under 42 U.S.C. § 1981, persons of all races are guaranteed the same right to make and enforce contracts, regardless of race.  The term "make and enforce" contracts includes the making, performance, modification, and terminations of contracts, as well as all of the other aspects of a contractual relationship.

88.     By seeking to refinance their home loans and submitting an application to Defendants, Plaintiff and others similarly situated sought to "make and enforce" contracts with the Defendants.

89.     Plaintiff and those similarly situated were denied their right to make and enforce contracts when Defendants refused to provide refinancing on the same terms as they offered to members of a different race, by delaying or frustrating the applications process, and/or by denying the applications.

90.     Plaintiff and those similarly situated were harmed by Defendants' denial of their rights to make and enforce contracts.

## COUNT IV

### VIOLATION OF THE UNRUH CIVIL RIGHTS ACT,
### CALIFORNIA CIVIL CODE §51

91.     Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

92.     The Unruh Civil Rights Act provides that all persons within the State of California are free and equal no matter their race and are entitled to full and equal treatment in all business establishments.

93.     The Unruh Civil Rights Act thus prohibits discrimination of any kind

-23-

COMPLAINT

Case No.

2013830.1

1   against any person in any business establishment.

2        94.   Defendants are business establishments under the Unruh Civil Rights

3   Act.

4        95.   Plaintiff and other individuals similarly situated were denied full and

5   equal treatment under the Unruh Civil Rights Act when Defendants refused to offer

6   them refinancing terms on the same terms as individuals who were not Black

7   Americans.

8        96.   Plaintiff and other individuals similarly situated were harmed by

9   Defendants' refusal to transact business with them because they paid application

10   fees for refinancing applications that were delayed or denied, because they

11   continued to pay higher interest rates while their delayed applications were pending,

12   because they were provided with higher interest rates than other homeowners with

13   similar qualifications, and/or because their applications were denied.

14                  **<u>COUNT V</u>**

15   **VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**

16        97.   Plaintiff realleges each and every paragraph above and incorporates

17   them by reference as though fully stated herein.

18        98.   The California Unfair Competition Law ("UCL") forbids "unlawful,

19   unfair or fraudulent" conduct in connection with business activity.

20        99.   Defendants' business offering refinancing of existing loans is a

21   business activity under the UCL.

22        100.   Plaintiff and others similarly situated are "persons" under the UCL.

23        101.   Defendants' conduct described herein constitutes unlawful competition,

24   as in the course of engaging in the business acts described above, it engaged in

25   conduct that constituted a predicate violation of the laws identified herein, namely

26   the Equal Credit Opportunity Act, the Fair Housing Act, 42 U.S.C. § 1981, and the

27   Unruh Civil Rights Act.

28        102.   Defendants' conduct described herein constitutes unfair competition

1  under the UCL, as their practices are likely to deceive the public by informing the

2  public of an alleged commitment to diversity and equality, but instead using hidden

3  business practices designed to deny, delay and refuse the refinancing of loans of

4  Black Americans, and subjecting those that are approved, to unfavorable terms.  As

5  there is no legitimate justification for these practices, which have a

6  disproportionately negative impact on the public, in comparison to any fair business,

7  purpose Defendants' practices are unfair as defined under the UCL.

8        103.   Defendants' conduct described herein constitutes fraudulent

9  competition under the UCL, as they advertise and other wise state that they are

10  committed to diversity and equality, and will fairly and quickly process the

11  refinancing applications of all applicants, but instead use hidden business practices

12  designed to deny, delay and refuse the refinancing of loans of Black Americans, and

13  subjecting those that are approved, to unfavorable terms.  These business practices

14  are likely to deceive the public, and thus are fraudulent.

15        104.   Plaintiff and those similarly situated were injured by Defendants'

16  refusal to transact business with them because they paid application fees for

17  refinancing applications that were delayed or denied, because they continued to pay

18  higher interest rates while their delayed applications were pending, because they

19  were provided with higher interest rates than other homeowners with similar

20  qualifications, and/or because their applications were denied.

21                        **PRAYER FOR RELIEF**

22        WHEREFORE, Plaintiff respectfully requests that this Court provides the

23  following relief:

24        a.     Certify the 23(b)(2) and 23(b)(3) classes outlined above;

25        b.     Designate Plaintiff as a Class Representative and designate the

26               undersigned counsel as lead Class Counsel;

27        c.     Find that Defendants' acts described herein violate the Equal Credit

28               Opportunity Act, the Fair Housing Act, 42 U.S.C. § 1981, the Unruh

-25-
COMPLAINT                                          Case No.

2013830.1

1    Civil Rights Act, and the California UCL;

2    d.    Find that Defendants have engaged in a pattern and practice of racial

3          discrimination resulting in the harm to Plaintiff and class members

4          described above;

5    e.    Award Plaintiff and all others similarly situated restitutionary relief,

6          together with compensatory and punitive damages;

7    f.    Award Plaintiff and all others similarly situated injunctive relief by

8          ordering Defendants to stop the discriminatory practices described

9          herein;

10   g.    Award Plaintiff and all others similarly situated prejudgment interest

11         and attorney's fees, costs, and disbursements; and

12   h.    Award Plaintiff and all others similarly situated such other relief as this

13         Court deems just and proper.

14              **<u>DEMAND FOR JURY TRIAL</u>**

15   Plaintiff demands a trial by jury of all issues so triable.

16

17   DATED:  March 18, 2022          ELLIS GEORGE CIPOLLONE
                                     O'BRIEN ANNAGUEY LLP
18                                        Dennis S. Ellis
19                                        Noah S. Helpern
                                          Ryan Q. Keech
20                                        Joseph Kiefer (*pro hac vice* forthcoming)
21                                        Stefan Bogdanovich

22

23
                                     By: _____
24
                                          Dennis S. Ellis
25                                   Attorneys for Plaintiff Aaron Braxton and all
26                                   other similarly situated Plaintiffs

27

28

                              COMPLAINT                          Case No.
2013830.1

DATED:  March 18, 2022          FRANK, SIMS & STOLPER LLP
                                        Jason M. Frank
                                        Scott H. Sims
                                        Andrew D. Stolper


                                By:  ____/s/ Jason Frank_____
                                        Jason Frank
                                Attorneys for Plaintiff Aaron Braxton and all
                                other similarly situated Plaintiffs

**Attestation under N.D. Cal. L.R. 5-1(h)**: the ECF filer of this document attests that all of the other signatories have concurred in the filing of the document, which shall serve in lieu of their signatures on the document.

-27-
COMPLAINT

Case No.

2013830.1

# EXHIBIT E

1  ELLIS GEORGE CIPOLLONE
   O'BRIEN ANNAGUEY LLP
2  Dennis S. Ellis (State Bar No. 178196)
     dellis@egcfirm.com
3  Trent B. Copeland (State Bar No. 136890)
     tcopeland@egcfirm.com
4  Ryan Q. Keech (State Bar No. 280306)
     rkeech@egcfirm.com
5  2121 Avenue of the Stars, Suite 2800
   Los Angeles, California 90067
6  Telephone: (310) 274-7100
   Facsimile: (310) 275-5697
7

8  FRANK SIMS & STOLPER LLP
   Jason Frank (State Bar No. 190957)
9    jfrank@lawfss.com
   Scott H. Sims (State Bar No. 234148)
10    ssims@lawfss.com
   Andrew D. Stolper (State Bar No. 205462)
11    astolper@lawfss.com
   19800 MacArthur Blvd., Suite 855
12 Irvine, California 92612
   Telephone: (949) 210-2400
13 Facsimile: (949) 201-2405

14 (Additional Counsel on Signature Page)

15 Attorneys for Plaintiffs Aaron Braxton,
   Gia Gray, Bryan Brown, Paul Martin, on
16 behalf of themselves and all others
   similarly situated

17

18                    UNITED STATES DISTRICT COURT

19                  NORTHERN DISTRICT OF CALIFORNIA

20

21 AARON BRAXTON, GIA GRAY,          Case No. 4:22-cv-01748-KAW
   BRYAN BROWN AND PAUL
22 MARTIN, on behalf of themselves and **FIRST AMENDED CLASS ACTION**
   all others similarly situated,      **COMPLAINT FOR:**
23
                                       **1. VIOLATION OF THE EQUAL**
24          Plaintiffs,                 **CREDIT OPPORTUNITY ACT,**
                                       **15 U.S.C. § 1691,** *ET SEQ.*
25     vs.                             **2. RACE DISCRIMINATION IN**
                                       **VIOLATION OF THE FAIR**
26 WELLS FARGO BANK, N.A., a           **HOUSING ACT OF 1968, 42**
   Delaware corporation; WELLS FARGO   **U.S.C. § 3601,** *ET SEQ.*
27 HOME MORTGAGE, INC., a
   Delaware corporation; WELLS FARGO
28 & CO., a Delaware corporation,

2029104

|  |  |
|---|---|
| Defendants. | **3. RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981**<br>**4. VIOLATION OF THE UNRUH CIVIL RIGHTS ACT, CALIFORNIA CIVIL CODE § 51**<br>**5. VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Aaron Braxton, Gia Gray, Bryan Brown and Paul Martin, individually and as representatives of a nationwide class of Black applicants for home mortgage refinancing through Wells Fargo and its related entities (collectively "Plaintiffs" or the "Class"), allege as follows:

## I.    NATURE OF ACTION

1.    The benefits of homeownership have long been the cornerstone of the American Dream—allowing citizens to accumulate wealth through access to credit, generating equity, and reducing housing costs.[1]

2.    However, the benefits of homeownership have for far too long been unattainable for a disproportionate number of Black Americans, and more difficult for Black Americans to maintain once achieved.  Historically, Black Americans have been repeatedly and systematically denied access to the financial benefits of homeownership through the use of pernicious and pervasive race-based exclusions. These denials included, for example, the Federal Housing Administration's refusal to insure mortgages in and near Black neighborhoods—a practice now referred to as "redlining"—at the same time that the FHA subsidized builders who mass-produced entire subdivisions made for White Americans.

---

[1] https://www.forbes.com/sites/forbesrealestatecouncil/2021/09/28/homeownership-and-the-american-dream/?sh=1c78499623b5.

2029104

3.     The passage of civil rights legislation in the 1960s was supposed to fix that historical injustice, eliminate race-based gatekeeping practices like redlining and restrictive covenants while righting this long-standing American wrong.  For many homeowners seeking a first or refinanced mortgage with some banks, it did.  For many Black Americans, however, discrimination in the realm of home ownership remains a vestige of the country's prejudice narrative.

4.     Over the past few years, historically low interest rates spawned an unprecedented opportunity for homeowners to refinance their home mortgages.  Refinanced mortgages allow homeowners to reduce their monthly payments (as well as the overall interest due during the life of their loan) while still amassing equity in their homes.  Not surprisingly, millions of homeowners across the nation sought to reduce their payments through refinancing.

5.     Unfortunately, Black homeowners who sought to refinance through the Defendants in this case—Wells Fargo Bank, N.A., Wells Fargo & Co., and Wells Fargo Home Mortgage (collectively "Defendants" or "Wells Fargo")—were disproportionately denied refinance applications or, even if ultimately approved, faced unjustified delays in the processing of their applications.

6.     Wells Fargo *denied the applications of over 50%* of the Black Americans seeking to refinance in 2020, and *denied the applications of just under 50%* of the Black Americans seeking to refinance in 2021.  No other major lending institution refused to refinance the homes of Black Americans at such stunning rates.

7.     The numbers associated with Defendants' misconduct tell a shameful story, without any legitimate explanation.  Data from eight million refinancing applications from 2020 reveal that "the highest-income Black applicants [had] an approval rate about the same as White borrowers in the lowest-income bracket."[2]

---

[2] *Id*.

2029104

Case No. 4:22-cv-01748-KAW

FIRST AMENDED CLASS ACTION COMPLAINT

White refinancing applicants earning between $0 and $63,000 a year were ***more likely*** to have their refinancing application approved by Wells Fargo than Black refinancing applicants earning between $120,000 and $168,000 a year.[3]  Overall, in 2020, Wells Fargo rejected a ***majority*** of all the completed applications submitted by Black homeowners.[4]  And because Wells Fargo designed an application process that is disproportionately difficult for Black homeowners to complete, 27% of all Black homeowners who began a refinance application with Wells Fargo withdrew it.[5]  When this group of Black homeowners who were unable to complete the refinance process due to discriminatory barriers are added to the total pool of Black homeowner refinance applicants, just one-third of the Black homeowners who applied for a refinance loan with Wells Fargo were successful.

8.    In 2020—at the height of the refinancing boom, when millions of Americans benefitted from the historically low interest rate environment—Wells Fargo approved 47% of all applications by Black homeowners (meaning that Wells Fargo rejected the majority of applications from Black homeowners), whereas all other lenders approved 71% of all applications by Black homeowners.[6]  In 2020, no other lending institution rejected a majority of Black homeowners' applications for refinancing.[7]

9.    Wells Fargo was the only major lender in the United States that approved a smaller share of refinancing applications from Black homeowners in

---

[3] *Id.*

[4] *Id.*

[5] *Id.*

[6] *Id.*

[7] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-refinancing/.

1  2020 than it had in 2010.[8]

2      10.     The story in 2021 was the same, with Wells Fargo approving a much

3  lower percentage of Black homeowner applicants than any other lender.[9]  Wells

4  Fargo approved only 58% of Black applicants compared to other lenders, which

5  approved 74% of Black homeowner applicants.[10]  And the disparity between Black

6  and White refinance approval rates was 21% at Wells Fargo, nearly double the

7  disparity (13%) for all other for other lenders.[11]  And while Wells Fargo's Black

8  homeowner refinancing approval rate improved slightly from 2020, the same was

9  true at all other lenders, due to broader economic conditions.[12]  By comparison,

10  other major lenders approved much higher rates of Black homeowner refinancing

11  applicants in 2021:  JP Morgan Chase & Co. approved 87% of Black homeowner

12  applicants (only 6% less than White applicants), Rocket Mortgage LLC approved

13  81% of Black homeowner applicants (only 7% less than White applicants), and

14  Bank of America Corporation approved 75% of Black homeowner applicants (only

15  11% less than White applicants).[13]

16      11.     Overall, the data released under the federal Home Mortgage Disclosure

17  Act shows unequivocally that Wells Fargo rejects a disproportionate number of

18  Black homeowners' refinancing applications.[14]  Wells Fargo also makes the

19

20  _____

[8] Id.

21
[9] https://www.bloomberg.com/news/articles/2022-03-25/wells-fargo-faces-
22  persistent-racial-gap-in-mortgage-refinancing.

23  [10] Id.

24  [11] Id.

25  [12] Id.

26
[13] Id.
27
[14] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-
28

2029104

refinancing application process more difficult for Black homeowner applicants than others on a national scale.[15]  And Wells Fargo customers report loan officers stating that Wells Fargo's underlying refinance calculation tools consider certain "areas" with large Black populations to be ineligible for rapid valuations.[16]  Black homeowner applicants are further subjected to delays, feigned mistakes, and other obstacles, leading many Black Americans to withdraw their requests for refinancing and leading others to wait indefinitely while Wells Fargo refuses to act upon their applications.

12.     In light of this, Wells Fargo's stated commitment to "help[] ensure that all people across our workforce, our communities, and our supply chain feel valued and respected and have equal access to resources, services, products, and opportunities to succeed"[17] rings hollow.  Instead, Wells Fargo pervasively denies Black homeowners' refinancing applications and consistently delays the applications it does not deny, in many cases ultimately forcing Black homeowners into foreclosure.[18]

13.     Core responsibility for Wells Fargo's discriminatory treatment of Black homeowner applicants lies with its decision to employ centralized, universal, race-infected lending algorithms without correction to differentially assess, delay and ultimately reject refinancing applications.

14.     Used properly, automated underwriting technology helps individual

_____

refinancing/.

[15] *Id.*

[16] *Id.*

[17] https://www.wellsfargo.com/about/diversity/diversity-and-inclusion/.

[18] https://www.nclc.org/images/pdf/special_projects/covid-19/IB_Covid_Black_Forbearance_Foreclosure.pdf.

2029104

loan officers who are properly trained and familiar with the legal environment in which banks operate make sound, individualized underwriting decisions that protect the interests of borrowers, banks, investors, insurers and the federal government, taking into account race-neutral data points and employing formulae based on those data points to decide whether or not the proposed loan is in the best interest of the bank and the borrower.

15.    But that is not how Wells Fargo utilized its automated underwriting technology.  Quite the contrary:  confidential informants with knowledge of Wells Fargo's refinance operations confirm that the onset of the COVID-19 pandemic led Wells Fargo to jettison or otherwise ignore well-established internal fair lending checks and balances in favor of implementing a centralized, "pioneering automated underwriting" system—sometimes referred to as CORE—without sufficient, or sometimes any, human supervision or involvement.

16.    These witnesses describe troubling facts whereby, as COVID-19 hit, multiple loan processors and underwriters were terminated or otherwise left the bank's residential lending operations and were not replaced, and, instead, the CORE pioneering automated underwriting system was increasingly centralized to facilitate at-home work by originators, processors, and underwriters.  According to these same witnesses, the coding and machine learning endemic to the CORE algorithmic underwriting platform were—byte by byte—stuffed chock-full of numerous Wells Fargo-generated geographic, demographic, race-stratified liquidity and appraisal and other "overlays" that Wells Fargo knew served no legitimate underwriting basis but, instead, functioned as signals for race discrimination in Wells Fargo's residential refinance decisions.

17.    These and other "overlays" pervasively infecting Wells Fargo's CORE algorithms—which become even more invidious with each successive denial that taught the algorithm these denials were appropriate—ultimately serve Wells Fargo's purpose of segregating the creditworthiness of prospective applicants based on their

race, and differentiate Wells Fargo's assessments from the other major lending institutions.

18.    Confidential informants with knowledge of Wells Fargo's recent lending operations also specify just how heavily Wells Fargo relied on its systematically racist algorithmic underwriting decisions and increasing lack of an individualized human element in Wells Fargo's process.  As but one example, Wells Fargo loan processors supposedly responsible for shepherding applications through the bank's systems—typically expected to process 30 applications per month but forced by Wells Fargo's CORE platform to process more than 50 and sometimes nearly 100 per month—were rendered powerless to supervise the process, override the algorithm, or otherwise intervene on the side of basic compliance with the fair housing laws.

19.    Some of these same confidential informants have further confirmed that, over and over during the COVID-19 pandemic and afterwards, they referred denied Black homeowner applicants to competitor financial institutions that swiftly approved the applications and asked, because the applications should have resulted in "easy approvals" for Wells Fargo, how Wells Fargo could have denied them.

20.    Wells Fargo propounds its discriminatory treatment of Black homeowners by incorporating, without adjustment, appraisals that have been shaped by years of race-based valuation standards or appraisals that are based on race-based criteria that have markedly affected Black homeowners into its analysis.  Homes in majority Black neighborhoods are worth an average of 23% less than homes in neighborhoods with "very few or no Black residents" and similar home quality.[19]

_____

[19] https://www.brookings.edu/research/devaluation-of-assets-in-black-neighborhoods/?utm_source=newsletter&utm_medium=email&utm_campaign=sendto_newslettertest_business&stream=top#_ga=2.213288596.1000901909.1649553887-1080662765.1648140872.

2029104

The disparities in home appraisals leave Black homeowners at a disadvantage where below market home appraisals limit refinancing options.

21.    In September 2021, the Federal Home Loan Mortgage Corporation released the results of a five-year study based on more than 12 million appraisals.[20] The study found that "Appraisers' opinions of value are more likely to fall below the contract price in Black and Latino census tracts, and the extent of the gap increases as the percentage of Black or Latino people in the tract increases."[21]  Wells Fargo's practice of engaging in appraisal discrimination has not only led to delays in the application process for Black homeowners but has forced those who received under-market appraisals from Wells Fargo to abandon the process with Wells Fargo and turn elsewhere.

22.    Plaintiffs are the unfortunate victims of Wells Fargo's pervasive misconduct:  Black homeowners from across the country whose applications to refinance their home loans have been systematically delayed or denied because Wells Fargo's CORE algorithm operates to discriminate against them.  Tens of thousands have been victimized by Wells Fargo's intentional, knowing and systematic race discrimination, violating the contractual, commercial and civil rights of Class members and causing millions (and perhaps even billions) of dollars in damages to the Nationwide Class.  Individually and as representatives of the Class (defined below), Plaintiffs bring this action to enjoin the present day redlining by Wells Fargo through its discriminatory practices and to make good to the Class all damages resulting from Defendants' violations of civil rights laws and to restore to the Class any amounts to which they otherwise would have been entitled, together with such other equitable and remedial relief as the Court may deem appropriate.

---

[20] https://www.freddiemac.com/research/insight/20210920-home-appraisals.

[21] *Id.*

## II.    JURISDICTION AND VENUE

23.    This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332(d), and 1343, because the Plaintiffs assert federal causes of action, because Plaintiffs assert civil rights causes of action, because at least one member of the Class is a citizen of a different state than all Defendants, and because the amount in controversy exceeds $5,000,000.

24.    Personal jurisdiction is appropriate over Defendants because Wells Fargo Bank, N.A. transacts business in the State of California and has its principal place of business in San Francisco, California, Wells Fargo Home Mortgage, Inc. originates loans to California customers from its California offices and maintains a systematic and continuous presence in the State, Wells Fargo & Co. has its corporate headquarters in San Francisco, California.

25.    Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b) because Wells Fargo Bank, N.A. resides in this district, a substantial part of the events or omissions giving rise to the claim occurred in this district, Wells Fargo Bank, N.A.'s principal place of business is in this district, and Wells Fargo & Co. has its corporate headquarters in this district.

## III.    PARTIES

### *Aaron Braxton*

26.    Plaintiff Aaron Braxton, who is a Black homeowner, is a natural person and a citizen of the State of California and resides in Los Angeles, California.

27.    Mr. Braxton is one victim of Wells Fargo's discriminatory policies. He is a financially successful and eminently creditworthy Black playwright, performer, and a math and science teacher with a Master's degree from the University of Southern California.[22]  He has authored several award-winning plays, including *DID*

---

[22] https://www.imdb.com/name/nm1347914/bio?ref_=nm_ov_bio_sm.

*YOU DO YOUR HOMEWORK?*, which broke the Beverly Hills Playhouse's record for longest running play (nine months).[23]  He has also written several films and television pilots, and acted in several film, television, and theatre projects.[24]

28.    In addition, for two decades, Mr. Braxton was a Wells Fargo mortgage customer.  He purchased his home in 2000, in a historically Black neighborhood located in South Los Angeles near the campus of the University of Southern California, and secured his property with a Wells Fargo home mortgage insured by the Federal Housing Administration (FHA).  Mr. Braxton always made his mortgage payments and bills on time, and he had a good credit score.

29.    Yet despite his successful career and his creditworthiness, when Mr. Braxton sought to refinance his home mortgage loans in August of 2019, Wells Fargo consistently obstructed his ability to refinance his loans.  Despite favorable loan-to-value metrics and his personal history with the institution, Wells Fargo was focused more on his race and the location of his home within a historically Black Los Angeles neighborhood, and used the fact of his race and the location of his home to delay, obstruct and deny him the full benefits of historically low home mortgage interest rates.  Wells Fargo did this even though, having paid his loans for more than 18 years, Mr. Braxton had equity in his home far greater than the amount remaining on his FHA-secured loan.

30.    Mr. Braxton was given the runaround to such an extent that it took him over nine months to refinance his federally backed mortgage loan (and 12 months to refinance his home equity loan) at an above-market interest rate of around 4%.  This was after various Wells Fargo representatives kept telling him they lost his paperwork, made incomplete inquiries and needed to request more information, delayed their responses, and even placed him into an unsolicited debt-trap deferred

---

[23] *Id.*

[24] *Id.*

2029104

payment program without his permission.  It was only after Mr. Braxton notified the Department of Housing and Urban Development ("HUD") that Wells Fargo approved the refinancing of his federally backed FHA loans (indeed, Wells Fargo approved the application the very next day).  Of course, for the prolonged period that Mr. Braxton was waiting for Wells Fargo to refinance his loans, he was paying the higher rates associated with his original loans.

## *Gia Gray*

31.    Plaintiff Gia Gray, who is a Black homeowner, is a natural person and a citizen of the State of California and resides in Danville, California.

32.    Mrs. Gray is another victim of Wells Fargo's discriminatory policies.  Mrs. Gray is a physician, as is her husband.  Both are employed and both, individually, are in the top quintile of income earners.  The same was true when they applied to refinance their loans with Wells Fargo.  Mrs. Gray's FICO score is above 800.

33.    The Grays own three homes.  Their primary residence is in Danville, California, a predominately White area.  The couple also own income properties in Stockton, California and Chicago, Illinois that are more diverse areas.  The couple had Wells Fargo mortgages for their three homes, and, save for a balance of approximately $1,000 on a credit card, the couple has and had no other debt.  The couple never missed a mortgage payment and always paid on time.  They began the refinancing process for their homes in February 2020.

34.    The Grays were only able to refinance the Danville, California property—in the predominately White area—after four months.  Their loan officer was located in Walnut Creek, California, another predominately White area, and he actually took time out of his day to visit their multimillion-dollar home in Danville in-person to sign refinancing documentation.  Even still, Wells Fargo kept asking the Grays to provide additional information, and even contacted the Human Resources department at Mrs. Gray's office.

2029104

35.     The Grays were not as lucky on their two other income properties.  The loan officer would try to steer Mrs. Gray away from these properties and only expressed an interest in refinancing her Danville, California property.  Wells Fargo eventually switched the couple's Walnut Creek loan officer to a Black assistant to handle these properties.  Wells Fargo would not return their calls for inquiries on refinancing these two properties.  When the couple did manage to get a hold of the assistant or loan officer, they were told that the Stockton, California property was in a bad area, and that the Chicago, Illinois property, although in a good area, was high risk, and that Wells Fargo was not looking to refinance high-risk areas.  Frustrated by Wells Fargo's ambivalence and inaction, the couple gave up on refinancing these properties in December 2020, nearly a year after they started.

