1 | ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
2 | Dennis S. Ellis (State Bar No. 178196)
   dellis@egcfirm.com
3 | Trent B. Copeland (State Bar No. 136890)
   tcopeland@egcfirm.com
4 | Ryan Q. Keech (State Bar No. 280306)
   rkeech@egcfirm.com
5 | 2121 Avenue of the Stars, 30th Floor
Los Angeles, California 90067
6 | Telephone: (310) 274-7100
Facsimile: (310) 275-5697
7 |
8 | FRANK SIMS & STOLPER LLP
Jason Frank (State Bar No. 190957)
9 |    jfrank@lawfss.com
Scott H. Sims (State Bar No. 234148)
10 |    ssims@lawfss.com
Andrew D. Stolper (State Bar No. 205462)
11 |    astolper@lawfss.com
19800 MacArthur Blvd., Suite 855
12 | Irvine, California 92612
Telephone: (949) 210-2400
13 | Facsimile: (949) 201-2405

14 | (Additional Counsel on Signature Page)

15 | Attorneys for Plaintiffs Aaron Braxton, Gia Gray,
Bryan Brown, Paul Martin, on behalf of
16 | themselves and all others similarly situated

17

UNITED STATES DISTRICT COURT

18

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

19

20 | AARON BRAXTON, GIA GRAY, BRYAN BROWN AND PAUL MARTIN, on behalf of themselves and all others similarly situated,

Case No. 3:22-cv-01748-JD
Honorable James Donato

21 | Plaintiffs,

**NOTICE OF LODGING THE *BRAXTON* PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF OPPOSITION TO THE MOTION FOR APPOINTMNENT OF INTERIM LEAD COUNSEL FILED BY GUSTAFSON GLUEK PLLC**

22 | vs.

23 | WELLS FARGO BANK, N.A., a Delaware corporation; WELLS FARGO HOME MORTGAGE, INC., a Delaware corporation; WELLS FARGO & CO., a Delaware corporation,

24 |

25 |

26 |

Date:    October 20, 2022
Time:    10:00 a.m.
Location :   Courtroom 11
         United States Courthouse
         450 Golden Gate Avenue
         San Francisco, CA  94102

27

28

1    TO THE HONORABLE JUDGE JAMES DONATO, AND TO ALL PARTIES AND

2    THEIR ATTORNEYS OF RECORD:

3    PLEASE TAKE NOTICE that on September 9, 2022, pursuant to Rules 42(a)(2) and

4    23(g)(3) of the Federal Rules of Civil Procedure, Plaintiffs Aaron Braxton, et al.'s Request for

5    Judicial Notice in Support of Opposition to the Motion for Appointment of Interim Lead Counsel

6    filed by Gustafson Gluek PLLC was Filed in the case of *Elretha Perkins, et al. vs. Wells Fargo*

7    *Bank, N.A., Wells Fargo Home Mortgage, Inc.*, Northern District of California, Case No. 3:22-cv-

8    03455-JD.

9    A true and correct copy of the Request for Judicial Notice in Support of Opposition to the

10   Motion for Appointment of Interim Lead Counsel Filed by Gustafson Gluek PLLC is hereby

11   lodged with this Court as Exhibit A to this Notice of Lodging.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF LODGING THE BRAXTON PLAINTIFFS' PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
OPPOSITION TO THE MOTION FOR APPOINTMENT OF INTERIM LEAD COUNSEL FILED BY GUSTAFSON GLUEK PLLC

1  DATED:  September 9, 2022

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP

By:  _____/s/ Dennis S. Ellis_____
     Dennis S. Ellis (SBN 178196)
     Trent B. Copeland (SBN 136890)
     Ryan Q. Keech (SBN 280306)
     Stefan Bogdanovich (SBN 324525)
     2121 Avenue of the Stars, Suite 3000
     Los Angeles, California 90067
     Telephone: (310) 274-7100
     Facsimile: (310) 275-5697
     Email:  dellis@egcfirm.com
             tcopeland@egcfirm.com
             rkeech@egcfirm.com
             sbogdanovich@egcfirm.com

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
     Noah S. Helpern (SBN 254023)
     Milin Chun (SBN 262674)
     801 South Figueroa Street, Suite 2000
     Los Angeles, California 90017
     Telephone: (213) 725-9800
     Facsimile: (213) 725-9808
     Email:  nhelpern@egcfirm.com
             mchun@egcfirm.com

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
     Joseph N. Kiefer (admitted *pro hac vice*) (NY Bar
     No. 5345657)
     157 West 57th Street, Suite 28 S
     New York, New York 10019
     Telephone: (212) 413-2600
     Facsimile: (212) 413-2629
     Email:  jkiefer@egcfirm.com

Attorneys for Plaintiffs Aaron Braxton, Gia Gray, Bryan
Brown, Paul Martin and all others similarly situated

DATED:  September 9, 2022

FRANK, SIMS & STOLPER LLP
     Jason M. Frank (SBN 190957)
     Scott H. Sims (SBN 234148)
     Andrew D. Stolper (SBN 205462)

By:  _____/s/ Jason Frank_____
     Jason Frank
Attorneys for Plaintiffs Aaron Braxton, Gia Gray, Bryan
Brown, Paul Martin and all others similarly situated

NOTICE OF LODGING THE BRAXTON PLAINTIFFS' PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF
OPPOSITION TO THE MOTION FOR APPOINTMENT OF INTERIM LEAD COUNSEL FILED BY GUSTAFSON GLUEK PLLC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ATTORNEY ATTESTATION**

Pursuant to Civil L.R. 5-1(h)(3), I hereby attest that concurrence in the filing of this document has been obtained from each of the other signatories.

*/s/ Dennis S. Ellis*
Dennis S. Ellis

NOTICE OF LODGING THE BRAXTON PLAINTIFFS' PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF OPPOSITION TO THE MOTION FOR APPOINTMENT OF INTERIM LEAD COUNSEL FILED BY GUSTAFSON GLUEK PLLC

# EXHIBIT A

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
Dennis S. Ellis (State Bar No. 178196)
    dellis@egcfirm.com
Trent Copeland (State Bar No. 136890)
    tcopeland@egcfirm.com
Ryan Q. Keech (State Bar No. 280306)
    rkeech@egcfirm.com
2121 Avenue of the Stars, 30th Floor
Los Angeles, California 90067
Telephone: (310) 274-7100; Facsimile: (310) 275-5697


FRANK SIMS & STOLPER LLP
Jason Frank (State Bar No. 190957)
    jfrank@lawfss.com
Scott H. Sims (State Bar No. 234148)
    ssims@lawfss.com
Andrew D. Stolper (State Bar No. 205462)
    astolper@lawfss.com
19800 MacArthur Blvd., Suite 855
Irvine, California 92612
Telephone: (949) 210-2400; Facsimile: (949) 201-2405

(Additional Counsel on Signature Page)

Attorneys for Plaintiffs Aaron Braxton, Gia Gray,
Bryan Brown, Paul Martin, on behalf of
themselves and all others similarly situated

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| AARON BRAXTON, GIA GRAY, BRYAN BROWN AND PAUL MARTIN, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>WELLS FARGO BANK, N.A., a Delaware corporation; WELLS FARGO HOME MORTGAGE, INC., a Delaware corporation; WELLS FARGO & CO., a Delaware corporation,<br><br>Defendants. | Case No. 3:22-cv-01748-JD<br>*(Related to Case No. 3:22-cv-00990-JD)*<br><br>Honorable James Donato<br><br>**THE BRAXTON PLAINTIFFS REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF OPPOSITION TO MOTION FOR APPOINTMNENT OF INTERIM LEAD COUNSEL FILED BY GUSTAFSON GLUEK PLLC**<br><br>Date:          October 20, 2022<br>Time:          10:00 a.m.<br>Location :   Courtroom 11<br>                    United States Courthouse<br>                    450 Golden Gate Avenue<br>                    San Francisco, CA  94102 |

2105490.1

Case No. 3:22-cv-01748-JD

A.      Plaintiffs Aaron Braxton et. al.'s Motion for Appointment of Interim Lead Counsel for a Putative Refinancing Class, filed on July 28, 2022 in the matter of *Braxton v. Wells Fargo*, Case No. 4:22-cv-01748-JD, at Dkt. 45, a true and correct copy of which is attached hereto as Exhibit A.

B.      The Declaration of Dennis S. Ellis in support of Plaintiffs Aaron Braxton et. al.'s Motion for Appointment of Interim Lead Counsel for a Putative Refinancing Class, filed on July 28, 2022 in the matter of *Braxton v. Wells Fargo*, Case No. 4:22-cv-01748-JD, at Dkt. 45-1, a true and correct copy of which is attached hereto as Exhibit B.

C.      The Declaration of Jason M. Frank in support of Plaintiffs Aaron Braxton et. al.'s Motion for Appointment of Interim Lead Counsel for a Putative Refinancing Class, filed on July 28, 2022 in the matter of *Braxton v. Wells Fargo*, Case No. 4:22-cv-01748-JD, at Dkt. 45-2, a true and correct copy of which is attached hereto as Exhibit C.

D.      Plaintiffs Aaron Braxton et. al.'s Opposition to Wells Fargo Bank, N.A. and Wells Fargo & Company's Motion to Consolidate, filed on August 26, 2022 in the matter of *Williams v. Wells Fargo*, Case No. 3:22-cv-00990-JD, at Dkt. 70, a true and correct copy of which is attached hereto as Exhibit D.

Rule 201 of the Federal Rules of Evidence authorizes a court to take judicial notice of a fact that is not subject to reasonable dispute because the fact "is either

(1)      generally known within the territorial jurisdiction of the trial court or

(2)      capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

"A trial court may presume that public records are authentic and trustworthy." *Gilbrook v. City of Westminster*, 177 F.3d 839, 858 (9th Cir. 1999). Courts therefore may take judicial notice of information "made publicly available by government entities." *Daniels-Hall v. Natl. Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010) (taking judicial notice of materials available on school district's website); *see also, e.g.*, *Gerritsen v. Warner Bros. Ent. Inc.*, 112 F. Supp. 3d 1011, 1033 (C.D. Cal. 2015) ("Under Rule 201, the court can take judicial notice of '[p]ublic records and government documents available from reliable sources on the Internet,' such as websites run by

1   governmental agencies."). The authenticity of each of the exhibits—all public records—cannot

2   reasonably be questioned. Judicial notice of these records is therefore appropriate.

3   "[C]ourt orders and filings are proper subjects of judicial notice." *CarMax Auto*

4   *Superstores California LLC v. Hernandez*, 94 F. Supp. 3d 1078, 1087 (C.D. Cal. 2015); *see also,*

5   *e.g.*, *Colony Cove Properties, LLC v. City of Carson*, 640 F.3d 948, 955 n.3 (9th Cir. 2011) (taking

6   judicial notice of petition for writ of mandamus and orders filed in Los Angeles Superior Court);

7   *Louis v. McCormick & Schmick Rest. Corp.*, 460 F. Supp. 2d 1153, 1156 n.4 (C.D. Cal. 2006)

8   (taking judicial notice of Los Angeles Superior Court order granting motion for judgment on the

9   pleadings). Each of the exhibits is also subject to judicial notice for this reason.

10   Finally, "[m]aterials from a proceeding in another tribunal are appropriate for judicial

11   notice." *Biggs v. Terhune*, 334 F.3d 910, 916 n.3 (9th Cir. 2003), *overruled on other grounds by*

12   *Hayward v. Marshall*, 603 F.3d 546 (9th Cir. 2010) (taking judicial notice of transcript from

13   hearing before Board of Prison Terms). This includes taking judicial notice of transcripts from

14   prior court hearings. *E.g. Williams v. Yamaha Motor Corp., U.S.A.*, 106 F. Supp. 3d 1101, 1107

15   n.8 (C.D. Cal. 2015) (taking judicial notice of "transcript of the Court's hearing on Defendant's

16   previous motion to dismiss"); *Diaz v. Carlson*, 5 F. Supp. 2d 809, 814 n.4 (C.D. Cal. 1997) ("the

17   court takes judicial notice pursuant to Fed.R.Evid. 201 of the transcript of the administrative

18   hearing testimony and the California Supreme Court's order denying plaintiff's petition for

19   review"). Judicial notice of the attached exhibits is therefore proper for this reason too.

20   Accordingly, for the foregoing reasons, this Court should take judicial notice of Exhibits A

21   through D.

22

23

24

25

26

27

28

2105490.1

-2-                                      Case No. 3:22-cv-01748-JD

THE BRAXTON PLAINTIFFS REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF OPPOSITION TO
MOTION FOR APPOINTMNENT OF INTERIM LEAD COUNSEL FILED BY GUSTAFSON GLUEK PLLC

1  DATED:  September 9, 2022                    ELLIS GEORGE CIPOLLONE
2                                               O'BRIEN ANNAGUEY LLP

3                                               By:      /s/Dennis S. Ellis
4                                                   Dennis S. Ellis (SBN 178196)
                                                    Trent Copeland (SBN 136890)
5                                                   Ryan Q. Keech (SBN 280306)
                                                    Stefan Bogdanovich (SBN 324525)
6                                                   2121 Avenue of the Stars, 30th Floor
                                                    Los Angeles, California 90067
7                                                   Telephone: (310) 274-7100
                                                    Facsimile: (310) 275-5697
8                                                   Email:  dellis@egcfirm.com
9                                                           tcopeland@egcfirm.com
                                                            rkeech@egcfirm.com
10                                                          sbogdanovich@egcfirm.com

11                                              ELLIS GEORGE CIPOLLONE
12                                              O'BRIEN ANNAGUEY LLP
                                                    Noah S. Helpern (SBN 254023)
13                                                  Milin Chun (SBN 262674)
                                                    801 South Figueroa Street, Suite 2000
14                                                  Los Angeles, California 90017
                                                    Telephone: (213) 725-9800
15                                                  Facsimile: (213) 725-9808
16                                                  Email:  nhelpern@egcfirm.com
                                                            mchun@egcfirm.com
17

18                                              ELLIS GEORGE CIPOLLONE
                                                O'BRIEN ANNAGUEY LLP
19                                                  Joseph N. Kiefer (*pro hac vice forthcoming*) (NY
                                                    Bar No. 5345657)
20                                                  157 West 57th Street, Suite 28 S
                                                    New York, New York 10019
21                                                  Telephone: (212) 413-2600
                                                    Facsimile: (212) 413-2629
22                                                  Email:  jkiefer@egcfirm.com
23

                                                Attorneys for Plaintiffs Aaron Braxton, Gia Gray, Bryan
24                                              Brown, Paul Martin and all others similarly situated

25

26

27

28

2105490.1

THE BRAXTON PLAINTIFFS REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF OPPOSITION TO
MOTION FOR APPOINTMNENT OF INTERIM LEAD COUNSEL FILED BY GUSTAFSON GLUEK PLLC

1   DATED:  September 9, 2022                    FRANK, SIMS & STOLPER LLP
2                                                   Jason M. Frank (SBN 190957)
                                                    Scott H. Sims (SBN 234148)
3                                                   Andrew D. Stolper (SBN 205462)

4
                                                 By:  _____/s/ Jason Frank_____
5                                                        Jason Frank
                                                 Attorneys for Plaintiffs Aaron Braxton, Gia Gray, Bryan
6                                                Brown, Paul Martin and all others similarly situated

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ATTORNEY ATTESTATION**

Pursuant to Civil L.R. 5-1(h)(3), I hereby attest that concurrence in the filing of this document has been obtained from each of the other signatories.

*/s/ Dennis S. Ellis*

2105490.1

-5-                                                                    Case No. 3:22-cv-01748-JD

THE BRAXTON PLAINTIFFS REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF OPPOSITION TO
MOTION FOR APPOINTMNENT OF INTERIM LEAD COUNSEL FILED BY GUSTAFSON GLUEK PLLC

# EXHIBIT A

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
Dennis S. Ellis (State Bar No. 178196)
 dellis@egcfirm.com
Trent B. Copeland (State Bar No. 136890)
 tcopeland@egcfirm.com
Ryan Q. Keech (State Bar No. 280306)
 rkeech@egcfirm.com
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697

FRANK SIMS & STOLPER LLP
Jason Frank (State Bar No. 190957)
 jfrank@lawfss.com
Scott H. Sims (State Bar No. 234148)
 ssims@lawfss.com
Andrew D. Stolper (State Bar No. 205462)
 astolper@lawfss.com
19800 MacArthur Blvd., Suite 855
Irvine, California 92612
Telephone: (949) 210-2400
Facsimile: (949) 201-2405

(Additional Counsel on Signature Page)

Attorneys for Plaintiffs Aaron Braxton,
Gia Gray, Bryan Brown, Paul Martin, on
behalf of themselves and all others
similarly situated

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| AARON BRAXTON, GIA GRAY, BRYAN BROWN AND PAUL MARTIN, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>WELLS FARGO BANK, N.A., a Delaware corporation; WELLS FARGO HOME MORTGAGE, INC., a Delaware corporation; WELLS FARGO & CO., a Delaware corporation, | Case No. 4:22-cv-01748-JD<br><br>Honorable James Donato<br><br>**PLAINTIFFS AARON BRAXTON, ET AL.'S MOTION FOR APPOINTMENT OF INTERIM COUNSEL FOR A PUTATIVE REFINANCING CLASS**<br><br>Date:      September 1, 2022<br>Time:      10:00 a.m.<br>Location : Courtroom 11<br>              United States Courthouse,<br>              450 Golden Avenue<br>              San Francisco, CA |

# NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on September 1, 2022, at 10:00 a.m. in Courtroom 11, 19th Floor of the United States District Court for the Northern District of California, San Francisco Division, located at 450 Golden Gate Avenue, California 94102, Plaintiffs Aaron Braxton, Gia Gray, Bryan Brown, Paul Martin ("Plaintiffs"), will move the Court for appointment of interim counsel for a putative class consisting of Black homeowners who submitted refinancing applications to Wells Fargo and were allegedly discriminated against by Wells Fargo as a result of their race (the "Putative Refinancing Class").

Pursuant to Rules 42(a)(2) and 23(g)(3) of the Federal Rules of Civil Procedure, Plaintiffs move for the appointment of Dennis S. Ellis of Ellis George Cipollone O'Brien Annaguey, LLP ("EGC") and Jason M. Frank of Frank Sims & Stolper, LLP ("FSS") to serve as interim counsel on behalf of the Putative Refinancing Class

Plaintiffs' motion is based on this notice, the memorandum of points and authorities that follows, the pleadings on file herein, the accompanying Declarations of Dennis S. Ellis and Jason M. Frank, the proposed order, and such other matters as the Court may consider.

1  DATED:  July 28, 2022

2

3  By:

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP

By:      */s/ Dennis S. Ellis*
Dennis S. Ellis (SBN 178196)
Trent B. Copeland (SBN 136890)
Ryan Q. Keech (SBN 280306)
Stefan Bogdanovich (SBN 324525)
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697
Email:  dellis@egcfirm.com
         tcopeland@egcfirm.com
         rkeech@egcfirm.com
         sbogdanovich@egcfirm.com

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
Noah S. Helpern (SBN 254023)
Milin Chun (SBN 262674)
801 South Figueroa Street, Suite 2000
Los Angeles, California 90017
Telephone: (213) 725-9800
Facsimile: (213) 725-9808
Email:  nhelpern@egcfirm.com
         mchun@egcfirm.com

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
Joseph N. Kiefer (admitted *pro hac vice*)
(NY Bar No. 5345657)
157 West 57th Street, Suite 28 S
New York, New York 10019
Telephone: (212) 413-2600
Facsimile: (212) 413-2629
Email:  jkiefer@egcfirm.com

Attorneys for Plaintiffs Aaron Braxton, Gia
Gray, Bryan Brown, Paul Martin and all others
similarly situated

PLAINTIFFS AARON BRAXTON, ET AL.'S MOTION FOR APPOINTMENT OF INTERIM COUNSEL
FOR A PUTATIVE REFINANCING CLASS

DATED:  July 28, 2022

FRANK, SIMS & STOLPER LLP
    Jason M. Frank (SBN 190957)
    Scott H. Sims (SBN 234148)
    Andrew D. Stolper (SBN 205462)

By: _____*/s/ Jason Frank*_____
        Jason Frank
Attorneys for Plaintiffs Aaron Braxton, Gia
Gray, Bryan Brown, Paul Martin and all others
similarly situated

# STATEMENT OF ISSUES TO BE DECIDED

1.      Should the Court appoint Dennis S. Ellis of EGC and Jason M. Frank of FSS as interim counsel for the Putative Refinancing Class pursuant to Federal Rule of Civil Procedure 23(g)?

PLAINTIFFS AARON BRAXTON, ET AL.'S MOTION FOR APPOINTMENT OF INTERIM COUNSEL
FOR A PUTATIVE REFINANCING CLASS

# <u>TABLE OF CONTENTS</u>

**Page(s)**

I.    INTRODUCTION ................................................................................ 1

II.   RELEVANT PROCEDURAL BACKGROUND ............................................ 3

III.  LEGAL STANDARD ........................................................................... 6

IV.  ARGUMENT ..................................................................................... 7

    A.    Selecting Interim Counsel At This Time Is Necessary and Appropriate to Protect the Interests of the Putative Refinancing Class ............................................................................. 7

    B.    The Court Should Appoint The *Braxton* Firms as Interim Counsel ........................................................................... 8

        1.    As the First to File a Refinance-Focused Complaint, the *Braxton* Firms Have Put In Significant Work Identifying And Investigating The Potential Claims Specific to the Putative Refinancing Class ............................................ 8

        2.    The *Braxton* Firms Are Experienced In Both Prosecuting *And* Defending Class Actions ..................................... 11

        3.    The *Braxton* Firms Are Willing To Commit Significant Resources To This Case ............................................. 15

V.    CONCLUSION .................................................................................. 15

PLAINTIFFS AARON BRAXTON, ET AL.'S MOTION FOR APPOINTMENT OF INTERIM COUNSEL FOR A POTENTIAL REFINANCING CLASS

1

2

# <u>TABLE OF AUTHORITIES</u>

3

**Page(s)**

4

# <u>CASES</u>

5

6

*Azpeitia v. Tesoro Ref. & Mktg. Co. LLC*,
 No. 17-CV-00123-JST, 2017 WL 4071368 (N.D. Cal. Sept. 14, 2017)............... 6

7

*Cadena v. Am. Honda Motor Co.*,
 2020 WL 3107798 (C.D. Cal. June 9, 2020).................................................... 9, 10

8

9

*Case v. Merlin Ents. Grp. U.S. Holdings Inc.*,
 2021 WL 1195813 (S.D. Cal. Mar. 30, 2021) ......................................................... 9

10

11

*Ebo v. Wells Fargo Bank, N.A.*,
 No. 22-cv-02535-SK .......................................................................................... 1, 5

12

13

*Guido v. L'Oreal, USA, Inc.*,
 2013 WL 454861 (C.D. Cal. Feb. 6, 2013) ......................................................... 11

14

15

*In re Apple Inc. S'holder Derivative Litig.*,
 No. 19-CV-05153-YGR, 2020 WL 3507426 (N.D. Cal. June 29, 2020) ............. 8

16

17

*In re Cree, Inc. Securities Litig.*,
 219 F.R.D. 369 (M.D.N.C. 2003)........................................................................ 11

18

19

*In re GSE Bonds Antitrust Litig.*,
 377 F. Supp. 3d 437 (S.D.N.Y. 2019) ................................................................. 10

20

21

*In re Mun. Derivatives Antitrust Litig.*,
 252 F.R.D. 184 (S.D.N.Y. 2008)........................................................................ 15

22

*In re Seagate Tech. LLC Litig.*,
 No. 16-CV-00523-RMW, 2016 WL 3401989 (N.D. Cal. June 21, 2016)............. 6

23

24

*In re Terazosin Hydrochloride Antitrust Litig.*,
 220 F.R.D. 672 (S.D. Fla. 2004) ........................................................................ 11

25

26

*LeBeau v. U.S.*,
 222 F.R.D. 613 (D.S.D. 2004)............................................................................ 15

27

28

*Lowery v. Spotify USA Inc.*,
 2016 WL 6818756 (C.D. Cal. May 23, 2016).................................................... 9

*Perkins, et al. v. Wells Fargo, N.A.,*,
    No. 22-cv-03455-CRB ........................................................................ 1, 5

*Parrish v. Nat'l Football League Players Inc.,*
    No. C 07-00943 WHA, 2007 WL 1624601 (N.D. Cal. June 4, 2007).................. 8

*Pope v. Wells Fargo Bank, N.A.,*
    No. 22-cv-01793-JD ................................................................... 1, 4, 5

*Potzner v. Tommie Copper Inc.,*
    2016 WL 304746 (S.D.N.Y. Jan. 4, 2016) ............................................ 9

*Robbins v. Phillips 66 Co.,*
    2019 WL 13119275 (N.D. Cal. Aug. 8, 2019) ........................................ 8

*Smallman v. MGM Resorts Int'l,*
    2021 WL 326135 (D. Nev. Feb. 1, 2021)............................................. 8

*Stringer v. Combe, Inc.,*
    No. 17-CV-03192-WHO, 2017 WL 6539779 (N.D. Cal. Dec. 21, 2017) ........... 11

*Thomas v. Wells Fargo Bank, N.A.,*
    No. 22-cv-01931-CRB ................................................................ 1, 5, 6

*Tolmasoff v. Gen. Motors, LLC,*
    No. 16-11747, 2016 WL 3548219 (E.D. Mich. June 30, 2016)........................... 8

*Williams v. Wells Fargo Bank, N.A.,*
    No. 22-cv-0090-JD ............................................................ 1, 2, 4, 6, 8

# TABLE OF AUTHORITIES (*continued*)

**Page(s)**

**STATUTES**

California Unfair Competition Law .......................................................................... 11

**RULES**

Fed. R. Civ. P. 23 .............................................................................................. 6, 11

Fed. R. Civ. P. 23(g) .................................................................................... 7, 11, 15

Fed. R. Civ. P. 23(g)(1)(A) ..................................................................................... 6

Fed. R. Civ. P. 23(g)(2) ................................................................................... 7, 11

Fed. R. Civ. P. 23(g)(3) ........................................................................................... 6

**OTHER AUTHORITIES**

*Appointment of Class Counsel,*
   7B Fed. Prac. & Proc. Civ. § 1802.3 (3d ed.) ................................................... 6

Manual for Complex Litigation (Fourth) § 21.11 (2004) ........................................ 6

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

The Court should appoint Dennis S. Ellis of Ellis George Cipollone O'Brien Annaguey LLP ("EGC") and Jason M. Frank of Frank, Sims & Stolper LLP ("FSS") (collectively the "*Braxton* Firms") as interim counsel for a putative class consisting of Black homeowners who submitted refinancing applications to Wells Fargo and were allegedly discriminated against by Wells Fargo as a result of their race (the "Putative Refinancing Class").  The *Braxton* Firms were the first to file on behalf of a Putative Refinancing Class, have performed an extensive investigation related to that specific putative class, and seek to be appointed interim counsel solely on behalf of that specific putative class.  This is evidenced by paragraph 146 of the First Amended Complaint ("FAC") filed in this action.  The *Braxton* firms do ***not*** seek to be appointed interim counsel for prospective borrowers who were allegedly discriminated against outside the refinancing process (*e.g.*, in the home loan origination process, where prospective buyers seek purchase money loans), nor do they seek to represent non-Black homeowners allegedly discriminated against on grounds of race (*e.g.*, Hispanic or Latino homeowners).[1]

Appointment of interim counsel for the Putative Refinancing Class is consistent with this Court's prior order denying Wells Fargo's motion to dismiss this refinance-only *Braxton* action based on the related *Williams* action, which seeks relief on behalf of a significantly broader putative class of Black Americans who applied for, received, or maintained credit from Wells Fargo related to residential

---

[1] *See Williams v. Wells Fargo Bank, N.A.*, Case No. 22-cv-0090 (not limited to refinance applicants or time period); *Pope v. Wells Fargo Bank, N.A.*, Case No. 3:22-cv-01793-JD (not limited to Black homeowners); *Thomas v. Wells Fargo Bank, N.A.*, Case No.3: 22-cv-01931-CRB (not limited to Black homeowners); *Ebo v. Wells Fargo Bank, N.A.*, Case No. 22-cv-02535-SK (not limited to refinance applicants or time period); *Perkins, et al. v. Wells Fargo, N.A.*, case no. 22-cv-03455 (not limited to Black homeowners).

1   real estate.  Dkt. 44.  This Court held "[t]he cases are sufficiently similar for

2   purposes of relation under the District[']s local rules, but not so similar that *Braxton*

3   is subsumed in *Williams*."  *Id.*  Appointment of interim counsel is also necessary

4   because the Putative Refinancing Class will benefit from having independent and

5   specific counsel appointed to prosecute the litigation on their behalf and pursuing

6   solely their interests, just as loan origination plaintiffs or non-Black minority

7   borrowers will benefit from having their own independent and specific counsel

8   pursuing solely their interests.  Appointing interim counsel will best position the

9   Putative Refinancing Class to obtain class certification and avoid they delay the that

10  Class will likely suffer if they are lumped into broader proceedings related to

11  differently-situated borrowers.

12      The *Braxton* Firms are uniquely positioned and qualified to act as interim

13  counsel representing the interests of the Putative Refinancing Class.  They have

14  invested and continue to invest significant time and resources solely on behalf of the

15  Putative Refinancing Class.  Their work has included interviewing dozens of

16  confidential informants with knowledge of Wells Fargo's refinance operations;

17  developing an initial understanding of Wells Fargo's underwriting algorithm and

18  identifying and investigating the algorithm's differences based on the type of loan,

19  specifically loan origination (purchase money loans) versus refinance; consulting

20  with experts with domain expertise in algorithmic modeling and discriminatory

21  biases associated with artificial intelligence and machine learning; analyzing Wells

22  Fargo's COVID-19 era algorithmic overlays; examining Wells Fargo's appraisal

23  process and its discriminatory impact on the Putative Refinancing Class; and

24  interviewing members of the Putative Refinancing Class.

25      The *Braxton* Firms also bring a blend of experience that will maximize the

26  odds of a successful resolution for the Putative Refinancing Class.  The *Braxton*

27  Firms consist almost exclusively of former "big firm" lawyers who have recovered

28  well over $1 billion on behalf of their plaintiff clients in class action and other

PLAINTIFFS AARON BRAXTON, ET AL.'S MOTION FOR APPOINTMENT OF INTERIM COUNSEL
FOR A PUTATIVE REFINANCING CLASS

complex litigation, including recent class action litigation against Wells Fargo in the Central District of California in which Wells Fargo was represented by the same lawyers representing it here.

But the *Braxton* Firms' experience is not limited to prosecuting class actions. The *Braxton* Firms also have substantial experience defending class actions. Messrs. Ellis and Frank are both former equity partners at Paul Hastings LLP, where Mr. Ellis served as the Global Chair of the firm's Complex Litigation Practice for more than a decade and Mr. Frank served as one of the leaders of the firm's global class action team. This experience in having prosecuted *and* defended class actions will allow the *Braxton* Firms to blend their plaintiff-side class action experience with their knowledge of the "defense playbook" and provide the best possible representation of the Putative Refinancing Class.[2]

Accordingly, the *Braxton* Plaintiffs and their counsel request that this Motion be granted.

## II.  RELEVANT PROCEDURAL BACKGROUND

On March 18, 2022, Plaintiff Aaron Braxton and the *Braxton* Firms filed the first putative class action against Wells Fargo on behalf of Black homeowners who had submitted refinance applications to Wells Fargo and were harmed by Wells Fargo's alleged race-based discrimination. Dkt. 1. Since then, the *Braxton* Plaintiffs have filed their FAC. Dkt. 14. The FAC provides a detailed account of Wells Fargo's COVID-19 era refinancing application process and its increased reliance on algorithms and Wells Fargo's CORE automated underwriting system. *Id*. at ¶¶ 70-78. The FAC alleges that Wells Fargo's automated underwriting system was increasingly infected with explicit and implicit racial signals (so-called "overlays") that had, as their proximate and likely result, the disparate impact

---

[2] The *Braxton* Firms are not suggesting that alternative counsel are not well qualified. The *Braxton* Firms, however, submit that their blend of experience focused exclusively on the Putative Refinancing Class will provide the best possible representation for that Class here.

reflected in the statistical analyses identified in the FAC. *Id*. at ¶¶ 79-91. The FAC also draws on confidential informants to describe Wells Fargo's failure to control for discriminatory practices. *Id*. at ¶¶ 82, 91, 101 103-05.

In addition to this *Braxton* action, five additional putative class actions are pending in this District in which the plaintiff seeks to represent Black homeowners allegedly discriminated against by Wells Fargo. The cases are:

- *Williams v. Wells Fargo Bank, N.A.*, case no. 3:22-cv-0090-JD: As originally filed on February 17, 2022, the plaintiffs in *Williams* sought to represent a putative class of African Americans who applied for credit related to residential real estate and who were subjected to discrimination by Defendants due to their race. Declaration of Dennis S. Ellis ("Ellis Decl."), Ex. C, ¶ 19. The original *Williams* Complaint did not include allegations related to discrimination in the refinancing process; allegations related to refinancing were added in an amended complaint filed *after* the *Braxton* action was filed. *Compare* Ellis Decl., Ex. A *with* Ex. D. The putative class in the operative amended *Williams* complaint is not limited to homeowners seeking to refinance. This Court related the *Williams* and *Braxton* actions on June 9, 2022, but denied Wells Fargo's motion to dismiss *Braxton* on grounds of the pending *Williams* action, noting

> [t]he *Williams* action involves a proposed class of African American applicants who applied for, received, or maintained credit from Wells Fargo related to residential real estate, while the *Braxton* action involves a proposed class of African American homeowners who submitted applications to refinance their home mortgages. The cases are sufficiently similar for purposes of relation under the District's local rules, but not so similar that *Braxton* is subsumed in *Williams*.

Dkts. 37, 44.

- *Pope v. Wells Fargo Bank, N.A.*, case no. 3:22-cv-01793-JD: Filed on March 21, 2022 and then amended on March 25, 2022– *i.e.*, after the *Braxton* action – the plaintiff in *Pope* seeks to represent all minority borrowers who were allegedly discriminated against by Wells Fargo in the refinance process. Ellis Decl., Ex. E, ¶

34.  In other words, although the *Pope* action is limited to refinancing, it extends to all minority borrowers, not just Black borrowers.

•   *Thomas v. Wells Fargo Bank, N.A.*, case no. 3:22-cv-01931-CRB: The *Thomas* action was filed on March 26, 2022, after the *Braxton* action.  Ellis Decl., Ex. F.  The *Thomas* action was filed by the same lawyers and law firms as the *Pope* action.  The complaint in *Thomas* is word-for-word identical to the complaint in *Pope*, other than differing allegations related to the named plaintiffs in the two cases and grammatical edits related thereto.  *Compare* Ellis Decl., Ex. E *with* Ex. F.  Thus, although the *Thomas* action is limited to refinancing, it extends to all minority borrowers, not just Black borrowers  The *Thomas* action is currently pending before Judge Breyer in this District and has not been related to any other cases in this District.  To the best of the *Braxton* Plaintiffs' knowledge, the *Thomas* complaint has not been served on Wells Fargo.  Ellis Decl., ¶ 4.c.

•   *Ebo v. Wells Fargo Bank, N.A.*, case no. 3:22-cv-02535-SK:  After originally filing suit on April 5, 2022, in the Eastern District of New York[3], the *Ebo* action was filed in the Northern District of California on April 26, 2022, after the *Braxton* action.  Ellis Decl., Ex. G.  The *Ebo* proposed class is limited to Black borrowers, but extends to all types of loans related to residential real property.  *Id.*, Ex. G at ¶ 50.

•   *Perkins, et al. v. Wells Fargo, N.A.*, case no. 3:22-cv-03455-CRB:  The *Perkins* action was filed on June 10, 2022 and seeks to represent a putative class consisting of all racial minorities who submitted, or attempted to submit, an application to finance *or* refinance their home mortgage.  Ellis Decl., Ex. H at ¶ 56.  In other words, *Perkins* is not limited to refinancing applicants or limited to Black borrowers.

---

[3] The matter was voluntarily dismissed by Plaintiffs on April 29, 2022.

PLAINTIFFS AARON BRAXTON, ET AL.'S MOTION FOR APPOINTMENT OF INTERIM COUNSEL
FOR A PUTATIVE REFINANCING CLASS

1    As of the filing of this motion, this Court has related *Braxton*, *Pope*, *Ebo*, and
2    *Perkins* to the *Williams* action, such that all five actions are pending before this
3    Court.  Ellis Decl., at ¶ 5.  The *Braxton* Firms also understand that, upon being
4    served, Wells Fargo intends to seek relation of the *Thomas* case.  *Id.*

5    ## III.   LEGAL STANDARD

6    "The court may designate interim counsel to act on behalf of a putative class
7    before determining whether to certify the action as a class action."  Fed. R. Civ. P.
8    23(g)(3).  This rule "authorizes [a] court to designate interim counsel during the pre-
9    certification period if necessary to protect the interests of the putative class."  Fed.
10   R. Civ. P. 23 advisory committee's note to 2003 amendment.  It recognizes that "it
11   will usually be important for an attorney to take action to prepare for the
12   certification decision" and thus that designation of interim counsel may be necessary
13   due to "rivalry or uncertainty."  *Id.*; *Azpeitia v. Tesoro Ref. & Mktg. Co. LLC*, No.
14   17-CV-00123-JST, 2017 WL 4071368, at *2 (N.D. Cal. Sept. 14, 2017) (stating that
15   this rule "authorizes [a] court to designate interim counsel during the pre-
16   certification period if necessary to protect the interests of the putative class").
17   Doing so "clarifies responsibility for protecting the interests of the class during
18   precertification activities."  Manual for Complex Litigation (Fourth) § 21.11 (2004).

19   "Although Rule 23(g)(3) does not provide a standard for appointment of
20   interim counsel, courts typically look to the factors used in determining the
21   adequacy of class counsel under Rule 23(g)(1)(A)."  *In re Seagate Tech. LLC Litig.*,
22   No. 16-CV-00523-RMW, 2016 WL 3401989, at *2 (N.D. Cal. June 21, 2016).
23   These are "(1) the work counsel has done in identifying or investigating the
24   potential claims in the action; (2) counsel's experience in handling class actions,
25   complex litigation, and the types of claim asserted in the action; (3) counsel's
26   knowledge of the applicable law; and (4) the resources that counsel will commit to
27   representing the class."  Fed. R. Civ. P. 23(g)(1)(A).  "But these considerations are
28   not exclusive.'"  Wright & Miller, *Appointment of Class Counsel*, 7B Fed. Prac. &

-6-

PLAINTIFFS AARON BRAXTON, ET AL.'S MOTION FOR APPOINTMENT OF INTERIM COUNSEL
FOR A PUTATIVE REFINANCING CLASS

Proc. Civ. § 1802.3 (3d ed.)  The Court also "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(2).

## IV.    ARGUMENT

### A.    SELECTING INTERIM COUNSEL AT THIS TIME IS NECESSARY AND APPROPRIATE TO PROTECT THE INTERESTS OF THE PUTATIVE REFINANCING CLASS

Appointing interim counsel here pursuant to Rule 23(g) is necessary and appropriate to protect the Putative Refinancing Class.  That is the case for at least two reasons.

*First*, the members of the Putative Refinancing Class will be prejudiced if they are lumped in with a broader class, including loan origination applicants who applied for purchase money loans and/or non-Black applicants.  The Potential Refinancing Class is, simply put, differently situated than purchase money loan customers.  For example, all members of the Putative Refinancing Class were already deemed sufficiently creditworthy to obtain a home loan, and thus unlike classes including prospective homeowners seeking a purchase money loan.  This distinction will require separate discovery for a purchase loan class as compared to a refinancing class.  Further, purchase money loans are non-recourse loans, whereas refinanced home loans are not.  Also, the damages model for the Putative Refinancing Class differs from that for consumers who applied for purchase money loans.  Thus, if the Putative Refinancing Class is lumped in with the loan origination plaintiffs, it will lead to delays as a result of unrelated discovery disputes unique to the loan origination plaintiffs and will materially and detrimentally affect the Putative Refinancing Class's odds of obtaining class certification.

Likewise, Black refinance applicants are differently situated than non-Black applicants because the algorithm and underwriting process allegedly discriminated against them on the basis of them being Black, not simply as a result of them being in a minority group.  Wells Fargo may well have discriminated against other

minority groups, but that will require a distinct and different analysis than the one to be undertaken on behalf of Black refinance applicants.  Given these differences, separate and independent counsel for the Putative Refinancing Class is necessary and appropriate, whoever that counsel may be.

*Second*, appointment of interim counsel for the Putative Refinancing Class is appropriate because a rivalry has emerged between firms attempting to represent members of that putative Class.  For example, counsel in the  related *Williams* action previously took the position that "the *Braxton* case could be stayed or dismissed." *Williams*  Dkt. 40 at p. 2.  Thus, "[i]n the present case, appointing interim class counsel is appropriate… two teams of attorneys are competing to represent the putative class." *Smallman v. MGM Resorts Int'l*, 2021 WL 326135, at *2 (D. Nev. Feb. 1, 2021) (citing *Parrish v. Nat'l Football League Players Inc*., No. C 07-00943 WHA, 2007 WL 1624601, at *9 (N.D. Cal. June 4, 2007) (stating that interim counsel may be appointed where there is "a gaggle of law firms jockeying to be appointed class counsel"); *see also Tolmasoff v. Gen. Motors, LLC*, No. 16-11747, 2016 WL 3548219, at *9 (E.D. Mich. June 30, 2016) (stating that "interim counsel is particularly appropriate when a number of lawyers have filed related 'copycat' actions" (citation omitted)).

**B.**  **THE COURT SHOULD APPOINT THE *BRAXTON* FIRMS AS INTERIM COUNSEL**

**1.**  **As the First to File a Refinance-Focused Complaint, the *Braxton* Firms Have Put In Significant Work Identifying And Investigating The Potential Claims Specific to the Putative Refinancing Class**

The *Braxton* Firms were the first to file[4] a class action alleging that Black borrowers were discriminated against in ***the home loan refinancing process***.  As

---

[4]  "Courts have held that the first-to-file factor may be considered an 'objective tie-breaker' in appointing lead counsel" in close cases.  *In re Apple Inc. S'holder Derivative Litig*., No. 19-CV-05153-YGR, 2020 WL 3507426, at *1, n.2 (N.D. Cal. June 29, 2020); *see also Robbins v. Phillips 66 Co*., 2019 WL 13119275, at *3 (N.D. Cal. Aug. 8, 2019) ("The only factor that separates the two is that the [firm A] has

reflected by the comprehensive FAC filed in *Braxton*, the *Braxton* Firms have performed substantial work in building a case focusing on Wells Fargo's specific set of policies and practices relating to refinance applications and its discriminatory impact on Black borrowers.  In appointing interim lead counsel, courts evaluate "[t]he quality of pleadings [to help] determin[e] counsel's ability and adequacy to represent the interests of the class."  *Case v. Merlin Ents. Grp. U.S. Holdings Inc*., 2021 WL 1195813, at *5 (S.D. Cal. Mar. 30, 2021); *see also Cadena v. Am. Honda Motor Co*., 2020 WL 3107798, at *4 (C.D. Cal. June 9, 2020) (selecting as interim lead counsel the two firms that prepared the most "detailed complaints."); *Potzner v. Tommie Copper Inc*., 2016 WL 304746, at *1 (S.D.N.Y. Jan. 4, 2016) ("As reflected in the detailed 86–page complaint filed in the Lucero action, Faruqi and Marron have done more work than Cuneo and Lockridge to investigate and identify potential claims in this action.  In addition to being more specifically pleaded, the Lucero complaint asserts a more comprehensive set of theories of liability than the Potzner complaint and is more factually developed.").

In preparing its case against Wells Fargo, the *Braxton* Firms interviewed several confidential informants, which revealed (1) that the bank collects "key geographic, financial, and demographic data" and processes them in a CORE algorithm, (2) that Wells Fargo management got real-time data about how its policies were worsening racial disparities, and (3) that, rather than rectifying the problem, management pressured loan officers to increasingly rely on these discriminatory algorithms.  Ellis Decl., ¶ 6, Ex. B at ¶¶ 70-78, 103-105; *see Lowery v. Spotify USA Inc.*, 2016 WL 6818756, at *3 (C.D. Cal. May 23, 2016) (Court selected as interim lead counsel the two firms that "interviewed numerous industry participants to confirm the theory of the case, develop the allegations, and

_____

been involved in this litigation from the outset. [Firm A] filed the [] matter first… they therefore will be appointed as interim class counsel.").

PLAINTIFFS AARON BRAXTON, ET AL.'S MOTION FOR APPOINTMENT OF INTERIM COUNSEL
FOR A PUTATIVE REFINANCING CLASS

1  understand the industry.")  This research is reflected in the *Braxton* FAC, which

2  goes into great detail discussing how the algorithm's use of geographic indicators,

3  Bayesian Improved Surname Geocoding (which were used as demographic

4  indicators), post-close liquidity requirements, uncorrected and racially-based home

5  appraisals, and indefensibly high FICO requirements can cause disparate racial

6  disparities and impact.  *Id*. at ¶¶ 82-92.  At the heart of the Wells Fargo process

7  challenged in *Braxton* is a new online mortgage application and associated tools and

8  the manner in which Wells Fargo supervised (or failed to supervise) the operation of

9  these data collection and review processes.  *Id*. at ¶¶ 82-91, 100-105.

10      The *Braxton* Firms also interviewed scores of Black victims and listened to

11  their stories.  *See Cadena*, *supra*,  2020 WL 3107798, at *5 (selecting as interim

12  lead counsel the two firms that "interviewed approximately 80 putative class

13  members as part of an ongoing independent investigation of Plaintiffs' claims.").  In

14  the process, the *Braxton* Firms were retained by compelling lead plaintiffs that

15  include a Hollywood executive, a medical doctor, an award-winning playwright and

16  actor, and a real estate entrepreneur.  Ellis Decl., ¶ 6, Ex. B at ¶¶ 26-44.  The

17  *Braxton* Firms have further consulted with experts with domain expertise in

18  algorithmic modeling and discriminatory biases associated with artificial

19  intelligence and machine learning, consulted with civil rights and housing

20  organizations seeking to support the *Braxton* Plaintiffs, and engaged a highly-

21  regarded damages expert to assist the class on analyzing damages and the value of

22  other non-monetary relief.  Ellis Decl., ¶ 8.  The *Braxton* Firms' work in this case so

23  far reflects the care and commitment they have devoted, and will continue to devote,

24  to this litigation and the Putative Refinancing Class.

25      In addition, the first-filed *Braxton* complaint spurred the filing of all the

26  subsequent refinancing complaints, further supporting the appropriateness of

27  appointing the *Braxton* Firms as lead counsel.  *In re GSE Bonds Antitrust Litig.*, 377

28  F. Supp. 3d 437, 438 (S.D.N.Y. 2019) ("the Scott/Lowey complaint is clearly the

template for the great majority of the cases filed since and… weighs in favor of appointment.")

### 2. The *Braxton* Firms Are Experienced In Both Prosecuting *And* Defending Class Actions

Courts applying Rule 23(g) emphasize proposed class counsel's experience and knowledge of the applicable law. *See, e.g., In re Cree, Inc. Securities Litig.*, 219 F.R.D. 369, 373 (M.D.N.C. 2003) (appointing class counsel in securities case where firm had "extensive experience in representing institutional investors in securities actions throughout the country and ... long been heavily engaged in securities and corporate litigation"); *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 702 (S.D. Fla. 2004) ("The consideration that the Court finds to be the most persuasive, however, relates to [proposed class counsel's] experience in, and knowledge of, the applicable law in this field"). As the Committee Notes to the 2003 amendments to Federal Rule of Civil Procedure 23 explain, designation of interim counsel before class certification is appropriate because the motion for class certification itself is a crucial and often hard-fought issue, involving both discovery and extensive briefing. For this reason, courts should consider not only counsel's expertise with the substantive law at issue, but also "counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action." Fed. R. Civ. P. 23(g)(2).

The *Braxton* Firms are uniquely qualified to serve as interim counsel for the Putative Refinancing Class. Consisting largely of former "big firm" partners and associates, the *Braxton* firms have extensive experience both prosecuting *and* defending class actions. This dual experience makes the *Braxton* Firms uniquely positioned to represent the Putative Refinancing Class because of their greater knowledge of the law and the pitfalls and limitations of their putative plaintiffs' theory. *See, e.g.*, *Stringer v. Combe, Inc.*, No. 17-CV-03192-WHO, 2017 WL 6539779, at *1 (N.D. Cal. Dec. 21, 2017) (dismissing 42 U.S.C. § 1981 race

discrimination class action);  *Guido v. L'Oreal, USA, Inc*., 2013 WL 454861, at *1

(C.D. Cal. Feb. 6, 2013) (dismissing class action claims under California Unfair

Competition Law with prejudice).  Indeed, the *Braxton* Firms could have chosen to

sue Wells Fargo on a theory as expansive as others have chosen, but after

investigating the case, they chose to narrow their theory to only the Putative

Refinancing Class because they knew that narrowing would maximize the odds of

success for that putative Class and eliminate many of the arguments Wells Fargo

will make against a broader class.  The *Braxton* Firms' experience is set forth, in

detail, in the concurrently filed Declarations of Messrs. Ellis and Frank, but briefly

summarized here:

**Ellis George Cipollone**.  The attorneys at EGC have extensive expertise in

pursuing class action and other complex commercial litigation.  They possess

substantial experience in plaintiffs' race discrimination cases and plaintiffs'

consumer fraud, antitrust and securities fraud class action litigation against

defendants in a wide variety of industries.  The firm has successfully prosecuted

dozens of class actions on behalf of defrauded consumers and investors.  Major class

action settlements in which the firm has been involved include *In re Nasdaq

Market-Makers Antitrust Litigation* (S.D.N.Y.) ($1.027 billion); *In re Rite Aid

Securities Litigation* (E.D. Pa.) ($334 million) and *In re Computer Associates

Securities Litigation* (E.D.N.Y.) ($134 million).  Additionally, the firm has

extensive consumer fraud and financial services class action litigation experience,

including cases concerning improper deferred annuities sales practices that led to

settlements with Pacific Life Insurance Company, American Express (IDS),

Principal Life, AIG SunAmerica, and MetLife, among others, and cases concerning

defective products that have resulted in settlements with Pioneer Corporation and

Iomega Corporation.  *See* Ellis Decl., ¶ 9.

The EGC team will be led by named partner Dennis S. Ellis.  Ellis Decl., ¶ 10.

Prior to joining EGC, Mr. Ellis enjoyed a sophisticated litigation practice at

international law firm Paul Hastings LLP for more than 24 years, where he served as Global Chair of Complex Litigation and Arbitration. *Id.* While Mr. Ellis's practice at Paul Hastings consisted primarily of a class action and complex litigation defense work, he also has a notable track record of success on the plaintiff side. Mr. Ellis, along with Mr. Frank (when both were at Paul Hastings), obtained the largest known judgment on behalf of a Chinese firm in a U.S. court, in excess of $2.8 billion, *New World TMT Limited v. PrediWave Corporation, et al.*, case no. 06-cv-05564 (N.D. Cal.), and a $97.2 million jury verdict for claims related to an alleged failure to disclose material information in an investment solicitation, *see Pacific Coin Management v. BR Telephony Partners, L.P., et al.*, case nos. BC242432/BC243969. *Id.*

Mr. Ellis is a recipient of the Legacy of Leadership Award from the John M. Langston Bar Association of Los Angeles, and has been recognized in the Los Angeles Business Journal's "Leaders of Influence Minority Attorneys" special issue in 2016 and 2022. *Id.* Mr. Ellis is also a Fellow of the Litigation Counsel of America's Trial Lawyer Honorary Society, which was established to reflect the "new face of the American bar"—one that values not only accomplishments in litigation, but also ethical reputation and diversity and inclusiveness. *Id.* He has also been annually selected to the Southern California Super Lawyers List since 2007 and was selected to the Lawdragon "500 Leading Lawyers in America" list in 2021 and 2022.

Mr. Ellis leads an accomplished group of six EGC attorneys, including three partners, two senior counsel, and one associate, each of whom possesses diverse professional and personal backgrounds, ready to devote significant resources on behalf of the refinancing class in this case. Ellis Decl., ¶ 11. The EGC attorneys' experience is vast and varied, and includes serving as lead counsel for a government entity as part of consolidated class action proceedings involving multibillion dollar claims against major banks, including Wells Fargo; representing banks in a class action alleging that the bank aided and abetted a Ponzi scheme; and representing

prominent African-American journalists against major television network in claims related to employment discrimination. *See generally,* Ellis Decl., ¶ 11a-f, Ex. I.

**Frank Sims Stolper LLP**. FSS is a plaintiffs' class action and complex litigation boutique. Since its inception in 2016, FSS has enjoyed substantial success in the class action arena. That includes settlements against major corporations such as Wells Fargo (value at over $400 million), Mercedes Benz (value at $85 million); Hewlett-Packard (value at $100 million) and Toyota Motor Credit Corporation (preliminary approval of settlement valued at over $300), among others.

Mr. Frank, a 1997 graduate of the University of Michigan School of Law, was previously an equity partner at Paul Hastings LLP. Frank Decl., ¶ 3. At Paul Hastings, Mr. Frank was one of the leaders of the firm's global class action practice group. *Id.* He has been a member of the editorial board for Lexis/Nexis legal publications since 1999 and has also served as a member of the Board of Governors for the Association of Business Trial Lawyers ("ABTL"), Los Angeles Chapter. *Id.* Mr. Frank has been repeatedly included in Los Angeles Magazine's list of "Super Lawyers" in Southern California. *Id.* Mr. Frank specializes in representing both plaintiffs and defendants in complex litigation and consumer class actions. *Id.* In his class action defense practice, he has represented fortune 500 companies, such as AT&T, and major private corporations, such as L.A. Fitness. *Id.* In his plaintiff practice, he has obtained verdicts and settlements totaling over a billion dollars in the last ten years. *Id.* Mr. Frank will be joined by two of his partners at FSS, who are likewise former "big firm" lawyers and include a former Assistant United States Attorney. *See* Frank Declaration, ¶¶ 4-5.

The *Braxton* Firms have worked with each other on other cases, understand each other's strengths, and how to leverage each firm's complimentary skills to best represent the class. The extensive working relationship will enable the *Braxton* Firms to efficiently allocate work based on each firm's strengths, and to avoid duplication that could delay progress of the case and result in unwarranted costs.

Given their work on this matter to date and their collective experience, the *Braxton* Firms easily meet the Rule 23(g) criteria.

### 3.      The *Braxton* Firms Are Willing To Commit Significant Resources To This Case

Rule 23(g) mandates the Court consider the resources proposed class counsel will commit to the lawsuit's prosecution.  *LeBeau v. U.S.,* 222 F.R.D. 613, 618 (D.S.D. 2004) ("In considering the resources that counsel will commit to representing the class, the Court may consider the staff, supplies and professional commitments of that attorney.").  EGC is a bicoastal firm with 57 lawyers total, and is willing and able to contribute as many of those lawyers to this litigation as is necessary and efficient.  Further, EGC has partnered with a class action boutique in FSS, and each FSS named partner is ready and willing to work on this case as necessary.  This factor also takes outsized importance in a case like this one, "[b]ecause… the defendant[] in this case [is a] large financial institution[] with substantial financial and legal resources, it is likely that interim lead plaintiffs in this case will have to expend considerable resources when representing the plaintiffs." *In re Mun. Derivatives Antitrust Litig*., 252 F.R.D. 184, 187 (S.D.N.Y. 2008) (selecting the largest firm as interim lead counsel).

The *Braxton* Firms have already expended hundreds of hours investigating the facts underlying the claims against Wells Fargo, drafted highly-detailed complaints, conducted interviews of former Wells Fargo employees, and conferred with experts.  By these actions, the *Braxton* Firms demonstrate their commitment to the class and their ability to devote the necessary time, effort, skill and technological resources to adequately and effectively represent the class.

## V.      CONCLUSION

For all these reasons, the *Braxton* Plaintiffs respectfully request that the Court appoint Dennis S. Ellis of EGC and Jason M. Frank of FSS as interim counsel for a Putative Refinancing Class.

DATED:  July 28, 2022

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP

By:       */s/ Dennis S. Ellis*
_____
    Dennis S. Ellis (SBN 178196)
    Trent B. Copeland (SBN 136890)
    Ryan Q. Keech (SBN 280306)
    Stefan Bogdanovich (SBN 324525)
    2121 Avenue of the Stars, Suite 2800
    Los Angeles, California 90067
    Telephone: (310) 274-7100
    Facsimile: (310) 275-5697
    Email:  dellis@egcfirm.com
          tcopeland@egcfirm.com
          rkeech@egcfirm.com
          sbogdanovich@egcfirm.com

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
    Noah S. Helpern (SBN 254023)
    Milin Chun (SBN 262674)
    801 South Figueroa Street, Suite 2000
    Los Angeles, California 90017
    Telephone: (213) 725-9800
    Facsimile: (213) 725-9808
    Email:  nhelpern@egcfirm.com
          mchun@egcfirm.com

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
    Joseph N. Kiefer (admitted *pro hac vice*)
    (NY Bar No. 5345657)
    157 West 57th Street, Suite 28 S
    New York, New York 10019
    Telephone: (212) 413-2600
    Facsimile: (212) 413-2629
    Email:  jkiefer@egcfirm.com

Attorneys for Plaintiffs Aaron Braxton, Gia Gray, Bryan Brown, Paul Martin and all others similarly situated

1    DATED:  July 28, 2022                FRANK, SIMS & STOLPER LLP
2                                              Jason M. Frank (SBN 190957)
                                              Scott H. Sims (SBN 234148)
3                                              Andrew D. Stolper (SBN 205462)
4
5                                        By:   _____/s/ Jason Frank_____
                                                   Jason Frank
6                                        Attorneys for Plaintiffs Aaron Braxton, Gia
                                         Gray, Bryan Brown, Paul Martin and all others
7                                        similarly situated
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFFS AARON BRAXTON, ET AL.'S MOTION FOR APPOINTMENT OF INTERIM COUNSEL
FOR A PUTATIVE REFINANCING CLASS

1

## ATTORNEY ATTESTATION

2          Pursuant to Civil L.R. 5-1(h)(3), I hereby attest that concurrence in the filing

3    of this document has been obtained from each of the other signatories.

4

5                                              */s/ Dennis S. Ellis*
                                               Dennis S. Ellis
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT B

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
Dennis S. Ellis (State Bar No. 178196)
 dellis@egcfirm.com
Trent B. Copeland (State Bar No. 136890)
 tcopeland@egcfirm.com
Ryan Q. Keech (State Bar No. 280306)
 rkeech@egcfirm.com
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697

FRANK SIMS & STOLPER LLP
Jason Frank (State Bar No. 190957)
 jfrank@lawfss.com
Scott H. Sims (State Bar No. 234148)
 ssims@lawfss.com
Andrew D. Stolper (State Bar No. 205462)
 astolper@lawfss.com
19800 MacArthur Blvd., Suite 855
Irvine, California 92612
Telephone: (949) 210-2400
Facsimile: (949) 201-2405

(Additional Counsel on Signature Page)

Attorneys for Plaintiffs Aaron Braxton,
Gia Gray, Bryan Brown, Paul Martin, on
behalf of themselves and all others
similarly situated

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| AARON BRAXTON, GIA GRAY, BRYAN BROWN AND PAUL MARTIN, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>WELLS FARGO BANK, N.A., a Delaware corporation; WELLS FARGO HOME MORTGAGE, INC., a Delaware corporation; WELLS FARGO & CO., a Delaware corporation, | Case No. 4:22-cv-01748-JD<br>Honorable James Donato<br>*(Related to Case No. 3:22-cv-00990-JD)*<br><br>**DECLARATION OF DENNIS S. ELLIS IN SUPPORT OF PLAINTIFFS AARON BRAXTON, ET AL.'S MOTION FOR APPOINTMENT OF INTERIM COUNSEL FOR A PUTATIVE REFINANCING CLASS**<br><br>Date: July 21, 2022<br>Time: 10:00 a.m.<br>Crtrm.: 11<br><br>Trial Date: None set. |

2083882.1

Case No. 4:22-cv-01748-JD

DECLARATION OF DENNIS S. ELLIS IN SUPPORT OF PLAINTIFFS AARON BRAXTON, ET AL.'S
MOTION FOR APPOINTMENT OF INTERIM COUNSEL FOR A PUTATIVE REFINANCING CLASS

## <u>DECLARATION OF DENNIS S. ELLIS</u>

I, Dennis S. Ellis, declare and state as follows:

1.      I am an attorney at law, duly admitted to practice before this Court and all courts of the State of California.  I am a partner with Ellis George Cipollone O'Brien Annaguey LLP, counsel of record for Plaintiffs Aaron Braxton, Gia Gray, Bryan Brown, Paul Martin, on behalf of themselves and all others similarly situated in this matter.  This declaration is submitted in support of Plaintiffs' Opposition to Defendants Wells Fargo Bank, N.A., Wells Fargo Home Mortgage, Inc., and Wells Fargo & Co.'s ("Wells Fargo Defendants") Motion to Dismiss or, in the Alternative, Stay Proceedings in this action.  I have firsthand, personal knowledge of the facts set forth below and if called as a witness could competently testify thereto.

### <u>FILED ACTIONS AGAINST WELLS FARGO</u>

2.      On March 18, 2022, Plaintiff Aaron Braxton and the *Braxton* Firms filed the first putative class action against Wells Fargo on behalf of Black homeowners who had submitted refinance applications to Wells Fargo and were harmed by Wells Fargo's alleged race-based discrimination.  Dkt. 1.  The *Braxton* Complaint sought to represent a class of all Black persons in the United States who, from January 1, 2018 through the present (the "Class Period"), submitted an application to refinance their home mortgage through Defendants that was (i) processed at a rate slower than that of the average processing time of applications made by non-Black applicants; or (ii) whose applications were denied; or (iii) whose resulting refinance loans were made at higher interest rates as compared to similarly situated non-Black applicants.  A true and correct copy of the complaint is attached hereto as **Exhibit A**.

3.      On April 12, 2022, the *Braxton* Plaintiffs filed their First Amended Complaint ("FAC").  Dkt. 14.  A true and correct copy of the *Braxton* First Amended Complaint is attached hereto as **Exhibit B**.

4.      In addition to this *Braxton* action, five additional putative class actions are pending in this District in which the plaintiff seeks to represent Black homeowners allegedly discriminated against by Wells Fargo.  The cases are:

a.      On February 17, 2022, a putative class action complaint was filed against Wells Fargo Bank, N.A and Wells Fargo & Company titled *Christopher Williams v. Wells Fargo Bank, N.A. et al.,* No. 3:22-cv-00990-JD ("*Williams*").  A true and correct copy of the *Williams* complaint is attached hereto as **Exhibit C**.  The *Williams* complaint included several factual allegations, ranging from Wells Fargo's "long history of maintaining a corporate culture replete with harmful racial stereotypes and biased views about African American customers" and its discrimination against African American employees to its intentional use of factors "to determine eligibility for home loan rates, terms, and conditions that facilitate redlining and reverse redlining against and disfavor African American borrowers."  Dkt. 1 at ¶¶ 7-13 (*Williams*).  On April 14, 2022, the *Williams* plaintiffs filed a First Amended Complaint.  A true and correct copy of the *Williams* First Amended Complaint is attached hereto as **Exhibit D**.  Despite not having a single representative plaintiff whose refinancing application was denied by Wells Fargo, the *Williams* First Amended Complaint included, for the first time, allegations relating to Wells Fargo's discrimination against Black Americans who submitted applications for refinancing and sought to represent a class of Black and/or African American applicants or borrowers who applied for, received, or maintained credit from Defendants related to residential real estate and who were subjected to discrimination by Defendants due to their race.  This Court related the *Williams* and *Braxton* actions on June 9, 2022, but denied Wells Fargo's motion to dismiss *Braxton* on grounds of the pending *Williams* action, noting "[t]he *Williams* action involves a proposed class of African American applicants who applied for, received, or maintained credit from Wells Fargo related to residential real estate, while the *Braxton* action involves a proposed class of African American homeowners who

-2-
DECLARATION OF DENNIS S. ELLIS IN SUPPORT OF PLAINTIFFS AARON BRAXTON, ET AL.'S MOTION FOR APPOINTMENT OF INTERIM COUNSEL FOR A PUTATIVE REFINANCING CLASS

submitted applications to refinance their home mortgages. The cases are sufficiently similar for purposes of relation under the District's local rules, but not so similar that *Braxton* is subsumed in *Williams*."  Dkts. 37, 44.

b.      On March 21, 2022, a putative class action complaint was filed against Wells Fargo Bank, N.A and Wells Fargo & Company titled *Pope v. Wells Fargo Bank, N.A.*, Case No. 3:22-cv-01793-JD ("*Pope*").  The complaint was amended on March 25, 2022.  The plaintiff in *Pope* seeks to represent all minority borrowers who were allegedly discriminated against by Wells Fargo in the refinance process.  A true and correct copy of the *Pope* First Amended Complaint is attached hereto as **Exhibit E**.

c.      On March 26, 2022, a putative class action complaint was filed against Wells Fargo Bank, N.A and Wells Fargo & Company titled *Thomas v. Wells Fargo Bank, N.A.*, Case No.3: 22-cv-01931-CRB ("*Thomas*").  The complaint in *Thomas* is word-for-word identical to the complaint in *Pope*, other than differing allegations related to the named plaintiffs in the two cases and grammatical edits related thereto.  Thus, although the *Thomas* action is limited to refinancing, it extends to all minority borrowers, not just Black borrowers  The *Thomas* action is currently pending before Judge Breyer in this District and has not been related to any other cases in this District.  To the best of the *Braxton* Plaintiffs' knowledge, the *Thomas* complaint has not been served on Wells Fargo.  A true and correct copy of the *Thomas* complaint is attached hereto as **Exhibit F**.

d.      On April 26, 2022, a putative class action complaint was filed against Wells Fargo Bank, N.A and Wells Fargo & Company titled *Ebo v. Wells Fargo Bank, N.A.*, Case No. 22-cv-02535-SK ("*Ebo*").  The matter was previously filed in the Eastern District of New York, but voluntarily dismissed on April 29, 2022.  The *Ebo* proposed class is limited to Black borrowers, but extends to all types of loans related to residential real property.  A true and correct copy of the *Ebo* complaint is attached hereto as **Exhibit G**.

e.      On June 10, 2022, a putative class action complaint was filed against Wells Fargo Bank, N.A and Wells Fargo & Company titled *Perkins, et al. v. Wells Fargo, N.A.*, case no. 22-cv-03455 ("*Perkins*").  The Perkins plaintiff seeks to represent a broad class, including all racial minorities who submitted, or attempted to submit, an application to finance *or* refinance their home mortgage.  A true and correct copy of the *Perkins* complaint is attached hereto as **Exhibit H**.

5.      As of the filing of this motion, in addition to the *Braxton* action, this Court has related *Pope*, *Ebo*, and *Perkins* to the *Williams* action, such that all five actions are pending before this Court.  The *Braxton* Firms also understand that, upon being served, Wells Fargo intends to seek relation of the *Thomas* case.

## WORK PERFORMED BY THE BRAXTON FIRMS

6.      In preparing its case against Wells Fargo, the *Braxton* Firms interviewed dozens of confidential informants with knowledge of Wells Fargo's refinance operations which revealed (1) that the bank collects "key geographic, financial, and demographic data" and processes them in a CORE algorithm, (2) that Wells Fargo management got real-time data about how its policies were worsening racial disparities, and (3) that, rather than rectifying the problem, management pressured loan officers to increasingly rely on these discriminatory algorithms, and failed to control for its discriminatory practices.

7.      Through its investigation and research, the *Braxton* Firms have developed an initial understanding of Wells Fargo's underwriting algorithm and identified and investigated the algorithm's differences based on the type of loan, specifically loan origination (purchase money loans) versus refinance; analyzed Wells Fargo's COVID-19 era algorithmic overlays; examined Wells Fargo's appraisal process and its discriminatory impact on the Putative Refinancing Class; and interviewed members of the Putative Refinancing Class.

8.      The *Braxton* Firms have further consulted with experts with domain expertise in algorithmic modeling and discriminatory biases associated with

artificial intelligence and machine learning, consulted with civil rights and housing organizations seeking to support the *Braxton* Plaintiffs, and engaged a highly-regarded damages expert to assist the class on analyzing damages and the value of other non-monetary relief.

QUALIFICATIONS AS INTERIM COUNSEL

9.      Ellis George Cipollone O'Brien Annaguey LLP ("Ellis George Cipollone" or "EGC") is based in Century City, California and has offices in Downtown Los Angeles, San Francisco, New York, and Washington D.C.  The attorneys at Ellis George Cipollone have extensive expertise in pursuing class action and other complex commercial litigation.  They possess substantial experience in plaintiffs' consumer fraud, antitrust and securities fraud class action litigation against defendants in a wide variety of industries.  The firm has successfully prosecuted dozens of class actions on behalf of defrauded consumers and investors. Major class action settlements in which the firm has been involved include *In re Nasdaq Market-Makers Antitrust Litigation* (S.D.N.Y.) ($1.027 billion); *In re Rite Aid Securities Litigation* (E.D. Pa.) ($334 million) and *In re Computer Associates Securities Litigation* (E.D.N.Y.) ($134 million).  Additionally, the firm has extensive consumer fraud and financial services class action litigation experience, including cases concerning improper deferred annuities sales practices that led to settlements with Pacific Life Insurance Company, American Express (IDS), Principal Life, AIG SunAmerica, and MetLife, among others, and cases concerning defective products that have resulted in settlements with Pioneer Corporation and Iomega Corporation.  A true and correct copy of the firm's resume with backgrounds of attorneys proposed to work on this case is attached as **Exhibit I**.

10.      Ellis George Cipollone's team in this matter will be led by **Dennis S. Ellis**.  Prior to joining EGC, Mr. Ellis enjoyed a sophisticated litigation practice at international law firm Paul Hastings LLP for more than 24 years, where he served as Global Chair of Complex Litigation and Arbitration.  While Mr. Ellis is well-known

DECLARATION OF DENNIS S. ELLIS IN SUPPORT OF PLAINTIFFS AARON BRAXTON, ET AL.'S MOTION FOR APPOINTMENT OF INTERIM COUNSEL FOR A PUTATIVE REFINANCING CLASS

for representing international celebrities, cosmetic companies, and his consumer class action defense practice, he also has a notable track record of success on the plaintiff side.  Mr. Ellis obtained the largest known judgment on behalf of a Chinese firm in a U.S. court, in excess of $2.8 billion, *New World TMT Limited v. PrediWave Corporation, et al., and* a $97.2 million jury verdict for claims related to an alleged failure to disclose material information in an investment solicitation, *see Pacific Coin Management v. BR Telephony Partners, L.P., et al.*.  Annually selected to the Southern California Super Lawyers List since 2007, Mr. Ellis was also selected to the Lawdragon "500 Leading Lawyers in America" list in 2022, is a recipient of the Legacy of Leadership Award from the John M. Langston Bar Association of Los Angeles, and has been recognized in the Los Angeles Business Journal's "Leaders of Influence Minority Attorneys" special issue in 2016 and 2022. Mr. Ellis is also a Fellow of the Litigation Counsel of America's Trial Lawyer Honorary Society, which was established to reflect the "new face of the American bar"—one that values not only accomplishments in litigation, but also ethical reputation and diversity and inclusiveness.  Mr. Ellis was also named to the Top 20 under 40 list by the Daily Journal and named a California Lawyer of the Year by California Lawyer Magazine in 2006.

11.     Ellis George's team will be supported by six other attorneys, including three partners, two senior counsel, and one associate.

a.     **Trent Copeland**, a partner in Ellis George's Century City office, began his career at a major multinational law firm and then as a solo practitioner specializing in both criminal and civil litigation.  He is a nationally recognized attorney and has successfully defended hundreds of serious high stakes civil and criminal matters including several capital offenses.  Mr. Copeland has represented two prominent African-American journalists against major television network in claims related to employment discrimination, and within the last year, led the representation of a high-profile news anchor in obtaining a confidential multi-

million dollar resolution of claims of discrimination against a major television network.

        b.     **Noah Helpern**, a partner in Ellis George's downtown Los Angeles office, has over 15 years of experience in complex commercial litigation on behalf of both plaintiffs and defendants.  Mr. Helpern has litigated extensively on behalf of plaintiffs against banks, including: on behalf of the San Diego Association of Governments in a multi-billion dollar antitrust putative class action currently pending in the U.S. District Court for the Southern District of New York alleging improper collusion among banks with respect to interest rates for municipal bonds; on behalf of monoline insurer MBIA Insurance Corporation as subrogee to claims under California securities laws of purchasers of residential mortgage backed securities for losses in excess of $2.5 billion in connection with securitizations comprised of Countrywide and IndyMac mortgages; on behalf of Assured Municipal Guaranty as subrogee to claims under California securities laws of purchasers of residential mortgage backed securities for losses in excess of $235 million in connection with securitizations comprised of IndyMac mortgages.  In addition, Mr. Helpern has represented banks, including in class actions, such as his representation of East West Bank in a class action alleging the bank aided and abetted an alleged Ponzi scheme perpetrated by Terchi Liao and AOB Commerce, Inc.  He also has extensive experience in alternative dispute resolution and served as a teaching assistant for the Harvard Negotiation Institute (formerly Program of Instruction for Lawyers) at Harvard Law School's Program on Negotiation.

        c.     **Ryan Keech** is a partner in Ellis George's Century City office, whose practice involves advising and representing companies and individuals in high-stakes business and entertainment disputes from matter inception through trial. Mr. Keech has represented U.S. and foreign clients in trial and appellate litigation and arbitration in a wide variety of industries, including feature and television production, general media and entertainment, toys and other consumer products,

DECLARATION OF DENNIS S. ELLIS IN SUPPORT OF PLAINTIFFS AARON BRAXTON, ET AL.'S MOTION FOR APPOINTMENT OF INTERIM COUNSEL FOR A PUTATIVE REFINANCING CLASS

cosmetics, financial services, insurance, social media and mobile technology.  In the financial services context, Mr. Keech has significant experience as part of teams handling plaintiff-side litigation against the major banks in the residential mortgage context and otherwise.  Along with a team of EGC lawyers, Mr. Keech currently serves as lead counsel for a Southern California government entity as part of consolidated class action proceedings pending in the Southern District of New York involving multibillion dollar claims against major banks, including Wells Fargo, arising out of these banks' alleged manipulation of the Variable Rate Demand Obligation ("VRDO") market.  Mr. Keech has previously served, among others, as part of litigation teams litigating multibillion dollar claims against the major banks arising out of the collapse of the residential mortgage backed securities ("RMBS") market; as part of the litigation team that acted on behalf of institutional investors against numerous banks that participated in settling the U.S. Dollar LIBOR benchmark interest rates; as part of the court-appointed co-lead class counsel litigation team in MDL litigation against fourteen of the world's largest banks, including Wells Fargo, alleged to have manipulated the ISDAFix interest rate benchmark; and as part of the court-appointed co-lead class counsel litigation team in class action litigation concerning price fixing and manipulation of worldwide gold prices.

    d. **Joseph Kiefer**, who clerked for Judge Thomas W. Thrash of the Northern District of Georgia, is a senior counsel in Ellis George's New York office. With ten years of experience, Mr. Kiefer's practice focuses primarily on plaintiff-side antitrust cases.  Mr. Kiefer has been a part of many of the most notable and successful antitrust cases from the last few years, including cases involving complex financial products, intricate and concealed agreements, and groundbreaking damages calculations.  Mr. Kiefer was recently recognized in the 2022 edition of The Best Lawyers in America as a "One to Watch" in the field of Antitrust Law and received the American Antitrust Institute 2018 Antitrust Enforcement Award.

e.     **Milin Chun**, a senior counsel in Ellis George's downtown Los Angeles office, has 15 years of experience in both criminal and civil litigation.  Prior to joining EGC, Ms. Chun's practice focused on white collar criminal defense, civil rights, class action prosecution, and mass tort litigation.  In her plaintiffs practice, Ms. Chun has represented African American and Hispanic inmates in suits against both the State of California and the federal government arising from the inmates' exposure to coccidioidomycosis and victims of the 1998 embassy bombings in Kenya and Tanzania in their suit against the Republic of the Sudan and the Islamic Republic of Iran.  Ms. Chun also previously served on the Editorial Advisory Board for *The Daily Record*, Maryland's business and legal newspaper.

f.     **Stefan Bogdanovich** is a fourth-year associate in Ellis George's Century City office, whose practices complex commercial litigation, including class action, data privacy, IP, and entertainment litigation..

Executed this 28$^h$ day of June 2022, at Los Angeles, California.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

*/s/ Dennis S. Ellis*
Dennis S. Ellis

# EXHIBIT A

1 | ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP

2 | Dennis S. Ellis (State Bar No. 178196)
  dellis@egcfirm.com

3 | Noah S. Helpern (State Bar No. 254023)
  nhelpern@egcfirm.com

4 | Ryan Q. Keech (State Bar No. 280306)
  rkeech@egcfirm.com

5 | Stefan Bogdanovich (State Bar No. 324525)
  sbogdanovich@egcfirm.com

6 | 2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067

7 | Telephone: (310) 274-7100
Facsimile: (310) 275-5697

8 |

9 | Joseph Kiefer (*pro hac vice* forthcoming)
  jkiefer@egcfirm.com

10 | 152 West 57th St., 28th Fl.
New York, New York 10019

11 | Telephone: (212) 413-2600
Facsimile: (212) 413-2629_

12 | FRANK SIMS & STOLPER LLP
Jason Frank (State Bar No. 190957)

13 |   jfrank@lawfss.com
Scott H. Sims (State Bar No. 234148)

14 |   ssims@lawfss.com
Andrew D. Stolper (State Bar No. 205462)

15 |   astolper@lawfss.com
19800 MacArthur Blvd., Suite 855

16 | Irvine, California 92612
Telephone: (949) 210-2400

17 | Facsimile: (949) 201-2405

18 | Attorneys for Plaintiff Aaron Braxton, on
behalf of himself and all others similarly

19 | situated

20 |

21 | UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

22 |

23 |

24 | AARON BRAXTON, on behalf of
himself and all others similarly situated,

25 | Plaintiff,

26 | vs.

27 | WELLS FARGO BANK, N.A., a
Delaware corporation; WELLS FARGO

28 | HOME MORTGAGE, INC., a

Case No.

**CLASS ACTION COMPLAINT FOR:**

**1. VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT, 15 U.S.C. § 1691, *ET SEQ.***
**2. RACE DISCRIMINATION IN VIOLATION OF THE FAIR**

Case No.

Delaware corporation,

        Defendants.

**HOUSING ACT OF 1968, 42 U.S.C. § 3601, *ET SEQ.***
**3. RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981**
**4. VIOLATION OF THE UNRUH CIVIL RIGHTS ACT, CALIFORNIA CIVIL CODE § 51**
**5. VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**

**DEMAND FOR JURY TRIAL**

Plaintiff Aaron Braxton, individually and as a representative of a nationwide class of Black applicants for home mortgage refinancing through Wells Fargo and its related entities (collectively "Plaintiffs" or the "Class"), alleges as follows:

## I.    NATURE OF ACTION

1.    Homeownership has long been considered the cornerstone of the American Dream—allowing citizens to accumulate wealth through access to credit, generating equity, and reducing housing costs.[1]  For a decade, historically low interest rates have provided more and more Americans with access to this dream and, by way of refinanced lower home mortgages, the ability to pass their properties on to their next generation.

2.    But careful students of American history know that homeownership has for far too long been unattainable for a disproportionate number of Black Americans, and even worse, more difficult for Black Americans to maintain once achieved.  Indeed, prior to the passage of the Civil Rights Act (and sometimes even afterwards), Black American homeowners were systematically denied access to the financial benefits of this particular American Dream through the use of pernicious

---

[1] https://www.forbes.com/sites/forbesrealestatecouncil/2021/09/28/homeownership-and-the-american-dream/?sh=1c78499623b5

and pervasive race-based exclusions.  These included, for example, the Federal Housing Administration's refusal to insure mortgages in and near Black neighborhoods—a practice now referred to as "redlining"—at the same time that the FHA subsidized builders who mass-produced entire subdivisions made for White Americans.  These also included restrictive covenants in deeds that prohibited or restricted the sale of American homes to Black Americans.

3.　　The passage of the Civil Rights Act in 1965—and the judicial interventions that followed—were supposed to fix that historical injustice, eliminate race-based gatekeeping practices like redlining and restrictive covenants while righting this long-standing American wrong.  For many homeowners seeking a first or refinanced mortgage with some banks, it did.

4.　　However, despite publicly touting their commitment to "help[] ensure that all people across our workforce, our communities, and our supply chain feel valued and respected and have equal access to resources, services, products, and opportunities to succeed,"[2] Defendants in this case—Wells Fargo Bank, N.A. and Wells Fargo Home Mortgage (collectively "Defendants" or "Wells Fargo")—have continued to discriminate against Black American home loan applicants.  Federal data shows that over the last several years thousands of Black homeowners have been unable to maintain the dream of home ownership because of Wells Fargo's ongoing and discriminatory modern day "redlining" practices.  These practices delayed, obstructed and denied Black homeowners the benefit of lower interest rates obtained through refinancing, forcing them to pay more for their loans than was required of non-Black applicants, and in many cases sending them into foreclosure.[3]

---

[2] https://www.wellsfargo.com/about/diversity/diversity-and-inclusion/

[3] https://www.nclc.org/images/pdf/special_projects/covid-19/IB_Covid_Black_Forbearance_Foreclosure.pdf

5. Bloomberg reported that the data released under the federal Home Mortgage Disclosure Act shows unequivocally that Wells Fargo rejects a disproportionate number of Black homeowners' refinancing applications.[4] Wells Fargo also makes the refinancing application process purposely more difficult and less attractive for Black applicants than others—on a consistently national scale— demanding higher interest rates for loans secured by homes located in neighborhoods with greater proportions of Black residents by placing its loan officers much farther away from those same neighborhoods.[5] And Wells Fargo customers report that loan officers state that certain "areas" with large Black populations are ineligible for rapid valuations.[6] Black applicants are further subjected to delays, feigned mistakes, and other obstacles, leading many Black Americans to withdraw their requests for refinancing, and leading others to wait indefinitely while Wells Fargo refuses to act upon their applications.

6. Wells Fargo also uses automated algorithms and machine learning to make underwriting decisions. But these, too, are infected with Wells Fargo's pervasive race-based discrimination. Wells Fargo's algorithms and machine learning select "areas" and other characteristics for greater or lesser scrutiny of credit applications, which, over time, only exacerbates the wealth disparities between people living in those areas or among groups which tend to have certain characteristics analyzed by the algorithms and machine learning.

7. Numbers do not lie and, here, the numbers tell a shameful story, without any legitimate explanation. Data from eight million refinancing

---

[4] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-refinancing/

[5] *Id.*

[6] *Id.*

COMPLAINT

Case No.

applications from 2020 reveal that "the highest-income Black applicants [had] an approval rate about the same as White borrowers in the lowest-income bracket."[7] White refinancing applicants earning between $0 and $63,000 a year were ***more likely*** to have their refinancing application approved by Wells Fargo than Black refinancing applicants earning between $120,000 and $168,000 a year.[8]  Overall, in 2020, Wells Fargo rejected a ***majority*** of all the completed applications submitted by Black homeowners.[9]  And because Wells Fargo designed an application process that is disproportionately difficult for Black homeowners to complete, 27% of all Black homeowners who began a refinance application with Wells Fargo withdrew it.[10]

8. As a result of its discriminatory practices, Wells Fargo was the only major lender in the United States that approved a smaller share of refinancing applications from Black homeowners in 2020 than it had in 2010.[11]  And its disproportionally low approval rates for Black applicants are well below the national average.

9. In 2020—at the height of the refinancing boom, when millions of Americans benefitted from the historically low interest rate environment—Wells Fargo approved 47% of all applications by Black homeowners (meaning that Wells Fargo rejected the majority of applications from Black homeowners), whereas all

---

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.*

COMPLAINT                                          Case No.

1    other lenders approved 71% of all applications by Black homeowners.[12]

2        10.    No other lending institution rejected a majority of Black homeowners'
3    applications for refinancing.[13]

4        11.    Wells Fargo also systematically and discriminatorily applied to Black
5    refinance applicants some of the tightest lending standards in the industry, which
6    disproportionately affect minority applicants.[14]  A study done by the Board of
7    Governors of the Federal Reserve System analyzing federal mortgage data stated
8    that they "do not have any evidence [a]s to whether these tighter standards reduce
9    loan risk to justify the disparate impact on minority denials they are associated
10   with."[15]  And after controlling for relevant underwriting factors (debt-to-income
11   ratios, loan-to-value ratios, credit scores, etc.) the study found that "[l]enders who
12   impose the strictest standards on their white applicants [like Wells Fargo] tend to
13   have the largest unexplained excess denials of minority applicants."[16]

14       12.    Plaintiff Aaron Braxton is one victim of Wells Fargo's discriminatory
15   policies.  Mr. Braxton is a financially successful and eminently creditworthy Black
16   playwright, performer, and a math and science teacher with a Masters degree from
17   the University of Southern California.[17]  He has authored several award winning

18   _____

19   [12] *Id.*

20   [13] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-
21   refinancing/

22   [14] *Id.*

23   [15] *How Much Does Racial Bias Affect Mortgage Lending? Evidence from Human
24   and Algorithmic Credit Decisions*, Neil Bhutta, Aurel Hizmo, and Daniel Ringo
     (July 2021), at 12, n.20. Available at:
25   https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3887663

26   [16] *Id.* at 12.

27   [17] https://www.imdb.com/name/nm1347914/bio?ref_=nm_ov_bio_sm

28

plays, including *DID YOU DO YOUR HOMEWORK?*, which broke the Beverly Hills Playhouse's record for longest running play (9 months).[18]  He has also written several films and television pilots, and acted in several film, television, and theatre projects.[19]

13.     In addition, for two decades, Mr. Braxton was a loyal Wells Fargo mortgage customer.  He purchased his home in 2000, in a historically Black neighborhood located in South Los Angeles near the campus of the University of Southern California and secured his property with a Wells Fargo home mortgage insured by the Federal Housing Administration.  Mr. Braxton always made his mortgage payments and bills on time, and he had a good credit score.

14.     Yet despite his successful career and his creditworthiness, when Mr. Braxton sought to refinance his home mortgage loans in August of 2019, Wells Fargo consistently obstructed his ability to refinance his loan.  Despite favorable loan-to-value metrics and his personal history with the institution, Wells Fargo was focused more on his race and the location of his home within a historically Black Los Angeles neighborhood, and used the fact of his race and the location of his home to delay, obstruct and deny him the full benefits of historically low home mortgage interest rates.  Wells Fargo did this even though, having paid his loan for more than 18 years, Mr. Braxton had equity in his home far greater than the amount remaining, on his Federal Housing Administration (FHA) secured loan.

15.     Mr. Braxton was given the runaround to such an extent that it took him over nine months to refinance his federally backed mortgage loan (and 12 months to refinance his home equity loan) at an above-market interest rate of around 4%.  This was after various Wells Fargo representatives kept telling him they lost his paperwork, made incomplete inquiries and needed to request more information,

---

[18] *Id.*

[19] *Id.*

Case No.

COMPLAINT

2013830.1

delayed its responses, and even placed him into an unsolicited debt-trap deferred payment program without his permission.  It was only after Mr. Braxton notified the Department of Housing and Urban Development ("HUD") that Wells Fargo approved the refinancing of his federally backed FHA loan (indeed, Wells Fargo approved the application the very next day).  Of course, for the prolonged period that Mr. Braxton was waiting for Wells Fargo to refinance his loans, he was paying the higher rates associated with his original loans.

16.     Mr. Braxton's experience is unfortunately consistent with the experiences of thousands of Black Americans who have been victimized by Wells Fargo's intentional, knowing and systematic race discrimination, violating the contractual, commercial and civil rights of Class members and causing millions (and perhaps even billions) of dollars in damages to the Nationwide Class.  Individually and as a representative of the Class, Mr. Braxton brings this action to make good to the Class all damages resulting from Defendants' violations of the federal civil rights laws and to restore to the Class any amounts to which they otherwise would have been entitled, together with other equitable and remedial relief as the Court may deem appropriate.

## II.     JURISDICTION AND VENUE

17.     This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332(d), and 1343, because the Plaintiff asserts federal causes of action, because Plaintiff asserts civil rights causes of action, and because at least one member of the Class is a citizen of a different state than all Defendants, and because the amount in controversy exceeds $5,000,000.

18.     Personal jurisdiction is appropriate over Defendants because Wells Fargo Bank, N.A. transacts business in the State of California and has its principal place of business in San Francisco, California.  Wells Fargo Home Mortgage, Inc. originates loans to California customers from its California offices and maintains a systematic and continuous presence in the State.

19.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b) because Wells Fargo Bank, N.A. resides in this district, a substantial part of the events or omissions giving rise to the claim occurred in this district, and Wells Fargo Bank, N.A.'s principal place of business is in this district.

### III.     PARTIES

20.     Plaintiff Aaron Braxton, who is Black, is a natural person and a citizen of the State of California and resides in Los Angeles, California.

21.     Defendant Wells Fargo Bank, N.A. is a publicly traded, global financial services firm and a Fortune 500 corporation incorporated in Delaware with its principal place of business in San Francisco, California.  As of December 31, 2020, Wells Fargo has assets of approximately $1.9 trillion, loans of $887.6 billion, deposits of $1.4 trillion, and stockholders' equity of $185 billion.  Wells Fargo is a mortgage lender; and also provides a wide variety of financial products and services to its global and domestic clients.

22.     Defendant Wells Fargo Home Mortgage, Inc. is a home lending company that is part of the "Wells Fargo banking family."  It operates about 725 mortgage stores nationally and originates and services one-to-four-family residential first and junior-lien mortgages and home equity loans.  On average, it originates approximately $300 billion worth of loans per year.  It is incorporated in the State of Delaware, and has its principal place of business in Des Moines, Iowa. Wells Fargo Home Mortgage, Inc. originates loans to California customers from its California office locations.

### IV.     FACTUAL ALLEGATIONS

23.     During the last few years interest rates were near an all-time low in the United States, and homeowners who held mortgage loans at higher rates (meaning a great deal of homeowners) sought to refinance their loans at lower rates. Refinancing would allow a homeowner to significantly reduce their monthly payments and to owe less mortgage interest over the life of the loan.  Over the last

two years, homeowners in the United States refinanced over $5 trillion worth of mortgages.

**A.      Wells Fargo's Discriminatory Refinancing Practices**

24.      Wells Fargo is a major issuer of home-based loans in the United States, holding nearly a trillion dollars in outstanding debt.

25.      Wells Fargo's discrimination began at the latest in 2018 and continues through today.

26.      In 2020, Defendant Wells Fargo approved Black homeowner refinancing applications at a rate lower than that of any other major lender in America.  It is the only lender that approved fewer such applications in 2020 than it did in 2010.[20]

27.      Bloomberg analyzed data from eight million refinancing applications from 2020, released under the Home Mortgage Disclosure Act, and found that, for Wells Fargo, "the highest-income Black applicants [had] an approval rate about the same as White borrowers in the lowest-income bracket."[21]

28.      The disparate treatment of Black applicants results at least in part from Wells Fargo's tactics that, in practice, perpetuate redlining of areas with disproportionately more Black residents and imposing in those areas hurdles and obstacles that either delay or prevent refinancing.

29.      For example, in order to minimize the likelihood and frequency of Black mortgage applications, Wells Fargo systematically and intentionally places its loan officers in areas with disproportionately low numbers of Black residents.  In many cities across the nation with large Black populations, like Atlanta, Baltimore,

---

[20] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-refinancing/

[21] *Id.*

COMPLAINT

Case No.

2013830.1

1  and Philadelphia, Wells Fargo's online store locator will direct individuals in

2  predominately Black ZIP codes to areas in predominately White ZIP codes.[22]

3  Likewise, in New Haven, Connecticut, which in 2020 was a hot spot for denials, the

4  nearest Wells Fargo loan officer available to homeowners was 25 miles away.  Even

5  to initiate the application process by visiting a loan officer, a Black applicant had to

6  do more than a non-Black applicant.

7       30.    The effect of this is clear: while Wells Fargo's approval rates for Black

8  refinancing applicants are much lower than the approval rates for Black applicants at

9  other national banks, ***this gap widens in counties with more Black residents***.[23]  As

10  noted above, nationally, Wells Fargo approved just 47% of its Black refinancing

11  applicants.[24]  However, in Fulton County, which has more Black than white

12  residents, Wells Fargo only approved 43% of its Black refinancing applications,

13  nearly 10% less than its already-low national approval rate.[25]

14       31.    And even for those Black applicants whose loans were ultimately

15  approved, they faced delays that White applicants living in predominately White

16  neighborhoods did not, causing them damages through continued higher mortgage

17  rates during the unjustified delay as they awaited loan approval.  In some cases,

18  Wells Fargo officers simply told Black applicants living in predominately Black

19  neighborhoods that "perhaps the area is not eligible" for quick evaluations of

20  refinancing applications.[26]  Wells Fargo regularly approved refinancing applications

21

22  [22] https://www.wellsfargo.com/locator/mortgage/consultant .

23  [23] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-
24  refinancing/

25  [24] *Id.*

26  [25] *Id.*

27  [26] *Id.*

28

Case No.
COMPLAINT
2013830.1

of non-Black homeowners in a matter of weeks, but only approved the applications of Black homeowners after many months (if those Blacks applicants happened to be approved).

32.     Wells Fargo also perpetuated its discriminatory practices using algorithms.  Wells Fargo identifies neighborhoods eligible for quick evaluations of refinancing applications using an internal algorithm.

33.     The director of the CFPB describes these types of banking algorithms as "black boxes behind brick walls."[27]  "When consumers and regulators do not know how decisions are made by the algorithms, consumers are unable to participate in a fair and competitive market free from bias." [28]

34.     Wells Fargo's algorithm singled out predominately Black neighborhoods and labeled those neighborhoods ineligible for rapid processing, which led loan officers to inform Black applicants that they could not enjoy the same rapid application processing as white applicants.

35.     Wells Fargo's lending standards also help to perpetuate its discrimination of Black applicants.  Wells Fargo has the strictest lending policies of any other major lender.[29]  And as a result, Wells Fargo has the largest disparity between the approval rates of Black refinancing applicants to white refinancing applicants—25% compared to 16%.[30]  A study done by the Board of Governors of the Federal Reserve System analyzing federal mortgage data stated that they "do not

---

[27] https://www.consumerfinance.gov/about-us/newsroom/remarks-of-director-rohit-chopra-at-a-joint-doj-cfpb-and-occ-press-conference-on-the-trustmark-national-bank-enforcement-action/

[28] *Id.*

[29] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-refinancing/

[30] *Id.*

Case No.

COMPLAINT

2013830.1

have any evidence [ ] as to whether these tighter standards reduce loan risk to justify the disparate impact on minority denials they are associated with."[31]  And after controlling for relevant underwriting factors (debt-to-income ratios, loan-to-value ratios, credit scores, etc.) the study found that "[l]enders who impose the strictest standards on their white applicants tend to have the largest unexplained excess denials of minority applicants."[32]  The study also found that, under the more stringent standards, "Black applicants are 1.9 percentage points more likely…to be denied than a comparable white applicant after controlling flexibly for an array of important underwriting factors."[33]

36.     This Federal Reserve study also found that the most common reasons for denials "for Black applicants [were] 'incomplete' [documents] and 'verification'" issues.[34]  The study found that loan officers like those of Wells Fargo "may work less diligently with minority borrowers to gather all necessary documents or verify aspects of their application, resulting in a denial."[35]  Excess denials are also caused by "issues with the latter stages of the mortgage application process that disproportionately affect minorities."[36]  Wells Fargo's loan officers' lack of diligence in processing applications from Black homeowners seeking refinancing caused disproportionate delays in the processing of their applications,

---

[31] *How Much Does Racial Bias Affect Mortgage Lending? Evidence from Human and Algorithmic Credit Decisions*, Neil Bhutta, Aurel Hizmo, and Daniel Ringo (July 2021), at 12, n.20. Available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3887663

[32] *Id*. at 12.

[33] *Id*. at 9.

[34] *Id*. at 13.

[35] *Id*. at 13, n.23.

[36] *Id*. at 14.

COMPLAINT
2013830.1

1    causing damage even when the loans were ultimately approved.

2         37.    The above practices are arbitrary and artificial and unnecessary to

3    achieve a valid interest or legitimate objective.  The vast difference between

4    refinancing approval rates Wells Fargo issued to Black Americans as compared to

5    any other lending institutions' approval rates negates any possible legitimate

6    objective.

7         38.    As noted, the above practices have a disproportionately adverse effect

8    on Black Americans seeking to refinance their loans.  Black Americans are

9    members of a protected class.

10        39.    Wells Fargo's practices directly harmed Black Americans by forcing

11   them to pay higher interest rates while applications were pending, by forcing them

12   to pay higher interest rates when applications were completed, and/or by denying

13   refinancing applications.  In the absence of these policies, Black Americans would

14   not have had to pay higher rates or face rejection in their refinancing applications.

15        40.    The disparity between Wells Fargo's treatment of Black American

16   applicants and non-Black American applicants is significant and shocking.  As

17   noted, a White American in the lowest income bracket was just as likely to receive

18   refinancing approval as a Black American in the highest income bracket.

19        41.    Wells Fargo's racial discrimination during the refinancing boom is

20   consistent with Wells Fargo's sordid history of racial discrimination in lending.  In

21   2012, it agreed to pay $184 million to settle claims with the Department of Justice

22   that the bank pushed Black and Hispanic homeowners to obtain subprime

23   mortgages, and then charged them higher fees and interest rates.[37]

24        42.    Several municipalities have sued Wells Fargo as well.  In 2019, it

25   settled a lawsuit with the City of Philadelphia premised on allegations that it

26   _____

27   [37] https://www.justice.gov/opa/pr/justice-department-reaches-settlement-wells-fargo-resulting-more-175-million-relief.

28

COMPLAINT                                    Case No.

2013830.1

purposefully made it difficult for minorities to refinance their mortgages.[38]

43.     Worse yet, despite harming Black homeowners by making it more difficult to refinance their loans, Wells Fargo deceives the public by trumpeting its supposed commitment to diversity, equity and inclusion.  In its 2020 annual report, Wells Fargo expressed its supposed commitment to "the concept of equity to our diversity and inclusion efforts in recognition of the systemic and structural challenges in our society that have contributed to disparities that exist today." [39]

44.     In the same year that Wells Fargo denied a majority of Black homeowners' refinancing applications, the Wells Fargo CEO claimed that "the calls for racial justice in 2020 reinforced the urgency of working to create a company culture with broad representation in who we are, how we think, and how we make decisions."[40]  However these words ultimately ring hollow, because it denied Black homeowners refinancing at much higher rates than any other major lender in that same year.

**B.     Plaintiff Aaron Braxton is Harmed by Wells Fargo's Race-Based Discrimination**

45.     Plaintiff Aaron Braxton purchased his home in South Los Angeles, California, near the University of Southern California, in April 2000, through a Wells Fargo home loan for $139,500 ("First Loan").  This First Loan was insured through the FHA. In 2005, after the price of the house appreciated, he took out a second home equity line of credit loan, also from Wells Fargo ("Second Loan").  He improved upon the property and built an accessory dwelling unit.  Today, the home

---

[38] https://www.phila.gov/2019-12-16-city-of-philadelphia-and-wells-fargo-resolve-litigation/.

[39] 2020 Annual Report, at 17; accessible at https://www08.wellsfargomedia.com/assets/pdf/about/investor-relations/annual-reports/2020-annual-report.pdf.

[40] *Id*. at 16.

2013830.1

is worth approximately $800,000, as it was in 2019.  In or about August 2019, Mr. Braxton began the process of applying to refinance his two Wells Fargo loans to take advantage of reduced interest rates.  At the time, he owed $185,000 on both his Wells Fargo loans and paid a 6% interest rate on both loans, multiple percentage points higher than the average refinance rate at the time.

46.     When Mr. Braxton initially applied to refinance his First Loan, Wells Fargo repeatedly asked him to resubmit paperwork because Wells Fargo representatives claimed the paperwork was either missing or lost.  Wells Fargo representatives also continually took weeks and weeks to issue or reply to correspondence.  Mr. Braxton thereafter began the process of refinancing his Second Loan and was confronted with the same delays.

47.     Frustrated by the delays and because he was continuing to pay a higher mortgage rate while his applications were pending, Mr. Braxton regularly contacted his loan officers and other Wells Fargo personnel to ask about the status of his applications.

48.     After months of frustrating encounters with Wells Fargo personnel, Mr. Braxton decided to call HUD.  A HUD representative informed Mr. Braxton that they would be contacting Wells Fargo.  The very next day, Wells Fargo approved the refinancing of Mr. Braxton's federally backed FHA home loan, approximately nine months after he began the process.

49.     Eventually, around October 2020, Wells Fargo finally approved a refinancing of his Second Loan.  However, despite the contact from HUD, which presumably prompted it to act on Mr. Braxton's First Loan, Wells Fargo continued its discrimination through race-based application delays.  It continued to claim that paperwork needed to process the Second Loan was missing, even though Mr. Braxton had already provided the paperwork.  At one point, after having sent a notary to his home to finalize some paperwork, Wells Fargo informed Mr. Braxton that the notary had lost the paperwork and he needed to complete some forms again.

2013830.1

50.     All told, Mr. Braxton submitted four applications because Wells Fargo kept losing them.  During the 16 months that his applications were pending, Mr. Braxton continued to pay the higher original mortgage rates instead of the lower refinanced rates he was seeking (and ultimately proven entitled to).  However, unbeknownst to Mr. Braxton, in the end the rate he received for his refinancing, while lower than his original rate, was much higher than the fair market rate received by similarly situated non-Black applicants.

## V.     CLASS ALLEGATIONS

51.     Plaintiff Aaron Braxton brings this action on behalf of himself and a potential class of similarly situated Black Americans.

52.     Each and every claim alleged in this case is also alleged on behalf of every member of the Class.

### A.     Class Definition

53.     The Class includes all Black persons in the United States who, from January 1, 2018 through the present (the "Class Period"), submitted an application to refinance their home mortgage through Defendants that was (i) processed at a rate slower than that of the average processing time of applications made by non-Black applicants; or (ii) whose applications were denied; or (iii) whose resulting refinance loans were made at higher interest rates as compared to similarly situated non-Black applicants.  Excluded from the Class are Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this complaint, and the United States government.

54.     Class certification is authorized under Federal Rule of Civil Procedure 23 and applies to claims for injunctive and equitable relief, including restitution, under Rule 23(b)(2), and for monetary damages under Rule 23(b)(3).

55.     There are at least 13,000 members of the Class.

56.     The number of persons who fall within the definitions of the Class are so numerous and geographically dispersed so as to make joinder of all members of

the Class or Subclass in their individual capacities impracticable, inefficient, and unmanageable, and without class-wide relief, each member of the Class would effectively be denied his, her, or their rights to prosecute and obtain legal and equitable relief based on the claims and allegations averred in the Complaint.

57.     Plaintiff, as detailed below, can fairly and adequately represent the proposed Class.  In the alternative, Plaintiff can act as the representative of the below subclasses.

**B.     Proposed Subclasses**

58.     Additionally, or in the alternative, pursuant to Federal Rule of Civil Procedure 23(c)(5), Mr. Braxton brings this action on behalf of the following subclasses:

59.     The Delayed Refinancing Subclass:  All Black persons in the United States who applied for refinancing from the Defendants during the class period and whose applications processed at a rate slower than that of the average processing time of applications made by non-Black applicants.

60.     The Higher Rate Subclass:  All Black persons in the United States who applied for refinancing from the Defendants during the class period and whose refinancing applications were eventually approved, but at a higher interest rate than prevailing market rates based on their creditworthiness.

**C.     Numerosity and Ascertainability**

61.     **Numerosity.**  While the exact numbers of the members of the Class and Subclasses are unknown to Plaintiff at this time, membership in the Class and Subclasses may be ascertained from the records maintained by Wells Fargo.  At this time, Plaintiff is informed and believes that the Class includes hundreds of thousands of members and the Subclasses includes tens of thousands of members. Therefore, the Class and Subclasses are sufficiently numerous that joinder of all members of the Class and Subclasses in a single action is impracticable under Rule 23(a)(1) of the Federal Rules of Civil Procedure, and the resolution of their claims

through a class action will be of benefit to the parties and the Court.

62. **Ascertainability.** The names and addresses of the members of the Class and Subclasses are contained in Wells Fargo's records. Notice can be provided to the members of the Class and Subclasses through direct mailing, email, publication, or otherwise using techniques and a form of notice similar to those customarily used in consumer class actions arising under State and Federal law.

## D. Commonality and Predominance

63. This matter involves common questions of law and fact which predominate over any question solely affecting individual Class Members.

64. The common questions of law and fact include, but are not limited to:

- Whether Defendant systematically discriminated against Class Members on account of their race;

- Whether Black applicants' home mortgage and refinance applications were processed at a rate slower than that of the average processing time of applications made by non-Black applicants;

- Whether Black applicants' home mortgage and refinance applications were denied when the score of a similarly situated non-Black applicant would be approved;

- Whether Black applicants' resulting refinance loans were made at higher interest rates as compared to similarly situated non-Black applicants;

- Whether Defendant selected disproportionately white areas for rapid refinancing evaluation and disproportionately Black areas for increased scrutiny;

- Whether Defendants' underwriting algorithms and machine learning programs were racially biased and led to unfairly discriminatory credit policies that harmed Black refinancing applicants.

65. **Predominance.** Class action status is warranted under Rule 23(b)(3) of the Federal Rules of Civil Procedure because questions of law or fact common to the members of the Class and Subclasses predominate over any questions affecting only individual members. The interests of the members of the Class and Subclasses in individually controlling the prosecution of separate actions are theoretical and not

practical.  Prosecution of this action through multiple Class Representatives would be superior to individual lawsuits.  Plaintiff is not aware of any difficulty which will be encountered in the management of this litigation which should preclude its maintenance as a class action.

**E.    Typicality and Adequacy**

66.    Plaintiff Aaron Braxton's claims are typical of the other Class Members' claims because all Class Members were injured in the same manner as a result of substantially similar conduct by Wells Fargo.

67.    Mr. Braxton is an adequate Class Representative because his interests do not conflict with the interests of the other members of the Class and Subclasses he seeks to represent.  Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.  The Class and Subclasses' interests will be fairly and adequately protected by Plaintiff and his counsel.

**F.    Superiority**

68.    A class action is the superior method for the fair and efficient adjudication of this matter, because the damages and other harms suffered by Plaintiff and other Class Members are small compared to the burden and expense of individual litigation.  Thus, it would be impractical, if not impossible, for individual plaintiffs to seek redress against Defendants for the harms suffered.

69.    Individual litigation of these harms would also be inefficient for the court system, and would create a risk of inconsistent or contradictory rulings and judgments.

70.    No unusual circumstances exist that would make this matter more difficult to manage than a typical class action.  Individualized damages figures can be mathematically computed by collecting data about the length of each Class Member's delay and the differential between the interest rates they ultimately received versus the prevailing market rate based on race-neutral variables such as

debt-to-income ratio, loan-to-value ratio, and credit score.

**G.    Injunctive Relief**

71.    Plaintiff also seeks to represent a class under Rule 23(b)(2) seeking injunctive relief forcing Wells Fargo to cease and desist its current discriminatory practices.

<u>**COUNT I**</u>

**VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT**

**15 U.S.C. § 16901, *et seq.***

72.    Plaintiff, on behalf of himself and all those similarly situated, realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

73.    The Equal Credit Opportunity Act makes it unlawful for a creditor to discriminate against any applicant with respect to any aspect of a credit transaction on the basis of race.

74.    The Equal Credit Opportunity Act applies to applications for refinancing, like those of the Plaintiff and others similarly situated.  Plaintiff applied for credit by seeking to refinance his home loans.

75.    Defendants are creditors because they regularly extend, renew, and continue issuances of credit.

76.    Defendants' consistent delays, roadblocks, feigned difficulties, and sometimes denials of applications for refinancing submitted by Black Americans constitute race-based discrimination forbidden by the Equal Credit Opportunity Act.

77.    Plaintiff and all those similarly situated were harmed by Defendants' conduct, including but not limited to harm in the form of higher interest rates paid while applications were pending, higher interest rates paid upon a delayed approval, or from a denied application.

78.    On behalf of himself and the Class he seeks to represent, Plaintiff requests the relief set forth below.

<u>**COUNT II**</u>

**RACE DISCRIMINATION IN VIOLATION OF THE FAIR HOUSING ACT OF 1968, 42 U.S.C. § 3601, *et seq.***

79.     Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

80.     The Fair Housing Act makes it unlawful, in residential real estate transactions, such as refinancing, to discriminate against designated classes of individuals.

81.     Plaintiff and others similarly situated sought to engage in residential real estate transactions with the Defendants.

82.     Plaintiff and others similarly situated are Black Americans and therefore members of a protected class under the Fair Housing Act.

83.     Defendants refused to transact business with Plaintiff and others similarly situated when they refused to approve refinancing applications on the same timeline as the applications made by other parties with similar qualifications that were not members of the protected class, by causing applicants to withdraw applications due to roadblocks and feigned difficulties, or by denying refinancing applications.  As noted, Defendants approved fewer than half of Black homeowners' refinancing applications in 2020 while approving 71% of the applications of White homeowners.

84.     Defendants refused to transact business with Plaintiff and those similarly situated during the Class Period and at the same time did transact business with non-Black homeowners with similar qualifications.

85.     Plaintiff and those similarly situated were injured by Defendants' refusal to transact business with them because they paid application fees for refinancing applications that were delayed or denied, because they continued to pay higher interest rates while their delayed applications were pending, because they were provided with higher interest rates than other homeowners with similar

1   qualifications, and/or because their applications were denied.

2   ## COUNT III

3   ### RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981

4   86.    Plaintiff realleges each and every paragraph above and incorporates

5   them by reference as though fully stated herein.

6   87.    Under 42 U.S.C. § 1981, persons of all races are guaranteed the same

7   right to make and enforce contracts, regardless of race.  The term "make and

8   enforce" contracts includes the making, performance, modification, and

9   terminations of contracts, as well as all of the other aspects of a contractual

10  relationship.

11  88.    By seeking to refinance their home loans and submitting an application

12  to Defendants, Plaintiff and others similarly situated sought to "make and enforce"

13  contracts with the Defendants.

14  89.    Plaintiff and those similarly situated were denied their right to make

15  and enforce contracts when Defendants refused to provide refinancing on the same

16  terms as they offered to members of a different race, by delaying or frustrating the

17  applications process, and/or by denying the applications.

18  90.    Plaintiff and those similarly situated were harmed by Defendants'

19  denial of their rights to make and enforce contracts.

20  ## COUNT IV

21  ### VIOLATION OF THE UNRUH CIVIL RIGHTS ACT,

22  ### CALIFORNIA CIVIL CODE §51

23  91.    Plaintiff realleges each and every paragraph above and incorporates

24  them by reference as though fully stated herein.

25  92.    The Unruh Civil Rights Act provides that all persons within the State of

26  California are free and equal no matter their race and are entitled to full and equal

27  treatment in all business establishments.

28  93.    The Unruh Civil Rights Act thus prohibits discrimination of any kind

-23-

Case No.

1    against any person in any business establishment.

2        94.     Defendants are business establishments under the Unruh Civil Rights

3    Act.

4        95.     Plaintiff and other individuals similarly situated were denied full and

5    equal treatment under the Unruh Civil Rights Act when Defendants refused to offer

6    them refinancing terms on the same terms as individuals who were not Black

7    Americans.

8        96.     Plaintiff and other individuals similarly situated were harmed by

9    Defendants' refusal to transact business with them because they paid application

10   fees for refinancing applications that were delayed or denied, because they

11   continued to pay higher interest rates while their delayed applications were pending,

12   because they were provided with higher interest rates than other homeowners with

13   similar qualifications, and/or because their applications were denied.

14                                **COUNT V**

15   **VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**

16       97.     Plaintiff realleges each and every paragraph above and incorporates

17   them by reference as though fully stated herein.

18       98.     The California Unfair Competition Law ("UCL") forbids "unlawful,

19   unfair or fraudulent" conduct in connection with business activity.

20       99.     Defendants' business offering refinancing of existing loans is a

21   business activity under the UCL.

22       100.    Plaintiff and others similarly situated are "persons" under the UCL.

23       101.    Defendants' conduct described herein constitutes unlawful competition,

24   as in the course of engaging in the business acts described above, it engaged in

25   conduct that constituted a predicate violation of the laws identified herein, namely

26   the Equal Credit Opportunity Act, the Fair Housing Act, 42 U.S.C. § 1981, and the

27   Unruh Civil Rights Act.

28       102.    Defendants' conduct described herein constitutes unfair competition

under the UCL, as their practices are likely to deceive the public by informing the public of an alleged commitment to diversity and equality, but instead using hidden business practices designed to deny, delay and refuse the refinancing of loans of Black Americans, and subjecting those that are approved, to unfavorable terms.  As there is no legitimate justification for these practices, which have a disproportionately negative impact on the public, in comparison to any fair business, purpose Defendants' practices are unfair as defined under the UCL.

103.   Defendants' conduct described herein constitutes fraudulent competition under the UCL, as they advertise and other wise state that they are committed to diversity and equality, and will fairly and quickly process the refinancing applications of all applicants, but instead use hidden business practices designed to deny, delay and refuse the refinancing of loans of Black Americans, and subjecting those that are approved, to unfavorable terms.  These business practices are likely to deceive the public, and thus are fraudulent.

104.   Plaintiff and those similarly situated were injured by Defendants' refusal to transact business with them because they paid application fees for refinancing applications that were delayed or denied, because they continued to pay higher interest rates while their delayed applications were pending, because they were provided with higher interest rates than other homeowners with similar qualifications, and/or because their applications were denied.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court provides the following relief:

a.     Certify the 23(b)(2) and 23(b)(3) classes outlined above;

b.     Designate Plaintiff as a Class Representative and designate the undersigned counsel as lead Class Counsel;

c.     Find that Defendants' acts described herein violate the Equal Credit Opportunity Act, the Fair Housing Act, 42 U.S.C. § 1981, the Unruh

1   Civil Rights Act, and the California UCL;

2   d.   Find that Defendants have engaged in a pattern and practice of racial

3        discrimination resulting in the harm to Plaintiff and class members

4        described above;

5   e.   Award Plaintiff and all others similarly situated restitutionary relief,

6        together with compensatory and punitive damages;

7   f.   Award Plaintiff and all others similarly situated injunctive relief by

8        ordering Defendants to stop the discriminatory practices described

9        herein;

10  g.   Award Plaintiff and all others similarly situated prejudgment interest

11       and attorney's fees, costs, and disbursements; and

12  h.   Award Plaintiff and all others similarly situated such other relief as this

13       Court deems just and proper.

14   ## DEMAND FOR JURY TRIAL

15  Plaintiff demands a trial by jury of all issues so triable.

16

17  DATED:  March 18, 2022          ELLIS GEORGE CIPOLLONE
                                    O'BRIEN ANNAGUEY LLP
18                                      Dennis S. Ellis
19                                      Noah S. Helpern
                                        Ryan Q. Keech
20                                      Joseph Kiefer (*pro hac vice* forthcoming)
21                                      Stefan Bogdanovich

22

23

24                                  By: _____
                                            Dennis S. Ellis
25                                  Attorneys for Plaintiff Aaron Braxton and all
                                    other similarly situated Plaintiffs
26

27

28

-26-

DATED:  March 18, 2022       FRANK, SIMS & STOLPER LLP
                                        Jason M. Frank
                                        Scott H. Sims
                                        Andrew D. Stolper

By:          /s/ Jason Frank          
               Jason Frank
Attorneys for Plaintiff Aaron Braxton and all other similarly situated Plaintiffs

**<u>Attestation under N.D. Cal. L.R. 5-1(h)</u>**: the ECF filer of this document attests that all of the other signatories have concurred in the filing of the document, which shall serve in lieu of their signatures on the document.

# EXHIBIT B

1  ELLIS GEORGE CIPOLLONE
   O'BRIEN ANNAGUEY LLP
2  Dennis S. Ellis (State Bar No. 178196)
      dellis@egcfirm.com
3  Trent B. Copeland (State Bar No. 136890)
      tcopeland@egcfirm.com
4  Ryan Q. Keech (State Bar No. 280306)
      rkeech@egcfirm.com
5  2121 Avenue of the Stars, Suite 2800
   Los Angeles, California 90067
6  Telephone: (310) 274-7100
   Facsimile: (310) 275-5697
7

8  FRANK SIMS & STOLPER LLP
   Jason Frank (State Bar No. 190957)
9      jfrank@lawfss.com
   Scott H. Sims (State Bar No. 234148)
10     ssims@lawfss.com
   Andrew D. Stolper (State Bar No. 205462)
11     astolper@lawfss.com
   19800 MacArthur Blvd., Suite 855
12 Irvine, California 92612
   Telephone: (949) 210-2400
13 Facsimile: (949) 201-2405

14 (Additional Counsel on Signature Page)

15 Attorneys for Plaintiffs Aaron Braxton,
   Gia Gray, Bryan Brown, Paul Martin, on
16 behalf of themselves and all others
   similarly situated
17

18                  UNITED STATES DISTRICT COURT

19                  NORTHERN DISTRICT OF CALIFORNIA

20

21 AARON BRAXTON, GIA GRAY,           Case No. 4:22-cv-01748-KAW
   BRYAN BROWN AND PAUL
22 MARTIN, on behalf of themselves and   **FIRST AMENDED CLASS ACTION**
   all others similarly situated,        **COMPLAINT FOR:**
23
24          Plaintiffs,                   **1. VIOLATION OF THE EQUAL**
                                          **CREDIT OPPORTUNITY ACT,**
25     vs.                                **15 U.S.C. § 1691,** *ET SEQ.*
                                          **2. RACE DISCRIMINATION IN**
26 WELLS FARGO BANK, N.A., a             **VIOLATION OF THE FAIR**
   Delaware corporation; WELLS FARGO    **HOUSING ACT OF 1968, 42**
27 HOME MORTGAGE, INC., a               **U.S.C. § 3601,** *ET SEQ.*
   Delaware corporation; WELLS FARGO
28 & CO., a Delaware corporation,

2029104

                                          Case No. 4:22-cv-01748-KAW

| | |
|---|---|
| Defendants. | **3. RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981**<br>**4. VIOLATION OF THE UNRUH CIVIL RIGHTS ACT, CALIFORNIA CIVIL CODE § 51**<br>**5. VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Aaron Braxton, Gia Gray, Bryan Brown and Paul Martin, individually and as representatives of a nationwide class of Black applicants for home mortgage refinancing through Wells Fargo and its related entities (collectively "Plaintiffs" or the "Class"), allege as follows:

## I.    NATURE OF ACTION

1.    The benefits of homeownership have long been the cornerstone of the American Dream—allowing citizens to accumulate wealth through access to credit, generating equity, and reducing housing costs.[1]

2.    However, the benefits of homeownership have for far too long been unattainable for a disproportionate number of Black Americans, and more difficult for Black Americans to maintain once achieved.  Historically, Black Americans have been repeatedly and systematically denied access to the financial benefits of homeownership through the use of pernicious and pervasive race-based exclusions. These denials included, for example, the Federal Housing Administration's refusal to insure mortgages in and near Black neighborhoods—a practice now referred to as "redlining"—at the same time that the FHA subsidized builders who mass-produced entire subdivisions made for White Americans.

---

[1] https://www.forbes.com/sites/forbesrealestatecouncil/2021/09/28/homeownership-and-the-american-dream/?sh=1c78499623b5.

2029104

FIRST AMENDED CLASS ACTION COMPLAINT

3.     The passage of civil rights legislation in the 1960s was supposed to fix that historical injustice, eliminate race-based gatekeeping practices like redlining and restrictive covenants while righting this long-standing American wrong.  For many homeowners seeking a first or refinanced mortgage with some banks, it did.  For many Black Americans, however, discrimination in the realm of home ownership remains a vestige of the country's prejudice narrative.

4.     Over the past few years, historically low interest rates spawned an unprecedented opportunity for homeowners to refinance their home mortgages.  Refinanced mortgages allow homeowners to reduce their monthly payments (as well as the overall interest due during the life of their loan) while still amassing equity in their homes.  Not surprisingly, millions of homeowners across the nation sought to reduce their payments through refinancing.

5.     Unfortunately, Black homeowners who sought to refinance through the Defendants in this case—Wells Fargo Bank, N.A., Wells Fargo & Co., and Wells Fargo Home Mortgage (collectively "Defendants" or "Wells Fargo")—were disproportionately denied refinance applications or, even if ultimately approved, faced unjustified delays in the processing of their applications.

6.     Wells Fargo **denied the applications of over 50%** of the Black Americans seeking to refinance in 2020, and **denied the applications of just under 50%** of the Black Americans seeking to refinance in 2021.  No other major lending institution refused to refinance the homes of Black Americans at such stunning rates.

7.     The numbers associated with Defendants' misconduct tell a shameful story, without any legitimate explanation.  Data from eight million refinancing applications from 2020 reveal that "the highest-income Black applicants [had] an approval rate about the same as White borrowers in the lowest-income bracket."[2]

---

[2] *Id.*

White refinancing applicants earning between $0 and $63,000 a year were ***more likely*** to have their refinancing application approved by Wells Fargo than Black refinancing applicants earning between $120,000 and $168,000 a year.[3]  Overall, in 2020, Wells Fargo rejected a ***majority*** of all the completed applications submitted by Black homeowners.[4]  And because Wells Fargo designed an application process that is disproportionately difficult for Black homeowners to complete, 27% of all Black homeowners who began a refinance application with Wells Fargo withdrew it.[5]  When this group of Black homeowners who were unable to complete the refinance process due to discriminatory barriers are added to the total pool of Black homeowner refinance applicants, just one-third of the Black homeowners who applied for a refinance loan with Wells Fargo were successful.

8.       In 2020—at the height of the refinancing boom, when millions of Americans benefitted from the historically low interest rate environment—Wells Fargo approved 47% of all applications by Black homeowners (meaning that Wells Fargo rejected the majority of applications from Black homeowners), whereas all other lenders approved 71% of all applications by Black homeowners.[6]  In 2020, no other lending institution rejected a majority of Black homeowners' applications for refinancing.[7]

9.       Wells Fargo was the only major lender in the United States that approved a smaller share of refinancing applications from Black homeowners in

---

[3] *Id.*

[4] *Id.*

[5] *Id.*

[6] *Id.*

[7] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-refinancing/.

1    2020 than it had in 2010.[8]

2        10.    The story in 2021 was the same, with Wells Fargo approving a much

3    lower percentage of Black homeowner applicants than any other lender.[9]  Wells

4    Fargo approved only 58% of Black applicants compared to other lenders, which

5    approved 74% of Black homeowner applicants.[10]  And the disparity between Black

6    and White refinance approval rates was 21% at Wells Fargo, nearly double the

7    disparity (13%) for all other for other lenders.[11]  And while Wells Fargo's Black

8    homeowner refinancing approval rate improved slightly from 2020, the same was

9    true at all other lenders, due to broader economic conditions.[12]  By comparison,

10   other major lenders approved much higher rates of Black homeowner refinancing

11   applicants in 2021:  JP Morgan Chase & Co. approved 87% of Black homeowner

12   applicants (only 6% less than White applicants), Rocket Mortgage LLC approved

13   81% of Black homeowner applicants (only 7% less than White applicants), and

14   Bank of America Corporation approved 75% of Black homeowner applicants (only

15   11% less than White applicants).[13]

16       11.    Overall, the data released under the federal Home Mortgage Disclosure

17   Act shows unequivocally that Wells Fargo rejects a disproportionate number of

18   Black homeowners' refinancing applications.[14]  Wells Fargo also makes the

19   _____

20   [8] *Id.*

21   [9] https://www.bloomberg.com/news/articles/2022-03-25/wells-fargo-faces-
22   persistent-racial-gap-in-mortgage-refinancing.

23   [10] *Id.*

24   [11] *Id.*

25   [12] *Id.*

26   [13] *Id.*

27   [14] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-
28

2029104

refinancing application process more difficult for Black homeowner applicants than others on a national scale.[15]  And Wells Fargo customers report loan officers stating that Wells Fargo's underlying refinance calculation tools consider certain "areas" with large Black populations to be ineligible for rapid valuations.[16]  Black homeowner applicants are further subjected to delays, feigned mistakes, and other obstacles, leading many Black Americans to withdraw their requests for refinancing and leading others to wait indefinitely while Wells Fargo refuses to act upon their applications.

12.     In light of this, Wells Fargo's stated commitment to "help[] ensure that all people across our workforce, our communities, and our supply chain feel valued and respected and have equal access to resources, services, products, and opportunities to succeed"[17] rings hollow.  Instead, Wells Fargo pervasively denies Black homeowners' refinancing applications and consistently delays the applications it does not deny, in many cases ultimately forcing Black homeowners into foreclosure.[18]

13.     Core responsibility for Wells Fargo's discriminatory treatment of Black homeowner applicants lies with its decision to employ centralized, universal, race-infected lending algorithms without correction to differentially assess, delay and ultimately reject refinancing applications.

14.     Used properly, automated underwriting technology helps individual

---

refinancing/.

[15] *Id.*

[16] *Id.*

[17] https://www.wellsfargo.com/about/diversity/diversity-and-inclusion/.

[18] https://www.nclc.org/images/pdf/special_projects/covid-19/IB_Covid_Black_Forbearance_Foreclosure.pdf.

2029104

1  loan officers who are properly trained and familiar with the legal environment in
2  which banks operate make sound, individualized underwriting decisions that protect
3  the interests of borrowers, banks, investors, insurers and the federal government,
4  taking into account race-neutral data points and employing formulae based on those
5  data points to decide whether or not the proposed loan is in the best interest of the
6  bank and the borrower.

7     15.    But that is not how Wells Fargo utilized its automated underwriting
8  technology.  Quite the contrary:  confidential informants with knowledge of Wells
9  Fargo's refinance operations confirm that the onset of the COVID-19 pandemic led
10 Wells Fargo to jettison or otherwise ignore well-established internal fair lending
11 checks and balances in favor of implementing a centralized, "pioneering automated
12 underwriting" system—sometimes referred to as CORE—without sufficient, or
13 sometimes any, human supervision or involvement.

14    16.    These witnesses describe troubling facts whereby, as COVID-19 hit,
15 multiple loan processors and underwriters were terminated or otherwise left the
16 bank's residential lending operations and were not replaced, and, instead, the CORE
17 pioneering automated underwriting system was increasingly centralized to facilitate
18 at-home work by originators, processors, and underwriters.  According to these
19 same witnesses, the coding and machine learning endemic to the CORE algorithmic
20 underwriting platform were—byte by byte—stuffed chock-full of numerous Wells
21 Fargo-generated geographic, demographic, race-stratified liquidity and appraisal and
22 other "overlays" that Wells Fargo knew served no legitimate underwriting basis but,
23 instead, functioned as signals for race discrimination in Wells Fargo's residential
24 refinance decisions.

25    17.    These and other "overlays" pervasively infecting Wells Fargo's CORE
26 algorithms—which become even more invidious with each successive denial that
27 taught the algorithm these denials were appropriate—ultimately serve Wells Fargo's
28 purpose of segregating the creditworthiness of prospective applicants based on their

2029104

1　race, and differentiate Wells Fargo's assessments from the other major lending

2　institutions.

3　　　　18.　Confidential informants with knowledge of Wells Fargo's recent

4　lending operations also specify just how heavily Wells Fargo relied on its

5　systematically racist algorithmic underwriting decisions and increasing lack of an

6　individualized human element in Wells Fargo's process.  As but one example, Wells

7　Fargo loan processors supposedly responsible for shepherding applications through

8　the bank's systems—typically expected to process 30 applications per month but

9　forced by Wells Fargo's CORE platform to process more than 50 and sometimes

10　nearly 100 per month—were rendered powerless to supervise the process, override

11　the algorithm, or otherwise intervene on the side of basic compliance with the fair

12　housing laws.

13　　　　19.　Some of these same confidential informants have further confirmed

14　that, over and over during the COVID-19 pandemic and afterwards, they referred

15　denied Black homeowner applicants to competitor financial institutions that swiftly

16　approved the applications and asked, because the applications should have resulted

17　in "easy approvals" for Wells Fargo, how Wells Fargo could have denied them.

18　　　　20.　Wells Fargo propounds its discriminatory treatment of Black

19　homeowners by incorporating, without adjustment, appraisals that have been shaped

20　by years of race-based valuation standards or appraisals that are based on race-based

21　criteria that have markedly affected Black homeowners into its analysis.  Homes in

22　majority Black neighborhoods are worth an average of 23% less than homes in

23　neighborhoods with "very few or no Black residents" and similar home quality.[19]

24

25　_____

26　[19] https://www.brookings.edu/research/devaluation-of-assets-in-black-neighborhoods/?utm_source=newsletter&utm_medium=email&utm_campaign=sen

27　dto_newslettertest_business&stream=top#_ga=2.213288596.1000901909.16495538
87-1080662765.1648140872.

28

2029104

1  The disparities in home appraisals leave Black homeowners at a disadvantage where

2  below market home appraisals limit refinancing options.

3      21.    In September 2021, the Federal Home Loan Mortgage Corporation

4  released the results of a five-year study based on more than 12 million appraisals.[20]

5  The study found that "Appraisers' opinions of value are more likely to fall below the

6  contract price in Black and Latino census tracts, and the extent of the gap increases

7  as the percentage of Black or Latino people in the tract increases."[21]  Wells Fargo's

8  practice of engaging in appraisal discrimination has not only led to delays in the

9  application process for Black homeowners but has forced those who received under-

10  market appraisals from Wells Fargo to abandon the process with Wells Fargo and

11  turn elsewhere.

12      22.    Plaintiffs are the unfortunate victims of Wells Fargo's pervasive

13  misconduct:  Black homeowners from across the country whose applications to

14  refinance their home loans have been systematically delayed or denied because

15  Wells Fargo's CORE algorithm operates to discriminate against them.  Tens of

16  thousands have been victimized by Wells Fargo's intentional, knowing and

17  systematic race discrimination, violating the contractual, commercial and civil rights

18  of Class members and causing millions (and perhaps even billions) of dollars in

19  damages to the Nationwide Class.  Individually and as representatives of the Class

20  (defined below), Plaintiffs bring this action to enjoin the present day redlining by

21  Wells Fargo through its discriminatory practices and to make good to the Class all

22  damages resulting from Defendants' violations of civil rights laws and to restore to

23  the Class any amounts to which they otherwise would have been entitled, together

24  with such other equitable and remedial relief as the Court may deem appropriate.

25

26  _____

27  [20] https://www.freddiemac.com/research/insight/20210920-home-appraisals.

28  [21] *Id.*

2029104

FIRST AMENDED CLASS ACTION COMPLAINT

## II.  JURISDICTION AND VENUE

23.    This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332(d), and 1343, because the Plaintiffs assert federal causes of action, because Plaintiffs assert civil rights causes of action, because at least one member of the Class is a citizen of a different state than all Defendants, and because the amount in controversy exceeds $5,000,000.

24.    Personal jurisdiction is appropriate over Defendants because Wells Fargo Bank, N.A. transacts business in the State of California and has its principal place of business in San Francisco, California, Wells Fargo Home Mortgage, Inc. originates loans to California customers from its California offices and maintains a systematic and continuous presence in the State, Wells Fargo & Co. has its corporate headquarters in San Francisco, California.

25.    Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b) because Wells Fargo Bank, N.A. resides in this district, a substantial part of the events or omissions giving rise to the claim occurred in this district, Wells Fargo Bank, N.A.'s principal place of business is in this district, and Wells Fargo & Co. has its corporate headquarters in this district.

## III.  PARTIES

### *Aaron Braxton*

26.    Plaintiff Aaron Braxton, who is a Black homeowner, is a natural person and a citizen of the State of California and resides in Los Angeles, California.

27.    Mr. Braxton is one victim of Wells Fargo's discriminatory policies.  He is a financially successful and eminently creditworthy Black playwright, performer, and a math and science teacher with a Master's degree from the University of Southern California.[22]  He has authored several award-winning plays, including *DID*

---

[22] https://www.imdb.com/name/nm1347914/bio?ref_=nm_ov_bio_sm.

*YOU DO YOUR HOMEWORK?*, which broke the Beverly Hills Playhouse's record for longest running play (nine months).[23]  He has also written several films and television pilots, and acted in several film, television, and theatre projects.[24]

28.  In addition, for two decades, Mr. Braxton was a Wells Fargo mortgage customer.  He purchased his home in 2000, in a historically Black neighborhood located in South Los Angeles near the campus of the University of Southern California, and secured his property with a Wells Fargo home mortgage insured by the Federal Housing Administration (FHA).  Mr. Braxton always made his mortgage payments and bills on time, and he had a good credit score.

29.  Yet despite his successful career and his creditworthiness, when Mr. Braxton sought to refinance his home mortgage loans in August of 2019, Wells Fargo consistently obstructed his ability to refinance his loans.  Despite favorable loan-to-value metrics and his personal history with the institution, Wells Fargo was focused more on his race and the location of his home within a historically Black Los Angeles neighborhood, and used the fact of his race and the location of his home to delay, obstruct and deny him the full benefits of historically low home mortgage interest rates.  Wells Fargo did this even though, having paid his loans for more than 18 years, Mr. Braxton had equity in his home far greater than the amount remaining on his FHA-secured loan.

30.  Mr. Braxton was given the runaround to such an extent that it took him over nine months to refinance his federally backed mortgage loan (and 12 months to refinance his home equity loan) at an above-market interest rate of around 4%.  This was after various Wells Fargo representatives kept telling him they lost his paperwork, made incomplete inquiries and needed to request more information, delayed their responses, and even placed him into an unsolicited debt-trap deferred

---

[23] *Id.*

[24] *Id.*

1  payment program without his permission.  It was only after Mr. Braxton notified the
2  Department of Housing and Urban Development ("HUD") that Wells Fargo
3  approved the refinancing of his federally backed FHA loans (indeed, Wells Fargo
4  approved the application the very next day).  Of course, for the prolonged period
5  that Mr. Braxton was waiting for Wells Fargo to refinance his loans, he was paying
6  the higher rates associated with his original loans.

7  *Gia Gray*

8  31.  Plaintiff Gia Gray, who is a Black homeowner, is a natural person and a
9  citizen of the State of California and resides in Danville, California.

10  32.  Mrs. Gray is another victim of Wells Fargo's discriminatory policies.
11  Mrs. Gray is a physician, as is her husband.  Both are employed and both,
12  individually, are in the top quintile of income earners.  The same was true when they
13  applied to refinance their loans with Wells Fargo.  Mrs. Gray's FICO score is above
14  800.

15  33.  The Grays own three homes.  Their primary residence is in Danville,
16  California, a predominately White area.  The couple also own income properties in
17  Stockton, California and Chicago, Illinois that are more diverse areas.  The couple
18  had Wells Fargo mortgages for their three homes, and, save for a balance of
19  approximately $1,000 on a credit card, the couple has and had no other debt.  The
20  couple never missed a mortgage payment and always paid on time.  They began the
21  refinancing process for their homes in February 2020.

22  34.  The Grays were only able to refinance the Danville, California
23  property—in the predominately White area—after four months.  Their loan officer
24  was located in Walnut Creek, California, another predominately White area, and he
25  actually took time out of his day to visit their multimillion-dollar home in Danville
26  in-person to sign refinancing documentation.  Even still, Wells Fargo kept asking
27  the Grays to provide additional information, and even contacted the Human
28  Resources department at Mrs. Gray's office.

2029104

Case No. 4:22-cv-01748-KAW
FIRST AMENDED CLASS ACTION COMPLAINT

35.     The Grays were not as lucky on their two other income properties.  The loan officer would try to steer Mrs. Gray away from these properties and only expressed an interest in refinancing her Danville, California property.  Wells Fargo eventually switched the couple's Walnut Creek loan officer to a Black assistant to handle these properties.  Wells Fargo would not return their calls for inquiries on refinancing these two properties.  When the couple did manage to get a hold of the assistant or loan officer, they were told that the Stockton, California property was in a bad area, and that the Chicago, Illinois property, although in a good area, was high risk, and that Wells Fargo was not looking to refinance high-risk areas.  Frustrated by Wells Fargo's ambivalence and inaction, the couple gave up on refinancing these properties in December 2020, nearly a year after they started.

*Bryan Brown*

36.     Plaintiff Bryan Brown, who is a Black homeowner, is a natural person and a citizen of the State of Connecticut and resides in Bristol, Connecticut.

37.     Mr. Brown is another victim of Wells Fargo's discriminatory policies.  For the past two decades, Mr. Brown has been a CAD designer at a prominent engineering company in Connecticut, and has invested in residential properties in Bristol and Plymouth, Connecticut.

38.     Mr. Brown is a long-time Wells Fargo mortgage customer.  Having purchased his multi-unit home in December 2010 with a Wells Fargo home mortgage, he has always made his mortgage payments, paid his bills on time, and maintained a good credit score.

39.     In October 2020, Mr. Brown sought to refinance his loan to convert his conventional 30-year loan to a 15-year fixed mortgage and to obtain a lower interest rate.

40.     Despite his investment properties, longstanding employment, and creditworthiness, when Mr. Brown sought to refinance his home mortgage, Wells Fargo subjected him to long periods of nonresponsiveness, arbitrary requests for

1  additional documents, and multiple calls to his employer requesting verification of

2  his employment.  Despite favorable loan-to-value metrics and his personal history

3  with the institution, Wells Fargo denied Mr. Brown's application to refinance after a

4  four-month runaround.  Wells Fargo did this even though, having paid his loan for

5  more than ten years, Mr. Brown had equity in his home that was almost equal to the

6  amount remaining on his loan.

7        41.    To this day, Mr. Brown's interest rate remains at 4.75%.

8             *Paul Martin*

9        42.    Plaintiff Paul Martin, who is a Black homeowner, is a natural person

10  and a citizen of the State of California and resides in Los Angeles, California.

11        43.    Mr. Martin has been a Hollywood entertainment executive at Sony

12  Pictures for 14 years.  In 2020, Paul Martin sought to refinance his home in the

13  Ladera Heights neighborhood of Los Angeles, which has a higher proportion of

14  affluent Black residents than most Los Angeles neighborhoods.  His multimillion-

15  dollar home was previously owned by WNBA superstar Lisa Leslie and NBA player

16  Aaron Afflalo.

17        44.    But Wells Fargo refused to refinance Mr. Martin's loan.  The bank

18  would not refinance his home unless he could get it appraised for $2 million.  Wells

19  Fargo's appraiser refused to come inside Mr. Martin's home, and appraised it at just

20  shy of $2 million based on comparisons with homes in less affluent Black-populated

21  neighborhoods, apparently conflating all areas with a high concentration of Black

22  residents.  Mr. Martin went to another lender, who appraised the home at $2.4

23  million and promptly refinanced his loan.

24             *Wells Fargo Entities*

25        45.    Defendant Wells Fargo Bank, N.A. is a nationally chartered bank with

26  its principal place of business located in San Francisco, California, and is chartered

27  in Wilmington, Delaware.  It has 19,234 employees across all its locations,

28  including several in the Northern District of California, and generates nearly $70

2029104

Case No. 4:22-cv-01748-KAW

FIRST AMENDED CLASS ACTION COMPLAINT

billion in sales annually.

46.    Defendant Wells Fargo Home Mortgage, Inc. is a home lending company that is part of the "Wells Fargo banking family."  It operates about 725 mortgage stores nationally and originates and services one-to-four-family residential first and junior-lien mortgages and home equity loans.  On average, it originates approximately $300 billion worth of loans per year.  It is incorporated in the State of Delaware, and has its principal place of business in Des Moines, Iowa.  Wells Fargo Home Mortgage, Inc. originates loans to California customers from its California office locations.

47.    Defendant Wells Fargo & Co. is a nationwide, diversified financial holding company and bank holding company incorporated in the State of Delaware with its principal place of business in San Francisco, California.  Wells Fargo provides banking, insurance, investment, and mortgage and consumer finance services through storefronts, the Internet, and other distribution channels across the United States and internationally.  It is the parent company of Wells Fargo Bank, N.A.

## IV.    FACTUAL ALLEGATIONS

### A.    The History of Discrimination in Housing

48.    This country has an unfortunate history of discrimination, and housing discrimination has always been a large part of this historical discrimination.

49.    In 1924, the National Association of Realtors Code of Ethics mandated that a realtor should "never be instrumental in introducing into a neighborhood members of any race whose presence will be clearly detrimental to any property values in the neighborhood."[25]  In other words, realtors were instructed that it was an ethical infraction to integrate neighborhoods.

---

[25] https://sf.curbed.com/2020/4/29/21240456/moms-4-housing-oakland-house-history.

2029104

-15-

Case No. 4:22-cv-01748-KAW

50.     Pursuant to this policy and so many others like it, realtors and developers would routinely designate specific properties to White Americans while reserving properties in other areas for minority Americans.  These designations would be found in rules, restrictions, and covenants attached to the properties.

51.     Legislation introduced during the New Deal purporting to help homeowners nationwide, in fact, codified racism into housing.  The Home Owners' Loan Corporation and the Federal Housing Administration graded residential areas from A-D, with A being the most likely to receive federal loan insurance, and D the least.  Areas with "Colored" and "Oriental" people were automatically given D ratings.[26]

52.     Federal Housing Administration underwriting manuals issued in 1938 sought to present the "infiltration of inharmonious racial groups" and directed underwriters to refuse to insure mortgages that would lead to "a change in social or racial occupancy."[27]

53.     As observed above, California has long perpetuated these discriminatory practices.  In Los Angeles, which was a leader in the nation's discriminatory segregation, a Black American in 1917 said "we were encircled by invisible walls of steel.  The whites surrounded us and made it impossible for us to go beyond these walls."[28]  In this era, Black Americans were excluded from living in 95% of the houses in Los Angeles.[29]

---

[26] *Id.*

[27] https://sf.curbed.com/2020/4/29/21240456/moms-4-housing-oakland-house-history.

[28] https://www.latimes.com/opinion/story/2021-09-10/racial-covenants-los-angeles-pioneered.

[29] *Id.*

54.     In Oakland, racialized zoning and restrictive covenants directed 80% of the city's Black population to West Oakland following World War II.[30]  Redlining made it impossible for these residents to obtain loans to improve their properties. Instead of helping, the city eventually, in the 1960s, razed large swaths of West Oakland, purportedly to build new homes, but the replacement projects languished and most residents were simply forced from their homes with nowhere to go.[31]

55.     Similarly, in the San Francisco area, homes from the 1930s included in title reports restrictions that "no person of any other race other than the Caucasian or white race" may own or occupy the property, except for "domestic servants of a different race domiciled with the homeowner or tenant."[32]  Similar provisions would often prohibit residents of "African, Mongolian, or Japanese" descent.[33]

56.     When a Black American would obtain one of these properties despite the clauses, White neighbors would sue, and the courts would force the Black Americans to leave their properties, cementing the discrimination.[34]  Indeed, the California Supreme Court specifically held in 1919 that Black Americans could own houses with restrictive clauses, they just could not reside there.[35]  While the states no longer enforce these covenants, they still charge a fee to homeowners wishing to

---

[30] https://sf.curbed.com/2020/4/29/21240456/moms-4-housing-oakland-house-history.

[31] *Id.*

[32] https://www.mercurynews.com/2019/02/26/for-whites-only-shocking-language-found-in-property-docs-throughout-bay-area/.

[33] *Id.*

[34] *Id.*

[35] https://www.latimes.com/opinion/story/2021-09-10/racial-covenants-los-angeles-pioneered.

2029104

1 strike them from their property records.[36]

2      57.    Even after the Civil Rights Act was passed, California adopted

3 Proposition 14, allowing for continued discrimination under the guise of freedom.

4 The proposition was ruled unconstitutional, but the state's residents had made clear

5 their position on discrimination in housing.[37]

6      58.    The pervasive discrimination against Black homeowners and those

7 wishing to become homeowners sadly persists to this day, and Wells Fargo's

8 treatment of Black homeowners seeking refinancing during the refinance boom that

9 took place over the last few years is just the latest attack on these long-maligned

10 citizens of this country.

11 **B.    Wells Fargo Has an Established History of Discrimination**

12      59.    Wells Fargo's discriminatory behavior described herein is completely

13 in line with Wells Fargo's history of discrimination in lending.  Indeed, the genesis

14 of its latest discriminatory practices seems to have followed the end of the policies it

15 put in place after an earlier series of lawsuits.

16      60.    In 2012, Wells Fargo agreed to pay $184 million to settle claims with

17 the Department of Justice that the bank pushed Black and Hispanic homeowners to

18 obtain subprime mortgages and then charged them higher fees and interest rates.[38]

19      61.    In 2015, the City of Oakland filed suit against Wells Fargo over its

20 racially discriminatory banking practices in seeking to originate mortgage loans on

21 predatory terms in minority neighbors and then its "subsequent [refusal] to extend

22 credit to minority borrowers seeking to refinance previously issued unnecessarily

23 _____

24 [36] https://www.mercurynews.com/2019/02/26/for-whites-only-shocking-language-found-in-property-docs-throughout-bay-area/.

25 [37] *Id.*

26

27 [38] https://www.justice.gov/opa/pr/justice-department-reaches-settlement-wells-fargo-resulting-more-175-million-relief.

28

expensive loans."[39]  And "when a minority borrower who previously received a predatory loan sought to refinance the loan," they "discover[ed] that Wells Fargo refused to extend credit at all, or on equal terms as refinancing similar loans issued to [W]hite borrowers."[40]  Even when refinancing applications were approved, the loans turned from a "fixed-rate loan into an adjustable-rate loan that the lender knows the borrower cannot afford should interest rates rise… the likely result of such practices is to cause homeowners who are otherwise…comfortably making payments on a modest existing mortgage, to be unable to make payment on a new, unaffordable loan."[41]

62.     The City of Oakland also performed a decade-long regression analysis of Wells Fargo loans in Oakland, which controlled for objective variables like "credit history, loan to value ratio, and the ratio of loan amount to income."  The City of Oakland found that, controlling for these factors, "an African-American borrower is 2.583 times more likely to result in foreclosure than a more favorable and less expensive loan issued to a [W]hite borrower in Oakland."[42]  This corroborated other national studies which found that Black American borrowers were "124% more likely to receive a subprime refinance loan" than their White counterparts.[43]

63.     Moreover, the City of Oakland alleged that Wells Fargo employed systematic policies like "giving loan officers and others responsible for mortgage

---

[39] *City of Oakland v. Wells Fargo Bank, N.A.*, 3:15-cv-04321, Dkt. No. 1, at 2 (N.D. Cal. Sept. 21, 2015).

[40] *Id.* at 4.

[41] *Id.* at 20.

[42] *Id.* at 20-21.

[43] *Id.* at 15.

2029104

lending large financial incentives to issue loans to African-Americans and Hispanics that are costlier than better loans for which they qualify" and "failing to monitor" for racial disparities after "Wells Fargo had notice of widespread product placement disparities based on race and national origin."[44]  Wells Fargo also systematically "fail[ed] to underwrite loans based on traditional underwriting criteria such as debt-to-income ratio, loan-to-value ratio, FICO score, and work history."[45]  This led District Judge Edward M. Chen to conclude that "Oakland has identified specific employment practices in addition to the mere delegation of discretion."[46]

64.    The practices leading to the 2012 and 2015 suits against Wells Fargo included manual revisions to applications to reverse redline applicants who would have been classified in a more risky area.  For a time, these practices receded, and Wells Fargo's refinancing rates to Black homeowners were similar to those of other major lenders.  But by 2020, Wells Fargo's rates plummeted in relation to the approval rates at other banks.

65.    The City of Oakland is not the sole municipality that has sought to hold Wells Fargo to account for its discriminatory conduct.  Cook County (Chicago) brought suit alleging predatory lending practices to strip minority homeowners of the equity from their homes.[47]  "Publicly available loan origination data indicates that the percentage of high-cost and other nonprime loans issued by Wells Fargo in Cook County to minority borrowers well exceeded the County's percentage of

---

[44] *Id*. at 33.

[45] *Id*. at 9.

[46] *City of Oakland v. Wells Fargo Bank, N.A.*, No. 15-CV-04321-EMC, 2018 WL 3008538, at *15 (N.D. Cal. June 15, 2018), *aff'd in part, rev'd in part on other grounds City of Oakland v. Wells Fargo & Co.,* 14 F.4th 1030 (9th Cir. 2021).

[47] *Cty. of Cook, Illinois v. Wells Fargo & Co*., 14-C-9548-GF (N.D. Ill.).

minority home owners—typically by a factor of two to three."[48]  And the disproportionately White employees at Wells Fargo were given "discretion to steer prime-eligible minority borrowers into nonprime loans."[49]  "Wells Fargo subjected minority borrowers to equity stripping to a greater extent than it did nonminority borrowers with similar credit histories."[50]  And "minority borrowers were particularly susceptible to Wells Fargo's predatory practices because they were more likely than nonminority borrowers to lack access to low-cost credit, relationships with banks and other traditional depository institutions, and adequate comparative financial information."[51]

66.     In 2019, Wells Fargo settled a lawsuit with the City of Philadelphia premised on allegations that it purposefully made it difficult for minorities to refinance their mortgages.[52]  The court in that case identified seven Wells Fargo policies that contributed to the discrimination against minorities:  (1) knowing about lending practices that either created high risk and higher cost loans to minorities compared to comparably credit situated White borrowers or failing to adequately monitor the Bank's practices regarding mortgage loans, including but not limited to originations, marketing, sales, and risk management; (2) failing to underwrite loans based on traditional underwriting criteria such as debt-to-income ratio, loan-to-value ratio, FICO score, and work history; (3) failing to prudently underwrite hybrid adjustable-rate mortgages ("ARMs"), such as 2/28s and 3/27s; (4) failing to prudently underwrite refinance loans, where borrowers substitute unaffordable

---

[48] *Cty. of Cook, Illinois v. Wells Fargo & Co.*, 314 F. Supp. 3d 975, 980 (N.D. Ill. 2018).

[49] *Id.*

[50] *Id.*

[51] *Id.*

[52] https://www.phila.gov/2019-12-16-city-of-philadelphia-and-wells-fargo-resolve-litigation/.

mortgage loans for existing mortgages that they are well-suited for and that allow them to build equity; (5) failing to monitor and implement necessary procedures within Wells Fargo's Internal Audit, Corporate Risk, Human Resources, Law Department, and Board of Directors throughout the Community Banking segment, which includes Wells Fargo's retail mortgage banking business responsible for the unlawful activities set forth herein, to ensure compliance with federal fair lending laws; (6) failing to abide by the terms of Wells Fargo's Vision & Values, which purportedly guides Defendants' business practices and relationships with customers; and (7) failing to ensure that Wells Fargo's decentralized organizational structure was capable of properly monitoring mortgage lending activities within Community Banking.

67. Wells Fargo's pervasive discrimination is not limited to housing. In August 2020, the company entered into a conciliation agreement with the U.S. Department of Labor and paid $7,800,000 over allegations of racist hiring practices. The Department of Labor under the Trump administration found that the company "discriminated against 34,193 African American applicants for banking, customer sales and service, and administrative support positions at U.S. locations nationwide."[53]

## C. The Refinancing Boom

68. During the last few years, interest rates were near an all-time low in the United States, and homeowners who held mortgage loans at higher rates (meaning a great deal of homeowners) sought to refinance their loans at lower rates. Refinancing during this time allowed homeowners to significantly reduce their monthly payments and to owe less mortgage interest over the life of the loan. Over the last two years, homeowners in the United States refinanced over $5 trillion

---

[53] https://www.dol.gov/newsroom/releases/ofccp/ofccp20200824.

1   worth of mortgages.

2         69.    In 2020, the prevailing market interest rates on mortgages "fell below

3   3% for the first time"[54] since it began being surveyed in 1970.[55]  And a study by the

4   Federal Reserve Banks of Boston, Atlanta, and Philadelphia found these

5   unprecedented low rates "spurred a boom in refinances" that was distributed

6   unequally.[56]  Although "Black and [W]hite borrowers were about equally likely to

7   refinance before the pandemic, [] Black borrowers were 40 less likely than [W]hite

8   borrowers to refinance after the pandemic started and interest rates dropped."[57]  All

9   told, only 6% of Black borrowers refinanced during the COVID-19 pandemic,

10   compared to 12% of White borrowers.[58]  With respect to Wells Fargo, that disparity

11   does not result from a lack of interest in refinancing by Black homeowners; it results

12   from disparate and discriminatory treatment by Wells Fargo that blocked Black

13   homeowners from engaging in the process.

14  **D.**    **Wells Fargo's COVID-19 Era Refinancing Application Process**

15       Part 1: Gathering of Key Geographic, Financial and Demographic Data and

16                 Submission of Form 1003 Through "Blend"

17         70.    Refinancing is necessarily a simpler process than obtaining an initial

18   home loan.  Homeowners who have made their payments on time and who seek to

19   refinance already own the necessary collateral and have already been approved for a

20

---

21  [54] *Racial Differences in Mortgage Refinancing, Distress, and Housing Wealth

22  *Accumulation during COVID-19*, Kristopher Gerardi, Lauren Lambie-Hanson, and
    Paul Willen, available at https://www.bostonfed.org/-

23  /media/Documents/Workingpapers/PDF/2021/cpp20210622.pdf.

24  [55] *Id*. at 1.

25  [56] *Id*.

26

27  [57] *Id*. at 2.

28  [58] *Id*.

2029104

home loan.  In addition, if the borrower is refinancing with the same bank that holds the original mortgage, that bank has access to detailed information about a borrower's payment history and, in many cases, will be evaluating that borrower's ability to make an even *lower* monthly payment than what was already being made. Determining whether to refinance, thus, is a less involved process than determining whether to issue a mortgage, or at least it should be.

71.　On November 27, 2017, as part of its explicit policy to "leverage the ideas in Silicon Valley and beyond" in mortgage underwriting, then-Wells Fargo CEO Tim Sloan announced its partnership with San Francisco startup Blend Labs to develop a new online mortgage application and related tools.

72.　During the COVID-19 era, Wells Fargo's idea of "leverag[ing] the ideas in Silicon Valley" involved, first, obtaining a prospective refinance applicant's personal information, including name, phone number, email address, and the last four digits of the prospective applicant's Social Security number.  Applicants are, thus, required to have and utilize email to participate in the process, including checking Wells Fargo's loan tracker system for updates and requests for additional information.  When, during the pandemic, visiting loan officers in person became infeasible, applicants without technical sophistication were disadvantaged.

73.　At this preliminary stage, Wells Fargo's algorithm obtains the first data points that are subsequently utilized in its discriminatory refinance decisions: names, phone numbers (including area codes), email addresses and Social Security numbers that can then be tied to other data and used in other formulae within Wells Fargo's systems.

74.　Next, Wells Fargo sends the applicant, via electronic mail, a dedicated link through Blend, the digital banking platform developed by Wells Fargo in conjunction with Blend Labs.  That link enables the applicant to complete a Uniform Residential Loan Application (Form 1003) and submit that application to Wells Fargo.

2029104

75.     It is here that Wells Fargo collects more information for its lending algorithm to use:  the information collected on this form includes the borrower's name, alternate names, Social Security number, date of birth, citizenship status, names of borrowers, marital status, number and ages of dependents, home, mobile and work phone numbers, the subject property address, property value, status of property, intended occupancy and monthly expenses, former addresses, mailing addresses, employment information, income information, asset information, liabilities and expenses, and military service.

76.     Next, a Wells Fargo loan officer conducts a follow-up telephone or in-person interview with the refinance applicant to obtain additional information that cannot be submitted online, including the financial acknowledgment form and the Demographic Information Addendum, which specifically asks about ethnicity, race, and gender.

77.     Here, Wells Fargo's process places particular emphasis on race:  the company demands that, to the extent the interview is conducted in person, the loan officer must visually observe the applicant and consider the applicant's surname in an effort to determine the race of the prospective applicant.  Here, too, Wells Fargo's algorithm receives key demographic and financial data that it then utilizes in its lending decisions.

Part 2: Running "Blend" Data Through Automated CORE "Pioneering Underwriting System" Systematically Infected with Racially Infected Algorithms and Overlays

78.     Having obtained all of the geographic, demographic and other data necessary through Blend and the submission of the Form 1003, the Wells Fargo loan originator does the equivalent of pressing "send," submitting the 1003 for decision to Wells Fargo's CORE automated underwriting system.  Confidential informants with knowledge of the operation of these systems recount that after operating as described herein—running both Desktop Underwriter ("DU") and Loan Prospector

("LP") simultaneously—CORE's decision would come back as A1 or A2; which meant that the loan was approved; C1, which meant that the loan had to go through a manual underwriting process; or C2, which meant that the applicant was deemed "not loanable" and denied. During the COVID-19 era, Black refinance applicants were systematically slotted by CORE into C1 and C2 categories.

79. The idea of something that operates generally like CORE is, of course, nothing new or nothing unique. Used properly, automated underwriting systems can quickly use Fannie Mae and Freddie Mac underwriting criteria to evaluate the risk profile of a loan and recommend its approval or denial with respect to race-neutral criteria to human underwriters and loan processors who can, on average, comfortably handle 30 files per month, who are specially trained in the bank's fair lending compliance programs and procedures, and who can ensure that the guidelines and mechanics of the algorithm are operating in accordance with these requirements.

80. But the consequences can be immediate and pernicious when CORE-like systems are not properly used or supervised by employees with training in fair lending practices. The director of the Consumer Financial Protection Bureau ("CFPB") describes these types of banking algorithms as "black boxes behind brick walls."[59] "When consumers and regulators do not know how decisions are made by the algorithms, consumers are unable to participate in a fair and competitive market free from bias."[60]

81. Such was indeed the case at Wells Fargo. As recognized by a group of United States Senators, including the chairman of the Senate Finance Committee,

---

[59] https://www.consumerfinance.gov/about-us/newsroom/remarks-of-director-rohit-chopra-at-a-joint-doj-cfpb-and-occ-press-conference-on-the-trustmark-national-bank-enforcement-action/.

[60] *Id.*

who wanted to investigate the bank for "potentially illegal discrimination" and demanded the bank produce to the Committee the data and algorithms it uses to evaluate applicants,[61] the operations and impact of Wells Fargo's CORE automated underwriting system are both new and unique in their treatment of Black applicants.

82.     More specifically, confidential informants with knowledge of Wells Fargo's residential mortgage lending operations describe a situation where, around the time that COVID-19 hit, understaffed Wells Fargo underwriting departments made a series of deliberate and intentional choices to centralize lending decisions. These decisions, ostensibly made in order to facilitate work-from-home, took human supervision and fair-lending compliance out of the process. Seemingly trumpeting the effect of these decisions, Wells Fargo went so far as to make an internal announcement that it would place increasing and undue reliance on machine learning processes in an automated underwriting system. But that system was increasingly infected with explicit and implicit racial signals (so-called "overlays") that had, as their proximate and likely result, the disparate impact reflected in the statistical analyses set forth in this Amended Complaint during the time periods at issue herein.

83.     These Wells Fargo-specific overlays represent manifestations of the same continuous and unbroken practice of engaging in business policies and practices that create an "artificial, arbitrary, and unnecessary" barrier to fair-housing opportunities for Black home purchasers and owners.

84.     ***Geographic Indicators***. Among the overlays utilized by Wells Fargo's COVID-19 era CORE automated underwriting processes are geographic indicators, the effect of which is modern-day redlining. Borrowers seeking to refinance

---

[61] *Wells Fargo Pressed by Senators on Race Disparity in Refinancing*, Yahoo! Finance, accessible at: https://finance.yahoo.com/news/wells-fargo-pressed-senators-race-171439115.html.

2029104

FIRST AMENDED CLASS ACTION COMPLAINT

property in Black-majority neighborhoods are deemed by the algorithm to be more of a lending risk than similarly situated White borrowers seeking to refinance property in non-Black-majority neighborhoods. Wells Fargo's algorithm effectuates this racial signaling by comparing address data provided in the borrower's Form 1003 to low and moderate income census tract data within Wells Fargo's internal systems, and identifying borrowers with property in Black-majority neighborhoods as more of a lending risk than borrowers with property in White-majority neighborhoods. None of this is required by legitimate, race-neutral underwriting criteria, let alone criteria approved by Fannie Mae and Freddie Mac.

85. ***Post-Close Liquidity Requirements***. Another overlay utilized by Wells Fargo's CORE underwriting system is a 50% increase in Wells Fargo's requirements for post-close liquidity and severe restrictions on the sources of that liquidity. Before March 2020—and consistent with Fannie Mae and Freddie Mac underwriting guidelines—Wells Fargo generally required borrowers to be able to show 12 months of post-close reserves in order to close their loans. When COVID-19 hit, however, Wells Fargo programmed its system to only approve borrowers who could show 18 months of post-close liquidity for W-2 wage earners, and 24 months for self-employed K-1 borrowers. Wells Fargo further changed the definition of post-close liquidity to allow only 50% of the post-close liquidity to come from retirement accounts, often the greatest source of liquidity for borrowers.

86. Not only was this huge increase not required by legitimate, race-neutral underwriting criteria, it was a change that Wells Fargo knew would effectuate a racially disparate impact. An April 2020 JP Morgan Chase Institute report found that for every dollar in liquid assets held by White Americans, Black Americans held 32 cents.[62] On average, while Black families have $2,000 or less in liquid

---

[62] https://www.jpmorganchase.com/content/dam/jpmc/jpmorgan-chase-and-co/institute/pdf/institute-race-report.pdf.

1   savings, the typical White family has more than four times that amount.[63]

2       87.    ***Demographic Indicators***.  A further criteria utilized by Wells Fargo is,

3   indeed, race itself.  For example, employees responsible for the programming of

4   Wells Fargo's automated underwriting processes describe the system's use of

5   Bayesian Improved Surname Geocoding ("BISG"),[64] a method that applies Bayes'

6   Rule to predict the race or ethnicity of an individual utilizing the individual's

7   surname and geocoded location.  This process, which necessitates an internal

8   determination by the CORE algorithm of which neighborhoods are associated with

9   which racial group, works as follows:[65]

10      (i)       first, by calculating the prior probability of an individual – $i$ –

11   being of a certain racial group $r$ given their surname:

12   $$Pr(R_i = r | S_i = s)$$

13      (ii)      next, by updating that probability with the probability of the

14   individual $i$ living in a geographic location $g$ that is associated with a

15   particular racial group $r$:

16   $$Pr(G_i = g | R_i = r)$$

17      (iii)     and finally, by using Bayes' Theorem to determine the

18   probability that a particular borrower actually belongs to a particular racial or

19   ethnic group.

20
21   $$Pr(R_i = r | S_i = s, G_i = g) = \frac{Pr(G_i = g | R_i = r) Pr(R_i = r | S_i = s)}{\sum_{i=1}^{n} Pr(G_i = g | R_i = r) Pr(R_i = r | S_i = s)}$$

22      88.    By utilizing BISG processes in its automated underwriting processes,

23   Wells Fargo's formulae utilize demographic criteria, including race, "imputed from

24   _____

25   [63] *Id.*

26   [64] https://ww2.amstat.org/meetings/sdss/2020/onlineprogram/ViewPresentation.
27   cfm?file=309619.pdf.

28   [65] https://cran.r-project.org/web/packages/eiCompare/vignettes/bisg.html.

2029104

databases of names and addresses" using processes like Bayesian Improved Surname Geocoding that associate neighborhoods with races to supplement Form 1003's race disclosures and assist in the overall racial assessment that allows the algorithm, improperly, to rely on race in the risk determination process.

89.     ***Uncorrected and Racially Biased Appraisals***.  Wells Fargo also considers uncorrected historical and current appraisal data from geographically differentiated locations in its refinance evaluation process.  Race-stratified differentials in appraisal data are well known to Wells Fargo and others in the banking industry.  Indeed, according to a March 23, 2022 report in *The Washington Post* citing Brookings Institution data, "homes in Black neighborhoods" (which, as already discussed, CORE identifies) routinely appraise at "23 percent less, on average, than those in comparable White neighborhoods – despite having similar neighborhood and property characteristics and amenities."[66]  Freddie Mac has similarly "found that 12.5 percent of appraisals for home purchases in Black neighborhoods and 15.4 percent in Latino neighborhoods came in below the contract price, compared with 7.4 percent of appraisals in White neighborhoods,"[67] due in part to the well-known and systematic failure of appraisers to choose comparisons sales in an appropriately broad geographic range for properties located in Black and Latino neighborhoods.[68]  Failure to correct for this longstanding disparity within automated underwriting systems will automatically and systematically skew the loan-to-value calculations against Black homeowners, making their loans look like riskier bets than they actually are for the banks.

90.     Wells Fargo's automated underwriting system does not correct

---

[66] https://www.washingtonpost.com/business/2022/03/23/home-appraisal-racial-bias/.

[67] *Id.*

[68] *Id.*

2029104

-30-

FIRST AMENDED CLASS ACTION COMPLAINT

1  appropriately for these racial disparities in appraisals, instead placing undue reliance

2  on an uncorrected data point that systematically undervalues properties in

3  neighborhoods populated by Black homeowners.  Wells Fargo's failure to correct

4  for this well-known disparity is not required by any legitimate underwriting criteria.

5      91.    ***Unjustified Increased FICO Requirements***.  A further COVID-19 era

6  algorithmic overlay utilized by the Wells Fargo CORE system is increased credit

7  score requirements.  According to a confidential informant, Wells Fargo imposed a

8  higher minimum credit score than that required for an FHA loan or a Fannie Mae-

9  backed loan.  According to the confidential informant, if Fannie Mae required a

10  minimum credit score of 600, Wells Fargo would require a minimum score of 620,

11  meaning CORE automatically rejected anyone with a credit score below 620.  The

12  racial impact of this change, which was not justified by legitimate underwriting

13  criteria, is clear:  in February 2021, it was reported that one in five Black consumers

14  have FICO scores below 620; meanwhile one out of every 19 White consumers are

15  in the sub-620 category.[69]

16      92.    A study done by the Board of Governors of the Federal Reserve System

17  analyzing federal mortgage data identified no "evidence [a]s to whether these tighter

18  standards reduce loan risk to justify the disparate impact on minority denials they

19  are associated with."[70]  And after controlling for relevant underwriting factors (debt-

20  to-income ratios, loan-to-value ratios, credit scores, etc.) the study found that

21  "[l]enders who impose the strictest standards on their [W]hite applicants [like Wells

22

23  ───────────────

24  [69] https://www.forbes.com/advisor/credit-cards/from-inherent-racial-bias-to-
    incorrect-data-the-problems-with-current-credit-scoring-models/.

25  [70] *How Much Does Racial Bias Affect Mortgage Lending? Evidence from Human*

26  *and Algorithmic Credit Decisions*, Neil Bhutta, Aurel Hizmo, and Daniel Ringo

27  (July 2021), at 12, n.20, available at: https://papers.ssrn.com/sol3/papers.cfm?
    abstract_id=3887663.

28

2029104

-31-

1  Fargo] tend to have the largest unexplained excess denials of minority applicants,"

2  including Black applicants.[71]

3     93.    In 2021, six Wells Fargo employees and officers with doctorate degrees

4  published a study warning about the dangers of banking algorithms used by Wells

5  Fargo and its peers.  The study was published on arXiv, an open-access archive of

6  scholarly articles in the fields of computer science, quantitative finance, statistics,

7  and economics, among others, which is operated by Cornell University.[72]

8     94.    The authors of the study noted that "despite 'years of intense scrutiny,

9  lending discrimination still persist[s]'" and that the arrival of flexible and automated

10  AI/ML [artificial intelligence/machine learning] algorithms and "the availability of

11  alternative sources of data are… exacerbating" this discrimination.[73]

12     95.    The potential sources of bias and discrimination are multifold.

13  According to the study, historical data can often be skewed against specific groups,

14  particularly where there is limited information on protected groups.[74]  Moreover,

15  biases in historical data can be exacerbated with the use of machine learning

16  because algorithms, which automate feature engineering, can ignore the presence of

17  surrogate variables for protected attributes.[75]

18     96.    Bias can also be present in alternate sources of data, which can be

19  harvested from the worldwide web, social media, and blogs.  Often, one's digital

---

[71] *Id*. at 12.

[72] https://arxiv.org/.

[73] *Bias, Fairness, and Accountability with AI and ML Algorithms*, Nengfeng Zhou, Zach Zhang, Vijayan N. Nair, Harsh Singhal, Jie Chen, and Agus Sudjianto, Corporate Model Risk, Wells Fargo (May 6, 2021), available at: https://arxiv.org/ftp/arxiv/papers/2105/2105.06558.pdf, at page 4.

[74] *Id.* at 5.

[75] *Id*.

2029104

Case No. 4:22-cv-01748-KAW

FIRST AMENDED CLASS ACTION COMPLAINT

footprint has strong predictive performance in credit scoring, but these "predictors are highly correlated with socio-economic variables that are surrogates for protected groups."[76]  "[T]hese variables are highly related to protected classes, and the availability of such seemingly innocuous information, combined with flexible 'data snooping' ML algorithms, can easily lead to 'proxy discrimination.'"[77]

97.    "Unstructured data, *such as texts, audio, and images*, are increasingly analyzed through AI/ML [artificial intelligence/machine learning] techniques in banking and finance."[78]  Such a "selection process can suffer from 'implicit biases'" because the use of social media data is highly correlated with individuals' race and national origin.  It is easy to envision the invidious nature of this technology.  An algorithm that reviews billions of social media posts will start to associate accounts with more posts with more Black faces as having lower creditworthiness than posts with more lighter-skinned faces.  This same algorithm also analyzes the speech patterns used in the videos, and associate's creditworthiness with "talking white" and speaking fluent English.  The same algorithm deems those who speak in an Urban vernacular, Gullah, or those who learned English as a second language as less creditworthy.  Worse yet, this algorithm learns to judge creditworthiness based on word choice and use of certain slang.  What is more, these algorithms are more prone to perpetuate guilt by association because it is well known that face recognition technologies consistently misidentify Black faces at much higher rates than White faces.[79]  Thus, "[f]airness concerns are heightened when alternative

---

[76] *Id*.

[77] *Id*.

[78] *Id.* at 6.

[79] *Racial Discrimination in Face Recognition Technology*, Alex Najibi, Harvard University Graduate School of Arts and Sciences (October 24, 2020), available at: https://sitn.hms.harvard.edu/flash/2020/racial-discrimination-in-face-recognition-

sources of data, such as **social-media data, information on biometrics, speech or language**, are used because it is not easy to scrub the data of **demographic proxies**."[80]

98.     In addition to data bias, the automated nature of machine learning algorithms "miss[es] the potential for correlated surrogate variables causing proxy discrimination."[81] "Data bias together with poor optimization of algorithms can cause severe harm to protected groups."[82]

99.     Notably, the study concludes that the use of "black-box algorithms that are not well-understood" have "potential for serious harm" in the consumer lending space, and the models "must be continually monitored for disparate impact testing."[83] A "[s]eparate fair lending group conducts periodic backtesting and trend analysis to validate that credit underwriting systems do not discriminate against applicants on a prohibited basis."[84]

**E.     Wells Fargo's COVID-19 Era Understaffing and Failure to Correct for Discriminatory Automated Lending Decisions**

100.   Wells Fargo is no doubt well aware that properly functioning banks, including its competitors, correct for biases within automated underwriting processes by employing trained underwriters and fair lending teams that are supposed to act as a backstop against the racially pernicious consequences that arise

_____

technology/.

[80] *Id*. at 13.

[81] *Id*. at 6.

[82] *Id*. at 7.

[83] *Id*. at 13.

[84] https://ww2.amstat.org/meetings/sdss/2020/onlineprogram/ViewPresentation. cfm?file=309619.pdf.

2029104

from the unrestrained functioning of automated processes that, left unchecked, can systematically identify Black borrowers as undue credit risks.

101.    Such was not the case at Wells Fargo.  Confidential informants with knowledge of Wells Fargo's refinance practices in recent years describe a system where Wells Fargo made a business decision to centralize and emphasize automated processes at the expense of individualized lending decisions.  They explain that Wells Fargo's loan originators, processors and underwriters were overworked—sometimes handling as many as *three times* the normal monthly volume expected of loan processors and underwriters—and systematically disincentivized to "check the work" of the CORE system.  These witnesses also describe changes that were made, such as to remove their ability to make changes within Wells Fargo's automated system, that would result in a greater likelihood of an application being approved.

102.    Given the racially signaled functioning of Wells Fargo's COVID-19 era CORE algorithm, the effect of this was clear:  nobody was available to provide a check on the racially biased lending decisions taking place at Wells Fargo, which resulted in delays, denials and systematic application of higher interest rates to Black borrowers at a rate that far exceeded anything in the industry.

F.    **Wells Fargo's Knowledge of Disparate Impact of Overlays**

103.    Not providing a human check on Wells Fargo's discriminatory lending practices did not, however, mean that Wells Fargo was unaware of the discriminatory impact of its practices.  Quite the contrary:  throughout the relevant time period, confidential informants with knowledge of Wells Fargo's residential lending practices emphasize the extent to which senior Wells Fargo executives were fully aware of the disparate impact of these policies and practices.

104.    These witnesses emphasize that throughout the relevant time period, Wells Fargo generated a "Diversity Market Segments Report" that was distributed companywide via electronic mail distribution on a monthly basis.  Comprised of Wells Fargo's nationwide lending statistics, the report included, among other things,

the racial breakdown of Wells Fargo's lending, the percentage of loans being made in certain locations and by certain originators and offices, whether Wells Fargo met the Community Reinvestment Act[85] requirements, and the percentage of loans that were made to first-time homebuyers. These reports were reviewed and discussed during monthly regional calls that congratulated employees on their efforts reflected therein.

105. And yet, despite these monthly reports that provided a real-time exposé of the pernicious significant adverse effect of its overlays on Black applicants, Wells Fargo did nothing.

## G. Wells Fargo's Algorithm Has a Disparate Impact on Black Homeowners

106. The above practices, policies, and procedures are arbitrary and artificial and unnecessary to achieve a valid underwriting interest or legitimate objective. The vast difference between refinancing approval rates Wells Fargo issued to Black homeowners as compared to any other lending institution's approval rates negates any possible legitimate objective.

107. As noted, the above practices have a disproportionately adverse effect on Black Americans seeking to refinance their loans. Black homeowners are members of a protected class.

108. Wells Fargo's practices directly harmed Black homeowners by forcing them to pay higher interest rates while applications were pending, by forcing them to pay higher interest rates when applications were completed, and/or by denying refinancing applications. In the absence of these policies, Black homeowners would not have had to pay higher rates or face rejection in their refinancing applications.

109. The disparity between Wells Fargo's treatment of Black homeowner

---

[85] The Community Reinvestment Act, enacted in 1977, requires the Federal Reserve and other federal banking regulators to encourage financial institutions to help meet the credit needs of the communities in which they do business, including low- and moderate-income neighborhoods.

applicants and non-Black homeowner applicants is significant and shocking. As noted, a White American in the lowest income bracket was just as likely to receive refinancing approval as a Black homeowner in the highest income bracket.

110.   Overall, in 2020, 8.4 million homeowners refinanced their mortgage loans to take advantage of historically low interest rates.[86]  White homeowners saved an estimated $3.8 billion in 2020.  In comparison, Black homeowners who make up 9% of all homeowners saved just $198 million, less than 4% of the total savings.[87]

111.   In 2020, using its algorithm, Defendant Wells Fargo approved Black homeowner refinancing applications at a rate lower than that of any other major lender in America.  Wells Fargo was the only major lender in the United States that approved a smaller share of refinancing applications from Black homeowners in 2020 than it had in 2010.[88]

112.   Wells Fargo *denied over 50%* of the Black homeowners seeking to refinance in 2020, and *denied just under 50%* of the Black homeowners seeking to refinance in 2021.  No other major lending institution refused to refinance the homes of Black Americans at such stunning rates.  The numbers tell a shameful story, without any legitimate explanation.  In 2020—at the height of the refinancing boom, when millions of Americans benefitted from the historically low interest rate environment—Wells Fargo approved 47% of all applications by Black homeowners

---

[86] "Data Point 2020: Mortgage Market Activity and Trends," Consumer Financial Protection Bureau, August 2021, pg. 11, available at https://files.consumerfinance.gov/f/documents/cfpb_2020-mortgage-market-activitytrends_report_2021-08.pdf.

[87] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-refinancing/.

[88] *Id*.

(meaning that Wells Fargo rejected the majority of applications from Black homeowners), whereas all other lenders approved 71% of all applications by Black homeowners.[89] In 2020, no other lending institution rejected a majority of Black homeowners' applications for refinancing.[90]

113. As shown in a recent Bloomberg article by Shawn Donnan, Ann Choi, Hannah Levitt, and Christopher Cannon, data from eight million refinancing applications from 2020 reveal that "the highest-income Black applicants [had] an approval rate about the same as White borrowers in the lowest-income bracket."[91] White refinancing applicants earning between $0 and $63,000 a year were ***more likely*** to have their refinancing application approved by Wells Fargo than Black refinancing applicants earning between $120,000 and $168,000 a year.[92]

_____

[89] *Id.*

[90] https://www.bloomberg.com/graphics/2022-wells-fargo-Black-home-loan-refinancing/.

[91] *Id.*

[92] *Id.*

2029104



**Higher Income, Same Approval**
Wells Fargo's refinancing approval rates were higher for the lowest-income White applicants in 2020 than for all but the highest-income Black applicants.

Source: Bloomberg analysis of Home Mortgage Disclosure Act data for 8 million completed applications to refinance conventional loans in 2020.

114.    Black applicants with properties in predominately Black counties fared worse.  In Fulton County, where the population was 43.6% African American in 2020,[93] Wells Fargo approved fewer than 43% of refinancing applications completed by Black homeowners, the lowest approval rate among major lenders.[94]

---

[93] https://data.census.gov/cedsci/table?g=0500000US13121&tid=ACSDP5Y2020 .DP05.

[94] *Id.*

2029104

115.    And even for those Black applicants whose loans were ultimately approved, they faced delays that White applicants living in predominately White neighborhoods did not, causing them damages through continued higher mortgage rates during the unjustified delay as they awaited loan approval.  In some cases, Wells Fargo officers simply told Black applicants living in predominately Black neighborhoods that "perhaps the area is not eligible" for quick evaluations of refinancing applications.[95]  Wells Fargo regularly approved refinancing applications of non-Black homeowners in a matter of weeks, but only approved the applications of Black homeowners after many months (if those Black applicants happened to be approved).

116.    And because Wells Fargo designed an application process that is disproportionately difficult for Black homeowners to complete and engages in a practice of "soft denials," where the loan officers leave applicants hanging or encourage them to look elsewhere, 27% of all Black homeowners who began a refinance application with Wells Fargo withdrew it.[96]  Thus, only one-third of the 17,702 Black homeowners who sought refinancing were successful.[97]

117.    The story in 2021 was the same, with Wells Fargo approving a much lower percentage of Black American applicants than any other lender.[98]  While the number of Black refinance applicants at Wells Fargo nearly doubled in 2021, accounting for 7% of the bank's total refinance applicants and two percent higher than industry averages, Wells Fargo's approval rates for Black borrowers continued

---

[95] *Id.*

[96] *Id.*

[97] *Id.*

[98] https://www.bloomberg.com/news/articles/2022-03-25/wells-fargo-faces-persistent-racial-gap-in-mortgage-refinancing.

2029104

1  to lag behind its major competitors.

2      118.  Wells Fargo approved only 58% of Black applicants compared to other

3  lenders, which approved 74% of Black applicants.[99]  And the disparity between

4  Black and White refinance approval rates was 21% at Wells Fargo, nearly double

5  the disparity (13%) for all other for other lenders.[100]

6

7  **Refinancing Disparities**

8  Wells Fargo approved fewer Black homeowners' applications in 2021 than other lenders.



9

10

11

12

13

14

15

16

17  Source: Bloomberg analysis of Home Mortgage Disclosure Act data.
Note: Approval rates for completed applications for refinancing conventional, non-jumbo and first-lien mortgages in 2021.

18

19      119.  And though Wells Fargo's Black refinancing approval rate improved

20  slightly from 2020, the same was true at all other lenders, due to broader economic

21  conditions.[101]  By comparison, other major lenders approved much higher rates of

22  Black refinancing applicants in 2021: JP Morgan Chase & Co. approved 87% of

23  Black applicants (only 6% less than White applicants), Rocket Mortgage LLC

24  _____

25  [99] *Id.*

26  [100] *Id.*

27  [101] *Id.*

28  2029104

FIRST AMENDED CLASS ACTION COMPLAINT

approved 81% of Black applicants (only 7% less than White applicants), and Bank of America Corporation approved 75% of Black applicants (only 11% less than White applicants).[102]

**H.      Plaintiffs and the Class are Harmed by Wells Fargo's Race-Based Discrimination**

120.    The stories of Black Americans whose applications were delayed or denied are legion.

121.    One Black American applicant sought to refinance an $890,000 mortgage in February 2020.  The applicant worked as a dentist and earned approximately $250,000 a year.  The applicant had never missed a mortgage payment and had minimal credit card debt.  The applicant had over $1 million in a Wells Fargo account, and also owned several rental properties with paying tenants.  Nevertheless, over a six-month period, Wells Fargo asked and re-asked for documents.  After the lengthy delay, Wells Fargo denied the application.  The applicant subsequently sought refinancing from a different institution that granted the refinancing over the phone.

122.    Another applicant sought to refinance a loan already held by Wells Fargo, which it had issued two years prior.  The applicant had never missed a payment and had never even been late on a payment.  They held the same job they held when they obtained the mortgage, and their credit score was over 780.  For at least two months, Wells Fargo demanded more and more documents, leading the applicant to complain to his broker's superior.  The applicant had to fax the same documents four or five times, which Wells Fargo claimed to have lost.  Before Wells Fargo decided to deny the loan, the applicant went to another lender, who refinanced the loan in only three or four days.

123.    Yet another applicant waited four months for Wells Fargo to approve

---

[102] *Id.*

2029104

their refinancing applications.  This applicant is a practicing doctor who owns multiple investment properties attempting to refinance their primary residence.  During the application process, Wells Fargo repeatedly asked for documents and repeatedly went silent, refusing to return the applicant's calls.

124.   Plaintiff Aaron Braxton purchased his home in South Los Angeles, California, near the University of Southern California, in April 2000, through a Wells Fargo home loan for $139,500 ("First Loan").  This First Loan was insured through the FHA.  In 2005, after the price of the house appreciated, he took out a second home equity line of credit loan, also from Wells Fargo ("Second Loan").  He improved upon the property and built an accessory dwelling unit.  Today, the home is worth approximately $800,000, as it was in 2019.  In or about August 2019, Mr. Braxton began the process of applying to refinance his two Wells Fargo loans to take advantage of reduced interest rates.  At the time, he owed $185,000 on both his Wells Fargo loans and paid a 6% interest rate on both loans, multiple percentage points higher than the average refinance rate at the time.

125.   When Mr. Braxton initially applied to refinance his First Loan, Wells Fargo repeatedly asked him to resubmit paperwork because Wells Fargo representatives claimed the paperwork was either missing or lost.  Wells Fargo representatives also continually took weeks and weeks to issue or reply to correspondence.  Mr. Braxton thereafter began the process of refinancing his Second Loan and was confronted with the same delays.

126.   Frustrated by the delays and because he was continuing to pay a higher mortgage rate while his applications were pending, Mr. Braxton regularly contacted his loan officers and other Wells Fargo personnel to ask about the status of his applications.

127.   After months of frustrating encounters with Wells Fargo personnel, Mr. Braxton decided to call HUD.  A HUD representative informed Mr. Braxton that they would be contacting Wells Fargo.  The very next day, Wells Fargo approved

2029104

-43-

FIRST AMENDED CLASS ACTION COMPLAINT

the refinancing of Mr. Braxton's federally backed FHA home loan, approximately nine months after he began the process.

128. Eventually, around October 2020, Wells Fargo finally approved a refinancing of his Second Loan. However, despite the contact from HUD, which presumably prompted it to act on Mr. Braxton's First Loan, Wells Fargo continued its discrimination through race-based application delays. It continued to claim that paperwork needed to process the Second Loan was missing, even though Mr. Braxton had already provided the paperwork. At one point, after having sent a notary to his home to finalize some paperwork, Wells Fargo informed Mr. Braxton that the notary had lost the paperwork, and he needed to complete some forms again.

129. All told, Mr. Braxton submitted four applications because Wells Fargo kept losing them. During the 16 months that his applications were pending, Mr. Braxton continued to pay the higher original mortgage rates instead of the lower refinanced rates he was seeking (and ultimately proven entitled to). However, unbeknownst to Mr. Braxton, in the end the rate he received for his refinancing, while lower than his original rate, was much higher than the fair market rate received by similarly situated non-Black applicants.

130. Plaintiff Gia Gray is a Black homeowner who resides in Danville, California.

131. Mrs. Gray is another victim of Wells Fargo's discriminatory policies. Both Mrs. Gray and her husband are physicians. Both are employed and both, individually, are in the top quintile of income earners. The same was true when they applied to refinance their loans with Wells Fargo. Mrs. Gray's FICO score is above 800.

132. The couple owns three homes. Their primary residence is in Danville, California—a predominately White area. The couple also own income properties in Stockton, California, and Chicago, Illinois—more diverse areas. The couple had Wells Fargo mortgages for all these homes, and, save for a balance of approximately

$1,000 on their credit card, the couple has and had no other debt. The couple never missed a mortgage payment, and they always paid on time. They began the refinancing process for their homes in February 2020.

133. The couple was only able to finance the Danville, California property—in the predominately White area—after four months. Their loan officer was located in Walnut Creek, California, another predominately White area, who actually took time out of his day to visit their multimillion-dollar home in Danville in-person to sign refinancing documentation. Even still, Wells Fargo kept asking them to provide additional information, and even contacted the Human Resources department at Mrs. Gray's office.

134. The couple was not as lucky on their two other income properties. The loan officer would try to steer Mrs. Gray away from these properties and only expressed an interest in refinancing her Danville, California property. Wells Fargo eventually switched the couple's Walnut Creek loan officer to a Black assistant to handle these properties. Wells Fargo would not return their calls for inquiries on refinancing these two properties. When the couple did manage to get a hold of the assistant or loan officer, they were told that Stockton, California property was in a bad area, and that the Chicago, Illinois property, although in a good area, was high risk, and that Wells Fargo was not looking to refinance high-risk areas. Frustrated by Wells Fargo's ambivalence and inaction, the couple gave up on refinancing these properties in December 2020, nearly a year after they started.

135. Plaintiff Bryan Brown is a Black homeowner who resides at 18 Elm Street, 3rd Floor, Bristol, Connecticut 06010.

136. Mr. Brown purchased a three-unit, multifamily property in Bristol, Connecticut in December 2010, through a Wells Fargo home loan for approximately $204,000. Mr. Brown and his family reside in one of the units, and he receives rental income from the other two units. Today, the property is worth approximately $250,000.

137.   In October 2020, Mr. Brown began the process of applying to refinance his loan to take advantage of reduced interest rates and to convert his conventional 30-year loan to a 15-year fixed mortgage.  At the time, Mr. Brown owed approximately $150,000 and paid a 4.75% interest rate.

138.   When Mr. Brown initially applied to refinance his loan, he submitted financial statements, including but not limited to those relating to his three investment properties.  Frustrated by the delays and because he was continuing to pay a higher mortgage rate while his application was pending, Mr. Brown regularly contacted Wells Fargo personnel to ask about the status of his application.  Rather than provide Mr. Brown an explanation as to the delay, Wells Fargo repeatedly requested that Mr. Brown *resubmit* financial documents and/or provide additional documentation to demonstrate *how* he paid his credit card statements.  Wells Fargo also contacted Mr. Brown's employer on multiple occasions requesting that they verify his employment.

139.   Four months after Mr. Brown submitted his application, in or around January/February 2021, Mr. Brown's application was denied.

140.   Plaintiff Paul Martin is a Black homeowner and resides in Los Angeles, California.

141.   Paul Martin is a 14-year Hollywood entertainment executive at Sony Pictures.  In 2020, Paul Martin sought to refinance his home in the Ladera Heights neighborhood of Los Angeles, California, which has a higher proportion of affluent Blacks.  His multimillion-dollar home was previously owned by WNBA superstar Lisa Leslie and NBA player Aaron Afflalo.

142.   But even Mr. Martin's shot was blocked by Wells Fargo.  The bank would not refinance his home unless he could get it appraised for $2.0 million. Wells Fargo's appraiser refused to come into Mr. Martin's home, and appraised it at just shy of $2.0 million based on comparisons in the neighborhood.  Mr. Martin went to another lender, who appraised the home at $2.4 million and promptly

2029104

Case No. 4:22-cv-01748-KAW

1  refinanced his loan.

2      143.   Plaintiffs' experiences are emblematic of the experiences of Black

3  Americans all over the country.

4                          **V.    CLASS ALLEGATIONS**

5      144.   Plaintiffs bring this action on behalf of themselves and a potential class

6  of similarly situated Black homeowners.

7      145.   Each and every claim alleged in this case is also alleged on behalf of

8  every member of the Class.

9  **A.    Class Definition**

10     146.   The Class includes all Black homeowners in the United States who,

11 from January 1, 2018 through the present (the "Class Period"), submitted an

12 application to refinance their home mortgage through Defendants that was (i)

13 processed at a rate slower than that of the average processing time of applications

14 made by non-Black applicants; or (ii) whose applications were denied; or (iii) whose

15 resulting refinance loans were made at higher interest rates as compared to similarly

16 situated non-Black applicants.  Excluded from the Class are Defendants and their

17 employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not

18 named in this Complaint, and the United States government.

19     147.   Class certification is authorized under Federal Rule of Civil Procedure

20 23 and applies to claims for injunctive and equitable relief, including restitution,

21 under Rule 23(b)(2), and for monetary damages under Rule 23(b)(3).

22     148.   There are at least 13,000 members of the Class.

23     149.   The number of persons who fall within the definitions of the Class are

24 so numerous and geographically dispersed so as to make joinder of all members of

25 the Class or Subclass in their individual capacities impracticable, inefficient, and

26 unmanageable, and without class-wide relief, each member of the Class would

27 effectively be denied his, her, or their rights to prosecute and obtain legal and

28 equitable relief based on the claims and allegations averred in the Complaint.

2029104

-47-                          Case No. 4:22-cv-01748-KAW

1    150.  Plaintiffs, as detailed below, can fairly and adequately represent the

2    proposed Class.  In the alternative, Plaintiffs can act as the representatives of the

3    below subclasses.

4    **B.    Proposed Subclasses**

5    151.  Additionally, or in the alternative, pursuant to Federal Rule of Civil

6    Procedure 23(c)(5), Plaintiffs bring this action on behalf of the following subclasses:

7    152.  **The Delayed Refinancing Subclass**:  All Black persons in the United

8    States who applied for refinancing from the Defendants during the class period and

9    whose applications processed at a rate slower than that of the average processing

10   time of applications made by non-Black applicants.

11   153.  **The Higher Rate Subclass**:  All Black persons in the United States

12   who applied for refinancing from the Defendants during the class period and whose

13   refinancing applications were eventually approved, but at a higher interest rate than

14   prevailing market rates based on their creditworthiness.

15   154.  **The Denied Refinancing Subclass**:  All Black persons in the United

16   States who applied for refinancing from the Defendants during the class period and

17   whose applications were denied but should have been approved based on objective,

18   race-neutral factors, including but not limited to:  loan-to-value ratio, debt-to-

19   income ratio, and credit score.

20   **C.    Numerosity and Ascertainability**

21   155.  **Numerosity**.  While the exact numbers of the members of the Class

22   and Subclasses are unknown to Plaintiffs at this time, membership in the Class and

23   Subclasses may be ascertained from the records maintained by Defendants.  At this

24   time, Plaintiffs are informed and believe that the Class includes at least 13,000 and

25   the Subclasses include tens of thousands of members.  Therefore, the Class and

26   Subclasses are sufficiently numerous that joinder of all members of the Class and

27   Subclasses in a single action is impracticable under Rule 23(a)(1) of the Federal

28   Rules of Civil Procedure, and the resolution of their claims through a class action

will be of benefit to the parties and the Court.

156. **Ascertainability**. The names and addresses of the members of the Class and Subclasses are contained in Defendants' records. Notice can be provided to the members of the Class and Subclasses through direct mailing, email, publication, or otherwise using techniques and a form of notice similar to those customarily used in consumer class actions arising under State and Federal law.

**D.    Commonality and Predominance**

157. This matter involves common questions of law and fact which predominate over any question solely affecting individual Class Members.

158. The common questions of law and fact include, but are not limited to:

- Whether Defendants systematically discriminated against Class Members on account of their race;

- Whether Black applicants' refinance applications were processed at a rate slower than that of the average processing time of applications made by non-Black applicants;

- Whether Black applicants' refinance applications were denied when the score of a similarly situated non-Black applicant would be approved;

- Whether Black applicants' resulting refinance loans were made at higher interest rates as compared to similarly situated non-Black applicants;

- Whether Defendants selected disproportionately White areas for rapid refinancing evaluation and disproportionately Black areas for increased scrutiny;

- Whether Defendants' underwriting algorithms and machine learning programs were racially biased and led to unfairly discriminatory credit policies that harmed Black refinancing applicants;

- Defendants' knowledge;

- Defendants' consumer disclosures;

- Defendants' internal approval process; and

- Defendants' use of appraisals.

159. **Predominance**. Class action status is warranted under Rule 23(b)(3) of the Federal Rules of Civil Procedure because questions of law or fact common to the

members of the Class and Subclasses predominate over any questions affecting only individual members.  The interests of the members of the Class and Subclasses in individually controlling the prosecution of separate actions are theoretical and not practical.  Prosecution of this action through multiple Class Representatives would be superior to individual lawsuits.  Plaintiffs are not aware of any difficulty which will be encountered in the management of this litigation which should preclude its maintenance as a class action.

**E.    Typicality and Adequacy**

160.   Plaintiffs' claims are typical of the other Class Members' claims because all Class Members were injured in the same manner as a result of substantially similar conduct by Defendants.

161.   Plaintiffs are adequate Class Representatives because their interests do not conflict with the interests of the other members of the Class and Subclasses they seek to represent.  Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this action vigorously.  The Class and Subclasses' interests will be fairly and adequately protected by Plaintiffs and their counsel.

**F.    Superiority**

162.   A class action is the superior method for the fair and efficient adjudication of this matter because the damages and other harms suffered by Plaintiffs and other Class Members are small compared to the burden and expense of individual litigation.  Thus, it would be impractical, if not impossible, for individual plaintiffs to seek redress against Defendants for the harms suffered.

163.   Individual litigation of these harms would also be inefficient for the court system, and would create a risk of inconsistent or contradictory rulings and judgments.

164.   No unusual circumstances exist that would make this matter more difficult to manage than a typical class action.  Individualized damages figures can

be mathematically computed by collecting data about the length of each Class Member's delay and the differential between the interest rates they ultimately received versus the prevailing market rate based on race-neutral variables such as debt-to-income ratio, loan-to-value ratio, and credit score.

**G.    Injunctive Relief**

165.    Plaintiffs also seek to represent a class under Rule 23(b)(2) seeking injunctive relief forcing Wells Fargo to cease and desist its current discriminatory practices.

**<u>COUNT I</u>**

**VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT**

**15 U.S.C. § 16901, *et seq.***

166.    Plaintiffs, on behalf of themselves and all those similarly situated, reallege each and every paragraph above and incorporate them by reference as though fully stated herein.

167.    The Equal Credit Opportunity Act makes it unlawful for a creditor to discriminate against any applicant with respect to any aspect of a credit transaction on the basis of race.

168.    The Equal Credit Opportunity Act applies to applications for refinancing, like those of the Plaintiffs and others similarly situated.  Plaintiffs applied for credit by seeking to refinance their home loans.

169.    Defendants are creditors because they regularly extend, renew, and continue issuances of credit.

170.    Defendants' consistent delays, roadblocks, feigned difficulties, and sometimes denials of applications for refinancing submitted by Black Americans constitute race-based discrimination forbidden by the Equal Credit Opportunity Act.

171.    Plaintiffs and all those similarly situated were harmed by Defendants' conduct, including but not limited to harm in the form of higher interest rates paid while applications were pending, higher interest rates paid upon a delayed approval,

1   or from a denied application.

2      172.   On behalf of themselves and the Class they seek to represent, Plaintiffs

3   request the relief set forth below.

4      <u>**COUNT II**</u>

5   **RACE DISCRIMINATION IN VIOLATION OF THE FAIR HOUSING ACT**

6   **OF 1968, 42 U.S.C. § 3601, *et seq.***

7      173.   Plaintiffs reallege each and every paragraph above and incorporate

8   them by reference as though fully stated herein.

9      174.   The Fair Housing Act makes it unlawful, in residential real estate

10   transactions, such as refinancing, to discriminate against designated classes of

11   individuals.

12      175.   Plaintiffs and others similarly situated sought to engage in residential

13   real estate transactions with the Defendants.

14      176.   Plaintiffs and others similarly situated are Black Americans and

15   therefore members of a protected class under the Fair Housing Act.

16      177.   Defendants refused to transact business with Plaintiffs and others

17   similarly situated when they refused to approve refinancing applications on the same

18   timeline as the applications made by other parties with similar qualifications that

19   were not members of the protected class, by causing applicants to withdraw

20   applications due to roadblocks and feigned difficulties, or by denying refinancing

21   applications.  As noted, Defendants approved fewer than half of Black homeowners'

22   refinancing applications in 2020 while approving 71% of the applications of White

23   homeowners.

24      178.   Defendants refused to transact business with Plaintiffs and those

25   similarly situated during the Class Period and at the same time did transact business

26   with non-Black homeowners with similar qualifications.

27      179.   Plaintiffs and those similarly situated were injured by Defendants'

28   refusal to transact business with them because they paid application fees for

1   refinancing applications that were delayed or denied, because they continued to pay

2   higher interest rates while their delayed applications were pending, because they

3   were provided with higher interest rates than other homeowners with similar

4   qualifications, and/or because their applications were denied.

## COUNT III

### RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981

180.   Plaintiffs reallege each and every paragraph above and incorporate
them by reference as though fully stated herein.

181.   Under 42 U.S.C. § 1981, persons of all races are guaranteed the same
right to make and enforce contracts, regardless of race.  The term "make and
enforce" contracts includes the making, performance, modification, and
terminations of contracts, as well as all of the other aspects of a contractual
relationship.

182.   By seeking to refinance their home loans and submitting an application
to Defendants, Plaintiffs and others similarly situated sought to "make and enforce"
contracts with the Defendants.

183.   Plaintiffs and those similarly situated were denied their right to make
and enforce contracts when Defendants refused to provide refinancing on the same
terms as they offered to members of a different race, by delaying or frustrating the
applications process, and/or by denying the applications.

184.   Plaintiffs and those similarly situated were harmed by Defendants'
denial of their rights to make and enforce contracts.

## COUNT IV

### VIOLATION OF THE UNRUH CIVIL RIGHTS ACT,
### CALIFORNIA CIVIL CODE §51

185.   Plaintiffs reallege each and every paragraph above and incorporate
them by reference as though fully stated herein.

186.   The Unruh Civil Rights Act provides that all persons within the State of

California are free and equal no matter their race and are entitled to full and equal treatment in all business establishments.

187. The Unruh Civil Rights Act thus prohibits discrimination of any kind against any person in any business establishment.

188. Defendants are business establishments under the Unruh Civil Rights Act.

189. Plaintiffs and other individuals similarly situated were denied full and equal treatment under the Unruh Civil Rights Act when Defendants refused to offer them refinancing terms on the same terms as individuals who were not Black Americans.

190. Plaintiffs and other individuals similarly situated were harmed by Defendants' refusal to transact business with them because they paid application fees for refinancing applications that were delayed or denied, because they continued to pay higher interest rates while their delayed applications were pending, because they were provided with higher interest rates than other homeowners with similar qualifications, and/or because their applications were denied.

## COUNT V

## VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW

191. Plaintiffs reallege each and every paragraph above and incorporate them by reference as though fully stated herein.

192. The California Unfair Competition Law ("UCL") forbids "unlawful, unfair or fraudulent" conduct in connection with business activity.

193. Defendants' business offering refinancing of existing loans is a business activity under the UCL.

194. Plaintiffs and others similarly situated are "persons" under the UCL.

195. Defendants' conduct described herein constitutes unlawful competition, as in the course of engaging in the business acts described above, it engaged in conduct that constituted a predicate violation of the laws identified herein, namely

the Equal Credit Opportunity Act, the Fair Housing Act, 42 U.S.C. § 1981, and the Unruh Civil Rights Act.

196.   Defendants' conduct described herein constitutes unfair competition under the UCL, as their practices are likely to deceive the public by informing the public of an alleged commitment to diversity and equality, but instead using hidden business practices designed to deny, delay and refuse the refinancing of loans of Black Americans, and subjecting those that are approved, to unfavorable terms.  As there is no legitimate justification for these practices, which have a disproportionately negative impact on the public, in comparison to any fair business purpose, Defendants' practices are unfair as defined under the UCL.

197.   Defendants' conduct described herein constitutes fraudulent competition under the UCL, as they advertise and otherwise state that they are committed to diversity and equality, and will fairly and quickly process the refinancing applications of all applicants, but instead use hidden business practices designed to deny, delay and refuse the refinancing of loans of Black Americans, and subjecting those that are approved, to unfavorable terms.  These business practices are likely to deceive the public, and thus are fraudulent.

198.   Plaintiffs and those similarly situated were injured by Defendants' refusal to transact business with them because they paid application fees for refinancing applications that were delayed or denied, because they continued to pay higher interest rates while their delayed applications were pending, because they were provided with higher interest rates than other homeowners with similar qualifications, and/or because their applications were denied.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court provides the following relief:

a.   Certify the 23(b)(2) and 23(b)(3) classes outlined above;

b.   Designate Plaintiffs as Class Representatives and designate the

undersigned counsel as lead Class Counsel;

c. Find that Defendants' acts described herein violate the Equal Credit Opportunity Act, the Fair Housing Act, 42 U.S.C. § 1981, the Unruh Civil Rights Act, and the California UCL;

d. Find that Defendants have engaged in a pattern and practice of racial discrimination resulting in the harm to Plaintiffs and class members described above;

e. Award Plaintiffs and all others similarly situated restitutionary relief, together with compensatory and punitive damages;

f. Award Plaintiffs and all others similarly situated injunctive relief by ordering Defendants to stop the discriminatory practices described herein;

g. Award Plaintiffs and all others similarly situated prejudgment interest and attorney's fees, costs, and disbursements; and

h. Award Plaintiffs and all others similarly situated such other relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury of all issues so triable.

2029104

Case No. 4:22-cv-01748-KAW

FIRST AMENDED CLASS ACTION COMPLAINT

DATED:  April 12, 2022

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP

By:      */s/ Dennis S. Ellis*
Dennis S. Ellis (SBN 178196)
Trent B. Copeland (SBN 136890)
Ryan Q. Keech (SBN 280306)
Stefan Bogdanovich (SBN 324525)
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697
Email:  dellis@egcfirm.com
        tcopeland@egcfirm.com
        rkeech@egcfirm.com
        sbogdanovich@egcfirm.com

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
Noah S. Helpern (SBN 254023)
Milin Chun (SBN 262674)
801 South Figueroa Street, Suite 2000
Los Angeles, California 90017
Telephone: (213) 725-9800
Facsimile: (213) 725-9808
Email:  nhelpern@egcfirm.com
        mchun@egcfirm.com

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
Joseph N. Kiefer (*pro hac vice forthcoming*)
(NY Bar No. 5345657)
157 West 57th Street, Suite 28 S
New York, New York 10019
Telephone: (212) 413-2600
Facsimile: (212) 413-2629
Email:  jkiefer@egcfirm.com

Attorneys for Plaintiffs Aaron Braxton, Gia
Gray, Bryan Brown, Paul Martin and all others
similarly situated

2029104

DATED:  April 12, 2022  FRANK, SIMS & STOLPER LLP
         Jason M. Frank (SBN 190957)
         Scott H. Sims (SBN 234148)
         Andrew D. Stolper (SBN 205462)


By:  /s/ Jason Frank
     Jason Frank
Attorneys for Plaintiffs Aaron Braxton, Gia Gray, Bryan Brown, Paul Martin and all others similarly situated

**Attestation under N.D. Cal. L.R. 5-1(h)**: the ECF filer of this document attests that all of the other signatories have concurred in the filing of the document, which shall serve in lieu of their signatures on the document.

2029104

-58-    Case No. 4:22-cv-01748-KAW

FIRST AMENDED CLASS ACTION COMPLAINT

# EXHIBIT C

LINDA D. FRIEDMAN (pro hac vice to be requested)
DANIEL LEWIN (pro hac vice to be requested)
JARED A. CALVERT (pro hac vice to be requested)
STOWELL & FRIEDMAN LTD.
303 W. Madison St., Suite 2600
Chicago, Illinois 60606
(312) 431-0888
Lfriedman@sfltd.com

Sam Sani (SBN 273993)
SANI LAW, APC
15720 Ventura Blvd., Suite 405
Encino, CA 91436
Telephone:     (310) 935-0405
Facsimile:     (310) 935-0409
ssani@sanilawfirm.com

Attorneys for Plaintiff
CHRISTOPHER WILLIAMS

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| CHRISTOPHER WILLIAMS, individually and on behalf of all others similarly situated, | CASE NO: |
| | **COMPLAINT** |
| Plaintiff, | |
| v. | Class Action |
| | Jury Trial Demanded |
| WELLS FARGO BANK, N.A. and WELLS FARGO & CO., | |
| Defendants. | |

## COMPLAINT
### CLASS ACTION

Plaintiff Christopher Williams ("Williams"), on behalf of himself and all others similarly

situated, by and through his attorneys, hereby files this Complaint against Defendants Wells

Fargo Bank, N.A. and Wells Fargo & Co. (collectively "Wells Fargo" or the "Firm"), and states

as follows:

COMPLAINT

462878

## JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343. In addition, this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332, as the amount in controversy exceeds $75,000, Plaintiff is a citizen of Georgia, and neither Defendant is a citizen of Georgia. Defendant Wells Fargo & Co. is incorporated in Delaware and its principal place of business is in San Francisco, California, as set forth further below. Defendant Wells Fargo Bank, N.A. is a national banking association chartered in South Dakota and with its principal place of business in San Francisco, California.

2.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b) because both Defendants reside in this District and a substantial part of the events or omissions giving rise to the claim occurred in this district, as the discriminatory policies emanated and were executed from Wells Fargo's headquarters in this District.  Venue is proper in the San Francisco Division of the Northern District of California because a substantial part of the events or omissions giving rise to the claims occurred in the county of San Francisco.

## PARTIES

3.     Defendant Wells Fargo & Co., is a publicly-traded, global financial services firm and Fortune 500 corporation incorporated in Delaware and has its principal place of business in San Francisco, California. As of December 31, 2020, Wells Fargo has assets of approximately $1.9 trillion, loans of $887.6 billion, deposits of $1.4 trillion and stockholders' equity of $185 billion.[1] Wells Fargo provides a wide variety of financial products and services to its global and domestic clients, who include corporations, governments, financial institutions and individuals, including

---

[1] https://www.wellsfargo.com/assets/pdf/about/investor-relations/sec-filings/2020/10k.pdf

462878

home mortgages. Wells Fargo claims to serve at least one out of three households in the United States.[2]

4. Defendant Wells Fargo Bank, N.A. is a national banking association chartered in South Dakota with its principal place of business in San Francisco, California, and a subsidiary of Wells Fargo & Co.

5. Plaintiff Christopher Williams is African American and a citizen of Georgia. As described below, Williams applied for a home mortgage with Wells Fargo and was discriminated against on the basis of his race in the mortgage lending process by Wells Fargo.

## FACTUAL ALLEGATIONS

6. As stated above, Wells Fargo is one of the largest banks in the country and one of the top residential mortgage providers in the United States. Across the country, Wells Fargo applies mortgage origination and underwriting policies and practices that intentionally and disproportionately discriminate against and harm African American home loan applicants. Williams was one of the many victims of Wells Fargo's racially discriminatory residential mortgage policies and practices.

7. Wells Fargo has a long history of discriminating against African Americans and maintains a corporate culture replete with harmful racial stereotypes and biased views about African American customers. While Wells Fargo has long advertised its willingness to symbolically support racial equality in banking, such as making investments to black owned

---

[2] https://newsroom.wf.com/English/news-releases/news-release-details/2021/Wells-Fargo-launches-Banking-Inclusion-Initiative-to-accelerate-unbanked-households-access-to-affordable-transactional-accounts/default.aspx#:~:text=Wells%20Fargo%20%26%20Company%20(NYSE%3A,of%20banking%2C%20investment%20and%20mortgage

462878

banks,[3] it has not and will not meaningfully redress its systematic discrimination against its Black and African American customers, borrowers, and mortgage applicants.

8.   Wells Fargo's racial bias is illustrated by racial redlining and other discriminatory practices against customers of color, as illustrated in a number of recent lawsuits and settlements. For example, in 2011, a jury found Wells Fargo guilty of systematically discriminating against minority home buyers by using a computer software for minority homeowners which resulted in them paying more for their home loans than white borrowers. *Opal Jones, et. al v. Wells Fargo Bank, N.A., et al.*, Case No. BC337821 (Los Angeles Superior Court) ($3.5 million verdict). Wells Fargo has also paid hundreds of millions of dollars to avoid litigating its discriminatory home lending practices.  Indeed, Wells Fargo agreed to a settlement valued at over $440 million of a lawsuit challenging the Firm's redlining practices that resulted in a disproportionate number of foreclosures in African American neighborhoods in Shelby County and the City of Memphis. *City of Memphis and Shelby County, et al. v. Wells Fargo Bank, N.A., et al.*, Case No. 2:09-CV-02857 (W.D. Tenn.).   Wells Fargo also settled a lawsuit for $37 million led by the National Fair Housing Alliance alleging that Wells Fargo took better care of foreclosed properties that it owned in white neighborhoods than those in African American and Latino communities. *National Fair Housing Alliance, et al. v. Wells Fargo Bank N.A., et al*, HUD Case No. 09-12-0708-8 (U.S. Department of Housing & Urban Development Office of Fair Housing & Equal Opportunity). Wells Fargo has also faced and settled numerous lawsuits challenging its "reverse redlining" practices of charging higher rates and imposing less favorable terms for minority home borrowers than for white home borrowers. For instance, in 2013, Wells Fargo paid $175 million to settle a lawsuit brought by the United States Department of Justice alleging that the Firm charged higher rates to its African

---

[3] https://www.foxbusiness.com/markets/wells-fargo-announces-investments-in-six-black-owned-banks

462878

American and Latino borrowers. *United States v. Wells Fargo Bank, NA*, Case No. 1:12-cv-01150 (D.D.C.).

9. In 2019, Wells Fargo paid $10 million to settle a similar claim brought by the City of Philadelphia. *City of Philadelphia v. Wells Fargo & Co., et al.*, No. 2:17-cv-02203-AB (E.D. Pa. 2019). Philadelphia alleged that Wells Fargo simply swapped the evil of redlining—refusing to lend to minority communities—for the similarly pernicious reverse redlining—lending to minority borrowers, but only saddling them with more expensive loans with worse terms than those extended to white borrowers. *City of Philadelphia v. Wells Fargo & Co., et al.*, No. 2:17-cv-02203-AB (E.D. Pa. 2019), Dkt. 1 (Complaint) ¶¶ 5–21. Philadelphia alleged that "since at least 2004 . . . Wells Fargo has systematically engaged in a continuous and unbroken discriminatory pattern and practice of issuing higher cost or more onerous mortgage loans to minority borrowers in Philadelphia when more favorable and less expensive loans were being offered to similarly situated non-minority borrowers." *Id.* ¶ 5 (E.D. Pa.). Philadelphia's statistical analysis revealed that African American borrowers were more than twice as likely to "receive a high-cost or high-risk loan" than a white borrower even when controlling for credit score. *Id.* ¶ 14. Indeed, the discrimination worsened as the credit score increased—especially creditworthy "African-Americans with FICO scores over 660 were 2.570 times more likely to receive a high-cost or high-risk loan from Wells Fargo as a white borrower." *Id.* The predictable result of Wells Fargo's foisting high-cost, high-risk loans on African Americans was an explosion of foreclosures in minority communities, where loans were "4.710 times more likely to result in foreclosure than is a loan in a predominantly white neighborhood." *Id.* ¶ 12. This precipitated what "many leading commentators describe[d] as the 'greatest loss of wealth for people of color in modern US history.'" *Id.* ¶ 18.

10. Wells Fargo discriminates against its African American employees just as readily as it does its customers. In 2016, Wells Fargo was charged with systemic discrimination against

462878

minority Financial Advisors including by African American Financial Advisors in the class action lawsuit *Slaughter v. Wells Fargo Advisors*, 14-cv-06368 (N.D Ill. 2014). Wells Fargo eventually settled the *Slaughter* litigation for over $35 million. *Slaughter v. Wells Fargo Advisors*, 14-cv-06368 (N.D Ill. 2014), Dkt. 99-1 (Settlement Agreement), 29

11.     Rather than earnestly trying to address and remedy the problems raised by these numerous lawsuits, Wells Fargo has worked to circumvent and diminish fair housing and credit laws, including delaying and appealing multiple fair housing lending lawsuits brought by municipalities across the Country so that it could continue to discriminate against black borrowers.[4] Wells Fargo's discrimination in lending against African Americans has therefore continued unbated.

12.     Specifically, in determining home loans, interest rates, points, etc., Wells Fargo intentionally uses factors to determine eligibility for home loan rates, terms, and conditions that facilitate redlining and reverse redlining against and disfavor African American borrowers. Specifically, Wells Fargo's uniform, nationwide policies and practices related to mortgage approvals, interest rate determinations, fees, and costs that intentionally discriminate against African Americans and have a disparate impact on African Americans. These policies and practices include but are not limited to:

(a)     placing black borrowers in predatory and higher costs loans even though they qualify for prime loans on better terms;

(b)     failing to underwrite loans based on traditional underwriting criteria such as debt-to-income ratio, loan-to-value ratio, FICO score, and work history and instead utilizing factors that intentionally discriminate and/or have a disparate impact on black borrowers;

(c)     subjective surcharges on minority borrowers of additional points, fees, and other credit and servicing costs over and above an otherwise objective risk-based financing rate for such loan products;

---

[4] *See* generally, *Oakland v. Wells Fargo,* 15-cv-04321 (N.D. Cal.); *Sacramento v. Wells Fargo*, 18-cv-00416 (E.D. Cal.); *Miami v. Wells Fargo*, 13-cv-24508, (S.D. Fla.).

462878

(d)　charging excessive points and fees that are not associated with any increased benefits to black borrowers;

(e)　failing to adequately monitor the Bank's policies and practices regarding mortgage loans, including but not limited to originations, marketing, sales, and risk management;

(f)　Reverse redlining;

(g)　and Redlining;

13.　The racially discriminatory policies and practices at Wells Fargo are uniform and national in scope and create an artificial, arbitrary, and unnecessary barrier to fair housing opportunities for Black or African American borrowers. Class members are relying on Plaintiff to protect their rights applied for loans at Wells Fargo offices across the country and were harmed by these same policies and practices.  Wells Fargo's policies are practices are implemented with discrimination intent and/or disproportionately impact Black of African Americans borrowers.

## PLAINTIFF WAS INJURED BY DEFENDANT'S
## DISCRIMINATORY POLICIES AND PRACTICES

14.　Williams is African American. Williams was a well-qualified African American home borrower. When he applied for his mortgage, Williams maintained a FICO score of over 750. Based on this, Williams believed he should have qualified for Wells Fargo's prime interest rate, which would have saved him substantial money over time on his home mortgage. However, consistent with Wells Fargo's pattern of discrimination against African American borrowers, Wells Fargo offered Williams an interest rate nearly three points higher than the prime interest rate offered by Wells Fargo, which is disproportionately and discriminatorily offered to white applicants.

15.　Believing it to be a mistake, Williams spoke to Wells Fargo's home lending department to have his credit report rechecked and for his interest rate to be lowered. Instead, the Firm refused to reconsider his credit score or his interest rate.

16.　Williams agreed to revisit its refusal to extend the loan to Williams on favorable terms.  However, in a letter dated September 5, 2019, Wells Fargo finally articulated for the first

time, that it did not use solely FICO credit scores to determine home interest rates, but instead used "a unique scoring model, which considers more than credit scores to evaluate applications."

17.    Indeed, the "other" factors used by Wells Fargo to determine interest rates for home loans serve to intentionally exclude Black or African American borrowers from affordable and lower-risk loans, force African American borrowers to pay higher interest rates and other fees that similarly situated white borrowers, and have a disparate impact based on race.  Williams applied for and received a home loan from another bank at its prime interest rate.

18.    Williams did identify his race to Wells Fargo during the application process.

## CLASS ALLEGATIONS

19.    Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and a class of African Americans who applied for credit related to residential real estate and who were subjected to discrimination by Defendants due to their race. Plaintiff seeks certification of a liability and injunctive and declaratory relief class under Rule 23(b)(2) and 23(c)(4), and/or certification of a broader class under Rule 23(b)(3).  All requirements of class certification are met by the proposed class.

20.    The class of African Americans who applied for credit related to residential real estate is so numerous that joinder of all members is impracticable. Fed. R.Civ.P. 23(a)(1).

21.    There are questions of law and fact common to the class, and those questions can and should be resolved in a single proceeding that furthers this litigation. Fed. R.Civ.P. 23(a)(2).

22.    The claims alleged by Plaintiff are typical of the claims of the class. Fed. R.Civ.P. 23(a)(3).

23.    Plaintiff will fairly and adequately represent and protect the interests of the class. Fed. R.Civ.P. 23(a)(4).

24.     The issue of determining liability regarding whether Defendant's policies and practices result in a pattern or practice of intentional discrimination and/or have a disparate impact on African Americans is appropriate for issue certification under Rule 23(c)(4).  Other common issues are also appropriate for certification.

25.     Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate with regard to the class as a whole.  Fed. R.Civ.P. 23(b)(2).

26.     The questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R.Civ.P. 23(b)(3).

## <u>COUNT I</u>

### EQUAL CREDIT OPPORTUNITY ACT

27.     Plaintiff, on behalf of himself and all those similarly situated, realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

28.     The Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*, makes it unlawful for a creditor to discriminate against any applicant with respect to any aspect of a credit transaction on the basis of race.

29.     As described above, Defendants are creditors because they regularly extend, renew, and continue credit, and Plaintiff was an applicant for credit.

30.     Defendants maintained a nationwide set of uniform, discriminatory mortgage loan origination and underwriting practices and engaged in a pattern or practice of systemic race discrimination against African American mortgage loan applicants that constitutes illegal intentional race discrimination in violation of the Equal Credit Opportunity Act.

31.    Plaintiff and all those similarly situated were subjected to and harmed by Defendant's systemic and individual discrimination.

32.    Defendants' unlawful conduct resulted in considerable harm to Plaintiff and all those similarly situated.

33.    On behalf of himself and the class he seeks to present, Plaintiff requests the relief set forth below.

## COUNT II

### RACE DISCRIMINATION IN VIOLATION
### OF 42 U.S.C. § 1981

34.    Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

35.    Under 42 U.S.C. § 1981, persons of all races are guaranteed the same right to make and enforce contracts, regardless of race.  The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

36.    Defendants maintained a nationwide set of uniform, discriminatory mortgage loan origination and underwriting practices and engaged in a pattern or practice of systemic race discrimination against African American mortgage loan applicants that constitutes illegal intentional race discrimination in the making and modification of contracts in violation of 42 U.S.C. § 1981.

37.    Plaintiff and all those similarly situated were subjected to and harmed by Defendants' systemic and individual discrimination.

38.    On behalf of himself and the class he seeks to present, Plaintiff requests the relief set forth below.

## COUNT III

COMPLAINT

- 10 -

462878

## RACE DISCRIMINATION IN VIOLATION
## OF 42 U.S.C. § 1982

39.     Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

40.     Under 42 U.S.C. § 1982, all citizens are guaranteed the same right to inherit, purchase, lease, sell, hold, and convey real and personal property, regardless of race.

41.     As set forth above, Defendants maintained a nationwide set of uniform, discriminatory mortgage loan origination and underwriting practices and engaged in a pattern or practice of systemic race discrimination against African American mortgage loan applicants that constitutes illegal intentional race discrimination and disparately impacts African Americans in violation of 42 U.S.C. § 1982.

42.     Plaintiff and all those similarly situated were subjected to and harmed by Defendants' systemic and individual discrimination.

43.     On behalf of himself and the class he seeks to present, Plaintiff requests the relief set forth below.

## <u>COUNT IV</u>

## RACE DISCRIMINATION IN VIOLATION OF
## THE FAIR HOUSING ACT OF 1968, 42 U.S.C § 3601 *et seq.*

44.     Plaintiff realleges each and every paragraph above and incorporates them by reference as though fully stated herein.

45.     The Fair Housing Act, 42 U.S.C. § 3605(a), prohibits any entity whose business includes engaging in residential real estate-related transactions from discriminating against any person in making available such a transaction on the basis of race.

46.     Defendants' business includes engaging in residential real estate-related transactions.

COMPLAINT
- 11 -

462878

47.     As set forth above, Defendants maintained a nationwide set of uniform, discriminatory mortgage loan origination and underwriting practices and engaged in a pattern or practice of systemic race discrimination against African American mortgage loan applicants that constitutes illegal intentional race discrimination and disparately impacts African Americans in violation of the Fair Housing Act of 1968.

48.     Plaintiff and all those similarly situated were subjected to and harmed by Defendants' systemic and individual discrimination.

49.     On behalf of himself and the class he seeks to present, Plaintiff requests the relief set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court find against Defendants as follows:

a.     Certify this case as a class action;

b.     Designate Plaintiff as a Class Representative and designate Plaintiff's counsel of record as Class Counsel;

c.     Declare that Defendants' acts, conduct, policies and practices are unlawful and violate the Equal Credit Opportunity Act, 42 U.S.C. §§ 1981 and 1982, and the Fair Housing Act;

d.     Declare that Wells Fargo engaged in a pattern and practice of racial discrimination against African Americans;

e.     Order Plaintiff and all others similarly situated offered mortgage loans at non-discriminatory rates, and otherwise make Plaintiff whole;

f.     Award Plaintiff and all others similarly situated compensatory and punitive damages;

COMPLAINT
- 12 -

462878

i.     Award Plaintiff and all others similarly situated prejudgment interest and attorneys fees, costs and disbursements, as provided by law;

j.     Award Plaintiff and all others similarly situated such other make whole equitable, injunctive and legal relief as this Court deems just and proper to end the discrimination and fairly compensate Plaintiff and all others similarly situated.

k.     Award Plaintiff and all others similarly situated such other relief as this Court deems just and proper.

Respectfully submitted,

STOWELL & FRIEDMAN, LTD.

By:_____
     Linda D. Friedman (pro hac vice to be requested)
     Daniel Lewin (pro hac vice to be requested)
     Jared Calvert (pro hac vice to be requested)
     **STOWELL & FRIEDMAN LTD.**
     303 W. Madison St., Suite 2600
     Chicago, Illinois 60606
     Phone: (312) 431-0888
     Lfriedman@sfltd.com

SANI LAW, APC

By: */s/ Sam Sani*_____
     Sam Sani
     **SANI LAW, APC**
     15720 Ventura Blvd., Suite 405
     Encino, CA 94612
     Tel: (310) 935-0405
     ssani@sanilawfirm.com

     Attorneys for Plaintiff

462878

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure and Civil Local Rule 3-6.

STOWELL & FRIEDMAN, LTD.

By:_____

Linda D. Friedman (pro hac vice to be requested)
Daniel Lewin (pro hac vice to be requested)
Jared Calvert (pro hac vice to be requested)
**STOWELL & FRIEDMAN LTD.**
303 W. Madison St., Suite 2600
Chicago, Illinois 60606
Phone: (312) 431-0888
Lfriedman@sfltd.com


SANI LAW, APC

By: */s/ Sam Sani*_____

Sam Sani
**SANI LAW, APC**
15720 Ventura Blvd., Suite 405
Encino, CA 94612
Tel: (310) 935-0405
ssani@sanilawfirm.com

Attorneys for Plaintiff

462878

# EXHIBIT D

BENJAMIN L. CRUMP (Pro hac vice to be requested)
BEN CRUMP, PLLC
633 Pennsylvania Avenue Northwest
Floor 2
Washington D.C. 20004
(800) 713-1222
court@bencrump.com

LINDA D. FRIEDMAN (Appearing pro hac vice)
SUZANNE E. BISH (Pro hac vice to be requested)
STOWELL & FRIEDMAN LTD.
303 W. Madison St.
Suite 2600
Chicago, Illinois 60606
(312) 431-0888
Lfriedman@sfltd.com

SAM SANI (SBN 2733993) (Local Counsel)
SANI LAW, APC
15720 Ventura Blvd.
Suite 405
Encino, CA 91436
Telephone:     (310) 935-0405
Facsimile:     (310) 935-0409
ssani@sanilawfirm.com

Attorneys for Plaintiffs
CHRISTOPHER WILLIAMS, SAM ALBURY, AND SHAIA BECKWITH SIMMONS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| CHRISTOPHER WILLIAMS, SAM ALBURY, and SHAIA BECKWITH SIMMONS, individually and on behalf of all others similarly situated, | CASE NO: 3:22-cv-00990-JD |
| | **AMENDED COMPLAINT** |
| Plaintiffs, | Class Action |
| v. | Jury Trial Demanded |
| WELLS FARGO BANK, N.A. and WELLS FARGO & CO., | Hon. James Donato |
| Defendant. | |

AMENDED
COMPLAINT

464456

# AMENDED COMPLAINT
## CLASS ACTION

Plaintiffs Christopher Williams ("Williams"), Sam Albury ("Albury"), and Shaia Beckwith Simmons ("Simmons"), on behalf of themselves and all others similarly situated, by and through their attorneys, hereby file this Amended Complaint against Defendants Wells Fargo Bank, N.A. and Wells Fargo & Co. (collectively "Wells Fargo" or the "Firm"), and state as follows:

## JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343. In addition, this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(d), as the amount in controversy exceeds $5,000,000, and at least one member of the class is a citizen of a different state than any defendant. Plaintiff Williams is a citizen of Georgia, Plaintiff Albury is a citizen of Nevada, Plaintiff Simmons is a citizen of Florida, and neither Defendant is a citizen of Georgia, Nevada, or Florida. Defendant Wells Fargo & Co. is incorporated in Delaware and its principal place of business is in San Francisco, California, as set forth further below. Defendant Wells Fargo Bank, N.A. is a national banking association chartered in South Dakota and with its principal place of business in San Francisco, California.

2.      Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b) because both Defendants reside in this District and a substantial part of the events or omissions giving rise to the claim occurred in this District, as the discriminatory policies emanated and were executed from Wells Fargo's headquarters in this District. Venue is proper in the San Francisco Division of the Northern District of California because a substantial part of the events or omissions giving rise to the claims occurred in the county of San Francisco.

**PARTIES**

3.      Defendant Wells Fargo & Co. is a publicly-traded, global financial services firm and Fortune 500 corporation incorporated in Delaware and has its principal place of business in San Francisco, California. As of December 31, 2020, Wells Fargo has assets of approximately $1.9 trillion, loans of $887.6 billion, deposits of $1.4 trillion and stockholders' equity of $185 billion.[1] Wells Fargo provides a wide variety of financial products and services to its global and domestic clients, who include corporations, governments, financial institutions and individuals, including home mortgages. Wells Fargo claims to serve at least one out of three households in the United States.[2]

4.      Defendant Wells Fargo Bank, N.A. is a national banking association chartered in South Dakota with its principal place of business in San Francisco, California, and a subsidiary of Wells Fargo & Co.

5.      Plaintiff Christopher Williams is African American and a citizen of Georgia. As described below, Williams applied for a home mortgage with Wells Fargo and was subjected to racial discrimination in Wells Fargo's mortgage lending process.

6.      Plaintiff Sam Albury is African American and a citizen of Nevada. As described below, Albury applied for a home mortgage with Wells Fargo and was subjected to racial discrimination in Wells Fargo's mortgage lending process.

7.      Plaintiff Shaia Beckwith Simmons is African American and a citizen of Florida. As described below, Plaintiff Simmons obtained a home mortgage with Wells Fargo and was subjected to racial discrimination in Wells Fargo's mortgage lending process.

---

[1] https://www.wellsfargo.com/assets/pdf/about/investor-relations/sec-filings/2020/10k.pdf
[2] https://newsroom.wf.com/English/news-releases/news-release-details/2021/Wells-Fargo-launches-Banking-Inclusion-Initiative-to-accelerate-unbanked-households-access-to-affordable-transactional-accounts/default.aspx#:~:text=Wells%20Fargo%20%26%20Company%20(NYSE%3A,of%20banking%2C%20investment%20and%20mortgage

AMENDED
COMPLAINT
- 3 -

# **FACTUAL ALLEGATIONS**

8.     As stated above, Wells Fargo is one of the largest banks in the country and one of the top residential mortgage providers in the United States. Across the country, Wells Fargo applies mortgage origination, approvals, interest rate determinations, fees, costs, refinancing, underwriting, deferment, forbearance, default, and foreclosure policies and practices that intentionally and disproportionately discriminate against and harm Black and/or African American home loan applicants and home mortgage borrowers. Williams, Albury, and Simmons were injured by Wells Fargo's racially discriminatory residential mortgage policies and practices.

9.     Wells Fargo has a long history of racial discrimination and maintains a corporate culture replete with harmful racial stereotypes and biased views about Black and/or African American customers.

10.     Wells Fargo discriminates against Black and/or African American customers throughout its lending process, from application—where Wells Fargo disproportionately denies credit to Black and/or African American applicants—to origination—where Wells Fargo disproportionately charges higher interest rates, imposes higher fees and costs, and offers worse terms to Black and/or African Americans compared to non-Black, non-African Americans—to refinancing—where Wells Fargo disproportionately denies Black and/or African Americans the opportunity to modify or lower their interest rates—and servicing—where Black and/or African American borrowers are subjected to additional racial discrimination.

11.     Wells Fargo engages in redlining by approving white applicants for mortgage loans at substantially higher rates than Black and/or African American applicants. In 2020, for instance, according to an analysis of nationwide data published under the Home Mortgage Disclosure Act, Wells Fargo approved approximately 67.1% of white borrowers who applied for a mortgage, compared to only 51.8% of Black and/or African American applicants.

12.     When evaluating statistical disparities like the one described above, statisticians use a tool called the "standard deviation" to assess the likelihood that the disparity is due to chance. The more standard deviations, the more the observed result deviates from the expected result and the less likely that the disparity is due to random chance. Courts and statisticians consider a disparity "statistically significant"—that there is a 95% level of confidence that random chance did not cause the disparity—at 1.96 standard deviations. In this case, the difference in approvals is statistically significant at *over 29 standard deviations*.

13.     When Wells Fargo approves Black and/or African American borrowers' mortgage applications, it does so on substantially worse terms than offered to non-Black, non-African American borrowers. Nationwide, in 2020, the average interest rate Wells Fargo charged to Black and/or African American borrowers was 3.34%, versus 3.23% to white borrowers. The difference is statistically significant at over 17 standard deviations.

14.     Wells Fargo also imposes higher costs on Black and/or African American borrowers relative to the size of their loans. In 2020, Black and/or African American borrowers nationwide had to spend, on average, 2.0% of their Wells Fargo loan value on costs and fees, versus 1.7% for white borrowers. The disparity is statistically significant at 9 standard deviations.

15.     Wells Fargo has faced a number of recent lawsuits and settlements challenging these practices and disparities. For example, in 2011, a jury found Wells Fargo guilty of systematically discriminating against minority home buyers by using a computer software for minority homeowners which resulted in them paying more for their home loans than white borrowers. *Opal Jones, et. al v. Wells Fargo Bank, N.A., et al.*, Case No. BC337821 (Los Angeles Superior Court) ($3.5 million verdict). Wells Fargo has also paid hundreds of millions of dollars to avoid litigating its discriminatory home lending practices. Indeed, Wells Fargo agreed to a settlement valued at over $440 million of a lawsuit challenging the Firm's redlining practices,

resulting in a disproportionate number of foreclosures in African American neighborhoods in Shelby County and the City of Memphis. *City of Memphis and Shelby County, et al. v. Wells Fargo Bank, N.A., et al.*, Case No. 2:09-CV-02857 (W.D. Tenn.). Wells Fargo also settled a lawsuit for $37 million led by the National Fair Housing Alliance alleging that Wells Fargo took better care of foreclosed properties that it owned in white neighborhoods than those in African American and Latino communities. *National Fair Housing Alliance, et al. v. Wells Fargo Bank N.A., et al.*, HUD Case No. 09-12-0708-8 (U.S. Department of Housing & Urban Development Office of Fair Housing & Equal Opportunity).

16.     Wells Fargo has also faced and settled numerous lawsuits challenging its "reverse redlining" practices of charging higher rates and imposing less favorable terms for minority home borrowers than for white home borrowers. For instance, in 2013, Wells Fargo paid $175 million to settle a lawsuit brought by the United States Department of Justice alleging that the Firm charged higher rates to its African American and Latino borrowers.  *United States v. Wells Fargo Bank, NA*, Case No. 1:12-cv-01150 (D.D.C.).

17.     In 2019, Wells Fargo paid $10 million to settle a similar claim brought by the City of Philadelphia. *City of Philadelphia v. Wells Fargo & Co., et al.*, No. 2:17-cv-02203-AB (E.D. Pa. 2019). Philadelphia alleged that Wells Fargo simply swapped the evil of redlining—refusing to lend to minority communities—for the similarly pernicious reverse redlining—lending to minority borrowers, but saddling them with more expensive loans with worse terms than those extended to white borrowers. *City of Philadelphia v. Wells Fargo & Co., et al.*, No. 2:17-cv-02203-AB (E.D. Pa. 2019), Dkt. 1 (Complaint) ¶¶ 5–21. Philadelphia alleged that "since at least 2004 . . . Wells Fargo has systematically engaged in a continuous and unbroken discriminatory pattern and practice of issuing higher cost or more onerous mortgage loans to minority borrowers in Philadelphia when more favorable and less expensive loans were being offered to similarly

AMENDED
COMPLAINT
- 6 -

situated non-minority borrowers." *Id.* ¶ 5 (E.D. Pa.). Philadelphia's statistical analysis revealed that African American borrowers were more than twice as likely to "receive a high-cost or high-risk loan" than a white borrower even when controlling for credit score. *Id.* ¶ 14. Indeed, the discrimination worsened as the credit score increased—especially creditworthy "African-Americans with FICO scores over 660 were 2.570 times more likely to receive a high-cost or high-risk loan from Wells Fargo as a white borrower." *Id.* The predictable result of Wells Fargo's foisting high-cost, high-risk loans on African Americans was an explosion of foreclosures in minority communities, where loans were "4.710 times more likely to result in foreclosure than is a loan in a predominantly white neighborhood." *Id.* ¶ 12. This precipitated what "many leading commentators describe[d] as the 'greatest loss of wealth for people of color in modern US history.'" *Id.* ¶ 18.

18.     Wells Fargo has found new avenues to discriminate against Black and/or African American customers with recent changes to the home mortgage market. Nationwide, homeowners have had the opportunity to take advantage of historically low interest rates through refinancing, which occurs when a homeowner applies for credit related to their residential real estate to change the terms of an earlier loan. Over the last two years, U.S. homeowners refinanced almost $5 trillion in mortgages, generating untold savings.[3] This could have been an opportunity for African American homeowners to build wealth and secure their families' futures.

19.     Wells Fargo, however, systematically and intentionally shut Black and/or African American customers out of this major wealth event. According to an analysis of 2020 Home Mortgage Disclosure Act data, Wells Fargo approved 33.7% of refinancing applications from Black and/or African American applicants, compared with 49.1% from white applicants. Wells

---

[3] https://www.bloomberg.com/graphics/2022-wells-fargo-black-home-loan-refinancing/

AMENDED
COMPLAINT
- 7 -

Fargo denied Black and/or African Americans borrowers' applications outright 36.1% of the time, versus 20.3% of the time for white borrowers. These disparities are statistically significant at over 31 standard deviations.

20.     And just as it does with home purchase loans, Wells Fargo charges higher costs and interest rates to Black and/or African American customers who obtain refinancing. In 2020, Wells Fargo charged the average national Black and/or African American refinancing recipient 3.18% versus 3.11% for white refinancing recipients, and charged Black and/or African American customers an average of $5,335 in costs and fees versus $4,193 for white borrowers, for an average cost of borrowing of 2.6% for Black and/or African American customers versus 1.8% for white borrowers. All these disparities are statistically significant.

21.     Wells Fargo's failure to extend refinancing and other home loans to Black and/or African American customers has even drawn the attention of members of Congress. Senators Elizabeth Warren and Ron Wyden recently wrote a letter to Wells Fargo's Chief Executive Officer Charles Scharf excoriating the Bank for its "shocking disparity" in its approval ratings of Black and/or African American refinancing applicants.[4] The Senators stated that Wells Fargo's recent actions were consistent with "Wells Fargo's long history of scamming and mistreating consumers of color."[5] Furthermore, the Senators believed "Wells Fargo's treatment of Black borrowers is deeply concerning, no matter how one looks at the data" and concluded, "Wells Fargo appears to be simply unable or unwilling to stop preying upon customers of color."[6]

22.     Wells Fargo discriminates against its African American employees just as readily as it does its customers. In 2016, Wells Fargo was charged with systemic discrimination against

---

[4] Letter from Senators Elizabeth Warren and Ron Wyden, March 16, 2022
https://www.warren.senate.gov/imo/media/doc/2022.3.16%20Letter%20to%20Wells%20Fargo%20on%20Refinancing%20Discrimination.pdf
[5] *Id.*
[6] *Id.*

AMENDED
COMPLAINT
- 8 -

minority Financial Advisors including by African American Financial Advisors in the class action lawsuit *Slaughter v. Wells Fargo Advisors*, 14-cv-06368 (N.D Ill. 2014). Wells Fargo eventually settled the *Slaughter* litigation for over $35 million. *Slaughter v. Wells Fargo Advisors*, 14-cv-06368 (N.D Ill. 2014), Dkt. 99-1.

23. In determining home loans, interest rates, points, and other credit and contractual terms, Wells Fargo intentionally uses factors to determine eligibility for home loan rates, terms, and conditions that facilitate redlining and reverse redlining against and disfavor Black and/or African American applicants.

24. Many traditional techniques for determining creditworthiness, such as FICO score, debt-to-income ratio, and work history, have been demonstrated to cause an unlawful disparate impact against Black borrowers and/or African Americans. Wells Fargo, however, employs an even more discriminatory "unique scoring model" that eschews even these traditionally discriminatory origination and underwriting techniques. Wells Fargo thereby intentionally discriminates and creates an unlawful disparate impact against Black and/or African American mortgage applicants, including applicants for refinancing.

25. Additionally, pursuant to its Firm-wide discriminatory culture, Wells Fargo unduly scrutinizes and is unduly skeptical of the application materials submitted by Black and/or African American applicants, causing undue delays and rejections of Black and/or African American mortgage applicants, including applicants for refinancing.

26. In the rare case Wells Fargo offers mortgage loans to Black and/or African American customers on reasonable terms, Wells Fargo engages in predatory lending practices to force Black and/or African American borrowers out of those terms, including pressuring Black and/or African American borrowers to increase their rates by improperly treating Black and/or African American borrowers' loans in default and instituting improper foreclosures.

27.     The racially discriminatory policies and practices at Wells Fargo are uniform and national in scope and create an artificial, arbitrary, and unnecessary barrier to fair housing opportunities for Black and/or African American borrowers. Class members who applied for loans at Wells Fargo offices across the country and were harmed by these same policies and practices are relying on Plaintiffs and this lawsuit to protect their rights. Wells Fargo's policies are practices are implemented with discriminatory intent and/or disproportionately impact Black and/or African Americans borrowers.

### PLAINTIFFS WERE INJURED BY DEFENDANTS' DISCRIMINATORY POLICIES AND PRACTICES

**Christopher Williams**

28.     Williams is African American. Williams was a well-qualified African American home borrower. When he applied for his mortgage loan, Williams was highly creditworthy, as reflected in his high FICO score of over 750. Based on this, Williams believed he should have qualified for Wells Fargo's prime interest rate, which would have saved him substantial money over time on his home mortgage. However, consistent with Wells Fargo's pattern of discrimination against African American borrowers, Wells Fargo offered Williams an interest rate nearly three points higher than the prime interest rate offered by Wells Fargo, which is disproportionately and discriminatorily offered to white applicants.

29.     Believing it to be a mistake, Williams spoke to Wells Fargo's home lending department to have his credit report rechecked and for his interest rate to be lowered. Instead, the Firm refused to reconsider his credit score or his interest rate.

30.     Wells Fargo agreed to revisit its refusal to extend the loan to Williams on favorable terms. However, in a letter dated September 5, 2019, Wells Fargo finally articulated for the first time, that it did not use solely FICO credit scores to determine home interest rates, but

instead used "a unique scoring model, which considers more than credit scores to evaluate applications."

31.     Indeed, the "other" factors used by Wells Fargo to determine interest rates for home loans serve to intentionally exclude Black and/or African American borrowers from affordable and lower-risk loans, force Black and/or African American borrowers to pay higher interest rates and other fees that similarly situated white borrowers, and have a disparate impact based on race. Williams applied for and received a home loan from another bank at its prime interest rate.

32.     Williams identified his race to Wells Fargo during the application process.

**Sam Albury**

33.     Plaintiff Albury is African American. Albury is a well-qualified African American home borrower. When he applied for his mortgage, Albury was gainfully employed, had already owned two properties, and was highly creditworthy. In or around June 2020, Albury agreed to purchase a new home in Las Vegas, Nevada. To do so, Albury agreed to close on the property in 35 days and paid the buyer a considerable amount of earnest money. Despite being warned not to use Wells Fargo by his realtor, Albury believed he would receive a prime mortgage due to his preexisting banking relationship with Wells Fargo.

34.     However, consistent with Wells Fargo's pattern of discrimination against Black and/or African American borrowers across the country, Wells Fargo offered Albury an interest rate higher than the prime interest rate offered by Wells Fargo to white applicants. Wells Fargo also unduly scrutinized his application and subjected him to baseless inquiries regarding his finances and work history. Worried that Wells Fargo would not approve his mortgage application in time for the scheduled closing, Albury answered all of Wells Fargo's baseless inquiries.

35.     Wells Fargo continued to string Albury along until, just days before his scheduled closing, Wells Fargo denied his application in full. Wells Fargo's actions forced Albury to walk away from his home purchase, thereby forfeiting thousands of dollars in earnest money.

**Shaia Beckwith Simmons**

36.     Plaintiff Shaia Beckwith Simmons is a public relations expert, community advocate, and motivational speaker, with a Bachelor's in Business Administration and Management and a Master's in Educational Leadership and Administration from Florida A&M University. She and her husband, the head coach of Florida A&M's Division I football team, are pillars of their local community.

37.     Simmons is a well-qualified African American home borrower who obtained a home mortgage loan from Wells Fargo in 2009 and refinanced it for a lower interest rate in 2013.

38.     Simmons is a model homeowner and has timely made her monthly payments without incident. During the COVID-19 pandemic, as required by the CARES Act, Wells Fargo offered existing home mortgage borrowers the option to defer their payments. Simmons accepted Wells Fargo's deferment option, which allowed her to restructure her loan to defer monthly payments during the pandemic and instead make those monthly payments at the end of her loan.

39.     After several months of approved deferments, Simmons promptly resumed making her mortgage payments in full, as she had done for decades without issue.

40.     Yet consistent with its nationwide discriminatory practices, Wells Fargo maliciously and unlawfully instituted foreclosure proceedings against Simmons without prior notice, asserting without justification that Simmons was in default for failure to make mortgage payments during her deferment.

41.     Consistent with its nationwide practices of predatory lending to extract wealth from Black and/or African American customers, Wells Fargo presented Simmons with an

AMENDED
COMPLAINT
- 12 -

ultimatum: she could renegotiate her loan, potentially at a higher interest rate that would cost her many thousands of dollars over the remaining life of the loan, or Wells Fargo would persist with the unjustified foreclosure to take her home away from her and resell it in a booming market.

42. Simmons refused to renegotiate her loan and is resisting the wrongful foreclosure, which remains pending.

43. Wells Fargo's unlawful actions have caused Simmons emotional distress, and the pendency of the wrongful foreclosure and filing of a lis pendens against her property have damaged Simmons's credit rating, causing further injury.

## CLASS ALLEGATIONS

44. Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and a class of Black and/or African American applicants or borrowers who applied for, received, or maintained credit from Defendants related to residential real estate and who were subjected to discrimination by Defendants due to their race. Plaintiffs seek certification of a liability and injunctive and declaratory relief class under Rule 23(b)(2) and 23(c)(4), and/or certification of a broader class under Rule 23(b)(3). All requirements of class certification are met by the proposed class.

45. The class of Black and/or African American participants in Wells Fargo's home lending process is so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1).

46. There are questions of law and fact common to the class, and those questions can and should be resolved in a single proceeding that furthers this litigation. Fed. R. Civ. P. 23(a)(2).

47. The claims alleged by Plaintiffs are typical of the claims of the class. Fed. R. Civ. P. 23(a)(3).

AMENDED
COMPLAINT
- 13 -

48.     Plaintiffs will fairly and adequately represent and protect the interests of the class. Fed. R. Civ. P. 23(a)(4).

49.     The issue of determining liability regarding whether Defendant's policies and practices result in a pattern or practice of intentional discrimination and/or have a disparate impact against African Americans is appropriate for issue certification under Rule 23(c)(4). Other common issues are also appropriate for certification.

50.     Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate with regard to the class as a whole.  Fed. R. Civ. P. 23(b)(2).

51.     The questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3).

## COUNT I

## EQUAL CREDIT OPPORTUNITY ACT

52.     Plaintiffs, on behalf of themselves and all those similarly situated, reallege each and every paragraph above and incorporate them by reference as though fully stated herein.

53.     The Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*, makes it unlawful for a creditor to discriminate against any applicant with respect to any aspect of a credit transaction on the basis of race.

54.     As described above, Defendants are creditors because they regularly extend, renew, and continue credit, and Plaintiffs were applicants for credit.

55.     Defendants maintained a nationwide set of uniform, discriminatory mortgage loan origination, refinancing, and underwriting practices and engaged in a pattern or practice of

AMENDED
COMPLAINT
- 14 -

systemic race discrimination against Black and/or African American mortgage loan applicants and borrowers that constitutes illegal intentional race discrimination in violation of the Equal Credit Opportunity Act.

56.     Plaintiffs and all those similarly situated were subjected to and harmed by Defendant's systemic and individual discrimination.

57.     Defendants' unlawful conduct resulted in considerable harm to Plaintiffs and all those similarly situated.

58.     On behalf of themselves and the class they seek to present, Plaintiffs request the relief set forth below.

## COUNT II

### RACE DISCRIMINATION IN VIOLATION
### OF 42 U.S.C. § 1981

59.     Plaintiffs, on behalf of themselves and all those similarly situated, reallege each and every paragraph above and incorporate them by reference as though fully stated herein.

60.     Under 42 U.S.C. § 1981, persons of all races are guaranteed the same right to make and enforce contracts, regardless of race. The term "make and enforce" contracts includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

61.     Defendants maintained a nationwide set of uniform, discriminatory mortgage loan origination, refinancing, and underwriting practices and engaged in a pattern or practice of systemic race discrimination against Black and/or African American mortgage loan applicants and borrowers that constitutes illegal intentional race discrimination in the making and modification of contracts in violation of 42 U.S.C. § 1981.

AMENDED
COMPLAINT
- 15 -

62.     Plaintiffs and all those similarly situated were subjected to and harmed by Defendants' systemic and individual discrimination.

63.     On behalf of themselves and the class they seek to present, Plaintiffs request the relief set forth below.

<u>**COUNT III**</u>

**RACE DISCRIMINATION IN VIOLATION**
**OF 42 U.S.C. § 1982**

64.     Plaintiffs reallege each and every paragraph above and incorporate them by reference as though fully stated herein.

65.     Under 42 U.S.C. § 1982, all citizens are guaranteed the same right to inherit, purchase, lease, sell, hold, and convey real and personal property, regardless of race.

66.     As set forth above, Defendants maintained a nationwide set of uniform, discriminatory mortgage loan origination, refinancing, and underwriting practices and engaged in a pattern or practice of systemic race discrimination against Black and/or African American mortgage loan applicants and borrowers that constitutes illegal intentional race discrimination and disparately impacts Black and/or African American applicants and borrowers in violation of 42 U.S.C. § 1982.

67.     Plaintiffs and all those similarly situated were subjected to and harmed by Defendants' systemic and individual discrimination.

68.     On behalf of themselves and the class they seek to present, Plaintiffs request the relief set forth below.

## COUNT IV

### RACE DISCRIMINATION IN VIOLATION OF
### THE FAIR HOUSING ACT OF 1968, 42 U.S.C § 3601 *et seq.*

69.     Plaintiffs reallege each and every paragraph above and incorporate them by reference as though fully stated herein.

70.     The Fair Housing Act, 42 U.S.C. § 3605(a), prohibits any entity whose business includes engaging in residential real estate-related transactions from discriminating against any person in making available such a transaction on the basis of race.

71.     Defendants' business includes engaging in residential real estate-related transactions.

72.     As set forth above, Defendants maintained a nationwide set of uniform, discriminatory mortgage loan origination, refinancing, and underwriting practices and engaged in a pattern or practice of systemic race discrimination against Black and/or African American mortgage loan applicants and borrowers that constitutes illegal intentional race discrimination and disparately impacts Black and/or African American mortgage loan applicants and borrowers in violation of the Fair Housing Act of 1968.

73.     Plaintiffs and all those similarly situated were subjected to and harmed by Defendants' systemic and individual discrimination.

74.     On behalf of themselves and the class they seek to present, Plaintiffs request the relief set forth below.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court find against Defendants as follows:

a.     Certify this case as a class action;

b. Designate Plaintiffs as Class Representatives and designate Plaintiffs' counsel of record as Class Counsel;

c. Declare that Defendants' acts, conduct, policies and practices are unlawful and violate the Equal Credit Opportunity Act, 42 U.S.C. §§ 1981 and 1982, and the Fair Housing Act;

d. Declare that Wells Fargo engaged in a pattern and practice of racial discrimination against Black and/or African American applicants and borrowers;

e. Order Plaintiffs and all others similarly situated offered mortgage loans at non-discriminatory rates, and otherwise make Plaintiffs whole;

f. Award Plaintiffs and all others similarly situated compensatory and punitive damages;

i. Award Plaintiffs and all others similarly situated prejudgment interest and attorneys fees, costs and disbursements, as provided by law;

j. Award Plaintiffs and all others similarly situated such other make whole equitable, injunctive and legal relief as this Court deems just and proper to end the discrimination and fairly compensate Plaintiffs and all others similarly situated.

k. Award Plaintiffs and all others similarly situated such other relief as this Court deems just and proper.

# DEMAND FOR A JURY TRIAL

Plaintiffs hereby demand a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure and Civil Local Rule 3-6.

Respectfully submitted,

BEN CRUMP, PLLC

BENJAMIN CRUMP (Pro hac vice to be requested)
633 Pennsylvania Avenue Northwest
Floor 2
Washington D.C. 20004
Tel: (800) 713-1222
court@bencrump.com

STOWELL & FRIEDMAN, LTD.

By: */s/ Linda D. Friedman*
LINDA D. FRIEDMAN (Appearing pro hac vice)
SUZANNE E. BISH (Pro hac vice to be requested)
**STOWELL & FRIEDMAN LTD.**
303 W. Madison St.
Suite 2600
Chicago, Illinois 60606
Phone: (312) 431-0888
Lfriedman@sfltd.com

SANI LAW FIRM

SAM SANI (local counsel)
**SANI LAW FIRM**
15720 Ventura Blvd.
Suite 405
Encino, CA 94612
Tel: (310) 935-0405
ssani@sanilawfirm.com

*Attorneys for Plaintiffs Williams, Albury, Simmons, individually and on behalf of all others similarly situated*

# EXHIBIT E

Alex R. Straus (SBN 321366)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN PLLC**
280 South Beverly Drive
Beverly Hills, CA 90212
Tel.:    (917) 471-1894
Fax:    (310) 496-3176
Email: astraus@milberg.com

*Attorneys for Plaintiff*
*Additional Counsel on Signature Page*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| ALFRED POPE, on behalf of himself and all others similarly situated, | Case No.: 4:22-cv-01793-KAW |
| Plaintiff, | **AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| WELLS FARGO BANK, N.A., WELLS FARGO & COMPANY, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiff alleges upon personal knowledge as to himself and his own actions, and upon information and belief, including the investigation of counsel, as follows:

## I.    NATURE OF THE ACTION

1.    Spurred in part by the COVID-19 pandemic, low interest rates allowed American homeowners to refinance their home mortgages at more favorable interest rates from 2019 through present (the "Class Period").

2.    Plaintiff, and members of the putative Class (the "Class"), seek damages for Defendants' -- Wells Fargo Bank, N.A. and Wells Fargo & Company (collectively, "Wells Fargo") -- discriminatory practices in denying their applications to refinance their Wells Fargo mortgage loans in violation of the federal Fair Housing and Fair Lending acts, as well as state consumer protection laws.  Indeed, according to recent investigations of Wells Fargo's refinance activity during the Class Period that have been publicized in the media, Wells Fargo approved white applicants' mortgage refinance requests at twice the rate of its approval of Black and Hispanic/Latino minority applicants' refinance requests in numerous areas across the United States.[1] Plaintiff' own analysis of Wells Fargo's mortgage refinance rates bears this out.

3.    This is no accident.  For nearly two decades, Wells Fargo exploited the American dream of home ownership through discriminatory housing practices in violation of the FHA, including by making a disproportionately higher number of subprime and higher cost mortgage loans to minorities than to white borrowers, and then discriminatorily foreclosing on minority mortgage loans in higher minority concentration neighborhoods compared to white neighborhoods.  Such reprehensible conduct has stripped many Wells Fargo minority customers of their single greatest asset – the equity value in their homes.

4.    To add further injury to the insult Wells Fargo's minority customers have already sustained, Wells Fargo is now discriminatorily refusing to refinance minority higher cost

---

[1] Shawn Donnan, Ann Choi, Hannah Levitt, and Christopher Cannon, "*Wells Fargo Left Black Homeowners Behind in Pandemic Mortgage Refinancing Boom*, Bloomberg (Online) (March 11, 2022), at https://www.bloomberg.com/graphics/2022-wells-fargo-black-home-loan-refinancing/. *See also* J.J. McCorvey and Julia Carpenter, "*Millions of Americans Refinanced Last Year – but Fewer Black and Latino Homeowners Did*," WALL STREET JOURNAL (June 25, 2021), at https://www.wsj.com/articles/millions-of-americans-refinanced-last-yearbut-fewer-black-and-latino-homeowners-did-11624440601.

AMENDED CLASS ACTION COMPLAINT
CASE NO. 4:22-cv-01793-KAW

mortgages. Such reprehensible conduct begs the question why any minority would ever bank with this institution. Indeed, as Wells Fargo's CEO Charles Scharf has publicly acknowledged in Congressional testimony, Wells Fargo engaged in predatory and discriminatory mortgage lending and servicing practices, as well as fraudulent customer account practices.[2] And, as CEO Scharf further admitted in relatively recent media reports, Wells Fargo has an institutional, discriminatory bias.[3]

5.      Plaintiff and members of the putative Class have suffered harm due to the discriminatory tactics used by the Defendants with respect to their rejections of minority and female homeowners seeking the ability to refinance their mortgages. Due to this conduct, Plaintiff and members of the putative Class bring this Action under federal and state law against the Defendants for damages, injunctive relief, attorney's fees, and any other relief this Court deems just and proper.

## II.      JURISDICTION AND VENUE

6.      This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332(d), and 1343, because the Plaintiff asserts federal causes of action, because Plaintiff assert civil rights causes of action, and because at least one member of the Class is a citizen of a different state than all Defendants, and because the amount in controversy exceeds $5,000,000.

7.      Personal jurisdiction is appropriate over Defendants because Wells Fargo Bank, N.A. transacts business in the State of California and has its principal place of business in San Francisco, California. Wells Fargo Home Mortgage, Inc. originates loans to California customers from its California offices and maintains a systematic and continuous presence in the State.

---

[2] Wells Fargo CEO Charles Scharf admitted these failings in congressional testimony. *See* https://financialservices.house.gov/uploadedfiles/chrg-116hhrg428866.pdf at 9 (last visited Jan. 13, 2022) (testifying that he did not disagree with the Report's findings, and that "the series of behavior that is described should have never happened at the company. The failures that are described a direct result of us not managing the company properly"); *id.* at 5 ("[W]e had a flawed business model in how the company was managed").

[3] *See, e.g.,* https://www.businesswire.com/news/home/20200923005604/en/ (last visited March 19, 2022) (discussing CEO Scharf's unconscious bias); *see also* https://www.charlotteobserver.com/news/business/banking/article246012155.html (Jimmie Paschall, Wells Fargo's head of enterprise diversity and inclusion, revealed: "There definitely is a sense that bias lives vibrantly at Wells Fargo. And I think it is around gender, gender identity, and race as well as race and ethnicity.)

AMENDED CLASS ACTION COMPLAINT
CASE NO. 4:22-cv-01793-KAW

8.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b) because Wells Fargo Bank, N.A. resides in this district, a substantial part of the events or omissions giving rise to the claim occurred in this district, and Wells Fargo Bank, N.A.'s principal place of business is in this district.

## INTRADISTRICT ASSIGNMENT

9.     This action is properly assigned to the San Francisco Division of this District pursuant to N.D. Cal. L.R. 3-2, because Defendant Wells Fargo & Company is headquartered in San Francisco, California, which is served by the San Francisco Division.

## III.    PARTIES

10.     **Plaintiff.**

11.     Plaintiff Alfred Pope is a minority homeowner who owns equity in a home located in Chesapeake, Virginia. Plaintiff Pope applied for a Wells Fargo home refinance in September of 2021 and his application was denied.

12.     **Defendants.**

13.     Defendant Wells Fargo Bank, N.A. is a nationally chartered bank with its principal place of business located in Sioux Falls, South Dakota and is chartered in Wilmington, Delaware.

14.     Defendant Wells Fargo & Company is Defendant Wells Fargo Bank, N.A.'s parent company and is headquartered in San Francisco, California with its principal place of business located in Manhattan, New York, New York.

## IV.    FACTUAL ALLEGATIONS

### A.  Wells Fargo, the Home Mortgage Industry, and Home Mortgage Refinancing

15.     Wells Fargo is one of the Country's largest first and second lien mortgage lenders. Included within that line of business are its new mortgages derived from refinancing existing home mortgages.

16.     Refinancing an existing mortgage allows a borrower to try to obtain better terms including, for example, a lower interest rate.  A lower mortgage interest rate enables a borrower to

save hundreds, if not thousands, of dollars per year on interest charges. As Wells Fargo explains on "Why Refinance a Mortgage" page on its website, refinancing a mortgage enables a borrower: (1) to tap into home equity (using the equity established in the home in order to get a cash-out refinance where the bank gives the borrower cash in exchange for that equity in order to pay other loans or credit card debt), (2) take advantage of lower [interest] rates (which reduce the monthly payments and the total interest paid out over the duration of the loan), (3) change your loan term (to shorten or lengthen the loan term length), and (4) to convert to an adjustable rate mortgage or a fixed-rate mortgage.[4]

17. Conversely, the denial of refinance applications means that a mortgage borrower must continue to pay higher mortgage costs. Brookings Institute senior fellow Andre Perry states that the inability of Black homeowners to refinance their home mortgage loans "means people have less resources to invest in their children, less resources to start businesses, less resources to renovate their homes, less resources to buy additional homes."[5] This, in the aggregate, widens the racial wealth gap in the United States.

**B. The Pandemic-induced Interest Rates Made Mortgage Refinancing Attractive to Homeowners**

18. During the Class Period, interest rates dropped substantially due to economic pressures caused by the COVID-19 pandemic – this made refinancing more attractive for mortgage holders.

19. A study by the Federal Reserve Bank of Boston concluded the following:

a. The typical refinance during the Class Period reduced borrowers' monthly payments by $279 per month, leading to a total payment reduction of $5.3 billion per year in the United States for all households that refinanced.[6]

---

[4] https://www.wellsfargo.com/mortgage/mortgage-refinance/why-refinance/, (last accessed Mar. 7, 2022).

[5] *Id.*

[6] Larry Bean, "*Fed study: Minority borrowers bore the brunt of COVID-19's impact on the mortgage market*," FEDERAL RESERVE BANK OF BOSTON (June 22, 2021), at https://www.bostonfed.org/news-and-events/news/2021/06/minority-borrowers-bear-brunt-of-covid-19-impact-on-mortgage-market.aspx.

AMENDED CLASS ACTION COMPLAINT
CASE NO. 4:22-cv-01793-KAW

b. However, only $198 million, or 3.7% of the total payment reduction of $5.3 billion, went to Black households.[7]

c. This is especially problematic considering that Black households account for over 13% of the entire United States population and over 9% of all homeowners.[8]

d. Additionally, the study concluded that white homeowners were approved at twice the rate of Black homeowners with respect to mortgage refinancing during the Class Period.[9]

20. The study found that, "[c]ompared with white borrowers, Black borrowers on average have lower credit scores and higher loan-to-value ratios [which are] risk factors that can prevent someone from refinancing and reducing their monthly mortgage payments. However, when authors [of the study] control for these factors, they find that before the pandemic, Black and white borrowers were roughly equally likely to refinance. After the pandemic began and interest rates plummeted, Black homeowners were 40% less likely than white homeowners to finance, holding equal the risk factors for both groups."[10]

21. Critically, the authors of the study concluded, "borrowers who could use the payment reductions the most moving forward may be the least likely to obtain them."[11]

**C. Due to the Discriminatory Conduct of the Defendants, Plaintiff and the Members of the Putative Class Were Denied Refinancing Opportunities by Defendants' Bank, Wells Fargo**

22. Wells Fargo has engaged in discriminatory practices that disparately reduce the number of home mortgage refinance requests by minority applicants. With respect to minority applicants. these tactics, taken generally, are called "redlining."

---

[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.*

23.     The term "redlining" has its roots in New Deal-era racism, which limited minority access to housing opportunities. Historically, the concept of redlining comes "from government maps that outlined areas where Black residents lived and therefore were deemed more risky [real estate] investments."[12]

24.     In the past, redlining took place through the use of mapping where Black neighborhoods were and consisted of coloring those neighborhoods "red" as to denote that they were high risk investments because of the populations that inhabited them. In the modern day, redlining takes place usually though an algorithmic bias which considers multiple factors tied to race (such as ZIP code, education, area code, census track, average home values, and other factors) and uses them in the decision of whether to approve a home mortgage refinancing application.

25.     For example, the refinancing calculator on Wells Fargo's website, utilizes a digitized algorithmic tool that assesses creditworthiness and other factors to offer estimated refinance rates. The tool asks for inputs for factors that are proxies for minority homeowner status, such as geography (Wells Fargo notes: "[Refinancing] [r]ates can vary by location")[13] and credit score (to which Wells Fargo gives four options: Excellent, Good, Fair, or Poor/Limited).[14]

26.     On its refinance applications, hosted by Blend Labs, Inc., the digitized algorithmic tool (which assesses creditworthiness and other factors to lock in a home mortgage refinance interest rate) also asks for information that can be proxies for race, including "demographic information," employment and income information, real estate holdings by the applicant, and other information.[15]

---

[12] Candace Jackson, "*What is Redlining?*," NYTIMES (ONLINE) (Aug. 17, 2021), at https://www.nytimes.com/2021/08/17/realestate/what-is-redlining.html.

[13] https://www.wellsfargo.com/mortgage/mortgage-refinance/why-refinance/, (last accessed Mar. 7, 2022).

[14] *Id.*

[15] https://yourmortgageapp.wf.com/section/Getting%20Started/task/BORROWER/3652fd6a-b3e4-4308-bfa8-a92e9f4bbb83, (last accessed Mar. 7, 2022).

27.     Wells Fargo's use of these factors has resulted in discrimination by disparately denying minority and female applicants' refinance applications at rates far in excess of denial rates experienced by white borrowers.

**D.  Due to the Discriminatory Conduct of the Defendants, Plaintiff and the Members of the Putative Class Were Harmed**

28.     Plaintiff and members of the putative Class were harmed because they were either denied the ability to refinance their home mortgages entirely due to Wells Fargo's conduct described herein, or they were given less favorable terms than white borrowers who similarly refinanced their home mortgages through Wells Fargo.

29.     Either way, Plaintiff and members of the putative Class were harmed in the form of higher monthly payments on their home mortgage loan payments which could have been reduced but for Wells Fargo's discriminatory conduct.

30.     Indeed, an investigation by Bloomberg News further unveiled Wells Fargo's discriminatory practices with respect to the mortgage refinancing industry.[16] Statistics collected by Bloomberg show how wide Wells Fargo's disparity in refinance approvals was in 2020 compared to all other mortgage lenders in the United States:

---

[16] Shawn Donnan, Ann Choi, Hannah Levitt, and Christopher Cannon, "*Wells Fargo Left Black Homeowners Behind in Pandemic Mortgage Refinancing Boom*," Bloomberg (Online) (March 11, 2022), at https://www.bloomberg.com/graphics/2022-wells-fargo-black-home-loan-refinancing/.



**Disparity by Lender**
Wells Fargo approved fewer than half of Black homeowners' refinancing applications in 2020.

Source: Bloomberg analysis of Home Mortgage Disclosure Act data for 8 million completed applications to refinance conventional loans in 2020.

[17]

31.     For example, during the time period at issue here, JP Morgan (the largest U.S. bank in terms of assets) approved 81% of mortgage refinance applications from Black homeowners, Rocket Mortgage LLC approved nearly 80% of Black applicants, and Bank of America approved 66% of Black applicants. This is in stark contrast to Wells Fargo's mere 47% approval rate of Black mortgage refinance applications.

32.     Notably, Wells Fargo denied Black mortgage refinance applicants at significantly higher rates than White applicants that had significantly lower incomes:

---

[17] *Id.*

AMENDED CLASS ACTION COMPLAINT
CASE NO. 4:22-CV-01793-KAW



Higher Income, Same Approval
Wells Fargo's refinancing approval rates were higher for the lowest-income White applicants in 2020 than for all but the highest-income Black applicants.

Source: Bloomberg analysis of Home Mortgage Disclosure Act data for 8 million completed applications to refinance conventional loans in 2020.

33.     According to Kristy Fercho, the Wells Fargo employee responsible for overseeing Wells Fargo's home-lending line of business, lending decisions were "consistent across racial and ethnic groups" and that racial disparity in outcomes for refinancing in 2020 was the result of variables that Wells Fargo doesn't control.[18] That provides no excuse because Wells Fargo is not permitted by law to discriminate in its mortgage application process.

---

[18] *Id.*

AMENDED CLASS ACTION COMPLAINT
CASE NO. 4:22-cv-01793-KAW

## V.   CLASS ALLEGATIONS

34.     Pursuant to F.R.C.P. Rule 23(b)(2) and (b)(3), as applicable, and (c)(4), Plaintiff seeks certification of a class of all first and second lien Wells Fargo minority mortgage refinance applicants from 2019-present (the "Class Period") whose refinancing applications were discriminatorily denied (the "Class".)

35.     Excluded from the Class are Defendants, their subsidiaries, affiliates, officers, directors, and employees.

36.     **Numerosity: Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. Plaintiff is informed and believes — based upon the publicly-available information discussed herein — that there are tens of thousands of Class members, making joinder impracticable. Those individuals' identities are available through Defendants' records, and Class members may be notified of the pendency of this Action by recognized, Court-approved notice dissemination methods.

37.     **Commonality and Predominance: Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3).** Defendants have acted in a manner generally applicable to Plaintiff and the other members of the proposed Class. There is a well-defined community of interest in the questions of law and fact involved, which affect all Class members. The questions of law and fact common to the Classes predominate over the questions that may affect individual Class members, including, *inter alia*:

    a.   Whether Defendants systematically discriminated against Class members based upon their minority status;

    b.   Whether minority Class members' applications to refinance a first or second lien loan were denied where similarly situated non-minority applicants were approved; and,

c. Whether the algorithms used by Defendants unfairly discriminated against minority Class members and contained algorithmic bias.

38.     **Typicality: Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of other Class members' claims because Plaintiff and Class members were subjected to the same allegedly unlawful conduct and damaged in the same way.

39.     **Adequacy of Representation: Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate class representative because his interests do not conflict with the interests of Class members whom he seeks to represent, Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff intends to prosecute this Action vigorously. The Class members' interests will be fairly and adequately protected by Plaintiff and his counsel.

40.     **Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2).** The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants. Such individual actions would create a risk of adjudications that would be dispositive of the interests of other Class members and impair their interests. Defendants have acted and/or refused to act on grounds generally applicable to the Classes, making final, public injunctive relief or corresponding declaratory relief appropriate.

41.     Injunctive relief, and specifically public injunctive relief, is necessary in this Action.

42.     The harm that Defendants impose on Plaintiff and Class members cause ripple effects for the public-at-large and Plaintiff seeks injunctive relief forcing Defendants to cease and desist its discriminatory practices.

43.     **Superiority: Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The

damages or other financial detriment suffered by Plaintiff and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Plaintiff and Class members to individually seek redress for Defendants' wrongful conduct. Even if Plaintiff and Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## VI. CAUSES OF ACTION

### <u>COUNT I</u>

### VIOLATIONS OF THE FAIR HOUSING ACT

44.     Plaintiff, on behalf of himself and all others similarly situated, realleges each previous paragraph as if fully alleged herein.

45.     The Fair Housing Act, 42 U.S.C. § 3605(a), prohibits any entity whose business includes engaging in residential real estate-related transactions from discriminating against any person in making available such a transaction on the basis of race.

46.     Defendants' business includes engaging in residential real estate-related transactions.

47.     As set forth above, Defendants maintain a nationwide set of uniform, discriminatory refinancing practices and engage in a pattern or practice of systemic discrimination against minority homeowners that constitute illegal, intentional discrimination and disparately impacts Black Americans and minorities in violation of the Fair Housing Act of 1968.

48.     Plaintiff and Class members were subjected to and harmed by Defendants' systemic and individual discrimination.

49. On behalf of Plaintiff and the putative Class, Plaintiff seeks the relief set forth below.

## COUNT II

### VIOLATIONS OF THE EQUAL CREDIT OPPORTUNITY ACT

47. Plaintiff, on behalf of himself and all others similarly situated, realleges each previous paragraph as if fully alleged herein.

48. The Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*, makes it unlawful for a creditor to discriminate against any applicant with respect to any aspect of a credit transaction on the basis of race.

49. As described above, Defendants are creditors because they regularly extend, renew, and continue credit, and Plaintiff were applicants for credit.

50. Defendants maintain a nationwide set of uniform, discriminatory mortgage loan origination and underwriting practices and engaged in a pattern or practice of systemic race discrimination against minority mortgage loan applicants that constitute illegal intentional race discrimination in violation of the Equal Credit Opportunity Act.

51. Plaintiff and Class members were subjected to and harmed by Defendants' systemic and individual discrimination.

52. Defendants' unlawful conduct resulted in considerable harm to Plaintiff and all Class members.

53. On behalf of himself and the Class he seeks to represent, Plaintiff requests the relief set forth below.

## COUNT THREE

### VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW

54. Plaintiff, on behalf of himself and all others similarly situated, realleges each previous paragraph as if fully alleged herein.

55. California's Unfair Competition Law ("UCL") defines unfair competition to include any "unfair, unlawful, or fraudulent business practice and unfair, deceptive, untrue, or misleading advertising and any act prohibited by Chapter 1 of Part 3 of Division 7 of [California's] Business and Professions Code."

56. Defendants violated the UCL by engaging in unlawful and unfair business acts and practices.

57. Defendants are considered "person[s]" as defined by the statute.

58. Pursuant to the statute, Plaintiff named herein, as well as the putative Class members, have suffered injury-in-fact and have lost money or property because of the unfair competition set forth herein.

59. In accordance with the liberal application and construction of the UCL, application of the UCL to all Class members is appropriate given that Defendants are headquartered in this District, have a forum selection clause specific to this District, and direct sales, marketing and advertising in this District.

60. Unlawful Prong. A business act or practice is unlawful pursuant to the UCL if it violates any other law or regulation.

61. Defendants' conduct violates the Fair Housing Act and the Equal Credit Opportunity Act, and other applicable statutes which Plaintiff may add upon amending this Complaint.

62. Unfairness Prong. A business act or practice is unfair pursuant to the UCL if it is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

63. Defendants' unfair acts and practices include, but are not limited to: Plaintiff and the Class are discriminated upon with respect to Defendants' discriminatory denial of Plaintiff's and Class members' refinance applications during the Class Period; Defendants' denied Plaintiff's and Class members' applications to refinance a first or second lien loan where similarly situated

non-minority applicants were approved, and the algorithms used by Defendants unfairly discriminated against Plaintiff and minority Class members and contained algorithmic bias.

64. Defendants' conduct described herein caused Plaintiff and members of the putative Class to suffer frustration, anxiety, emotional distress, and financial hardship.

65. Defendants' business practices are unfair because they offend public policy; they are immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious. The injuries caused by this conduct and the harm to consumers outweigh the possible utility from these aforementioned practices.

66. There is no benefit to consumers or competition by allowing Defendants to engage in discriminatory denial of Plaintiff's and Class members' refinance applications.

67. The gravity of the harm suffered by Plaintiff and Class members resulting from Defendants' conduct alleged herein outweighs any legitimate justification, motive or reason for the discrimination described. Accordingly, Defendants' actions are immoral, unethical, unscrupulous and offend the established public policies as set out in federal regulations and are substantially injurious to Plaintiff and Class Members.

68. As a result of Defendants' above unlawful and unfair practices, Plaintiff and members of the putative Class, and as appropriate on behalf of the general public, seek all allowable damages under the UCL including injunctive relief ordering Defendants to transact in a timely manner.

## VII. PRAYER FOR RELIEF

69. WHEREFORE, Plaintiff respectfully requests that this Court find against the Defendants as follows:

    a. Certify this case as a class action;

    b. Designate Plaintiff as Class Representatives and designate Plaintiff's counsel of record as Class Counsel;

AMENDED CLASS ACTION COMPLAINT
CASE NO. 4:22-cv-01793-KAW

c. Declare that Defendants' acts, conduct, policies and practices are unlawful and violate the Equal Credit Opportunity Act and the Fair Housing Act and were in violation of California's UCL;

d. Declare that Wells Fargo engaged in a pattern and practice of racial discrimination against minorities;

e. Award Plaintiff and all others similarly situated compensatory and punitive damages;

f. Award Plaintiff and all others similarly situated prejudgment interest and attorneys' fees, costs and disbursements, as provided by law;

g. Award Plaintiff and all others similarly situated injunctive and legal relief as this Court deems just and proper to end the discrimination and fairly compensate Plaintiff and all others similarly situated.

h. Award Plaintiff and all others similarly situated such other relief as this Court deems just and proper.

## VIII.   JURY TRIAL DEMAND

70.     Jury trial demanded by Plaintiff and members of the putative Class.

DATED:  March 25, 2022.                          Respectfully submitted,

**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**

*/s/ Alex R. Straus*
Alex R. Straus, Esq. (SBN 321366)
280 South Beverly Place
Beverly Hills, CA 90212
Tel.:    (917) 471-1894
Fax:    (310) 496-3176
Email:  astraus@milberg.com

Jennifer Kraus Czeisler*
**MILBERG COLEMAN BRYSON**

PHILLIPS GROSSMAN, PLLC
100 Garden City Plaza, Suite 500
Garden City, New York 11530
Telephone:    212-594-5300
Email:         jczeisler@milberg.com

Sanford P, Dumain*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
100 Garden City Plaza, Suite 500
Garden City, New York 11530
Telephone:    212-594-5300
Email:         sdumain@milberg.com


James Evangelista*
**EVANGELISTA WORLEY**
500 Sugar Mill Rd, Suite 245A
Atlanta, GA 30350
Telephone:    (404) 205-8400
Facsimile:    (404) 205-8391
Email: jim@ewlawllc.com


*Attorneys for Plaintiff and the Putative Class*
*\*Pro Hac Vice Forthcoming*

# EXHIBIT F

1  Alex R. Straus (SBN 321366)
2  **MILBERG COLEMAN BRYSON**
   **PHILLIPS GROSSMAN PLLC**
3  280 South Beverly Drive
4  Beverly Hills, CA 90212
   Tel.:    (917) 471-1894
5  Fax:     (310) 496-3176
6  Email: astraus@milberg.com

7  *Attorneys for Plaintiff*
   *Additional Counsel on Signature Page*

8

9

10

11

12

13              **UNITED STATES DISTRICT COURT**
              **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
14                  **SAN FRANCISCO DIVISION**

15  WINFRED THOMAS and MICHELLE         Case No.: _____
    SIMS, on behalf of themselves and all
16  others similarly situated,
17                                      **CLASS ACTION COMPLAINT**
                    Plaintiffs,
18
                                        **DEMAND FOR JURY TRIAL**
19          v.

20  WELLS FARGO BANK, N.A., WELLS
    FARGO & COMPANY,
21
22                  Defendants.

23

24

25

26

27

28

Plaintiffs allege upon personal knowledge as to themselves and their own actions, and upon information and belief, including the investigation of counsel, as follows:

## I.       NATURE OF THE ACTION

1.     Spurred in part by the COVID-19 pandemic, low interest rates allowed American homeowners to refinance their home mortgages at more favorable interest rates from 2019 through present (the "Class Period").

2.     Plaintiffs, and members of the putative Class (the "Class"), seek damages for Defendants' -- Wells Fargo Bank, N.A. and Wells Fargo & Company (collectively, "Wells Fargo") -- discriminatory practices in denying their applications to refinance their Wells Fargo mortgage loans in violation of the federal Fair Housing and Fair Lending acts, as well as state consumer protection laws.  Indeed, according to recent investigations of Wells Fargo's refinance activity during the Class Period that have been publicized in the media, Wells Fargo approved white applicants' mortgage refinance requests at twice the rate of its approval of Black and Hispanic/Latino minority applicants' refinance requests in numerous areas across the United States.[1] Plaintiffs' own analysis of Wells Fargo's mortgage refinance rates bears this out.

3.     This is no accident.  For nearly two decades, Wells Fargo exploited the American dream of home ownership through discriminatory housing practices in violation of the FHA, including by making a disproportionately higher number of subprime and higher cost mortgage loans to minorities than to white borrowers, and then discriminatorily foreclosing on minority mortgage loans in higher minority concentration neighborhoods compared to white neighborhoods.  Such reprehensible conduct has stripped many Wells Fargo minority customers of their single greatest asset – the equity value in their homes.

---

[1] Shawn Donnan, Ann Choi, Hannah Levitt, and Christopher Cannon, "*Wells Fargo Left Black Homeowners Behind in Pandemic Mortgage Refinancing Boom*, Bloomberg (Online) (March 11, 2022), at https://www.bloomberg.com/graphics/2022-wells-fargo-black-home-loan-refinancing/. *See also* J.J. McCorvey and Julia Carpenter, "*Millions of Americans Refinanced Last Year – but Fewer Black and Latino Homeowners Did*," WALL STREET JOURNAL (June 25, 2021), at https://www.wsj.com/articles/millions-of-americans-refinanced-last-yearbut-fewer-black-and-latino-homeowners-did-11624440601.

4.      To add further injury to the insult Wells Fargo's minority customers have already sustained, Wells Fargo is now discriminatorily refusing to refinance minority higher cost mortgages.  Such reprehensible conduct begs the question why any minority would ever bank with this institution.   Indeed, as Wells Fargo's CEO Charles Scharf has publicly acknowledged in Congressional testimony, Wells Fargo engaged in predatory and discriminatory mortgage lending and servicing practices, as well as fraudulent customer account practices.[2]  And, as CEO Scharf further admitted in relatively recent media reports, Wells Fargo has an institutional, discriminatory bias.[3]

5.      Plaintiffs and members of the putative Class have suffered harm due to the discriminatory tactics used by the Defendants with respect to their rejections of minority and female homeowners seeking the ability to refinance their mortgages. Due to this conduct, Plaintiffs and members of the putative Class bring this Action under federal and state law against the Defendants for damages, injunctive relief, attorney's fees, and any other relief this Court deems just and proper.

## II.      JURISDICTION AND VENUE

6.      This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1332(d), and 1343, because the Plaintiff asserts federal causes of action, because Plaintiffs assert civil rights causes of action, and because at least one member of the Class is a citizen of a different state than all Defendants, and because the amount in controversy exceeds $5,000,000.

---

[2] Wells Fargo CEO Charles Scharf admitted these failings in congressional testimony. *See* https://financialservices.house.gov/uploadedfiles/chrg-116hhrg428866.pdf at 9 (last visited Jan. 13, 2022) (testifying that he did not disagree with the Report's findings, and that "the series of behavior that is described should have never happened at the company. The failures that are described a direct result of us not managing the company properly"); *id.* at 5 ("[W]e had a flawed business model in how the company was managed").

[3] *See, e.g.,* https://www.businesswire.com/news/home/20200923005604/en/ (last visited March 19, 2022) (discussing CEO Scharf's unconscious bias); *see also* https://www.charlotteobserver.com/news/business/banking/article246012155.html (Jimmie Paschall, Wells Fargo's head of enterprise diversity and inclusion, revealed: "There definitely is a sense that bias lives vibrantly at Wells Fargo. And I think it is around gender, gender identity, as well as race and ethnicity.)

7. Personal jurisdiction is appropriate over Defendants because Wells Fargo Bank, N.A. transacts business in the State of California and has its principal place of business in San Francisco, California. Wells Fargo Home Mortgage, Inc. originates loans to California customers from its California offices and maintains a systematic and continuous presence in the State.

8. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b) because Wells Fargo Bank, N.A. resides in this district, a substantial part of the events or omissions giving rise to the claim occurred in this district, and Wells Fargo Bank, N.A.'s principal place of business is in this district.

**INTRADISTRICT ASSIGNMENT**

9. This action is properly assigned to the San Francisco Division of this District pursuant to N.D. Cal. L.R. 3-2, because Defendant Wells Fargo & Company is headquartered in San Francisco, California, which is served by the San Francisco Division.

**III. PARTIES**

10. **Plaintiffs.**

11. Plaintiff Winfred Thomas is a minority homeowner who owns equity in a home located in Hogansville, Georgia. In December of 2020, Plaintiff Thomas applied for a Wells Fargo home refinance and his application was denied in 2021. Shortly thereafter, Plaintiff Thomas applied to refinance his Wells Fargo mortgage with Veteran's United Home Loans. Plaintiff Thomas's refinance application was approved by Veteran's United Home Loans, receiving a mortgage interest rate of 3.2% **less** than the 5.5% existing mortgage rate Plaintiff Thomas was paying on his initial Wells Fargo mortgage.

12. Plaintiff Michells Sims is a minority homeowner who owns equity in a home located in Desoto, Texas. In December of 2021, Plaintiff Sims applied for a Wells Fargo home refinance and her application was denied in early 2022.

13. **Defendants.**

CLASS ACTION COMPLAINT

4

14.     Defendant Wells Fargo Bank, N.A. is a nationally chartered bank with its principal place of business located in Sioux Falls, South Dakota and is chartered in Wilmington, Delaware.

15.     Defendant Wells Fargo & Company is Defendant Wells Fargo Bank, N.A.'s parent company and is headquartered in San Francisco, California with its principal place of business located in Manhattan, New York, New York.

## IV.     FACTUAL ALLEGATIONS

### A.  Wells Fargo, the Home Mortgage Industry, and Home Mortgage Refinancing

16.     Wells Fargo is one of the Country's largest first and second lien mortgage lenders. Included within that line of business are its new mortgages derived from refinancing existing home mortgages.

17.     Refinancing an existing mortgage allows a borrower to try to obtain better terms including, for example, a lower interest rate.  A lower mortgage interest rate enables a borrower to save hundreds, if not thousands, of dollars per year on interest charges.  As Wells Fargo explains on "Why Refinance a Mortgage" page on its website, refinancing a mortgage enables a borrower: (1) to tap into home equity (using the equity established in the home in order to get a cash-out refinance where the bank gives the borrower cash in exchange for that equity in order to pay other loans or credit card debt), (2) take advantage of lower [interest] rates (which reduce the monthly payments and the total interest paid out over the duration of the loan), (3) change your loan term (to shorten or lengthen the loan term length), and (4) to convert to an adjustable rate mortgage or a fixed-rate mortgage.[4]

18.     Conversely, the denial of refinance applications means that a mortgage borrower must continue to pay higher mortgage costs.  Brookings Institute senior fellow Andre Perry states that the inability of Black homeowners to refinance their home mortgage loans "means people

---

[4] https://www.wellsfargo.com/mortgage/mortgage-refinance/why-refinance/, (last accessed Mar. 7, 2022).

have less resources to invest in their children, less resources to start businesses, less resources to renovate their homes, less resources to buy additional homes."[5] This, in the aggregate, widens the racial wealth gap in the United States.

**B. The Pandemic-induced Interest Rates Made Mortgage Refinancing Attractive to Homeowners**

19.    During the Class Period, interest rates dropped substantially due to economic pressures caused by the COVID-19 pandemic – this made refinancing more attractive for mortgage holders.

20.    A study by the Federal Reserve Bank of Boston concluded the following:

a.    The typical refinance during the Class Period reduced borrowers' monthly payments by $279 per month, leading to a total payment reduction of $5.3 billion per year in the United States for all households that refinanced.[6]

b.    However, only $198 million, or 3.7% of the total payment reduction of $5.3 billion, went to Black households.[7]

c.    This is especially problematic considering that Black households account for over 13% of the entire United States population and over 9% of all homeowners.[8]

d.    Additionally, the study concluded that white homeowners were approved at twice the rate of Black homeowners with respect to mortgage refinancing during the Class Period.[9]

21.    The study found that, "[c]ompared with white borrowers, Black borrowers on average have lower credit scores and higher loan-to-value ratios [which are] risk factors that can

---

[5] *Id.*

[6] Larry Bean, "*Fed study: Minority borrowers bore the brunt of COVID-19's impact on the mortgage market,*" FEDERAL RESERVE BANK OF BOSTON (June 22, 2021), at https://www.bostonfed.org/news-and-events/news/2021/06/minority-borrowers-bear-brunt-of-covid-19-impact-on-mortgage-market.aspx.

[7] *Id.*

[8] *Id.*

[9] *Id.*

prevent someone from refinancing and reducing their monthly mortgage payments. However, when authors [of the study] control for these factors, they find that before the pandemic, Black and white borrowers were roughly equally likely to refinance. After the pandemic began and interest rates plummeted, Black homeowners were 40% less likely than white homeowners to finance, holding equal the risk factors for both groups."[10]

22. Critically, the authors of the study concluded, "borrowers who could use the payment reductions the most moving forward may be the least likely to obtain them."[11]

**C. Due to the Discriminatory Conduct of the Defendants, Plaintiffs and the Members of the Putative Class Were Denied Refinancing Opportunities by Defendants' Bank, Wells Fargo**

23. Wells Fargo has engaged in discriminatory practices that disparately reduce the number of home mortgage refinance requests by minority applicants. With respect to minority applicants. these tactics, taken generally, are called "redlining."

24. The term "redlining" has its roots in New Deal-era racism, which limited minority access to housing opportunities. Historically, the concept of redlining comes "from government maps that outlined areas where Black residents lived and therefore were deemed more risky [real estate] investments."[12]

25. In the past, redlining took place through the use of mapping where Black neighborhoods were and consisted of coloring those neighborhoods "red" as to denote that they were high risk investments because of the populations that inhabited them. In the modern day, redlining takes place usually though an algorithmic bias which considers multiple factors tied to race (such as ZIP code, education, area code, census track, average home values, and other

---

[10] *Id.*

[11] *Id.*

[12] Candace Jackson, "*What is Redlining?*," NYTimes (Online) (Aug. 17, 2021), at https://www.nytimes.com/2021/08/17/realestate/what-is-redlining.html.

factors) and uses them in the decision of whether to approve a home mortgage refinancing application.

26.     For example, the refinancing calculator on Wells Fargo's website, utilizes a digitized algorithmic tool that assesses creditworthiness and other factors to offer estimated refinance rates.  The tool asks for inputs for factors that are proxies for minority homeowner status, such as geography (Wells Fargo notes: "[Refinancing] [r]ates can vary by location")[13] and credit score (to which Wells Fargo gives four options: Excellent, Good, Fair, or Poor/Limited).[14]

27.     On its refinance applications, hosted by Blend Labs, Inc., the digitized algorithmic tool (which assesses creditworthiness and other factors to lock in a home mortgage refinance interest rate) also asks for information that can be proxies for race, including "demographic information," employment and income information, real estate holdings by the applicant, and other information.[15]

28.     Wells Fargo's use of these factors has resulted in discrimination by disparately denying minority and female applicants' refinance applications at rates far in excess of denial rates experienced by white borrowers.

**D.  Due to the Discriminatory Conduct of the Defendants, Plaintiffs and the Members of the Putative Class Were Harmed**

29.     Plaintiffs and members of the putative Class were harmed because they were either denied the ability to refinance their home mortgages entirely due to Wells Fargo's conduct described herein, or they were given less favorable terms than white borrowers who similarly refinanced their home mortgages through Wells Fargo.

---

[13] https://www.wellsfargo.com/mortgage/mortgage-refinance/why-refinance/, (last accessed Mar. 7, 2022).

[14] *Id.*

[15] https://yourmortgageapp.wf.com/section/Getting%20Started/task/BORROWER/3652fd6a-b3e4-4308-bfa8-a92e9f4bbb83, (last accessed Mar. 7, 2022).

30.     Either way, Plaintiffs and members of the putative Class were harmed in the form of higher monthly payments on their home mortgage loan payments which could have been reduced but for Wells Fargo's discriminatory conduct.

31.     Indeed, an investigation by Bloomberg News further unveiled Wells Fargo's discriminatory practices with respect to the mortgage refinancing industry.[16] Statistics collected by Bloomberg show how wide Wells Fargo's disparity in refinance approvals was in 2020 compared to all other mortgage lenders in the United States:



**Disparity by Lender**
Wells Fargo approved fewer than half of Black homeowners' refinancing applications in 2020.

Source: Bloomberg analysis of Home Mortgage Disclosure Act data for 8 million completed applications to refinance conventional loans in 2020.

[17]

---

[16] Shawn Donnan, Ann Choi, Hannah Levitt, and Christopher Cannon, "*Wells Fargo Left Black Homeowners Behind in Pandemic Mortgage Refinancing Boom*, Bloomberg (Online) (March 11, 2022), at https://www.bloomberg.com/graphics/2022-wells-fargo-black-home-loan-refinancing/.

[17] *Id.*

CLASS ACTION COMPLAINT
9

32.     For example, during the time period at issue here, JP Morgan (the largest U.S. bank in terms of assets) approved 81% of mortgage refinance applications from Black homeowners, Rocket Mortgage LLC approved nearly 80% of Black applicants, and Bank of America approved 66% of Black applicants. This is in stark contrast to Wells Fargo's mere 47% approval rate of Black mortgage refinance applications.

33.     Notably, Wells Fargo denied Black mortgage refinance applicants at significantly higher rates than White applicants that had significantly lower incomes:

## Higher Income, Same Approval

Wells Fargo's refinancing approval rates were higher for the lowest-income White applicants in 2020 than for all but the highest-income Black applicants.



Source: Bloomberg analysis of Home Mortgage Disclosure Act data for 8 million completed applications to refinance conventional loans in 2020.

34.    According to Kristy Fercho, the Wells Fargo employee responsible for overseeing Wells Fargo's home-lending line of business, lending decisions were "consistent across racial and ethnic groups" and that racial disparity in outcomes for refinancing in 2020 was the result of

CLASS ACTION COMPLAINT
11

variables that Wells Fargo doesn't control.[18] That provides no excuse because Wells Fargo is not permitted by law to discriminate in its mortgage application process.

## V. CLASS ALLEGATIONS

35.    Pursuant to F.R.C.P. Rule 23(b)(2) and (b)(3), as applicable, and (c)(4), Plaintiffs seek certification of a class of all first and second lien Wells Fargo minority mortgage refinance applicants from 2019-present (the "Class Period") whose refinancing applications were discriminatorily denied (the "Class".)

36.    Excluded from the Class are Defendants, their subsidiaries, affiliates, officers, directors, and employees.

37.    **Numerosity: Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. Plaintiffs are informed and believe — based upon the publicly-available information discussed herein — that there are tens of thousands of Class members, making joinder impracticable. Those individuals' identities are available through Defendants' records, and Class members may be notified of the pendency of this Action by recognized, Court-approved notice dissemination methods.

38.    **Commonality and Predominance: Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3).** Defendants have acted in a manner generally applicable to Plaintiffs and the other members of the proposed Class. There is a well-defined community of interest in the questions of law and fact involved, which affect all Class members. The questions of law and fact common to the Classes predominate over the questions that may affect individual Class members, including, *inter alia*:

---

[18] *Id.*

a.  Whether Defendants systematically discriminated against Class members based upon their minority status;

b.  Whether minority Class members' applications to refinance a first or second lien loan were denied where similarly situated non-minority applicants were approved; and,

c.  Whether the algorithms used by Defendants unfairly discriminated against minority Class members and contained algorithmic bias.

39. **Typicality: Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of other Class members' claims because Plaintiffs and Class members were subjected to the same allegedly unlawful conduct and damaged in the same way.

40. **Adequacy of Representation: Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate class representatives because their interests do not conflict with the interests of Class members whom they seeks to represent, Plaintiffs have retained counsel competent and experienced in complex class action litigation, and Plaintiffs intend to prosecute this Action vigorously. The Class members' interests will be fairly and adequately protected by Plaintiffs and their counsel.

41. **Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2).** The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants. Such individual actions would create a risk of adjudications that would be dispositive of the interests of other Class members and impair their interests. Defendants have acted and/or refused to act on grounds generally applicable to the Classes, making final, public injunctive relief or corresponding declaratory relief appropriate.

42. Injunctive relief, and specifically public injunctive relief, is necessary in this Action.

43. The harm that Defendants impose on Plaintiffs and Class members cause ripple effects for the public-at-large and Plaintiffs seek injunctive relief forcing Defendants to cease and desist its discriminatory practices.

44. **Superiority: Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Plaintiffs and Class members to individually seek redress for Defendants' wrongful conduct. Even if Plaintiff and Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## VI. CAUSES OF ACTION

### COUNT I

### VIOLATIONS OF THE FAIR HOUSING ACT

45. Plaintiffs, on behalf of themselves and all others similarly situated, reallege each previous paragraph as if fully alleged herein.

46. The Fair Housing Act, 42 U.S.C. § 3605(a), prohibits any entity whose business includes engaging in residential real estate-related transactions from discriminating against any person in making available such a transaction on the basis of race.

47. Defendants' business includes engaging in residential real estate-related transactions.

48. As set forth above, Defendants maintain a nationwide set of uniform, discriminatory refinancing practices and engage in a pattern or practice of systemic discrimination against minority homeowners that constitute illegal, intentional discrimination and disparately impacts Black Americans and minorities in violation of the Fair Housing Act of 1968.

49. Plaintiffs and Class members were subjected to and harmed by Defendants' systemic and individual discrimination.

50. On behalf of Plaintiffs and the putative Class, Plaintiffs seek the relief set forth below.

## COUNT II

### VIOLATIONS OF THE EQUAL CREDIT OPPORTUNITY ACT

47. Plaintiffs, on behalf of themselves and all others similarly situated, reallege each previous paragraph as if fully alleged herein.

48. The Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*, makes it unlawful for a creditor to discriminate against any applicant with respect to any aspect of a credit transaction on the basis of race.

49. As described above, Defendants are creditors because they regularly extend, renew, and continue credit, and Plaintiffs were applicants for credit.

50. Defendants maintain a nationwide set of uniform, discriminatory mortgage loan origination and underwriting practices and engaged in a pattern or practice of systemic race discrimination against minority mortgage loan applicants that constitute illegal intentional race discrimination in violation of the Equal Credit Opportunity Act.

51. Plaintiffs and Class members were subjected to and harmed by Defendants' systemic and individual discrimination.

52. Defendants' unlawful conduct resulted in considerable harm to Plaintiffs and all Class members.

53. On behalf of themselves and the Class they seeks to present, Plaintiffs request the relief set forth below.

## COUNT THREE

### VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW

54. Plaintiffs, on behalf of themselves and all others similarly situated, reallege each previous paragraph as if fully alleged herein.

55. California's Unfair Competition Law ("UCL") defines unfair competition to include any "unfair, unlawful, or fraudulent business practice and unfair, deceptive, untrue, or misleading advertising and any act prohibited by Chapter 1 of Part 3 of Division 7 of [California's] Business and Professions Code."

56. Defendants violated the UCL by engaging in unlawful and unfair business acts and practices.

57. Defendants are considered "person[s]" as defined by the statute.

58. Pursuant to the statute, Plaintiffs named herein, as well as the putative Class members, have suffered injury-in-fact and have lost money or property because of the unfair competition set forth herein.

59. In accordance with the liberal application and construction of the UCL, application of the UCL to all Class members is appropriate given that Defendants are headquartered in this District, have a forum selection clause specific to this District, and direct sales, marketing and advertising in this District.

60. Unlawful Prong. A business act or practice is unlawful pursuant to the UCL if it violates any other law or regulation.

61.     Defendants' conduct violates the Fair Housing Act and the Equal Credit Opportunity Act, and other applicable statutes which Plaintiffs may add upon amending this Complaint.

62.     Unfairness Prong. A business act or practice is unfair pursuant to the UCL if it is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

63.     Defendants' unfair acts and practices include, but are not limited to: Plaintiffs and the Class are discriminated upon with respect to Defendants' discriminatory denial of Plaintiffs' and Class members' refinance applications during the Class Period; Defendants' denied Plaintiffs' and Class members' applications to refinance a first or second lien loan where similarly situated non-minority applicants were approved, and the algorithms used by Defendants unfairly discriminated against minority Class members and contained algorithmic bias.

64.     Defendants' conduct described herein caused Plaintiff and members of the putative Class to suffer frustration, anxiety, emotional distress, and financial hardship.

65.     Defendants' business practices are unfair because they offend public policy; they are immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious. The injuries caused by this conduct and the harm to consumers outweigh the possible utility from these aforementioned practices.

66.     There is no benefit to consumers or competition by allowing Defendants to engage in discriminatory denial of Plaintiffs' and Class members' refinance applications.

67.     The gravity of the harm suffered by Plaintiffs and Class members resulting from Defendants' conduct alleged herein outweighs any legitimate justification, motive or reason for the discrimination described. Accordingly, Defendants' actions are immoral, unethical, unscrupulous and offend the established public policies as set out in federal regulations and are substantially injurious to Plaintiff and Class Members.

68. As a result of Defendants' above unlawful and unfair practices, Plaintiffs and members of the putative Class, and as appropriate on behalf of the general public, seek all allowable damages under the UCL including injunctive relief ordering Defendants to transact in a timely manner.

## VII. PRAYER FOR RELIEF

69. WHEREFORE, Plaintiffs respectfully request that this Court find against the Defendants as follows:

 a. Certify this case as a class action;

 b. Designate Plaintiffs as Class Representatives and designate Plaintiffs' counsel of record as Class Counsel;

 c. Declare that Defendants' acts, conduct, policies and practices are unlawful and violate the Equal Credit Opportunity Act and the Fair Housing Act and were in violation of California's UCL;

 d. Declare that Wells Fargo engaged in a pattern and practice of racial discrimination against minorities;

 e. Award Plaintiffs and all others similarly situated compensatory and punitive damages;

 f. Award Plaintiffs and all others similarly situated prejudgment interest and attorneys' fees, costs and disbursements, as provided by law;

 g. Award Plaintiffs and all others similarly situated injunctive and legal relief as this Court deems just and proper to end the discrimination and fairly compensate Plaintiffs and all others similarly situated.

 h. Award Plaintiffs and all others similarly situated such other relief as this Court deems just and proper.

## VIII.   JURY TRIAL DEMAND

70.     Jury trial demanded by Plaintiffs and members of the putative Class.

DATED:  March 25, 2022.                     Respectfully submitted,

                                            **MILBERG COLEMAN BRYSON
                                            PHILLIPS GROSSMAN PLLC**

                                            */s/ Alex R. Straus*
                                            Alex R. Straus, Esq. (SBN 321366)
                                            280 South Beverly Place
                                            Beverly Hills, CA 90212
                                            Tel.:    (917) 471-1894
                                            Fax:     (310) 496-3176
                                            Email: astraus@milberg.com

                                            Jennifer Kraus Czeisler*
                                            **MILBERG COLEMAN BRYSON
                                            PHILLIPS GROSSMAN, PLLC**
                                            100 Garden City Plaza, Suite 500
                                            Garden City, New York 11530
                                            Telephone:     212-594-5300
                                            Email:         jczeisler@milberg.com

                                            Sanford P, Dumain*
                                            **MILBERG COLEMAN BRYSON
                                            PHILLIPS GROSSMAN, PLLC**
                                            100 Garden City Plaza, Suite 500
                                            Garden City, New York 11530
                                            Telephone:     212-594-5300
                                            Email:         sdumain@milberg.com

                                            James Evangelista*
                                            **EVANGELISTA WORLEY**
                                            500 Sugar Mill Rd, Suite 245A
                                            Atlanta, GA 30350
                                            Telephone:     (404) 205-8400
                                            Facsimile:     (404) 205-8391
                                            Email: jim@ewlawllc.com

                                            *Attorneys for Plaintiffs and the Putative Class*

                                            *\*Pro Hac Vice Forthcoming*

CLASS ACTION COMPLAINT
19

# EXHIBIT G

1   Alisa Adams (SBN 277697)
    Adams Law Practice, LLC
2   P.O. Box 1834
    Cleveland, OH 44103
3   (216) 926-0065 telephone
    Email: aadams@advocateattorneys.com
4

5   *Attorneys for Plaintiff and Putative Class*
    *Additional Counsel on Signature Page*
6

7

8               **UNITED STATES DISTRICT COURT**
          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
9                  **SAN FRANCISCO DIVISION**

10  **IFEOMA EBO**,                          Case No.
    individually, and on behalf of all others
11  similarly situated,                      **CLASS ACTION COMPLAINT FOR:**

12                              Plaintiff,     1. **VIOLATIONS OF THE EQUAL**
                                                  **CREDIT OPPORTUNITY ACT, 15**
13          v.                                    **U.S.C. §§ 1691,** *ET SEQ.***;**
                                               2. **VIOLATIONS OF THE FAIR**
14  **WELLS FARGO BANK, N.A.**                    **HOUSING ACT, 42 U.S.C. §§ 3601,**
                                                  ***ET SEQ.***; and**
15                              Defendant.      3. **VIOLATIONS OF SECTION 1981,**
                                                  **42 U.S.C. § 1981.**
16

17                                           **DEMAND FOR JURY TRIAL**

18

19          NOW COMES Plaintiff IFEOMA EBO ("Plaintiff"), individually and on behalf of all others

20  similarly situated, by and through counsel, and for her Class Action Complaint against Defendant WELLS

21  FARGO BANK, N.A. ("Wells Fargo" or "Defendant"), states as follows:

22                               **INTRODUCTION**

23          **1.**     This case concerns Wells Fargo's pervasive pattern and practice of placing Black

24  Americans at a disadvantage in comparison to White Americans with respect to their applications for

25  mortgage loans.

26

27

28

**2.**     In fact, Wells Fargo's discriminatory practices were already the subject of a lawsuit brought by the United States Department of Justice ("DOJ") in 2012, which was resolved through a Consent Order (the "Consent Order").[1]  Pursuant to the terms of that Consent Order, Wells Fargo was required to "provide[] $184.3 million in compensation" to borrowers—which was "the second largest fair lending settlement in the [DOJ]'s history" to that point—and was required to institute procedures to ensure compliance with federal housing law.[2]

**3.**     Unfortunately for Black Americans, as soon as the terms of that Consent Order expired, Wells Fargo reverted back to its discriminatory practices.

**4.**     For example, according to a recent report from Bloomberg, "Wells Fargo approved fewer than half of Black homeowners' refinancing applications in 2020," which is a significantly lower rate than all other lenders.[3]  In fact, "Wells Fargo…was alone in rejecting more Black homeowners than it accepted."[4]

**5.**     Moreover, based on a review of publicly available data from the Consumer Financial Protection Bureau ("CFPB")—collected under the Home Mortgage Disclosure Act ("HMDA"), which is codified as 12 U.S.C. §§ 2801, *et seq.*—Wells Fargo still lags behind its industry counterparts with respect to approving Black Americans' loan applications, and, even when Wells Fargo does approve Black Americans' loan applications, Wells Fargo offers them significantly less favorable interest rates.

---

[1] *See, e.g.*, DOJ Complaint, available at: https://www.justice.gov/iso/opa/resources/9512012712113719995136.pdf; Consent Order, available at: https://www.justice.gov/iso/opa/resources/14201271211384881962.pdf.

[2] *See*, https://www.justice.gov/opa/pr/justice-department-reaches-settlement-wells-fargo-resulting-more-175-million-relief.

[3] *See*, https://www.bloomberg.com/graphics/2022-wells-fargo-black-home-loan-refinancing/.

[4] *Id.*

6. As explained below, Wells Fargo's discriminatory practices violate, *inter alia*, the Equal Credit Opportunity Act ("ECOA")—codified as 15 U.S.C. §§ 1691, *et seq.*—the Fair Housing Act ("FHA")—codified as 42 U.S.C. §§ 3601, *et seq.*—and 42 U.S.C. § 1981 ("Section 1981"). Accordingly, Plaintiff, individually, and on behalf of all others similarly situated (the "Class"), seeks redress in connection with the harm she and other Class members incurred as a result of Wells Fargo's discriminatory practices and violations of federal law.

## PARTIES, JURISDICTION, AND VENUE

7. Plaintiff is a citizen of the United States and an adult resident of the City of New York, New York.

8. Defendant Wells Fargo Bank, N.A. is a business incorporated under the laws of the State of Delaware. Defendant maintains its principal place of business at 420 Montgomery Street, San Francisco, California 94104. Defendant does business in the state of New York and nationwide.

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as several of Plaintiff's causes of action arise under federal law.

10. Personal jurisdiction is appropriate over Wells Fargo Bank, N.A. as it transacts business in the State of California and has its principal place of business in San Francisco, California.

11. Venue lies in this District pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## INTRADISTRICT ASSIGNMENT

12. This action is properly assigned to the San Francisco Division of this District pursuant to N.D. Cal. L.R. 3-2, because Defendant Wells Fargo Bank, N.A. is headquartered in San Francisco, California, which is served by the San Francisco Division.

## FACTUAL ALLEGATIONS

**13.**     Plaintiff and Class members are all Black Americans, and thus are members of a protected class.

**14.**     Plaintiff and Class members each submitted an application for a mortgage loan from Defendant in connection with the purchase or refinancing of residential real estate ("Application").

**15.**     Plaintiff and Class members were qualified to receive mortgage loans from Wells Fargo, and complied with all reasonable requirements imposed by Wells Fargo as necessary to substantiate their qualifications to receive mortgage loans.

**16.**     Nevertheless, Plaintiff's and Class members' Applications were either (1) denied by Wells Fargo, (2) never completed because of Wells Fargo's unreasonable demands that would not have been imposed by Wells Fargo in connection with a similarly situated White applicant, or (3) granted by Wells Fargo, but on significantly less favorable terms than a similarly situated White borrower would have received.

**17.**     Plaintiff's and Class members' experiences with Wells Fargo were part of a larger pattern and practice of racial discrimination against Black Americans.

**18.**     As noted above, Wells Fargo was already subjected to a DOJ lawsuit in 2012 alleging similar misconduct.  That lawsuit was ultimately resolved through a Consent Order which provided for "the second largest fair lending settlement in the [DOJ]'s history" to that point.[5]  Nevertheless, Wells Fargo's discriminatory practices continued.

**19.**     For example, according to Bloomberg, in 2020, Wells Fargo approved Black Americans' loan refinancing applications at a rate of 47%, in comparison to a rate of 72% for White Americans—a

---

[5] *See*, https://www.justice.gov/opa/pr/justice-department-reaches-settlement-wells-fargo-resulting-more-175-million-relief.

25% difference.[6]  Other similarly-sized lenders had only a modest disparity between Black and White applicants, ranging from 7% to 12%.[7]  For instance, Chase, "the largest U.S. bank by assets, accepted 81% of refinancing applications from Black homeowners in 2020 compared with 90% from White ones"—which only amounts to a 9% difference.[8]

20.     Notably, Wells Fargo's 47% approval rate does not even account for the "27% of Black borrowers who began an application with Wells Fargo in 2020 [and then] withdrew it."[9]  When those applicants are factored in, it means that "only one-third of the 17,702 Black homeowners who sought refinancing [from Wells Fargo] were successful."[10]

21.     The Bloomberg report also notes that "Wells Fargo approved a greater share of applications from low-income White homeowners than all but the highest-income Black applicants, who had an approval rate about the same as White borrowers in the lowest-income bracket."[11]  Clearly, the disparity between Black and White applicants seeking refinancing from Wells Fargo has little do with creditworthiness.

22.     Wells Fargo's discriminatory practices are also pervasive with respect to applicants for new mortgage loans.

23.     Based on a review of publicly available data collected by the CFPB in accordance with the HMDA, in 2019, Wells Fargo approved Black Americans' loan applications at a rate that was approximately 21% lower than White Americans' loan applications.  In comparison, three of the other

---

[6] *See*, https://www.bloomberg.com/graphics/2022-wells-fargo-black-home-loan-refinancing/.
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.*

largest lenders in the country—*i.e.*, Chase, Quicken Loans, and United Wholesale Mortgage—approved Black Americans' loan applications at a rate that was "only" approximately 10% lower than White Americans' loan applications.

24.     Moreover, even when common indicia of creditworthiness are controlled for—*e.g.*, debt to income ratio, loan to value ratio, etc.—Wells Fargo approved Black Americans' loan applications at a rate that was, on average, approximately 9% lower than similarly situated White Americans' loan applications. In contrast, Chase—one of the largest mortgage loan lenders in the country—approved Black Americans' loan applications at a rate that was, on average, approximately 3% *higher* than similarly situated White Americans' loan applications.  Chase is not an outlier.  When that same analysis is applied to data from three of the other largest lenders in the county—*i.e.*, Chase, Quicken Loans, and United Wholesale Mortgage—it reveals that Black Americans' loan applications were approved at a rate that was, on average, approximately 2% *higher* than similarly situated White Americans' loan applications.

25.      Even when Wells Fargo does approve Black Americans' loan applications, it offers them significantly less favorable terms than similarly situated White Americans.

26.     According to the same dataset referenced above, the interest rates on loans offered by Wells Fargo to Black Americans were, on average, half a percentage point *higher* than the interest rates on the loans it offered to similarly situated White Americans, even when common indicia of creditworthiness are controlled for.

27.     In comparison, there was no appreciable difference between the interest rates offered to Black Americans and similarly situated White Americans by three of the other largest lenders in the county—*i.e.*, Chase, Quicken Loans, and United Wholesale Mortgage.  For these lenders, the difference between the interest rates offered to Black Americans and similarly situated White Americans was, on average, only five hundredths of a percentage point—i.e., *ten times less* than Wells Fargo's disparity.

28. Wells Fargo's discriminatory practices are also evidenced by the fact that Wells Fargo artificially makes it more difficult for Black Americans to complete their applications for mortgage loans. For example, Wells Fargo has a pattern and practice of requiring Black Americans to repeatedly submit documentation that they have already submitted, or to submit additional documentation beyond what is necessary to determine their eligibility status.

29. Again, according to publicly available data collected by the CFPB in accordance with the HMDA, in 2019, new mortgage loan applications submitted by Black Americans to Wells Fargo were either withdrawn or never completed approximately 17% of the time, in comparison to only 14% for White Americans. But, there was no difference between Black Americans and White Americans with respect to applications submitted to three of the other largest lenders in the county—*i.e.*, Chase, Quicken Loans, and United Wholesale Mortgage. For these lenders, *both* Black Americans and White Americans either withdrew or never completed their mortgage loan applications 8% of the time.

30. The processing delays experienced by Black Americans who seek mortgage loans from Wells Fargo can prevent them from purchasing real property altogether because, in real estate transactions, time is frequently of the essence. In other words, sellers of real property are simply unwilling to wait for Wells Fargo's unnecessarily lengthy loan approval process to be completed, and sellers move on to other potential buyers with whom they will not experience this problem.

31. Those processing delays also made it more difficult for existing Black property owners to refinance their mortgage loans and take advantage of historically lower interest rates, which have since begun to rise.

32. In light of the foregoing, Plaintiff and Class members were harmed by Wells Fargo's discriminatory practices in one or more of the following ways: (1) they were unable to obtain or refinance mortgage loans to which they were qualified; (2) they were unable to obtain or refinance mortgage loans

on the same (more favorable) terms as White Americans; (3) they were unable to purchase real property that similarly situated White Americans would have been able to purchase; and (4) they spent time and money pursuing mortgage loans that similarly situated White Americans would not have been required to expend.

## FACTS RELEVANT TO PLAINTIFF

33.     Plaintiff is a Black American, and thus is a member of a protected class.

34.     In late 2021, Plaintiff began the process of searching for a new home to purchase.  That search ended in October 2021, when Plaintiff found a property (the "Property") located in Kings County, New York—and more specifically, the East Flatbush neighborhood of Brooklyn—and entered into a contract (the "Contract") to purchase it for the price of $900,000.

35.     Thereafter, Plaintiff submitted an application for a mortgage loan to Defendant in connection with the purchase of the Property ("Plaintiff's Application").

36.     At the time Plaintiff applied for the Loan (defined below), Plaintiff had a credit score of approximately 800, an annual income of approximately $178,000, and no significant debt.

37.     On November 1, 2021, Plaintiff received preapproval from Wells Fargo for a mortgage loan in the amount of $883,698 (the "Loan"), which would be used to purchase the Property.  According to Wells Fargo, Plaintiff's preapproval was to expire on February 24, 2022.

38.     After Plaintiff's Application was preapproved, Plaintiff began working with Wells Fargo to receive final approval for the Loan.

39.     Per Wells Fargo's requests, Plaintiff submitted all necessary documentation to verify her qualifications for the Loan.  Plaintiff timely provided Wells Fargo with documentation such as W-2 forms, paystubs, bank account statements, etc.

**40.** On December 29, 2021, Plaintiff received a "Commitment Letter" from Wells Fargo. According to the Commitment Letter, Plaintiff's Application was approved, and she only needed to submit some additional documentation "in order to complete the final underwriting and funding of" her Loan.

**41.** In January and February 2022, Wells Fargo informed Plaintiff that it required additional documentation to complete the underwriting process relative to Plaintiff's Application.

**42.** Notably, some of the additional documentation that Wells Fargo requested in January and February 2022 had *already* been submitted by Plaintiff (*e.g.*, recent paystubs from Plaintiff's employers).

**43.** Other documentation requested by Wells Fargo in January and February 2022 was unnecessary, unduly burdensome, and irrelevant to Plaintiff's qualifications for the Loan. For example, in one instance, Wells Fargo requested a written explanation as to why Plaintiff made a monthly credit card payment in the amount of $290 on her own credit card. In another instance, Wells Fargo requested a bank statement for a bank account that did not even exist.

**44.** As Wells Fargo's duplicative and unnecessary requests for documentation continued into February 2022, Plaintiff expressed her concern to Wells Fargo that she would not be able to complete the Loan application process by the time that her preapproval expired on February 24, 2022. Nevertheless, as of February 24, 2022, Plaintiff's Loan still had yet to receive final approval.

**45.** In March 2022, Wells Fargo continued to request additional documentation, much of which was duplicative of documentation that Plaintiff had already provided to Wells Fargo several times previously.

**46.** In sum, Plaintiff was highly qualified to receive a mortgage loan from Wells Fargo, and complied with all of Wells Fargo's reasonable requests for documentation to substantiate her qualifications. Yet, as of March 22, 2022—nearly a month after the Loan approval process should have concluded—Plaintiff still had not received final approval for her Loan.

47.     On or about March 22, 2022, the seller of the Property canceled the Contract due to the fact that Wells Fargo had still not approved Plaintiff's Loan, and it was unclear when (or if) that approval would ever come.  That same day, Plaintiff informed Wells Fargo of the seller's decision.  Accordingly, Plaintiff did not, and will never, receive the Loan.

48.     As explained above, Plaintiff's experience with Wells Fargo was part of a larger pattern and practice of racial discrimination against Black Americans.  Like the Applications of many other Black Americans who sought mortgage loans from Wells Fargo, Plaintiff's Application was never completed because of Wells Fargo's unreasonable demands that would not have been imposed by Wells Fargo in connection with a similarly situated White applicant.

49.     Plaintiff was harmed by Wells Fargo's discriminatory practices because she was unable to obtain the Loan—to which she was qualified—and was thus unable to purchase the Property, even though a similarly situated White American would have been able to do so.  Plaintiff was also harmed by Wells Fargo's discriminatory practices because she spent time and money pursuing her Application that similarly situated White Americans would not have been required to expend.

## **CLASS ACTION ALLEGATIONS**

50.     **Class Definition**: Plaintiff brings this action pursuant to Fed R. Civ. P. 23 on behalf of a Class of similarly situated individuals and entities, defined as follows:

> All Black Americans (1) who submitted applications to obtain or refinance a mortgage loan with respect to residential real property, (2) who were qualified to receive mortgage loans from Wells Fargo, and (3) whose applications were either (a) denied by Wells Fargo, (b) never completed, due to Wells Fargo's demands for documentation or information that would not have been imposed by Wells Fargo in connection with a similarly situated White applicant, or (c) granted by Wells Fargo, but on less favorable terms than a similarly situated White borrower would have received.

Excluded from the Class are: (1) the Judge to whom this case is assigned and the Judge's immediate family members; (2) Defendant, Defendant's agents, Defendant's employees, and other affiliates of Defendant; (4) any person(s) who executes and files a timely request for exclusion from the Class; (5) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; and (6) the legal representatives, successors and assigns of any such excluded person.

51. **Numerosity and Ascertainability**: Upon information and belief, the Class is comprised of more than 40 members. This conclusion is reasonable because Wells Fargo is one of the largest mortgage providers in the country, and, based on publicly available data collected by the CFPB in accordance with the HMDA, received over 7,000 Applications for mortgage loans from Black Americans in 2019. The Class is so numerous that joinder of all members is impractical. The exact number of members in the Class is presently unknown, can only be ascertained through discovery, and can easily be identified through Defendant's records or by other means.

52. **Commonality and Predominance**: All members of the Class have been subject to and affected by a uniform course of conduct: specifically, Wells Fargo's pattern and practice of racial discrimination against Black Americans. Accordingly, there are questions of law and fact common to the proposed Class that predominate over any individual questions.

53. **Typicality**: Plaintiff's claims are typical of the claims of the Class. As previously explained, Plaintiff, like all Class members, was subject to Wells Fargo's pattern and practice of racial discrimination against Black Americans, and did not receive a mortgage loan from Wells Fargo on terms that would have been the same as a similarly situated White Americans. Therefore, Plaintiff and Class members were all harmed in the same way, and incurred damages as a result.

54. **Adequacy**: Plaintiff will adequately represent the interests of the Class and does not have adverse interests to the Class. If individual Class members prosecuted separate actions it may create a risk

of inconsistent or varying judgments that would establish incompatible standards of conduct. A class action is the superior method for the quick and efficient adjudication of this controversy. Plaintiff's counsel has extensive experience litigating consumer class actions.

### COUNT I
**Violations of the Equal Credit Opportunity Act**
**15 U.S.C. §§ 1691, *et seq.***
**On Behalf of Plaintiff and the Class**

55.     Plaintiff repeats and realleges paragraphs 1-54 with the same force and effect as though fully set forth herein.

56.     The ECOA makes it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction…on the basis of race [or] color." 15 U.S.C. § 1691(a)(1).

57.     As one of the largest mortgage lenders in the country, Defendant "regularly extends, renews, or continues credit" and/or "regularly arranges for the extension, renewal, or continuation of credit." 15 U.S.C. § 1691a(e). Therefore, Defendant is a "creditor," as that term is defined by the ECOA.

58.     Plaintiff and Class members each applied "for an extension, renewal, or continuation of credit" from Wells Fargo. 15 U.S.C. § 1691a(b). Therefore, Plaintiff and Class members are each an "applicant," as that term is defined by the ECOA.

59.     Pursuant to 15 U.S.C. § 1691e, any creditor who violates the ECOA "shall be liable to the aggrieved applicant for any actual damages sustained by such applicant acting either in an individual capacity or as a member of a class." 15 U.S.C. § 1691e(a). The ECOA further provides for recovery of attorneys' fees incurred in connection with such a claim. 15 U.S.C. § 1691e(d).

60.     In general, to state a claim under the ECOA, a plaintiff must allege that: "(1) [she] was a member of a protected class, (2) [she] applied for credit from the defendant, (3) [she] was qualified for credit but the defendant denied [her] credit application, and (4) the defendant continued to engage in the

type of transaction in question with other parties with similar qualifications." *E.g.*, *Germain v. M & T Bank Corp.*, 111 F.Supp.3d 506, 526 (S.D.N.Y. 2015) (internal alterations and quotations omitted).

61. Importantly, however, ECOA "protection is not limited to those applicants who were rejected." *E.g.*, *Wilson v. Toussie*, 260 F.Supp.2d 530, 541 (E.D.N.Y. 2003) (quoting *Hargraves v. Capital City Mortg. Corp.*, 140 F.Supp.2d 7, 23 (D.D.C. 2000)). Accordingly, a plaintiff can also state a claim under the ECOA where, as a result of racial discrimination, a creditor's "investigation procedures" are more onerous, or a borrower receives approval for a loan, but on less favorable terms. *E.g.*, *Hargraves*, 140 F.Supp.2d at 23; *Phillips v. Better Homes Depot, Inc.*, 2003 WL 25867736, at *22 (E.D.N.Y. 2003).

62. Plaintiff and Class members are all Black Americans who submitted Applications for credit from Defendant to obtain or refinance mortgage loans secured by residential real property.

63. As a direct and proximate result of Wells Fargo's pattern and practice of racial discrimination against Black Americans, Plaintiff's and Class members' Applications were either (1) denied by Wells Fargo, despite the fact that a similarly situated White applicant would have been approved, (2) never completed because of Wells Fargo's unreasonable demands that would not have been imposed by Wells Fargo in connection with a similarly situated White applicant, or (3) granted by Wells Fargo, but on significantly less favorable terms than a similarly situated White borrower would have received.

64. Plaintiff and Class members were harmed by Defendant's violations of the ECOA in one or more of the following ways: (1) they were unable to obtain or refinance mortgage loans to which they were qualified; (2) they were unable to obtain or refinance mortgage loans on the same (more favorable) terms as White Americans; (3) they were unable to purchase real property that similarly situated White

Americans would have been able to purchase; and (4) they spent time and money pursuing mortgage loans that similarly situated White Americans would not have been required to expend.

65. Plaintiff, individually, and on behalf of the Class, seeks recovery of actual damages, punitive damages, and attorneys' fees and costs incurred connection with Defendant's violations of the ECOA.

**COUNT II**
**Violations of the Fair Housing Act**
**42 U.S.C. §§ 3601, *et seq*.**
**On Behalf of Plaintiff and the Class**

66. Plaintiff repeats and realleges paragraphs 1-54 with the same force and effect as though fully set forth herein.

67. The FHA makes it "unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color…or national origin." 42 U.S.C. § 3605(a).

68. As one of the largest mortgage lenders in the country, Defendant's business includes engaging in residential real estate-related transactions because it regularly makes loans and provides financial assistance in connection with "purchasing, constructing, improving, repairing, or maintaining a dwelling," and those loans are "secured by residential real estate." 42 U.S.C. § 3605(b). Therefore, Defendant is subject to the FHA's anti-discrimination provisions.

69. 42 U.S.C. § 3613 provides for a private right of action against any person who violates the FHA. The FHA further provides for recovery of attorneys' fees incurred in connection with such a claim. 42 U.S.C. § 3613(c)(2).

*Ebo, et al. v. Wells Fargo Bank, N.A., Class Action Complaint, p.14*

70. In general, to state a claim under the FHA, "plaintiffs who allege disparate treatment must show: (1) that they are members of a protected class; (2) that they sought and were qualified to rent or purchase the housing; (3) that they were rejected; and (4) that the housing opportunity remained available to other renters or purchasers." *M & T Mortg. Corp. v. White*, 736 F. Supp. 2d 538, 574 (E.D.N.Y. 2010) (internal quotations omitted).

71. However, like claims under the ECOA, racial discrimination need not result in an outright denial of an application for credit for purposes of stating a claim under the FHA; any less favorable outcome is sufficient. *E.g.*, *Hargraves*, 140 F.Supp.2d at 20-22.

72. Plaintiff and Class members are all Black Americans who submitted Applications for credit from Defendant to obtain or refinance mortgage loans secured by residential real property.

73. As a direct and proximate result of Wells Fargo's pattern and practice of racial discrimination against Black Americans, Plaintiff's and Class members' Applications were either (1) denied by Wells Fargo, despite the fact that a similarly situated White applicant would have been approved, (2) never completed because of Wells Fargo's unreasonable demands that would not have been imposed by Wells Fargo in connection with a similarly situated White applicant, or (3) granted by Wells Fargo, but on significantly less favorable terms than a similarly situated White borrower would have received.

74. Plaintiff and Class members were harmed by Defendant's violations of the FHA in one or more of the following ways: (1) they were unable to obtain or refinance mortgage loans to which they were qualified; (2) they were unable to obtain or refinance mortgage loans on the same (more favorable) terms as White Americans; (3) they were unable to purchase real property that similarly situated White Americans would have been able to purchase; and (4) they spent time and money pursuing mortgage loans that similarly situated White Americans would not have been required to expend.

75.     Plaintiff, individually, and on behalf of the Class, seeks recovery of actual damages, punitive damages, and attorneys' fees and costs incurred connection with Defendant's violations of the FHA.

**<u>COUNT III</u>**
**Violations of Section 1981**
**42 U.S.C. § 1981**
**On Behalf of Plaintiff and the Class**

76.     Plaintiff repeats and realleges paragraphs 1-54 with the same force and effect as though fully set forth herein.

77.     Under Section 1981, "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts," which "includes the making, performance, modification, and termination of contracts." 42 U.S.C. § 1981(a)-(b). The rights guaranteed by Section 1981 "are protected against impairment by nongovernmental discrimination" (42 U.S.C. § 1981(c)), and are enforceable through 42 U.S.C. § 1988, which provides for the recovery of attorney fees' and costs incurred in connection with a successful action under Section 1981 (42 U.S.C. § 1988(b)).

78.     "To establish a claim under [Section] 1981, a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (*i.e.*, make and enforce contracts, sue and be sued, give evidence, etc.)." *E.g.*, *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1087 (2nd Cir. 1993).

79.     Plaintiff and Class members are all Black Americans who submitted Applications for credit from Defendant to obtain or refinance mortgage loans secured by residential real property. In other words, Plaintiff and Class members are each a member of a racial minority who sought to engage in the making of a contract.

80.     As a direct and proximate result of Wells Fargo's pattern and practice of racial discrimination against Black Americans, Plaintiff's and Class members' Applications were either (1) denied by Wells Fargo, despite the fact that a similarly situated White applicant would have been approved, (2) never completed because of Wells Fargo's unreasonable demands that would not have been imposed by Wells Fargo in connection with a similarly situated White applicant, or (3) granted by Wells Fargo, but on significantly less favorable terms than a similarly situated White borrower would have received.

81.     Accordingly, Defendant denied Plaintiff and Class members the same ability to make and enter into contracts "as is enjoyed by White citizens" of the United States.  42 U.S.C. § 1981(a).

82.     As evidenced by the pervasiveness of Defendant's racial discrimination in its lending practices, Defendant intended to discriminate against Plaintiff and Class members on the basis of race.

83.     Plaintiff and Class members were harmed by Defendant's violations of Section 1981 in one or more of the following ways: (1) they were unable to obtain or refinance mortgage loans to which they were qualified; (2) they were unable to obtain or refinance mortgage loans on the same (more favorable) terms as White Americans; (3) they were unable to purchase real property that similarly situated White Americans would have been able to purchase; and (4) they spent time and money pursuing mortgage loans that similarly situated White Americans would not have been required to expend.

84.     Plaintiff, individually, and on behalf of the Class, seeks recovery of actual damages, punitive damages, and attorneys' fees and costs incurred connection with Defendant's violations of Section 1981.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff IFEOMA EBO, individually, and on behalf of the Class, prays for an Order as follows:

A. Finding that this action satisfies the prerequisites for maintenance as a class action and certifying the Class defined herein;

B. Designating Plaintiff as representative of the Class and her undersigned counsel as Class Counsel;

C. Entering judgment in favor of Plaintiff and the Class and against Defendant as to each and every Count, as applicable;

D. Awarding Plaintiff and the Class actual damages, statutory damages, and punitive in an amount to be determined at trial as to each and every Count, as applicable;

E. Awarding Plaintiff and the Class attorneys' fees and costs, including interest thereon, as allowed or required by law, as to each and every Count, as applicable; and

F. Granting all such further and other relief as this Court deems just and appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all counts so triable.

DATED: April 26, 2022          */s/ Alisa Adams*
                              Alisa Adams (SBN 277697)
                              Adams Law Practice, LLC
                              P.O. Box 1834
                              Cleveland, OH 44103
                              (216) 926-0065 telephone
                              Email: aadams@advocateattorneys.com

                              Marc E. Dann (*pro hac vice* anticipated)
                              Brian D. Flick (*pro hac vice* anticipated)
                              DANNLAW
                              15000 Madison Avenue
                              Lakewood, OH 44107
                              (216) 373-0539 telephone
                              (216) 373-0536 facsimile
                              *notices@dannlaw.com*

*Ebo, et al. v. Wells Fargo Bank, N.A., Class Action Complaint, p.18*

Javier L. Merino (*pro hac vice* anticipated)
DANNLAW
1520 U.S. Highway 130, Suite 101
North Brunswick, NJ 08902
(201) 355-3440 telephone
(216) 373-0536 e-facsimile
notices@dannlaw.com

Thomas A. Zimmerman, Jr. (*pro hac vice* anticipated)
*tom@attorneyzim.com*
Matthew C. De Re (*pro hac vice* anticipated)
*matt@attorneyzim.com*
ZIMMERMAN LAW OFFICES, P.C.
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
(312) 440-0020 telephone
(312) 440-4180 facsimile

*Attorneys for Plaintiff and the Putative Class*

# EXHIBIT H

Dennis J. Stewart, CA Bar No. 99152
**GUSTAFSON GLUEK PLLC**
600 B Street, Suite 1700
San Diego, CA 92024QW
Tel.: (612) 333-8844
Fax: (612) 339-6622
dstewart@gustafsongluek.com
[Additional Counsel on Signature Page]
Attorneys for Plaintiffs and Others Similarly Situated

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **ELRETHA PERKINS and LARONICA JOHNSON**, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>**WELLS FARGO, N.A.**, a Delaware Corporation; **WELLS FARGO HOME MORTGAGE, INC.**, a Delaware Corporation,<br><br>Defendants. | **Case No. 3:22-cv-3455**<br><br>**CLASS ACTION COMPLAINT**<br><br>**(1) Violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691, et seq.**<br>**(2) Violation of the Fair Housing Act, 42 U.S.C. § 3601, et seq.**<br>**(3) Violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981, et seq.**<br>**(4) Violation of the California Unfair Competition Law, Cal. Bus. & Pro. Code §17200, et seq.**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Elretha Perkins and Laronica Johnson, on behalf of themselves and all others similarly situated, bring this action against Defendants Wells Fargo, N.A. and Wells Fargo Home Mortgage (The "Defendants" or "Wells Fargo") to address the substantial injuries they and all others similarly situated sustained arising from Wells Fargo's illegal discrimination, in violation of the Equal Credit Opportunity Act, the Fair Housing Act, the Civil Rights Act of 1866, and the California Unfair Competition Law.

## I. NATURE OF THE ACTION

1.      Homeownership in the United States of America is a central tenet of the American Dream.  For millions of Americans, homeownership is the foundation of family, community, and human dignity.

2.      By design, however, federal agencies and financial institutions in charge of making homeownership a reality have long placed African Americans and other racial minorities at a structural disadvantage.

3.      Soon after Congress passed the National Housing Act of 1934 (NHA) into law, federal agencies, and financial institutions responsible for fulfilling the NHA's promise drew maps across the United States, placing "greenlines" around neighborhoods that were predominantly white Anglo-Saxon and Northern European, and "redlines" around neighborhoods that were predominantly African American and other racial minority populations.

4.      This discriminatory practice of "redlining" caused African American home loan applicants to be denied more often than their similarly situated white counterparts, to receive less favorable terms than their similarly situated white counterparts, and to receive inferior treatment as part of the home loan application process than their similarly situated white counterparts.

5.      In 1968, Congress enacted the Fair Housing Act, seeking to, among other things, end the discriminatory practice of redlining.

6.      Despite decades of efforts since the Fair Housing Act, recent data from federal housing agencies indicate that African Americans and other racial minorities, of worthy credit, continue to face discrimination in access to, and quality of, home loans when compared to their similarly situated white counterparts.  Among those who continue to contribute to this injustice is Wells Fargo.

7.      Indeed, data reviewed reveals that in 2020, Wells Fargo rejected a majority of completed home loan applications submitted by African American homeowners as compared to similarly situated white applicants.[1]  Moreover, the application process designed by Wells Fargo is more difficult for African American applicants to complete, resulting in 27% of all African American applicants to withdraw their application before completing it.[2]

8.      Wells Fargo has a long history of discrimination against African Americans and other racial minorities in the home loan arena.  For example, in 2011, a jury found Wells Fargo guilty of systematically discriminating against minority home buyers by using a computer software in part to identify minority homeowners which resulted in them paying more for their home loans than white borrowers.  *See Opal Jones, et. al v. Wells Fargo Bank, N.A., et al.*, Case No. BC337821 (Los Angeles Superior Court. 2011), *rev'd on other grounds*, Case No. B243333, 2015 WL 662081.  The following year, a United States Department of Justice (DOJ) Civil Rights Division investigation found that in more than 34,000 cases, Wells Fargo charged Black and Hispanic customers higher fees and interest rates than white customers with similar credit profiles.[3]  Despite

---

[1]  https://www.bloomberg.com/graphics/2022-wells-fargo-black-home-loan-refinancing
[2]  *Id.*
[3]  *See Justice Department Reaches Settlement with Wells Fargo Resulting in More Than $175 Million in Relief for Homeowners to Resolve Fair Lending Claims* (DOJ Release) July 12, 2012, https://www.justice.gov/opa/pr/justice-department-reaches-settlement-wells-fargo-resulting-more-175-million-relief (accessed April 10, 2022).

CLASS ACTION COMPLAINT - 3

having to be held accountable for its discriminatory conduct many times before, Wells Fargo continues its pattern and practice of discrimination against non-white borrowers.

9.     Starting in at least 2018, and continuing to the present, Wells Fargo has discriminated against African Americans, and other racial minorities, by deploying a modern home loan scheme that is tantamount to 21st century redlining.

10.    Wells Fargo deploys this discriminatory scheme in two critical ways.  First, Wells Fargo uses a computer system which deploys automated algorithms and artificial intelligence-like machine learning as part of its home loan decisions.  These algorithms and artificial intelligence machine learning technologies—like the redlining maps of the 1930's—select geographic areas that are predominantly African American (and other racial minorities) and subject those geographies and persons within those geographies to adverse treatment as part of home loan decisions.

11.    For example, Wells Fargo's algorithm labels certain neighborhoods that are predominantly Black as neighborhoods ineligible for rapid loan processing, a service provided to similarly situated white applicants.  As a result, Wells Fargo loan personnel have told African American loan applicants who live in predominantly Black neighborhoods that they would not receive the same rapid application process as their white counterparts.[4]

12.    Second, Wells Fargo applies several pretextual actions in the home loan application process which are specifically targeted at non-white borrowers.  These actions include, but are not limited to, (i) providing African American applicants with an inferior and slower valuation process for homes in predominantly Black neighborhoods, (ii) placing loan officers who were able to process applications significantly farther away from Black applicants than their white

---

[4]    *See Wells Fargo Rejected Half Its Black Applicants in Mortgage Refinancing Boom (bloomberg.com)*, www.bloomberg.com/graphics/2022-wells-fargo-black-home-loan-refinancing/, (accessed March 28, 2022).

counterparts, and (iii) delaying processing of applications from African Americans, when compared to their similarly situated white counterparts.

13. Based on the data, the disparate impact of Wells Fargo's discriminatory scheme is quite clear. A white applicant seeking to refinance their home loan, who earned between $0 and $63,000 per year were more likely to have their home loan financing application approved by Wells Fargo than a Black applicant seeking to refinance their home loan, who earned between $120,000 and $168,000 per year.[5] As a result of Wells Fargo's barrage of pretextual actions aimed at deterring Black applicants, more than one-quarter of all Black homeowners who began an application to finance their home loan through Wells Fargo did not finish their application.[6]

14. Wells Fargo was the only major lender in the United States of America that approved a smaller share of refinancing applications from Black Americans in 2020 than it had in 2010.[7]

15. Notably, Wells Fargo was the *only* major lending institution in the United States to reject the majority of Black applicants seeking to refinance their homes. Wells Fargo's conduct is especially pernicious with regards to refinancing—as opposed to a new loan application—because with a refinance, the applicant has already established an ability to pay a mortgage with a *higher* interest rate than would be secured with a refinanced loan.

16. Wells Fargo's discrimination is even more stark when its treatment of Black home loan applicants is compared to other financial institutions.

17. By way of example, during the same time period, JP Morgan Chase & Co. approved 81% of Black applicants seeking to refinance their home loan. Bank of America Corp. approved

---

[5] *Id.*
[6] *Id.*
[7] *Id.*

over two-thirds of Black applicants; and Rocket Mortgage approved nearly 8-in-10 Black applicants.[8]  Overall, other comparable lenders approved 71% of Black applicants seeking to refinance their home loans.[9]  Meanwhile, Wells Fargo approved only 47% of Black applicants.

18.     One of those many Americans impacted by Wells Fargo's discriminatory scheme is Plaintiff Elretha Perkins.  Ms. Perkins is a successful small business owner with a 40+ year career in North Carolina's childcare and transportation industries.  Ms. Perkins is a business leader, a graduate of North Carolina A&T State University, a prominent Historically Black College and University ("HBCU"), and leader within her local African American community.  In addition to her personal successes, she has raised extremely successful children who are active in Georgia's film and entertainment industry.

19.     Ms. Perkins has consistently made payments on her home loan, originally financed by Wells Fargo.  Ms. Perkins' creditworthiness is evidenced by her 720-credit score.  Yet, despite her successful 40+ career and clear creditworthiness, when Ms. Perkins sought to refinance an equity line of credit, Wells Fargo subjected her to delay tactics and overt acts of discrimination.

20.     Ms. Perkins faced a multitude of pretextual obstacles and actions by Wells Fargo, including mandating that in order for her to refinance her equity line of credit she would have to apply for a modification under a "hardship" program, as if the loan was in distress, despite Ms. Perkins not facing any financial hardship or need to modify the loan under a loss mitigation program. Wells Fargo also required her to speak with third-party entities to simply make payments on her equity line of credit.  Ms. Perkins was given the runaround to such an extent that she has

---

[8]     *See Wells Fargo refinancing loan approvals lower for Blacks (Philadelphia Tribune)*, www.phillytrib.com/news/business/wells-fargo-refinancing-loan-approvals-lower-for-blacks/article_379b95bd-d8a7-5402-abb9-d569c68bbbc6.html, (accessed March 26, 2022).
[9]     *See Wells Fargo Rejected Half Its Black Applicants in Mortgage Refinancing Boom (bloomberg.com)*, www.bloomberg.com/graphics/2022-wells-fargo-black-home-loan-refinancing/, (accessed March 28, 2022)

had to submit the same tax and income documents multiple times only to face more delays from Wells Fargo in processing her refinancing request.

21.     Another American impacted by Wells Fargo's discriminatory scheme is Plaintiff Laronica Johnson.  Ms. Johnson is a caring and committed educator.  Ms. Johnson received her bachelor's degree from Texas Southern University and her master's degree from Prairie View A&M University, both HBCU's.  Today, Ms. Johnson works to ensure that all children receive equal treatment and access to education as a special education teacher.

22.     Ms. Johnson has consistently made payments on her home loan.  Ms. Johnson has never been late on her current home mortgage payment.  Her creditworthiness is evidenced by her 680-credit score.

23.     Despite her creditworthiness, Wells Fargo provided a series of pretextual reasons in discriminating against Ms. Johnson.  For example, contrary to the purpose of borrowers refinancing their home mortgage loans, Wells Fargo personnel told Ms. Johnson that refinancing did not make sense in her case and would result in her mortgage and/or interest rate increasing.  In addition, despite approving many other similarly situated white applicants, Wells Fargo personnel told Ms. Johnson that refinancing was "just not worth it."  Between 2019 and 2022, Ms. Johnson has applied three times to refinance her home mortgage loan with Wells Fargo.  Wells Fargo denied Ms. Johnson each time.

24.     The experiences of Ms. Perkins and Ms. Johnson mirror the experiences of so many Black and Brown Americans who have been damaged by Wells Fargo's systemic discrimination.  Wells Fargo's discriminatory conduct violates the commercial and civil rights of Class members and has caused hundreds of millions of dollars in damages to the Class.  Individually, and as Class Representatives, Ms. Perkins and Ms. Johnson bring this action against Wells Fargo to restore the

Class any amounts which they otherwise would have been entitled to under law, together with any other equitable and remedial relief as the Court may deem appropriate.

## II. JURISDICTION AND VENUE

25.     Plaintiffs bring this action under the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq*, the Fair Housing Act of 1968, 42 U.S.C. § 3601 *et seq*, and the Civil Rights Act of 1866, 42 U.S.C. § 1981, to secure declaratory and  injunctive relief, statutory damages, costs of suit, and reasonable attorneys' fees for the injuries that Plaintiffs and members of the Class sustained as a result of Defendants' violations.

26.     This Court has federal question jurisdiction under 28 U.S.C. §§ 1331, 1332(d), and 1343, regarding Plaintiffs' claims arising under the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq*, the Fair Housing Act of 1968, 42 U.S.C. § 3601 *et seq*, and the Civil Rights Act of 1866, 42 U.S.C. § 1981.

27.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a), regarding Plaintiffs' claims arising under California's Unfair Competition Law, Cal. Bus. And Pro. Code § 17200 *et seq.*, because this claim is so related to the federal Equal Credit Opportunity Act, the Fair Housing Act of 1968, and the Civil Rights Act of 1866 claims that they form part of the same case or controversy under Article III of the United States Constitution.

28.     This Court has personal jurisdiction over Defendants because, among other things, they: (a) transacted business throughout the United States, including in this District; (b) the illegal discrimination alleged took place in this District; (c) had maintained substantial aggregate contacts with the United States as a whole, including in this District; (d) had substantial contact in various states in the United States, including in this District; and (e) directed its illegal discrimination and had direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons

residing in, located in, or doing business throughout the United States, including in this District. Defendants also conduct business throughout the United States, including in this District, and have purposefully availed themselves of the laws of the United States.

29.     This District is the appropriate venue under 28 U.S.C. §1391(c), because during the Class Period, Defendants transacted business in this District, and a substantial part of the events giving rise to the Plaintiffs' claims took place in this District.

### III.  PARTIES

**A.  Plaintiffs**

*Elretha Perkins*

30.     Plaintiff Elretha Perkins is a Black female homeowner with a 720-credit score, and is a natural person and citizen of Eden, North Carolina.  Ms. Perkins owns homes in both Eden, North Carolina and Dacula, Georgia.  Ms. Perkins' Dacula, Georgia home was financed through Wells Fargo.  Ms. Perkins has been a Wells Fargo customer for nearly 20 years.

*Laronica Johnson*

31.     Plaintiff Laronica Johnson is a Black female homeowner with a 680-credit score, and is a natural person and citizen of Houston, Texas.  Ms. Johnson owns a home in Houston, Texas.  Ms. Johnson unsuccessfully sought to refinance her home mortgage loan through Wells Fargo on three separate occasions between 2019 and 2022.

**B.  Defendants**

*Wells Fargo, N.A.*

32.     Defendant Wells Fargo, N.A. a publicly traded, global financial services firm and a Fortune 500 corporation incorporated in the State of Delaware, with its principal place of

business in the State of California. As of 2020, Defendant Wells Fargo N.A. has assets of approximately $1.9 trillion. Among other things, Wells Fargo, N.A. is a mortgage lender.

*Wells Fargo Home Mortgage*

33.    Defendant Wells Fargo Home Mortgage is a home lending company that is one of Wells Fargo's various corporate entities. Defendant Wells Fargo Home Mortgage originates and services approximately $300 billion worth of loans per year. Wells Fargo Home Mortgage is incorporated in the State of Delaware and has its principal place of business in the State of Iowa.

## IV.  FACTUAL ALLEGATIONS

**A.    Access to Home Loan Refinancing Hits Record Highs**

34.    Refinancing a home loan provides homeowners the ability to reduce the interest on their home loan payments, to "cash out" and capture the additional equity their homes have gained since the previous financing and may permit home loan borrowers to save money on the principal of their loan.

35.    Because of historically low interest rates, millions of Americans have applied to refinance their homes over the last few years. These homeowners have refinanced over $5 trillion in mortgage value.

**B.    Wells Fargo's Discriminatory Scheme**

36.    Wells Fargo executes its discriminatory scheme in two key ways. First, Wells Fargo utilizes a computer system with a discriminatory automated algorithm and artificial intelligence machine learning program to make home loan decisions. These discriminatory algorithms and artificial intelligence machine learning technologies—like the redlining maps of the 1930's—select geographic areas that are predominantly Black, and then either deny home loan

opportunities to Black applicants or provide inferior terms and processing than the terms and processing received by similarly situated white applicants. For example, Wells Fargo's algorithms and artificial intelligence machine identified geographic neighborhoods eligible for quick evaluations of refinancing applicants. This algorithm consistently labeled predominantly Black neighborhoods *ineligible* for rapid processing.

37. Second, Wells Fargo employed a series of pretextual actions that are instrumental to further its discriminatory scheme.

38. One pretextual action was that Wells Fargo placed its loan officers significantly farther away from Black applicants to reduce the amount and frequency of home loan applications from Black applicants.

39. Another pretextual action was Wells Fargo delaying the home loan valuation process for Black applicants as well as delaying the valuation process of homes located in predominantly Black neighborhoods. The valuation process is critical to any home loan and home sale transaction. By deploying this pretextual action, Wells Fargo treated Black applicants differently than their similarly situated white counterparts.

40. A third pretextual action was the intentional delay in the processing of applications from African Americans, when compared to their similarly situated white counterparts. Wells Fargo regularly approved refinancing applications of non-Black homeowners in just weeks but took significantly longer to approve the applications of Black homeowners, sometimes taking months.

C. **Data Shows Wells Fargo Disparately Treated Its Black Home Loan Applicants.**

41. The impact of Wells Fargo's discriminatory scheme is also evident from the data.

42.     In 2020, Wells Fargo approved Black homeowner refinancing applications at a rate far lower than that of *any* other major lender in the United States of America.

43.     For instance, JP Morgan Chase & Co. approved 81% of Black applicants seeking to refinance their home loans.  Bank of America Corp. approved over two-thirds of Black applicants; and Rocket Mortgage approved nearly 8-in-10 Black applicants.

44.     Overall, other comparable lenders approved 71% of Black applicants seeking to refinance their home loans, whereas Wells Fargo approved only 47%.

**D.     Plaintiffs Elretha Perkins and Laronica Johnson Were Harmed by Wells Fargo's Race-Based Discrimination.**

45.     Plaintiff Elretha Perkins purchased her home in Dacula, Georgia in 2006, through a Wells Fargo home loan for $470,000 ("Home Loan").  Today, Ms. Perkin's Dacula home is worth approximately $630,000.  As part of this home loan approval, but without Ms. Perkins knowledge, Wells Fargo added a second home equity loan ("Home Equity Loan") to Ms. Perkins lending package.  Ms. Perkins consistently made payments to Wells Fargo from 2006 through 2018.

46.     In 2018, Ms. Perkins' Home Loan contract was moved to a third-party mortgage servicer, Specialized Loan Services.  Ms. Perkins' Home Equity Loan, however, continued to be serviced by Wells Fargo.  Ms. Perkins began making home loan payments to Specialized Loan Services, and Home Equity Loan payments to Wells Fargo.

47.     In 2021, Ms. Perkins sought to refinance her Home Equity Loan through Wells Fargo.  Because of her high credit score and history with Wells Fargo, Ms. Perkins believed refinancing her Home Equity Loan would be easy.  She was sadly mistaken.

48.     For example, upon initially seeking to refinance her Home Equity Loan, Wells Fargo repeatedly asked Ms. Perkins to resubmit paperwork because Wells Fargo personnel claimed that the information she had submitted was either not received, missing, or somehow lost. Wells Fargo personnel also took weeks or months to respond to Ms. Perkins' inquiries about the status of her Home Equity Loan refinance request.

49.     During this time, Wells Fargo mandated that for Ms. Perkins to refinance her Home Equity Loan she would have to apply for a loan modification classifying the loan with "Hardship" status, despite Ms. Perkins facing no financial hardship or requesting any hardship status. Wells Fargo then advised Ms. Perkins that the only way for her to be considered for a Home Equity Loan refinance would be for her to fill out paperwork seeking mortgage assistance through loss mitigation.

50.     Although Ms. Perkins was not under any financial hardship, she very much desired to refinance her Home Equity Loan so she acquiesced to Wells Fargo's request and filled out hardship paperwork. Despite following Wells Fargo's directions for nearly 12 months, including submitting paperwork for mortgage assistance and "hardship" status that Ms. Perkins did not need, Wells Fargo has constructively denied her home loan refinance request.

51.     Plaintiff Laronica Johnson purchased her home in Houston, Texas in 2016, for approximately $163,000. Her home is currently worth approximately $261,000. In 2018, Wells Fargo notified Ms. Johnson that it would take over servicing her mortgage, which was originated with a third-party, TexMex Mortgage Company.

52.     In July 2019, Ms. Johnson first applied to refinance her home mortgage loan through Wells Fargo. Contrary to the entire purpose of refinancing a home mortgage, Wells Fargo personnel told Ms. Johnson that refinance would cost her *more* money than her initial mortgage

agreement.  Following this illogical explanation, Wells Fargo personnel told Ms. Johnson that it "just did not make sense" for Ms. Johnson to obtain a home loan refinance at this time.

53.     In October 2020, Ms. Johnson again applied to refinance her home mortgage loan through Wells Fargo.  This time, Wells Fargo gave Ms. Johnson the runaround, farcically explaining that it just would not be "worth it" for her to refinance her home mortgage loan and that based upon the application she submitted, it did not look like refinancing would result in a lower interest rate.  When Ms. Johnson inquired into why, especially in light of her 680-credit score, Wells Fargo personnel relied on a nonsensical excuse that refinancing was simply not in Ms. Johnson's best interest.

54.      In February 2022, Ms. Johnson applied to refinance her home mortgage loan through Wells Fargo for a third time.  During this attempt, Wells Fargo personnel told Ms. Johnson that refinancing her home mortgage loan, which is typically sought for the purpose of reducing monthly payments for a borrower, would result in Ms. Johnson paying an additional $10,000 on her mortgage.  When Ms. Johnson explained to Wells Fargo that such an increase does not make sense in light of her knowing others who had been approved for refinancing, Wells Fargo continued the denial.

55.     In causing injury to the Plaintiffs and the members of the Class, Defendants have acted intentionally, maliciously, and with willful, callous, wanton, and reckless disregard for the Plaintiffs' and Class members' rights.

## V.  CLASS ACTION ALLEGATIONS

56.     Plaintiffs Elretha Perkins and Laronica Johnson bring this action on behalf of themselves and all others similarly situated as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the members of the following Class:

All Black persons, as well as other racial minorities, in the United States of America, who from January 1, 2018 through the Present (the "Class Period"), submitted, or attempted to submit, an application to finance or refinance their home mortgage through the Defendants that was (i) processed at a rate slower than that of the average processing time of applications made by non-Black or other non-racial minority applicants; or (ii) whose application was denied; or (iii) whose resulting refinanced loans were made at higher interest rates as compared to similarly situated non-Black applicants.

57. Plaintiffs and Class members reserve the right to amend the Class definitions as discovery proceeds and to conform to the evidence. Excluded from the Class are Defendants and their employees, affiliates, parent entities, subsidiaries, and co-conspirators, whether or not named in this complaint, and the United States Government.

58. The exact size of the Class is unknown at this time because the information is in the exclusive control of Defendants. However, upon information and belief and due to the nature of commerce involved, there are thousands of Class members geographically dispersed throughout the United States, such that joinder of all class members is impracticable.

59. The Class is readily ascertainable by business records and other data from Defendants.

60. Plaintiffs' claim is typical of the claims of the members of the Plaintiff Class because Plaintiffs and members of the Class all submitted applications for home loan refinancing to Defendants, and therefore Plaintiffs' claim arises from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class.

61. Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are aligned with, and not antagonistic to, the Class.

62. Plaintiffs has retained counsel competent and experienced in class action litigation.

63. Numerous questions of law and fact common to each Class member exist that predominate over questions affecting only individual members, including, but not limited to:

**A.** Whether Defendants discriminated against Plaintiffs and the Class;

**B.** Whether such discrimination is a violation of the Equal Credit Opportunity Act; the Fair Housing Act; the Civil Rights Act of 1866; and California's Unfair Competition Law;

**C.** Whether Defendants' acts, policies, and practices have a disparate impact on the basis of race, color, and/or national origin with respect to credit transactions, as described herein, on the basis of race;

**D.** Whether Defendants' acts, policies, and practices have provided and continue to provide different terms, conditions, and privileges on the basis of race, color, and/or national origin in connection with the making of residential real estate-related transactions;

**E.** The natural persons involved in the alleged discrimination, and their acts in furtherance of the illegal practice;

**F.** The period of time the alleged discrimination existed;

**G.** Whether and the extent to which Defendants' discrimination resulted in increased interest and/or principal amounts incurred by Plaintiffs and Class Members above natural market levels;

**H.** The nature and scope of the injunctive relief required to remedy continuous illegal discrimination;

**I.** The measure of damages suffered by Plaintiffs and the Class Members.

64. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged Class members is impractical. Prosecution as a class action will eliminate the possibility of repetitious litigation.

The damages suffered by individual Class members are relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation. Absent a class action, it would not be feasible for Class members to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court. The Class is readily definable and is one for which records likely exist in the files of Defendants.

65.    Defendants' actions are ongoing and without Court intervention, will continue unabated. Accordingly, Plaintiffs seek to represent the Class under Rule 23(b)(2) for an award of declaratory and injunctive relief finding the Defendants' discriminatory actions improper and enjoining the Defendants from continuing their acts of discrimination as described herein.

## VI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT
### 15 U.S.C. § 1691, *et seq.*

66.    Plaintiffs incorporate by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

67.    The Equal Credit Opportunity Act makes it unlawful for a creditor to discriminate against any applicant with respect to any aspect of a credit transaction on the basis of race.

68.    The Equal Credit Opportunity Act applies to all applications for financing, including applications for refinancing like those the Plaintiffs, and all others similarly situated, sought. Plaintiffs applied for credit by seeking to refinance their home loans.

69.     Defendants are creditors because they regularly extend, renew, and continue the issuance of credit.

70.     Defendants' denial of home loan refinance applications based on race, and Defendants' perpetual delays, roadblocks, and other pretextual actions, constitute race-based discrimination and are unlawful under the Equal Credit Opportunity Act.

71.     Defendants' acts, policies, and practices are intentionally discriminatory on the basis of race, color, and/or national origin with respect to aspects of credit transactions, constitute redlining, and violate 15 U.S.C. § 1691(a)(1).

72.     Defendants' acts, policies, and practices have a disparate impact on the basis of race, color, and/or national origin with respect to aspects of credit transactions in violation of 15 U.S.C. § 1691(a)(1).

73.     Defendants have maintained these acts, policies, and practices continuously and without material change since at least 2018, and they constitute a continuing violation of the Equal Credit Opportunity Act.

74.     Plaintiffs and all other similarly situated were harmed by Defendants' conduct, including, but not limited to, harm in the form of higher interest rates paid while applications were pending, higher interest rates paid upon a delayed approval, an inability to secure a "cash out" refinance loan, an inability to reduce the principal on a home loan payment, or from a denied application.

75.     On behalf of themselves, and all others similar situated, Plaintiffs requests the relief set forth below.

## SECOND CLAIM FOR RELIEF
## VIOLATION OF THE FAIR HOUSING ACT OF 1968
## 42 U.S.C. § 3601, *et seq.*

76.     Plaintiffs incorporate by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

77.     The Fair Housing Act makes it illegal to discriminate against any designated class of individuals in a residential real estate transaction.

78.     Plaintiffs and all others similarly situated sought to engage in a residential real estate transaction with the Defendants.

79.     Plaintiffs and all others similarly situated are African Americans, or other racial minorities, and therefore members of a protected class under the Fair Housing Act.

80.     Defendants refused to transact business with Plaintiffs and all others similarly situated by (i) denying Black (or other racial minority) home loan applicants, of worthy credit, while approving home loan applications from their similarly situated white counterparts; (ii) approving Black (or other racial minority) home loan applicants, but with inferior terms than terms offered to similarly situated white home loan applicants; (iii) refusing to approve refinancing applications on the same window of time as applications made by other parties with similar qualifications that were not members of the protected class, or by (iv) constructively causing applicants to withdraw applications due to roadblocks and pretextual actions.

81.     Defendants refused to transact business with Plaintiffs and all others similarly situated during the Class Period and at the same time transacted business with non-Black homeowners with similar qualifications.

82.     Defendants' acts, policies, and practices have provided and continue to provide different terms, conditions, and privileges on the basis of race, color, and/or national origin in

connection with the making of residential real estate-related transactions, in violation of 42 U.S.C. § 3605

83.     Plaintiffs and all others similarly situated were disparately impacted by Defendants' refusal to transact business with them on equal terms because, among other things, they: (i) paid application fees for refinancing applications that were delayed or denied;  (ii) continued to pay higher interest rates while their delayed applications were pending;  (iii)  were provided with higher interest rates than other similarly situated Non-Black applicants; or (iv) were unable to "cash out" of their mortgage and capture increased home value since a previous financing.

84.     Defendants have maintained these acts, policies, and practices continuously and without material change since at least 2018, and they constitute a continuing violation of the Fair Housing Act.

### THIRD CLAIM FOR RELIEF
### VIOLATION OF THE CIVIL RIGHTS ACT OF 1866
### 42 U.S.C. § 1981, *et seq.*

85.     Plaintiffs incorporate by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

86.     Racial discrimination in contracting is prohibited by 42 U.S.C. § 1981, which ensures that all people have the same right to make and enforce contracts "as is enjoyed by white citizens." Section 1981 was enacted to eradicate racial discrimination in contracting as is derived from the Civil Rights Act of 1866 and applies with full force and effect today.

87.     Defendants have engaged in, and is engaging in, pernicious, intentional racial discrimination in contracting, which is illegal under § 1981.  Section 1981 is broad, covering "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

88.     African Americans and other racial minorities are a protected class under § 1981. Plaintiffs and the Class Members are members of that class as they are African American or other racial minorities.

89.     As alleged herein, Plaintiffs and the Class Members attempted to contract with the Defendants for home loans and loan refinancing, but the Defendants refused, engaging in a series of pretextual acts meant to discriminate, including but not limited to, (i) denying Black (or other racial minority) home loan applicants, of worthy credit; (ii) approving Black (or other racial minority) home loan applicants, but with inferior terms than terms offered to similarly situated white home loan applicants; (iii) refusing to approve refinancing applications on the same window of time as applications made by other parties with similar qualifications that were not members of the protected class, or by (iv) constructively causing applicants to withdraw applications due to roadblocks and pretextual actions.  Yet, Defendants have continued to contract with and make themselves available to contract with similarly situated white home loan applicants.

90.     Defendants have refused to contract with Plaintiffs and the Class Members for home loan financing.  Defendants have a pattern and practice of refusing to do business, or offering unequal contracting terms to, African Americans and other racial minorities.

91.     Plaintiffs and all other similarly situated were harmed by Defendants' conduct, including, but not limited to, harm in the form of higher interest rates paid while applications were pending, higher interest rates paid upon a delayed approval, an inability to secure a "cash out" refinance loan, an inability to reduce the principal on a home loan payment, or from a denied application.

92.     Accordingly, Defendants' unlawful discrimination has caused Plaintiffs and those similarly situated harm for Defendants' refusal to contract with Plaintiffs.

## FOURTH CLAIM FOR RELIEF
## VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
### Cal. Bus. & Pro. Code §17200, *et seq*.

93.     Plaintiffs incorporates by reference each of the allegations contained in the preceding paragraphs as if fully set forth herein.

94.     The California Unfair Competition Law ("UCL") forbids "unlawful, unfair or fraudulent" conduct in connection with business activity.

95.     Defendants' business offering of financing loans and refinancing of existing loans is a business activity under the UCL.

96.     Plaintiffs and others similarly situated are "persons" under the UCL.

97.     Defendants' conduct described herein constitutes unlawful competition, as in the course of engaging in the business acts described above, it engaged in conduct that constituted a predicate violation of the laws identified herein, namely the Equal Credit Opportunity Act and the Fair Housing Act, 42 U.S.C. § 1981.

98.     Defendants' conduct described herein constitutes unfair competition under the UCL, as Defendants deploy hidden business practices designed to deny, delay and refuse the financing and/or refinancing of loans of Black Americans, and subjecting those that are approved, to less favorable terms than white borrowers.  Defendants' acts and practices offended an established public policy, and engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers. As there is no legitimate justification for these practices, which have a disproportionately negative impact on the public, in comparison to any fair business, purpose Defendants' practices are unfair as defined under the UCL.

99.     A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

100.    Defendants' acts and practices alleged above constitute unlawful business acts or practices as they have violated federal law as described herein.

101.    Defendants' conduct described herein constitutes fraudulent competition under the UCL, as they claim they will fairly and quickly process the financing and refinancing applications of all applicants, but instead use hidden business practices designed to deny, delay and refuse the refinancing of loans of Black Americans, and subjecting those that are approved to less favorable terms.  These business practices are likely to deceive the public, and thus are fraudulent.

102.    Plaintiffs and those similarly situated were injured by Defendants' refusal to transact business with them because they paid application fees for financing and refinancing applications that were delayed or denied, because they continued to pay higher interest rates while their delayed applications were pending, because they were provided with higher interest rates than other homeowners with similar qualifications, because they were offered less favorable terms than white borrowers, and/or because their applications were denied.

## VII.    REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Class of similarly situated persons, respectfully seek the following relief:

A.    An order certifying this action as a class action under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), defining the Class as requested herein, finding that Plaintiffs are proper representatives of the Class requested herein, and appointing Plaintiffs' counsel as Class Counsel;

B.    Designate Plaintiffs as Class Representatives and designate the undersigned counsel as lead Class Counsel;

**C.** Find that Defendants' acts described herein violate the Equal Credit Opportunity Act, the Fair Housing Act, the Civil Rights Act of 1866, and the California Unfair Competition Law;

**D.** Enter a declaratory judgment that the forgoing acts, policies, and practices of Defendants violate 15 U.S.C. § 1691; and 42 U.S.C. § 3605;

**E.** Enter a permanent injunction enjoining Defendants from continuing to implement and enforce the illegal conduct described herein and directing Defendants to take all affirmative steps necessary to remedy the effects of that conduct and to prevent additional instances of such conduct or similar conduct from occurring in the future;

**F.** Find that Defendants have engaged in a pattern and practice of racial discrimination resulting in the harm to Plaintiffs and class members described above;

**G.** Award Plaintiffs and the members of the Class damages in an amount to be determined by the Court;

**H.** Award Plaintiffs and the members of the Class pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

**I.** Award Plaintiffs and the members of the Class the costs of suit, including reasonable attorneys' fees, as provided by law; and

**J.** Award Plaintiffs and the members of the Class any other and further relief as the case may require and the Court may deem just and proper.

## VIII. JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated:     June 10, 2022          Respectfully submitted,

**GUSTAFSON GLUEK, PLLC**

By: */s/ Dennis J. Stewart*
Dennis J. Stewart, CA Bar No. 99152
600 B Street, Suite 1700
San Diego, CA 92024
Tel.: (612) 333-8844
Fax: (612) 339-6622
dstewart@gustafsongluek.com

Daniel E. Gustafson (Pro Hac Vice to be filed)
David A. Goodwin (Pro Hac Vice to be filed)
Amanda M. Williams (Pro Hac Vice to be filed)
Abou B. Amara, Jr. (Pro Hac Vice to be filed)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dgustafson@gustafsongluek.com
dgoodwin@gustafsongluek.com
awilliams@gustafsongluek.com
aamara@gustafsongluek.com

Scott D. Hirsch (*Pro Hac Vice to be filed*)
**SCOTT HIRSCH LAW GROUP, PLLC**
6810 N. State Road 7
Coconut Creek, FL 33073
Tel.: (561) 569-7062
scott@scotthirschlawgroup.com

Vildan A. Teske (*Pro Hac Vice to be filed*)
Marisa C. Katz *(Pro Hac Vice to be filed)*
**TESKE KATZ PLLP**
222 South Ninth Street, Suite 1600
Minneapolis, MN 55402
Telephone: (612) 746-1558
teske@teskekatz.com

*Attorneys for Plaintiffs and Others Similarly Situated*

# EXHIBIT I

Case 3:22-cv-01448-JD Document 46-1 Filed 09/09/22 Page 260 of 298

# ELLIS GEORGE CIPOLLONE

## ELLIS GEORGE CIPOLLONE O'BRIEN ANNAGUEY LLP

ABOUT US
ATTORNEYS
PRACTICE AREAS
COMMUNITY OUTREACH
CONSULTING
NEWS
CONTACT US

# About Us

Over the past 35 years, Ellis George Cipollone O'Brien Annaguey LLP (formerly Browne George Ross O'Brien Annaguey & Ellis LLP) has successfully litigated and tried challenging cases nationwide, securing favorable settlements and substantial sums for clients.

Trial lawyers, first and foremost

We are a firm of seasoned trial lawyers. Our lawyers have tried hundreds of cases successfully to judges and juries nationwide. We have distinguished ourselves in numerous "bet-the-company" cases, multi-billion-dollar disputes, and white-collar criminal trials where our client's freedom has been at stake. Through our extensive trial work, both fact and law intensive, we know how to advocate in any arena and at any time, and we understand how to counsel a client considering whether to settle or to fight.

*Read more about our recent victories and developments here.*

Success rooted deep in experience

We provide our clients with access to an exceptional range of knowledge and experience, developed in both private practice and the senior ranks of government. The firm is home to a U.S. Senator and California Governor, Counsel to the President of the United States, U.S. Ambassador to Mexico, U.S. Attorney for the Central District of California, numerous former senior Department of Justice and White House officials, and five former (or imminent) Supreme Court law clerks. Our unique insight into the legislative, executive, and judicial branches of government, as well as administrative agencies, gives us unparalleled advantages in navigating the legal process for our clients.

*Click here to view our roster of accomplished attorneys.*

It's not just business – it's personal

We understand what's at stake for our clients: their reputation, life's work, time, financial resources, and sometimes even their freedom. Whether Fortune 500 company or individual, plaintiff or defendant, we take

We use cookies on our website to give you the most relevant experience by remembering your preferences and repeat visits. By clicking "Accept All", you consent to the use of ALL the cookies. However, you may visit "Cookie Settings" to provide a controlled consent.

Cookie Settings      Accept All

From firm leadership to professional staff, we proudly bring our diverse perspectives to the table to customize innovative solutions for our clients. We are inspired by our differences, and we strive to promote equity and inclusion in our firm, in the courtroom, and in our communities.

*Learn more about our involvement with local organizations.*

*"Our clients turn to us to represent them with the utmost excellence, integrity, and zeal." – Keith Wesley, Managing Partner*

We use cookies on our website to give you the most relevant experience by remembering your preferences and repeat visits. By clicking "Accept All", you consent to the use of ALL the cookies. However, you may visit "Cookie Settings" to provide a controlled consent.

Cookie Settings      Accept All

# ELLIS GEORGE CIPOLLONE

Ellis George Cipollone O'Brien Annaguey llp



**Dennis S. Ellis**
**Partner**
**Office**: Century City

**T**: 310.274.7100
**D**: 424.202.5549
**F**: 310.275.5697
dellis@egcfirm.com

**Dennis S. Ellis** is based in the firm's Century City office, and his practice concentrates on consumer class actions, unfair competition (Section 17200), business torts, product liability defense, environmental law, and breach of contract actions. He has worked for a diverse group of clients, including major retail chains, petroleum, pharmaceutical, and manufacturing companies, and internationally-known celebrities. Mr. Ellis is the author of several articles that have appeared in various legal publications, including a law review article entitled "A Product Liability Claim By Any Other Name Remains A Product Liability Claim: California Courts Should Not Permit Plaintiffs To Recast A Product Liability Claim In The Terms Of Fraud," 25 Whittier L. Rev. 441 (2003). He also wrote a practitioner's treatise entitled *Enforcement of Judgments: A Practitioner's Guide to Recovery*, published by ALM Media LLC in July 2016.

Before studying law, Mr. Ellis was one of 18 individuals selected from a nationwide pool of over 350 applicants to work for the California State Assembly as a Jesse Marvin Unruh Assembly Fellow. After completing the year-long Fellowship program, he was hired as a legislative aide to Assemblywoman Carol Bentley. As Assemblywoman Bentley's chief legislative advisor, Mr. Ellis briefed the Assemblywoman on pending legislation and was responsible for drafting many of the bills she introduced.

Mr. Ellis graduated from California State University, Fullerton in 1990, where he was a scholarship student-athlete and starting offensive lineman on the Titan football team. He graduated *cum laude* from Howard University School of Law in 1995. While there, Mr. Ellis was first runner-up in the Charles H. Houston Moot Court Competition, a member of the National Moot Court Team, and a member of the *Howard Law Journal*.

## Recent Representations

Mr. Ellis has successfully represented clients in these matters:

- Consumer Class Action Defense: Mr. Ellis has a thriving practice representing consumer packaged goods companies across the country. He has successfully defended such cases by obtaining motions to dismiss at the pleading stage and denial of motions for class certification.

- *New World TMT Limited v. PrediWave Corporation, et al.*: Mr. Ellis was lead attorney in the case which resulted in what is believed to be the largest judgment ever obtained by a Chinese firm in a U.S. court. In New World, Mr. Ellis led a team of attorneys who successfully brought

### Education

- Howard University School of Law, J.D., *cum laude*, 1995
- California State University, Fullerton, B.A., 1990

### Bar Admissions

- California

1

# ELLIS GEORGE CIPOLLONE

## ELLIS GEORGE CIPOLLONE O'BRIEN ANNAGUEY LLP

a motion for terminating sanctions against PrediWave Corporation, eight PrediWave-related companies, and their CEO, Jianping "Tony" Qu. In its order, the court struck all the defendants' answers and cross-claims, and ordered that default be entered against them and in favor of Mr. Ellis' client, New World. A default hearing to prove compensatory and punitive damages resulted in a total judgment in excess of $2.8 billion.

- *Pacific Coin Management v. BR Telephony Partners, L.P., et al.*: Mr. Ellis was part of a trial team that obtained a $97.2 million jury verdict on behalf of their client in this lawsuit involving claims of unfair competition and other related claims regarding the alleged failure to disclose material information in an investment solicitation.

- *Broadlink Communications, Inc. v. MRV Communications, Inc.*: Mr. Ellis was the lead trial lawyer in the Broadlink case, assisted only by a junior associate, where they represented iTouch Communications, Inc. ("iTouch"), a division of MRV Communications, Inc. ("MRV"), in a case of breach of contract for sale of goods. A collection agency brought the case in Sonoma County Superior Court on behalf of bankrupt Broadlink. After deliberating for three and a half hours, the jury returned a defense verdict on all counts in favor of Mr. Ellis' clients, iTouch and MRV.

- Mr. Ellis was the lead trial lawyer in a three-month long trial handling the opening, closing, and direct and cross-examination of all the major witnesses.  This case involved a $16 million lawsuit filed by a Santa Barbara-based preventative medical scanning company. The jury concluded that the company's demise was due to a downward industry trend in the full-body scanning market and its own poor management decisions, rather than the company's claims of malfunctioning equipment manufactured by Mr. Ellis' client, a major healthcare company.

- Confidential JAMS Arbitration: Mr. Ellis served as lead counsel for Claimant in an environmental case, where Claimant alleged Respondents failed to pay their agreed portion of response costs related to an enforcement action brought by the Regional Water Quality Control Board. At the conclusion of the arbitration, the panel of three retired judges ordered Respondents to pay their full portion of response costs in the amount of $2,045,279.40 and an additional $651,638.81 in prejudgment interest. The panel also found that Claimant was the prevailing party and entitled to attorneys' fees in excess of $2,000,000.

## Accolades and Recognitions

- Member, International Association of Defense Counsel

- Fellow, Litigation Counsel of America's Trial Lawyer Honorary Society

- Selected to the *Lawdragon* "500 Leading Lawyers in America" list

2

# ELLIS GEORGE CIPOLLONE

ELLIS GEORGE CIPOLLONE O'BRIEN ANNAGUEY LLP

(2022)

- Recognized in the *Los Angeles Business Journal*'s "Leaders of Influence Minority Attorneys" special issue ([2016](#), [2022](#))
- Selected to the Southern California Super Lawyers list (2007-2022)
- John M. Langston Bar Association of Los Angeles; Legacy of Leadership Award (2016)
- Named "California Lawyer of the Year" by *California Lawyer* magazine (2006)
- Named as one of the "Top 20 Lawyers under 40" by the *Daily Journal* (2006)
- Included in "Who's Who in Black Los Angeles"

## Professional and Community Involvement

- Former General Counsel and Member, Board of Directors, Zeitgeist Community Learning Center, a community-based after school program for students grades three through five, in South Central Los Angeles
- Member, Board of Visitors, Howard University School of Law

## Practice Areas

- Advertising and Promotions Trade Secrets
- Mass Tort, Toxic Tort, and Environmental Litigation
- Life Sciences and Healthcare
- Financial Services Litigation
- Complex Litigation and Arbitration
- Class Actions
- Intellectual Property
- Environment and Energy Litigation

# ELLIS GEORGE CIPOLLONE

## Ellis George Cipollone O'Brien Annaguey llp



| | |
|---|---|
| **Trent Copeland** | **T**: 310.274.7100 |
| **Partner** | **F**: 310.275.5697 |
| **Office**: Century City | tcopeland@egcfirm.com |

**Education**
- Dartmouth College, A.B.
- George Washington University Law School, J.D.

**Bar Admissions**
- California

**Practice Areas**
- Civil Litigation
- Employment Discrimination
- Entertainment
- Defamation
- First Amendment rights
- Criminal Defense
- Sexual Assault / Battery

**Trent Copeland** is a Partner at Ellis George Cipollone O'Brien Annaguey LLP. He began his career at a major multinational law firm and then as a solo practitioner specializing in both criminal and civil litigation. He is a nationally recognized attorney and has successfully defended hundreds of serious high stakes civil and criminal matters including several capital offenses. He is regarded as a go-to lawyer for high-profile matters, particularly where legal acumen, courtroom competence and intense media interest intertwine.

Trent is the rare trial attorney who practices adeptly in both civil and criminal litigation. Among others, his list of clients have included prominent medical professionals such as Dr. Gordon Goei who faced criminal prosecution in a high-profile case related to his medical practice but was proven innocent and publicly vindicated following Trent's successful representation. Trent also successfully represented a Muslim college professor who had been wrongfully targeted by the FBI under one of the first uses of the Patriot Act against a U.S. citizen engaging in protected speech. After numerous proffers and an oral presentation by Trent, the Government withdrew its case against her and she was restored to her teaching position. Trent has also represented and provided legal counsel to numerous celebrities, including Jean Claude Van Damme, Matt LeBlanc, Tracey Edmonds, Shannen Doherty, TMZ Co-founder Jim Paratore and numerous other entertainment professionals. Recently, Trent also successfully handled a major dispute directly involving international music star Justin Bieber where he negotiated a substantial six-figure settlement of the claim.

With his colleague, Eric George, Trent took over the high-profile representation of Gary Franklin, who had been victimized by the criminal conduct of his former attorney, Michael Avenatti. Trent and Eric's representation of Mr. Franklin includes all matters associated with his civil interests in his well-documented role in the much-publicized NCAA basketball recruiting scandal.

Trent holds the distinction of being CBS News' first African-American national on-camera legal news analyst where he served in that capacity for eight years. In his role as CBS News on-camera legal news analyst, he provided expert legal analysis on dozens of legal cases, including the Scott Peterson murder trial, the Michael Jackson molestation trial and the Kobe Bryant sexual assault hearings. Trent has also provided legal news analysis for CNN, Fox News and MSNBC. Trent is currently an on-air legal analyst for legendary broadcaster Larry King's digital program Larry King Now where he provides both legal and political commentary on cases and issues of national and political interest. Larry King has publicly called Trent "one of the best attorneys and communicators in the country." Trent was also featured on Dr. Drew's national TV show as a "Life Changer" for his high-profile and successful work in the legal industry. Trent has

**1**

# ELLIS GEORGE CIPOLLONE

### ELLIS GEORGE CIPOLLONE O'BRIEN ANNAGUEY LLP

been interviewed on-camera by Katie Couric, Dan Rather and CNN's Don Lemon, among others. He has been quoted in *People Magazine*, *NY Daily News*, and *US Magazine*.

Trent is featured regularly as one of "California's Top 100 Lawyers" by the national publication, *Best Attorneys of America*, and he has been regularly selected to the Southern California Super Lawyers list. Trent has spoken at various law enforcement conferences and symposiums, including lecturing for the Beverly Hills Police Department on effective courtroom presentations. Trent was also a keynote speaker at the inaugural opening of the Tom Mesereau Free Legal Clinic. Trent is a frequent speaker on high-profile litigation and the representation of "celebrity" clients.

Additionally, Trent was recently profiled by *Lawdragon (*April 2021*)* and has been repeatedly recognized by *Best Attorneys of America*.

## Recent Representations

- Represents a leading global investment management firm as co-lead defense counsel in several multimillion dollar employment discrimination claims brought by C-suite level employees.

- Led the representation of a high-profile news anchor in obtaining a confidential multi-million dollar resolution of claims of discrimination against a major television network.

- Represented members of the family of the late Senator Robert F. Kennedy as Amicus Counsel in opposing the parole of assassin, Sirhan Sirhan.

- Represented a student in connection with the highly publicized college admissions cheating scandal.

- Led representation of a member of President's Coronavirus Task Force in connection with First Amendment issues related to his service as a Special Advisor to the President.

- Represented two prominent African-American journalists against major TV network in claims related to employment discrimination.

- Represented a Fox Television executive in an indictment filed by the United States Attorney's Office, Central District, into potential violations of the federal Anti-Kickback Statute. The case resolved with probation.

- Successfully represented an individual falsely accused of attempted murder in a high-profile case in San Bernardino, negotiating a dismissal of all charges on the eve of preliminary hearing. The case garnered local media coverage.

- Represented an attorney being investigated for potential participation in a major narcotics distribution ring. The investigation was closed by the Department of Justice with no charges being brought against the attorney.

# ELLIS GEORGE CIPOLLONE
## ELLIS GEORGE CIPOLLONE O'BRIEN ANNAGUEY LLP



| **Noah S. Helpern** | **T**: 213.725.9800 |
|---|---|
| **Partner** | **F**: 213.725.9808 |
| **Office**: Downtown Los Angeles | nhelpern@egcfirm.com |

**Noah Helpern** is a Partner in Ellis George Cipollone O'Brien Annaguey LLP's Downtown Los Angeles office. His practice focuses on complex commercial litigation, with an emphasis on IP/entertainment disputes, class actions, and structured finance litigation. He also has extensive experience in alternative dispute resolution and served as a teaching assistant for the Harvard Negotiation Institute (formerly Program of Instruction for Lawyers) at Harvard Law School's Program on Negotiation. From 2013 through 2017, Noah was selected to the Southern California Super Lawyers "Rising Stars" list.

## Practice Areas

- Complex Commercial Litigation
- Class Actions
- IP/Entertainment

**Education**
- Harvard Law School, J.D., 2007
- Pomona College, B.A., Public Policy Analysis/Politics, *magna cum laude*, 2003

**Bar Admissions**
- California

1

# ELLIS GEORGE CIPOLLONE

### Ellis George Cipollone O'Brien Annaguey llp



| | |
|---|---|
| **Ryan Q. Keech** | **T**: 310.274.7100 |
| **Partner** | **F**: 310.275.5697 |
| **Office**: Century City | rkeech@egcfirm.com |

**Education**
- New York University School of Law, J.D.
- Osgoode Hall Law School, LL.B.
- Queen's University at Kingston, B.A. (Hons.), *with distinction*

**Bar Admissions**
- California
- District of Columbia
- Ontario, Canada

**Court Admissions**
- U.S. District Court for the Central District of California
- U.S. District Court for the Northern District of California
- U.S. District Court for the Southern District of California
- U.S. Court of Appeals for the Ninth Circuit

**Ryan Q. Keech** is a Partner in the Los Angeles office of Ellis George Cipollone O'Brien Annaguey LLP, where he advises and represents companies and individuals in high-stakes entertainment and business disputes. Mr. Keech has represented U.S. and foreign clients in trial and appellate litigation and arbitration in a wide variety of industries, including feature and television production, general media and entertainment, toys and other consumer products, cosmetics, financial services, insurance, social media and mobile technology. He has particularly significant experience handling disputes involving copyright, trademark, trade dress, trade secrets, business torts, complex contract interpretation, unfair competition, false advertising and FTC claims, as well as with collective bargaining, labor relations and initial and residual compensation issues in the theatrical motion picture and television industry.

Prior to joining the firm, Mr. Keech most recently served for more than two years as in-house staff counsel for the Alliance of Motion Picture and Television Producers (AMPTP), where he represented the major studios, broadcast television networks and certain basic cable and pay television services in labor negotiations and related matters in the United States and Canada. Before serving as staff counsel to the AMPTP, Mr. Keech was an associate for five years litigating cases at both the trial and appellate level in the Los Angeles office of Quinn Emanuel Urquhart & Sullivan, LLP.

Mr. Keech received his J.D. from the New York University School of Law, where he served as a Notes Editor for the *New York University Journal of Legislation and Public Policy*. Mr. Keech also received an LL.B. from Osgoode Hall Law School, where he was an editor of the *Osgoode Hall Law Journal* and received top academic prizes in Criminal Law, Civil Procedure and Administrative Law. Mr. Keech earned his B.A. in Political Studies and Music, with distinction, from Queen's University at Kingston.

## Notable Representations

- Obtained preliminary injunction in the Central District of California halting all advertising and sales of competing product based on claims of trademark, trade dress and copyright infringement. Prevailed on subsequent appeal to Ninth Circuit Court of Appeals. Am. Rena Int'l Corp., et al v. Sis-Joyce Int'l Co., Ltd., et al, 2012 WL 12538385 (C.D. Cal. Oct. 15, 2012), aff'd, 534 Fed. Appx. 633 (9th Cir. Jul. 24, 2013).

- Obtained case-ending terminating sanctions prior to trial, including a seven-figure judgment with a full award of damages, over $1 million in attorneys' fees and a permanent injunction, in a trademark, trade dress and RICO conspiracy case in the Central District of California.

1

# ELLIS GEORGE CIPOLLONE

## ELLIS GEORGE CIPOLLONE O'BRIEN ANNAGUEY LLP

- Obtained summary judgment completely defeating eight-figure contract and tort claims brought by former independent contractor in Los Angeles Superior Court.

- Part of trial team that obtained seven-figure judgment for client on trademark and trade dress counterclaims at ensuing bench trial.

- Part of trial team that obtained full defense verdict at jury trial in the Central District of California on behalf of producers, writer, director and associated production company for intellectual property claims related to the development and production of a major theatrical motion picture.

- Successfully defended animation studio against claims of copyright infringement related to a major theatrical motion picture.

- Successfully defended owner and operators of major social media application against claims of trademark infringement.

- Successfully represented high-profile non-profit motion picture industry organization in enforcing intellectual property and related restrictions on the sale of industry award statuettes by award recipients.

- Part of industry negotiating team that successfully represented the major motion picture and television studios, network production entities and independent production companies in numerous labor negotiations and related matters.

## Practice Areas

- Complex Business
- Entertainment
- Copyright/Trademark
- Insurance

## Recognitions

- Selected to the Southern California Rising Stars list, 2021–2022

# ELLIS GEORGE CIPOLLONE

### ELLIS GEORGE CIPOLLONE O'BRIEN ANNAGUEY LLP



| | |
|---|---|
| **Joseph N. Kiefer** | **T**: 212.413.2600 |
| **Senior Counsel** | **F**: 212.413.2629 |
| **Office**: New York | jkiefer@egcfirm.com |

**Joseph N. Kiefer** is Senior Counsel in the New York office of Ellis George Cipollone O'Brien Annaguey LLP. Joe's practice focuses primarily on plaintiff-side antitrust cases, and Joe has a strong history of achieving successful outcomes for businesses injured by collusive schemes. Joe has been a part of many of the most notable and successful antitrust cases from the last few years, including cases involving complex financial products, intricate and concealed agreements, and groundbreaking damages calculations. Joe's experience covers antitrust cases not only in the financial sector but also in the health care, commodities, and transportation sectors, among others. In addition to antitrust cases, Joe has significant experience in a wide variety of cases, ranging from high-stakes defamation cases, to licensing disputes between professional sports teams to real estate disputes concerning intricate contract provisions.

Prior to joining the firm, Joe was a senior associate at the New York office of Quinn, Emanuel, Urquhart & Sullivan, LLP. Before that, Joe clerked for two years for Judge Thomas W. Thrash of the Northern District of Georgia where he had responsibility for numerous jury and bench trials and resolved dispositive motions involving topics such as patents, trade secrets, antitrust, non-competes, and voting rights. While attending law school, Joseph served as an intern to the Honorable Casey M. Rodgers, U.S. District Judge at the U.S. District Court for the Northern District of Florida and completed an internship in the chamber of Judge Hugh P. Thompson at the Supreme Court for the State of Georgia.

## Clerkships

- U.S. District Court for the Northern District of Georgia for the Honorable Thomas W. Thrash, U.S. District Judge (current Chief Judge of the District)

**Education**
- Emory University School of Law, J.D.
  Member, Order of the Coif; Managing Editor, *Emory Law Journal*

**Bar Admissions**
- Georgia
- New York

**Court Admissions**
- U.S. District Court for the Southern District of New York

1

# ELLIS GEORGE CIPOLLONE
### ELLIS GEORGE CIPOLLONE O'BRIEN ANNAGUEY LLP



| **Milin Chun** | **T**: 213.725.9800 |
|---|---|
| **Senior Counsel** | **F**: 213.725.9808 |
| **Office**: Downtown Los Angeles | mchun@egcfirm.com |

**Milin Chun** is Senior Counsel at Ellis George Cipollone O'Brien Annaguey LLP. Her practice focuses on complex commercial litigation, including consumer class actions and general business disputes, as well as defamation claims.

Prior to joining the firm, Ms. Chun was a senior associate at Boucher LLP, where her practice focused on civil rights, class action prosecution, mass tort litigation, and terrorism-related cases. Ms. Chun also previously practiced at a litigation boutique in Baltimore, Maryland where she focused on federal white-collar criminal defense and appellate matters. She represented clients in criminal investigations, including the Hobbs Act, Contraband Cigarette Trafficking Act, False Claims Act, securities fraud, money laundering, wire fraud, and tax evasion.

Ms. Chun earned her B.A. in Political Science from the University of California, San Diego. She then obtained her Juris Doctor degree from the University of Maryland, Baltimore, where she served as the Managing Editor of the *University of Maryland Law Journal of Race, Religion, Gender, and Class*. Following law school, Ms. Chun clerked for the Honorable Gale E. Rasin in the Circuit Court for Baltimore City.

Ms. Chun previously served on the Editorial Advisory Board for the *Daily Record*, Maryland's business and legal newspaper.

Ms. Chun was selected to the Maryland Super Lawyers "Rising Stars" list from 2013 through 2015 and to the Southern California Super Lawyers "Rising Stars" list from 2016 through 2017.

## Education
- University of Maryland, J.D., 2007
- University of California, San Diego, B.A., 2003

## Bar Admissions
- California
- District of Columbia
- Maryland

## Court Admissions
- U.S. Court of Appeals for the Fourth Circuit
- U.S. Court of Appeals for the Ninth Circuit
- U.S. District Court for the Central District of California
- U.S. District Court for the Eastern District of California
- U.S. District Court for the Northern District of California
- U.S. District Court for the District of Maryland
- U.S. District Court for the District of Nebraska

## Representative Matters

- Successfully drafted appellate brief in *Agurs v. State of Maryland*, 415 Md. 62 (2010)

- Successfully drafted and argued *Aluya, et al. v. Management & Training Corp.*, appeal no. 15-16581 (December 22, 2016), in the United States Court of Appeals for the Ninth Circuit

- Represented plaintiff in *Garza v. County of Los Angeles, et al.* and obtained $5.9 million settlement

- Represented victims of terrorist attacks in Kenya and Tanzania against the Republic of Sudan and the Islamic Republic of Iran

- Represented the former CEO of a public company charged with securities/insider trading/tax fraud in a nine-month federal court jury trial

1

# ELLIS GEORGE CIPOLLONE

ELLIS GEORGE CIPOLLONE O'BRIEN ANNAGUEY LLP

**Practice Areas**

- Complex Business Litigation
- Complex Commercial Litigation
- Class Action
- Defamation

2

# ELLIS GEORGE CIPOLLONE
## ELLIS GEORGE CIPOLLONE O'BRIEN ANNAGUEY LLP



**Stefan Bogdanovich**
**Associate**
**Office**: Century City

**T**: 310.274.7100
**F**: 310.275.5697
sbogdanovich@egcfirm.com

**Stefan Bogdanovich** is an Associate in Ellis George Cipollone O'Brien Annaguey LLP's Century City office. Stefan's practice includes a range of commercial disputes, including unfair competition and the theft and misuse of intellectual property. His practice also includes constitutional litigation.

Stefan secured significant victories for clients throughout the beginning and end of disputes, from drafting successful demand letters to enforcing final judgments. For example, he obtained a preliminary (and later, permanent) injunction stopping an online false advertising campaign and requiring corrective disclosures by a client's competitor, over the competitor's First Amendment objections. In another case, he enforced an international interim arbitration award against a well-known musical recording artist's company. In his pro bono practice, Stefan negotiated and obtained a favorable settlement from a City, which vindicated his client's Fourth Amendment rights and helped his client get back on his feet.

Stefan earned his J.D. at the University of Southern California, where he was selected to be on the Hale Moot Court Honors Program, the Willem C. Vis International Commercial Arbitration Moot, and the Trial Team. He received the highest grade in his class in three subjects, including First Amendment Law.

**Education**
- University of Southern California, Gould School of Law, J.D.
- University of California, Irvine, B.A.

**Bar Admissions**
- California

**Court Admissions**
- U.S. District Court for the Central District of California
- U.S. District Court for the Northern District of California
- U.S. District Court for the Southern District of California

1

# EXHIBIT C

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
Dennis S. Ellis (State Bar No. 178196)
  dellis@egcfirm.com
Trent B. Copeland (State Bar No. 136890)
  tcopeland@egcfirm.com
Ryan Q. Keech (State Bar No. 280306)
  rkeech@egcfirm.com
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697

FRANK SIMS & STOLPER LLP
Jason Frank (State Bar No. 190957)
  jfrank@lawfss.com
Scott H. Sims (State Bar No. 234148)
  ssims@lawfss.com
Andrew D. Stolper (State Bar No. 205462)
  astolper@lawfss.com
19800 MacArthur Blvd., Suite 855
Irvine, California 92612
Telephone: (949) 210-2400
Facsimile: (949) 201-2405

(Additional Counsel on Signature Page)

Attorneys for Plaintiffs Aaron Braxton,
Gia Gray, Bryan Brown, Paul Martin, on
behalf of themselves and all others
similarly situated

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| AARON BRAXTON, GIA GRAY, BRYAN BROWN AND PAUL MARTIN, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> WELLS FARGO BANK, N.A., a Delaware corporation; WELLS FARGO HOME MORTGAGE, INC., a Delaware corporation; WELLS FARGO & CO., a Delaware corporation, | Case No. 4:22-cv-01748-JD <br><br> Honorable James Donato <br><br> **DECLARATION OF JASON M. FRANK IN SUPPORT OF PLAINTIFFS AARON BRAXTON, ET AL.'S MOTION FOR APPOINTMENT OF INTERIM COUNSEL FOR A PUTATIVE REFINANCING CLASS** |

2083884.1

Case No. 4:22-cv-01748-JD

## **DECLARATION OF JASON M. FRANK**

I, Jason M. Frank, declare as follows:

     1.     I am an attorney at law duly licensed to practice before this Court, all the courts of the State of California, and other courts. I am a partner at Frank Sims & Stolper LLP and represent the above-referenced Plaintiffs in this action against Wells Fargo Bank, N.A. I have personal knowledge of the facts set forth below, unless stated on information and belief, and if called as a witness, I would testify competently thereto.

### **QUALIFICATIONS AS INTERIM COUNSEL**

     2.     In May 2016, I, along with my partners Scott Sims and Andrew Stolper, formed the law firm, Frank Sims & Stolper LLP ("FSS"). FSS is a litigation firm that specializes in handling complex commercial litigation, consumer and employment class actions and white-collar criminal defense matters.

     3.     I was previously an equity partner at Paul Hasting Janofsky & Walker, LLP ("Paul Hastings"), a global law firm based in Los Angeles, California. At Paul Hastings, I was one of the leaders of the firm's global class action practice group. I received my J.D. degree from the University of Michigan in 1997 and my B.A. from the University of Michigan in 1994. I have been a member of the editorial board for Lexis/Nexis legal publications since 1999. I have also served as a member of the Board of Governors for the Association of Business Trial Lawyers ("ABTL"), Los Angeles Chapter. I have been repeatedly included in Los Angeles Magazine's annual list of "Super Lawyers" in Southern California.

     4.     My partner, Andrew D. Stolper, was formerly an Assistant United States Attorney ("AUSA") for the Central District of California and an associate at Irell & Manella LLP. He was formerly in charge of white-collar prosecutions in Orange County and a member of the Enron Taskforce. For his service, Mr. Stolper was awarded the Attorney General Award for Exceptional Service, the highest honor

DECLARATION OF JASON M. FRANK IN SUPPORT OF PLAINTIFFS AARON BRAXTON, ET AL.'S MOTION FOR APPOINTMENT OF INTERIM COUNSEL FOR A PUTATIVE REFINANCING CLASS

bestowed by the Department of Justice to its prosecutors. He graduated Order of the Coif from the University of Southern California Law School in 1999 and received his B.A. degree from The George Washington University in 1996.

5. My partner, Scott H. Sims, was formerly a non-equity partner at a litigation firm in Newport Beach, California and an associate at Paul Hastings. Mr. Sims obtained his J.D. degree from Harvard Law School in 2004, and his B.A., summa cum laude, from Southern Methodist University in 2001. Mr. Sims has been repeatedly named a Southern California Rising Star and Super Lawyer by Los Angeles Magazine.

6. In my practice, I specialize in representing both plaintiffs and defendants in complex litigation and consumer class actions. In my class action defense practice, I represent fortune 500 companies, such as AT&T, and major private corporations, such as L.A. Fitness. In my plaintiff practice, I have obtained verdicts and settlements totaling over a $750 million in the last ten years.

7. A representative sample of our firm's recent class action matters include the following:

a. **The Wells Fargo GAP Class Action.** Our firm served as the lead counsel representing consumers in a nationwide class action concerning Wells Fargo's failure to issue GAP refunds after the early payoff of a finance agreement (the "Wells Fargo matter"). *See Herrera v. Wells Fargo*, CDCA Case No. 8:18-cv-00332. In November 2021, the United States District Court for the Central District of California approved a nationwide class action settlement which provided for approximately $500 million in benefits to the class and Wells Fargo's customers, including a $45 million settlement fund, a separate payment of over $33.3 million to the Statutory Subclass, and over $417 million in future refunds over a minimum four-year period. Wells Fargo was represented in *Herrera* by David Powell and Alicia Baiardo, the same McGuire Woods LLP lawyers representing Wells Fargo here. We

enjoy a productive and respectful working relationship with Mr. Powell and Ms. Baiardo.

b. **The Mercedes-Benz SUV Class Action**. Our firm served as the lead counsel representing a nationwide class of consumers against Mercedes-Benz for failing to disclose a design defect in its seat heaters (in certain SUV models) that could cause the seat heaters to overheat, smoke and burn a hole through the seat while the driver was operating the vehicle. *See* 8:14-cv-02011. The United States District Court for the Central District of California approved a nationwide class action settlement in that matter with a total value of over $85 million.

c. **The Hewlett-Packard Late Commission Class Action.** Our firm served as the lead lawyers representing a class of California employees against Hewlett-Packard ("HP") for failing to pay sales commissions on a timely basis in accordance with California law, including alleged violations of California Labor Code §§ 201, 202 and 203. *See Wall v. Hewlett-Packard*, Orange County Superior Court Case No. 30-2012-00537897. The California Superior Court, County of Orange granted class certification over the opposition of HP. After nearly a decade of litigation, the case settled a few weeks before trial. The settlement included a $25 million settlement fund, $75 million in technological investments to ensure the timely processing of sales commissions and a multi-million-dollar PAGA penalty to the State of California.

d. **The Supplemental Income Trust Fund ERISA Class Action.** Our firm served as the lead counsel in a nationwide ERISA class action involving one of the largest multi-employer 401(k) plans in the United States. *See Ybarra v. Board of Trustees of Supplemental Income Trust Fund*, CDCA Case No. 8:17-cv-2091. This was the first "excessive fee" case brought against a multi-employer 401(k) plan in the nation. The United States District Court for the Central District of California is Court approved a nationwide class action settlement in that matter for the full policy limits

of $8.75 million, along with corrective measures to prevent excessive fees in the future.

e. **The Quorn Foods False Advertising Class Action.** Our firm served as the lead counsel representing a nationwide class of consumers against Quorn Foods, Inc., a manufacturer of vegetarian and vegan food products. *See Birbower v. Quorn Foods*, CDCA Case No. 2:16-cv-01346. The case involved claims that Quorn misleadingly advertised the main ingredient in its products (mycoprotein) as being "like a mushroom, truffle or morel" when the ingredient was actually fermented mold. The case was filed after a child with severe mold allergies died after consuming the product. The case settled with Quorn agreeing to provide 4 years-worth of full refunds to consumers and to prominently disclose on its packaging that Quorn products contain mold. The Settlement was approved by the United States District Court for the Central District of California

f. **The Arthur J. Gallagher & Co. Misclassification Class Action.** Our firm served as the lead counsel in a California class action against Gallagher for misclassifying its Client Service Managers as exempt from federal and state overtime laws. *See* CDCA Case No. 2:18-cv-06227. The case settled for $8 million, along with a PAGA penalty to the State of California. The Settlement was approved by the United States District Court for the Central District of California

g. **The Toyota GAP Class Action:** Our firm serves as the lead class counsel representing consumers in a nationwide class action concerning Toyota Motor Credit Corporation's failure to issue GAP refunds after the early payoff of a finance agreement. *See Martin v. Toyota Motor Credit Corp.*, CDCA Case No. 2:20-cv-10518. In July 2022, the United States District Court for the Central District of California Court granted preliminary approval of a nationwide class action settlement that, if final approval is granted, will be worth well in excess of $300 million. The final approval hearing is set for October 2022.

h.      **The Anthony Pellicano Wiretapping Litigation.**   Our firm served as the lead counsel representing AT&T in a putative class action and 18 individual lawsuits in state and federal court concerning the wiretapping scheme perpetrated by convicted private investigator Anthony Pellicano.  *See In re: Pellicano Cases*, Los Angeles Superior Court Case No. 316 318 (Lead Case).  On behalf of AT&T, we defeated 12 of the individual lawsuits via dispositive motions and secured favorable settlements in the proposed class action and remaining individual lawsuits.

8.      FSS, along with our co-counsel at Ellis George Cipollone O'Brien Annaguey LLP ("EGC") are committed to vigorously prosecuting the claims in this action on behalf of the Putative Refinancing Class.[1]  We have successfully litigated prior cases together and have the financial resources and personnel necessary to prosecute this case on behalf of the Putative Refinancing Class.

9.      I am not aware of any conflicts of interests between FSS and EGC, on the one hand, and the Putative Refinancing Class, on the other.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Irvine, California on July 28, 2022.

/s/ Jason M. Frank
Jason M. Frank

---

[1] As defined in Plaintiffs' Motion.

2083884.1

DECLARATION OF JASON M. FRANK IN SUPPORT OF PLAINTIFFS AARON BRAXTON, ET AL.'S
MOTION FOR APPOINTMENT OF INTERIM COUNSEL FOR A PUTATIVE REFINANCING CLASS

# EXHIBIT D

# <u>TABLE OF CONTENTS</u>

**Page(s)**

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................1

I. PRELIMINARY STATEMENT.................................................................................1

II. BACKGROUND.........................................................................................................3

    A. Procedural History.........................................................................................3

        1. The *Braxton* Case Filing ..................................................................3

        2. The Other Actions.............................................................................4

        3. The Denied Motion to Dismiss .........................................................5

    B. Factual Development by the *Braxton* Plaintiffs ...........................................6

III. LEGAL STANDARD ON A MOTION TO CONSOLIDATE ...........................................8

IV. ARGUMENT ..............................................................................................................9

    A. Consolidation Would Be Unfair and Prejudicial to the *Braxton* Class ......................9

    B. Wells Fargo Has Not Shown There Are Efficiencies Outweighing The Prejudice to the *Braxton* Class from Consolidation. ..................................10

    C. Common Issues Across the Six Cases Do Not Merit Consolidation. .....................11

    D. If The Court Consolidates The Cases, It Should Limit Consolidation to Discovery and Permit The *Braxton* Firms To Move For Class Certification On Behalf Of A Black Refinancing-Only Class. ..................................13

V. CONCLUSION .........................................................................................................13

PLAINTIFFS AARON BRAXTON, ET AL.'S OPPOSITION TO WELLS FARGO BANK, N.A. AND WELLS
FARGO & COMPANY'S MOTION TO CONSOLIDATE

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Anderson Living Tr. v. WPX Energy Prod., LLC,*
297 F.R.D. 622 (D.N.M. 2014) ....................................................................2, 10, 11

*Campbell v. PricewaterhouseCoopers,*
No. CIV S-06-2376LKK/GGH, 2008 WL 3836972 (E.D. Cal. Aug. 14, 2008)............1, 2, 8, 11

*Cook v. AT&T Mobility, LLC,*
No. CV10-8870 R (OPx)) U.S.Dist.LEXIS 168372 (C.D.Cal. Jan. 7, 2011) ......................8, 10

*Dodaro v. Standard Pac. Corp.,*
No. EDCV 09-1666-VAP, 2009 WL 10673229 (C.D. Cal. Nov. 16, 2009)............................2, 8

*Dusky v. Bellasaire Invs.,*
No. SACV07-874 DOC, 2007 WL 4403985 (C.D. Cal. Dec. 4, 2007) ................................8, 12

*El Bannan v. Yonts,*
No. 5:06–cv–173–R, 2007 WL 1199432 (W.D. Ky. April 20, 2007).........................................1

*Humphreys & Partners, Architects, L.P. v. George F. Tibsherany, Inc.,*
No. CV-03-0169-PHX-SMM, 2006 WL 8440623 (D. Ariz. Feb. 22, 2006) ............................8

*Jackson v. City & Cnty. of San Francisco,*
No. C 09-2143 RS, 2010 WL 11582918 (N.D. Cal. Dec. 16, 2010) ...................................9, 12

*Johnson v. Celotex Corp.,*
899 F.2d 1281 (2d Cir.1990)..........................................................................................2, 8

*Lopez v. Liberty Mut. Ins. Co.,*
No. CV1405576BROJCX, 2014 WL 12853283 (C.D. Cal. Oct. 24, 2014) ......................12, 13

*Morgan v. Napolitano,*
No. CIV. S-09-2649 LKK, 2012 WL 4755034 (E.D. Cal. Oct. 4, 2012) ................................8

*P.S., et al. v. City of San Fernando, et al. Jonathan Valdivia,*
No. CV 21-4918 PA, 2022 WL 3016257 (C.D. Cal. Apr. 11, 2022)........................................9

*Southwest Marine, Inc. v. Triple A Machine Shop, Inc.,*
720 F. Supp. 805 (N.D. Cal. 1989) .................................................................................2

*Wright v. United States,*
1993 WL 313040 (N.D. Cal. 1993)...............................................................................2, 12

## RULES

Fed. R. Civ. P. 26 ...............................................................................................................10

PLAINTIFFS AARON BRAXTON, ET AL.'S OPPOSITION TO WELLS FARGO BANK, N.A. AND WELLS
FARGO & COMPANY'S MOTION TO CONSOLIDATE

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    PRELIMINARY STATEMENT

A motion for consolidation should only be granted when it will promote judicial economy without impeding justice and the interests of the parties. *Campbell v. PricewaterhouseCoopers*, No. CIV S-06-2376LKK/GGH, 2008 WL 3836972, at \*2 (E.D. Cal. Aug. 14, 2008) ("considerations of convenience and economy must yield to a paramount concern for a fair and impartial trial"). It is the district court's responsibility to ensure that the parties are not prejudiced by consolidation. *El Bannan v. Yonts,* No. 5:06-cv-173-R, 2007 WL 1199432, at \*1 (W.D. Ky. April 20, 2007). Through its motion to consolidate, Wells Fargo seeks to revisit (and reverse) the Court's prior determination that the *Braxton* case—which is specifically about discrimination against Black homeowners in the mortgage refinancing process—should not be subsumed by the *Williams* case. As this will unquestionably prejudice the representative plaintiffs and putative class in the *Braxton* case by distracting the Court from the precise issues facing their refinancing claims, this motion to consolidate should be denied.

Indeed, the instant motion, like the (denied) motion to dismiss, seeks to strategically dilute *Braxton*'s narrow refinancing claims into broader residential credit claims that, as the *Braxton* plaintiffs have already demonstrated, would potentially obscure Wells Fargo's established and extensive discrimination against Black homeowners with respect to refinancing. Unlike *Williams* and other cases pending before this Court, *Braxton* is specifically and *solely* about discrimination against Black homeowners in the mortgage refinancing process. Combining the *Braxton* plaintiffs with other groups of plaintiffs could hurt the *Braxton* plaintiffs' ability to certify their class, which benefits Well Fargo. Wells Fargo would prefer to defend against a large and varied class that involves all minorities and all aspects of lending in part because such a class could have issues demonstrating commonality and typicality, among other factors. But the *Braxton* plaintiffs filed on behalf of only Black homeowners discriminated against in the refinancing in part because of the ease of certifying their class, and they would be prejudiced if they are denied that opportunity.

Wells Fargo contends that "[w]hile the *Braxton* . . . plaintiffs may argue that their focus on refinancing renders the necessary discovery in their cases unique, that is simply not true [because]

PLAINTIFFS AARON BRAXTON, ET AL.'S OPPOSITION TO WELLS FARGO BANK, N.A. AND WELLS FARGO & COMPANY'S MOTION TO CONSOLIDATE

1   *Williams* and *Ebo* do include refinancing." Defendants Motion to Consolidate, Case No. 3:22-cv-

2   00990-JD, Dkt. 63 ("Mot."), at 9. In other words, Wells Fargo's position is that the *Braxton* case

3   is essentially unnecessary because there is another case—with different plaintiffs, different

4   lawyers, and different facts—that touches on refinancing. Wells Fargo, however, is mistaken;

5   similarity in the legal issues is not the determinative factor in a motion to consolidate. *See* Mot. 5

6   ("a single, common issue of law or fact is all the rule requires"); *see, e.g., Wright v. United States*,

7   1993 WL 313040, at *1 (N.D. Cal. 1993) (denying a motion for consolidation despite common

8   legal issues); *Dodaro v. Standard Pac. Corp.*, No. EDCV 09-1666-VAP (OPx), 2009 WL

9   10673229, at *3 (C.D. Cal. Nov. 16, 2009) ("The existence of common issues, while a prerequisite

10  to consolidation, does not compel consolidation.").

11          Despite any common issues, consolidation is inappropriate when, as here, concerns of

12  "delay, confusion, and prejudice" outweigh "the interest of judicial convenience." *Southwest*

13  *Marine, Inc. v. Triple A Machine Shop, Inc.,* 720 F. Supp. 805, 807 (N.D. Cal. 1989). Overall,

14  "considerations of convenience and economy must yield to a paramount concern for a fair and

15  impartial trial." *Campbell*, 2008 WL 3836972, at *3 (citing *Johnson v. Celotex Corp.,* 899 F.2d

16  1281, 1484 (2d Cir.1990)). Therefore, whatever (disputed) convenience and efficiencies Wells

17  Fargo claims do not "override the Plaintiffs' autonomy in mastering their own complaints."

18  *Anderson Living Tr. v. WPX Energy Prod., LLC*, 297 F.R.D. 622, 631 (D.N.M. 2014). This is

19  especially true here, where the efficiencies Wells Fargo purports to urge can be achieved without

20  formal consolidation. *Campbell*, 2008 WL 3836972, at *2-3 ("many of the efficiency gains

21  sought to be achieved by consolidation can also be achieved without consolidation."). Wells

22  Fargo's complaints about litigating individually the separate cases facing it due to its vast

23  discriminatory lending practices ring hollow.

24          Wells Fargo is in any event wrong that the cases share a common question of fact. That

25  supposed common question—whether "Wells Fargo intentionally and purposefully discriminated

26  against plaintiffs because of race in violation of state and federal law when they applied for home

27  mortgage loans and loan modifications," Mot. 6—is not a "common question" at all. This Court

28  has already ruled that the refinancing cases (like *Braxton*) and the broader lending cases (like

PLAINTIFFS AARON BRAXTON, ET AL.'S OPPOSITION TO WELLS FARGO BANK, N.A. AND WELLS
FARGO & COMPANY'S MOTION TO CONSOLIDATE

1     *Williams*) are not sufficiently similar to warrant subsuming the narrower refinancing cases into

2     broader mortgage lending cases. Ignoring this prior determination, Wells Fargo contends that the

3     refinancing plaintiffs do not need to prosecute their own case because "the application process for

4     refinancing applicants is not any different." Mot. 9. This is not only an untested statement of fact,

5     but is contrary to the *Braxton* plaintiffs' investigation of Wells Fargo's practices, which suggests

6     that Wells Fargo's consideration of refinancing applications is materially different from its

7     consideration of other residential lending applications.

8        In reality, the issues are *not* common across all of the cases Wells Fargo seeks to

9     consolidate. Even outside of the origination/refinancing distinction (which itself is significant),

10    the class definitions are not aligned. Several of the classes in the matters Wells Fargo seeks to

11    consolidate include all racial minorities, while several include only Black Americans. Wells

12    Fargo fails to contend with this important distinction and simply states that the allegations on

13    behalf of non-Black racial minorities are too thin to establish well-pleaded claims and that

14    therefore those portions of the class definitions disappear. *See* Mot. 11 ("those complaints make

15    no substantive allegations regarding any "non-Black applicants"). Wells Fargo cannot

16    manufacture commonality by making conclusory and self-serving assertions, in this case claiming

17    that the class claims explicitly made on behalf of all racial minorities are *not really* on behalf of all

18    racial minorities.

19        The Court should deny Wells Fargo's motion to consolidate cases, grant the *Braxton*

20    class's parallel motion for appointment of lead counsel, and allow the refinance-only Black

21    homeowner class to proceed. *See* Dkt. 45.[1]

22    **II.**      <u>**BACKGROUND**</u>

23        **A.**     <u>**Procedural History**</u>

24           **1.**     <u>**The *Braxton* Case Filing**</u>

25        On March 18, 2022, Plaintiff Aaron Braxton and the *Braxton* firms (Ellis George

26    Cipollone O'Brien Annaguey LLP and Frank, Sims, & Stolper LLP) filed the first putative class

27

---

28    [1] Unless otherwise indicated, docket references herein refer to docket entries in *Braxton v. Wells Fargo*, Case No. 4:22-cv-01748.

2094169                -3-                Case No. 3:22-cv-01748-JD

PLAINTIFFS AARON BRAXTON, ET AL.'S OPPOSITION TO WELLS FARGO BANK, N.A. AND WELLS FARGO & COMPANY'S MOTION TO CONSOLIDATE

action against Wells Fargo on behalf of Black homeowners who had submitted refinance applications to Wells Fargo and were harmed by Wells Fargo's race-based discrimination. Dkt. 1. Subsequently, the *Braxton* plaintiffs filed a First Amended Complaint providing a detailed account of Wells Fargo's refinancing application process, its increased reliance on algorithms, and its CORE automated underwriting system. Dkt. 14 ¶¶ 70-78. The *Braxton* allegations demonstrate that Wells Fargo's automated underwriting system was infected with explicit and implicit racial signals (so-called "overlays") that had, as their proximate and likely result, the disparate impact reflected in the statistical analyses discussed in the FAC. *Id.* at ¶¶ 79-91. The *Braxton* allegations also include facts learned from interviews with confidential informants describing Wells Fargo's failure to control for discriminatory practices. *Id.* at ¶¶ 82, 91, 101, 103-05.

## 2. The Other Actions

Wells Fargo seeks to combine the *Braxton* action with five additional putative class actions pending in this District: (1) *Williams v. Wells Fargo Bank, N.A.*, case no. 3:22-cv-0090-JD; (2) *Pope v. Wells Fargo Bank, N.A.*, case no. 3:22-cv-01793-JD; (3) *Thomas v. Wells Fargo Bank, N.A.*, case no. 3:22-cv-01931-CRB; (4) *Ebo v. Wells Fargo Bank, N.A.*, case no. 3:22-cv-02535-JD; and (5) *Perkins, et al. v. Wells Fargo, N.A.*, case no. 3:22-cv-03455-CRB.[2] The Court has already related all six of these pending actions.

The *Williams* case was originally filed on February 17, 2022, on behalf of a broad class of African Americans who applied for residential real estate loans. The initial *Williams* complaint made no allegations about refinancing. After the *Braxton* case was filed, the *Williams* plaintiffs amended their complaint to include allegations about refinancing but, unlike *Braxton*, the *Williams* plaintiffs continued to seek to represent a class of all African Americans discriminated against with respect to *all* residential real estate loan applications.

As to the four other pending actions, the *Pope* and *Thomas* actions were filed subsequent to the *Braxton* action and largely repeated the *Braxton* allegations. The proposed classes in *Pope*

---

[2] Wells Fargo states in its motion that it has not been served in the *Pope* or *Thomas* actions and Wells Fargo will move to consolidate those actions with *Braxton* at the appropriate time. Mot. 1, n.2. The *Braxton* plaintiffs, for the reasons set forth in this opposition, also oppose incorporating those cases into the *Braxton* case.

1    and *Thomas*, while limited to discrimination in refinancing, differ from the *Braxton* class. *Pope*

2    and *Thomas* seek to represent a class of "all first and second lien Wells Fargo *minority* [not limited

3    to Black] mortgage refinance applicants … whose refinancing applications were discriminatorily

4    denied." Case No. 4:22-cv-01793, ¶ 34; Case No. 3:22-cv-01931, ¶ 35 (emphasis added).

5        The *Ebo* and *Perkins* plaintiffs, like the *Williams* plaintiffs, seek to represent classes of

6    applicants discriminated against with respect to mortgage loans as well as refinancing.

7    *Ebo* proposes a class of "[a]ll Black Americans [] who submitted applications to obtain or

8    refinance a mortgage loan with respect to residential real property" and suffered from

9    discrimination. Case No. 3:22-cv-02535, ¶ 50. *Perkins* proposes a class of all minority applicants

10   who suffered discrimination in financing or refinancing: "[a]ll Black persons, as well as other

11   racial minorities [who] submitted, or attempted to submit, an application to finance or refinance

12   their home mortgage." Case No. 3:22-cv-03455, ¶ 56.

13       On July 28, 2022, the *Braxton* plaintiffs filed a motion for appointment of interim counsel

14   for a putative refinancing class. Dkt. 45. As stated in that motion, *Braxton* was the first filed case

15   on behalf of a putative class of Black homeowners discriminated against in the refinancing

16   process, and the *Braxton* firms have already performed an extensive investigation relating to that

17   specific class, have the experience and resources necessary to prosecute the case on behalf of

18   Black homeowners, and will be prejudiced if lumped into a broader class of origination plaintiffs

19   and/or non-Black applicants. Dkt. 45 at 1. The *Braxton* firms do not seek to be appointed counsel

20   for prospective borrowers harmed outside the refinancing process and do not seek to be appointed

21   counsel for non-Black homeowners. *Id.*

22       **3.    The Denied Motion to Dismiss**

23       On June 13, 2022, Wells Fargo moved to dismiss the *Braxton* complaint under the first-

24   filed rule because, according to Wells Fargo, the narrow *Braxton* refinancing class was subsumed

25   by the broader *Williams* class. Dkt. 39. The *Braxton* plaintiffs opposed, and on July 19, 2022, the

26   Court denied Wells Fargo's motion to dismiss, explaining that

27             [t]he *Williams* action involves a proposed class of African American
          applicants who applied for, received, or maintained credit from Wells

28             Fargo related to residential real estate, while the *Braxton* action

2094169          -5-          Case No. 3:22-cv-01748-JD

PLAINTIFFS AARON BRAXTON, ET AL.'S OPPOSITION TO WELLS FARGO BANK, N.A. AND WELLS
FARGO & COMPANY'S MOTION TO CONSOLIDATE

involves a proposed class of African American homeowners who submitted applications to refinance their home mortgages. **The cases are sufficiently similar for purposes of relation under the District's local rules, but not so similar that *Braxton* is subsumed in *Williams*.**

Dkt. 44 (emphasis added).

### B. <u>Factual Development by the *Braxton* Plaintiffs</u>

The *Braxton* plaintiffs intentionally brought their case *only* on behalf of Black homeowners who sought to refinance existing loans through Wells Fargo. The *Braxton* plaintiffs' continuing development of their case has only cemented their position that their class was uniquely affected by Wells Fargo's discriminatory practices. The facts reflected in the *Braxton* First Amended Complaint demonstrate that the *Braxton* plaintiffs are already pursuing their claims on a faster timeline than remaining cases Wells Fargo seeks to combine with *Braxton*.

The *Braxton* plaintiffs, in their First Amended Complaint, explain Wells Fargo's COVID 19-era refinancing application process in detail, beginning with Wells Fargo's steps gathering geographic, financial, and demographic data into Wells Fargo's Form 1003 through a platform developed by Blend Labs, including details about specific in-person efforts to gather information on applicants that could identify them as Black homeowners. Dkt. 14, ¶¶ 70-77. Next, the *Braxton* plaintiffs explain, the information that has been gathered, including the data reflecting racial judgments, is inputted into Wells Fargo's "CORE" automated underwriting system. *Id.* ¶ 78. According to the confidential informants the *Braxton* plaintiffs spoke to, CORE then classifies applicants into four categories, two of which automatically approved the loan, one of which referred the application to manual underwriting, and one of which automatically denied the application. *Id.* Black refinancing applicants were consistently relegated to the latter categories. *Id.* Further, again according to confidential informants, Wells Fargo severely understaffed the underwriting departments designed to flag potentially discriminatory outcomes, even going so far as to announce internally a decision to increasingly rely on the automated underwriting system. *Id.* ¶ 82.

Underlying that automated underwriting system, the *Braxton* plaintiffs' investigation shows, were "overlays" that served to single-out refinancing applications from Black

1   homeowners. *Id.* ¶¶ 83-91. These overlays included geographic indicators, used to identify

2   borrowers with property in Black-majority neighborhoods and classify them as lending risks, *id.*

3   ¶ 84; post-closing liquidity requirements, which Wells Fargo dramatically increased during the

4   pandemic knowing that Black Americans typically hold less than one-third the liquid assets as

5   White Americans, *id.* ¶¶ 85-86; racially biased appraisals, which Wells Fargo plugged into its

6   automated underwriting system without making any adjustment for the well-known disparity

7   between the appraisal values of Black-owned properties as compared to equivalent White-owned

8   properties, *id.* ¶¶ 89-90; and increased FICO requirements which, according to a confidential

9   informant, Wells Fargo moved its minimum requirement from 600 to 620, removing four times as

10   many Black applicants as White applicants from consideration. *Id.* ¶ 91. The *Braxton* First

11   Amended Complaint also detailed the pernicious demographic indicators overlayed into the Wells

12   Fargo algorithm. The overlays use Bayesian Improved Surname Geocoding and other advanced

13   statistical measures to estimate the likelihood that an individual is a Black American given their

14   surname and location. The First Amended Complaint relays information from responsible

15   employees at Wells Fargo, even listing the specific equations involved. *Id.* ¶¶ 87-88.

16        Finally, the *Braxton* First Amended Complaint explains how these practices at Wells Fargo

17   led to discriminatory results against Black homeowners in the refinancing process, noting that the

18   underwriters with supposed oversight of the process were systematically disincentivized to check

19   the results of the automatic system, despite Wells Fargo's knowledge of discriminatory outcomes.

20   *Id.* ¶¶ 100-05. Then the complaint reveals the extent of the impact on Black homeowners as seen

21   through public statistics. *Id.* ¶¶ 106-19.

22        The *Williams*, *Pope*, *Thomas*, *Ebo* and *Perkins* complaints do not contain the same detailed

23   factual allegations or support. *Williams* only mentions "redlining" and does not describe the

24   refinancing application process, does not address the automated underwriting system, does not

25   mention let alone explain any overlays, and does not address underwriting staffing. *Pope* and

26   *Thomas* also only contain references to "redlining" and provide no explanation of Wells Fargo's

27   underlying practices. *Ebo* does not address or elaborate on Wells Fargo's automated underwriting

28   system or its discriminatory overlays. *Perkins* states that Wells Fargo's machine learning

PLAINTIFFS AARON BRAXTON, ET AL.'S OPPOSITION TO WELLS FARGO BANK, N.A. AND WELLS
FARGO & COMPANY'S MOTION TO CONSOLIDATE

1   processes are responsible for Wells Fargo's discriminatory outcomes (repeating many of the

2   allegations made in the original *Braxton* complaint), but it does not detail the information

3   incorporated into the algorithm aside from an applicant's geographic location. There are no

4   allegations in *Williams*, *Pope*, *Thomas*, *Ebo*, or *Perkins* reflecting information gleaned from

5   confidential informants.

6   **III.    LEGAL STANDARD ON A MOTION TO CONSOLIDATE**

7            Courts have ample discretion to decline to consolidate cases before them, even cases that

8   have some common issues of fact and law. *Campbell*, 2008 WL 3836972, at *2 (E.D. Cal. Aug.

9   14, 2008). A party moving for consolidation has the burden of "establishing that the judicial

10  economy and convenience benefits of consolidation outweigh any prejudice that would result from

11  consolidation." *Cook v. AT&T Mobility, LLC*, No. CV10-8870 R (OPx), 2011 WL 13217794, at

12  *1 (C.D. Cal. Jan. 7, 2011). When assessing a consolidation motion, "considerations of

13  convenience and economy must yield to a paramount concern for a fair and impartial trial."

14  *Campbell*, 2008 WL 3836972, at *3 (citing *Johnson,* 899 F.2d at 1484). Thus,

15              [t]he critical question [is] whether the specific risks of prejudice and
                possible confusion [are] overborne by the risk of inconsistent
16              adjudications of common factual and legal issues, the burden on
                parties, witnesses and available judicial resources posed by multiple
17              lawsuits, the length of time required to conclude multiple suits as
                against a single one, and the relative expense to all concerned of the
18              single-trial, multiple-trial alternatives.

19

20  *Morgan v. Napolitano*, No. CIV. S-09-2649 LKK, 2012 WL 4755034, at *2 (E.D. Cal. Oct. 4,

21  2012).

22           Given the concerns of avoiding prejudice and ensuring fairness, "the existence

23  of common issues, while a prerequisite to consolidation, does not compel consolidation." *Dodaro*,

24  2009 WL 10673229, at *3 (citing *Dusky v. Bellasaire Invs.*, No. SACV07-874 DOC (ANx), 2007

25  WL 4403985, at *1 (C.D. Cal. Dec. 4, 2007)); *Humphreys & Partners, Architects, L.P. v. George*

26  *F. Tibsherany, Inc.*, No. CV-03-0169-PHX-SMM, 2006 WL 8440623, at *1 (D. Ariz. Feb. 22,

27  2006) ("While common questions of law or fact may exist, the Court finds no overriding

28  commonality of either that compels consolidation."). Consolidation may be inappropriate "[e]ven

2094169                                           -8-                         Case No. 3:22-cv-01748-JD

1 where claims are **identical** [because] distinct underlying facts may give rise to different defenses

2 and legal issues" *P.S., et al. v. City of San Fernando, et al. Jonathan Valdivia*, No. CV 21-4918

3 PA (PVCx), 2022 WL 3016257, at *2 (C.D. Cal. Apr. 11, 2022) (emphasis added).

**IV.** **ARGUMENT**

    **A.**   **Consolidation Would Be Unfair and Prejudicial to the *Braxton* Class.**

6       Consolidation would be unfair and prejudicial to the *Braxton* class because it would

7 significantly dilute the *Braxton* plaintiffs' allegations and materially hamper their claims,

8 including their ability to obtain class certification. *See Jackson v. City & Cnty. of San Francisco*,

9 No. C 09-2143 RS, 2010 WL 11582918, at *1 (N.D. Cal. Dec. 16, 2010) (noting that it would be

10 "unfair" to force a narrower class into a broader class via consolidation).

11       The decision of this District by Judge Seeborg in *Jackson* is instructive. In that case, the

12 defendant moved to consolidate *Jackson* with a much broader case, *Pizo*, that subsumed *Jackson*,

13 where the factual and legal overlap was undeniable (and much greater than any overlap here). *Id*.

14 But the court nevertheless ruled that the defendant "has not made a persuasive showing that any

15 benefits of consolidation outweigh the burdens" when *Jackson* "likely will be significantly

16 narrower than *Pizo*." *Id.* The court further explained that "[i]t would therefore be unfair to

17 plaintiffs in this action to force them to be involved in an action of a much broader scope than the

18 one they chose to initiate." *Id.* Here, Wells Fargo's motion seeks to do exactly that: force the

19 *Braxton* plaintiffs into a much broader action than the one they chose to initiate. The *Braxton*

20 plaintiffs' decision to allege a narrower class and limit the *Braxton* case to refinancing was not

21 accidental; the *Braxton* plaintiffs and their counsel view this as their greatest chance of success on

22 the merits and perhaps their only opportunity to hold Wells Fargo accountable for its racial

23 discrimination. Accordingly, as in *Jackson*, consolidation would be unfair and would potentially

24 deprive the *Braxton* plaintiffs of any chance to right the wrongs against them, and should be

25 denied.

26       Lumping the *Braxton* class into a far broader and varied class will also undermine the

27 *Braxton* plaintiffs' ability to certify their class. This is clearly a part of Wells Fargo's strategy:

28 force plaintiffs to pursue as broad of a putative class as possible, and then argue against class

1    certification on grounds that individual issues predominate given the breadth of the class and

2    differing factual circumstances within it.  The class Wells Fargo wants to defend against—

3    essentially a strawman of Wells Fargo's own design—includes all minorities and involves all

4    aspects of residential lending.  Such a large class will inevitably present more concerns with

5    respect to commonality, as well as with the adequacy and typicality of the associated class

6    representatives.  Indeed, one of the (many) reasons the *Braxton* plaintiffs filed on behalf of only

7    Black homeowners discriminated against in the refinancing process was the feasibility of

8    certification of that targeted class.

9          The *Braxton* class will also be prejudiced by the delays connected to a consolidated matter.

10   The factual development thus far in *Braxton*—incorporating detailed information from

11   confidential witnesses that is absent from any of the other pending cases—exceeds the factual

12   development in other cases Wells Fargo seeks to consolidate.  *See supra* Section II.B.  Further, the

13   *Braxton* plaintiffs have already served document requests on Wells Fargo concerning the

14   refinancing practices and associated underwriting department.  Wells Fargo's response to those

15   requests will be triggered after the parties' Rule 26 meet and confer, which Wells Fargo—

16   consistent with its goal of delaying the *Braxton* case—has refused to join.

17         Wells Fargo should not be allowed to prejudice the *Braxton* Class by diluting the strength

18   of its claims, by inserting it into a broader class that will be harder to certify, or by delaying its

19   already considerable progress.

20   **B.     Wells Fargo Has Not Shown There Are Efficiencies Outweighing The**
         **Prejudice to the *Braxton* Class from Consolidation.**

21

22         The burden is on Wells Fargo to demonstrate that consolidation will make the prosecution

23   of all six cases so much more efficient that it will outweigh the prejudice to the plaintiffs of losing

24   control over the case they filed.  *Cook*, 2011 WL 13217794, at *1.  Wells Fargo falls far short of

25   meeting this burden by only offering platitudes about the possibility of easier combined discovery.

26   When, as here, the "Defendants have not met their burden to show that consolidation would

27   produce substantial tangible efficiencies warranting the court to ***override the Plaintiffs' autonomy***

28   ***in mastering their own complaints***," consolidation should be rejected.  *Anderson Living Tr. v.*

*WPX Energy Prod., LLC*, 297 F.R.D. 622, 631 (D.N.M. 2014) (emphasis added) (explaining that the efficiencies the moving party claimed would result from consolidation did not outweigh the plaintiffs' right to pursue the case that they had initiated and denying consolidation).

Even assuming that there could be some efficiencies from combining aspects of these cases, they are already related and those efficiencies are available without prejudicial consolidation. This is because "[d]uplicative discovery can be avoided by permitting discovery in each related action to be used in all related actions." *Campbell*, 2008 WL 3836972, at *3; *Anderson Living*, 297 F.R.D. at 631. Likewise, parties in related cases can "coordinate hearing dates when appropriate, so that motions may be heard on the same day." *Id.* Thus, "many of the efficiency gains sought to be achieved by consolidation can also be achieved without consolidation." *Id.* The same is true here. Accordingly, Wells Fargo's assertion that failure to consolidate will create duplicative and overlapping discovery efforts is false and insufficient to meet the applicable burden.[3]

### C.    Common Issues Across the Six Cases Do Not Merit Consolidation.

The fact that Wells Fargo has been sued by multiple plaintiffs for various different kinds of discrimination does not create, as Wells Fargo contends, common issues such that consolidation of those various cases is required. That Wells Fargo faces multiple lawsuits based on its insidious and discriminatory practices is a problem of its own making, and the victims of that discrimination—the plaintiffs in *Braxton* among them—should not be further penalized because of what Wells Fargo has done by being stripped of their right to prosecute their claims.

In order to present the issues here as so "common" that consolidation is required, Wells Fargo paints the various cases with an extremely broad brush, contending that they all ask "whether plaintiffs can prove (1) disparate treatment (intentional discrimination) or disparate

---

[3] Because any efficiencies resulting from consolidation can be gained *without* consolidation, there is also no need for a consolidated master pleading. Wells Fargo boldly claims that the *Braxton* motion for appointment as interim counsel for a class of Black homeowners discriminated against with respect to refinancing illustrates the need for a consolidated complaint that eliminates the *Braxton* class. Mot. 10-11. This is, simply put, nonsensical. The fact that the *Braxton* plaintiffs seek to secure their right to prosecute their own distinct case shows that the *Braxton* suit should stand alone.

1   impact (by identifying a facially neutral policy that results in a disparate impact); and (2) that

2   Wells Fargo intentionally and purposefully discriminated against plaintiffs because of race in

3   violation of state and federal law when they applied for home mortgage loans and loan

4   modifications." Mot. 6. Wells Fargo's extremely broad descriptions of the issues in the cases

5   against it do not create the overlap in "key factual issues" Wells Fargo claims they do. While it is

6   correct that plaintiffs in all of the cases need to prove disparate treatment or disparate impact,

7   plaintiffs in two of the cases (*Williams* and *Ebo*) will need to prove disparate treatment or impact

8   against Black Americans concerning *all residential lending*; plaintiffs in two of the other cases

9   (*Pope* and *Thomas*) must prove disparate treatment or impact across *all racial minorities*

10  concerning refinancing; and plaintiffs in another case (*Perkins*) must prove disparate treatment or

11  impact across *all racial minorities* concerning *all residential lending*. The *Braxton* case is the

12  most refined and targeted. Wells Fargo also repeatedly claims, without support, that its treatment

13  of origination applications is the same as its treatment of refinancing applications and that the

14  resulting commonality warrants consolidation, but Wells Fargo's (untested) assertion is

15  inconsistent with the *Braxton* plaintiffs' investigation.

16      Simply put, the fact that Wells Fargo can manufacture an appearance of commonality

17  among all the cases through generic descriptions of them does not mean the cases must be

18  consolidated. "The mere existence of common issues, a prerequisite to consolidation, does not

19  require consolidation." *Dusky*, 2007 WL 4403985, at *2; *Jackson*, 2010 WL 11582918, at *1

20  ("consolidation is [not necessarily] appropriate every time there is some common question of law

21  or fact"). Here, because the actual "key issues" in the various at-issue cases are different, Wells

22  Fargo's motion should be denied. *See, e.g.*, *Wright*, 1993 WL 313040, at *1 (denying a motion

23  for consolidation where "[t]he factual and legal issues raised by [the] actions [we]re similar only

24  insofar as in both actions plaintiff claims that he was injured due to the negligence of defendant").

25  And just as the supposed overlap in "key issues" between the cases is insufficient to merit

26  consolidation, so too is the overlap between the defined classes. When putative classes asserted in

27  multiple cases are substantially different, as they are here, consolidation is not appropriate. *Lopez*

28  *v. Liberty Mut. Ins. Co.*, No. CV1405576BROJCX, 2014 WL 12853283, at *6 (C.D. Cal. Oct. 24,

PLAINTIFFS AARON BRAXTON, ET AL.'S OPPOSITION TO WELLS FARGO BANK, N.A. AND WELLS
FARGO & COMPANY'S MOTION TO CONSOLIDATE

1   2014).  In *Lopez*, the court denied plenary consolidation of pending class actions because there

2   was "a legitimate concern regarding the scope of the putative classes in each case."  *Id.*  The court

3   reasoned that if discovery revealed that the classes were in fact different, then the class actions

4   should not be consolidated.  *See id.* (if the classes are "materially distinct" then "it would be

5   prejudicial to Plaintiffs to consolidate these classes").

6          The potential classes in *Williams, Braxton, Thomas, Ebo and Perkins* are each different.

7   That is an undisputed fact.  In its motion, Wells Fargo implies that because the allegations of

8   discrimination against non-Black applicants in *Pope*, *Thomas*, and *Perkins* are "factually

9   unsupported," those cases are not differently situated than the classes focusing on discrimination

10  against Black applicants.  Mot. 11.  Wells Fargo does not and cannot cite any authority for the

11  argument that certain factual allegations can simply be ignored or set aside in order to manufacture

12  supposed commonality for the purposes of consolidation.  Because there are different class

13  definitions across the six cases, which Wells Fargo cannot explain away, consolidation should be

14  rejected.

15         **D.      If The Court Consolidates The Cases, It Should Limit Consolidation to**
           **Discovery and Permit The *Braxton* Firms To Move For Class Certification On**
16         **Behalf Of A Black Refinancing-Only Class.**

17         Finally, should the Court ultimately determine that the cases should be consolidated for

18  any purpose, the Court should limit consolidation to discovery only, grant the *Braxton* plaintiffs'

19  motion for interim counsel, and permit the *Braxton* plaintiffs to move for class certification on

20  behalf of Black refinancing applicants only.  The *Braxton* plaintiffs have demonstrated that their

21  claims are distinct given the repugnant treatment of Black homeowners seeking to refinance their

22  mortgage loans though Wells Fargo.  The *Braxton* plaintiffs have already served discovery

23  centered on Wells Fargo's refinancing practices, including the specific failures in Wells Fargo's

24  oversight practices.  Consolidation or not, the *Braxton* plaintiffs must be permitted to continue

25  prosecuting the distinct case they brought against Wells Fargo.

26  **V.     CONCLUSION**

27         For the reasons set forth above, the Court should deny Wells Fargo's motion to consolidate

28  in its entirety.

DATED: August 26, 2022

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP

By: _____/s/ Dennis S. Ellis_____
Dennis S. Ellis (SBN 178196)
Trent B. Copeland (SBN 136890)
Ryan Q. Keech (SBN 280306)
Stefan Bogdanovich (SBN 324525)
2121 Avenue of the Stars, Suite 2800
Los Angeles, California 90067
Telephone: (310) 274-7100
Facsimile: (310) 275-5697
Email: dellis@egcfirm.com
     tcopeland@egcfirm.com
     rkeech@egcfirm.com
     sbogdanovich@egcfirm.com

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
Noah S. Helpern (SBN 254023)
Milin Chun (SBN 262674)
801 South Figueroa Street, Suite 2000
Los Angeles, California 90017
Telephone: (213) 725-9800
Facsimile: (213) 725-9808
Email: nhelpern@egcfirm.com
     mchun@egcfirm.com

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
Joseph N. Kiefer (admitted *pro hac vice*) (NY Bar
No. 5345657)
157 West 57th Street, Suite 28 S
New York, New York 10019
Telephone: (212) 413-2600
Facsimile: (212) 413-2629
Email: jkiefer@egcfirm.com

Attorneys for Plaintiffs Aaron Braxton, Gia Gray, Bryan
Brown, Paul Martin and all others similarly situated

DATED: August 26, 2022

FRANK, SIMS & STOLPER LLP
Jason M. Frank (SBN 190957)
Scott H. Sims (SBN 234148)
Andrew D. Stolper (SBN 205462)

By: _____/s/ Jason Frank_____
Jason Frank
Attorneys for Plaintiffs Aaron Braxton, Gia Gray, Bryan
Brown, Paul Martin and all others similarly situated

2094169

-14-

Case No. 3:22-cv-01748-JD

PLAINTIFFS AARON BRAXTON, ET AL.'S OPPOSITION TO WELLS FARGO BANK, N.A. AND WELLS
FARGO & COMPANY'S MOTION TO CONSOLIDATE

# ATTORNEY ATTESTATION

Pursuant to Civil L.R. 5-1(h)(3), I hereby attest that concurrence in the filing of this document has been obtained from each of the other signatories.

*/s/ Dennis S. Ellis*
Dennis S. Ellis