*Bryan Brown*

36.     Plaintiff Bryan Brown, who is a Black homeowner, is a natural person and a citizen of the State of Connecticut and resides in Bristol, Connecticut.

37.     Mr. Brown is another victim of Wells Fargo's discriminatory policies.  For the past two decades, Mr. Brown has been a CAD designer at a prominent engineering company in Connecticut, and has invested in residential properties in Bristol and Plymouth, Connecticut.

38.     Mr. Brown is a long-time Wells Fargo mortgage customer.  Having purchased his multi-unit home in December 2010 with a Wells Fargo home mortgage, he has always made his mortgage payments, paid his bills on time, and maintained a good credit score.

39.     In October 2020, Mr. Brown sought to refinance his loan to convert his conventional 30-year loan to a 15-year fixed mortgage and to obtain a lower interest rate.

40.     Despite his investment properties, longstanding employment, and creditworthiness, when Mr. Brown sought to refinance his home mortgage, Wells Fargo subjected him to long periods of nonresponsiveness, arbitrary requests for

additional documents, and multiple calls to his employer requesting verification of his employment.  Despite favorable loan-to-value metrics and his personal history with the institution, Wells Fargo denied Mr. Brown's application to refinance after a four-month runaround.  Wells Fargo did this even though, having paid his loan for more than ten years, Mr. Brown had equity in his home that was almost equal to the amount remaining on his loan.

41.    To this day, Mr. Brown's interest rate remains at 4.75%.

### Paul Martin

42.    Plaintiff Paul Martin, who is a Black homeowner, is a natural person and a citizen of the State of California and resides in Los Angeles, California.

43.    Mr. Martin has been a Hollywood entertainment executive at Sony Pictures for 14 years.  In 2020, Paul Martin sought to refinance his home in the Ladera Heights neighborhood of Los Angeles, which has a higher proportion of affluent Black residents than most Los Angeles neighborhoods.  His multimillion-dollar home was previously owned by WNBA superstar Lisa Leslie and NBA player Aaron Afflalo.

44.    But Wells Fargo refused to refinance Mr. Martin's loan.  The bank would not refinance his home unless he could get it appraised for $2 million.  Wells Fargo's appraiser refused to come inside Mr. Martin's home, and appraised it at just shy of $2 million based on comparisons with homes in less affluent Black-populated neighborhoods, apparently conflating all areas with a high concentration of Black residents.  Mr. Martin went to another lender, who appraised the home at $2.4 million and promptly refinanced his loan.

### Wells Fargo Entities

45.    Defendant Wells Fargo Bank, N.A. is a nationally chartered bank with its principal place of business located in San Francisco, California, and is chartered in Wilmington, Delaware.  It has 19,234 employees across all its locations, including several in the Northern District of California, and generates nearly $70

2029104

1   billion in sales annually.

2   46.   Defendant Wells Fargo Home Mortgage, Inc. is a home lending

3   company that is part of the "Wells Fargo banking family."  It operates about 725

4   mortgage stores nationally and originates and services one-to-four-family residential

5   first and junior-lien mortgages and home equity loans.  On average, it originates

6   approximately $300 billion worth of loans per year.  It is incorporated in the State of

7   Delaware, and has its principal place of business in Des Moines, Iowa.  Wells Fargo

8   Home Mortgage, Inc. originates loans to California customers from its California

9   office locations.

10   47.   Defendant Wells Fargo & Co. is a nationwide, diversified financial

11   holding company and bank holding company incorporated in the State of Delaware

12   with its principal place of business in San Francisco, California.  Wells Fargo

13   provides banking, insurance, investment, and mortgage and consumer finance

14   services through storefronts, the Internet, and other distribution channels across the

15   United States and internationally.  It is the parent company of Wells Fargo Bank,

16   N.A.

17   ## IV.   FACTUAL ALLEGATIONS

18   **A.   The History of Discrimination in Housing**

19   48.   This country has an unfortunate history of discrimination, and housing

20   discrimination has always been a large part of this historical discrimination.

21   49.   In 1924, the National Association of Realtors Code of Ethics mandated

22   that a realtor should "never be instrumental in introducing into a neighborhood

23   members of any race whose presence will be clearly detrimental to any property

24   values in the neighborhood."[25]  In other words, realtors were instructed that it was

25   an ethical infraction to integrate neighborhoods.

26

27   [25] https://sf.curbed.com/2020/4/29/21240456/moms-4-housing-oakland-house-
     history.

28

2029104

FIRST AMENDED CLASS ACTION COMPLAINT

50.     Pursuant to this policy and so many others like it, realtors and developers would routinely designate specific properties to White Americans while reserving properties in other areas for minority Americans.  These designations would be found in rules, restrictions, and covenants attached to the properties.

51.     Legislation introduced during the New Deal purporting to help homeowners nationwide, in fact, codified racism into housing.  The Home Owners' Loan Corporation and the Federal Housing Administration graded residential areas from A-D, with A being the most likely to receive federal loan insurance, and D the least.  Areas with "Colored" and "Oriental" people were automatically given D ratings.[26]

52.     Federal Housing Administration underwriting manuals issued in 1938 sought to present the "infiltration of inharmonious racial groups" and directed underwriters to refuse to insure mortgages that would lead to "a change in social or racial occupancy."[27]

53.     As observed above, California has long perpetuated these discriminatory practices.  In Los Angeles, which was a leader in the nation's discriminatory segregation, a Black American in 1917 said "we were encircled by invisible walls of steel.  The whites surrounded us and made it impossible for us to go beyond these walls."[28]  In this era, Black Americans were excluded from living in 95% of the houses in Los Angeles.[29]

_____

[26] *Id.*

[27] https://sf.curbed.com/2020/4/29/21240456/moms-4-housing-oakland-house-history.

[28] https://www.latimes.com/opinion/story/2021-09-10/racial-covenants-los-angeles-pioneered.

[29] *Id.*

2029104

FIRST AMENDED CLASS ACTION COMPLAINT

54.     In Oakland, racialized zoning and restrictive covenants directed 80% of the city's Black population to West Oakland following World War II.[30]  Redlining made it impossible for these residents to obtain loans to improve their properties. Instead of helping, the city eventually, in the 1960s, razed large swaths of West Oakland, purportedly to build new homes, but the replacement projects languished and most residents were simply forced from their homes with nowhere to go.[31]

55.     Similarly, in the San Francisco area, homes from the 1930s included in title reports restrictions that "no person of any other race other than the Caucasian or white race" may own or occupy the property, except for "domestic servants of a different race domiciled with the homeowner or tenant."[32]  Similar provisions would often prohibit residents of "African, Mongolian, or Japanese" descent.[33]

56.     When a Black American would obtain one of these properties despite the clauses, White neighbors would sue, and the courts would force the Black Americans to leave their properties, cementing the discrimination.[34]  Indeed, the California Supreme Court specifically held in 1919 that Black Americans could own houses with restrictive clauses, they just could not reside there.[35]  While the states no longer enforce these covenants, they still charge a fee to homeowners wishing to

_____

[30] https://sf.curbed.com/2020/4/29/21240456/moms-4-housing-oakland-house-history.

[31] *Id.*

[32] https://www.mercurynews.com/2019/02/26/for-whites-only-shocking-language-found-in-property-docs-throughout-bay-area/.

[33] *Id.*

[34] *Id.*

[35] https://www.latimes.com/opinion/story/2021-09-10/racial-covenants-los-angeles-pioneered.

2029104

strike them from their property records.[36]

57.     Even after the Civil Rights Act was passed, California adopted Proposition 14, allowing for continued discrimination under the guise of freedom. The proposition was ruled unconstitutional, but the state's residents had made clear their position on discrimination in housing.[37]

58.     The pervasive discrimination against Black homeowners and those wishing to become homeowners sadly persists to this day, and Wells Fargo's treatment of Black homeowners seeking refinancing during the refinance boom that took place over the last few years is just the latest attack on these long-maligned citizens of this country.

**B.     Wells Fargo Has an Established History of Discrimination**

59.     Wells Fargo's discriminatory behavior described herein is completely in line with Wells Fargo's history of discrimination in lending.  Indeed, the genesis of its latest discriminatory practices seems to have followed the end of the policies it put in place after an earlier series of lawsuits.

60.     In 2012, Wells Fargo agreed to pay $184 million to settle claims with the Department of Justice that the bank pushed Black and Hispanic homeowners to obtain subprime mortgages and then charged them higher fees and interest rates.[38]

61.     In 2015, the City of Oakland filed suit against Wells Fargo over its racially discriminatory banking practices in seeking to originate mortgage loans on predatory terms in minority neighbors and then its "subsequent [refusal] to extend credit to minority borrowers seeking to refinance previously issued unnecessarily

---

[36] https://www.mercurynews.com/2019/02/26/for-whites-only-shocking-language-found-in-property-docs-throughout-bay-area/.

[37] *Id.*

[38] https://www.justice.gov/opa/pr/justice-department-reaches-settlement-wells-fargo-resulting-more-175-million-relief.

2029104

expensive loans."[39]  And "when a minority borrower who previously received a predatory loan sought to refinance the loan," they "discover[ed] that Wells Fargo refused to extend credit at all, or on equal terms as refinancing similar loans issued to [W]hite borrowers."[40]  Even when refinancing applications were approved, the loans turned from a "fixed-rate loan into an adjustable-rate loan that the lender knows the borrower cannot afford should interest rates rise… the likely result of such practices is to cause homeowners who are otherwise…comfortably making payments on a modest existing mortgage, to be unable to make payment on a new, unaffordable loan."[41]

62.     The City of Oakland also performed a decade-long regression analysis of Wells Fargo loans in Oakland, which controlled for objective variables like "credit history, loan to value ratio, and the ratio of loan amount to income."  The City of Oakland found that, controlling for these factors, "an African-American borrower is 2.583 times more likely to result in foreclosure than a more favorable and less expensive loan issued to a [W]hite borrower in Oakland."[42]  This corroborated other national studies which found that Black American borrowers were "124% more likely to receive a subprime refinance loan" than their White counterparts.[43]

63.     Moreover, the City of Oakland alleged that Wells Fargo employed systematic policies like "giving loan officers and others responsible for mortgage

---

[39] *City of Oakland v. Wells Fargo Bank, N.A.*, 3:15-cv-04321, Dkt. No. 1, at 2 (N.D. Cal. Sept. 21, 2015).

[40] *Id*. at 4.

[41] *Id.* at 20.

[42] *Id*. at 20-21.

[43] *Id*. at 15.

lending large financial incentives to issue loans to African-Americans and Hispanics that are costlier than better loans for which they qualify" and "failing to monitor" for racial disparities after "Wells Fargo had notice of widespread product placement disparities based on race and national origin."[44]  Wells Fargo also systematically "fail[ed] to underwrite loans based on traditional underwriting criteria such as debt-to-income ratio, loan-to-value ratio, FICO score, and work history."[45]  This led District Judge Edward M. Chen to conclude that "Oakland has identified specific employment practices in addition to the mere delegation of discretion."[46]

64.    The practices leading to the 2012 and 2015 suits against Wells Fargo included manual revisions to applications to reverse redline applicants who would have been classified in a more risky area.  For a time, these practices receded, and Wells Fargo's refinancing rates to Black homeowners were similar to those of other major lenders.  But by 2020, Wells Fargo's rates plummeted in relation to the approval rates at other banks.

65.    The City of Oakland is not the sole municipality that has sought to hold Wells Fargo to account for its discriminatory conduct.  Cook County (Chicago) brought suit alleging predatory lending practices to strip minority homeowners of the equity from their homes.[47]  "Publicly available loan origination data indicates that the percentage of high-cost and other nonprime loans issued by Wells Fargo in Cook County to minority borrowers well exceeded the County's percentage of

---

[44] *Id*. at 33.

[45] *Id*. at 9.

[46] *City of Oakland v. Wells Fargo Bank, N.A.*, No. 15-CV-04321-EMC, 2018 WL 3008538, at *15 (N.D. Cal. June 15, 2018), *aff'd in part, rev'd in part on other grounds City of Oakland v. Wells Fargo & Co.,* 14 F.4th 1030 (9th Cir. 2021).

[47] *Cty. of Cook, Illinois v. Wells Fargo & Co*., 14-C-9548-GF (N.D. Ill.).

minority home owners—typically by a factor of two to three."[48]  And the disproportionately White employees at Wells Fargo were given "discretion to steer prime-eligible minority borrowers into nonprime loans."[49]  "Wells Fargo subjected minority borrowers to equity stripping to a greater extent than it did nonminority borrowers with similar credit histories."[50]  And "minority borrowers were particularly susceptible to Wells Fargo's predatory practices because they were more likely than nonminority borrowers to lack access to low-cost credit, relationships with banks and other traditional depository institutions, and adequate comparative financial information."[51]

66.    In 2019, Wells Fargo settled a lawsuit with the City of Philadelphia premised on allegations that it purposefully made it difficult for minorities to refinance their mortgages.[52]  The court in that case identified seven Wells Fargo policies that contributed to the discrimination against minorities:  (1) knowing about lending practices that either created high risk and higher cost loans to minorities compared to comparably credit situated White borrowers or failing to adequately monitor the Bank's practices regarding mortgage loans, including but not limited to originations, marketing, sales, and risk management; (2) failing to underwrite loans based on traditional underwriting criteria such as debt-to-income ratio, loan-to-value ratio, FICO score, and work history; (3) failing to prudently underwrite hybrid adjustable-rate mortgages ("ARMs"), such as 2/28s and 3/27s; (4) failing to prudently underwrite refinance loans, where borrowers substitute unaffordable

---

[48] *Cty. of Cook, Illinois v. Wells Fargo & Co.*, 314 F. Supp. 3d 975, 980 (N.D. Ill. 2018).

[49] *Id.*

[50] *Id.*

[51] *Id.*

[52] https://www.phila.gov/2019-12-16-city-of-philadelphia-and-wells-fargo-resolve-litigation/.

FIRST AMENDED CLASS ACTION COMPLAINT

1   mortgage loans for existing mortgages that they are well-suited for and that allow

2   them to build equity; (5) failing to monitor and implement necessary procedures

3   within Wells Fargo's Internal Audit, Corporate Risk, Human Resources, Law

4   Department, and Board of Directors throughout the Community Banking segment,

5   which includes Wells Fargo's retail mortgage banking business responsible for the

6   unlawful activities set forth herein, to ensure compliance with federal fair lending

7   laws; (6) failing to abide by the terms of Wells Fargo's Vision & Values, which

8   purportedly guides Defendants' business practices and relationships with customers;

9   and (7) failing to ensure that Wells Fargo's decentralized organizational structure

10   was capable of properly monitoring mortgage lending activities within Community

11   Banking.

12       67.    Wells Fargo's pervasive discrimination is not limited to housing.  In

13   August 2020, the company entered into a conciliation agreement with the U.S.

14   Department of Labor and paid $7,800,000 over allegations of racist hiring practices.

15   The Department of Labor under the Trump administration found that the company

16   "discriminated against 34,193 African American applicants for banking, customer

17   sales and service, and administrative support positions at U.S. locations

18   nationwide."[53]

19   **C.    The Refinancing Boom**

20       68.    During the last few years, interest rates were near an all-time low in the

21   United States, and homeowners who held mortgage loans at higher rates (meaning a

22   great deal of homeowners) sought to refinance their loans at lower rates.

23   Refinancing during this time allowed homeowners to significantly reduce their

24   monthly payments and to owe less mortgage interest over the life of the loan.  Over

25   the last two years, homeowners in the United States refinanced over $5 trillion

26

27   ───────────────

[53] https://www.dol.gov/newsroom/releases/ofccp/ofccp20200824.

28

1    worth of mortgages.

2         69.    In 2020, the prevailing market interest rates on mortgages "fell below

3    3% for the first time"[54] since it began being surveyed in 1970.[55]  And a study by the

4    Federal Reserve Banks of Boston, Atlanta, and Philadelphia found these

5    unprecedented low rates "spurred a boom in refinances" that was distributed

6    unequally.[56]  Although "Black and [W]hite borrowers were about equally likely to

7    refinance before the pandemic, [] Black borrowers were 40 less likely than [W]hite

8    borrowers to refinance after the pandemic started and interest rates dropped."[57]  All

9    told, only 6% of Black borrowers refinanced during the COVID-19 pandemic,

10   compared to 12% of White borrowers.[58]  With respect to Wells Fargo, that disparity

11   does not result from a lack of interest in refinancing by Black homeowners; it results

12   from disparate and discriminatory treatment by Wells Fargo that blocked Black

13   homeowners from engaging in the process.

14   **D.      Wells Fargo's COVID-19 Era Refinancing Application Process**

15        Part 1: Gathering of Key Geographic, Financial and Demographic Data and

16              Submission of Form 1003 Through "Blend"

17        70.    Refinancing is necessarily a simpler process than obtaining an initial

18   home loan.  Homeowners who have made their payments on time and who seek to

19   refinance already own the necessary collateral and have already been approved for a

20

21   _____
     [54] *Racial Differences in Mortgage Refinancing, Distress, and Housing Wealth*

22   *Accumulation during COVID-19*, Kristopher Gerardi, Lauren Lambie-Hanson, and
     Paul Willen, available at https://www.bostonfed.org/-

23   /media/Documents/Workingpapers/PDF/2021/cpp20210622.pdf.

24   [55] *Id*. at 1.

25   [56] *Id*.

26   [57] *Id*. at 2.

27

28   [58] *Id*.

     2029104

home loan.  In addition, if the borrower is refinancing with the same bank that holds the original mortgage, that bank has access to detailed information about a borrower's payment history and, in many cases, will be evaluating that borrower's ability to make an even *lower* monthly payment than what was already being made. Determining whether to refinance, thus, is a less involved process than determining whether to issue a mortgage, or at least it should be.

71.     On November 27, 2017, as part of its explicit policy to "leverage the ideas in Silicon Valley and beyond" in mortgage underwriting, then-Wells Fargo CEO Tim Sloan announced its partnership with San Francisco startup Blend Labs to develop a new online mortgage application and related tools.

72.     During the COVID-19 era, Wells Fargo's idea of "leverag[ing] the ideas in Silicon Valley" involved, first, obtaining a prospective refinance applicant's personal information, including name, phone number, email address, and the last four digits of the prospective applicant's Social Security number.  Applicants are, thus, required to have and utilize email to participate in the process, including checking Wells Fargo's loan tracker system for updates and requests for additional information.  When, during the pandemic, visiting loan officers in person became infeasible, applicants without technical sophistication were disadvantaged.

73.     At this preliminary stage, Wells Fargo's algorithm obtains the first data points that are subsequently utilized in its discriminatory refinance decisions: names, phone numbers (including area codes), email addresses and Social Security numbers that can then be tied to other data and used in other formulae within Wells Fargo's systems.

74.     Next, Wells Fargo sends the applicant, via electronic mail, a dedicated link through Blend, the digital banking platform developed by Wells Fargo in conjunction with Blend Labs.  That link enables the applicant to complete a Uniform Residential Loan Application (Form 1003) and submit that application to Wells Fargo.

2029104

75.    It is here that Wells Fargo collects more information for its lending algorithm to use:  the information collected on this form includes the borrower's name, alternate names, Social Security number, date of birth, citizenship status, names of borrowers, marital status, number and ages of dependents, home, mobile and work phone numbers, the subject property address, property value, status of property, intended occupancy and monthly expenses, former addresses, mailing addresses, employment information, income information, asset information, liabilities and expenses, and military service.

76.    Next, a Wells Fargo loan officer conducts a follow-up telephone or in-person interview with the refinance applicant to obtain additional information that cannot be submitted online, including the financial acknowledgment form and the Demographic Information Addendum, which specifically asks about ethnicity, race, and gender.

77.    Here, Wells Fargo's process places particular emphasis on race:  the company demands that, to the extent the interview is conducted in person, the loan officer must visually observe the applicant and consider the applicant's surname in an effort to determine the race of the prospective applicant.  Here, too, Wells Fargo's algorithm receives key demographic and financial data that it then utilizes in its lending decisions.

Part 2: Running "Blend" Data Through Automated CORE "Pioneering Underwriting System" Systematically Infected with Racially Infected Algorithms and Overlays

78.    Having obtained all of the geographic, demographic and other data necessary through Blend and the submission of the Form 1003, the Wells Fargo loan originator does the equivalent of pressing "send," submitting the 1003 for decision to Wells Fargo's CORE automated underwriting system.  Confidential informants with knowledge of the operation of these systems recount that after operating as described herein—running both Desktop Underwriter ("DU") and Loan Prospector

1   ("LP") simultaneously—CORE's decision would come back as A1 or A2; which

2   meant that the loan was approved; C1, which meant that the loan had to go through

3   a manual underwriting process; or C2, which meant that the applicant was deemed

4   "not loanable" and denied.  During the COVID-19 era, Black refinance applicants

5   were systematically slotted by CORE into C1 and C2 categories.

6        79.    The idea of something that operates generally like CORE is, of course,

7   nothing new or nothing unique.  Used properly, automated underwriting systems can

8   quickly use Fannie Mae and Freddie Mac underwriting criteria to evaluate the risk

9   profile of a loan and recommend its approval or denial with respect to race-neutral

10   criteria to human underwriters and loan processors who can, on average,

11   comfortably handle 30 files per month, who are specially trained in the bank's fair

12   lending compliance programs and procedures, and who can ensure that the

13   guidelines and mechanics of the algorithm are operating in accordance with these

14   requirements.

15        80.    But the consequences can be immediate and pernicious when CORE-

16   like systems are not properly used or supervised by employees with training in fair

17   lending practices.  The director of the Consumer Financial Protection Bureau

18   ("CFPB") describes these types of banking algorithms as "black boxes behind brick

19   walls."[59]  "When consumers and regulators do not know how decisions are made by

20   the algorithms, consumers are unable to participate in a fair and competitive market

21   free from bias."[60]

22        81.    Such was indeed the case at Wells Fargo.  As recognized by a group of

23   United States Senators, including the chairman of the Senate Finance Committee,

---

25   [59] https://www.consumerfinance.gov/about-us/newsroom/remarks-of-director-rohit-chopra-at-a-joint-doj-cfpb-and-occ-press-conference-on-the-trustmark-national-bank-enforcement-action/.

27   [60] *Id.*

2029104

who wanted to investigate the bank for "potentially illegal discrimination" and demanded the bank produce to the Committee the data and algorithms it uses to evaluate applicants,[61] the operations and impact of Wells Fargo's CORE automated underwriting system are both new and unique in their treatment of Black applicants.

82.     More specifically, confidential informants with knowledge of Wells Fargo's residential mortgage lending operations describe a situation where, around the time that COVID-19 hit, understaffed Wells Fargo underwriting departments made a series of deliberate and intentional choices to centralize lending decisions. These decisions, ostensibly made in order to facilitate work-from-home, took human supervision and fair-lending compliance out of the process.  Seemingly trumpeting the effect of these decisions, Wells Fargo went so far as to make an internal announcement that it would place increasing and undue reliance on machine learning processes in an automated underwriting system.  But that system was increasingly infected with explicit and implicit racial signals (so-called "overlays") that had, as their proximate and likely result, the disparate impact reflected in the statistical analyses set forth in this Amended Complaint during the time periods at issue herein.

83.     These Wells Fargo-specific overlays represent manifestations of the same continuous and unbroken practice of engaging in business policies and practices that create an "artificial, arbitrary, and unnecessary" barrier to fair-housing opportunities for Black home purchasers and owners.

84.     ***Geographic Indicators***.  Among the overlays utilized by Wells Fargo's COVID-19 era CORE automated underwriting processes are geographic indicators, the effect of which is modern-day redlining.  Borrowers seeking to refinance

---

[61] *Wells Fargo Pressed by Senators on Race Disparity in Refinancing*, Yahoo! Finance, accessible at: https://finance.yahoo.com/news/wells-fargo-pressed-senators-race-171439115.html.

2029104

property in Black-majority neighborhoods are deemed by the algorithm to be more of a lending risk than similarly situated White borrowers seeking to refinance property in non-Black-majority neighborhoods.  Wells Fargo's algorithm effectuates this racial signaling by comparing address data provided in the borrower's Form 1003 to low and moderate income census tract data within Wells Fargo's internal systems, and identifying borrowers with property in Black-majority neighborhoods as more of a lending risk than borrowers with property in White-majority neighborhoods.  None of this is required by legitimate, race-neutral underwriting criteria, let alone criteria approved by Fannie Mae and Freddie Mac.

85.    ***Post-Close Liquidity Requirements***.  Another overlay utilized by Wells Fargo's CORE underwriting system is a 50% increase in Wells Fargo's requirements for post-close liquidity and severe restrictions on the sources of that liquidity.  Before March 2020—and consistent with Fannie Mae and Freddie Mac underwriting guidelines—Wells Fargo generally required borrowers to be able to show 12 months of post-close reserves in order to close their loans.  When COVID-19 hit, however, Wells Fargo programmed its system to only approve borrowers who could show 18 months of post-close liquidity for W-2 wage earners, and 24 months for self-employed K-1 borrowers.  Wells Fargo further changed the definition of post-close liquidity to allow only 50% of the post-close liquidity to come from retirement accounts, often the greatest source of liquidity for borrowers.

86.    Not only was this huge increase not required by legitimate, race-neutral underwriting criteria, it was a change that Wells Fargo knew would effectuate a racially disparate impact.  An April 2020 JP Morgan Chase Institute report found that for every dollar in liquid assets held by White Americans, Black Americans held 32 cents.[62]  On average, while Black families have $2,000 or less in liquid

---

[62] https://www.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/institute/pdf/institute-race-report.pdf.

1    savings, the typical White family has more than four times that amount.[63]

2        87.    ***Demographic Indicators***.  A further criteria utilized by Wells Fargo is,

3    indeed, race itself.  For example, employees responsible for the programming of

4    Wells Fargo's automated underwriting processes describe the system's use of

5    Bayesian Improved Surname Geocoding ("BISG"),[64] a method that applies Bayes'

6    Rule to predict the race or ethnicity of an individual utilizing the individual's

7    surname and geocoded location.  This process, which necessitates an internal

8    determination by the CORE algorithm of which neighborhoods are associated with

9    which racial group, works as follows:[65]

10       (i)    first, by calculating the prior probability of an individual – $i$ –

11   being of a certain racial group $r$ given their surname:

12   $$Pr(R_i = r | S_i = s)$$

13       (ii)    next, by updating that probability with the probability of the

14   individual $i$ living in a geographic location $g$ that is associated with a

15   particular racial group $r$:

16   $$Pr(G_i = g | R_i = r)$$

17       (iii)    and finally, by using Bayes' Theorem to determine the

18   probability that a particular borrower actually belongs to a particular racial or

19   ethnic group.

20
21   $$Pr(R_i = r | S_i = s, G_i = g) = \frac{Pr(G_i = g | R_i = r) Pr(R_i = r | S_i = s)}{\sum_{i=1}^{n} Pr(G_i = g | R_i = r) Pr(R_i = r | S_i = s)}$$

22       88.    By utilizing BISG processes in its automated underwriting processes,

23   Wells Fargo's formulae utilize demographic criteria, including race, "imputed from

24   _____

25   [63] *Id.*

26   [64] https://ww2.amstat.org/meetings/sdss/2020/onlineprogram/ViewPresentation.
27   cfm?file=309619.pdf.

28   [65] https://cran.r-project.org/web/packages/eiCompare/vignettes/bisg.html.

2029104

Case No. 4:22-cv-01748-KAW

FIRST AMENDED CLASS ACTION COMPLAINT

databases of names and addresses" using processes like Bayesian Improved Surname Geocoding that associate neighborhoods with races to supplement Form 1003's race disclosures and assist in the overall racial assessment that allows the algorithm, improperly, to rely on race in the risk determination process.

89.     ***Uncorrected and Racially Biased Appraisals***.  Wells Fargo also considers uncorrected historical and current appraisal data from geographically differentiated locations in its refinance evaluation process.  Race-stratified differentials in appraisal data are well known to Wells Fargo and others in the banking industry.  Indeed, according to a March 23, 2022 report in *The Washington Post* citing Brookings Institution data, "homes in Black neighborhoods" (which, as already discussed, CORE identifies) routinely appraise at "23 percent less, on average, than those in comparable White neighborhoods – despite having similar neighborhood and property characteristics and amenities."[66]  Freddie Mac has similarly "found that 12.5 percent of appraisals for home purchases in Black neighborhoods and 15.4 percent in Latino neighborhoods came in below the contract price, compared with 7.4 percent of appraisals in White neighborhoods,"[67] due in part to the well-known and systematic failure of appraisers to choose comparisons sales in an appropriately broad geographic range for properties located in Black and Latino neighborhoods.[68]  Failure to correct for this longstanding disparity within automated underwriting systems will automatically and systematically skew the loan-to-value calculations against Black homeowners, making their loans look like riskier bets than they actually are for the banks.

90.     Wells Fargo's automated underwriting system does not correct

---

[66] https://www.washingtonpost.com/business/2022/03/23/home-appraisal-racial-bias/.

[67] *Id.*

[68] *Id.*

2029104

appropriately for these racial disparities in appraisals, instead placing undue reliance on an uncorrected data point that systematically undervalues properties in neighborhoods populated by Black homeowners.  Wells Fargo's failure to correct for this well-known disparity is not required by any legitimate underwriting criteria.

91.  ***Unjustified Increased FICO Requirements***.  A further COVID-19 era algorithmic overlay utilized by the Wells Fargo CORE system is increased credit score requirements.  According to a confidential informant, Wells Fargo imposed a higher minimum credit score than that required for an FHA loan or a Fannie Mae-backed loan.  According to the confidential informant, if Fannie Mae required a minimum credit score of 600, Wells Fargo would require a minimum score of 620, meaning CORE automatically rejected anyone with a credit score below 620.  The racial impact of this change, which was not justified by legitimate underwriting criteria, is clear:  in February 2021, it was reported that one in five Black consumers have FICO scores below 620; meanwhile one out of every 19 White consumers are in the sub-620 category.[69]

92.  A study done by the Board of Governors of the Federal Reserve System analyzing federal mortgage data identified no "evidence [a]s to whether these tighter standards reduce loan risk to justify the disparate impact on minority denials they are associated with."[70]  And after controlling for relevant underwriting factors (debt-to-income ratios, loan-to-value ratios, credit scores, etc.) the study found that "[l]enders who impose the strictest standards on their [W]hite applicants [like Wells

---

[69] https://www.forbes.com/advisor/credit-cards/from-inherent-racial-bias-to-incorrect-data-the-problems-with-current-credit-scoring-models/.

[70] *How Much Does Racial Bias Affect Mortgage Lending? Evidence from Human and Algorithmic Credit Decisions*, Neil Bhutta, Aurel Hizmo, and Daniel Ringo (July 2021), at 12, n.20, available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3887663.

2029104

Fargo] tend to have the largest unexplained excess denials of minority applicants," including Black applicants.[71]

93.    In 2021, six Wells Fargo employees and officers with doctorate degrees published a study warning about the dangers of banking algorithms used by Wells Fargo and its peers.  The study was published on arXiv, an open-access archive of scholarly articles in the fields of computer science, quantitative finance, statistics, and economics, among others, which is operated by Cornell University.[72]

94.    The authors of the study noted that "despite 'years of intense scrutiny, lending discrimination still persist[s]'" and that the arrival of flexible and automated AI/ML [artificial intelligence/machine learning] algorithms and "the availability of alternative sources of data are… exacerbating" this discrimination.[73]

95.    The potential sources of bias and discrimination are multifold. According to the study, historical data can often be skewed against specific groups, particularly where there is limited information on protected groups.[74]  Moreover, biases in historical data can be exacerbated with the use of machine learning because algorithms, which automate feature engineering, can ignore the presence of surrogate variables for protected attributes.[75]

96.    Bias can also be present in alternate sources of data, which can be harvested from the worldwide web, social media, and blogs.  Often, one's digital

---

[71] *Id.* at 12.

[72] https://arxiv.org/.

[73] *Bias, Fairness, and Accountability with AI and ML Algorithms*, Nengfeng Zhou, Zach Zhang, Vijayan N. Nair, Harsh Singhal, Jie Chen, and Agus Sudjianto, Corporate Model Risk, Wells Fargo (May 6, 2021), available at: https://arxiv.org/ftp/arxiv/papers/2105/2105.06558.pdf, at page 4.

[74] *Id.* at 5.

[75] *Id.*

2029104

footprint has strong predictive performance in credit scoring, but these "predictors are highly correlated with socio-economic variables that are surrogates for protected groups."[76] "[T]hese variables are highly related to protected classes, and the availability of such seemingly innocuous information, combined with flexible 'data snooping' ML algorithms, can easily lead to 'proxy discrimination.'"[77]

97.     "Unstructured data, ***such as texts, audio, and images***, are increasingly analyzed through AI/ML [artificial intelligence/machine learning] techniques in banking and finance."[78]  Such a "selection process can suffer from 'implicit biases'" because the use of social media data is highly correlated with individuals' race and national origin.  It is easy to envision the invidious nature of this technology.  An algorithm that reviews billions of social media posts will start to associate accounts with more posts with more Black faces as having lower creditworthiness than posts with more lighter-skinned faces.  This same algorithm also analyzes the speech patterns used in the videos, and associate's creditworthiness with "talking white" and speaking fluent English.  The same algorithm deems those who speak in an Urban vernacular, Gullah, or those who learned English as a second language as less creditworthy.  Worse yet, this algorithm learns to judge creditworthiness based on word choice and use of certain slang.  What is more, these algorithms are more prone to perpetuate guilt by association because it is well known that face recognition technologies consistently misidentify Black faces at much higher rates than White faces.[79]  Thus, "[f]airness concerns are heightened when alternative

---

[76] *Id.*

[77] *Id.*

[78] *Id.* at 6.

[79] *Racial Discrimination in Face Recognition Technology*, Alex Najibi, Harvard University Graduate School of Arts and Sciences (October 24, 2020), available at: https://sitn.hms.harvard.edu/flash/2020/racial-discrimination-in-face-recognition-

sources of data, such as ***social-media data, information on biometrics, speech or language***, are used because it is not easy to scrub the data of ***demographic proxies***."[80]

98.    In addition to data bias, the automated nature of machine learning algorithms "miss[es] the potential for correlated surrogate variables causing proxy discrimination."[81]  "Data bias together with poor optimization of algorithms can cause severe harm to protected groups."[82]

99.    Notably, the study concludes that the use of "black-box algorithms that are not well-understood" have "potential for serious harm" in the consumer lending space, and the models "must be continually monitored for disparate impact testing."[83]  A "[s]eparate fair lending group conducts periodic backtesting and trend analysis to validate that credit underwriting systems do not discriminate against applicants on a prohibited basis."[84]

**E.    Wells Fargo's COVID-19 Era Understaffing and Failure to Correct for Discriminatory Automated Lending Decisions**

100.   Wells Fargo is no doubt well aware that properly functioning banks, including its competitors, correct for biases within automated underwriting processes by employing trained underwriters and fair lending teams that are supposed to act as a backstop against the racially pernicious consequences that arise

---

technology/.

[80] *Id*. at 13.

[81] *Id*. at 6.

[82] *Id*. at 7.

[83] *Id*. at 13.

[84] https://ww2.amstat.org/meetings/sdss/2020/onlineprogram/ViewPresentation.cfm?file=309619.pdf.

2029104

Case No. 4:22-cv-01748-KAW

from the unrestrained functioning of automated processes that, left unchecked, can systematically identify Black borrowers as undue credit risks.

101.   Such was not the case at Wells Fargo.  Confidential informants with knowledge of Wells Fargo's refinance practices in recent years describe a system where Wells Fargo made a business decision to centralize and emphasize automated processes at the expense of individualized lending decisions.  They explain that Wells Fargo's loan originators, processors and underwriters were overworked—sometimes handling as many as ***three times*** the normal monthly volume expected of loan processors and underwriters—and systematically disincentivized to "check the work" of the CORE system.  These witnesses also describe changes that were made, such as to remove their ability to make changes within Wells Fargo's automated system, that would result in a greater likelihood of an application being approved.

102.   Given the racially signaled functioning of Wells Fargo's COVID-19 era CORE algorithm, the effect of this was clear:  nobody was available to provide a check on the racially biased lending decisions taking place at Wells Fargo, which resulted in delays, denials and systematic application of higher interest rates to Black borrowers at a rate that far exceeded anything in the industry.

**F.   Wells Fargo's Knowledge of Disparate Impact of Overlays**

103.   Not providing a human check on Wells Fargo's discriminatory lending practices did not, however, mean that Wells Fargo was unaware of the discriminatory impact of its practices.  Quite the contrary:  throughout the relevant time period, confidential informants with knowledge of Wells Fargo's residential lending practices emphasize the extent to which senior Wells Fargo executives were fully aware of the disparate impact of these policies and practices.

104.   These witnesses emphasize that throughout the relevant time period, Wells Fargo generated a "Diversity Market Segments Report" that was distributed companywide via electronic mail distribution on a monthly basis.  Comprised of Wells Fargo's nationwide lending statistics, the report included, among other things,

2029104

the racial breakdown of Wells Fargo's lending, the percentage of loans being made in certain locations and by certain originators and offices, whether Wells Fargo met the Community Reinvestment Act[85] requirements, and the percentage of loans that were made to first-time homebuyers.  These reports were reviewed and discussed during monthly regional calls that congratulated employees on their efforts reflected therein.

105.   And yet, despite these monthly reports that provided a real-time exposé of the pernicious significant adverse effect of its overlays on Black applicants, Wells Fargo did nothing.

**G.    Wells Fargo's Algorithm Has a Disparate Impact on Black Homeowners**

106.   The above practices, policies, and procedures are arbitrary and artificial and unnecessary to achieve a valid underwriting interest or legitimate objective. The vast difference between refinancing approval rates Wells Fargo issued to Black homeowners as compared to any other lending institution's approval rates negates any possible legitimate objective.

107.   As noted, the above practices have a disproportionately adverse effect on Black Americans seeking to refinance their loans.  Black homeowners are members of a protected class.

108.   Wells Fargo's practices directly harmed Black homeowners by forcing them to pay higher interest rates while applications were pending, by forcing them to pay higher interest rates when applications were completed, and/or by denying refinancing applications.  In the absence of these policies, Black homeowners would not have had to pay higher rates or face rejection in their refinancing applications.

109.   The disparity between Wells Fargo's treatment of Black homeowner

---

[85] The Community Reinvestment Act, enacted in 1977, requires the Federal Reserve and other federal banking regulators to encourage financial institutions to help meet the credit needs of the communities in which they do business, including low- and moderate-income neighborhoods.

2029104

applicants and non-Black homeowner applicants is significant and shocking.  As noted, a White American in the lowest income bracket was just as likely to receive refinancing approval as a Black homeowner in the highest income bracket.

110.   Overall, in 2020, 8.4 million homeowners refinanced their mortgage loans to take advantage of historically low interest rates.[86]  White homeowners saved an estimated $3.8 billion in 2020.  In comparison, Black homeowners who make up 9% of all homeowners saved just $198 million, less than 4% of the total savings.[87]

111.   In 2020, using its algorithm, Defendant Wells Fargo approved Black homeowner refinancing applications at a rate lower than that of any other major lender in America.  Wells Fargo was the only major lender in the United States that approved a smaller share of refinancing applications from Black homeowners in 2020 than it had in 2010.[88]

112.   Wells Fargo *denied over 50%* of the Black homeowners seeking to refinance in 2020, and *denied just under 50%* of the Black homeowners seeking to refinance in 2021.  No other major lending institution refused to refinance the homes of Black Americans at such stunning rates.  The numbers tell a shameful story, without any legitimate explanation.  In 2020—at the height of the refinancing boom, when millions of Americans benefitted from the historically low interest rate environment—Wells Fargo approved 47% of all applications by Black homeowners

---

[86] "Data Point 2020: Mortgage Market Activity and Trends," Consumer Financial Protection Bureau, August 2021, pg. 11, available at https://files.consumerfinance.gov/f/documents/cfpb_2020-mortgage-market-activitytrends_report_2021-08.pdf.

[87] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-refinancing/.

[88] *Id.*

2029104

(meaning that Wells Fargo rejected the majority of applications from Black homeowners), whereas all other lenders approved 71% of all applications by Black homeowners.[89]  In 2020, no other lending institution rejected a majority of Black homeowners' applications for refinancing.[90]

113.   As shown in a recent Bloomberg article by Shawn Donnan, Ann Choi, Hannah Levitt, and Christopher Cannon, data from eight million refinancing applications from 2020 reveal that "the highest-income Black applicants [had] an approval rate about the same as White borrowers in the lowest-income bracket."[91] White refinancing applicants earning between $0 and $63,000 a year were ***more likely*** to have their refinancing application approved by Wells Fargo than Black refinancing applicants earning between $120,000 and $168,000 a year.[92]

---

[89] *Id.*

[90] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-refinancing/.

[91] *Id.*

[92] *Id.*

2029104

FIRST AMENDED CLASS ACTION COMPLAINT



**Higher Income, Same Approval**
Wells Fargo's refinancing approval rates were higher for the lowest-income White applicants in 2020 than for all but the highest-income Black applicants.

Source: Bloomberg analysis of Home Mortgage Disclosure Act data for 8 million completed applications to refinance conventional loans in 2020.

114.   Black applicants with properties in predominately Black counties fared worse.  In Fulton County, where the population was 43.6% African American in 2020,[93] Wells Fargo approved fewer than 43% of refinancing applications completed by Black homeowners, the lowest approval rate among major lenders.[94]

[93] https://data.census.gov/cedsci/table?g=0500000US13121&tid=ACSDP5Y2020.DP05.

[94] *Id.*

2029104

115.   And even for those Black applicants whose loans were ultimately approved, they faced delays that White applicants living in predominately White neighborhoods did not, causing them damages through continued higher mortgage rates during the unjustified delay as they awaited loan approval.  In some cases, Wells Fargo officers simply told Black applicants living in predominately Black neighborhoods that "perhaps the area is not eligible" for quick evaluations of refinancing applications.[95]  Wells Fargo regularly approved refinancing applications of non-Black homeowners in a matter of weeks, but only approved the applications of Black homeowners after many months (if those Black applicants happened to be approved).

116.   And because Wells Fargo designed an application process that is disproportionately difficult for Black homeowners to complete and engages in a practice of "soft denials," where the loan officers leave applicants hanging or encourage them to look elsewhere, 27% of all Black homeowners who began a refinance application with Wells Fargo withdrew it.[96]  Thus, only one-third of the 17,702 Black homeowners who sought refinancing were successful.[97]

117.   The story in 2021 was the same, with Wells Fargo approving a much lower percentage of Black American applicants than any other lender.[98]  While the number of Black refinance applicants at Wells Fargo nearly doubled in 2021, accounting for 7% of the bank's total refinance applicants and two percent higher than industry averages, Wells Fargo's approval rates for Black borrowers continued

---

[95] *Id.*

[96] *Id.*

[97] *Id.*

[98] https://www.bloomberg.com/news/articles/2022-03-25/wells-fargo-faces-persistent-racial-gap-in-mortgage-refinancing.

2029104

to lag behind its major competitors.

118.   Wells Fargo approved only 58% of Black applicants compared to other lenders, which approved 74% of Black applicants.[99]  And the disparity between Black and White refinance approval rates was 21% at Wells Fargo, nearly double the disparity (13%) for all other for other lenders.[100]



**Refinancing Disparities**
Wells Fargo approved fewer Black homeowners' applications in 2021 than other lenders.

Source: Bloomberg analysis of Home Mortgage Disclosure Act data.
Note: Approval rates for completed applications for refinancing conventional, non-jumbo and first-lien mortgages in 2021.

119.   And though Wells Fargo's Black refinancing approval rate improved slightly from 2020, the same was true at all other lenders, due to broader economic conditions.[101]  By comparison, other major lenders approved much higher rates of Black refinancing applicants in 2021: JP Morgan Chase & Co. approved 87% of Black applicants (only 6% less than White applicants), Rocket Mortgage LLC

---

[99] *Id.*

[100] *Id.*

[101] *Id.*

approved 81% of Black applicants (only 7% less than White applicants), and Bank of America Corporation approved 75% of Black applicants (only 11% less than White applicants).[102]

**H.      Plaintiffs and the Class are Harmed by Wells Fargo's Race-Based Discrimination**

120.   The stories of Black Americans whose applications were delayed or denied are legion.

121.   One Black American applicant sought to refinance an $890,000 mortgage in February 2020.  The applicant worked as a dentist and earned approximately $250,000 a year.  The applicant had never missed a mortgage payment and had minimal credit card debt.  The applicant had over $1 million in a Wells Fargo account, and also owned several rental properties with paying tenants. Nevertheless, over a six-month period, Wells Fargo asked and re-asked for documents.  After the lengthy delay, Wells Fargo denied the application.  The applicant subsequently sought refinancing from a different institution that granted the refinancing over the phone.

122.   Another applicant sought to refinance a loan already held by Wells Fargo, which it had issued two years prior.  The applicant had never missed a payment and had never even been late on a payment.  They held the same job they held when they obtained the mortgage, and their credit score was over 780.  For at least two months, Wells Fargo demanded more and more documents, leading the applicant to complain to his broker's superior.  The applicant had to fax the same documents four or five times, which Wells Fargo claimed to have lost.  Before Wells Fargo decided to deny the loan, the applicant went to another lender, who refinanced the loan in only three or four days.

123.   Yet another applicant waited four months for Wells Fargo to approve

---

[102] *Id.*

2029104

their refinancing applications.  This applicant is a practicing doctor who owns multiple investment properties attempting to refinance their primary residence. During the application process, Wells Fargo repeatedly asked for documents and repeatedly went silent, refusing to return the applicant's calls.

124.   Plaintiff Aaron Braxton purchased his home in South Los Angeles, California, near the University of Southern California, in April 2000, through a Wells Fargo home loan for $139,500 ("First Loan").  This First Loan was insured through the FHA.  In 2005, after the price of the house appreciated, he took out a second home equity line of credit loan, also from Wells Fargo ("Second Loan").  He improved upon the property and built an accessory dwelling unit.  Today, the home is worth approximately $800,000, as it was in 2019.  In or about August 2019, Mr. Braxton began the process of applying to refinance his two Wells Fargo loans to take advantage of reduced interest rates.  At the time, he owed $185,000 on both his Wells Fargo loans and paid a 6% interest rate on both loans, multiple percentage points higher than the average refinance rate at the time.

125.   When Mr. Braxton initially applied to refinance his First Loan, Wells Fargo repeatedly asked him to resubmit paperwork because Wells Fargo representatives claimed the paperwork was either missing or lost.  Wells Fargo representatives also continually took weeks and weeks to issue or reply to correspondence.  Mr. Braxton thereafter began the process of refinancing his Second Loan and was confronted with the same delays.

126.   Frustrated by the delays and because he was continuing to pay a higher mortgage rate while his applications were pending, Mr. Braxton regularly contacted his loan officers and other Wells Fargo personnel to ask about the status of his applications.

127.   After months of frustrating encounters with Wells Fargo personnel, Mr. Braxton decided to call HUD.  A HUD representative informed Mr. Braxton that they would be contacting Wells Fargo.  The very next day, Wells Fargo approved

1  the refinancing of Mr. Braxton's federally backed FHA home loan, approximately
2  nine months after he began the process.

3      128.   Eventually, around October 2020, Wells Fargo finally approved a
4  refinancing of his Second Loan.  However, despite the contact from HUD, which
5  presumably prompted it to act on Mr. Braxton's First Loan, Wells Fargo continued
6  its discrimination through race-based application delays.  It continued to claim that
7  paperwork needed to process the Second Loan was missing, even though Mr.
8  Braxton had already provided the paperwork.  At one point, after having sent a
9  notary to his home to finalize some paperwork, Wells Fargo informed Mr. Braxton
10 that the notary had lost the paperwork, and he needed to complete some forms again.

11     129.   All told, Mr. Braxton submitted four applications because Wells Fargo
12 kept losing them.  During the 16 months that his applications were pending, Mr.
13 Braxton continued to pay the higher original mortgage rates instead of the lower
14 refinanced rates he was seeking (and ultimately proven entitled to).  However,
15 unbeknownst to Mr. Braxton, in the end the rate he received for his refinancing,
16 while lower than his original rate, was much higher than the fair market rate
17 received by similarly situated non-Black applicants.

18     130.   Plaintiff Gia Gray is a Black homeowner who resides in Danville,
19 California.

20     131.   Mrs. Gray is another victim of Wells Fargo's discriminatory policies.
21 Both Mrs. Gray and her husband are physicians.  Both are employed and both,
22 individually, are in the top quintile of income earners.  The same was true when they
23 applied to refinance their loans with Wells Fargo.  Mrs. Gray's FICO score is above
24 800.

25     132.   The couple owns three homes.  Their primary residence is in Danville,
26 California—a predominately White area.  The couple also own income properties in
27 Stockton, California, and Chicago, Illinois—more diverse areas.  The couple had
28 Wells Fargo mortgages for all these homes, and, save for a balance of approximately

1   $1,000 on their credit card, the couple has and had no other debt.  The couple never

2   missed a mortgage payment, and they always paid on time.  They began the

3   refinancing process for their homes in February 2020.

4       133.   The couple was only able to finance the Danville, California property—

5   in the predominately White area—after four months.  Their loan officer was located

6   in Walnut Creek, California, another predominately White area, who actually took

7   time out of his day to visit their multimillion-dollar home in Danville in-person to

8   sign refinancing documentation.  Even still, Wells Fargo kept asking them to

9   provide additional information, and even contacted the Human Resources

10  department at Mrs. Gray's office.

11      134.   The couple was not as lucky on their two other income properties.  The

12  loan officer would try to steer Mrs. Gray away from these properties and only

13  expressed an interest in refinancing her Danville, California property.  Wells Fargo

14  eventually switched the couple's Walnut Creek loan officer to a Black assistant to

15  handle these properties.  Wells Fargo would not return their calls for inquiries on

16  refinancing these two properties.  When the couple did manage to get a hold of the

17  assistant or loan officer, they were told that Stockton, California property was in a

18  bad area, and that the Chicago, Illinois property, although in a good area, was high

19  risk, and that Wells Fargo was not looking to refinance high-risk areas.  Frustrated

20  by Wells Fargo's ambivalence and inaction, the couple gave up on refinancing these

21  properties in December 2020, nearly a year after they started.

22      135.   Plaintiff Bryan Brown is a Black homeowner who resides at 18 Elm

23  Street, 3rd Floor, Bristol, Connecticut 06010.

24      136.   Mr. Brown purchased a three-unit, multifamily property in Bristol,

25  Connecticut in December 2010, through a Wells Fargo home loan for approximately

26  $204,000.  Mr. Brown and his family reside in one of the units, and he receives

27  rental income from the other two units.  Today, the property is worth approximately

28  $250,000.

2029104

137.   In October 2020, Mr. Brown began the process of applying to refinance his loan to take advantage of reduced interest rates and to convert his conventional 30-year loan to a 15-year fixed mortgage.  At the time, Mr. Brown owed approximately $150,000 and paid a 4.75% interest rate.

138.   When Mr. Brown initially applied to refinance his loan, he submitted financial statements, including but not limited to those relating to his three investment properties.  Frustrated by the delays and because he was continuing to pay a higher mortgage rate while his application was pending, Mr. Brown regularly contacted Wells Fargo personnel to ask about the status of his application.  Rather than provide Mr. Brown an explanation as to the delay, Wells Fargo repeatedly requested that Mr. Brown *resubmit* financial documents and/or provide additional documentation to demonstrate *how* he paid his credit card statements.  Wells Fargo also contacted Mr. Brown's employer on multiple occasions requesting that they verify his employment.

139.   Four months after Mr. Brown submitted his application, in or around January/February 2021, Mr. Brown's application was denied.

140.   Plaintiff Paul Martin is a Black homeowner and resides in Los Angeles, California.

141.   Paul Martin is a 14-year Hollywood entertainment executive at Sony Pictures.  In 2020, Paul Martin sought to refinance his home in the Ladera Heights neighborhood of Los Angeles, California, which has a higher proportion of affluent Blacks.  His multimillion-dollar home was previously owned by WNBA superstar Lisa Leslie and NBA player Aaron Afflalo.

142.   But even Mr. Martin's shot was blocked by Wells Fargo.  The bank would not refinance his home unless he could get it appraised for $2.0 million. Wells Fargo's appraiser refused to come into Mr. Martin's home, and appraised it at just shy of $2.0 million based on comparisons in the neighborhood.  Mr. Martin went to another lender, who appraised the home at $2.4 million and promptly

1  refinanced his loan.

2      143.   Plaintiffs' experiences are emblematic of the experiences of Black

3  Americans all over the country.

4                          **V.     CLASS ALLEGATIONS**

5      144.   Plaintiffs bring this action on behalf of themselves and a potential class

6  of similarly situated Black homeowners.

7      145.   Each and every claim alleged in this case is also alleged on behalf of

8  every member of the Class.

9  **A.     Class Definition**

10      146.   The Class includes all Black homeowners in the United States who,

11  from January 1, 2018 through the present (the "Class Period"), submitted an

12  application to refinance their home mortgage through Defendants that was (i)

13  processed at a rate slower than that of the average processing time of applications

14  made by non-Black applicants; or (ii) whose applications were denied; or (iii) whose

15  resulting refinance loans were made at higher interest rates as compared to similarly

16  situated non-Black applicants.  Excluded from the Class are Defendants and their

17  employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not

18  named in this Complaint, and the United States government.

19      147.   Class certification is authorized under Federal Rule of Civil Procedure

20  23 and applies to claims for injunctive and equitable relief, including restitution,

21  under Rule 23(b)(2), and for monetary damages under Rule 23(b)(3).

22      148.   There are at least 13,000 members of the Class.

23      149.   The number of persons who fall within the definitions of the Class are

24  so numerous and geographically dispersed so as to make joinder of all members of

25  the Class or Subclass in their individual capacities impracticable, inefficient, and

26  unmanageable, and without class-wide relief, each member of the Class would

27  effectively be denied his, her, or their rights to prosecute and obtain legal and

28  equitable relief based on the claims and allegations averred in the Complaint.

2029104

150.   Plaintiffs, as detailed below, can fairly and adequately represent the proposed Class.  In the alternative, Plaintiffs can act as the representatives of the below subclasses.

**B.    Proposed Subclasses**

151.   Additionally, or in the alternative, pursuant to Federal Rule of Civil Procedure 23(c)(5), Plaintiffs bring this action on behalf of the following subclasses:

152.   **The Delayed Refinancing Subclass**:  All Black persons in the United States who applied for refinancing from the Defendants during the class period and whose applications processed at a rate slower than that of the average processing time of applications made by non-Black applicants.

153.   **The Higher Rate Subclass**:  All Black persons in the United States who applied for refinancing from the Defendants during the class period and whose refinancing applications were eventually approved, but at a higher interest rate than prevailing market rates based on their creditworthiness.

154.   **The Denied Refinancing Subclass**:  All Black persons in the United States who applied for refinancing from the Defendants during the class period and whose applications were denied but should have been approved based on objective, race-neutral factors, including but not limited to:  loan-to-value ratio, debt-to-income ratio, and credit score.

**C.    Numerosity and Ascertainability**

155.   **Numerosity**.  While the exact numbers of the members of the Class and Subclasses are unknown to Plaintiffs at this time, membership in the Class and Subclasses may be ascertained from the records maintained by Defendants.  At this time, Plaintiffs are informed and believe that the Class includes at least 13,000 and the Subclasses include tens of thousands of members.  Therefore, the Class and Subclasses are sufficiently numerous that joinder of all members of the Class and Subclasses in a single action is impracticable under Rule 23(a)(1) of the Federal Rules of Civil Procedure, and the resolution of their claims through a class action

will be of benefit to the parties and the Court.

156. **Ascertainability**. The names and addresses of the members of the Class and Subclasses are contained in Defendants' records. Notice can be provided to the members of the Class and Subclasses through direct mailing, email, publication, or otherwise using techniques and a form of notice similar to those customarily used in consumer class actions arising under State and Federal law.

**D.    Commonality and Predominance**

157. This matter involves common questions of law and fact which predominate over any question solely affecting individual Class Members.

158. The common questions of law and fact include, but are not limited to:

- Whether Defendants systematically discriminated against Class Members on account of their race;

- Whether Black applicants' refinance applications were processed at a rate slower than that of the average processing time of applications made by non-Black applicants;

- Whether Black applicants' refinance applications were denied when the score of a similarly situated non-Black applicant would be approved;

- Whether Black applicants' resulting refinance loans were made at higher interest rates as compared to similarly situated non-Black applicants;

- Whether Defendants selected disproportionately White areas for rapid refinancing evaluation and disproportionately Black areas for increased scrutiny;

- Whether Defendants' underwriting algorithms and machine learning programs were racially biased and led to unfairly discriminatory credit policies that harmed Black refinancing applicants;

- Defendants' knowledge;

- Defendants' consumer disclosures;

- Defendants' internal approval process; and

- Defendants' use of appraisals.

159. **Predominance**. Class action status is warranted under Rule 23(b)(3) of the Federal Rules of Civil Procedure because questions of law or fact common to the

members of the Class and Subclasses predominate over any questions affecting only individual members.  The interests of the members of the Class and Subclasses in individually controlling the prosecution of separate actions are theoretical and not practical.  Prosecution of this action through multiple Class Representatives would be superior to individual lawsuits.  Plaintiffs are not aware of any difficulty which will be encountered in the management of this litigation which should preclude its maintenance as a class action.

**E.     Typicality and Adequacy**

160.   Plaintiffs' claims are typical of the other Class Members' claims because all Class Members were injured in the same manner as a result of substantially similar conduct by Defendants.

161.   Plaintiffs are adequate Class Representatives because their interests do not conflict with the interests of the other members of the Class and Subclasses they seek to represent.  Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.  The Class and Subclasses' interests will be fairly and adequately protected by Plaintiffs and their counsel.

**F.     Superiority**

162.   A class action is the superior method for the fair and efficient adjudication of this matter because the damages and other harms suffered by Plaintiffs and other Class Members are small compared to the burden and expense of individual litigation.  Thus, it would be impractical, if not impossible, for individual plaintiffs to seek redress against Defendants for the harms suffered.

163.   Individual litigation of these harms would also be inefficient for the court system, and would create a risk of inconsistent or contradictory rulings and judgments.

164.   No unusual circumstances exist that would make this matter more difficult to manage than a typical class action.  Individualized damages figures can

be mathematically computed by collecting data about the length of each Class Member's delay and the differential between the interest rates they ultimately received versus the prevailing market rate based on race-neutral variables such as debt-to-income ratio, loan-to-value ratio, and credit score.

**G.    Injunctive Relief**

165.    Plaintiffs also seek to represent a class under Rule 23(b)(2) seeking injunctive relief forcing Wells Fargo to cease and desist its current discriminatory practices.

## <u>COUNT I</u>

### VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT

### 15 U.S.C. § 16901, *et seq.*

166.    Plaintiffs, on behalf of themselves and all those similarly situated, reallege each and every paragraph above and incorporate them by reference as though fully stated herein.

167.    The Equal Credit Opportunity Act makes it unlawful for a creditor to discriminate against any applicant with respect to any aspect of a credit transaction on the basis of race.

168.    The Equal Credit Opportunity Act applies to applications for refinancing, like those of the Plaintiffs and others similarly situated.  Plaintiffs applied for credit by seeking to refinance their home loans.

169.    Defendants are creditors because they regularly extend, renew, and continue issuances of credit.

170.    Defendants' consistent delays, roadblocks, feigned difficulties, and sometimes denials of applications for refinancing submitted by Black Americans constitute race-based discrimination forbidden by the Equal Credit Opportunity Act.

171.    Plaintiffs and all those similarly situated were harmed by Defendants' conduct, including but not limited to harm in the form of higher interest rates paid while applications were pending, higher interest rates paid upon a delayed approval,

1   or from a denied application.

2       172.   On behalf of themselves and the Class they seek to represent, Plaintiffs

3   request the relief set forth below.

4                          **COUNT II**

5   **RACE DISCRIMINATION IN VIOLATION OF THE FAIR HOUSING ACT**

6                **OF 1968, 42 U.S.C. § 3601, *et seq.***

7       173.   Plaintiffs reallege each and every paragraph above and incorporate

8   them by reference as though fully stated herein.

9       174.   The Fair Housing Act makes it unlawful, in residential real estate

10  transactions, such as refinancing, to discriminate against designated classes of

11  individuals.

12      175.   Plaintiffs and others similarly situated sought to engage in residential

13  real estate transactions with the Defendants.

14      176.   Plaintiffs and others similarly situated are Black Americans and

15  therefore members of a protected class under the Fair Housing Act.

16      177.   Defendants refused to transact business with Plaintiffs and others

17  similarly situated when they refused to approve refinancing applications on the same

18  timeline as the applications made by other parties with similar qualifications that

19  were not members of the protected class, by causing applicants to withdraw

20  applications due to roadblocks and feigned difficulties, or by denying refinancing

21  applications.  As noted, Defendants approved fewer than half of Black homeowners'

22  refinancing applications in 2020 while approving 71% of the applications of White

23  homeowners.

24      178.   Defendants refused to transact business with Plaintiffs and those

25  similarly situated during the Class Period and at the same time did transact business

26  with non-Black homeowners with similar qualifications.

27      179.   Plaintiffs and those similarly situated were injured by Defendants'

28  refusal to transact business with them because they paid application fees for

2029104

1  refinancing applications that were delayed or denied, because they continued to pay

2  higher interest rates while their delayed applications were pending, because they

3  were provided with higher interest rates than other homeowners with similar

4  qualifications, and/or because their applications were denied.

**COUNT III**

**RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981**

7      180.   Plaintiffs reallege each and every paragraph above and incorporate

8  them by reference as though fully stated herein.

9      181.   Under 42 U.S.C. § 1981, persons of all races are guaranteed the same

10  right to make and enforce contracts, regardless of race.  The term "make and

11  enforce" contracts includes the making, performance, modification, and

12  terminations of contracts, as well as all of the other aspects of a contractual

13  relationship.

14      182.   By seeking to refinance their home loans and submitting an application

15  to Defendants, Plaintiffs and others similarly situated sought to "make and enforce"

16  contracts with the Defendants.

17      183.   Plaintiffs and those similarly situated were denied their right to make

18  and enforce contracts when Defendants refused to provide refinancing on the same

19  terms as they offered to members of a different race, by delaying or frustrating the

20  applications process, and/or by denying the applications.

21      184.   Plaintiffs and those similarly situated were harmed by Defendants'

22  denial of their rights to make and enforce contracts.

**COUNT IV**

**VIOLATION OF THE UNRUH CIVIL RIGHTS ACT,**

**CALIFORNIA CIVIL CODE §51**

26      185.   Plaintiffs reallege each and every paragraph above and incorporate

27  them by reference as though fully stated herein.

28      186.   The Unruh Civil Rights Act provides that all persons within the State of

2029104

California are free and equal no matter their race and are entitled to full and equal treatment in all business establishments.

187.   The Unruh Civil Rights Act thus prohibits discrimination of any kind against any person in any business establishment.

188.   Defendants are business establishments under the Unruh Civil Rights Act.

189.   Plaintiffs and other individuals similarly situated were denied full and equal treatment under the Unruh Civil Rights Act when Defendants refused to offer them refinancing terms on the same terms as individuals who were not Black Americans.

190.   Plaintiffs and other individuals similarly situated were harmed by Defendants' refusal to transact business with them because they paid application fees for refinancing applications that were delayed or denied, because they continued to pay higher interest rates while their delayed applications were pending, because they were provided with higher interest rates than other homeowners with similar qualifications, and/or because their applications were denied.

## COUNT V

## VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW

191.   Plaintiffs reallege each and every paragraph above and incorporate them by reference as though fully stated herein.

192.   The California Unfair Competition Law ("UCL") forbids "unlawful, unfair or fraudulent" conduct in connection with business activity.

193.   Defendants' business offering refinancing of existing loans is a business activity under the UCL.

194.   Plaintiffs and others similarly situated are "persons" under the UCL.

195.   Defendants' conduct described herein constitutes unlawful competition, as in the course of engaging in the business acts described above, it engaged in conduct that constituted a predicate violation of the laws identified herein, namely

the Equal Credit Opportunity Act, the Fair Housing Act, 42 U.S.C. § 1981, and the Unruh Civil Rights Act.

196.   Defendants' conduct described herein constitutes unfair competition under the UCL, as their practices are likely to deceive the public by informing the public of an alleged commitment to diversity and equality, but instead using hidden business practices designed to deny, delay and refuse the refinancing of loans of Black Americans, and subjecting those that are approved, to unfavorable terms.  As there is no legitimate justification for these practices, which have a disproportionately negative impact on the public, in comparison to any fair business purpose, Defendants' practices are unfair as defined under the UCL.

197.   Defendants' conduct described herein constitutes fraudulent competition under the UCL, as they advertise and otherwise state that they are committed to diversity and equality, and will fairly and quickly process the refinancing applications of all applicants, but instead use hidden business practices designed to deny, delay and refuse the refinancing of loans of Black Americans, and subjecting those that are approved, to unfavorable terms.  These business practices are likely to deceive the public, and thus are fraudulent.

198.   Plaintiffs and those similarly situated were injured by Defendants' refusal to transact business with them because they paid application fees for refinancing applications that were delayed or denied, because they continued to pay higher interest rates while their delayed applications were pending, because they were provided with higher interest rates than other homeowners with similar qualifications, and/or because their applications were denied.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court provides the following relief:

a.   Certify the 23(b)(2) and 23(b)(3) classes outlined above;

b.   Designate Plaintiffs as Class Representatives and designate the

undersigned counsel as lead Class Counsel;

c.   Find that Defendants' acts described herein violate the Equal Credit Opportunity Act, the Fair Housing Act, 42 U.S.C. § 1981, the Unruh Civil Rights Act, and the California UCL;

d.   Find that Defendants have engaged in a pattern and practice of racial discrimination resulting in the harm to Plaintiffs and class members described above;

e.   Award Plaintiffs and all others similarly situated restitutionary relief, together with compensatory and punitive damages;

f.   Award Plaintiffs and all others similarly situated injunctive relief by ordering Defendants to stop the discriminatory practices described herein;

g.   Award Plaintiffs and all others similarly situated prejudgment interest and attorney's fees, costs, and disbursements; and

h.   Award Plaintiffs and all others similarly situated such other relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury of all issues so triable.

1   DATED:  April 12, 2022                    ELLIS GEORGE CIPOLLONE
2                                             O'BRIEN ANNAGUEY LLP

3                                             By:    _____/s/ Dennis S. Ellis_____
4                                                  Dennis S. Ellis (SBN 178196)
                                                   Trent B. Copeland (SBN 136890)
5                                                  Ryan Q. Keech (SBN 280306)
                                                   Stefan Bogdanovich (SBN 324525)
6                                                  2121 Avenue of the Stars, Suite 2800
7                                                  Los Angeles, California 90067
                                                   Telephone: (310) 274-7100
8                                                  Facsimile: (310) 275-5697
9                                                  Email:  dellis@egcfirm.com
                                                           tcopeland@egcfirm.com
10                                                          rkeech@egcfirm.com
11                                                          sbogdanovich@egcfirm.com

12                                            ELLIS GEORGE CIPOLLONE
13                                            O'BRIEN ANNAGUEY LLP
                                                   Noah S. Helpern (SBN 254023)
14                                                 Milin Chun (SBN 262674)
15                                                 801 South Figueroa Street, Suite 2000
                                                   Los Angeles, California 90017
16                                                 Telephone: (213) 725-9800
17                                                 Facsimile: (213) 725-9808
                                                   Email:  nhelpern@egcfirm.com
18                                                         mchun@egcfirm.com
19
                                              ELLIS GEORGE CIPOLLONE
20                                            O'BRIEN ANNAGUEY LLP
21                                                 Joseph N. Kiefer (*pro hac vice forthcoming*)
                                                   (NY Bar No. 5345657)
22                                                 157 West 57th Street, Suite 28 S
23                                                 New York, New York 10019
                                                   Telephone: (212) 413-2600
24                                                 Facsimile: (212) 413-2629
25                                                 Email:  jkiefer@egcfirm.com

26
                                              Attorneys for Plaintiffs Aaron Braxton, Gia
27                                            Gray, Bryan Brown, Paul Martin and all others
28                                            similarly situated

2029104

FIRST AMENDED CLASS ACTION COMPLAINT

1   DATED:  April 12, 2022             FRANK, SIMS & STOLPER LLP

2                                       Jason M. Frank (SBN 190957)

3                                       Scott H. Sims (SBN 234148)

                                      Andrew D. Stolper (SBN 205462)

4

5

6                          By:        /s/ Jason Frank

7                                  Jason Frank

                        Attorneys for Plaintiffs Aaron Braxton, Gia

8                         Gray, Bryan Brown, Paul Martin and all others

9                         similarly situated

10   **Attestation under N.D. Cal. L.R. 5-1(h)**: the ECF filer of this document attests that all of the other signatories have concurred in the filing of the document, which shall

11   serve in lieu of their signatures on the document.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2029104

# EXHIBIT F

Alex R. Straus (SBN 321366)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN PLLC**
280 South Beverly Drive
Beverly Hills, CA 90212
Tel.:    (917) 471-1894
Fax:    (310) 496-3176
Email: astraus@milberg.com

*Attorneys for Plaintiff*
*Additional Counsel on Signature Page*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| ALFRED POPE, on behalf of himself, | Case No.: _____ |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| WELLS FARGO BANK, N.A., WELLS FARGO & COMPANY, | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

CLASS ACTION COMPLAINT
1

Plaintiff alleges upon personal knowledge as to himself and his own actions, and upon information and belief, including the investigation of counsel, as follows:

I.      **NATURE OF THE ACTION**

1.      Spurred in part by the COVID-19 pandemic, low interest rates allowed American homeowners to refinance their home mortgages at more favorable interest rates from 2019 through present (the "Class Period").

2.      Plaintiff, and members of the putative Class (the "Class"), seek damages for Defendants' -- Wells Fargo Bank, N.A. and Wells Fargo & Company (collectively, "Wells Fargo" or "WF") -- discriminatory practices in denying their applications to refinance their Wells Fargo mortgage loans in violation of the federal Fair Housing and Fair Lending acts, as well as state consumer protection laws.  Indeed, according to recent investigations of Wells Fargo's refinance activity during the Class Period that have been publicized in the media, Wells Fargo approved white applicants' mortgage refinance requests at twice the rate of its approval of Black and Hispanic/Latino minority applicants' refinance requests in numerous areas across the United States.[1]  Plaintiff's own analysis of Wells Fargo's mortgage refinance rates bears this out.

3.      This is no accident.  For nearly two decades, Wells Fargo exploited the American dream of home ownership through discriminatory housing practices in violation of the FHA, including by making a disproportionately higher number of subprime and higher cost mortgage loans to minorities than to white borrowers, and then discriminatorily foreclosing on minority mortgage loans in higher minority concentration neighborhoods compared to white neighborhoods.  Such reprehensible conduct has stripped many Wells Fargo minority customers of their single greatest asset – the equity value in their homes.

---

[1] Shawn Donnan, Ann Choi, Hannah Levitt, and Christopher Cannon, "*Wells Fargo Left Black Homeowners Behind in Pandemic Mortgage Refinancing Boom*, Bloomberg (Online) (March 11, 2022), at https://www.bloomberg.com/graphics/2022-wells-fargo-black-home-loan-refinancing/. *See also* J.J. McCorvey and Julia Carpenter, "*Millions of Americans Refinanced Last Year – but Fewer Black and Latino Homeowners Did*," WALL STREET JOURNAL (June 25, 2021), at https://www.wsj.com/articles/millions-of-americans-refinanced-last-yearbut-fewer-black-and-latino-homeowners-did-11624440601.

CLASS ACTION COMPLAINT

2

4.     To add further injury to the insult Wells Fargo's minority customers have already sustained, Wells Fargo is now discriminatorily refusing to refinance minority higher cost mortgages.  Such reprehensible conduct begs the question why any minority would ever bank with this institution.  Indeed, as Wells Fargo's CEO Charles Scharf has publicly acknowledged in Congressional testimony, Wells Fargo engaged in predatory and discriminatory mortgage lending and servicing practices, as well as fraudulent customer account practices.[2]  And, as CEO Scharf further admitted in relatively recent media reports, Wells Fargo has an institutional, discriminatory bias.[3]

5.     Plaintiff and members of the putative Class have suffered harm due to the discriminatory tactics used by the Defendants with respect to their rejections of minority and female homeowners seeking the ability to refinance their mortgages. Due to this conduct, Plaintiff and members of the putative Class bring this Action under federal and state law against the Defendants for damages, injunctive relief, attorney's fees, and any other relief this Court deems just and proper.

## II.     JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

6.     This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332(d), and 1343, because the Plaintiff asserts federal causes of action, because Plaintiff asserts civil rights causes of action, and because at least one member of the Class is a citizen of a different state than all Defendants, and because the amount in controversy exceeds $5,000,000.

7.     Personal jurisdiction is appropriate over Defendants because Wells Fargo Bank, N.A. transacts business in the State of California and has its principal place of business in San

---

[2] Wells Fargo CEO Charles Scharf admitted these failings in congressional testimony. *See* https://financialservices.house.gov/uploadedfiles/chrg-116hhrg428866.pdf at 9 (last visited Jan. 13, 2022) (testifying that he did not disagree with the Report's findings, and that "the series of behavior that is described should have never happened at the company. The failures that are described a direct result of us not managing the company properly"); *id.* at 5 ("[W]e had a flawed business model in how the company was managed").

[3] *See, e.g.*, https://www.businesswire.com/news/home/20200923005604/en/ (last visited March 19, 2022) (discussing CEO Scharf's unconscious bias); *see also* https://www.charlotteobserver.com/news/business/banking/article246012155.html (Jimmie Paschall, Wells Fargo's head of enterprise diversity and inclusion, revealed: "There definitely is a sense that bias lives vibrantly at Wells Fargo. And I think it is around gender, gender identity, as well as race and ethnicity.")

Francisco, California. Wells Fargo Home Mortgage, Inc. originates loans to California customers from its California offices and maintains a systematic and continuous presence in the State.

8.      Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b) because Wells Fargo Bank, N.A. resides in this district, a substantial part of the events or omissions giving rise to the claim occurred in this district, and Wells Fargo Bank, N.A.'s principal place of business is in this district.

### III.   PARTIES

9.      **Plaintiff.** Plaintiff Alfred Pope is a minority homeowner who owns equity in a home located in Virginia Beach, Virginia. In December of 2021, Plaintiff Pope applied for a Wells Fargo home refinance and his application was denied.

10.     **Defendants.** Defendant Wells Fargo Bank, N.A. is a nationally chartered bank with its principal place of business located in Sioux Falls, South Dakota and is chartered in Wilmington, Delaware.

11.     Defendant Wells Fargo & Company is Defendant Wells Fargo Bank, N.A.'s parent company and is headquartered in San Francisco, California with its principal place of business located in Manhattan, New York, New York.

### IV.   FACTUAL ALLEGATIONS

#### A.  Wells Fargo, the Home Mortgage Industry, and Home Mortgage Refinancing

12.     Wells Fargo is one of the Country's largest first and second lien mortgage lenders. Included within that line of business are its new mortgages derived from refinancing existing home mortgages.

13.     Refinancing an existing mortgage allows a borrower to try to obtain better terms including, for example, a lower interest rate. A lower mortgage interest rate enables a borrower to save hundreds, if not thousands, of dollars per year on interest charges. As Wells Fargo explains on "Why Refinance a Mortgage" page on its website, refinancing a mortgage enables a borrower:

CLASS ACTION COMPLAINT

4

(1) to tap into home equity (using the equity established in the home in order to get a cash-out refinance where the bank gives the borrower cash in exchange for that equity in order to pay other loans or credit card debt), (2) take advantage of lower [interest] rates (which reduce the monthly payments and the total interest paid out over the duration of the loan), (3) change your loan term (to shorten or lengthen the loan term length), and (4) to convert to an adjustable rate mortgage or a fixed-rate mortgage.[4]

14.     Conversely, the denial of refinance applications means that a mortgage borrower must continue to pay higher mortgage costs.  Brookings Institute senior fellow Andre Perry states that the inability of Black homeowners to refinance their home mortgage loans "means people have less resources to invest in their children, less resources to start businesses, less resources to renovate their homes, less resources to buy additional homes."[5] This, in the aggregate, widens the racial wealth gap in the United States.

**B. The Pandemic-induced Interest Rates Made Mortgage Refinancing Attractive to Homeowners**

15.     During the Class Period, interest rates dropped substantially due to economic pressures caused by the COVID-19 pandemic – this made refinancing more attractive for mortgage holders.

16.     A study by the Federal Reserve Bank of Boston concluded the following:

a.     The typical refinance during the Class Period reduced borrowers' monthly payments by $279 per month, leading to a total payment reduction of $5.3 billion per year in the United States for all households that refinanced.[6]

---

[4] https://www.wellsfargo.com/mortgage/mortgage-refinance/why-refinance/, (last accessed Mar. 7, 2022).

[5] *Id.*

[6] Larry Bean, "*Fed study: Minority borrowers bore the brunt of COVID-19's impact on the mortgage market*," FEDERAL RESERVE BANK OF BOSTON (June 22, 2021), at https://www.bostonfed.org/news-and-events/news/2021/06/minority-borrowers-bear-brunt-of-covid-19-impact-on-mortgage-market.aspx.

b. However, only $198 million, or 3.7% of the total payment reduction of $5.3 billion, went to Black households.[7]

c. This is especially problematic considering that Black households account for over 13% of the entire United States population and over 9% of all homeowners.[8]

d. Additionally, the study concluded that white homeowners were approved at twice the rate of Black homeowners with respect to mortgage refinancing during the Class Period.[9]

17.     The study found that, "[c]ompared with white borrowers, Black borrowers on average have lower credit scores and higher loan-to-value ratios [which are] risk factors that can prevent someone from refinancing and reducing their monthly mortgage payments. However, when authors [of the study] control for these factors, they find that before the pandemic, Black and white borrowers were roughly equally likely to refinance. After the pandemic began and interest rates plummeted, Black homeowners were 40% less likely than white homeowners to finance, holding equal the risk factors for both groups."[10]

18.     Critically, the authors of the study concluded, "borrowers who could use the payment reductions the most moving forward may be the least likely to obtain them."[11]

**C. Due to the Discriminatory Conduct of the Defendants, Plaintiff and the Members of the Putative Class Were Denied Refinancing Opportunities by Defendants' Bank, Wells Fargo**

---

[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.*

CLASS ACTION COMPLAINT
6

19.     WF has engaged in discriminatory practices that disparately reduce the number of home mortgage refinance requests by minority and female applicants. With respect to minority applicants. these tactics, taken generally, are called "redlining."

20.     The term "redlining" has its roots in New Deal-era racism, which limited minority access to housing opportunities. Historically, the concept of redlining comes "from government maps that outlined areas where Black residents lived and therefore were deemed more risky [real estate] investments."[12]

21.     In the past, redlining took place through the use of mapping where Black neighborhoods were and consisted of coloring those neighborhoods "red" as to denote that they were high risk investments because of the populations that inhabited them. In the modern day, redlining takes place usually though an algorithmic bias which considers multiple factors tied to race (such as ZIP code, education, area code, census track, average home values, and other factors) and uses them in the decision of whether to approve a home mortgage refinancing application.

22.     For example, the refinancing calculator on Wells Fargo's website, utilizes a digitized algorithmic tool that assesses creditworthiness and other factors to offer estimated refinance rates.  The tool asks for inputs for factors that are proxies for minority homeowner status, such as geography (Wells Fargo notes: "[Refinancing] [r]ates can vary by location")[13] and credit score (to which Wells Fargo gives four options: Excellent, Good, Fair, or Poor/Limited).[14]

23.     On its refinance applications, hosted by Blend Labs, Inc., the digitized algorithmic tool (which assesses creditworthiness and other factors to lock in a home mortgage refinance interest rate) also asks for information that can be proxies for race, including "demographic

---

[12] Candace Jackson, "*What is Redlining?*," NYTIMES (ONLINE) (Aug. 17, 2021), at https://www.nytimes.com/2021/08/17/realestate/what-is-redlining.html.

[13] https://www.wellsfargo.com/mortgage/mortgage-refinance/why-refinance/, (last accessed Mar. 7, 2022).

[14] *Id.*

information," employment and income information, real estate holdings by the applicant, and other information.[15]

24.    Wells Fargo's use of these factors has resulted in discrimination by disparately denying minority and female applicants' refinance applications at rates far in excess of denial rates experienced by white borrowers.

**D.  Due to the Discriminatory Conduct of the Defendants, Plaintiff and the Members of the Putative Class Were Harmed**

25.    Plaintiff and members of the putative Class were harmed because they were either denied the ability to refinance their home mortgages entirely due to Wells Fargo's conduct described herein, or they were given less favorable terms than white borrowers who similarly refinanced their home mortgages through Wells Fargo.

26.    Either way, Plaintiff and members of the putative Class were harmed in the form of higher monthly payments on their home mortgage loan payments which could have been reduced but for Wells Fargo's discriminatory conduct.

27.    Indeed, an investigation by Bloomberg News further unveiled Wells Fargo's discriminatory practices with respect to the mortgage refinancing industry.[16] Statistics collected by Bloomberg show how wide Wells Fargo's disparity in refinance approvals was in 2020 compared to all other mortgage lenders in the United States:

---

[15] https://yourmortgageapp.wf.com/section/Getting%20Started/task/BORROWER/3652fd6a-b3e4-4308-bfa8-a92e9f4bbb83, (last accessed Mar. 7, 2022).

[16] Shawn Donnan, Ann Choi, Hannah Levitt, and Christopher Cannon, *"Wells Fargo Left Black Homeowners Behind in Pandemic Mortgage Refinancing Boom*, Bloomberg (Online) (March 11, 2022), at https://www.bloomberg.com/graphics/2022-wells-fargo-black-home-loan-refinancing/.

CLASS ACTION COMPLAINT
8



**Disparity by Lender**
Wells Fargo approved fewer than half of Black homeowners' refinancing applications in 2020.

Source: Bloomberg analysis of Home Mortgage Disclosure Act data for 8 million completed applications to refinance conventional loans in 2020.

[17]

28.     For example, during the time period at issue here, JP Morgan (the largest U.S. bank in terms of assets) approved 81% of mortgage refinance applications from Black homeowners, Rocket Mortgage LLC approved nearly 80% of Black applicants, and Bank of America approved 66% of Black applicants. This is in stark contrast to Wells Fargo's mere 47% approval rate of Black mortgage refinance applications.

29.     Notably, Wells Fargo denied Black mortgage refinance applicants at significantly higher rates than White applicants that had significantly lower incomes:

_____

[17] *Id.*



30.    According to Kristy Fercho, the Wells Fargo employee responsible for overseeing

Wells Fargo's home-lending line of business, lending decisions were "consistent across racial and

ethnic groups" and that racial disparity in outcomes for refinancing in 2020 was the result of

variables that Wells Fargo doesn't control.[18] That provides no excuse because Wells Fargo is not permitted by law to discriminate in its mortgage application process.

## V.   CLASS ALLEGATIONS

31.    Pursuant to F.R.C.P. Rule 23(b)(2) and (b)(3), as applicable, and (c)(4), Plaintiff seeks certification of a class of all first and second lien Wells Fargo minority mortgage refinance applicants from 2019-present (the "Class Period") whose refinancing applications were discriminatorily denied (the "Class".)

32.    Excluded from the Class are Defendants, their subsidiaries, affiliates, officers, directors, and employees.

33.    **Numerosity: Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. Plaintiff is informed and believes—based upon the publicly-available information discussed herein— that there are tens of thousands of Class members, making joinder impracticable. Those individuals' identities are available through Defendants' records, and Class members may be notified of the pendency of this Action by recognized, Court-approved notice dissemination methods.

34.    **Commonality and Predominance: Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3).** Defendants have acted in a manner generally applicable to Plaintiff and the other members of the proposed Classes. There is a well-defined community of interest in the questions of law and fact involved, which affect all Class members. The questions of law and fact common to the Classes predominate over the questions that may affect individual Class members, including, *inter alia*:

---

[18] *Id.*

a.   Whether Defendants systematically discriminated against Class members based upon their minority status;

b.   Whether minority Class members' applications to refinance a first or second lien loan were denied where similarly situated non-minority applicants were approved; and,

c.   Whether the algorithms used by Defendants unfairly discriminated against minority Class members and contained algorithmic bias.

35.    **Typicality: Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of other Class members' claims because Plaintiff and Class members were subjected to the same allegedly unlawful conduct and damaged in the same way.

36.    **Adequacy of Representation: Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate class representative because his interests do not conflict with the interests of Class members whom he seeks to represent, Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff intends to prosecute this Action vigorously. The Class members' interests will be fairly and adequately protected by Plaintiff and his counsel.

37.    **Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2).** The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants. Such individual actions would create a risk of adjudications that would be dispositive of the interests of other Class members and impair their interests. Defendants have acted and/or refused to act on grounds generally applicable to the Classes, making final, public injunctive relief or corresponding declaratory relief appropriate.

38.    Injunctive relief, and specifically public injunctive relief, is necessary in this Action.

39.     The harm that Defendants imposes on Consumers causes ripple effects for the public-at-large and Plaintiff seeks injunctive relief forcing Defendants to cease and desist its discriminatory practices.

40.     **Superiority: Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## VI.   CAUSES OF ACTION

### COUNT I

### VIOLATIONS OF THE FAIR HOUSING ACT

41.     Plaintiff, on behalf of himself and all others similarly situated, realleges each previous paragraph as if fully alleged herein.

42.     The Fair Housing Act, 42 U.S.C. § 3605(a), prohibits any entity whose business includes engaging in residential real estate-related transactions from discriminating against any person in making available such a transaction on the basis of race.

43.     Defendants' business includes engaging in residential real estate-related transactions.

44.     As set forth above, Defendants maintained a nationwide set of uniform, discriminatory refinancing practices and engages in a pattern or practice of systemic discrimination against Black homeowners that constitutes illegal, intentional discrimination and disparately impacts Black Americans in violation of the Fair Housing Act of 1968.

45.     Plaintiff and all those similarly situated were subjected to and harmed by Defendants' systemic and individual discrimination.

46.     On behalf of Plaintiff and the putative Class, Plaintiff seeks the relief set forth below.

## COUNT II

### VIOLATIONS OF THE EQUAL CREDIT OPPORTUNITY ACT

47.     Plaintiff, on behalf of himself and all others similarly situated, realleges each previous paragraph as if fully alleged herein.

48.     The Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*, makes it unlawful for a creditor to discriminate against any applicant with respect to any aspect of a credit transaction on the basis of race.

49.     As described above, Defendants are creditors because they regularly extend, renew, and continue credit, and Plaintiff was an applicant for credit.

50.     Defendants maintained a nationwide set of uniform, discriminatory mortgage loan origination and underwriting practices and engaged in a pattern or practice of systemic race discrimination against African American mortgage loan applicants that constitutes illegal intentional race discrimination in violation of the Equal Credit Opportunity Act.

51.     Plaintiff and all those similarly situated were subjected to and harmed by Defendant's systemic and individual discrimination.

52.     Defendants' unlawful conduct resulted in considerable harm to Plaintiff and all those similarly situated.

53.     On behalf of himself and the class he seeks to present, Plaintiff requests the relief set forth below.

## COUNT THREE

### VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW

54.     Plaintiff, on behalf of himself and all others similarly situated, realleges each previous paragraph as if fully alleged herein.

55.     California's Unfair Competition Law defines unfair competition to include any "unfair, unlawful, or fraudulent business practice and unfair, deceptive, untrue, or misleading advertising and any act prohibited by Chapter 1 of Part 3 of Division 7 of [California's] Business and Professions Code."

56.     Defendants violated the UCL by engaging in unlawful and unfair business acts and practices.

57.     Defendants are considered "person[s]" as defined by the statute.

58.     Pursuant to the statute, Plaintiff named herein, as well as the putative Class members, have suffered injury-in-fact and have lost money or property because of the unfair competition set forth herein.

59.     In accordance with the liberal application and construction of the UCL, application of the UCL to all Class members is appropriate given that Defendants are headquartered in this District, have a forum selection clause specific to this District, and direct sales/marketing/distribution of Coinbase card accounts to this District.

60.     Unlawful Prong. A business act or practice is unlawful pursuant to the UCL if it violates any other law or regulation.

61.     Defendants' conduct violates the Fair Housing Act and the Equal Credit Opportunity Act, and other applicable statutes which Plaintiffs may add upon amending this Complaint.

62.     Unfairness Prong. A business act or practice is unfair pursuant to the UCL if it is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

63.     Defendants' unfair acts and practices include, but are not limited to: Plaintiff and the Class are discriminated upon with respect to Defendants' discriminatory denial of Plaintiff's and Class members' refinance applications during the Class Period.

64.     Defendants' conduct described herein caused Plaintiff and members of the putative Class to suffer frustration, anxiety, emotional distress, and financial hardship.

65.     Defendants' business practices are unfair because they offend public policy; they are immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious. The injuries caused by this conduct and the harm to consumers outweigh the possible utility from these aforementioned practices.

66.     Plaintiff and members of the putative Class seek all allowable damages under the UCL including injunctive relief ordering Defendants to transact in a timely manner.

## VII.    PRAYER FOR RELIEF

67.     WHEREFORE, Plaintiff respectfully requests that this Court find against the Defendants as follows:

    a.   Certify this case as a class action;

    b.   Designate Plaintiff as a Class Representative and designate Plaintiff's counsel of record as Class Counsel;

    c.   Declare that Defendants' acts, conduct, policies and practices are unlawful and violate the Equal Credit Opportunity Act and the Fair Housing Act;

    d. Declare that Wells Fargo engaged in a pattern and practice of racial discrimination against minorities;

    e. Award Plaintiff and all others similarly situated compensatory and punitive damages;

    f. Award Plaintiff and all others similarly situated prejudgment interest and attorneys fees, costs and disbursements, as provided by law;

    g. Award Plaintiff and all others similarly situated such other make whole equitable, injunctive and legal relief as this Court deems just and proper to end the discrimination and fairly compensate Plaintiff and all others similarly situated.

    h. Award Plaintiff and all others similarly situated such other relief as this Court deems just and proper.

## VIII.   JURY TRIAL DEMAND

68.   Jury trial demanded by Plaintiffs and members of the putative Class.

DATED:  March __21__, 2021.       Respectfully submitted,

                **MILBERG COLEMAN BRYSON**
                **PHILLIPS GROSSMAN PLLC**

                */s/ Alex R. Straus*
                Alex R. Straus, Esq. (SBN 321366)
                280 South Beverly Place
                Beverly Hills, CA 90212
                Tel.:   (917) 471-1894
                Fax:    (310) 496-3176
                Email: astraus@milberg.com

1

2   Jennifer Kraus Czeisler*
    **MILBERG COLEMAN BRYSON**
3   **PHILLIPS GROSSMAN, PLLC**
    405 E. 50TH Street
4   New York, New York 10022
    Telephone:      212-594-5300
5   Email:          jczeisler@milberg.com

6

7   James Evangelista*
    **EVANGELISTA WORLEY**
8   500 Sugar Mill Rd, Suite 245A
    Atlanta, GA 30350
9   Telephone:      (404) 205-8400
    Facsimile:      (404) 205-8391
10  Email: jim@ewlawllc.com

11

12  *Attorneys for Plaintiffs and Putative Class*

13  *\*Pro Hac Vice Forthcoming*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT G

1  Alex R. Straus (SBN 321366)
   **MILBERG COLEMAN BRYSON**
2  **PHILLIPS GROSSMAN PLLC**
3  280 South Beverly Drive
   Beverly Hills, CA 90212
4  Tel.:   (917) 471-1894
   Fax:    (310) 496-3176
5  Email: astraus@milberg.com
6
   *Attorneys for Plaintiff*
7  *Additional Counsel on Signature Page*
8
9
10
11
12
13              **UNITED STATES DISTRICT COURT**
            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
14                  **SAN FRANCISCO DIVISION**
15  ALFRED POPE, on behalf of himself and      Case No.: 4:22-cv-01793-KAW
    all others similarly situated,
16                                             **AMENDED CLASS ACTION**
                                               **COMPLAINT**
17                    Plaintiff,
18          v.                                 **DEMAND FOR JURY TRIAL**
19  WELLS FARGO BANK, N.A., WELLS
    FARGO & COMPANY,
20
                      Defendants.
21
22
23
24
25
26
27
28

Plaintiff alleges upon personal knowledge as to himself and his own actions, and upon information and belief, including the investigation of counsel, as follows:

## I.    NATURE OF THE ACTION

1.    Spurred in part by the COVID-19 pandemic, low interest rates allowed American homeowners to refinance their home mortgages at more favorable interest rates from 2019 through present (the "Class Period").

2.    Plaintiff, and members of the putative Class (the "Class"), seek damages for Defendants' -- Wells Fargo Bank, N.A. and Wells Fargo & Company (collectively, "Wells Fargo") -- discriminatory practices in denying their applications to refinance their Wells Fargo mortgage loans in violation of the federal Fair Housing and Fair Lending acts, as well as state consumer protection laws.  Indeed, according to recent investigations of Wells Fargo's refinance activity during the Class Period that have been publicized in the media, Wells Fargo approved white applicants' mortgage refinance requests at twice the rate of its approval of Black and Hispanic/Latino minority applicants' refinance requests in numerous areas across the United States.[1] Plaintiff' own analysis of Wells Fargo's mortgage refinance rates bears this out.

3.    This is no accident.  For nearly two decades, Wells Fargo exploited the American dream of home ownership through discriminatory housing practices in violation of the FHA, including by making a disproportionately higher number of subprime and higher cost mortgage loans to minorities than to white borrowers, and then discriminatorily foreclosing on minority mortgage loans in higher minority concentration neighborhoods compared to white neighborhoods.  Such reprehensible conduct has stripped many Wells Fargo minority customers of their single greatest asset – the equity value in their homes.

4.    To add further injury to the insult Wells Fargo's minority customers have already sustained, Wells Fargo is now discriminatorily refusing to refinance minority higher cost

---

[1] Shawn Donnan, Ann Choi, Hannah Levitt, and Christopher Cannon, *Wells Fargo Left Black Homeowners Behind in Pandemic Mortgage Refinancing Boom*, Bloomberg (Online) (March 11, 2022), at https://www.bloomberg.com/graphics/2022-wells-fargo-black-home-loan-refinancing/. *See also* J.J. McCorvey and Julia Carpenter, "*Millions of Americans Refinanced Last Year – but Fewer Black and Latino Homeowners Did*," WALL STREET JOURNAL (June 25, 2021), at https://www.wsj.com/articles/millions-of-americans-refinanced-last-yearbut-fewer-black-and-latino-homeowners-did-11624440601.

mortgages.  Such reprehensible conduct begs the question why any minority would ever bank with this institution.  Indeed, as Wells Fargo's CEO Charles Scharf has publicly acknowledged in Congressional testimony, Wells Fargo engaged in predatory and discriminatory mortgage lending and servicing practices, as well as fraudulent customer account practices.[2]  And, as CEO Scharf further admitted in relatively recent media reports, Wells Fargo has an institutional, discriminatory bias.[3]

5.      Plaintiff and members of the putative Class have suffered harm due to the discriminatory tactics used by the Defendants with respect to their rejections of minority and female homeowners seeking the ability to refinance their mortgages. Due to this conduct, Plaintiff and members of the putative Class bring this Action under federal and state law against the Defendants for damages, injunctive relief, attorney's fees, and any other relief this Court deems just and proper.

**II.      JURISDICTION AND VENUE**

6.      This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332(d), and 1343, because the Plaintiff asserts federal causes of action, because Plaintiff assert civil rights causes of action, and because at least one member of the Class is a citizen of a different state than all Defendants, and because the amount in controversy exceeds $5,000,000.

7.      Personal jurisdiction is appropriate over Defendants because Wells Fargo Bank, N.A. transacts business in the State of California and has its principal place of business in San Francisco, California. Wells Fargo Home Mortgage, Inc. originates loans to California customers from its California offices and maintains a systematic and continuous presence in the State.

---

[2] Wells Fargo CEO Charles Scharf admitted these failings in congressional testimony. *See* https://financialservices.house.gov/uploadedfiles/chrg-116hhrg428866.pdf at 9 (last visited Jan. 13, 2022) (testifying that he did not disagree with the Report's findings, and that "the series of behavior that is described should have never happened at the company. The failures that are described a direct result of us not managing the company properly"); *id.* at 5 ("[W]e had a flawed business model in how the company was managed").

[3] *See, e.g.*, https://www.businesswire.com/news/home/20200923005604/en/ (last visited March 19, 2022) (discussing CEO Scharf's unconscious bias); *see also* https://www.charlotteobserver.com/news/business/banking/article246012155.html (Jinmie Paschall, Wells Fargo's head of enterprise diversity and inclusion, revealed: "There definitely is a sense that bias lives vibrantly at Wells Fargo. And I think it is around gender, gender identity, as well as race and ethnicity.)

AMENDED CLASS ACTION COMPLAINT
CASE NO. 4:22-CV-01793-KAW

8.      Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b) because Wells Fargo Bank, N.A. resides in this district, a substantial part of the events or omissions giving rise to the claim occurred in this district, and Wells Fargo Bank, N.A.'s principal place of business is in this district.

## INTRADISTRICT ASSIGNMENT

9.      This action is properly assigned to the San Francisco Division of this District pursuant to N.D. Cal. L.R. 3-2, because Defendant Wells Fargo & Company is headquartered in San Francisco, California, which is served by the San Francisco Division.

**III.     PARTIES**

10.     **Plaintiff.**

11.     Plaintiff Alfred Pope is a minority homeowner who owns equity in a home located in Chesapeake, Virginia. Plaintiff Pope applied for a Wells Fargo home refinance in September of 2021 and his application was denied.

12.     **Defendants.**

13.     Defendant Wells Fargo Bank, N.A. is a nationally chartered bank with its principal place of business located in Sioux Falls, South Dakota and is chartered in Wilmington, Delaware.

14.     Defendant Wells Fargo & Company is Defendant Wells Fargo Bank, N.A.'s parent company and is headquartered in San Francisco, California with its principal place of business located in Manhattan, New York, New York.

**IV.     FACTUAL ALLEGATIONS**

**A. Wells Fargo, the Home Mortgage Industry, and Home Mortgage Refinancing**

15.     Wells Fargo is one of the Country's largest first and second lien mortgage lenders. Included within that line of business are its new mortgages derived from refinancing existing home mortgages.

16.     Refinancing an existing mortgage allows a borrower to try to obtain better terms including, for example, a lower interest rate.  A lower mortgage interest rate enables a borrower to

save hundreds, if not thousands, of dollars per year on interest charges. As Wells Fargo explains on "Why Refinance a Mortgage" page on its website, refinancing a mortgage enables a borrower: (1) to tap into home equity (using the equity established in the home in order to get a cash-out refinance where the bank gives the borrower cash in exchange for that equity in order to pay other loans or credit card debt), (2) take advantage of lower [interest] rates (which reduce the monthly payments and the total interest paid out over the duration of the loan), (3) change your loan term (to shorten or lengthen the loan term length), and (4) to convert to an adjustable rate mortgage or a fixed-rate mortgage.[4]

17.     Conversely, the denial of refinance applications means that a mortgage borrower must continue to pay higher mortgage costs. Brookings Institute senior fellow Andre Perry states that the inability of Black homeowners to refinance their home mortgage loans "means people have less resources to invest in their children, less resources to start businesses, less resources to renovate their homes, less resources to buy additional homes."[5] This, in the aggregate, widens the racial wealth gap in the United States.

**B. The Pandemic-induced Interest Rates Made Mortgage Refinancing Attractive to Homeowners**

18.     During the Class Period, interest rates dropped substantially due to economic pressures caused by the COVID-19 pandemic – this made refinancing more attractive for mortgage holders.

19.     A study by the Federal Reserve Bank of Boston concluded the following:

a.   The typical refinance during the Class Period reduced borrowers' monthly payments by $279 per month, leading to a total payment reduction of $5.3 billion per year in the United States for all households that refinanced.[6]

---

[4] https://www.wellsfargo.com/mortgage/mortgage-refinance/why-refinance/, (last accessed Mar. 7, 2022).
[5] *Id.*
[6] Larry Bean, "*Fed study: Minority borrowers bore the brunt of COVID-19's impact on the mortgage market*," FEDERAL RESERVE BANK OF BOSTON (June 22, 2021), at https://www.bostonfed.org/news-and-events/news/2021/06/minority-borrowers-bear-brunt-of-covid-19-impact-on-mortgage-market.aspx.

AMENDED CLASS ACTION COMPLAINT
CASE NO. 4:22-CV-01793-KAW

b. However, only $198 million, or 3.7% of the total payment reduction of $5.3 billion, went to Black households.[7]

c. This is especially problematic considering that Black households account for over 13% of the entire United States population and over 9% of all homeowners.[8]

d. Additionally, the study concluded that white homeowners were approved at twice the rate of Black homeowners with respect to mortgage refinancing during the Class Period.[9]

20.     The study found that, "[c]ompared with white borrowers, Black borrowers on average have lower credit scores and higher loan-to-value ratios [which are] risk factors that can prevent someone from refinancing and reducing their monthly mortgage payments. However, when authors [of the study] control for these factors, they find that before the pandemic, Black and white borrowers were roughly equally likely to refinance. After the pandemic began and interest rates plummeted, Black homeowners were 40% less likely than white homeowners to finance, holding equal the risk factors for both groups."[10]

21.     Critically, the authors of the study concluded, "borrowers who could use the payment reductions the most moving forward may be the least likely to obtain them."[11]

**C. Due to the Discriminatory Conduct of the Defendants, Plaintiff and the Members of the Putative Class Were Denied Refinancing Opportunities by Defendants' Bank, Wells Fargo**

22.     Wells Fargo has engaged in discriminatory practices that disparately reduce the number of home mortgage refinance requests by minority applicants. With respect to minority applicants. these tactics, taken generally, are called "redlining."

---

[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.*

23.     The term "redlining" has its roots in New Deal-era racism, which limited minority access to housing opportunities. Historically, the concept of redlining comes "from government maps that outlined areas where Black residents lived and therefore were deemed more risky [real estate] investments."[12]

24.     In the past, redlining took place through the use of mapping where Black neighborhoods were and consisted of coloring those neighborhoods "red" as to denote that they were high risk investments because of the populations that inhabited them. In the modern day, redlining takes place usually though an algorithmic bias which considers multiple factors tied to race (such as ZIP code, education, area code, census track, average home values, and other factors) and uses them in the decision of whether to approve a home mortgage refinancing application.

25.     For example, the refinancing calculator on Wells Fargo's website, utilizes a digitized algorithmic tool that assesses creditworthiness and other factors to offer estimated refinance rates.  The tool asks for inputs for factors that are proxies for minority homeowner status, such as geography (Wells Fargo notes: "[Refinancing] [r]ates can vary by location")[13] and credit score (to which Wells Fargo gives four options: Excellent, Good, Fair, or Poor/Limited).[14]

26.     On its refinance applications, hosted by Blend Labs, Inc., the digitized algorithmic tool (which assesses creditworthiness and other factors to lock in a home mortgage refinance interest rate) also asks for information that can be proxies for race, including "demographic information," employment and income information, real estate holdings by the applicant, and other information.[15]

---

[12] Candace Jackson, "*What is Redlining?*," NYTimes (Online) (Aug. 17, 2021), at https://www.nytimes.com/2021/08/17/realestate/what-is-redlining.html.

[13] https://www.wellsfargo.com/mortgage/mortgage-refinance/why-refinance/, (last accessed Mar. 7, 2022).

[14] *Id.*

[15] https://yourmortgageapp.wf.com/section/Getting%20Started/task/BORROWER/3652fd6a-b3e4-4308-bfa8-a92e9f4bbb83, (last accessed Mar. 7, 2022).

27.     Wells Fargo's use of these factors has resulted in discrimination by disparately denying minority and female applicants' refinance applications at rates far in excess of denial rates experienced by white borrowers.

**D.  Due to the Discriminatory Conduct of the Defendants, Plaintiff and the Members of the Putative Class Were Harmed**

28.     Plaintiff and members of the putative Class were harmed because they were either denied the ability to refinance their home mortgages entirely due to Wells Fargo's conduct described herein, or they were given less favorable terms than white borrowers who similarly refinanced their home mortgages through Wells Fargo.

29.     Either way, Plaintiff and members of the putative Class were harmed in the form of higher monthly payments on their home mortgage loan payments which could have been reduced but for Wells Fargo's discriminatory conduct.

30.     Indeed, an investigation by Bloomberg News further unveiled Wells Fargo's discriminatory practices with respect to the mortgage refinancing industry.[16] Statistics collected by Bloomberg show how wide Wells Fargo's disparity in refinance approvals was in 2020 compared to all other mortgage lenders in the United States:

---

[16] Shawn Donnan, Ann Choi, Hannah Levitt, and Christopher Cannon, *"Wells Fargo Left Black Homeowners Behind in Pandemic Mortgage Refinancing Boom*, Bloomberg (Online) (March 11, 2022), at https://www.bloomberg.com/graphics/2022-wells-fargo-black-home-loan-refinancing/.

AMENDED CLASS ACTION COMPLAINT
CASE NO. 4:22-CV-01793-KAW



**Disparity by Lender**
Wells Fargo approved fewer than half of Black homeowners' refinancing applications in 2020.

Approval rate

Wells Fargo
WHITE 72%
ASIAN 67%
HISPANIC 53%
BLACK 47%

All other lenders
WHITE 87%
ASIAN 85%
HISPANIC 79%
BLACK 71%

Source: Bloomberg analysis of Home Mortgage Disclosure Act data for 8 million completed applications to refinance conventional loans in 2020.

[17]

31.     For example, during the time period at issue here, JP Morgan (the largest U.S. bank in terms of assets) approved 81% of mortgage refinance applications from Black homeowners, Rocket Mortgage LLC approved nearly 80% of Black applicants, and Bank of America approved 66% of Black applicants. This is in stark contrast to Wells Fargo's mere 47% approval rate of Black mortgage refinance applications.

32.     Notably, Wells Fargo denied Black mortgage refinance applicants at significantly higher rates than White applicants that had significantly lower incomes:

[17] *Id.*



Source: Bloomberg analysis of Home Mortgage Disclosure Act data for 8 million completed applications to refinance conventional loans in 2020.

33.     According to Kristy Fercho, the Wells Fargo employee responsible for overseeing Wells Fargo's home-lending line of business, lending decisions were "consistent across racial and ethnic groups" and that racial disparity in outcomes for refinancing in 2020 was the result of variables that Wells Fargo doesn't control.[18] That provides no excuse because Wells Fargo is not permitted by law to discriminate in its mortgage application process.

_____

[18] *Id.*

## V.   CLASS ALLEGATIONS

34.    Pursuant to F.R.C.P. Rule 23(b)(2) and (b)(3), as applicable, and (c)(4), Plaintiff seeks certification of a class of all first and second lien Wells Fargo minority mortgage refinance applicants from 2019-present (the "Class Period") whose refinancing applications were discriminatorily denied (the "Class".)

35.    Excluded from the Class are Defendants, their subsidiaries, affiliates, officers, directors, and employees.

36.    **Numerosity: Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. Plaintiff is informed and believes — based upon the publicly-available information discussed herein — that there are tens of thousands of Class members, making joinder impracticable. Those individuals' identities are available through Defendants' records, and Class members may be notified of the pendency of this Action by recognized, Court-approved notice dissemination methods.

37.    **Commonality and Predominance: Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3).** Defendants have acted in a manner generally applicable to Plaintiff and the other members of the proposed Class. There is a well-defined community of interest in the questions of law and fact involved, which affect all Class members. The questions of law and fact common to the Classes predominate over the questions that may affect individual Class members, including, *inter alia*:

a.   Whether Defendants systematically discriminated against Class members based upon their minority status;

b.   Whether minority Class members' applications to refinance a first or second lien loan were denied where similarly situated non-minority applicants were approved; and,

c.   Whether the algorithms used by Defendants unfairly discriminated against minority Class members and contained algorithmic bias.

38.    **Typicality: Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of other Class members' claims because Plaintiff and Class members were subjected to the same allegedly unlawful conduct and damaged in the same way.

39.    **Adequacy of Representation: Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate class representative because his interests do not conflict with the interests of Class members whom he seeks to represent, Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff intends to prosecute this Action vigorously. The Class members' interests will be fairly and adequately protected by Plaintiff and his counsel.

40.    **Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2).** The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants. Such individual actions would create a risk of adjudications that would be dispositive of the interests of other Class members and impair their interests. Defendants have acted and/or refused to act on grounds generally applicable to the Classes, making final, public injunctive relief or corresponding declaratory relief appropriate.

41.    Injunctive relief, and specifically public injunctive relief, is necessary in this Action.

42.    The harm that Defendants impose on Plaintiff and Class members cause ripple effects for the public-at-large and Plaintiff seeks injunctive relief forcing Defendants to cease and desist its discriminatory practices.

43.    **Superiority: Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The

damages or other financial detriment suffered by Plaintiff and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Plaintiff and Class members to individually seek redress for Defendants' wrongful conduct. Even if Plaintiff and Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## VI.     CAUSES OF ACTION

### COUNT I

### VIOLATIONS OF THE FAIR HOUSING ACT

44.     Plaintiff, on behalf of himself and all others similarly situated, realleges each previous paragraph as if fully alleged herein.

45.     The Fair Housing Act, 42 U.S.C. § 3605(a), prohibits any entity whose business includes engaging in residential real estate-related transactions from discriminating against any person in making available such a transaction on the basis of race.

46.     Defendants' business includes engaging in residential real estate-related transactions.

47.     As set forth above, Defendants maintain a nationwide set of uniform, discriminatory refinancing practices and engage in a pattern or practice of systemic discrimination against minority homeowners that constitute illegal, intentional discrimination and disparately impacts Black Americans and minorities in violation of the Fair Housing Act of 1968.

48.     Plaintiff and Class members were subjected to and harmed by Defendants' systemic and individual discrimination.

49.     On behalf of Plaintiff and the putative Class, Plaintiff seeks the relief set forth below.

## COUNT II

### VIOLATIONS OF THE EQUAL CREDIT OPPORTUNITY ACT

47.     Plaintiff, on behalf of himself and all others similarly situated, realleges each previous paragraph as if fully alleged herein.

48.     The Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*, makes it unlawful for a creditor to discriminate against any applicant with respect to any aspect of a credit transaction on the basis of race.

49.     As described above, Defendants are creditors because they regularly extend, renew, and continue credit, and Plaintiff were applicants for credit.

50.     Defendants maintain a nationwide set of uniform, discriminatory mortgage loan origination and underwriting practices and engaged in a pattern or practice of systemic race discrimination against minority mortgage loan applicants that constitute illegal intentional race discrimination in violation of the Equal Credit Opportunity Act.

51.     Plaintiff and Class members were subjected to and harmed by Defendants' systemic and individual discrimination.

52.     Defendants' unlawful conduct resulted in considerable harm to Plaintiff and all Class members.

53.     On behalf of himself and the Class he seeks to represent, Plaintiff requests the relief set forth below.

## COUNT THREE

### VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW

54.     Plaintiff, on behalf of himself and all others similarly situated, realleges each previous paragraph as if fully alleged herein.

55.     California's Unfair Competition Law ("UCL") defines unfair competition to include any "unfair, unlawful, or fraudulent business practice and unfair, deceptive, untrue, or misleading advertising and any act prohibited by Chapter 1 of Part 3 of Division 7 of [California's] Business and Professions Code."

56.     Defendants violated the UCL by engaging in unlawful and unfair business acts and practices.

57.     Defendants are considered "person[s]" as defined by the statute.

58.     Pursuant to the statute, Plaintiff named herein, as well as the putative Class members, have suffered injury-in-fact and have lost money or property because of the unfair competition set forth herein.

59.     In accordance with the liberal application and construction of the UCL, application of the UCL to all Class members is appropriate given that Defendants are headquartered in this District, have a forum selection clause specific to this District, and direct sales, marketing and advertising in this District.

60.     Unlawful Prong. A business act or practice is unlawful pursuant to the UCL if it violates any other law or regulation.

61.     Defendants' conduct violates the Fair Housing Act and the Equal Credit Opportunity Act, and other applicable statutes which Plaintiff may add upon amending this Complaint.

62.     Unfairness Prong. A business act or practice is unfair pursuant to the UCL if it is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

63.     Defendants' unfair acts and practices include, but are not limited to: Plaintiff and the Class are discriminated upon with respect to Defendants' discriminatory denial of Plaintiff's and Class members' refinance applications during the Class Period; Defendants' denied Plaintiff's and Class members' applications to refinance a first or second lien loan where similarly situated

non-minority applicants were approved, and the algorithms used by Defendants unfairly discriminated against Plaintiff and minority Class members and contained algorithmic bias.

64.     Defendants' conduct described herein caused Plaintiff and members of the putative Class to suffer frustration, anxiety, emotional distress, and financial hardship.

65.     Defendants' business practices are unfair because they offend public policy; they are immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious. The injuries caused by this conduct and the harm to consumers outweigh the possible utility from these aforementioned practices.

66.     There is no benefit to consumers or competition by allowing Defendants to engage in discriminatory denial of Plaintiff's and Class members' refinance applications.

67.     The gravity of the harm suffered by Plaintiff and Class members resulting from Defendants' conduct alleged herein outweighs any legitimate justification, motive or reason for the discrimination described. Accordingly, Defendants' actions are immoral, unethical, unscrupulous and offend the established public policies as set out in federal regulations and are substantially injurious to Plaintiff and Class Members.

68.     As a result of Defendants' above unlawful and unfair practices, Plaintiff and members of the putative Class, and as appropriate on behalf of the general public, seek all allowable damages under the UCL including injunctive relief ordering Defendants to transact in a timely manner.

## VII.   PRAYER FOR RELIEF

69.     WHEREFORE, Plaintiff respectfully requests that this Court find against the Defendants as follows:

   a.   Certify this case as a class action;

   b.   Designate Plaintiff as Class Representatives and designate Plaintiff's counsel of record as Class Counsel;

c.  Declare that Defendants' acts, conduct, policies and practices are unlawful and violate the Equal Credit Opportunity Act and the Fair Housing Act and were in violation of California's UCL;

d.  Declare that Wells Fargo engaged in a pattern and practice of racial discrimination against minorities;

e.  Award Plaintiff and all others similarly situated compensatory and punitive damages;

f.  Award Plaintiff and all others similarly situated prejudgment interest and attorneys' fees, costs and disbursements, as provided by law;

g.  Award Plaintiff and all others similarly situated injunctive and legal relief as this Court deems just and proper to end the discrimination and fairly compensate Plaintiff and all others similarly situated.

h.  Award Plaintiff and all others similarly situated such other relief as this Court deems just and proper.

## VIII.  JURY TRIAL DEMAND

70.    Jury trial demanded by Plaintiff and members of the putative Class.

DATED:  March 25, 2022.                    Respectfully submitted,

                                           **MILBERG COLEMAN BRYSON**
                                           **PHILLIPS GROSSMAN PLLC**

                                           _/s/ Alex R. Straus_
                                           Alex R. Straus, Esq. (SBN 321366)
                                           280 South Beverly Place
                                           Beverly Hills, CA 90212
                                           Tel.:   (917) 471-1894
                                           Fax:    (310) 496-3176
                                           Email: astraus@milberg.com

                                           Jennifer Kraus Czeisler*
                                           **MILBERG COLEMAN BRYSON**

AMENDED CLASS ACTION COMPLAINT
CASE NO. 4:22-CV-01793-KAW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PHILLIPS GROSSMAN, PLLC**
100 Garden City Plaza, Suite 500
Garden City, New York 11530
Telephone:      212-594-5300
Email:          jczeisler@milberg.com

Sanford P, Dumain*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
100 Garden City Plaza, Suite 500
Garden City, New York 11530
Telephone:      212-594-5300
Email:          sdumain@milberg.com


James Evangelista*
**EVANGELISTA WORLEY**
500 Sugar Mill Rd, Suite 245A
Atlanta, GA 30350
Telephone:      (404) 205-8400
Facsimile:      (404) 205-8391
Email: jim@ewlawllc.com


*Attorneys for Plaintiff and the Putative Class*
*Pro Hac Vice Forthcoming*

# EXHIBIT H

Alex R. Straus (SBN 321366)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN PLLC**
280 South Beverly Drive
Beverly Hills, CA 90212
Tel.:    (917) 471-1894
Fax:    (310) 496-3176
Email: astraus@milberg.com

*Attorneys for Plaintiff*
*Additional Counsel on Signature Page*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| WINFRED THOMAS and MICHELLE SIMS, on behalf of themselves and all others similarly situated, | Case No.: _____ |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY TRIAL** |
| WELLS FARGO BANK, N.A., WELLS FARGO & COMPANY, | |
| Defendants. | |

Plaintiffs allege upon personal knowledge as to themselves and their own actions, and upon information and belief, including the investigation of counsel, as follows:

## I.        NATURE OF THE ACTION

1.        Spurred in part by the COVID-19 pandemic, low interest rates allowed American homeowners to refinance their home mortgages at more favorable interest rates from 2019 through present (the "Class Period").

2.        Plaintiffs, and members of the putative Class (the "Class"), seek damages for Defendants' -- Wells Fargo Bank, N.A. and Wells Fargo & Company (collectively, "Wells Fargo") -- discriminatory practices in denying their applications to refinance their Wells Fargo mortgage loans in violation of the federal Fair Housing and Fair Lending acts, as well as state consumer protection laws.  Indeed, according to recent investigations of Wells Fargo's refinance activity during the Class Period that have been publicized in the media, Wells Fargo approved white applicants' mortgage refinance requests at twice the rate of its approval of Black and Hispanic/Latino minority applicants' refinance requests in numerous areas across the United States.[1] Plaintiffs' own analysis of Wells Fargo's mortgage refinance rates bears this out.

3.    This is no accident.  For nearly two decades, Wells Fargo exploited the American dream of home ownership through discriminatory housing practices in violation of the FHA, including by making a disproportionately higher number of subprime and higher cost mortgage loans to minorities than to white borrowers, and then discriminatorily foreclosing on minority mortgage loans in higher minority concentration neighborhoods compared to white neighborhoods.  Such reprehensible conduct has stripped many Wells Fargo minority customers of their single greatest asset – the equity value in their homes.

---

[1] Shawn Donnan, Ann Choi, Hannah Levitt, and Christopher Cannon, *"Wells Fargo Left Black Homeowners Behind in Pandemic Mortgage Refinancing Boom*, Bloomberg (Online) (March 11, 2022), at https://www.bloomberg.com/graphics/2022-wells-fargo-black-home-loan-refinancing/. *See also* J.J. McCorvey and Julia Carpenter, *"Millions of Americans Refinanced Last Year – but Fewer Black and Latino Homeowners Did,"* WALL STREET JOURNAL (June 25, 2021), at https://www.wsj.com/articles/millions-of-americans-refinanced-last-yearbut-fewer-black-and-latino-homeowners-did-11624440601.

4.      To add further injury to the insult Wells Fargo's minority customers have already sustained, Wells Fargo is now discriminatorily refusing to refinance minority higher cost mortgages.  Such reprehensible conduct begs the question why any minority would ever bank with this institution.  Indeed, as Wells Fargo's CEO Charles Scharf has publicly acknowledged in Congressional testimony, Wells Fargo engaged in predatory and discriminatory mortgage lending and servicing practices, as well as fraudulent customer account practices.[2]  And, as CEO Scharf further admitted in relatively recent media reports, Wells Fargo has an institutional, discriminatory bias.[3]

5.      Plaintiffs and members of the putative Class have suffered harm due to the discriminatory tactics used by the Defendants with respect to their rejections of minority and female homeowners seeking the ability to refinance their mortgages. Due to this conduct, Plaintiffs and members of the putative Class bring this Action under federal and state law against the Defendants for damages, injunctive relief, attorney's fees, and any other relief this Court deems just and proper.

## II.      JURISDICTION AND VENUE

6.      This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332(d), and 1343, because the Plaintiff asserts federal causes of action, because Plaintiffs assert civil rights causes of action, and because at least one member of the Class is a citizen of a different state than all Defendants, and because the amount in controversy exceeds $5,000,000.

---

[2] Wells Fargo CEO Charles Scharf admitted these failings in congressional testimony. *See* https://financialservices.house.gov/uploadedfiles/chrg-116hhrg428866.pdf at 9 (last visited Jan. 13, 2022) (testifying that he did not disagree with the Report's findings, and that "the series of behavior that is described should have never happened at the company. The failures that are described are a direct result of us not managing the company properly"); *id.* at 5 ("[W]e had a flawed business model in how the company was managed").

[3] *See, e.g.,* https://www.businesswire.com/news/home/20200923005604/en/ (last visited March 19, 2022) (discussing CEO Scharf's unconscious bias); *see also* https://www.charlotteobserver.com/news/business/banking/article246012155.html (Jimmie Paschall, Wells Fargo's head of enterprise diversity and inclusion, revealed: "There definitely is a sense that bias lives vibrantly at Wells Fargo. And I think it is around gender, gender identity, as well as race and ethnicity.")

7.   Personal jurisdiction is appropriate over Defendants because Wells Fargo Bank, N.A. transacts business in the State of California and has its principal place of business in San Francisco, California. Wells Fargo Home Mortgage, Inc. originates loans to California customers from its California offices and maintains a systematic and continuous presence in the State.

8.   Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b) because Wells Fargo Bank, N.A. resides in this district, a substantial part of the events or omissions giving rise to the claim occurred in this district, and Wells Fargo Bank, N.A.'s principal place of business is in this district.

**INTRADISTRICT ASSIGNMENT**

9.   This action is properly assigned to the San Francisco Division of this District pursuant to N.D. Cal. L.R. 3-2, because Defendant Wells Fargo & Company is headquartered in San Francisco, California, which is served by the San Francisco Division.

**III.   PARTIES**

10.   **Plaintiffs.**

11.   Plaintiff Winfred Thomas is a minority homeowner who owns equity in a home located in Hogansville, Georgia. In December of 2020, Plaintiff Thomas applied for a Wells Fargo home refinance and his application was denied in 2021. Shortly thereafter, Plaintiff Thomas applied to refinance his Wells Fargo mortgage with Veteran's United Home Loans. Plaintiff Thomas's refinance application was approved by Veteran's United Home Loans, receiving a mortgage interest rate of 3.2% **less** than the 5.5% existing mortgage rate Plaintiff Thomas was paying on his initial Wells Fargo mortgage.

12.   Plaintiff Michells Sims is a minority homeowner who owns equity in a home located in Desoto, Texas. In December of 2021, Plaintiff Sims applied for a Wells Fargo home refinance and her application was denied in early 2022.

13.   **Defendants.**

14.     Defendant Wells Fargo Bank, N.A. is a nationally chartered bank with its principal place of business located in Sioux Falls, South Dakota and is chartered in Wilmington, Delaware.

15.     Defendant Wells Fargo & Company is Defendant Wells Fargo Bank, N.A.'s parent company and is headquartered in San Francisco, California with its principal place of business located in Manhattan, New York, New York.

**IV.     FACTUAL ALLEGATIONS**

**A.  Wells Fargo, the Home Mortgage Industry, and Home Mortgage Refinancing**

16.     Wells Fargo is one of the Country's largest first and second lien mortgage lenders. Included within that line of business are its new mortgages derived from refinancing existing home mortgages.

17.     Refinancing an existing mortgage allows a borrower to try to obtain better terms including, for example, a lower interest rate.  A lower mortgage interest rate enables a borrower to save hundreds, if not thousands, of dollars per year on interest charges.  As Wells Fargo explains on "Why Refinance a Mortgage" page on its website, refinancing a mortgage enables a borrower: (1) to tap into home equity (using the equity established in the home in order to get a cash-out refinance where the bank gives the borrower cash in exchange for that equity in order to pay other loans or credit card debt), (2) take advantage of lower [interest] rates (which reduce the monthly payments and the total interest paid out over the duration of the loan), (3) change your loan term (to shorten or lengthen the loan term length), and (4) to convert to an adjustable rate mortgage or a fixed-rate mortgage.[4]

18.     Conversely, the denial of refinance applications means that a mortgage borrower must continue to pay higher mortgage costs.  Brookings Institute senior fellow Andre Perry states that the inability of Black homeowners to refinance their home mortgage loans "means people

---

[4] https://www.wellsfargo.com/mortgage/mortgage-refinance/why-refinance/, (last accessed Mar. 7, 2022).

CLASS ACTION COMPLAINT
5

have less resources to invest in their children, less resources to start businesses, less resources to renovate their homes, less resources to buy additional homes."[5] This, in the aggregate, widens the racial wealth gap in the United States.

**B. The Pandemic-induced Interest Rates Made Mortgage Refinancing Attractive to Homeowners**

19.     During the Class Period, interest rates dropped substantially due to economic pressures caused by the COVID-19 pandemic – this made refinancing more attractive for mortgage holders.

20.     A study by the Federal Reserve Bank of Boston concluded the following:

   a.   The typical refinance during the Class Period reduced borrowers' monthly payments by $279 per month, leading to a total payment reduction of $5.3 billion per year in the United States for all households that refinanced.[6]

   b.   However, only $198 million, or 3.7% of the total payment reduction of $5.3 billion, went to Black households.[7]

   c.   This is especially problematic considering that Black households account for over 13% of the entire United States population and over 9% of all homeowners.[8]

   d.   Additionally, the study concluded that white homeowners were approved at twice the rate of Black homeowners with respect to mortgage refinancing during the Class Period.[9]

21.     The study found that, "[c]ompared with white borrowers, Black borrowers on average have lower credit scores and higher loan-to-value ratios [which are] risk factors that can

---

[5] *Id.*

[6] Larry Bean, "*Fed study: Minority borrowers bore the brunt of COVID-19's impact on the mortgage market,*" FEDERAL RESERVE BANK OF BOSTON (June 22, 2021), at https://www.bostonfed.org/news-events/news/2021/06/minority-borrowers-bear-brunt-of-covid-19-impact-on-mortgage-market.aspx.

[7] *Id.*

[8] *Id.*

[9] *Id.*

prevent someone from refinancing and reducing their monthly mortgage payments. However, when authors [of the study] control for these factors, they find that before the pandemic, Black and white borrowers were roughly equally likely to refinance. After the pandemic began and interest rates plummeted, Black homeowners were 40% less likely than white homeowners to finance, holding equal the risk factors for both groups."[10]

22.     Critically, the authors of the study concluded, "borrowers who could use the payment reductions the most moving forward may be the least likely to obtain them."[11]

**C. Due to the Discriminatory Conduct of the Defendants, Plaintiffs and the Members of the Putative Class Were Denied Refinancing Opportunities by Defendants' Bank, Wells Fargo**

23.     Wells Fargo has engaged in discriminatory practices that disparately reduce the number of home mortgage refinance requests by minority applicants. With respect to minority applicants. these tactics, taken generally, are called "redlining."

24.     The term "redlining" has its roots in New Deal-era racism, which limited minority access to housing opportunities. Historically, the concept of redlining comes "from government maps that outlined areas where Black residents lived and therefore were deemed more risky [real estate] investments."[12]

25.     In the past, redlining took place through the use of mapping where Black neighborhoods were and consisted of coloring those neighborhoods "red" as to denote that they were high risk investments because of the populations that inhabited them. In the modern day, redlining takes place usually though an algorithmic bias which considers multiple factors tied to race (such as ZIP code, education, area code, census track, average home values, and other

---

[10] *Id.*
[11] *Id.*
[12] Candace Jackson, "*What is Redlining?*," NYTIMES (ONLINE) (Aug. 17, 2021), at https://www.nytimes.com/2021/08/17/realestate/what-is-redlining.html.

factors) and uses them in the decision of whether to approve a home mortgage refinancing application.

26.     For example, the refinancing calculator on Wells Fargo's website, utilizes a digitized algorithmic tool that assesses creditworthiness and other factors to offer estimated refinance rates.  The tool asks for inputs for factors that are proxies for minority homeowner status, such as geography (Wells Fargo notes: "[Refinancing] [r]ates can vary by location")[13] and credit score (to which Wells Fargo gives four options: Excellent, Good, Fair, or Poor/Limited).[14]

27.     On its refinance applications, hosted by Blend Labs, Inc., the digitized algorithmic tool (which assesses creditworthiness and other factors to lock in a home mortgage refinance interest rate) also asks for information that can be proxies for race, including "demographic information," employment and income information, real estate holdings by the applicant, and other information.[15]

28.     Wells Fargo's use of these factors has resulted in discrimination by disparately denying minority and female applicants' refinance applications at rates far in excess of denial rates experienced by white borrowers.

**D. Due to the Discriminatory Conduct of the Defendants, Plaintiffs and the Members of the Putative Class Were Harmed**

29.     Plaintiffs and members of the putative Class were harmed because they were either denied the ability to refinance their home mortgages entirely due to Wells Fargo's conduct described herein, or they were given less favorable terms than white borrowers who similarly refinanced their home mortgages through Wells Fargo.

---

[13] https://www.wellsfargo.com/mortgage/mortgage-refinance/why-refinance/, (last accessed Mar. 7, 2022).
[14] *Id.*
[15] https://yourmortgageapp.wf.com/section/Getting%20Started/task/BORROWER/3652fd6a-b3e4-4308-bfa8-a92e9f4bbb83, (last accessed Mar. 7, 2022).

30.     Either way, Plaintiffs and members of the putative Class were harmed in the form of higher monthly payments on their home mortgage loan payments which could have been reduced but for Wells Fargo's discriminatory conduct.

31.     Indeed, an investigation by Bloomberg News further unveiled Wells Fargo's discriminatory practices with respect to the mortgage refinancing industry.[16] Statistics collected by Bloomberg show how wide Wells Fargo's disparity in refinance approvals was in 2020 compared to all other mortgage lenders in the United States:



**Disparity by Lender**
Wells Fargo approved fewer than half of Black homeowners' refinancing applications in 2020.

Approval rate

**Wells Fargo**
- WHITE 72%
- ASIAN 67%
- HISPANIC 53%
- BLACK 47%

**All other lenders**
- WHITE 87%
- ASIAN 85%
- HISPANIC 79%
- BLACK 71%

Source: Bloomberg analysis of Home Mortgage Disclosure Act data for 8 million completed applications to refinance conventional loans in 2020.

[17]

---

[16] Shawn Donnan, Ann Choi, Hannah Levitt, and Christopher Cannon, "*Wells Fargo Left Black Homeowners Behind in Pandemic Mortgage Refinancing Boom*," Bloomberg (Online) (March 11, 2022), at https://www.bloomberg.com/graphics/2022-wells-fargo-black-home-loan-refinancing/.

[17] *Id.*

32.     For example, during the time period at issue here, JP Morgan (the largest U.S. bank in terms of assets) approved 81% of mortgage refinance applications from Black homeowners, Rocket Mortgage LLC approved nearly 80% of Black applicants, and Bank of America approved 66% of Black applicants. This is in stark contrast to Wells Fargo's mere 47% approval rate of Black mortgage refinance applications.

33.     Notably, Wells Fargo denied Black mortgage refinance applicants at significantly higher rates than White applicants that had significantly lower incomes:



34.     According to Kristy Fercho, the Wells Fargo employee responsible for overseeing

Wells Fargo's home-lending line of business, lending decisions were "consistent across racial and

ethnic groups" and that racial disparity in outcomes for refinancing in 2020 was the result of

variables that Wells Fargo doesn't control.[18] That provides no excuse because Wells Fargo is not permitted by law to discriminate in its mortgage application process.

**V.    CLASS ALLEGATIONS**

35.    Pursuant to F.R.C.P. Rule 23(b)(2) and (b)(3), as applicable, and (c)(4), Plaintiffs seek certification of a class of all first and second lien Wells Fargo minority mortgage refinance applicants from 2019-present (the "Class Period") whose refinancing applications were discriminatorily denied (the "Class".)

36.    Excluded from the Class are Defendants, their subsidiaries, affiliates, officers, directors, and employees.

37.    **Numerosity: Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. Plaintiffs are informed and believe — based upon the publicly-available information discussed herein — that there are tens of thousands of Class members, making joinder impracticable. Those individuals' identities are available through Defendants' records, and Class members may be notified of the pendency of this Action by recognized, Court-approved notice dissemination methods.

38.    **Commonality and Predominance: Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3).** Defendants have acted in a manner generally applicable to Plaintiffs and the other members of the proposed Class. There is a well-defined community of interest in the questions of law and fact involved, which affect all Class members. The questions of law and fact common to the Classes predominate over the questions that may affect individual Class members, including, *inter alia*:

---

[18] *Id.*

a.   Whether Defendants systematically discriminated against Class members based upon their minority status;

b.   Whether minority Class members' applications to refinance a first or second lien loan were denied where similarly situated non-minority applicants were approved; and,

c.   Whether the algorithms used by Defendants unfairly discriminated against minority Class members and contained algorithmic bias.

39.      **Typicality: Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of other Class members' claims because Plaintiffs and Class members were subjected to the same allegedly unlawful conduct and damaged in the same way.

40.      **Adequacy of Representation: Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate class representatives because their interests do not conflict with the interests of Class members whom they seeks to represent, Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this Action vigorously. The Class members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

41.      **Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2).** The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants. Such individual actions would create a risk of adjudications that would be dispositive of the interests of other Class members and impair their interests. Defendants have acted and/or refused to act on grounds generally applicable to the Classes, making final, public injunctive relief or corresponding declaratory relief appropriate.

42.      Injunctive relief, and specifically public injunctive relief, is necessary in this Action.

43.     The harm that Defendants impose on Plaintiffs and Class members cause ripple effects for the public-at-large and Plaintiffs seek injunctive relief forcing Defendants to cease and desist its discriminatory practices.

44.     **Superiority: Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Plaintiffs and Class members to individually seek redress for Defendants' wrongful conduct. Even if Plaintiff and Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

**VI.     CAUSES OF ACTION**

<u>**COUNT I**</u>

**VIOLATIONS OF THE FAIR HOUSING ACT**

45.     Plaintiffs, on behalf of themselves and all others similarly situated, reallege each previous paragraph as if fully alleged herein.

46.     The Fair Housing Act, 42 U.S.C. § 3605(a), prohibits any entity whose business includes engaging in residential real estate-related transactions from discriminating against any person in making available such a transaction on the basis of race.

47.     Defendants' business includes engaging in residential real estate-related transactions.

48.     As set forth above, Defendants maintain a nationwide set of uniform, discriminatory refinancing practices and engage in a pattern or practice of systemic discrimination against minority homeowners that constitute illegal, intentional discrimination and disparately impacts Black Americans and minorities in violation of the Fair Housing Act of 1968.

49.     Plaintiffs and Class members were subjected to and harmed by Defendants' systemic and individual discrimination.

50.     On behalf of Plaintiffs and the putative Class, Plaintiffs seek the relief set forth below.

## COUNT II

### VIOLATIONS OF THE EQUAL CREDIT OPPORTUNITY ACT

47.     Plaintiffs, on behalf of themselves and all others similarly situated, reallege each previous paragraph as if fully alleged herein.

48.     The Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*, makes it unlawful for a creditor to discriminate against any applicant with respect to any aspect of a credit transaction on the basis of race.

49.     As described above, Defendants are creditors because they regularly extend, renew, and continue credit, and Plaintiffs were applicants for credit.

50.     Defendants maintain a nationwide set of uniform, discriminatory mortgage loan origination and underwriting practices and engaged in a pattern or practice of systemic race discrimination against minority mortgage loan applicants that constitute illegal intentional race discrimination in violation of the Equal Credit Opportunity Act.

51.     Plaintiffs and Class members were subjected to and harmed by Defendants' systemic and individual discrimination.

52.     Defendants' unlawful conduct resulted in considerable harm to Plaintiffs and all Class members.

53.     On behalf of themselves and the Class they seeks to present, Plaintiffs request the relief set forth below.

## **COUNT THREE**

### **VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW**

54.     Plaintiffs, on behalf of themselves and all others similarly situated, reallege each previous paragraph as if fully alleged herein.

55.     California's Unfair Competition Law ("UCL") defines unfair competition to include any "unfair, unlawful, or fraudulent business practice and unfair, deceptive, untrue, or misleading advertising and any act prohibited by Chapter 1 of Part 3 of Division 7 of [California's] Business and Professions Code."

56.     Defendants violated the UCL by engaging in unlawful and unfair business acts and practices.

57.     Defendants are considered "person[s]" as defined by the statute.

58.     Pursuant to the statute, Plaintiffs named herein, as well as the putative Class members, have suffered injury-in-fact and have lost money or property because of the unfair competition set forth herein.

59.     In accordance with the liberal application and construction of the UCL, application of the UCL to all Class members is appropriate given that Defendants are headquartered in this District, have a forum selection clause specific to this District, and direct sales, marketing and advertising in this District.

60.     Unlawful Prong. A business act or practice is unlawful pursuant to the UCL if it violates any other law or regulation.

61.     Defendants' conduct violates the Fair Housing Act and the Equal Credit Opportunity Act, and other applicable statutes which Plaintiffs may add upon amending this Complaint.

62.     Unfairness Prong. A business act or practice is unfair pursuant to the UCL if it is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

63.     Defendants' unfair acts and practices include, but are not limited to: Plaintiffs and the Class are discriminated upon with respect to Defendants' discriminatory denial of Plaintiffs' and Class members' refinance applications during the Class Period; Defendants' denied Plaintiffs' and Class members' applications to refinance a first or second lien loan where similarly situated non-minority applicants were approved, and the algorithms used by Defendants unfairly discriminated against minority Class members and contained algorithmic bias.

64.     Defendants' conduct described herein caused Plaintiff and members of the putative Class to suffer frustration, anxiety, emotional distress, and financial hardship.

65.     Defendants' business practices are unfair because they offend public policy; they are immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious. The injuries caused by this conduct and the harm to consumers outweigh the possible utility from these aforementioned practices.

66.     There is no benefit to consumers or competition by allowing Defendants to engage in discriminatory denial of Plaintiffs' and Class members' refinance applications.

67.     The gravity of the harm suffered by Plaintiffs and Class members resulting from Defendants' conduct alleged herein outweighs any legitimate justification, motive or reason for the discrimination described. Accordingly, Defendants' actions are immoral, unethical, unscrupulous and offend the established public policies as set out in federal regulations and are substantially injurious to Plaintiff and Class Members.

CLASS ACTION COMPLAINT
17

68.     As a result of Defendants' above unlawful and unfair practices, Plaintiffs and members of the putative Class, and as appropriate on behalf of the general public, seek all allowable damages under the UCL including injunctive relief ordering Defendants to transact in a timely manner.

## VII.   PRAYER FOR RELIEF

69.     WHEREFORE, Plaintiffs respectfully request that this Court find against the Defendants as follows:

a.   Certify this case as a class action;

b.   Designate Plaintiffs as Class Representatives and designate Plaintiffs' counsel of record as Class Counsel;

c.   Declare that Defendants' acts, conduct, policies and practices are unlawful and violate the Equal Credit Opportunity Act and the Fair Housing Act and were in violation of California's UCL;

d.   Declare that Wells Fargo engaged in a pattern and practice of racial discrimination against minorities;

e.   Award Plaintiffs and all others similarly situated compensatory and punitive damages;

f.   Award Plaintiffs and all others similarly situated prejudgment interest and attorneys' fees, costs and disbursements, as provided by law;

g.   Award Plaintiffs and all others similarly situated injunctive and legal relief as this Court deems just and proper to end the discrimination and fairly compensate Plaintiffs and all others similarly situated.

h.   Award Plaintiffs and all others similarly situated such other relief as this Court deems just and proper.

## VIII.   JURY TRIAL DEMAND

70.     Jury trial demanded by Plaintiffs and members of the putative Class.

DATED:  March 25, 2022.                    Respectfully submitted,

                                           **MILBERG COLEMAN BRYSON
                                           PHILLIPS GROSSMAN PLLC**

                                           */s/ Alex R. Straus*
                                           Alex R. Straus, Esq. (SBN 321366)
                                           280 South Beverly Place
                                           Beverly Hills, CA 90212
                                           Tel.:    (917) 471-1894
                                           Fax:     (310) 496-3176
                                           Email: astraus@milberg.com

                                           Jennifer Kraus Czeisler*
                                           **MILBERG COLEMAN BRYSON
                                           PHILLIPS GROSSMAN, PLLC**
                                           100 Garden City Plaza, Suite 500
                                           Garden City, New York 11530
                                           Telephone:     212-594-5300
                                           Email:         jczeisler@milberg.com

                                           Sanford P, Dumain*
                                           **MILBERG COLEMAN BRYSON
                                           PHILLIPS GROSSMAN, PLLC**
                                           100 Garden City Plaza, Suite 500
                                           Garden City, New York 11530
                                           Telephone:     212-594-5300
                                           Email:         sdumain@milberg.com

                                           James Evangelista*
                                           **EVANGELISTA WORLEY**
                                           500 Sugar Mill Rd, Suite 245A
                                           Atlanta, GA 30350
                                           Telephone:     (404) 205-8400
                                           Facsimile:     (404) 205-8391
                                           Email: jim@ewlawllc.com

                                           *Attorneys for Plaintiffs and the Putative Class*

                                           *Pro Hac Vice Forthcoming*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT I

1
2
3
4

Alisa Adams (SBN 277697)
Adams Law Practice, LLC
P.O. Box 1834
Cleveland, OH 44103
(216) 926-0065 telephone
Email: aadams@advocateattorneys.com

5
6

*Attorneys for Plaintiff and Putative Class*
*Additional Counsel on Signature Page*

7

8
9

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

10
11
12
13
14
15
16
17
18

| | |
|---|---|
| **IFEOMA EBO**, individually, and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> **WELLS FARGO BANK, N.A.** <br><br> Defendant. | Case No. <br><br> **CLASS ACTION COMPLAINT FOR:** <br><br> 1. **VIOLATIONS OF THE EQUAL CREDIT OPPORTUNITY ACT, 15 U.S.C. §§ 1691, *ET SEQ.*;** <br> 2. **VIOLATIONS OF THE FAIR HOUSING ACT, 42 U.S.C. §§ 3601, *ET SEQ.*; and** <br> 3. **VIOLATIONS OF SECTION 1981, 42 U.S.C. § 1981.** <br><br> **DEMAND FOR JURY TRIAL** |

19
20
21

NOW COMES Plaintiff IFEOMA EBO ("Plaintiff"), individually and on behalf of all others similarly situated, by and through counsel, and for her Class Action Complaint against Defendant WELLS FARGO BANK, N.A. ("Wells Fargo" or "Defendant"), states as follows:

22

<u>**INTRODUCTION**</u>

23
24
25
26

1.    This case concerns Wells Fargo's pervasive pattern and practice of placing Black Americans at a disadvantage in comparison to White Americans with respect to their applications for mortgage loans.

27
28

*Ebo, et al. v. Wells Fargo Bank, N.A., Class Action Complaint, p.1*

**2.**     In fact, Wells Fargo's discriminatory practices were already the subject of a lawsuit brought by the United States Department of Justice ("DOJ") in 2012, which was resolved through a Consent Order (the "Consent Order").[1]  Pursuant to the terms of that Consent Order, Wells Fargo was required to "provide[] $184.3 million in compensation" to borrowers—which was "the second largest fair lending settlement in the [DOJ]'s history" to that point—and was required to institute procedures to ensure compliance with federal housing law.[2]

**3.**     Unfortunately for Black Americans, as soon as the terms of that Consent Order expired, Wells Fargo reverted back to its discriminatory practices.

**4.**     For example, according to a recent report from Bloomberg, "Wells Fargo approved fewer than half of Black homeowners' refinancing applications in 2020," which is a significantly lower rate than all other lenders.[3]   In fact, "Wells Fargo…was alone in rejecting more Black homeowners than it accepted."[4]

**5.**     Moreover, based on a review of publicly available data from the Consumer Financial Protection Bureau ("CFPB")—collected under the Home Mortgage Disclosure Act ("HMDA"), which is codified as 12 U.S.C. §§ 2801, *et seq*.—Wells Fargo still lags behind its industry counterparts with respect to approving Black Americans' loan applications, and, even when Wells Fargo does approve Black Americans' loan applications, Wells Fargo offers them significantly less favorable interest rates.

---

[1] *See, e.g.*, DOJ Complaint, available at: https://www.justice.gov/iso/opa/resources/951201271211371999995136.pdf; Consent Order, available at: https://www.justice.gov/iso/opa/resources/1420127121384881962.pdf.
[2] *See*, https://www.justice.gov/opa/pr/justice-department-reaches-settlement-wells-fargo-resulting-more-175-million-relief.
[3] *See*, https://www.bloomberg.com/graphics/2022-wells-fargo-black-home-loan-refinancing/.
[4] *Id.*

**6.**     As explained below, Wells Fargo's discriminatory practices violate, *inter alia*, the Equal Credit Opportunity Act ("ECOA")—codified as 15 U.S.C. §§ 1691, *et seq.*—the Fair Housing Act ("FHA")—codified as 42 U.S.C. §§ 3601, *et seq.*—and 42 U.S.C. § 1981 ("Section 1981"). Accordingly, Plaintiff, individually, and on behalf of all others similarly situated (the "Class"), seeks redress in connection with the harm she and other Class members incurred as a result of Wells Fargo's discriminatory practices and violations of federal law.

## PARTIES, JURISDICTION, AND VENUE

**7.**     Plaintiff is a citizen of the United States and an adult resident of the City of New York, New York.

**8.**     Defendant Wells Fargo Bank, N.A. is a business incorporated under the laws of the State of Delaware.  Defendant maintains its principal place of business at 420 Montgomery Street, San Francisco, California 94104.  Defendant does business in the state of New York and nationwide.

**9.**     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as several of Plaintiff's causes of action arise under federal law.

**10.**     Personal jurisdiction is appropriate over Wells Fargo Bank, N.A. as it transacts business in the State of California and has its principal place of business in San Francisco, California.

**11.**     Venue lies in this District pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## INTRADISTRICT ASSIGNMENT

**12.**     This action is properly assigned to the San Francisco Division of this District pursuant to N.D. Cal. L.R. 3-2, because Defendant Wells Fargo Bank, N.A. is headquartered in San Francisco, California, which is served by the San Francisco Division.

*Ebo, et al. v. Wells Fargo Bank, N.A., Class Action Complaint, p.3*

**FACTUAL ALLEGATIONS**

**13.**   Plaintiff and Class members are all Black Americans, and thus are members of a protected class.

**14.**   Plaintiff and Class members each submitted an application for a mortgage loan from Defendant in connection with the purchase or refinancing of residential real estate ("Application").

**15.**   Plaintiff and Class members were qualified to receive mortgage loans from Wells Fargo, and complied with all reasonable requirements imposed by Wells Fargo as necessary to substantiate their qualifications to receive mortgage loans.

**16.**   Nevertheless, Plaintiff's and Class members' Applications were either (1) denied by Wells Fargo, (2) never completed because of Wells Fargo's unreasonable demands that would not have been imposed by Wells Fargo in connection with a similarly situated White applicant, or (3) granted by Wells Fargo, but on significantly less favorable terms than a similarly situated White borrower would have received.

**17.**   Plaintiff's and Class members' experiences with Wells Fargo were part of a larger pattern and practice of racial discrimination against Black Americans.

**18.**   As noted above, Wells Fargo was already subjected to a DOJ lawsuit in 2012 alleging similar misconduct.  That lawsuit was ultimately resolved through a Consent Order which provided for "the second largest fair lending settlement in the [DOJ]'s history" to that point.[5]  Nevertheless, Wells Fargo's discriminatory practices continued.

**19.**   For example, according to Bloomberg, in 2020, Wells Fargo approved Black Americans' loan refinancing applications at a rate of 47%, in comparison to a rate of 72% for White Americans—a

---

[5] *See*, https://www.justice.gov/opa/pr/justice-department-reaches-settlement-wells-fargo-resulting-more-175-million-relief.

25% difference.[6]  Other similarly-sized lenders had only a modest disparity between Black and White applicants, ranging from 7% to 12%.[7]  For instance, Chase, "the largest U.S. bank by assets, accepted 81% of refinancing applications from Black homeowners in 2020 compared with 90% from White ones"—which only amounts to a 9% difference.[8]

20.     Notably, Wells Fargo's 47% approval rate does not even account for the "27% of Black borrowers who began an application with Wells Fargo in 2020 [and then] withdrew it."[9]  When those applicants are factored in, it means that "only one-third of the 17,702 Black homeowners who sought refinancing [from Wells Fargo] were successful."[10]

21.     The Bloomberg report also notes that "Wells Fargo approved a greater share of applications from low-income White homeowners than all but the highest-income Black applicants, who had an approval rate about the same as White borrowers in the lowest-income bracket."[11]  Clearly, the disparity between Black and White applicants seeking refinancing from Wells Fargo has little do with creditworthiness.

22.     Wells Fargo's discriminatory practices are also pervasive with respect to applicants for new mortgage loans.

23.     Based on a review of publicly available data collected by the CFPB in accordance with the HMDA, in 2019, Wells Fargo approved Black Americans' loan applications at a rate that was approximately 21% lower than White Americans' loan applications.  In comparison, three of the other

---

[6] *See*, https://www.bloomberg.com/graphics/2022-wells-fargo-black-home-loan-refinancing/.
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.*

largest lenders in the country—*i.e.*, Chase, Quicken Loans, and United Wholesale Mortgage—approved Black Americans' loan applications at a rate that was "only" approximately 10% lower than White Americans' loan applications.

24.     Moreover, even when common indicia of creditworthiness are controlled for—*e.g.*, debt to income ratio, loan to value ratio, etc.—Wells Fargo approved Black Americans' loan applications at a rate that was, on average, approximately 9% lower than similarly situated White Americans' loan applications. In contrast, Chase—one of the largest mortgage loan lenders in the country—approved Black Americans' loan applications at a rate that was, on average, approximately 3% *higher* than similarly situated White Americans' loan applications.  Chase is not an outlier.  When that same analysis is applied to data from three of the other largest lenders in the county—*i.e.*, Chase, Quicken Loans, and United Wholesale Mortgage—it reveals that Black Americans' loan applications were approved at a rate that was, on average, approximately 2% *higher* than similarly situated White Americans' loan applications.

25.     Even when Wells Fargo does approve Black Americans' loan applications, it offers them significantly less favorable terms than similarly situated White Americans.

26.     According to the same dataset referenced above, the interest rates on loans offered by Wells Fargo to Black Americans were, on average, half a percentage point *higher* than the interest rates on the loans it offered to similarly situated White Americans, even when common indicia of creditworthiness are controlled for.

27.     In comparison, there was no appreciable difference between the interest rates offered to Black Americans and similarly situated White Americans by three of the other largest lenders in the county—*i.e.*, Chase, Quicken Loans, and United Wholesale Mortgage.  For these lenders, the difference between the interest rates offered to Black Americans and similarly situated White Americans was, on average, only five hundredths of a percentage point—i.e., *ten times less* than Wells Fargo's disparity.

*Ebo, et al. v. Wells Fargo Bank, N.A., Class Action Complaint, p.6*

**28.** Wells Fargo's discriminatory practices are also evidenced by the fact that Wells Fargo artificially makes it more difficult for Black Americans to complete their applications for mortgage loans. For example, Wells Fargo has a pattern and practice of requiring Black Americans to repeatedly submit documentation that they have already submitted, or to submit additional documentation beyond what is necessary to determine their eligibility status.

**29.** Again, according to publicly available data collected by the CFPB in accordance with the HMDA, in 2019, new mortgage loan applications submitted by Black Americans to Wells Fargo were either withdrawn or never completed approximately 17% of the time, in comparison to only 14% for White Americans. But, there was no difference between Black Americans and White Americans with respect to applications submitted to three of the other largest lenders in the county—*i.e.*, Chase, Quicken Loans, and United Wholesale Mortgage. For these lenders, *both* Black Americans and White Americans either withdrew or never completed their mortgage loan applications 8% of the time.

**30.** The processing delays experienced by Black Americans who seek mortgage loans from Wells Fargo can prevent them from purchasing real property altogether because, in real estate transactions, time is frequently of the essence. In other words, sellers of real property are simply unwilling to wait for Wells Fargo's unnecessarily lengthy loan approval process to be completed, and sellers move on to other potential buyers with whom they will not experience this problem.

**31.** Those processing delays also made it more difficult for existing Black property owners to refinance their mortgage loans and take advantage of historically lower interest rates, which have since begun to rise.

**32.** In light of the foregoing, Plaintiff and Class members were harmed by Wells Fargo's discriminatory practices in one or more of the following ways: (1) they were unable to obtain or refinance mortgage loans to which they were qualified; (2) they were unable to obtain or refinance mortgage loans

on the same (more favorable) terms as White Americans; (3) they were unable to purchase real property that similarly situated White Americans would have been able to purchase; and (4) they spent time and money pursuing mortgage loans that similarly situated White Americans would not have been required to expend.

### **FACTS RELEVANT TO PLAINTIFF**

**33.**   Plaintiff is a Black American, and thus is a member of a protected class.

**34.**   In late 2021, Plaintiff began the process of searching for a new home to purchase.  That search ended in October 2021, when Plaintiff found a property (the "Property") located in Kings County, New York—and more specifically, the East Flatbush neighborhood of Brooklyn—and entered into a contract (the "Contract") to purchase it for the price of $900,000.

**35.**   Thereafter, Plaintiff submitted an application for a mortgage loan to Defendant in connection with the purchase of the Property ("Plaintiff's Application").

**36.**   At the time Plaintiff applied for the Loan (defined below), Plaintiff had a credit score of approximately 800, an annual income of approximately $178,000, and no significant debt.

**37.**   On November 1, 2021, Plaintiff received preapproval from Wells Fargo for a mortgage loan in the amount of $883,698 (the "Loan"), which would be used to purchase the Property.  According to Wells Fargo, Plaintiff's preapproval was to expire on February 24, 2022.

**38.**   After Plaintiff's Application was preapproved, Plaintiff began working with Wells Fargo to receive final approval for the Loan.

**39.**   Per Wells Fargo's requests, Plaintiff submitted all necessary documentation to verify her qualifications for the Loan.  Plaintiff timely provided Wells Fargo with documentation such as W-2 forms, paystubs, bank account statements, etc.

1
2
3

**40.**     On December 29, 2021, Plaintiff received a "Commitment Letter" from Wells Fargo. According to the Commitment Letter, Plaintiff's Application was approved, and she only needed to submit some additional documentation "in order to complete the final underwriting and funding of" her Loan.

4
5
6

**41.**     In January and February 2022, Wells Fargo informed Plaintiff that it required additional documentation to complete the underwriting process relative to Plaintiff's Application.

7
8

**42.**     Notably, some of the additional documentation that Wells Fargo requested in January and February 2022 had *already* been submitted by Plaintiff (*e.g.*, recent paystubs from Plaintiff's employers).

9
10
11
12
13
14

**43.**     Other documentation requested by Wells Fargo in January and February 2022 was unnecessary, unduly burdensome, and irrelevant to Plaintiff's qualifications for the Loan.  For example, in one instance, Wells Fargo requested a written explanation as to why Plaintiff made a monthly credit card payment in the amount of $290 on her own credit card.  In another instance, Wells Fargo requested a bank statement for a bank account that did not even exist.

15
16
17
18

**44.**     As Wells Fargo's duplicative and unnecessary requests for documentation continued into February 2022, Plaintiff expressed her concern to Wells Fargo that she would not be able to complete the Loan application process by the time that her preapproval expired on February 24, 2022. Nevertheless, as of February 24, 2022, Plaintiff's Loan still had yet to receive final approval.

19
20
21
22

**45.**     In March 2022, Wells Fargo continued to request additional documentation, much of which was duplicative of documentation that Plaintiff had already provided to Wells Fargo several times previously.

23
24
25
26

**46.**     In sum, Plaintiff was highly qualified to receive a mortgage loan from Wells Fargo, and complied with all of Wells Fargo's reasonable requests for documentation to substantiate her qualifications.  Yet, as of March 22, 2022—nearly a month after the Loan approval process should have concluded—Plaintiff still had not received final approval for her Loan.

27
28

47.    On or about March 22, 2022, the seller of the Property canceled the Contract due to the fact that Wells Fargo had still not approved Plaintiff's Loan, and it was unclear when (or if) that approval would ever come.  That same day, Plaintiff informed Wells Fargo of the seller's decision. Accordingly, Plaintiff did not, and will never, receive the Loan.

48.    As explained above, Plaintiff's experience with Wells Fargo was part of a larger pattern and practice of racial discrimination against Black Americans.  Like the Applications of many other Black Americans who sought mortgage loans from Wells Fargo, Plaintiff's Application was never completed because of Wells Fargo's unreasonable demands that would not have been imposed by Wells Fargo in connection with a similarly situated White applicant.

49.    Plaintiff was harmed by Wells Fargo's discriminatory practices because she was unable to obtain the Loan—to which she was qualified—and was thus unable to purchase the Property, even though a similarly situated White American would have been able to do so.  Plaintiff was also harmed by Wells Fargo's discriminatory practices because she spent time and money pursuing her Application that similarly situated White Americans would not have been required to expend.

## CLASS ACTION ALLEGATIONS

50.    **Class Definition**: Plaintiff brings this action pursuant to Fed. R. Civ. P. 23 on behalf of a Class of similarly situated individuals and entities, defined as follows:

> All Black Americans (1) who submitted applications to obtain or refinance a mortgage loan with respect to residential real property, (2) who were qualified to receive mortgage loans from Wells Fargo, and (3) whose applications were either (a) denied by Wells Fargo, (b) never completed, due to Wells Fargo's demands for documentation or information that would not have been imposed by Wells Fargo in connection with a similarly situated White applicant, or (c) granted by Wells Fargo, but on less favorable terms than a similarly situated White borrower would have received.

*Ebo, et al. v. Wells Fargo Bank, N.A., Class Action Complaint, p.10*

Excluded from the Class are: (1) the Judge to whom this case is assigned and the Judge's immediate family members; (2) Defendant, Defendant's agents, Defendant's employees, and other affiliates of Defendant; (4) any person(s) who executes and files a timely request for exclusion from the Class; (5) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (6) the legal representatives, successors and assigns of any such excluded person.

**51.    Numerosity and Ascertainability**: Upon information and belief, the Class is comprised of more than 40 members.  This conclusion is reasonable because Wells Fargo is one of the largest mortgage providers in the country, and, based on publicly available data collected by the CFPB in accordance with the HMDA, received over 7,000 Applications for mortgage loans from Black Americans in 2019.  The Class is so numerous that joinder of all members is impractical.  The exact number of members in the Class is presently unknown, can only be ascertained through discovery, and can easily be identified through Defendant's records or by other means.

**52.    Commonality and Predominance**: All members of the Class have been subject to and affected by a uniform course of conduct: specifically, Wells Fargo's pattern and practice of racial discrimination against Black Americans.  Accordingly, there are questions of law and fact common to the proposed Class that predominate over any individual questions.

**53.    Typicality**: Plaintiff's claims are typical of the claims of the Class. As previously explained, Plaintiff, like all Class members, was subject to Wells Fargo's pattern and practice of racial discrimination against Black Americans, and did not receive a mortgage loan from Wells Fargo on terms that would have been the same as a similarly situated White Americans.  Therefore, Plaintiff and Class members were all harmed in the same way, and incurred damages as a result.

**54.    Adequacy**: Plaintiff will adequately represent the interests of the Class and does not have adverse interests to the Class. If individual Class members prosecuted separate actions it may create a risk

of inconsistent or varying judgments that would establish incompatible standards of conduct. A class action is the superior method for the quick and efficient adjudication of this controversy. Plaintiff's counsel has extensive experience litigating consumer class actions.

**COUNT I**
**Violations of the Equal Credit Opportunity Act**
**15 U.S.C. §§ 1691,** *et seq.*
**On Behalf of Plaintiff and the Class**

55.     Plaintiff repeats and realleges paragraphs 1-54 with the same force and effect as though fully set forth herein.

56.     The ECOA makes it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction…on the basis of race [or] color." 15 U.S.C. § 1691(a)(1).

57.     As one of the largest mortgage lenders in the country, Defendant "regularly extends, renews, or continues credit" and/or "regularly arranges for the extension, renewal, or continuation of credit." 15 U.S.C. § 1691a(e).  Therefore, Defendant is a "creditor," as that term is defined by the ECOA.

58.     Plaintiff and Class members each applied "for an extension, renewal, or continuation of credit" from Wells Fargo.  15 U.S.C. § 1691a(b).  Therefore, Plaintiff and Class members are each an "applicant," as that term is defined by the ECOA.

59.     Pursuant to 15 U.S.C. § 1691e, any creditor who violates the ECOA "shall be liable to the aggrieved applicant for any actual damages sustained by such applicant acting either in an individual capacity or as a member of a class." 15 U.S.C. § 1691e(a).   The ECOA further provides for recovery of attorneys' fees incurred in connection with such a claim.  15 U.S.C. § 1691e(d).

60.     In general, to state a claim under the ECOA, a plaintiff must allege that: "(1) [she] was a member of a protected class, (2) [she] applied for credit from the defendant, (3) [she] was qualified for credit but the defendant denied [her] credit application, and (4) the defendant continued to engage in the

type of transaction in question with other parties with similar qualifications." *E.g.*, *Germain v. M & T Bank Corp.*, 111 F.Supp.3d 506, 526 (S.D.N.Y. 2015) (internal alterations and quotations omitted).

61.    Importantly, however, ECOA "protection is not limited to those applicants who were rejected." *E.g.*, *Wilson v. Toussie*, 260 F.Supp.2d 530, 541 (E.D.N.Y. 2003) (quoting *Hargraves v. Capital City Mortg. Corp.*, 140 F.Supp.2d 7, 23 (D.D.C. 2000)). Accordingly, a plaintiff can also state a claim under the ECOA where, as a result of racial discrimination, a creditor's "investigation procedures" are more onerous, or a borrower receives approval for a loan, but on less favorable terms. *E.g.*, *Hargraves*, 140 F.Supp.2d at 23; *Phillips v. Better Homes Depot, Inc.*, 2003 WL 25867736, at *22 (E.D.N.Y. 2003).

62.    Plaintiff and Class members are all Black Americans who submitted Applications for credit from Defendant to obtain or refinance mortgage loans secured by residential real property.

63.    As a direct and proximate result of Wells Fargo's pattern and practice of racial discrimination against Black Americans, Plaintiff's and Class members' Applications were either (1) denied by Wells Fargo, despite the fact that a similarly situated White applicant would have been approved, (2) never completed because of Wells Fargo's unreasonable demands that would not have been imposed by Wells Fargo in connection with a similarly situated White applicant, or (3) granted by Wells Fargo, but on significantly less favorable terms than a similarly situated White borrower would have received.

64.    Plaintiff and Class members were harmed by Defendant's violations of the ECOA in one or more of the following ways: (1) they were unable to obtain or refinance mortgage loans to which they were qualified; (2) they were unable to obtain or refinance mortgage loans on the same (more favorable) terms as White Americans; (3) they were unable to purchase real property that similarly situated White

Americans would have been able to purchase; and (4) they spent time and money pursuing mortgage loans that similarly situated White Americans would not have been required to expend.

**65.** Plaintiff, individually, and on behalf of the Class, seeks recovery of actual damages, punitive damages, and attorneys' fees and costs incurred connection with Defendant's violations of the ECOA.

**COUNT II**
**Violations of the Fair Housing Act**
**42 U.S.C. §§ 3601, *et seq.***
**On Behalf of Plaintiff and the Class**

**66.** Plaintiff repeats and realleges paragraphs 1-54 with the same force and effect as though fully set forth herein.

**67.** The FHA makes it "unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color…or national origin." 42 U.S.C. § 3605(a).

**68.** As one of the largest mortgage lenders in the country, Defendant's business includes engaging in residential real estate-related transactions because it regularly makes loans and provides financial assistance in connection with "purchasing, constructing, improving, repairing, or maintaining a dwelling," and those loans are "secured by residential real estate." 42 U.S.C. § 3605(b). Therefore, Defendant is subject to the FHA's anti-discrimination provisions.

**69.** 42 U.S.C. § 3613 provides for a private right of action against any person who violates the FHA. The FHA further provides for recovery of attorneys' fees incurred in connection with such a claim. 42 U.S.C. § 3613(c)(2).

**70.**     In general, to state a claim under the FHA, "plaintiffs who allege disparate treatment must show: (1) that they are members of a protected class; (2) that they sought and were qualified to rent or purchase the housing; (3) that they were rejected; and (4) that the housing opportunity remained available to other renters or purchasers." *M & T Mortg. Corp. v. White*, 736 F. Supp. 2d 538, 574 (E.D.N.Y. 2010) (internal quotations omitted).

**71.**     However, like claims under the ECOA, racial discrimination need not result in an outright denial of an application for credit for purposes of stating a claim under the FHA; any less favorable outcome is sufficient.  *E.g.*, *Hargraves*, 140 F.Supp.2d at 20-22.

**72.**     Plaintiff and Class members are all Black Americans who submitted Applications for credit from Defendant to obtain or refinance mortgage loans secured by residential real property.

**73.**     As a direct and proximate result of Wells Fargo's pattern and practice of racial discrimination against Black Americans, Plaintiff's and Class members' Applications were either (1) denied by Wells Fargo, despite the fact that a similarly situated White applicant would have been approved, (2) never completed because of Wells Fargo's unreasonable demands that would not have been imposed by Wells Fargo in connection with a similarly situated White applicant, or (3) granted by Wells Fargo, but on significantly less favorable terms than a similarly situated White borrower would have received.

**74.**     Plaintiff and Class members were harmed by Defendant's violations of the FHA in one or more of the following ways: (1) they were unable to obtain or refinance mortgage loans to which they were qualified; (2) they were unable to obtain or refinance mortgage loans on the same (more favorable) terms as White Americans; (3) they were unable to purchase real property that similarly situated White Americans would have been able to purchase; and (4) they spent time and money pursuing mortgage loans that similarly situated White Americans would not have been required to expend.

**75.**     Plaintiff, individually, and on behalf of the Class, seeks recovery of actual damages, punitive damages, and attorneys' fees and costs incurred connection with Defendant's violations of the FHA.

**COUNT III**
**Violations of Section 1981**
**42 U.S.C. § 1981**
**On Behalf of Plaintiff and the Class**

**76.**     Plaintiff repeats and realleges paragraphs 1-54 with the same force and effect as though fully set forth herein.

**77.**     Under Section 1981, "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts," which "includes the making, performance, modification, and termination of contracts." 42 U.S.C. § 1981(a)-(b).  The rights guaranteed by Section 1981 "are protected against impairment by nongovernmental discrimination" (42 U.S.C. § 1981(c)), and are enforceable through 42 U.S.C. § 1988, which provides for the recovery of attorney fees' and costs incurred in connection with a successful action under Section 1981 (42 U.S.C. § 1988(b)).

**78.**     "To establish a claim under [Section] 1981, a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (*i.e.*, make and enforce contracts, sue and be sued, give evidence, etc.)." *E.g.*, *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2nd Cir. 1993).

**79.**     Plaintiff and Class members are all Black Americans who submitted Applications for credit from Defendant to obtain or refinance mortgage loans secured by residential real property.  In other words, Plaintiff and Class members are each a member of a racial minority who sought to engage in the making of a contract.

**80.**     As a direct and proximate result of Wells Fargo's pattern and practice of racial discrimination against Black Americans, Plaintiff's and Class members' Applications were either (1) denied by Wells Fargo, despite the fact that a similarly situated White applicant would have been approved, (2) never completed because of Wells Fargo's unreasonable demands that would not have been imposed by Wells Fargo in connection with a similarly situated White applicant, or (3) granted by Wells Fargo, but on significantly less favorable terms than a similarly situated White borrower would have received.

**81.**     Accordingly, Defendant denied Plaintiff and Class members the same ability to make and enter into contracts "as is enjoyed by White citizens" of the United States.  42 U.S.C. § 1981(a).

**82.**     As evidenced by the pervasiveness of Defendant's racial discrimination in its lending practices, Defendant intended to discriminate against Plaintiff and Class members on the basis of race.

**83.**     Plaintiff and Class members were harmed by Defendant's violations of Section 1981 in one or more of the following ways: (1) they were unable to obtain or refinance mortgage loans to which they were qualified; (2) they were unable to obtain or refinance mortgage loans on the same (more favorable) terms as White Americans; (3) they were unable to purchase real property that similarly situated White Americans would have been able to purchase; and (4) they spent time and money pursuing mortgage loans that similarly situated White Americans would not have been required to expend.

**84.**     Plaintiff, individually, and on behalf of the Class, seeks recovery of actual damages, punitive damages, and attorneys' fees and costs incurred connection with Defendant's violations of Section 1981.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiff IFEOMA EBO, individually, and on behalf of the Class, prays for an Order as follows:

| | | |
|---|---|---|
| 1 | A. | Finding that this action satisfies the prerequisites for maintenance as a class action and certifying the Class defined herein; |
| 2 | | |
| 3 | B. | Designating Plaintiff as representative of the Class and her undersigned counsel as Class Counsel; |
| 4 | | |
| 5 | C. | Entering judgment in favor of Plaintiff and the Class and against Defendant as to each and every Count, as applicable; |
| 6 | D. | Awarding Plaintiff and the Class actual damages, statutory damages, and punitive in an amount to be determined at trial as to each and every Count, as applicable; |
| 7 | | |
| 8 | E. | Awarding Plaintiff and the Class attorneys' fees and costs, including interest thereon, as allowed or required by law, as to each and every Count, as applicable; and |
| 9 | | |
| 10 | F. | Granting all such further and other relief as this Court deems just and appropriate. |

11

**JURY DEMAND**

13   Plaintiff demands a trial by jury on all counts so triable.

14

15

16

17   DATED: April 26, 2022                          */s/ Alisa Adams*
                                                   Alisa Adams (SBN 277697)
18                                                 Adams Law Practice, LLC
                                                   P.O. Box 1834
19                                                 Cleveland, OH 44103
                                                   (216) 926-0065 telephone
20                                                 Email: aadams@advocateattorneys.com

21
                                                   Marc E. Dann (*pro hac vice* anticipated)
22                                                 Brian D. Flick (*pro hac vice* anticipated)
                                                   DANNLAW
23                                                 15000 Madison Avenue
                                                   Lakewood, OH 44107
24                                                 (216) 373-0539 telephone
                                                   (216) 373-0536 facsimile
25                                                 *notices@dannlaw.com*

26

27

28

1

2

Javier L. Merino (*pro hac vice* anticipated)
DANNLAW
1520 U.S. Highway 130, Suite 101
North Brunswick, NJ 08902
(201) 355-3440 telephone
(216) 373-0536 e-facsimile
notices@dannlaw.com

Thomas A. Zimmerman, Jr. (*pro hac vice* anticipated)
*tom@attorneyzim.com*
Matthew C. De Re (*pro hac vice* anticipated)
*matt@attorneyzim.com*
ZIMMERMAN LAW OFFICES, P.C.
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
(312) 440-0020 telephone
(312) 440-4180 facsimile

*Attorneys for Plaintiff and the Putative Class*

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT J

BENJAMIN L. CRUMP (pro hac vice)
BEN CRUMP, PLLC
633 Pennsylvania Avenue Northwest
Floor 2
Washington D.C. 20004
(800) 713-1222
court@bencrump.com

LINDA D. FRIEDMAN (pro hac vice)
SUZANNE E. BISH (pro hac vice)
STOWELL & FRIEDMAN LTD.
303 W. Madison St.
Suite 2600
Chicago, Illinois 60606
(312) 431-0888
Lfriedman@sfltd.com

SAM SANI (SBN 2733993) (Local Counsel)
SANI LAW, APC
15720 Ventura Blvd., Suite 405
Encino, CA 91436
Telephone:      (310) 935-0405
Facsimile:       (310) 935-0409
ssani@sanilawfirm.com

Attorneys for Plaintiffs
CHRISTOPHER WILLIAMS, SAM ALBURY, AND SHAIA BECKWITH SIMMONS,
INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CHRISTOPHER WILLIAMS, SAM ALBURY, and SHAIA BECKWITH SIMMONS, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br> v. <br><br> WELLS FARGO BANK, N.A. and WELLS FARGO & CO., <br><br> Defendant. | CASE NO: 3:22-cv-00990-JD <br><br> **PLAINTIFFS' RESPONSE TO ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES SHOULD BE RELATED** <br><br> Class Action <br><br> Jury Trial Demanded <br><br> Hon. James Donato |

PLAINTIFFS' RESPONSE TO ADMINISTRATIVE MOTION TO CONSIDER WHETHER
CASES SHOULD BE RELATED, 3:22-cv-00990-JD

466496

Pursuant to Local Rules 3-12 and 7-11, Plaintiffs Christopher Williams ("Williams"), Sam Albury ("Albury"), and Shaia Beckwith Simmons ("Simmons") (Williams, Albury, and Simmons collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, by and through their attorneys, hereby file Plaintiffs' Response to Administrative Motion to Consider Whether Cases Should be Related and state as follows:

Plaintiff Christopher Williams filed this lawsuit challenging Wells Fargo's racially discriminatory lending practices on a class-wide basis on February 17, 2022; he later amended the complaint to add additional plaintiffs and allegations. The *Williams* lawsuit was filed only after considerable investigation, statistical analysis, and discussions with Wells Fargo concerning its lending practices.

Bloomberg News published an investigative news report on March 10, 2022, detailing racial disparities in Wells Fargo's lending based on publicly available data. On March 18, 2022, the *Braxton* lawsuit was filed, quoting heavily from the Bloomberg news report, which appears to be the sole basis of the *Braxton* lawsuit.

The cases are not necessarily related at this juncture. The *Williams* complaint is broader than the *Braxton* case and, importantly, is first-filed and can proceed expeditiously. As a result, it is not likely that the cases will result in "an unduly burdensome duplication of labor and expense or conflicting results" if they proceed before different Judges. Plaintiffs respectfully submit that the *Braxton* case could be stayed or dismissed without prejudice pending the outcome of class certification in this case. Putative class counsel in this case have a long history of class litigation of race discrimination cases (including against Wells Fargo) and obtaining substantial monetary and programmatic relief.

Counsel for Plaintiffs and Wells Fargo in this case have agreed to meet to discuss Plaintiffs' statistical findings on June 7, 2022 in Philadelphia. Plaintiffs respectfully request that the Court

1   delay making any findings of relatedness until the parties may be heard (after their meeting) at the

2   June 16, 2022 conference set by this Court or at another date set by this Court. The *Williams*

3   plaintiffs believe that the best interests of the class are served by allowing them to zealously

4   represent the class and proceed with this class action.

5

6                                        Respectfully submitted,

7                                        BEN CRUMP, PLLC

8                                        BENJAMIN CRUMP (pro hac vice)
                                         633 Pennsylvania Avenue Northwest
9                                        Floor 2
                                         Washington D.C. 20004
10                                       Tel: (800) 713-1222
                                         court@bencrump.com
11
                                         STOWELL & FRIEDMAN, LTD.
12

13                                       By: */s/ Linda D. Friedman*
                                         LINDA D. FRIEDMAN (pro hac vice)
14                                       SUZANNE E. BISH (pro hac vice)
                                         **STOWELL & FRIEDMAN LTD.**
15                                       303 W. Madison St.
                                         Suite 2600
16                                       Chicago, Illinois 60606
                                         Phone: (312) 431-0888
17                                       Lfriedman@sfltd.com

18
                                         SANI LAW FIRM
19                                       */s/ Sam Sani*
                                         SAM SANI (local counsel)
20                                       **SANI LAW FIRM**
                                         15720 Ventura Blvd.
21                                       Suite 405
                                         Encino, CA 94612
22                                       Tel: (310) 935-0405
                                         ssani@sanilawfirm.com
23
                                         *Attorneys for Plaintiffs Williams, Albury, Simmons,*
24                                       *individually and on behalf of all others similarly*
                                         *situated*
25

26

27

28

                PLAINTIFFS' RESPONSE TO ADMINISTRATIVE MOTION TO CONSIDER
                WHETHER CASES SHOULD BE RELATED, 3:22-cv-00990-JD, - 3 -

466496

# EXHIBIT K

| | |
|---|---|
| **From:** | Marc Dann |
| **To:** | Groves, Amanda |
| **Cc:** | Brian Flick; Brinson, Kobi |
| **Subject:** | Re: Ebo follow-up |
| **Date:** | Monday, June 6, 2022 6:48:58 AM |

We do oppose

Marc Dann
DannLaw
15000 Madison Ave.
Cleveland OH 44107
216-452-1026 Direct
216-373-0536 Fax
216-373-0539 Office
330-651-3131 Cell
mdann@dannlaw.com

Admitted to Practice Law in the State of Ohio, The United States District Courts of the Northern and Southern District of Ohio, the Northern District of Illinois, the Northern District of Indiana and the Sixth Circuit Court of Appeals.

 Cleveland Columbus Cincinnati Chicago New York New Jersey
877-475-8100

If you would like to schedule an appointment with Marc please click on the following link: https://calendly.com/mdann

Sent via Superhuman iOS

On Mon, Jun 6 2022 at 7:46 AM, Amanda Groves <AGroves@winston.com> wrote:

> Hi Marc and Brian – Just a quick note to follow up on our call Friday.  Can you let us know whether you oppose relating Ebo to Williams at some point this morning  (our response is due this afternoon)?  Thank you!
>
>
> Amanda
>
>
> **Amanda Groves**
>
> Winston & Strawn LLP
>
> D: +1 213-615-1851
>
> M: +1 925-577-7088
>
> winston.com
>
> *Admitted to practice in California, North Carolina*



The contents of this message may be privileged and confidential. If this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author. Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under applicable tax laws and regulations.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ALFRED POPE, individually and on behalf of all others similarly situated, | Case No. 4:22-cv-01793-KAW |
| Plaintiff, | Magistrate Judge Kandis A. Westmore |
| v. | **[PROPOSED] ORDER DENYING PLAINTIFF IFEOMA EBO'S ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES SHOULD BE RELATED** |
| WELLS FARGO BANK, N.A., WELLS FARGO & COMPANY, | |
| Defendants. | |

The Court, having considered all papers filed in support of and in opposition to Plaintiff Ifeoma Ebo's Administrative Motion to Consider Whether the Cases Should Be Related ("Motion"), IT IS HEREBY ORDERED:

1. Plaintiff Ifeoma Ebo's Motion is DENIED;

2. Pursuant to Civil Local Rule 3-12(c), the above captioned case is referred to Judge James Donato to determine whether it is related to *Williams, et al. v. Well Fargo Bank, N.A., et al.*, Case No.: 3-22-cv-00990-JD.

**IT IS SO ORDERED.**

Date: _____, 2022

_____
The Honorable Kandis A. Westmore
United States District Judge